Joseph M. Alioto, SBN 42680
Theresa D. Moore, SBN 99978
Tom Pier SBN, 235740
Jamie L. Miller, SBN 271452
ALIOTO LAW FIRM
225 Bush Street, 16th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Facsimile: (415) 434-9200

John Haslet Boone
LAW OFFICES OF JOHN H. BOONE
4319 Sequoia Drive
Oakley, CA  94561
Telephone:  (415) 434-8900
Facsimile:  (415) 434-9200
deacon38@gmail.com

LAW OFFICE OF JAMES M. DOMBROSKI
James M. Dombroski, SBN 56898
P.O. Box 751027
Petaluma, CA 94975
Telephone: (707) 762-7807
Facsimile: (707) 769-0419
Email: jdomski@aol.com

*Attorneys for Plaintiffs RP Healthcare, et al.*
[ADDITIONAL COUNSEL APPEAR ON LAST PAGE]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: LIPITOR ANTITRUST LITIGATION**<br><br>**This Document Relates To:**<br><br>*RP Healthcare, Inc., et al. v. Pfizer, Inc., et al.,* **Docket No. 3:12-cv-5129 (PGS/DEA)** | MDL NO. 2332<br>Master Docket No.:<br>3:12-cv-2389(PGS/DEA)<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA ANTITRUST LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs bring this private antitrust action under Section 16750 of the California Cartwright Antitrust Act (California Business and Professions Code § 16750) for damages by reason of the Defendants' violations of Section 16720 of the California Cartwright Antitrust Act (California Business and Professions Code §16720).  Plaintiffs, nine pharmacists, demanding a trial by jury, allege and complain as follows:

1. Pfizer is the largest pharmaceutical company in the world.  It is the largest bio-pharmaceutical company in the four global markets, the United States, the European Union, Japan and Latin America.  It is also the largest United States headquartered bio-pharmaceutical company in what Pfizer describes as the "Emerging Markets" of Asia, the Middle East, Africa, central and Eastern Europe, Russia, Turkey, and South Korea.

2. Lipitor is a drug used to treat high cholesterol, containing atorvastatin calcium as its active ingredient.

3. Lipitor was purchased by Pfizer as part of its acquisition of Warner-Lambert in 2000.

4. Pfizer purchased Warner-Lambert to prevent Lipitor from going to a competitor.

5. Lipitor is the best-selling drug in the history of the pharmaceutical business.

6. Lipitor sales under Pfizer's regime were and are over $13 billion per year worldwide, more than $1 billion per month.

7. Of Pfizer's total annual revenue from Lipitor, at least $7 billion per year was sold in the United States alone.

8. 16 millions Americans take Lipitor every day.

9. Lipitor has constituted 25-30% of the total revenues of Pfizer since 2006

or earlier.

10. For several years, Defendant Pfizer has enjoyed billions of dollars in revenue and profits from the prescription drug Lipitor.

11. The main patent on the active ingredient in Lipitor (atorvastatin) expired on March 24, 2010.

12. The enantimer patent on a particular form of the Lipitor molecule was set to expire on June 28, 2011, but was invalidated by the Court of Appeals in 2006 and not reissued until January 2009.

13. In 2003, Ranbaxy, the largest pharmaceutical company in India, developed a generic of Lipitor. In order to sell their generic in the United States in competition with Lipitor, Ranbaxy challenged the validity of the Lipitor patents.

14. Because of Ranbaxy's early challenge of the Lipitor patents under the 1984 Hatch-Waxman law, Ranbaxy gained the exclusive right to sell its generic and preclude all other generics for 180 days after the Lipitor patents expired.

15. In July 2006, Jeffrey Kindler became Chief Executive Officer of Pfizer.

16. In December 2006, Jeffrey Kindler became Chairman of the Board of Pfizer.

17. In June 2008, Pfizer's common stock dropped in value by 32%, the lowest it had been in the last decade due to investors' concerns over the expiration of the Lipitor patents.

18. The expiration of the Lipitor patents and generics' entry into the market would impact 30% of Pfizer's business and substantially decrease Pfizer's revenue.

