**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE LIPITOR ANTITRUST LITIGATION | MDL No. 2332 |
| THIS DOCUMENT RELATES TO:<br><br>All Direct Purchaser Class Actions | Master Docket No.: 3:12-cv-2389 (PGS/DEA)<br><br>**REDACTED** |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO DIRECT PURCHASER CLASS PLAINTIFFS' MOTION TO AMEND THE JUDGMENT AND FOR LEAVE TO AMEND**

**CONNELL FOLEY LLP**
85 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500

**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

*Attorneys for Defendants Pfizer Inc., Pfizer Ireland Pharmaceuticals, Pfizer Manufacturing Ireland, Warner-Lambert Co., and Warner-Lambert Co., LLC*

**LITE DEPALMA GREENBERG, LLC**
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

*Counsel for Defendants Ranbaxy Inc., Ranbaxy Pharmaceuticals, Inc., and Ranbaxy Laboratories Limited*

## TABLE OF CONTENTS


I. INTRODUCTION ........................................................................ 1

II. BACKGROUND ........................................................................ 2

III. ARGUMENT ........................................................................ 7

A. The Legal Standard ........................................................................ 7

B. DPPs Fail to Meet the Standards for a Motion to Alter or Amend the Judgment Under Federal Rule of Civil Procedure 59. ................... 9

1. The September 12 Order Is Not an Intervening Change in Controlling Law. ........................................................................ 10

2. DPPs Cannot Establish Manifest Injustice Because They Have Had Ample Opportunity, with the Benefit of Extensive Discovery, to Amend Their Claims in Light of *Twombly* and *Actavis*. ........................................................................ 16

C. The Motion to Amend the Complaint Should Be Denied.................. 17

1. The Proposed Amendments Would Be Futile. ......................... 18

2. DPPs Unduly Delayed Seeking Leave to Amend: The Relevant Information was Available to Them Before They Filed Their Second Amended Complaint. ................................ 24

3. Allowing Amendment at This Late Juncture Would Prejudice Defendants, Who Have Expended Substantial Resources in the Pending Motions........................................... 26

IV. CONCLUSION........................................................................ 27

# TABLE OF AUTHORITIES

## CASES

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 13

*Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220 (3d Cir. 1995) .......... 8, 10

*Bjorgun v. Whitetail Resort, LP*, 550 F3d 263 (3d Cir. 2008) .......... 25

*Bryant v. N.J. Dep't of Transp.*, 998 F. Supp. 438 (D.N.J. 1998) .......... 11

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) .......... 7, 9, 10

*Conseco Life Ins. Co. v. Smith*, Civ. A. No. 2:11-cv-3716 (SDW) (MCA), 2013 WL 3285065 (D.N.J. June 26, 2013) .......... 27

*Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820 (3d Cir. 1978) .......... 26

*Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267 (3d Cir. 2001) .......... 24

*D&D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*¸ Civ. A. No. 03-1026 (MLC), 2009 WL 904054 (D.N.J. Mar. 31, 2009) .......... 9

*Farricker v. Pension Dev., Ins.*, No. 07 Civ. 1191(DAB), 2009 WL 860239 (S.D.N.Y. Mar. 31, 2009) .......... 27

*Filler v. Hanvit Bank*, Nos. 01 Civ. 9510(MGC), 01 Civ. 8251(MGC), 2003 WL 21729978 (S.D.N.Y. July 25, 2003) .......... 11

*FTC v. Actavis*, 133 S. Ct. 2223 (2013) .......... 13, 24

*Glenn v. Hayman*, No. 07-112 (PGS), 2007 WL 894213 (D.N.J. Mar. 21, 2007) .......... 17

*Goow v. Wittig*, 558 F. App'x 257 (3d Cir. 2014) .......... 8

*Holland v. Macerich*
Civ. No. 09-914, 2012 WL 1377359 (D.N.J. Apr. 18, 2012) .......... 26

*Holland v. Simon Prop. Grp., Inc.*, 495 F. App'x 270 (3d Cir. 2012) .......... 27

*In re Complaint of Weeks Marine, Inc.*, No. 04-0494, 2006 WL 2830970 (D.N.J. Sept. 29, 2006) .......... 1

*Jablonski v. Pan Am. World Airways, Inc*., 863 F.2d 289 (3d Cir. 1988) .......... 8

*Jemas v. CitiMortgage Inc.*, Civ. A. No. 12-3807-ES-SCM, 2013 WL 1314729 (D.N.J. Mar. 28, 2013) .......... 25

*Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993) .......... 8

*Max's Seafood Cafe v. Quinteros*, 176 F.3d 669 (3d Cir. 1999) .......... 16, 17

*Navraj Rest. Grp., LLC v. Panchero's Franchise Corp.*, Civ. A. No. 11-7490, 2014 WL 1405042 (D.N.J. Apr. 10, 2014) .......... 17

*Pardy v. Dupuy*, Civ. A. No. 07-1385(SDW), 2008 WL 2704998 (D.N.J. July 8, 2008) .......... 25

*Richman v. W.L. Gore & Assocs., Inc.*, 988 F. Supp. 753 (S.D.N.Y. 1997) .......... 11

*Rivera v. F.B.I.*, Civ. A. No. 12-cv-4174 PGS–DEA, 2014 WL 3809182 (D.N.J. Aug. 1, 2014) .......... 8

*Treusch v. Ctr. Square Supermarket, LLC*, Civ. No. 11-4874 (JBS/JS), 2013 WL 1405031 (D.N.J. Apr. 5, 2013) .......... 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) .......... 26