19. Facing a dramatic reduction in future revenue with the loss of exclusivity

of Lipitor, Pfizer entered into an agreement in 2008 with Ranbaxy to eliminate the competition from generic versions of Lipitor in the United States and California markets for up to 20 months after its patents had expired.

20. The fundamental terms of this agreement were that Ranbaxy would not enter the United States market with its Lipitor generic until November 2011.

21. From November 2011 and during the six months of its exclusivity as a generic to Lipitor, Ranbaxy agreed with Pfizer that it would price the generic at or slightly lower than the price charged by Pfizer for Lipitor, so that Pfizer did not have to substantially lower the price it charged for Lipitor.

22. Ranbaxy agreed to remain in the bottleneck, preventing other generics from entering the United States market until the summer or later of 2012.

23. In return for Ranbaxy's agreement not to introduce, sell or distribute its generic in the United States and California markets, Pfizer authorized Ranbaxy to sell generic Lipitor in seven other countries -- Australia, Canada, Belgium, Germany, Italy, the Netherlands and Sweden before the Lipitor-related patents' expiration. Pfizer also agreed to drop its challenge to Ranbaxy's current sale of a generic Lipitor in Brunei, Malaysia, Peru and Vietnam.

24. Ranbaxy agreed to withdraw its challenge to the reissue of Pfizer's patent 5,273,995, covering the form of the Lipitor molecule.

25. It is that agreement and that elimination of competition of the entry of generic versions of Lipitor into the United States and California markets that are the source of the anti-competitive behavior alleged herein.

26. After the expiration of the Lipitor patent, Pfizer bribed the Defendants CVS CAREMARK CORPORATION, CALIFORNIA PHYSICIANS SERVICE, INC. and on information and belief, other unknown pharmacy benefit managers and doctors, to boycott and not to sell generic Lipitor in the United States and California markets.

27. CVS Caremark Corporation is the largest pharmacy care company in the United States. It is a conglomerate whose business segments include a leading pharmacy benefits manager. This segment provides a full range of PBM services including mail order pharmacy services, specialty pharmacy services, plan-design and administration, formulary management and claims processing. Its clients are employers, insurance companies, unions, government employee groups, managed care organizations, and other sponsors of health benefit plans.

28. California Physicians Service, Inc. is a large pharmacy care company. It provides a full range of PBM services including plan-design and administration, formulary management and claims processing. Its clients are employers, insurance companies, unions, government employee groups, managed care organizations, and other sponsors of health benefit plans.

29. Each of the Plaintiffs named in this complaint has purchased drugs, directly or indirectly, from the Defendants, including Lipitor. Each Plaintiff has been injured in its business or property by having paid more for the drugs purchased than they would have paid in the absence of the Defendants' violations.

30. Plaintiff Chimes Pharmacy, Inc. is a California corporation, managed by John Gelinas, R.Ph., with its principal place of business at 3210 College Avenue, Berkeley, California 94705.

31. Plaintiff Marin Apothecaries, Inc. d/b/a/ Ross Valley Pharmacy, is a California corporation managed by Paul Lofholm, R.Ph, with its principal place of business at 2 Bon Air Road, Larkspur, California 94939.

32. Plaintiff Golden Gate Pharmacy Services, Inc. d/b/a Golden Gate Pharmacy is a California corporation managed by Rebecca Lofholm, R.Ph, with its principal place of business at 2165 E. Francisco Boulevard, Suite A-2, San Rafael, California.

33. Plaintiff Pediatric Care Pharmacy, Inc. is a California corporation, managed by Tom Liautaud, R.Ph., with its principal place of business at 4616 Delongpre Avenue, Los Angeles, California 90027.

34. Plaintiff James Clayworth, R.Ph., is a California resident doing business as Clayworth Pharmacy and Clayworth Healthcare, 20353 Lake Chabot Road, Suite 101, Castro Valley, California 94546.

35. Plaintiff Meyers Pharmacy, Inc. is a California corporation, with its principal place of business at 20914 Roscoe Boulevard, Canoga Park, California 94034.

36. Plaintiff Tony Mavrantonis, R. Ph. is a California resident doing business as Jack's Drug, 121 Tunstead, San Anselmo, California 94960.