*Zichy v. Philadelphia*, 590 F.2d 503 (3d Cir. 1979) .......... 11

**MISCELLANEOUS**

Fed. R. Civ. P. 9 .......... 4

Fed. R. Civ. P. 12(b)(6) .......... 8

Fed. R Civ. P. 15 .......... 9

Fed. R. Civ. P. 59(e) .......... 7, 17, 26

# I. INTRODUCTION

The Direct Purchaser Class Plaintiffs ("DPPs") ask this Court to amend its September 12, 2014 opinion and order, which dismissed DPPs' complaint with prejudice, in order to allow DPPs another chance to amend their complaint and take yet another bite at an apple that is already at its core.[1] DPPs, however, fail to meet the stringent standard for a motion to amend a judgment. They fail to identify any intervening change in controlling law and they cannot point to any manifest injustice that would warrant amendment of the Court's order, particularly as DPPs have already amended their complaints twice, including *after* the Supreme Court's decision in *Actavis* and *after* receiving millions of pages of discovery relating to the claimed reverse payment. Indeed, DPPs have had access to years of pleadings and filings in the underlying litigations, including the Accupril litigation. In allowing the most recent amendment (the third iteration of their complaints), the Court urged DPPs to take their "best shot" to allege a cognizable reverse payment – among other things, to assert facts making plausible the notion that the settlement of *competing* damage claims in the Accupril litigation could be viewed as unreasonably one-sided in light of the uncertainties facing both sides in the case.

[1] This Court has jurisdiction to hear DPPs' motion despite the fact that they have filed a notice of appeal. *See, e.g.*, *In re Complaint of Weeks Marine, Inc.*, No. 04-0494, 2006 WL 2830970, at *3 n.5 (D.N.J. Sept. 29, 2006) ("Here, Plaintiff timely filed this motion for reconsideration before filing a notice of appeal with the Third Circuit, accordingly, I retain jurisdiction and decide the motion.").

There is no basis to allow DPPs a fourth attempt after so much effort has been expended by the Court and the Defendants in litigating the third and last "best shot" complaint.

Nor, separately, do DPPs meet the standard for leave to amend their complaint. Among other things, their proposed amendments would be futile as they fail adequately to address *any* of the deficiencies that were the basis for the Court's dismissal ruling. Their request for leave is also untimely and prejudicial, particularly as the parties and the Court have expended substantial resources in briefing and arguing motions to dismiss over the past three years. DPPs have had access to all of the information that forms the basis for their proposed amendments for more than a year, and there simply is no justification for delaying their request for leave to amend until now. DPPs' Motion to Amend the Judgment and for Leave to Amend (ECF No. 583) should be denied.

## II. BACKGROUND

DPPs first filed six putative class action complaints in November 2011 followed by a consolidated amended complaint on September 10, 2012. Consolidated Am. Class Action Compl. & Jury Demand (Sept. 10, 2012), ECF No. 149. In their consolidated complaint, DPPs claimed, among other things, that Pfizer allegedly "forgave" "money judgments" owed by Ranbaxy in connection with the *Accupril II* litigation in exchange for Ranbaxy's agreement to delay its

introduction of a generic Lipitor product in the U.S. *Id.* ¶¶ 19, 316, 324. Defendants moved to dismiss the consolidated complaint on November 16, 2012. Mem. in Supp. of Pfizer Defs.' Mot. to Dismiss All Direct Purchaser Compls. (Nov. 16, 2012), ECF No. 246-1. After the Supreme Court issued its decision in *FTC v. Actavis* on June 28, 2013, the parties filed supplemental briefing on the motion in light of the decision. *See, e.g.*, Supplemental Mem. of Law in Supp. of Pfizer's Mot. to Dismiss All Compls. in Opp'n to Pfizer & Ranbaxy's Mots. to Dismiss (July 12, 2013), ECF No. 425; DPPs' Supplemental Br.in Opp'n to Pfizer & Ranbaxy's Mots. to Dismiss (July 12, 2013), ECF No. 424 ("DPP Supp. Br.").

The Court heard oral arguments on the motions to dismiss and the impact of *Actavis* on July 24, 2013. *See* Minute of Proceeding (July 24, 2013), ECF No. 432. At the hearing, the Court raised several questions regarding DPPs' core reverse payment claim based on the *Accupril II* litigation. In particular, the Court noted that while DPPs repeatedly and frivolously referred to an alleged forgiveness of a "so-called judgment" in relation to *Accupril II*, they failed to acknowledge that in fact there was no "money judgment" to forgive – only a claim for damages – and that, in any event, DPPs had failed to specify the amount of the supposed judgment. Mot. to Dismiss Hr'g Tr. 57:17-23 (July 24, 2013) ("July MTD Tr."). At that same hearing on July 24, 2013, the Court made very clear that simply characterizing an alleged payment as "significant" was problematic "under the

*Twombly* case." *Id.* ("I couldn't find when I was looking through the complaint the amount of any judgment . . . ."); *see also id.* at 72:4-20 ("[The Complaint is] not that specific. If you go back to that judgment, it would be really great to know what the amount of the judgment was, but you don't allege that. You say it was significant, but it doesn't give us a dollar amount. It doesn't give us a relationship to the sales of Lipitor. . . . I think under *Twombly* and Rule 9 you have obligations to come forward with more specific allegations."); *id.* at 73:1-3 ("I would think an antitrust violation requires some type of more specific proof."). In response to the Court's question, DPPs admitted that they could not in fact show that Pfizer forgave an outstanding money judgment because they could not identify a judgment in relation to the *Accupril II* litigation. *Id.* at 64:11-19.