37. Plaintiff Tilley Apothecaries, Inc. d/b/a Zweber's Apothecary is a California corporation, managed by John Tilley, R.Ph, with its principal place of business at 11411 Brookshire Ave, Downey, California 90241.

38. Plaintiff RP Healthcare, Inc. is a California corporation managed by Greg Kappes, R.Ph. and John O'Connell, R.Ph. with its principal place of business at 2456 West Third Street, Santa Rosa, California 95401.

39. Defendant Pfizer, Inc. is a corporation organized and existing under the laws of the State of Delaware and has a place of business at 235 East 42nd Street, New York, New York 10017.

40. Defendant Warner-Lambert Company is a corporation formerly organized under the laws of the State of Delaware with offices at 235 East 42nd Street, New York, New

York 10017.  Warner-Lambert Company has been the owner of record of the relevant patents covering Lipitor since their issuance.

41. Defendant Warner-Lambert Company became a wholly owned subsidiary of Pfizer, Inc. effective June 19, 2000.

42. Defendant Warner-Lambert Company was converted into Warner-Lambert Company, LLC, a Delaware limited liability company by certificate dated December 31, 2002.  Warner-Lambert Company has offices located at 235 East 42nd Street, New York, New York 10017.

43. Defendant Pfizer Ireland Pharmaceuticals is partnership organized and existing under the laws of Ireland, with registered offices at Pottery Road, Dun Laoghaire, Co. Dublin, Ireland.  Pfizer Ireland Pharmaceuticals is a wholly owner, indirect subsidiary of Pfizer, Inc.

44. Defendant Warner-Lambert Export, Ltd. is a corporation formerly organized under the laws of Ireland with a registered office at Pottery Road, Dun Laoghaire, Co. Dublin, Ireland.

45. Defendant Pfizer, Inc., through Parke-Davis Pharmaceutical Research, a division of Warner-Lambert Company, holds an approved New Drug Application for an atorvastatin calcium formulation which it sells under the registered name of Lipitor.®

46. Upon information and belief, Defendant Ranbaxy Laboratories is a corporation organized and existing under the laws of India, with corporate offices located at 19, Nehru Place New Delhi – 110019 India.

47. Defendant Ranbaxy, Inc. is a corporation organized and existing under the laws of the State of Delaware, and has a place of business located at 600 College Road East, Princeton, New Jersey 08540.

48. Upon information and belief, Defendant Ranbaxy, Inc. was formerly known as Ranbaxy Pharmaceuticals, Inc.

49. Upon information and belief, Defendant Ranbaxy, Inc. is a wholly-owned subsidiary of Ranbaxy Laboratories.

50. Defendant Ranbaxy Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, and has a place of business located at 600 College Road East, Princeton, New Jersey 08540.

51. Upon information and belief, Ranbaxy, Inc. and Ranbaxy Pharmaceuticals, Inc. are the agents for Ranbaxy Laboratories.

52. Defendant Daiichi Sankyo Co., Ltd is a corporation organized and existing under the laws of Japan with its main office in Tokyo, Japan and is the corporate parent of Daiichi Sankyo, Inc.

53. Defendant Daiichi Sankyo, Inc. is a corporation organized and existing under the laws of New Jersey, qualified to do business in California, and with its main office at Two Hilton Court, Parsippinay, N.J. Daiichi Sankyo, Inc. is a subsidiary of Daiichi Sankyo Co., Ltd.

54. Defendant CVS CAREMARK CORPORATION is a corporation organized and existing under the laws of Rhode Island, qualified to do business in California, and with its main office at One CVS Drive, Woonsocket, RI 02896,

55. Defendant CALIFORNIA PHYSICIANS SERVICE, INC. d/b/a/ Blue Shield of California is a California corporation with its principal place of business in California.

56. Certain individuals, firms and corporations made statements and performed acts in furtherance of the conspiracy herein alleged and are named herein co-conspirators, including David Reid, Pfizer's then acting general counsel, Jeffrey Kindler, former general counsel and CEO of Pfizer, and Malvinder Mohan Singh, former CEO of Ranbaxy.