DPPs thereafter filed a motion to amend their consolidated amended complaint "[i]n light of the questions raised by the Court" regarding the existence of a reverse payment. *See* Direct Purchaser Class Pls.' Mem. of Law in Supp. of Mot. for Leave to Am. the Consolidated Am. Class Action Compl. at 2 (Aug. 7, 2013), ECF No. 435-1. Specifically, DPPs sought to remove the prior baseless allegation that Pfizer forgave "money judgments" owed by Ranbaxy and replace it with allegations that Pfizer agreed to settle the *Accupril II* litigation for less than what DPPs claim it could have or should have agreed, in light of the damages it might have secured had it won on the merits and secured the absolutely most

favorable potential award. DPPs argued that such amendments would not be futile because such additional amendments would clarify their reverse payment allegations and somehow "show" that Defendants' settlement of the *Accupril II* litigation "constitutes a reverse payment under *Actavis*." *Id.* at 22.

The Court granted DPPs' motion for leave to amend their complaint. Mem. & Order, at 48-50 (Sept. 5, 2013), ECF No. 455. The Court explained that DPPs sought to "clarify and augment the 'reverse payment' allegations already contained in the Complaint, because of new information [they had] learned in discovery." *Id.* at 47. The Court granted DPPs leave to amend their complaint to re-plead their "best shot[]" at a reverse payment claim by "incorporat[ing] evidence uncovered in discovery to date as well as their understanding of the law as it was laid out recently in *Actavis*." *Id.* at 48. In the meantime, Defendants had produced over six million pages of documents, including the discovery materials, pleadings, and document productions from the *Accupril II* litigation. DPPs filed their amended complaint on October 14, 2013. Consolidated Am. Class Action Compl. & Jury Demand (Oct. 14, 2013), ECF No. 472 ("Second Amended Complaint"). Defendants filed motions to dismiss the Second Amended Complaint.

The Court heard oral argument on the second round of motions to dismiss on March 6, 2014. *See* Minute of Proceedings (Mar. 6, 2014), ECF No. 532. The Court once again expressed concerns as to whether DPPs plausibly pleaded a

reverse payment. Mot. to Dismiss Hr'g Tr. at 41:5-11 (Mar. 6, 2014) ("Mar. 6 MTD Tr.") ("[W]hat I don't understand about the plaintiffs' case is that you argue about Lipitor, there's all these other factors in the settlement agreement, there's no mention of them anywhere, and then you mention Accupril. So, if there's something that's a reverse payment, maybe it's for all these other factors that haven't been analyzed."); *id.* at 57:5-6 ("But don't you have to get into some sort of an analysis as to what substantial means?"); *id.* at 15:23-16:2 ("So, we'd have to take whatever the payment is, value it, and then try to adduce what the legal fees are, and see if there was more money than legal fees. And then we'd have to decide whether that was substantial.").[2]

On September 12, 2014, the Court dismissed all direct purchaser plaintiffs' complaints in their entirety, finding that DPPs failed plausibly to allege a reverse payment. Mem. (Sept. 12, 2014), ECF No. 566 ("Sept. 12 Mem." or "September 12 Order"). Because DPPs' Second Amended Complaint constituted a second (if not third) attempt to state a claim, and DPPs did not even attempt to argue that they should be given yet another chance to re-plead, the Court held that the claims should be dismissed with prejudice. Sept. 12 Mem. at 43-44. The Court reasoned

[2] *See also* Mar. 6 MTD Tr. at 69:1-7 (in response to plaintiffs' argument that they only had to show that Pfizer paid a "grossly disproportionate amount to pay to settle a claim that was worth hundreds of millions of dollars," the Court responded that "I'm not sure that reaches the plausibility condition").

that the DPP Second Amended Complaint reflected DPPs' *best shot*, that is, it "update[d] the facts of the complaint that were disclosed during discovery, and . . . incorporate[d] changes based upon the recently decided *Actavis* case." *Id*. at 3.

Now, after extensive and multiple rounds of briefing and oral argument, and after the Court has thoroughly considered the issues and rendered a forty-four page decision dismissing DPPs' Second Amended Complaint, DPPs move the Court to amend its judgment and grant DPPs leave to amend their complaint yet again. Direct Purchaser Class Pls.' Mem. of Law in Supp. of Their Mot. to Amend the Judgment and for Leave to Amend (Oct. 10, 2014), ECF No. 585 ("Br."). For the reasons discussed below, the Court should deny the motion.

## III. ARGUMENT

### A. The Legal Standard

Motions for reconsideration under Rule 59(e) must be based on one of the following three grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 230 (3d Cir. 2011) (internal citation omitted). The Third Circuit has cautioned that a motion for

reconsideration should not be used to gain a "second bite" at the apple. *See Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1231 (3d Cir. 1995).[3]

The decision whether to grant leave to amend a complaint is committed to the sound discretion of the district court. *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *Goow v. Wittig*, 558 F. App'x 257, 259 (3d Cir. 2014) (quoting *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000)). "Repeated failure to cure deficiencies by amendments previously allowed" is also grounds for denying a leave to amend. *Rivera v. F.B.I.*, Civ. A. No. 12-cv-4174 PGS–DEA, 2014 WL 3809182, at *1 (D.N.J. Aug. 1, 2014) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In assessing whether a proposed amendment would be futile, the district court applies the same standard of legal sufficiency that applies to a motion to dismiss under Rule 12(b)(6). *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988) ("Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss.").