57. Upon information and belief, Defendants Pfizer, Ranbaxy Laboratories, Ranbaxy Pharmaceuticals, Ranbaxy, Inc., CVS Caremark, California Physicians Service, and Daiichi Sankyo are subject to personal jurisdiction in this Court.

58. Venue is proper in this County because one of the Plaintiffs resides in this county.

59. A generic drug is a pharmaceutical product that is the bioequivalent to a brand-name drug in terms of dosage, form, strength, route of administration, quality, performance characteristics and intended use. Where a generic drug is completely equivalent to a pioneer or brand-name drug, the Food and Drug Administration ("FDA") assigns the generic drug an AB rating.

60. A generic drug is typically sold at a substantial discount from the brand-name drug's price.

61. Lipitor is a branded drug that is available in the United States only by prescription written by a physician. When a prescription is written for a brand-name drug such as Lipitor, a pharmacist can fill the prescription only by dispensing either the brand-name drug or its AB rated generic equivalent.

62. Under most insurance plans, a pharmacist will substitute an AB rated generic version of a prescribed brand-name drug, when available, unless the physician has indicated "DAW" or "dispense as written" on the prescription.

63. The entry of a generic drug into the market significantly lowers the costs of the drug by 90% in the first year. The manufacturer of the brand-name drug will typically suffer a substantial decline in its market share immediately after generic alternatives are made available to purchasers.

64. The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585, encourages the challenge to branded drug patents and/or to design around them, by granting the first filer a 180-day period to exclusively market the generic version of the drug, during which the FDA may not grant final approval to any other generic drug manufacturer's generic for the same brand-name drug. This "180-day exclusivity period" does not begin to run until the patent expires.

65. The introduction of a generic drug thus is an event with unique and dramatic economic consequences for purchasers because generics are significantly lower-priced bio-equivalents of branded drugs.

66. The practical consequences of generic drug economics create a substantial competitive threat and a motive for the manufacturer of the branded drug to enter into an agreement with the generic manufacturer to fix prices and/or to divide markets and/or customers, per se violations of the California antitrust laws, without regard to the business excuse for their use.

67. Thus, there exists anti-competitive dynamics encouraging the execution of agreements that eliminate competition, and that injure purchasers by denying them access to significantly-lower priced generic drugs that are the bioequivalent to the branded drugs.

68. Pfizer owned two principal patents covering Lipitor, U.S. Patent No. 4,681,893 ("the '893 patent") covering the active ingredient in Lipitor, atorvastatin calcium, and U.S. Patent No. 5,273,995 ("the '955 patent"), covering the particular form of the Lipitor molecule (collectively "the Lipitor-related patents").

69. The '893 patent covering the active ingredient in Lipitor expired on March 24, 2010.

70. The '995 patent covering the particular form of the Lipitor molecule expired on June 28, 2011.

71. The former Chairman and CEO of Defendant Pfizer stated that "There are dozens of generic drug manufacturing companies with a red circle around June 28, 2011. That's the day the patent for our anti-cholesterol medication Lipitor expires."

72. The former Chairman and CEO of Defendant Pfizer recognized that, "Shortly thereafter a number of generic alternatives to Lipitor will be introduced and consumers will have a choice of generic tablets containing Atorvastatin calcium, the active ingredient of Lipitor."

73. The former Chairman and CEO of Defendant Pfizer further stated, "Pfizer can expect in the following year to lose 90% of revenue from that drug as the market switches [to] generic versions."

74. At least as of June 29, 2011, Pfizer and Ranbaxy were direct competitors.

75. As direct competitors, the agreements between Pfizer and Ranbaxy to divide markets, allocate customers, eliminate competition, foreclose Ranbaxy from a substantial market (the United States, including California), and fix prices are illegal per se without regard to their business excuse for their use.

76. In 2002, Defendant Ranbaxy announced its intention at that time to produce a generic version of the drug at the expiration of Pfizer's Lipitor-related patents. Ranbaxy had the ability to sell the generic version of Lipitor exclusively for the 180-day exclusivity period beginning from the date the Lipitor-related patents expired before any other generic drug maker could enter the market.