---

[3] Although DPPs' motion is in effect a motion for reconsideration of the Court's September 12 Order, DPPs do not move for reconsideration under Local Rule 7(i). If they had done so, their motion would have been untimely. *See* Local Civ. R. 7(i).

Contrary to DPPs' claims, Br. at 6, once judgment has been entered, "the liberality of [Rule 15(a)] is no longer applicable . . . because Rule 15(a) and 59(e) should not be employed in a manner contrary to favoring finality of judgments and the expeditious termination of litigation . . . that would render those provisions meaningless." *Burtch*, 662 F.3d at 231 (internal citations and quotations omitted).

**B. DPPs Fail to Meet the Standards for a Motion to Alter or Amend the Judgment Under Federal Rule of Civil Procedure 59.**

DPPs ask the Court to amend that portion of the September 12 Order that denied them the opportunity to re-plead their claims. They purport to base their motion on (i) an intervening change in controlling law, and (ii) the need to prevent manifest injustice. Br. at 8-9. DPPs, however, fail to identify *any* intervening change in controlling law since this Court's September 12 Order, nor could they, as there had been no ruling by either the Supreme Court or the Third Circuit addressing *Actavis* or *Twombly* in that period. *See D&D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*¸ Civ. A. No. 03-1026 (MLC), 2009 WL 904054, at *2 (D.N.J. Mar. 31, 2009) ("[A] decision that is not controlling precedent is not an intervening change in the controlling law for purposes of a motion for reconsideration . . . ."); *id.* ("emphasizing that movant did not cite any authority from the Court of Appeals for the Third Circuit or the United States Supreme Court in finding movant did not identify an intervening change in controlling law")

(citing *Engers v. AT&T*, No. 98-3660, 2006 WL 3626945, at *2 (D.N.J. Dec. 12, 2006)). Rather, they contend that the Court's September 12 Order *itself* should be considered an "intervening" event. As explained below, there is no support in law or logic for such an argument. Moreover, there is no basis to construe the September 12 Order as constituting a "change" in controlling law because the Court simply applied binding precedent that had existed prior to DPPs' Second Amended Complaint.

Nor can DPPs establish manifest injustice, because DPPs have had ample opportunity to conform their allegations to the Supreme Court's decision in *Actavis* and to the concerns expressed by this Court at the July 24, 2013 hearing. Moreover, unlike the typical plaintiff, DPPs had the benefit of millions of pages of discovery at their disposal in taking their best shot at alleging a reverse payment.

DPPs' request for *yet another* bite at the apple flies in the face of the finality of judgments and the expeditious termination of litigation and should be denied. *Burtch*, 662 F.3d at 230-31; *Bhatnagar*, 52 F.3d at 1231-32.

### 1. <u>The September 12 Order Is Not an Intervening Change in Controlling Law.</u>

DPPs mistakenly argue that the decision that is the subject of their motion – the September 12 Order – constitutes an "intervening change in controlling law" because it announced a "new, heightened pleading standard," Br. at 1, that their

complaint "'must show some reliable foundation for estimating the alleged reverse payment,'" *Id.* at 3-4 (quoting Sept. 12 Mem. at 33).

As a threshold matter, setting aside the logical impossibility of a decision "intervening" on itself, DPPs do not cite a single case to support the novel claim that a court's *own ruling* may be the source of an intervening change in controlling law that warrants reconsideration of that same ruling – a claim that DPPs themselves admit is "unusual." *Id.* at 8. To the contrary, in each of the cases cited by DPPs, a district court reconsidered or was ordered to reconsider its decision based on an intervening Supreme Court ruling that was not available at the time of the district court's decision; in none was the district court's ruling itself the change in controlling law. *See Zichy v. Philadelphia*, 590 F.2d 503, 508 (3d Cir. 1979) (Supreme Court issued precedential decision "between the first time the case was before us and this appeal"); *Bryant v. N.J. Dep't of Transp.*, 998 F. Supp. 438, 441 (D.N.J. 1998) (reviving case initially dismissed for lack of standing where Supreme Court rendered controlling decision *after* case was dismissed); *Richman v. W.L. Gore & Assocs., Inc.*, 988 F. Supp. 753,755-59 (S.D.N.Y. 1997) (granting reconsideration in part where Supreme Court handed down controlling decision *after* the district court dismissed the case and appeal was pending); *Filler v. Hanvit Bank*, Nos. 01 Civ. 9510(MGC), 01 Civ. 8251(MGC), 2003 WL 21729978

(S.D.N.Y. July 25, 2003) (revising and vacating previous ruling where Supreme Court handed down controlling law weeks *after* the district court entered its order).

In short, DPPs cite no authority for the rule they suggest, and Defendants are aware of none. Nor is it difficult to see why no such support would exist: DPPs' rule would mean that every time a plaintiff loses a motion to dismiss, it could seek reconsideration on the grounds that the court's dismissal order "changed" the law. Such a result clearly would be absurd. DPPs' motion should be denied for this reason alone.

In addition to the fact that a court's own ruling cannot constitute an *intervening* event that warrants reconsideration of itself, DPPs also fail to demonstrate that the September 12 Order constitutes *a change in the law*.