77. In 2006, the Federal Circuit declared that Pfizer's form patent protection over Lipitor was invalid. Therefore, the only remaining patent ('893) would expire on March 24, 2010.

78. In January, 2007, Pfizer filed a reissue application with the Patent and Trademark Office ("PTO"), seeking to revive the form patents.

79. In May, 2007, Ranbaxy opposed Pfizer's reissue application.

80. In August, 2007, Pfizer's reissue application was rejected.

81. Pfizer then filed a response which was also rejected in April 2008.

82. Consequently, Ranbaxy proposed to enter the market with its generic immediately after March 24, 2010.

83. Pfizer immediately sought out its generic competitor for the purpose of keeping the generic off the market in the United States.

84. On June 18, 2008, Pfizer announced it had entered into an Agreement with Ranbaxy.

85. At this time, Daiichi Sankyo, a new potential purchaser of a substantial part of Ranbaxy, more than $3 billion worth, advised, encouraged, aided, and abetted Ranbaxy by threatening that it would not make that purchase unless Ranbaxy entered into the unlawful agreement with Pfizer to divide markets and fix prices.

86. In 2008, Pfizer and Ranbaxy entered into an Agreement wherein they agreed to divide markets, fix prices on Lipitor and the Lipitor generic, keeping the generic off the market, and artificially extending the patent beyond its time. Pursuant to the Agreement, Ranbaxy would not market its generic in the United States, including California, and Pfizer would not object to Ranbaxy's sale of its generic in countries outside of the United States; and that both would continue to charge at high-priced levels.

87. As part of the Agreement, Pfizer granted licenses to Ranbaxy authorizing the company to sell generic Lipitor in seven other important pharmaceutical markets -- Australia, Canada, Belgium, Germany, Italy, the Netherlands and Sweden -- from two to four months before the key Lipitor-related patents expired there. Pfizer also dropped its challenge

to Ranbaxy's current sale of a generic Lipitor in four other countries — Brunei, Malaysia, Peru and Vietnam — allowing those sales to continue.

88.     As part of the Agreement, Ranbaxy was granted the right to start selling copies of Caduet, a Pfizer pill that combines Lipitor and the off-patent Pfizer blood pressure drug Norvasc.

89.     In return, the Agreement provided that Ranbaxy would refrain from any further challenges to the validity of the Lipitor-related patents, including the reissue application for the '995 patent then pending before the PTO, and would not market any generic competitor for Lipitor in the United States until November 30, 2011 – 20 months after the then sole principal and valid patent on Lipitor (the '893 patent) would have expired and Ranbaxy would have otherwise been able to sell its generic.

90.     As a consequence of the Agreement, in January, 2009, the PTO without any objection by Ranbaxy, issued a Notice of Allowance accepting Pfizer's application in the '955 patent and reissuing the same thereby moving the expiration date for patent protection over Lipitor back to June 28, 2011.

91.     By delaying Ranbaxy's generic version of Lipitor in the United States – which would have been lawfully sold as early as March 24, 2010 --- Pfizer obtained extra time for the exclusive sales of Lipitor, totaling extra sales of Lipitor of approximately 18 billion dollars, which they would not have sold in the absence of the unlawful Agreement with Ranbaxy.  In return, Ranbaxy will be able to distribute a generic substitute for Lipitor earlier in foreign markets than it otherwise would have been able to do, reaping substantial profits it otherwise would not have gained.

92. The Agreement by Defendants denies purchasers' access to a generic substitute to Lipitor in the United States, including California, for up to 20 months after the expiration of the active ingredient patent for Lipitor. Lipitor's current price exceeds $4 a day, while a generic version will sell for between $0.25-$0.35 and even as low as $0.10. Consequently, Lipitor purchasers in the United States paid inflated prices for this life saving pharmaceutical through at least May of 2012.

93. By reason of these unlawful agreements, the generic competition to Lipitor has been eliminated in the United States market with the result that the prices for Lipitor are 1200% or 12 times higher than they should be and would be since March 2010.

94. In 2009, Pfizer had annual revenues of $50 billion, net income of $8.6 billion, working capital of $24 billion, assets of $212 billion, and stockholder equity of $90 billion, with 116,500 employees around the world.