DPPs contend that the "new" rule announced by the Court's September 12 Order is that a plaintiff alleging a "non-cash" reverse payment must allege the estimated dollar value of the claimed payment, and that it must do so according to a methodology applied within the industry. Br. at 7-8. DPPs' only basis for arguing that this amounts to a "new rule" is that DPPs do not believe that any other court has expressly articulated that obligation in exactly the same manner as this Court in a case which presented an identical set of facts. Br. at 7. It surely cannot be the case that a "new" rule is created each time a district court applies existing

Supreme Court precedent to a set of facts, particularly when the decision at issue is new and thus there is paucity of interpretive guidance.

Nor is it true that the Court had no support from commentators, as the decision itself reflects. Sept. 12 Mem. at 34 ("'The payment prong involves the following steps: (a) valuing any consideration . . . . Valuing this consideration, step (a) above, is sometimes an intricate proposition.'" (quoting Aaron Edlin, et. al., *Activating Actavis*, 28 Antitrust 16, 18 (2013))). Indeed, on this point the Court specifically relied on authority *cited by DPPs*. *See* Direct Purchaser Class Pls.' Opp'n to Defs.' Mots. to Dismiss the Second Am. Compl. at 40 (Jan. 17, 2014), ECF No. 510. This element of the September 12 Order, therefore, is hardly new.

More fundamentally, the Court's September 12 Order simply applied Supreme Court precedent that existed *before* the Court's decision and *before* DPPs filed their Second Amended Complaint – *FTC v. Actavis*, 133 S. Ct. 2223 (2013) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In particular, the Court "examine[d] whether the factual allegations [were] sufficient to make plausible [under *Twombly*] that Pfizer made a large and unexplained reverse payment to Ranbaxy in support of antitrust activities" under *Actavis.* Sept. 12 Mem., at 30. It concluded they were not.

What DPPs attempt to argue is a "new" ruling – the Court's holding that a plaintiff must plausibly estimate the alleged payment – was based squarely on the

Court's application of *Twombly* and *Actavis*. The Court held that "[i]n applying *Actavis*" to DPPs' alleged non-monetary reverse payment claim, "the non-monetary payment must be converted to a reliable estimate of its monetary value so that it may be analyzed against the *Actavis* factors such as whether it is 'large' once the subtraction of legal fees and other services provided by generics occurs." Sept. 12 Mem. at 32. In the Court's analysis, such a valuation was necessary to establish not only the plausible existence of a payment, but also to plead that the payment was "large" under *Actavis*. This is a matter of logic: to allege, for example, that an alleged non-cash payment is large (as DPPs must under *Actavis*), DPPs must be able to convert a claimed non-cash "payment" into a reliable monetary value; otherwise, there is no way to carry out the inquiry mandated by *Actavis*. *See id.* at 32-33.

Similarly, the Court also based its holding on *Twombly*'s requirement of plausibility. DPPs' reverse payment theory is premised on the value that the parties assigned to Pfizer's potential damages claim in *Accupril II* – a damage claim that had yet to be sustained in the underlying case and that was subject to a competing claim by Ranbaxy for wrongful injunction (secured by a $200 million supersedeas bond) if Pfizer lost on the merits. The Court held, simply, that to be plausible under *Twombly*, a reverse payment theory of this sort must allege facts from the perspective of the parties at the time of settlement because the way parties

value a settlement can vary due to the parties' mindset at the time of settlement as to the risks presented by litigation. Sept. 12 Mem. at 35-36. The Court, accordingly, suggested that to be plausible, any allegation of the potential damages at stake in a litigation should be based on a measure the parties themselves would have used to assess the risks and value of the litigation at the time of settlement, *e.g.*, a lost-profits or reasonable royalty measure in a patent litigation. This is nothing more than the application of the *Twombly* plausibility standard to DPPs' reverse payment theory.

Moreover, in the September 12 Order, the Court explicitly held that it was not announcing a heightened standard or "changing plausibility to probability," and cited established precedent in this Circuit that "[s]ome claims require more factual explication than others to state a plausible claim for relief. For example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." Sept 12 Mem. at 33 (citation omitted). This is consistent with comments the Court made during the July 24, 2013 oral argument *before* DPPs were given their last opportunity to amend their complaint. *See supra* at 3-4. The Court made very clear that simply characterizing an alleged payment as "significant" "may not be satisfactory under the *Twombly* case"; rather, the Court commented it was necessary for DPPs to come forward with a plausible valuation of the dollar amount of the purported payment. July MTD Tr. 57:17-23;

*see also id.* 72:4-20. As discussed above, DPPs amended their complaint *in light of* and *expressly to address* such comments by the Court. *See supra* at 4-5.

What DPPs mischaracterize as a "new rule," therefore, is no more than the Court's application of *Twombly* and *Actavis*, Supreme Court decisions that were issued well before the DPPs amended their complaint and that formed the central focus of the parties' motion to dismiss briefing and oral arguments. DPPs' assertion that the September 12 Order reflects a "change in the law" is meritless.

**2. DPPs Cannot Establish Manifest Injustice Because They Have Had Ample Opportunity, with the Benefit of Extensive Discovery, to Amend Their Claims in Light of *Twombly* and *Actavis.***

DPPs separately argue that they are entitled to reconsideration "to prevent manifest injustice." Br. at 9. However, DPPs' arguments merely rehash their claim that the Court's decision announced a "new" pleading rule. *Id*. As explained above, it did not. Further, DPPs' claim of "manifest injustice" is belied by the fact that DPPs were given the chance to take their "best shots" at amending their complaint in accordance with *Actavis* and with the benefit of substantial discovery.