95. In 2007, 2008, 2009, and to the extent reported for 2010, Lipitor accounted for at least 23% of all market products by Pfizer.

96. In 2009, after the Agreement with Ranbaxy but before the implementation of that agreement, Lipitor accounted for 29-30% of total bio-pharmaceutical products produced by Pfizer and total revenue produced by Pfizer.

97. By delaying Ranbaxy's generic version of Lipitor, which would have been sold as early as March 2010, Pfizer obtained extra time for the exclusive sales of Lipitor, totaling billions of additional dollars.

98. Ranbaxy launched Lipitor generic in the American market in November 2011, risk free with 180-day exclusivity and an agreement with Pfizer that it will price its generic at or slightly less than the Pfizer price.

99. With the launching of generic Lipitor Defendants Pfizer and CVS Caremark and other co-conspirators agreed to boycott generic Lipitor by not reimbursing patients or their pharmaceutical benefit payor for generic Lipitor and requiring pharmacist to buy the higher priced Pfizer Lipitor. This boycott was fueled by large kickbacks to CVS Caremark to exclude generic Lipitor from their drug formularies. This boycott was a further act in Defendant Pfizer's attempt to monopolize the statin market. In boycotting generic Lipitor CVS Caremark and other co-conspirators acted against their economic self interest.

100. The Agreement*s* between the Defendants, which artificially extended the length of the Lipitor-related patents, allocated markets between them, artificially postponed price reductions, and restrained trade in the provision of Lipitor and its generic alternatives, are a violation of the Cartwright Act.

101. The Agreement between Pfizer and Ranbaxy is an agreement to divide markets in that Ranbaxy agreed that it would not sell its generic in the United States and California markets until November 2011 in exchange for being able to sell in other countries.

102. The Agreement between Pfizer and Ranbaxy is an agreement to fix prices in that Pfizer would be able to charge 1200% or 12 times more for Lipitor than it otherwise would be in the absence of the unlawful agreement.

103. The Agreement between Pfizer and Ranbaxy is a bribe in that Pfizer allows Ranbaxy to sell generics in countries other than the United States so long as it does not sell generics in the United States.

104. The Agreements between Pfizer, Physicians Service and CVS Caremark is a boycott of generic Lipitor and results in Plaintiffs being forced to buy the higher priced Pfizer Lipitor.

105. Ranbaxy agreed to abuse its exclusivity by preventing other generics from entering the market.

106. The Agreement meant that purchasers would continue to pay branded pharmaceutical prices for Lipitor longer than necessary.

107. The Agreement between Defendants constitutes a market allocation agreement between competing providers of Lipitor and its generic equivalent to illegally restrain trade in violation of the California Cartwright Act by dividing markets, allocating customers, and fixing prices.

108. Defendants combined, conspired, and contracted between and among themselves to unreasonably and unlawfully restrain trade and establish an unlawful trust it the United States and in the State of California in the cholesterol lowering medication market (statin), and to eliminate competition in the sale of Lipitor and its generic equivalents in the United States and the State of California.

109. Defendants, their agents and affiliates and co-conspirators, both known and unknown, entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce in Lipitor and its generic equivalents in violation of the Cartwright Act.  Defendants and each of them have acted in violation of the antitrust laws by entering into agreements to divide markets, allocate customers, and fix prices.

110. The purpose and effect of such agreements was to fix, raise, stabilize, and maintain the prices for Lipitor and its generic equivalents at supra-competitive levels, which increased prices were paid to the Plaintiffs.

111. During the period covered by this complaint and thereafter, Plaintiffs purchased Lipitor and will continue to purchase Lipitor and by reason of the alleged violations of the antitrust laws, Plaintiffs paid more and will pay more for these drugs than they would have paid in the absence of the illegal trust, combination, and agreement. As a proximate result cause thereof, Plaintiffs have been injured and will continue to be injured in their business and property and have suffered damages in an amount according to proof at trial.