The only case DPPs cite to support their "manifest injustice" theory, *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669 (3d Cir. 1999), is completely inapposite. There, the district court had declined to dismiss a corporate defendant that was not in existence during the relevant period; reconsideration was, therefore, appropriate

to correct a "clear error of law and fact." *Id.* at 679. Nothing like those circumstances exists here. To the contrary, DPPs have been afforded a full and complete opportunity to plead their complaint, having had access to millions of pages of discovery to do so, and can claim no injustice in being denied yet another attempt. DPPs should not be permitted to "relitigate matters that have already been considered by the Court and present arguments that should have been raised earlier in this litigation." *Navraj Rest. Grp., LLC v. Panchero's Franchise Corp.*, Civ. A. No. 11-7490, 2014 WL 1405042, at *2 (D.N.J. Apr. 10, 2014).

Evidently, DPPs "dislike[] the current legal regime and this Court's conclusions based on that regime." *Glenn v. Hayman*, No. 07-112 (PGS), 2007 WL 894213, at *2, 11 (D.N.J. Mar. 21, 2007). If that is the case, DPPs' recourse should be to seek appeal of the Court's September 12 Order, not to seek reconsideration of it, improperly, under Rule 59(e).

### C. The Motion to Amend the Complaint Should Be Denied.

For the reasons explained above, the Court should deny DPPs' request under Rule 59(e) to amend the September 12 Order to allow the DPPs the opportunity to re-plead their complaint. Additional, independent grounds exist to deny DPPs' request to re-plead their claims, namely, that (i) DPPs' proposed amendments would be futile; (ii) DPPs unduly delayed seeking leave to amend; and (iii)

allowing the amendments at this late juncture would prejudice Defendants and the Court.

**1. <u>The Proposed Amendments Would Be Futile.</u>**

In the September 12 Order, the Court held that DPPs failed to plausibly allege a large, unexplained reverse payment. Among other things, the Court found that DPPs failed to:

- plausibly allege the monetary value of Pfizer's potential damages claim in the *Accupril II* litigation (Sept. 12 Mem. at 35-36);
- plausibly allege the value of the Lipitor-related licenses granted by Pfizer to Ranbaxy outside the U.S. (*id.* at 37);
- plausibly allege the saved litigation costs to either party as a result of the settlement (*id.* at 37-38);
- plausibly allege that the purported payments were "large" within the meaning of *Actavis* (*id.* at 38-39); and
- adequately consider the terms of the Settlement Agreement as a whole, including terms relating to the Caduet litigation, the non-U.S. patent settlements, and a bulk supply agreement with respect to Canada (*id.* at 41-42).

DPPs' Proposed Second Consolidated Amended Class Action Complaint ("Proposed Complaint" or "Proposed Compl.") (Oct. 10, 2014), ECF No. 585-1, is futile because the proposed amendments fail to cure *any* of these errors. To pass muster under *Twombly*, any valuation of an alleged reverse payment must be plausible. DPPs' Proposed Complaint continues to fall afoul of this requirement.

DPPs' proposed amendments to the complaint purport to provide a valuation of Pfizer's potential damages claim in *Accupril II* based on a lost profits theory. According to the Proposed Complaint, Pfizer's (hypothetical) potential damages claim based on lost profits would have been approximately [redacted]. Proposed Compl. ¶ 9. To arrive at this number, DPPs apparently engaged a purported expert to review documents produced to DPPs more than a year ago to calculate diverted sales of and price erosion for Pfizer's Accupril product as a result of Ranbaxy's launch at risk of a generic quinapril product. *Id.* The Proposed Complaint then alleges that Pfizer's chances of winning the litigation were at least 50%, since the district court found that Pfizer had established a likelihood of success on the merits, which finding was affirmed by the Federal Circuit. *Id.* Accordingly, Pfizer's purported "net expectation" value from *Accupril II* was at least 50% of its damages claim, or approximately [redacted], which, DPPs allege, is greater than the $1 million settlement payment Ranbaxy made to Pfizer to resolve *Accupril II* and, therefore, contains a reverse payment. *Id.* ¶ 190.

Setting aside any potential computational issues in DPPs' analysis (of which there are many), this attempt to allege a reverse payment fails on multiple grounds. First, and most glaringly, DPPs' purported valuation ignores the fact that Ranbaxy had a countervailing claim for damages against Pfizer in the form of damages for wrongful injunction as to which Pfizer posted a bond of $200 million. If, as DPPs

allege, Pfizer had a 50% chance of winning *Accupril II*, it also had a 50% chance of *losing* and, therefore, faced potential exposure to Ranbaxy. To take this into account, any plausible valuation of Pfizer's potential claim against Ranbaxy in *Accupril II* would have to be discounted by the risk-adjusted value of *Ranbaxy's* potential claim *against Pfizer*, which, based on the allegations in DPPs' Proposed Complaint, could have been as much as $100 million (e.g., 50% of the $200 million bond amount). To even approach plausibility, DPPs' valuation must take this into account, but it makes no effort to do so.