112. Defendants, their agents and affiliates and co-conspirators, both known and unknown, entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce in Lipitor and its generic equivalents in violation of the Cartwright Act (Business and Professions Code § 16720, et seq). Defendants and each of them have acted in violation of the Cartwright Act by entering into agreements to divide markets, allocate customers, and fix prices.

113. The purpose and effect of such agreements was to fix, raise, stabilize, and maintain the prices for Lipitor and its generic equivalents at supra-competitive levels, which increased prices were passed on to the Plaintiffs.

114. During the period covered by this complaint and thereafter, Plaintiffs purchased Lipitor and will continue to purchase Lipitor and by reason of the alleged violations of the antitrust laws, Plaintiffs paid more and will pay more for these drugs than they would have paid in the absence of the illegal trust, combination, and agreement. As a proximate result cause thereof, Plaintiffs have been injured and will continue to be injured in their business and property and have suffered damages in an amount according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

1. That the Court adjudge and decree that the Defendants and each of them have violated Section 16720, et seq. of the California Cartwright Act.

2. That the Plaintiffs be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with law;

3. That the Plaintiffs be awarded reasonable attorneys fees and costs;

4. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs Demand a trial by jury of all claims asserted in this Complaint so triable.

DATED:   December 7, 2012.

Respectfully Submitted,

_/s/ Joseph M. Alioto_
Joseph M. Alioto
Attorney for Plaintiffs

**PLAINTIFFS' COUNSEL**

| | |
|---|---|
| Joseph M. Alioto, Sr.<br>Angelina Alioto-Grace<br>Theresa Driscoll Moore<br>Tom Pier<br>Jamie L. Miller<br>ALIOTO LAW FIRM<br>225 Bush Street, 16th Floor<br>San Francisco, CA  94104<br>Telephone:  (415) 434-8900<br>Facsimile:  (415) 434-9200<br>jmalioto@aliotolaw.com<br>tmoore@aliotolaw.com<br>jmiller@aliotolaw.com<br>tpier@aliotolaw.com<br>*Counsel for RP Healthcare Inc., et al.*<br>*Docket No. 3:12-cv-5129 (PGS/DEA)* | Jeffery K. Perkins<br>LAW OFFICES OF JEFFERY K. PERKINS<br>1550-G Tiburon Boulevard, #344<br>Tiburon, CA  94920<br>Telephone:  (415) 302-1115<br>Facsimile:  (415) 435-4053<br>jefferykperkins@aol.com<br>*Counsel for RP Healthcare Inc., et al.*<br>*Docket No. 3:12-cv-5129 (PGS/DEA)* |
| Russell F. Brasso<br>FOREMAN AND BRASSO<br>930 Montgomery Street, Suite 600<br>San Francisco, CA  94133<br>Telephone:  (415) 433-3475<br>Facsimile:  (415) 781-8030<br>brasso@foremanandbrasso.com<br>*Counsel for RP Healthcare Inc., et al.*<br>*Docket No. 3:12-cv-5129 (PGS/DEA)* | James M. Dombroski<br>LAW OFFICES OF JAMES M. DOMBROSKI<br>P.O. Box 751027<br>Petaluma, CA  94975<br>Telephone:  (707) 762-7807<br>Facsimile:  (707) 769-0419<br>jdomski@aol.com<br>*Counsel for RP Healthcare Inc., et al.*<br>*Docket No. 3:12-cv-5129 (PGS/DEA)* |
| John Haslet Boone<br>LAW OFFICES OF JOHN H. BOONE<br>4319 Sequoia Drive<br>Oakley, CA  94561<br>Telephone:  (415) 434-8900<br>Facsimile:  (415) 434-9200<br>deacon38@gmail.com<br>*Counsel for RP Healthcare Inc., et al.*<br>*Docket No. 3:12-cv-5129 (PGS/DEA)* | Jack Lee<br>Derek Howard<br>Minami Tamaki, LLP<br>360 Post Street, 8th Floor<br>San Francisco, CA  94108<br>Telephone:  415-788-9000<br>Facsimile: 415-398-3887<br>Email:  jlee@minamitamaki.com<br>*Counsel for RP Healthcare Inc., et al.*<br>*Docket No. 3:12-cv-5129 (PGS/DEA)* |