Moreover, DPPs fail adequately to explain why it is reasonable to assume that Pfizer had at least a 50% chance of winning *Accupril II*. The Proposed Complaint bases this assumption on the preliminary injunction ruling and outcome of the appeal, which occurred well before the parties settled the litigation. In the September 12 Order, the Court held that, to be plausible, a valuation of the parties' respective damages claims in *Accupril II* must be based on how the parties viewed those claims *at the time of settlement*. Sept. 12 Mem. at 36. The Court further noted that any valuation of the *Accupril II* claims is "intricate" because it depends on a "future event that may never happen" and because "circumstances surrounding the parties often change as a litigation progresses." Sept. 12 Mem. at 34. Crucially, DPPs fail to address these factors, including the chances of success faced by the parties at the time of settlement. What may have begun as a 51%

chance of Pfizer winning at the preliminary injunction stage could have drastically changed as the case proceeded through discovery and expert analyses. DPPs take none of this into account in their Proposed Complaint. DPPs also ignore the possibility that although Pfizer sought damages based on lost profits, the Court may instead have awarded it only a reasonable royalty on Ranbaxy's sales, a (again *hypothetical*) figure that necessarily would be but a fraction of any lost profits claim.[4] Nowhere does the Proposed Complaint address this possibility or plausibly allege what Pfizer's damages would have been under this theory. Nor does the Proposed Complaint take into consideration the risks inherent in a review of any final rulings or judgments in *Accupril II* by the Federal Circuit.

In addition, DPPs' Proposed Complaint continues to ignore saved litigation costs in its purported valuation of the alleged reverse payment. DPPs make the same allegations regarding litigation costs that this Court has already found implausible. Sept. 12 Mem. at 38. In the September 12 Order, the Court estimated that the settlement could have resulted in between $117 and $260 million in saved litigation costs, which would have to be deducted from the net value of Pfizer's

[4] By contrast, *Ranbaxy's* competing wrongful injunction damages claim against Pfizer would not vary in this manner, meaning that a risk-adjusted comparison of competing damages claims, even by DPPs telling, may well amount to a large relative risk-adjusted payment from *Ranbaxy to Pfizer*. But the Court yet again need not wade into a detailed analysis of implausible speculation and counter speculation. DPPs' lack of any *factual* basis for their attempted allegations renders implausible DPPs' renewed efforts here as a matter of law.

*Accupril II* damages claim to calculate any alleged reverse payment. *Id.* The Proposed Complaint does not address this.[5]

DPPs also fail to allege plausible facts to support the claim that the purported reverse payment was "large." As this Court stated, "[o]ne way to measure the 'largeness' of a reverse payment is to assess whether the amount is larger than what the generic would gain in profits if it won the Paragraph IV litigation and entered the market." Sept. 12 Mem. at 39. DPPs' Proposed Complaint makes no effort to factor such profits into its analysis. As the Court recognized, and DPPs concede, this figure would be substantial in light of the "blockbuster" status of Lipitor. Sept. 12 Mem. at 8 (Lipitor "is characterized as a 'blockbuster' drug with sales of about *$1 billion per month*") (emphasis added).

Finally, in every prior iteration of their complaint, DPPs alleged that the non-U.S. settlements were "reverse payments" that induced delay of generic Lipitor in the United States. In a striking about-face, DPPs now allege, in a conclusory manner, that the Caduet and non-U.S. settlements were each an independent, arms-length transaction and, therefore, that those components of the

[5] The Proposed Complaint simply states that, "[t]here is no basis in antitrust law for the suggestion that actual, or even potential, cost savings from patent litigation in foreign jurisdictions can justify a reverse payment which is alleged to have anticompetitive effects in the US market." Proposed Compl. ¶ 197. Once again, rather than actually address a factor identified by the Court in the September 12 Order, DPPs' Proposed Complaint simply ignores it.

settlement can simply be ignored. Proposed Compl. ¶ 8 & n.2, 150 n.8. DPPs thus continue to focus on certain terms of the agreement and disregard others, which the Court held was an unreasonable analysis given the nature of their claims. In particular, DPPs fail to account for the pro-competitive benefits of early entry in the non-US settlements and the Caduet settlement, which must be part of any analysis of the entire agreement's impact on competition. They fail to explain why those provisions, which they now appear to concede are pro-competitive, do not affect DPPs' ultimate claim that the settlement agreement as a whole is anti-competitive. Similarly, DPPs purport to rely on Defendants' representations as support for the proposition that the Caduet and non-U.S. settlements were independent, arms-length transactions. Defendants, however, have also argued that the Accupril and U.S. Lipitor settlements were independent, arms-length transactions, and DPPs offer no plausible explanation why this statement should be taken as true for some terms but not others. DPPs thus continue to take "a selective look at certain provisions of the agreement and bypass[] others," rendering their challenge to the settlement as a whole implausible. Sept. 12 Mem. at 42.

Because they continue to ignore the multiple factors the Court held were necessary to allege plausibly the existence and size of the purported reverse payment, DPPs' proposed amendments to the complaint would be futile. DPPs'

proposed amendments are futile for additional reasons set forth in Defendants' motions to dismiss, including that the Supreme Court held in *Actavis* that "commonplace" settlements involving compromises of damages claims – such as the one at issue in *Accupril II* – are not subject to antitrust scrutiny. *Actavis*, 133 S. Ct. at 2233; *see also* Sept. 12 Mem. at 23. Accordingly, DPPs' request for leave to amend the complaint should be denied.

**2. <u>DPPs Unduly Delayed Seeking Leave to Amend: The Relevant Information was Available to Them Before They Filed Their Second Amended Complaint.</u>**

In addition to being futile, the proposed amendment comes far too late and is unjustified. "[T]he question of undue delay requires that [the court] focus on the movant's reasons for not amending sooner." *Treusch v. Ctr. Square Supermarket, LLC*, Civ. No. 11-4874 (JBS/JS), 2013 WL 1405031, at *4 (D.N.J. Apr. 5, 2013) (internal citation and quotations omitted). "Delay may become undue when a movant has had previous opportunities to amend a complaint." *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).

DPPs have already filed three rounds of complaints, and their most recent complaint, which was the subject of the September 12 Order, was amended specifically to attempt to take their "best shot" after receiving discovery regarding *Accupril II*. DPPs have already attempted to put a value on the Accupril settlement – after the Court had given DPPs ample notice by expressing concerns about the

plausibility of any such valuation – and should not be permitted to put all concerned through yet more rounds of briefing and argument based on a Proposed Complaint that is so plainly deficient. The amendments DPPs now propose are based on the *very same information* to which they have had access *for more than one year*. DPPs have long been aware of *Twombly* and *Actavis* and the need to allege their challenge to the settlement agreement with plausibility. And, if they had any doubts about it, they certainly were made aware during the oral arguments held in July 2013 and March 2014 that their complaint was vulnerable on this ground, and yet did nothing. *Cf. Pardy v. Dupuy*, Civ. A. No. 07-1385(SDW), 2008 WL 2704998, at *3 (D.N.J. July 8, 2008) (denying motion to amend complaint post-judgment where "[d]uring oral argument . . . Plaintiff had the opportunity to expand and explain the basis of her claims" but failed to do so). There simply is no justification for DPPs' delay in seeking leave to amend their complaint to address these issues that they have long known about.

This is the classic case of "undue delay," warranting denial of a motion for leave to amend. *Bjorgun v. Whitetail Resort*, *LP*, 550 F3d 263, 266 (3d Cir. 2008) ("Delay becomes 'undue' and thereby creates grounds for the district court to refuse leave, when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend.") (citing *Cureton*, 252 F.3d at 272); *Jemas v. CitiMortgage Inc.*, Civ. A. No. 12-3807-ES-SCM, 2013 WL

1314729, at *4 (D.N.J. Mar. 28, 2013) (denying motion to amend where court could not "identify any reason why Plaintiffs did not include the proposed claims in their original complaint."); *Holland v. Macerich*, Civ. No. 09-914, 2012 WL 1377359, at *2 (D.N.J. Apr. 18, 2012) (denying Rule 59(e) motion to amend complaint post-judgment where, *inter alia*, (1) plaintiff already had an opportunity to amend his complaint, (2) plaintiff "sought leave . . . only after summary judgment was already entered against him, when judicial interest in economy and finality [were] heightened," (3) the claims plaintiff intended to assert were based on facts known to plaintiff form the outset, and (4) plaintiff advanced no reason for his delay in seeking to amend). The motion for leave to amend should be denied as a result of undue delay.

**3. Allowing Amendment at This Late Juncture Would Prejudice Defendants, Who Have Expended Substantial Resources in the Pending Motions.**

As the Third Circuit has warned, "[i]t is well-settled that prejudice to the non-moving party is the touchstone for the denial of an amendment." *Cornell & Co. v. Occupational Safety & Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971)). Here, Defendants have produced millions of pages of documents, and the Defendants and the Court have devoted substantial effort to multiple rounds of briefing on DPPs' complaint and Second Amended Complaint and have engaged in

multiple oral arguments related to those briefs over the past three years. Given this history, a motion to amend now, after the Court has expended considerable resources in producing a substantial opinion, is clearly prejudicial. *See, e.g.*, *Holland v. Simon Prop. Grp., Inc.*, 495 F. App'x 270, 274 (3d Cir. 2012) (finding prejudice where amendment "would have resulted in 'additional discovery, cost, and preparation to defend against new facts or new theories' after judgment was entered in their favor") (internal citation omitted); *E-Lynxx Corp. v. InnerWorkings, Inc.*, 958 F. Supp. 2d 569, 578-79 (M.D. Pa. 2013); *Conseco Life Ins. Co. v. Smith*, Civ. A. No. 2:11-cv-3716 (SDW) (MCA), 2013 WL 3285065, at *5 (D.N.J. June 26, 2013); *see also Farricker v. Pension Dev., Ins.*, No. 07 Civ. 1191(DAB), 2009 WL 860239, at *4 (S.D.N.Y. Mar. 31, 2009). Such prejudice alone is enough to deny DPPs' Motion.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that DPPs' Motion be denied.

Dated: October 27, 2014

Respectfully submitted,

**CONNELL FOLEY LLP**

*/s/ Liza M. Walsh*
Liza M. Walsh
CONNELL FOLEY

85 Livingston Avenue
Roseland, NJ 07068
(973) 535-0500
Email: lwalsh@connellfoley.com

Dimitrios T. Drivas
Robert A. Milne
Brendan G. Woodard
Raj S. Gandesha
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

*Counsel for Defendants Pfizer Inc., Pfizer Ireland Pharmaceuticals, Pfizer Manufacturing Ireland, Warner-Lambert Co., and Warner-Lambert Co., LLC*

*/s/ Michael E. Patunas*
Michael E. Patunas
Mayra V. Tarantino
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

Jay P. Lefkowitz
Joseph Serino
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Karen N. Walker
Jonathan D. Janow
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

(202) 879-5000

*Counsel for Defendants Ranbaxy Inc., Ranbaxy Pharmaceuticals, Inc., and Ranbaxy Laboratories Limited*