

ONE RIVERFRONT PLAZA
1037 Raymond Blvd., Suite 600
Newark, NJ 07102

T: 973.757.1100
F: 973.757.1090

**WALSH.LAW**

Liza M. Walsh
Direct Dial: (973) 757-1101
lwalsh@walsh.law

August 17, 2018

**VIA ECF**

Honorable Douglas E. Arpert, U.S.M.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

      **Re:**   *In re Lipitor Antitrust Litigation*
           *Master Docket No.: 12-cv-02389 (PGS-DEA)*

Dear Judge Arpert:

      This firm, together with White & Case LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP, represents Defendants Pfizer Inc., Pfizer Manufacturing Ireland, Warner-Lambert Co., and Warner-Lambert Co. LLC. in the above-referenced matter. We write, jointly with Plaintiffs and with Defendants Ranbaxy, Inc., Ranbaxy Pharmaceuticals, Inc., and Ranbaxy Laboratories, Ltd., to seek Your Honor's assistance in resolving several discovery disputes on which the parties have reached an impasse after meeting and conferring.

      Because many of the discovery issues arising in *Lipitor* also arose in *Effexor XR* and have recently been briefed (Civ. No. 3:11-cv-05479, ECF # 528 (the "*Effexor* Joint Letter")) by many of the same lawyers and parties, the parties incorporate the arguments made in the *Effexor* Joint Letter (Issues III-VII), attached as Exhibit A, as well as the parties' subsequent submissions on defendants' notice of subsequent authority, attached as Exhibit B.

      This Joint Letter will address only (a) new arguments, (b) discovery disputes not at issue in *Effexor*, and (c) factual distinctions between the *Lipitor* and *Effexor* cases.

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                              Page 2

I.   **Plaintiffs Should Produce Documents and Data Regarding Products that Compete with Lipitor and Atorvastatin**

**Defendants' Statement**

Lipitor (atorvastatin) competes in a crowded field of "statins," all of which treat high cholesterol.  Defendants have served a number of requests on Plaintiffs regarding competition in this market.  *See, e.g.*, Req. to DPPs No. 1-2, 5, 11-29, 32-38, 41-43, 45-56, 73-81, 105, 111; Req. to Retail. No. 1-2, 5, 11-29, 32-38, 41-56, 76-84, 94-106, 111-115, 119-20, 127, 133; Req. to EPPs No. 1-2, 5, 11-35, 38-71, 75-76, 78, 97-103, 106, 126, 128, 134, 138-139, 141-142, 145-148, Exhibit C-1 (providing text of requests).  To reduce the burden on Plaintiffs, Defendants have offered a reasonable compromise, asking Plaintiffs to search for documents mentioning Lipitor and eleven statins that most often compete with Lipitor, rather than all competing drugs.[1]  Defendants have also made clear that they are open to further discussion as to the scope of this discovery.  Plaintiffs have refused any such compromise, however, instead asserting that because Plaintiffs believe the relevant market includes only Lipitor and its generic equivalents, discovery should likewise be so-limited.  However, Defendants are entitled to present a full defense on this issue, and discovery should not be foreclosed as Plaintiffs demand.

Defendants refer the Court to pages 8-12 of the *Effexor* Joint Letter for a full discussion of the reasons that discovery concerning the relevant product market is critical to this case, and also note the following:

a.  **Plaintiffs Cannot Withhold Evidence They Deem "Anecdotal"**

Defendants seek discovery from Plaintiffs that will allow the parties and the Court to determine the "commercial realities" of the market, including how customers such as Plaintiffs view competing products in the statins market.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("[C]ourts should combin[e] different products or services into a single market when that combination reflects commercial realities.").   Nonetheless, Plaintiffs dismiss the relevance and discoverability of such market evidence, calling it "anecdotal."  Plaintiffs are wrong. Courts frequently consider "anecdotal" evidence in defining a relevant market,

---

[1] 1) Lescol (fluvastatin); 2) Mevacor (lovastatin); 3) Altoprev (lovastatin extended-release); 4) Livalo (pitavastatin); 5) Pravachol (pravastatin); 6) Crestor (rosuvastatin); 7) Zocor (simvastatin); 8) Advicor (lovastatin/niacin extended-release); 9) Simcor (simvastatin/niacin extended-release); 10) Vytorin (simvastatin/ezetimibe); and 11) Caduet (atorvastatin/amlodipine).

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                 Page 3

regardless of whether they label it as such.

 First, the Supreme Court has expressly relied on "anecdotal" evidence of consumer preference to help define a relevant market. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 606 (1985) ("Expert testimony and anecdotal evidence supported these statistical measures of consumer preference."). Similarly, in defining the relevant market in *American Express* the Supreme Court considered evidence the district court had noted was "anecdotal" in nature. 138 S. Ct. at 2285-86; *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 151 (E.D.N.Y. 2015) (referencing "anecdotal merchant testimony" later discussed by Supreme Court). The Third Circuit and other courts likewise have expressly referred to "anecdotal" evidence in defining relevant markets, without any of the pejorative gloss Plaintiffs seek to add. *See, e.g.*, *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 205-06 (3d Cir. 1994) (discussing "anecdotes" in the record and remanding for further consideration of relevant market issue); *FTC v. Swedish Match N. Am. Inc.*, 131 F. Supp. 2d 151, 165 (D.D.C. 2000) (considering FTC's "[a]necdotal evidence" of relevant market based on the behavior of market participants); *Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 447 (M.D. Pa. 2003) (considering "anecdotal" evidence of consumer behavior in identifying relevant geographic market).

 Moreover, the label is not what is important, and courts frequently rely on exactly the type of evidence that Defendants seek without expressly calling it "anecdotal." Rather, such evidence might more appropriately be referred to as "market participant evidence." For example, the Third Circuit in *Mylan Pharms. v. Warner Chilcott PLC* ("*Doryx II*"), 838 F.3d 421, 436 (3d Cir. 2016), relied on market evidence from "health insurers and other managed care providers," including promotion and marketing documents, drug substitutability evidence, pharmaceutical advertising, physicians' preference evidence, and drug pricing, among other things in defining a relevant market.[2] *See also Mylan Pharms. v. Warner Chilcott PLC* ("*Doryx I*"), 2015 U.S. Dist. LEXIS 50026, at **25-28 (E.D. Pa. Apr. 16, 2015) (relying on market evidence including promotion and marketing documents, FDA labeling, drug substitutability evidence, pharmaceutical advertising, physicians' preference evidence, and drug pricing, among other things). Courts in this Circuit routinely do the same. *See, e.g.*, *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063-64 (3d Cir. 1978) (discussing customer behavior in defining market); *Allen-*

---

[2] Plaintiffs now assert that such evidence was not the *sole* reason the Third Circuit found a lack of monopoly power in *Doryx*. But Defendants are entitled to discovery into the types of evidence the Third Circuit considered relevant and important, even if market-wide price data might also be important to the analysis.

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                    Page 4

*Myland*, 33 F.3d at 202 (discussing market evidence of customer conduct with regard to purchasing decisions); *FTC v. AbbVie Inc.*, 2018 U.S. Dist. LEXIS 109628, at \*\*66-67 (E.D. Pa. June 29, 2018).  Courts in other circuits also routinely consider such market evidence.  *See, e.g.*, *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016) (considering anecdotal evidence in determining relevant market); *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) ("To conduct this [relevant product market] inquiry, the courts must weigh several factors including, industry or public recognition of the products as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.").

     "In the majority of cases" even the FTC—which takes a plaintiff-friendly view of market definition—considers evidence "obtained primarily from customers and from business documents," such as "evidence that customers highly value certain product attributes" which "may limit their willingness to substitute other products in the event of a price increase."[3]  The DOJ—which often takes a similar view to the FTC—will consider "evidence that sellers base business decisions on the prospect of buyer substitution between products in response to relative changes in price or other competitive variables; the influence of downstream competition faced by buyers in their output markets; and the timing and costs of switching products."[4]  Plaintiffs' position thus has no support in law *or* agency practice.

     Nonetheless, Plaintiffs rely on *SmithKline* to assert that "the Third Circuit has recognized that it is error to rely on anecdotal evidence when determining the relevant market."  That is not what *SmithKline* says.  In *SmithKline*, the Third Circuit in fact *considered* "anecdotal" evidence of purchaser behavior, including physician behavior (*see also infra* Section II (addressing need for discovery in this area)), to determine whether there was cross-elasticity of demand between pharmaceuticals, and then (separately) whether the product was interchangeable with other competing products.  575 F.2d at 1063-64.  To read *SmithKline* to say the exact opposite,

---

[3]  FTC, *Markets*, *available at* https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/markets.  Defendants in no sense adopt, and courts have rejected, the test for market definition advocated by the FTC and DOJ. *See, e.g.*, *AbbVie*, 2018 U.S. Dist. LEXIS 109628, at \*63 (rejecting "the FTC's proposed single-product market" as defined under the FTC/DOJ Horizontal Merger Guidelines' Hypothetical Monopolist Test for defining product market); *FTC v. Penn State Hershey Med. Ctr.*, 185 F. Supp. 3d 552, 558 (M.D. Pa. 2016) (same).

[4]  DOJ, *Product Market Definition* (June 25, 2015), *available at* https://www.justice.gov/atr/11-product-market-definition.

Hon. Douglas E. Arpert, U.S.M.J.

August 17, 2018                                                                                                        Page 5

Plaintiffs combine one phrase from the cross-elasticity analysis, and one phrase from the interchangeability analysis several paragraphs later, into a misrepresentation of the Court's ruling.  To be clear, Defendants are not arguing that market-wide price data is unimportant to a relevant market analysis.  But the kind of evidence that Plaintiffs dismiss as "anecdotal" is *also* relevant, as *SmithKline* shows.

### b. Plaintiffs Cannot Rely on a Direct Evidence Theory to Avoid Product Market Discovery

Plaintiffs have argued that they need not prove market power for their Sherman Act Section 1 claims because they will show direct evidence of anticompetitive effects.  But as the Supreme Court noted in *American Express*, "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."  138 S. Ct. at 2285; *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315-16 (3d Cir. 2010) ("Because of the difficulty of isolating the actual market effects of challenged conduct, successful attempts to meet [the] burden [of showing anticompetitive effects] typically include a demonstration of defendants' market power." (internal citations and alterations omitted)).  Moreover, even if Plaintiffs could use direct evidence to avoid "*precisely* defin[ing] the relevant market," *id.* at 2285 n.7 (emphasis added), courts nonetheless consistently require plaintiffs to show at least the "rough contours" of a relevant market.  *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) ("Economic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market."); *Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 2015 U.S. Dist. LEXIS 36588, at *26 (D.N.J. Mar. 24, 2015) ("[W]here a plaintiff demonstrates direct evidence of actual anticompetitive effects, the plaintiff's burden is diminished and it must only demonstrate 'the rough contours of a relevant market.'"); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997) (Section 1 claims require proof of, among other things, "anticompetitive effects *within the [relevant product and geographic] market[s]*") (emphasis added).  *Actavis* did nothing to change this rule.  *See FTC v. Actavis, Inc.*, 570 U.S. 136, 160 (2013) ("We . . . leave to the lower courts the structuring of the present rule-of-reason antitrust litigation.").  Plaintiffs therefore cannot avoid their obligation to produce product market discovery by asserting that they will have some direct evidence of anticompetitive effects to prove their Section 1 claims.

In an attempt to avoid their discovery obligations, Plaintiffs seek to rely on a *dicta* footnote in *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007), to argue that the Third Circuit has, as one court put it, "remove[d] the

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                        Page 6

requirement of establishing the relevant market under the direct evidence method"
for proving Section 2 monopolization claims.  *In re Neurontin Antitrust Litig.*, 2013
U.S. Dist. LEXIS 111587, at **8-9 (D.N.J. Aug. 8, 2013) (rejecting this reading of
*Broadcom*).  As several courts have since explained, however, "[t]he Third Circuit
[in *Broadcom*] did not state that the direct evidence could be completely untethered
or unmoored from a roughly identified relevant market."  *In re Comp. of Managerial,
Prof'l & Tech. Emps. Antitrust Litig.*, 2008 U.S. Dist. LEXIS 63633, at *26 (D.N.J.
Aug. 20, 2008); *see also Carpenter Tech. Corp. v. Allegheny Tech., Inc.*, 2011 U.S.
Dist. LEXIS 112556, at **34-35 (E.D. Pa. Sept. 30, 2011); *Neurontin*, 2013 U.S.
Dist. LEXIS 111587, at **8-9.  Plaintiffs similarly quote *Toys "R" Us, Inc. v. F.T.C.*,
221 F.3d 928, 937 (7th Cir. 2000), but ignore that the Seventh Circuit subsequently
explained that "neither *Toys "R" Us* nor [*FTC v.*] *Indiana Federation of Dentists*[,
476 U.S. 447, 461-62 (1986)] allows an antitrust plaintiff to dispense entirely with
market definition."  *Republic Tobacco*, 381 F.3d at 737.  Equally wrong are
Plaintiffs' citations to *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d
Cir. 2002), which acknowledged Plaintiffs' position but did not adopt it, and *Todd
v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001), as the Second Circuit in
*Heerwagen v. Clear Channel Communications* later squarely concluded that a
plaintiff "cannot escape proving her claims with reference to a particular market
even if she intends to proffer direct evidence."  435 F.3d 219, 229 (2nd Cir. 2006).

     Moreover, Plaintiffs cannot reserve the right to rely on indirect evidence of
market power in a relevant market while nonetheless denying Defendants discovery
into that market.  If Plaintiffs, having reviewed the above authority, nonetheless
chose to waive any and all arguments based on market power and to rely solely on
direct evidence instead, then their argument against discovery into market power
would at least be internally consistent.  But they have not made such a waiver—even
in their response below.  Instead, Plaintiffs explicitly have reserved the right to show
market power as an element of their Section 1 claims in the event that they cannot
show anticompetitive effects directly, and to take discovery for that purpose—while
simultaneously seeking to deny Defendants the opportunity to take their own
discovery on this issue.  *See, e.g.*, EPPs' Sec. Am. Compl. at ¶ 462 (reserving right
to use relevant market analysis); DPPs' Sec. Set of Requests to Pfizer at ¶¶ 143-49
(requesting discovery regarding the product market in which Lipitor competes).
Such one-sided discovery is inappropriate.

     Finally, *even if* Plaintiffs could rely on a shortcut for showing anticompetitive
effects with respect to their Section 1 claims, discovery regarding the relevant
product market would still be available under *Doryx* with respect to Plaintiffs'
Section 2 claims.  *See Doryx II*, 838 F.3d at 436-37 (reviewing same types of

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                              Page 7

documents Defendants seek here in defining the relevant product market with respect to Section 2 claims); *see also In re Neurontin Antitrust Litig.*, 2013 U.S. Dist. LEXIS 111587, at \*\*8-9 (D.N.J. Aug. 8, 2013) (plaintiffs relying on direct evidence of monopoly power must "define or refer to the relevant market, or at least the rough contours of one"). Although the relevant market *analysis* is often similar for both Section 1 and Section 2, it is settled Supreme Court and Third Circuit law that the *requirements* for a showing of monopoly power under Section 2 are higher. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 186 (3d Cir. 2005) ("Monopoly power under § 2 requires . . . something greater than market power under § 1.") (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992)). Thus, it simply is not the case that a shortcut for Section 1 could avoid discovery with respect to Section 2—particularly when the Third Circuit has made clear that Section 2 claims are subject to the analysis the court applied in *Doryx*.[5]

### c. Retailer Plaintiffs Cannot Refuse to Produce "P&T Committee" Meeting Materials

Some of the most important documents in a pharmaceutical antitrust case come in the form of so-called Pharmacy & Therapeutics ("P&T") committee meeting minutes. Such P&T committees at health plans are tasked with creating "formularies"—lists of drugs that will be covered by insurance. In doing so, the committees necessarily have to decide which products are interchangeable for which other products. P&T committee materials are thus persuasive evidence in defining the relevant product market. *See, e.g.*, Memorandum and Order, *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-md-2472 (D.R.I. Mar. 15, 2017), Ex. D (granting motion to compel and concluding that materials such as formularies and documents illustrating adjustments made to promote switch to generics were relevant to substitutability determinations). Defendants accordingly requested any such materials in the possession of the Plaintiffs. *See* Req. to Retail. 111-13. Retailers, however, refuse to produce such documents, asserting that they are somehow not relevant to market definition. By their very definition, these documents are relevant to the question of which products are interchangeable.

In response, Retailers argue that Defendants should seek only the "bull's-eye set" of documents that would address economic interchangeability. *But that is exactly what Defendants seek.* For example, as prior cases including *Doryx* have shown, if two drugs are therapeutically interchangeable (i.e., they have

---

[5] Plaintiffs argue that Defendants have not addressed *In re Aggrenox Antitrust Litigation*, but Defendants previously have done so. *Effexor* Joint Letter at 9 n.6.

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                Page 8

interchangeable uses with patients), then, where possible, an insurer will generally seek to place the cheaper one on its formulary to save money. Which products the insurer places on its formularies, **and why**, is therefore also evidence of *economic* interchangeability. Indeed, this illustrates the flaw in Plaintiffs' market definition argument generally, because as the above example demonstrates, interchangeability of use and cross-elasticity of demand are not two wholly distinct concepts as Plaintiffs suggest. Rather, both concepts are necessary to understand which products customers view as substitutable—a practical analysis that includes what the Supreme Court recently called "commercial realities." *See Amex*, 138 S. Ct. at 2285. Plaintiffs' efforts to limit discovery to exclude these realities should be rejected.

**Plaintiffs' Statement**

> **a.  Additional Discovery Will Not Help Defendants Rebut Direct Proof of Market Power**

Market power is the ability to profitably charge more than the competitive price for a prolonged time. As Judge Posner explained, it is "the power to raise price above the competitive level without losing so much business to other sellers that the price would quickly fall back to that level." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012). Courts have recognized that, "when direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established from that fact alone." That is because "the ability to charge supracompetitive prices . . . is the sine qua non of market power." *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 664-65 (D. Conn. 2016) (holding that the relevant market in pay-for-delay litigation is "determined by the nature of the challenged agreement," *id.* at 663, and thus concluding that the only relevant market at issue in that suit is the market for Aggrenox and its generic equivalent and not other drugs in the same therapeutic category as Aggrenox).

As with evidence in other fields of law, *direct* proof of market power is more probative than *circumstantial* proof of market power (*i.e.*, "relevant market" analysis). As the Second Circuit has recognized, evidence of "an actual adverse effect on competition . . . arguably is more direct evidence of market power than calculations of elusive market share figures[.]" *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001). The Seventh Circuit has also expressly rejected the notion that a plaintiff must prove a high share within a relevant market:

> TRU seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff, or here the Commission, first proves that it has a large market share. This, however, has things backwards. As we

have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration.

*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). *See also FTC v. Ind. Fed. Dentists*, 476 U.S. 447, 461-62 (1986) proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power).

Defendants cite cases where direct proof was unsuitable on the facts and record of those specific cases; those cases did not arise in the pharmaceutical context where the price reducing effects of generic entry are systematic, undisputed, and well-documented. Sales data for brand and generic Lipitor bears that out in this very case. *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 500 (2d Cir. 2004) ("plaintiffs' pricing proof may of course be indicative of monopoly power.") Indeed, given that "the anticompetitive effects of [delaying generic entry] cannot be seriously debated," *Valley Drug Co. v. Geneva Pharms., Inc*., 344 F.3d 1294, 1311 n.27 (11th Cir. 2003), *overruled on other grounds, FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013). The ultimate goal of the market power question is to determine whether Pfizer had the power to keep prices from falling to the competitive level, something the transactional sales data will demonstrate. *See* Areeda & Hovenkamp, ANTITRUST LAW ¶ 507a (goods not in the same market "unless the availability of one effectively limited the price of the other to the competitive level or something slightly above"). Anecdotal evidence of subjective market participants' perspectives on the "market" cannot trump, or even persuasively rebut, direct evidence.

Defendants do not squarely argue that the discovery they seek from Plaintiffs *could* rebut direct evidence of Pfizer power over Lipitor's price. Instead, they argue that Plaintiffs must do some sort of market definition exercise, as a matter of law, prior to offering direct evidence. Defendants misunderstand the law. *See Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007) ("direct proof of monopoly power does not require a definition of the relevant market"); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002) ("relevant market definition is not a necessary component of a monopolization claim").

Defendants attempt to dismiss *Broadcom* as *dicta*, but doing so begs the question – what evidence from Plaintiffs would be required to *rebut* direct evidence of monopoly power in even a "roughly defined" relevant market? In none of the cases Defendants cite do the courts rely on anecdotal evidence to reject a finding of market power. Instead, what the courts found is that plaintiffs failed to carry their affirmative burden to show power over price. *See, e.g., Carpenter Tech. Corp. v.*

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                 Page 10

*Allegheny Techs. Inc.*, No. CIV.A. 08-2907, 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011) (plaintiff did not present sufficient pricing evidence); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (finding "no evidentiary support for the putative Southeast geographic market."). And in *Neurontin*, another case cited by Defendants, plaintiffs' rough market definition was satisfied by an allegation of antitrust violation that "suggests a market consisting of branded Neurontin and its generic equivalents." *In re Neurontin Antitrust Litig.*, No. 02-1390 FSH, 2013 WL 4042460, at *3 (D.N.J. Aug. 8, 2013). Even under Defendants' own reading, additional discovery from Plaintiffs is unnecessary.

Nor do Defendants address the ruling in *Aggrenox*, described at length in Plaintiffs' *Effexor* submission, where the court concluded that because the market should be defined as Aggrenox and its generic equivalents, the court refused to permit discovery into, or evidence relating to, other drugs that in the same therapeutic category as Aggrenox, concluding that "such discovery is therefore irrelevant." *In re Aggrenox*, 199 F. Supp. 3d at 669.

**b.    Defendants Cannot Rebut Plaintiffs' Market Power Proof with Anecdotal Evidence**

Even if indirect proof of a "relevant market" were required, there is no need for anything other than defendants' sales data to perform the analysis. A "relevant market" is "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228-29 (2d Cir. 1999) (citing Areeda and Hovenkamp, ANTITRUST LAW ¶ 533b (2002)). The market is the "smallest possible group of products" that satisfies this test. *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 360 (S.D.N.Y. 1995); Areeda & Hovenkamp, ANTITRUST LAW ¶ 536; U.S. Dep't of Justice & Federal Trade Comm'n, HORIZONTAL MERGER GUIDELINES § 1.11 (2010). Data reflecting the sales and sale prices of Pfizer and other atorvastatin sellers is all that is needed to evaluate whether Defendants could profitably raise or maintain atorvastatin prices significantly above the competitive levels generic Lipitor competition belatedly produced by controlling just atorvastatin sales and the sales of no other product.

Defendants claim to require "anecdotal" evidence of how consumers view "commercial realities." Defendants claim these anecdotes will show that Lipitor "competed" with other drugs on therapeutic or other bases. But it is error to include in the relevant product market pharmaceuticals that did not constrain Lipitor prices that generic atorvastatin competition produced simply because they might function

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                 Page 11

similarly to Lipitor. "Reasonable interchangeability" has a very specific meaning in antitrust law; it depends on whether the products are *economic* substitutes for one another – whether relative changes in the price of one product cause substantial shifts in the quantities demanded for another – commonly referred to as "cross-elasticity of demand." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-38 (3d Cir. 1997) ("products in a relevant market are characterized by a cross-elasticity of demand, in other words, the rise in price of a good within a relevant product market would tend to create a greater demand for other like goods in that market").

The Supreme Court has made it clear that the fact that two products serve the same function is insufficient to put them together in a relevant antitrust product market. What is required is the existence of significant (not small) and positive cross-elasticity of demand with respect to price.  Thus, the Supreme Court has warned:

> For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small.

*Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 613 (1953). "The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services[,]" *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979).  *See also Hayden Pub. Co., Inc. v. Cox Broadcasting Corp.*, 730 F.2d 64, 70 (2d Cir. 1984) (district court committed reversible error in "neglect[ing] the factor of cross-elasticity of demand," which directs that the court determine not just functional substitutability, but primarily "how far buyers will go to substitute one commodity for another").

In fact, the Third Circuit has recognized that it is error to rely on anecdotal evidence when determining the scope of the relevant market.  *See SmithKline Corp. v. Eli Lilly & Co.* (Third Circuit described defining a relevant market as "an economic task put to the uses of the law"). 575 F.2d at 1063.  The economic task must begin, as the SmithKline court did, with an  examination of price sensitivity between similar products.  *Id*. ("defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability actual or potential to take significant amounts of business away from each other.").  Only after examining cross-elasticity did the SmithKline court look at anecdotal evidence, and no such evidence was sufficient to include any other antibiotic in the relevant market.  Notably, among the evidence the court found

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                            Page 12

insufficient was "a nationwide study of hospital-based physicians, describing actual use of antibiotics in treating hospitalized patients" which supposedly showed that "for virtually every purpose for which hospital physicians use cephalosporins, they also use other antibiotics." *Id.* at 1064. Of course, such nationwide data is beyond what *could* be elicited from Plaintiffs here, who account for only a small portion of the distribution level of which they are a part. In short, the task to which Defendants would put Plaintiffs – combing their files for documents concerning only other statins, would be enormously burdensome, yet would still not lead to the type of interchangeability evidence a court might find useful. *See also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 207 (3d Cir. 1994) (rejecting anecdotal evidence that did not suggest price relationship between products).

Particularly in pharmaceutical cases, even close therapeutic equivalents have been deemed to be in separate markets. *See In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472-S-PAS, 2017 WL 3600938, at *12 (D.R.I. Aug. 8, 2017) ("Products are not reasonably interchangeable merely because they share similar forms or functions, but rather '[s]uch limits are drawn according to the cross-elasticity of demand for the product in question—the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes.'" (*quoting In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F.Supp.2d 367, 387–88 (D. Mass. 2013)), *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1170 (N.D. Cal. 2017) ("Defendants' analysis—essentially ignoring cross-elasticity—creates a vastly overbroad market"). Discovery must be more beneficial than burdensome to be allowed, and even if the Court believed that relevant market discovery was appropriate, unless defendants can show that there was a drug out there that constrained atorvastatin prices down to the levels that generic Lipitor competition produced—i.e., is in the "smallest possible group," no benefit can be shown.

*Doryx* is no exception to the well-established Supreme Court and Third Circuit authority above. But neither the district court nor the Third Circuit relied on anecdotal evidence from plaintiffs' documents to determine how price affected the demand for Doryx. Rather, the *Doryx* court clearly describes how a relevant market analysis is done: expert economists do statistical analyses of *market wide data* for the various drugs supposedly included in a market. *See Mylan Pharms. v. Warner Chilcott PLC*, 838 F.3d 421, 437 (3d Cir. 2016)(emphasis added). The *Doryx* court was also clear that it was this sort of statistical analysis that plaintiffs failed to present at summary judgment. *Id.* The *Doryx* plaintiffs lost at summary judgment because they failed to show low cross-elasticity of demand—economic interchangeability— and defendants put on "unrebutted" proof of the positive cross-elasticity. *Id.* The

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                          Page 13

*Doryx* court did note additional "evidence from "health insurers and other managed care providers," but the dispositive holding is based on plaintiffs' failure to carry their burden of direct or indirect market power proof, not the presence of the anecdotal subjective evidence. To read *Doryx* otherwise is to read it into conflict with controlling Supreme Court precedent. *See supra*.

### c.    Defendants' Demand for P&T Materials is Misplaced

Defendants' requests appear designed to support the contention that Lipitor is not the only treatment for hypercholesterolemia and mixed dyslipidemia on the market. If so, this conflates therapeutic (or functional) alternatives with economic substitutes. The issue here is not whether Lipitor has therapeutic and functional alternatives, but whether those alternatives are economic substitutes. Other treatments are not relevant for antitrust purposes unless they constrained the seller of Lipitor from raising the price of its product above a competitive level—i.e., above marginal cost. Defendants gravely misread Magistrate Judge Sullivan's order in the *Loestrin* litigation. Judge Sullivan's order was far narrower than defendants characterize here. She explicitly limited her ruling to "the bull's-eye set – documents that reflect ways in which therapeutically interchangeable oral contraceptives *are also economically interchangeable* in that patients can be steered to the least expensive among an array of therapeutic substitutes." Defs.' Ex. C at 13 (emphasis added). Defendants requests here seek far from a "bull's-eye set." Defendants seek from Retailers documents pertaining to "P&T committees at health plans." Retailer Plaintiffs are not health plans, do not have P&T committees, and do not receive copies of health plans' P&T committee meeting minutes in the regular course of business. As Judge Sullivan explained in the *Loestrin* opinion relied upon by Defendants, "it is axiomatic that Plaintiffs need not produce information that is not in their possession, custody or control; the corollary to the axiom is that a search-term-based query for what is not there is both burdensome and disproportional." *Id.*, at 12 (citation omitted).

To the extent any exist, the types of documents related to PBMs that are likely to be within Retailer Plaintiffs' possession, custody or control are PBM formularies and changes to those formularies. These documents, created and sent by third parties, are most frequently nothing more than lists of pharmaceutical products and do not address ways in which therapeutically interchangeable classes of drugs are also economically interchangeable. In fact, many of these documents are publicly available. Moreover, notwithstanding their irrelevance, Retailer Plaintiffs have agreed to produce responsive formularies if they are located within the files of the Retailers' proposed custodians and collected pursuant to their proposed search

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                    Page 14

terms. In sum, Defendants have rejected a reasonable compromise and not explained how these documents – which are not Retailer Plaintiffs' documents and which are not the P&T committee minutes upon which the Defendants appear to be focused – further the Defendants' purported goal of identifying how other drugs are determined to be economically interchangeable with Lipitor.

## II. Individual Plaintiffs Cannot Use Privilege As a Sword and Shield to Avoid Producing Information Regarding the Reasons They Chose Lipitor and Their Switching Between High Cholesterol Treatments

**Defendants' Statement:**

Several of the proposed end-payor class representatives in *Lipitor* are consumers, who claim that (a) they were injured because they were prescribed Lipitor and overpaid for that product, (b) their physicians did not view other statins as economically or therapeutically substitutable for Lipitor, and (c) they are typical of other alleged absent class members with respect to the reasons they were prescribed Lipitor rather than other statins and the time that they took Lipitor. *See, e.g.*, EPPs' Sec. Am. Compl. at ¶¶ 455, 457-459, 473, 475, 479-480, 507. Defendants are entitled to test these assertions, and as such have served discovery for this purpose. *See* Req. to EPPs 141 ("Documents sufficient to identify the physician or other medical professionals who treated Individual EPPs for the condition that precipitated the prescription of any Cholesterol Treatment."); Exhibit C-2; *In re Asbestos Prods. Liab. Litig.*, 256 F.R.D. 151, 155 n.10 (E.D. Pa. 2009) (permitting disclosure of "physician-patient privileged information when the patient puts his health at issue 'as part of a claim or defense in a lawsuit'"); *Iwanejko v. Cohen & Grigsby, P.C.*, 2005 U.S. Dist. LEXIS 22563, at **3-4 (W.D. Pa. Oct. 5, 2005) (plaintiff waived "patient privilege by placing his . . . medical condition at issue, and therefore cannot use said privilege to shield records which pertain to his mental health and/or medical condition from discovery").

The proposed consumer class representatives, however, have claimed that any such discovery is subject to a doctor-patient privilege.[6] A party cannot use privilege as both a sword and a shield. *In re New England Compounding Pharm., Inc.*, 2013 U.S. Dist. LEXIS 161652, at *52 (D. Mass. Nov. 13, 2013) (indicating that "[i]n

---

[6] Nor would HIPAA apply, as HIPAA is "not intended to disrupt current practice whereby an individual who is a party to a proceeding and has put his or her medical condition at issue will not prevail without consenting to the production of his or her protected health information." 65 Fed. Reg. 82462-01, 82530 (Dec. 28, 2000).

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                          Page 15

most cases, when a patient puts his health at issue in litigation, the privilege is waived"); *In re Asbestos Prods. Liab. Litig.*, 256 F.R.D. at 155 n.10 (same).  The consumer plaintiffs thus cannot simultaneously assert claims based on their medical histories and the decisions of their physicians and refuse to allow discovery into the very same topics, and any privilege assertion regarding these materials should be rejected.  *Id.*  Plaintiffs cite *In re Prograf Antitrust Litig.*, 2013 U.S. Dist. LEXIS 18592 (D. Mass. Feb. 12, 2013), in support of their argument, but *Prograf* was not a reverse payment case as Plaintiffs claim.  Instead, *Prograf* was a *sham citizen petition* case in which the defendants sought medical records to support their own affirmative argument that the citizen petition was consistent with what doctors were telling patients.  *Id.* at **8-9.  Here, by contrast, *Plaintiffs* have put their medical histories at issue, and Defendants merely seek to obtain the same information that Plaintiffs have.  *Prograf*'s reasoning thus does not support Plaintiffs' position.

**Plaintiffs' Statement**

The individual End-Payor Plaintiffs allege that they overpaid for Lipitor and its AB-rated generic equivalents because of Defendants' unlawful conduct.  Defendants' argument that an antitrust claim to recover overcharges entitles them to discovery regarding Plaintiffs' medical history is wrong as a matter of fact and law.

The individual End-Payor Plaintiffs have a statutory or common law right to withhold discovery regarding their medical history in cases such as this, where they have not placed their medical condition at issue.[7]  Defendants erroneously contend that the End-Payors have alleged in their complaint that they are placing their medical condition at issue because: (1) their injuries stem from having been "prescribed Lipitor"; (2) their "physicians did not view other statins as economically or therapeutically substitutable for Lipitor"; and (3) that they are typical of other absent class members because of the "reasons they were prescribed Lipitor." Def. Mot. at [14].[8]  Even a cursory review of the portions of the End-Payor Plaintiffs'

---

[7] *See, e.g.,* Arkansas (Ark. Code Ann. § 23-76-129 and § 16-46-106); Hawaii (Haw. Rev. Stat. § 325-2); Massachusetts (*Alberts v. Devine*, 479 N.E.2d 113, 119-120 (Mass. 1985)); Montana (Mont. Code Ann. § 26-1-805); North Dakota (N.D. Cent. Code § 31-01-06); N.D.R. Ev. Rule 503); Wisconsin (Wis. Stat. Ann. § 905.04).  However, even if no such privilege applies, as explained more fully herein, the requested discovery is irrelevant and should be denied.

[8] Aside from a generalized statement that the individual Plaintiffs have put their medical history at issue, Defendants have failed to articulate any reason why broad discovery regarding the names of the physicians who prescribed the individual

Hon. Douglas E. Arpert, U.S.M.J.

August 17, 2018                                                                 Page 16

Complaint cited by Defendants demonstrates that these paragraphs say nothing about the individual End-Payors' medical conditions or their physicians' decision-making processes. *See, e.g.,* EPPs' Sec. Am. Compl. at ¶¶ 455, 457-459, 473, 475, 479-480 and 507. The product liability and discrimination cases on which Defendants rely are factually inapposite and legally irrelevant.[9] Indeed, the only Court to consider this issue in the context of a similar antitrust pay-for-delay claim agreed with Plaintiffs, holding that "unlike in a medical malpractice or personal injury suit, it is difficult to see how the circumstances of this antitrust case give rise to the conclusion that the consumer plaintiffs have placed their medical condition at issue beyond their tacrolimus prescription drug history….Absent good reason to overcome consumer plaintiffs' statutory privileges, [defendants'] motion must be denied." *In re Prograf Antitrust Litig.*, No. 11-md-02242-RWZ (ECF No. 163) (D. Mass. Feb. 12, 2013).[10] Likewise, here, Defendants are not entitled to the far-reaching discovery they seek, and their motion must be denied.

## III.   Plaintiffs Cannot Avoid Producing Business Information Merely by Labeling It "Downstream" Discovery

**Defendants' Statement**

The parties in this case have had many of the same disputes regarding business information—which Plaintiffs misleadingly call "downstream" information—as they did in *Effexor*, and Defendants thus refer the Court to pages 18-20 of the *Effexor* Joint Letter for a full discussion of this issue. This issue applies to the following Requests in this case: Req. to DPPs 8-10, 35, 37-39, 45-47, 51, 80-83; Req. to Retail. 5, 11, 14-15, 17, 18, 22-23, 25, 28-29, 32-35, 38-39, 42-48, 50-51, 53, 54-56, 58-59,

---

Plaintiffs Lipitor, the conditions they were treating and other prescriptions they may have taken, is relevant or necessary. Nor can they. The question in this case is whether these Plaintiffs would have paid less for their purchases had a generic been available. The reasons they were prescribed Lipitor by their physicians are entirely irrelevant to that analysis.

[9] *In re Asbestos Prods. Liab. Litig.*, 256 F.R.D. 151 (E.D. Pa. 2009) (products liability personal injury case based on exposure to asbestos); *Iwanejko v. Cohen & Grigsby, P.C.*, 2005 U.S. Dist. LEXIS 22563 (W.D. Pa. Oct. 5, 2005) (case alleging discrimination under the Americans with Disabilities Act).

[10] Defendants attempt to distinguish *Prograf* on the basis that it involved a sham citizen petition claim falls flat. Other than circuitously stating that the Plaintiffs here have put their medical condition at issue, Defendants offer no justification for treating the two pharmaceutical antitrust cases differently.

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                    Page 17

76, 79, 82-84, 90, 94-109, 119, 121-124, 127; Req. to EPPs 33, 41, 50-53, 55, 72-73, 107-109; *see also* Exhibit C-3 (providing text of relevant requests).  Many of these requests have nothing to do with downstream discovery, and instead relate to topics such as competition, relevant market, prescribing practices etc.  *Compare Effexor* Joint Letter at 18-19 *with* Req. to DPPs 8, 10; Req. to Retail. 5, 11, 15, 17, 22-23, 25, 28-29, 32-34, 42, 44, 48, 54, 56, 58-59, 76, 79, 109, 119, 122-123, 127; Req. to EPPs 33, 107, 109.  And for the handful of requests that do involve actual pass-on issues, discovery should be permitted for the reasons described in the *Effexor* Joint Letter at 19-20.  Req. to DPPs 9, 35, 37-39, 45-47, 51, 80-83; Req. to Retail. 14, 18, 35, 38-39, 43, 45-47, 50-51, 53, 55, 82-84, 90, 94-108, 121, 124; Req. to EPPs 41, 50-53, 55, 72-73, 108; Req. to EPPs 41, 50-53, 55, 72-73, 108.

**Plaintiffs' Statement**

As Plaintiffs explain in the *Effexor* Joint Letter at 21-24, under the Supreme Court's decisions in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), a direct purchaser is injured to the full extent of the overcharge at the moment of purchase and the defendant is not permitted to introduce evidence that the direct purchaser passed on some of the overcharge to its own customers.  Part of the rationale for this rule was "an unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." *Illinois Brick*, 431 U.S. at 725.

Under the relevant precedent, therefore, "[t]he proper inquiry in 'overcharge' anti-trust cases is not 'why' or 'whether' the cost was passed on to customers farther down stream, but 'if' an overcharge was improperly imposed in the first place." *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-CV-2680 AJN RLE, 2015 WL 4510416, at *2 (S.D.N.Y. July 24, 2015).  Simply put, "events farther down the stream of commerce are irrelevant." *Id.*  at *2.  Although Defendants attempt to characterize their requests otherwise, most of the disputed requests seek information about events farther down the stream of commerce, including information relating to the plaintiffs' sales, profits, marketing and promotion.  *See, e.g.* Retailer Request Nos. 5, 11, 14, 15, 17, 18, 22, 23, 25, 28, 29, 35, 38, 45, 46, 50, 51, 53, 56, 59, 83, 84, 98, 108, & 127.

In the *Effexor* Joint Letter, Plaintiffs set forth the many reasons courts routinely reject arguments such as Defendants' that downstream discovery is relevant on some other ground.  *See, e.g., In re Air Cargo Shipping Servs. Antitrust*

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                    Page 18

*Litig.*, No. 06–MD–1775, 2010 WL 4916723, *2 (E.D.N.Y. Nov. 24, 2010) ("The vast majority of courts that have entertained discovery disputes concerning . . . 'downstream' information have declined to compel plaintiffs to produce discovery about those matters").

## IV.   Plaintiffs Should Be Required to Produce Documents from Assignors, As Well As Documents Regarding the Assignments Themselves

### Defendants' Statement

As in *Effexor*, several of the Plaintiffs here are only asserting the claims of other market participants that have been assigned to them.  As described in the *Effexor* Joint Letter at 24-25, while a plaintiff can assign its claims to a third party, in doing so it also assigns all of the rights and burdens associated with that claim, such that an assignor cannot simply bring its claims through a third party while simultaneously avoiding discovery regarding those claims.  Plaintiffs therefore should produce relevant documents in their possession, custody, and control even if those documents currently reside in the files of their assignors.  If they cannot, as they claim in their response, then their assignments are invalid.  *See id.*

Plaintiffs have also objected to the production of documents regarding the assignments, instead offering to produce *only* the assignment agreements.  Because the legality, scope, and purpose of the assignments are very much at issue (including, for example, whether they were entered into to avoid discovery), Defendants are entitled not only to the assignment agreements but also to documents that might shed light on why the parties entered the agreements and whether they represent the entirety of the parties' agreements on these issues.  *See, e.g.*, *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 289 F.R.D. 41, 52 (E.D.N.Y. 2011) (granting motion to compel documents relating to assignment agreement, finding "Safeco is entitled to receive documents relating to the assigned claims"); *iFreedom Direct Corp. v. First Tenn. Bank Nat'l Ass'n*, 2010 U.S. Dist. LEXIS 65379, at **17-18 (D. Utah June 30, 2010) (requiring production of internal communications relating to the assignment agreement). Plaintiffs thus cannot shield such documents from discovery, and thus should be ordered to produce all documents responsive to Req. to DPPs 96-102 and Req. to Retail. 40, 85-91; *see also* Exhibit C-4 (providing text of requests).

### Plaintiffs' Statement

As Plaintiffs explained in the Joint Letter at 25-26, Plaintiffs do not have possession, custody or control of their assignors' documents, and have no legal right, explicitly or implicitly, to obtain documents from their assignors.

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                  Page 19

As for the assignments, Plaintiffs have agreed to produce the assignments from their assignors. The assignments conclusively and unambiguously establish that the purpose of the agreement was to transfer ownership of an antitrust claim from one party to another according to the enumerated terms. The scope and validity of the transfer is evident from the documents themselves. Thus, any documents concerning the negotiation of the assignments amounts to "parol evidence," and are not relevant. *King Pharm., Inc. v. Teva Pharm. USA, Inc*., 2007 WL 2261547, at *5 (D.N.J. Aug. 3, 2007) ("[T]he Court rejects Teva's invitation to sidestep the parol evidence rule and look beyond the four corners of [the] documents.")

Moreover, the communications surrounding their execution have no bearing on the ultimate resolution of the antitrust claims at issue in this case. In the cases cited by Defendants, the party seeking documents had a contractual interest in the transfer of the assets that were the subject of the document request dispute, and the parties to the transfer were parties in the dispute, neither situation applies here. In *Safeco*, the requested documents related to indemnity agreements between defendants and Safeco that granted Safeco an assignment of defendants' claims, the subject of the litigation; in *iFreedom*, the breach of contract claim between iFreedom and First Tennessee put the assignment of assets and its value at issue in the litigation, and communications regarding the value of the assignment to a third party rendered the assignment negotiations highly relevant. Here, however, defendants were *not* parties to the asset transfer and have *no contractual interest* in the asset transfer. These assignments were made for legitimate business purposes between two private parties, did not include defendants, and defendants had and have no financial or legal interest in the assignment. Defendants request for documents and communications regarding the execution of the assignments should be denied.

## V.   **Plaintiffs Cannot Use Privilege to Shield Facts Relevant to Class Certification or the Filing of the Instant Litigation**

**Defendants' Statement**

As in *Effexor*, Plaintiffs seek to use privilege to shield *facts*—not attorney-client communications—from discovery.  *See* Req. to DPPs 63, 89, 91; Req. to Retail. 58-59, 66-67, 133-134; Req. to EPPs 87, 119-122; Exhibit C-5 (providing request text).  Plaintiffs cannot do so.  *See Effexor* Joint Letter at 26-27.

**Plaintiffs' Statement**

Defendants have made no showing that any facts are being withheld that would render protected work product or communications as their only source.  This

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                Page 20

fact alone justifies denying this demand.  *See Hickman v. Taylor*, 329 U.S. 495, 512 (1947) (finding that a "naked, general demand" is "insufficient to justify discovery").  Moreover, Defendants are seeking discovery of privileged documents, not of mere "facts."  Plaintiffs object to producing documents created in anticipation of this litigation.  Fed. R. Civ. P. 26(b)(3)(A).  The strong rule protecting privileged documents may be overcome only in narrow circumstances not present here.  *See Effexor* Joint Letter at 28-29.

## VI. Plaintiffs May Not Limit the Relevant Time Period to Exclude the Periods Central to the Allegations in the Complaints

**Defendants' Statement**

Although the time periods at issue are different, the issues regarding the relevant time period for Plaintiffs' production are largely similar to the issues addressed at pages 28-29 of the *Effexor* Joint Letter.  Exhibit C-6 provides the text of a few representative requests from each of these categories.

**Relevant product market:** The scope of the relevant market is typically assessed as of the time of the alleged conduct, which here took place as early as 1996, and in particular involves a citizen petition filed with the FDA in 2005 and patent litigation pending from 2003 to 2006.  Plaintiffs claim to have been customers in that market during that time and thus by definition would have relevant documents related to the market by virtue of their participation.  Nonetheless, DPPs and EPPs refuse to produce documents dated before January 1, 2010 and Retailers refuse to produce documents before March 24, 2008.  Plaintiffs should be ordered to produce documents from January 1, 2005 to December 31, 2013 on this issue.

**Litigation-related materials:** As discussed in the *Effexor* Joint Letter at 29, there are certain issues related to the litigation for which Defendants need discovery dating back to at least the beginning of the challenged conduct because (a) they relate to assignments, which may have been made long before this case began, (b) they relate to the development of this case, which may go to class certification, and/or (c) they relate to the allegations in Plaintiffs' complaint.  *See* Req. to DPPs 57-72, 96-102; Req. to Retail. 57-75, 85-91; Req. to EPPs. 79-96.  For this issue, Plaintiffs should produce documents from March 24, 2008 to December 31, 2013.[11]

---

[11] Retailer Plaintiffs have agreed to this time period for litigation-related materials, but should also produce documents beginning in 2005 for relevant market requests and documents through 2017 for class certification and damages purposes.

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                    Page 21

**Class certification and damages:** As in *Effexor*, Defendants agree that class certification and damages-related requests need not extend prior to January 1, 2010. However, the end date of these requests should extend past December 31, 2017 because class certification depends in part on Plaintiffs' current typicality and adequacy as class representatives, as well as the fact that damages are alleged to continue. *See* Req. to DPPs 82-95; Req. to Retail. 92-93; Req. to EPPs 112-125.

**Plaintiffs' Statement**

Plaintiffs have agreed to produce responsive documents at least as far back as January 2010, *eighteen months* before the start of the class period. Defendants demand that Plaintiffs produce documents back to 2005 in some cases – more than six years before the start of the class period. Even if requested discovery is marginally relevant, the court may proscribe discovery if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," Fed. R. Civ. P. 26(b)(2)(C).

Defendants have failed to show how their blunderbuss demands for documents that predate the claims in this case by six years will generate relevant discovery, or why the documents they purport to seek are not merely cumulative of documents Plaintiffs will produce from the period relevant to their claims, or that Defendants may find in their own files. Defendants do not cite a single case supporting the relevance of the documents they seek, and they do not identify any instance in which a Court has required class representatives to produce documents going back so far.

Defendants concede that Plaintiffs need not produce documents pre-dating the beginning of the class period concerning class certification, but insist that it is insufficient for the date range of Plaintiffs' production to end with the commencement of this action. However, Requests concerning subject matters such as the relevant product market, operation of the market at the time of the settlement, litigation-related materials and class certification and damages categories include documents that Plaintiffs object to producing. It is premature to adjudicate time periods before it has been decided whether such documents are subject to production in the first instance.

Respectfully submitted,

*s/Liza M. Walsh*

Liza M. Walsh

Hon. Douglas E. Arpert, U.S.M.J.
August 17, 2018                                                                Page 22

Enclosures
cc:    All Counsel of Record (via ECF & email)

# Exhibit A

**EXHIBIT A**

# COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP

COUNSELLORS AT LAW

PARK 80 WEST - PLAZA ONE 250 PEHLE AVE. SUITE 401 SADDLE BROOK N.J. 07663 201-845-9600 FAX 201-845-9423

General E-mail: clphk@njlawfirm.com
Internet Address: www.njlawfirm.com

PETER S. PEARLMAN, ESQ. Email: psp@njlawfirm.com

June 6, 2018

*Via ECF*

Honorable Lois H. Goodman, U.S.M.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

Re:   *In re Effexor XR Antitrust Litigation*
      **Master Docket No. 11-5479 (PGS/LHG)**

Dear Judge Goodman:

The parties submit this joint letter in accordance with this Court's order of May 14, 2018 [ECF #518] and its May 31, 2018 docket entry [ECF #526].[1]

## I.   Wyeth Should Produce Complete Document Families, Including All Related Email Attachments and Embedded Files

### Plaintiffs' Statement

All parties should produce "complete document families." Teva has agreed to do so; Plaintiffs have as well. Wyeth should be ordered to do likewise. Emails should be produced with all their attachments; Word or PowerPoint documents should be accompanied by any embedded files. This simple proposition is not novel; indeed, it is recognized by the Federal Rules. *See* Fed. R. Civ. P. 26(b)(1) (importance of access to complete document families outweighs potential burden, if any, of proposed truncated search).

An attachment is part of an email communication – the email and attachments are expected to be read together – so all attachments to responsive emails should be included. *See* Fed. R. Civ. P. 34(b)(2)(E)(ii); *Virco Mfg. Corp. v. Hertz Furniture*

---

[1] The plaintiffs are evaluating Wyeth's June 4, 2018 responses and objections to plaintiffs' second request for production of documents, and if necessary will timely bring any unresolved disputes relating thereto to the Court's attention.

EXHIBIT A

*Sys.*, 2014 WL 12591482, at \*5-6 (C.D. Cal. Jan. 21, 2014) ("emails produced in discovery should be accompanied by their attachments" and the failure to do so is, in effect, an improper, unilateral redaction of "portions of documents it otherwise apparently views to be discoverable/relevant/ responsive"); *Nguyen v. Roth & Rau AG*, 2009 WL 10682036, at \*2-3 (D. Md. Jul. 28, 2009) ("e-mails and attachments must be produced together"). Likewise, a spreadsheet embedded in a responsive PowerPoint presentation or Word document is part of the PowerPoint or Word document. The embedded Excel spreadsheet may include the backup calculations upon which a chart in a corresponding PowerPoint is based. Like email attachments, all such embedded files should be produced.

Wyeth proposes to chop up its production, withholding any document that does not itself contain agreed search terms. And it would do so even if the withheld document is expressly referenced by another part of the family, and appears to be relevant based on the description in the other part of the document family that is being produced. For example, Wyeth would produce a cover email without its attachment if the agreed search terms hit the email but not the attachment; Wyeth would also withhold spreadsheet files embedded within a responsive document unless the spreadsheet itself is also hit by a search term. Wyeth's approach denies Plaintiffs relevant discovery and is improper.

Wyeth's claim that production of complete families would be voluminous or burdensome is insufficient. Even if inconvenient, inconvenience to Wyeth does not outweigh the proportional benefit to Plaintiffs from discovery of complete document families. *See Virco Mfg. Corp.*, 2014 WL 12591482, at \*6; *Nguyen*, 2009 WL 10682036, at \*3. Besides, Plaintiffs are not asking for different search parameters to be applied, only for the production of *complete* versions of documents that are returned when Wyeth uses the agreed upon search terms. There *is not* additional search or review burden.

Wyeth's citation to *G.P.P., Inc. v. Guardian Prot. Prods.*, 2016 U.S. Dist. LEXIS 88926, at \*2-3 (E.D. Cal. July 8, 2016) is misleading. There, the term "document family" is not used to describe email attachments or embedded files, but a distinct category of business records (profit and loss statements). In *G.P.P.*, the court held only that "family" documents outside the relevant time restriction need not be produced. Similarly distinguishable is *Han v. Futurewei Techs., Inc.*, 2011 U.S. Dist. LEXIS 104538 (S.D. Cal. Sept. 15, 2011). Instead of considering whether email attachments should be produced, the court held that a producing party did not have to produce full copies of hard drives from personal computers.

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                                      Page 3
June 6, 2018

Wyeth proposes an in-house "methodology" that uses limited searches to isolate some responsive email attachments. It presumes that complete documents families should not be produced. But the presumption should be production of the complete family. *See* Fed. R. Civ. P. 26(b)(1). Under the presumption of full production, Wyeth still can selectively redact. *See* ECF No. 245, ESI protocol, at §D.1.i. Authority cited by Wyeth exemplifies a similar redaction procedure. *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 223 (N.D. Ill. 2013) (allowing redactions based on relevance, but specifically ordering producing party "to review its redacted documents to ensure that the context is clear and produce documents with less redaction if the produced versions are unintelligible"). The least burdensome and only way to ensure that Wyeth's production is complete is for Wyeth to review and produce complete families of documents.

**<u>Wyeth's Statement</u>**

Plaintiffs' request that Wyeth review and produce "complete document families," along with their request that Wyeth search the files of every individual listed in Wyeth's Initial Disclosures, would have the combined effect of more than tripling Wyeth's document review burden, from an already challenging and costly 1 million documents to a completely unreasonable and disproportionate 3.1 million documents. Wyeth could not substantially complete such a review by the August 31, 2018 deadline. And, as shown below, the overwhelming burden to Wyeth would result in no significant additional benefit to Plaintiffs. Plaintiffs' request should be denied.

Numerous courts have held that it is appropriate for a producing party to withhold certain non-responsive documents because the requesting party is not entitled to the discovery of non-relevant information. *See, e.g.*, *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 222 (N.D. Ill. 2013) ("Withholding and redacting documents that are non-responsive to [a party's] document requests is appropriate.") (collecting cases); *Han v. Futurewei Techs., Inc.*, 2011 U.S. Dist. LEXIS 104538, at *13 (S.D. Cal. Sept. 15, 2011) ("A requesting party . . . must rely on the representations of the producing party or its representative that it is producing all responsive, relevant, and non-privileged discovery."). In the context of producing document families, courts have recognized that it is appropriate to assess the responsiveness of each document in a family separately and that it can be proper to withhold non-responsive attachments. *See, e.g.*, *G.P.P., Inc. v. Guardian Prot. Prods.*, 2016 U.S. Dist. LEXIS 88926, at *2-3 (E.D. Cal. July 8, 2016); *In re: Takata Airbag Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS 46206, at *145-46 (S.D. Fla. Mar. 1, 2016). It would be appropriate for Wyeth to withhold non-responsive attachments here.

Honorable Lois H. Goodman, U.S.M.J.                                    Page 4
June 6, 2018

     It is also appropriate for Wyeth to use search terms to identify non-responsive attachments, rather than having to review each such document manually. It is axiomatic that when adopting a search term methodology for identifying potentially responsive documents, the producing party generally will not review documents that do *not* hit on search terms, as the point of search terms is to narrow the universe of what will need to be reviewed, and then produce the documents that are deemed responsive. *See BancPass, Inc. v. Highway Toll Admin., LLC*, 2016 U.S. Dist. LEXIS 96978, at *8 (W.D. Tex. July 26, 2016) (search terms "simplify and limit the scope of production responsive to [document requests]"). Plaintiffs nonetheless complain that Wyeth does not plan to review and produce attachments that do not hit on search terms ("Non-Hit Attachments"), even if they are in a family of documents where another family member hits on a search term, because Wyeth will instead use a search term methodology to identify responsive attachments. According to Plaintiffs, Wyeth's approach will "chop up its document production" and "deny Plaintiffs relevant discovery." These concerns are unfounded.

     Wyeth and its parent company Pfizer have a well-established, search term-based methodology for efficiently identifying, reviewing, and producing responsive documents in large cases such as this one.[2] That methodology begins with running a broad set of search terms, including *all* the terms proposed by Plaintiffs (as amended through the meet-and-confer process). *See* Exhibit D (listing Wyeth's broad, agreed-upon search terms). Wyeth then reviews the documents that hit on a search term to determine whether each document is responsive to Plaintiffs' requests (as amended by Wyeth's objections and the meet-and-confer process), and produces all non-privileged, responsive documents it identifies. And if a search-hit document is an attachment responsive to a document request, Wyeth will also review and produce its parent document, if it is not privileged, regardless of whether the parent itself contains a search term, as parent documents may provide Plaintiffs the context they need to review the corresponding responsive attachments. Any attachments that do not contain search terms, or that contain search terms but are deemed non-responsive after review, will be produced as slipsheets marked "non-responsive." Rather than "chop[ping] up its production," Wyeth will produce non-responsive attachments as slipsheets with their corresponding families, so Plaintiffs will be fully aware of their existence and relation to other documents.

     Wyeth's approach also will not deny Plaintiffs relevant discovery because, as Wyeth has already explained to Plaintiffs, the process includes iterative statistical

---

    [2] Wyeth would be happy to provide a declaration with additional details about this methodology, if the Court would find it useful.

EXHIBIT A

sampling that allows Wyeth to identify responsive attachments that do *not* hit on previously agreed upon search terms, and then to expand search terms to capture those and similar documents. Wyeth has already conducted a statistical sample in this case, concluding that over 90% of the Non-Hit Attachments were *not* responsive to Plaintiffs' requests. Nonetheless, Wyeth broadened its search terms to capture the responsive Non-Hit Attachments in an effort to identify those documents as search hits going forward. Wyeth will continue to sample Non-Hit Attachments and is confident the vast majority of responsive attachments will be produced. Thus, Wyeth's methodology for identifying responsive attachments will be statistically validated, and Wyeth will share the ultimate results with Plaintiffs.

Wyeth does not have unlimited resources for reviewing documents. Nor do the Federal Rules require that every document in a company be reviewed. Proportionality is the goal. Fed. R. Civ. P. 26. Accordingly, the goal of Wyeth's review method is to use Wyeth's resources to find, review, and produce more *responsive* documents in an efficient manner, rather than reviewing hundreds of thousands of attachments that do not contain the parties' extremely broad agreed-upon search terms and are thus highly unlikely to be relevant. On the other hand, if Wyeth had to take on Plaintiffs' suggested additional review burden, it would have to narrow its search terms so that the total universe of documents to be reviewed would remain proportional to the needs of this case. The result would be that Wyeth would locate fewer responsive documents and instead produce more non-responsive documents.

The burden Plaintiffs seek to impose on Wyeth is not proportional to the needs of this case: a manual review of Non-Hit Attachments would add 678,000 documents to the over one million documents Wyeth is currently reviewing—and each of these 678,000 documents would have to be reviewed for responsiveness, privilege, patient information and/or personal information prior to production. Additionally, the privilege logs in this case, which will be substantial because many of the custodians are attorneys, would grow exponentially as Wyeth would be required to log non-responsive documents if they were withheld as privileged. Weighed against this significant burden is only Plaintiffs' speculation that in some cases Wyeth's methodology *might* fail to identify a responsive attachment—notwithstanding the statistical sampling described above, and its success in other cases in identifying substantially all responsive attachments. As Wyeth has explained, Wyeth is taking reasonable steps to try to mitigate against this very possibility, and it will continue to discuss the results of its statistical sampling with Plaintiffs. Plaintiffs' speculation therefore cannot outweigh the staggering costs that would be involved in their request.

**EXHIBIT A**

Honorable Lois H. Goodman, U.S.M.J.                                    Page 6
June 6, 2018

     Finally, Wyeth respectfully submits that it is unnecessary to approach this issue in the abstract, given the significant burdens a blanket rule would impose.  After Plaintiffs review Wyeth's production, if they feel that Wyeth has incorrectly withheld specific attachments, Wyeth would be happy to meet and confer with Plaintiffs in the context of the specific documents.

## II.    Wyeth Should Search the Files of Wyeth Employees that Wyeth Identified in its Rule 26 Initial Disclosures

### <u>Plaintiffs' Statement</u>

     Wyeth should also be directed to search the files of all current and former Wyeth employees that Wyeth identified in its Initial Disclosures under Fed. R. Civ. P. 26(a)(1)(A) as "likely to have discoverable information that Wyeth may use to support its defenses."  The importance of searching these files is undisputed—Wyeth affirmatively asserts that these employees possess relevant information.

     Wyeth incorrectly claims that it is *Plaintiffs'* burden to show why custodians are necessary.  But Wyeth cannot identify Wyeth employees with relevant information that "Wyeth may use to support its defenses," who will likely be deposed and may be called at trial, and then refuse to search their files.  Plaintiffs must be permitted to discover, prior to trial, information that is relevant to the claims and defenses in this litigation.

     Wyeth has not shown any burden from searching these employees' files, let alone a burden that would outweigh the clear, undisputed benefit of searching the files.  Wyeth only claims that it might be forced to review duplicate documents in the files of multiple custodians.  But the parties have already agreed that multiple copies of the same document need not be produced, and Wyeth can automatically sort duplicate documents.  Section C.4 of the Agreement Establishing Protocol for Discovery of Electronically Stored Information provides that "each Party may produce only a single copy of a responsive document or record… [t]he Producing Party can [] de-duplicate documents within custodians, or across custodians."  *See* ECF No. 245, at 6-7.  In other words, Wyeth need not produce multiple copies of the same document, and so need not review the multiple copies.

### <u>Wyeth's Statement</u>

     Plaintiffs ask the Court to order Wyeth to collect and produce documents from every current and former Wyeth employee listed in Wyeth's Rule 26 Initial Disclosures.  But the standards for identifying individuals in Initial Disclosures is not

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                                    Page 7
June 6, 2018

the same as the standard for determining who should be a custodian. Instead, on the one hand, Rule 26 *requires* a party to identify in its Initial Disclosures, "each individual likely to have discoverable information . . . that the disclosing party *may* use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added). By contrast, Rule 26(b)(1) requires that discovery be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

Consistent with these differing standards, Wyeth took a comprehensive approach to its Initial Disclosures, with the expectation that Plaintiffs would work with Wyeth in good faith to agree on a subset of individuals who would make appropriate custodians. And, initially, that is exactly what happened, before Plaintiffs abruptly changed course and demanded that Wyeth produce documents from *everyone* identified in its Disclosures—an additional 31 individuals.[3]

Once Wyeth has adopted a reasonable search methodology, including reasonable custodians, it becomes *Plaintiffs'* burden to demonstrate that any additional requested custodians have "*unique*, responsive ESI that Defendants improperly failed to capture through their search methodology." *Enslin v. Coca-Cola Co.*, 2016 WL 7042206, at *4 (E.D. Pa. June 8, 2016) (emphasis added); *see also Forth Worth Employees Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013) ("[P]laintiffs must demonstrate that the additional requested custodians would provide *unique* relevant information not already obtained."). This burden is not met by simply asserting without support that additional custodians possess relevant information. *Enslin*, 2016 WL 7042206, at *2. Yet, Plaintiffs never named in the meet-and-confer process, and still fail to name in their motion, a single individual who they think would have unique information, much less explain why that individual's documents adds value that is proportional to the needs of the case and the burden they are seeking to impose. Indeed, as Wyeth has repeatedly told Plaintiffs,

---

[3] Wyeth initially proposed 20 custodians, but agreed to add seven more at Plaintiffs' request. Plaintiffs' counsel responded by saying, "If the defendants are representing that the current universe of custodians is sufficient to identify all such documents, we have to at some level take you at your word on that for now." Two days later, however, Plaintiffs retracted this agreement and demanded Wyeth add all individuals identified in its Rule 26 Disclosures. In the spirit of compromise, Wyeth agreed to add seven more custodians (for a total of 34).

EXHIBIT A

based on Wyeth's current knowledge it is unlikely the other individuals listed in Wyeth's Initial Disclosures would have unique, material information not possessed by the custodians that Wyeth has already agreed to search.

Finally, Plaintiffs' suggestion that they need discovery from all the individuals listed in Wyeth's Initial Disclosures because Wyeth *may* rely on these individuals in presenting its defense is not persuasive. The individuals that Wyeth has proposed as custodians are those most likely to be the individuals on whom Wyeth will rely. And, if Wyeth does decide to rely on any other individual, Wyeth will produce that individual's documents.

## III. Plaintiffs Should Produce Documents and Data Regarding Products That Compete with Effexor XR and Venlafaxine

### Defendants' Statement

Effexor XR (venlafaxine) competes with many other antidepressants, including immediate release Effexor ("Effexor IR") and at least 38 others. In this crowded market, a subcategory of 12 "Second Generation Antidepressants" are most likely to compete with Effexor XR.[4] Defendants' own documents demonstrate that Effexor XR competed with—and had a relatively low market share when compared to—a number of other antidepressants. *See* Exh. C-1 to C-3. And at least one Plaintiff has acknowledged that "[l]ess expensive therapeutic alternatives to Effexor XR include [SSRIs and SNRIs] – such as instant release venlafaxine (Effexor)" and that Effexor faced "substitution competition." Am. Compl. at ¶¶ 86-87, *Am. Fed'n of State, Cty. & Mun. Employees v. Pfizer, Inc.*, No. 1:12-cv-02237 (S.D.N.Y. Oct. 16, 2012), Dkt. No. 18 (Exh. B-1)

Defendants therefore seek documents relevant to the scope of the relevant market,[5] a critical issue in this case, as in virtually all antitrust cases. *See Mylan*

---

[4] 1) Celexa (citalopram); 2) Cymbalta (duloxetine); 3) Desyrel (trazodone); 4) Effexor (venlafaxine); 5) Lexapro (escitalopram); 6) Serzone (nefazodone); 7) Paxil (paroxetine); 8) Pristiq (desvenlafaxine); 9) Prozac (fluoxetine); 10) Remeron (mirtazapine); 11) Wellbutrin (bupropion); and 12) Zoloft (sertraline).

[5] The Requests at issue, as described in Exhibit A-1, are: Req. to DPPs 16-30, 33-35, 38-62, 73, 79-87, 90, 112, 118; Req. to Retailers 2, 11-12, 16-36, 38-62, 73, 79-87, 97-112, 114-17, 119, 123-27, 130, 136; Req. to EPPs 5, 11-43, 45-78, 81-83, 86, 97, 103-12, 135, 141, 148-55.

EXHIBIT A

*Pharms. v. Warner Chilcott PLC* ("*Doryx II*"), 838 F.3d 421, 433, 435 (3d Cir. 2016).[6] In the spirit of compromise, Defendants are, for now, willing to accept documents relating only to the Second Generation Antidepressants, rather than 38 antidepressants. In response, Plaintiffs made an arbitrary offer to search for documents concerning three (later five) drugs of Defendants' choice—a proposal bearing no connection to the facts, unlike Defendants' proposal to limit the Requests to the drugs most likely to compete with Effexor.

### A.     Discovery into the Relevant Market Is Relevant and in Some Cases Has Been Found to Be Dispositive on Summary Judgment

The discovery that Defendants seek is relevant—and may be dispositive—under Third Circuit law. In *Doryx II*, the Third Circuit emphasized that "uncontradicted evidence" of the interchangeability of antibiotics was fatal to the plaintiff's attempt to define a market limited to a single antibiotic, and that within the broader market, the defendant lacked monopoly power. 838 F.3d at 436. *Doryx II* made clear that documents from market participants, including purchasers, retailers, and end-payors (like Plaintiffs), are critical to defining the relevant market and evaluating monopoly power. *See id.* Indeed, the district court in *Doryx* relied heavily on the exact types of documents Defendants seek here: promotion/marketing documents, labeling, drug substitutability evidence, physicians' preference evidence, and drug pricing, among others. *See Mylan Pharms. v. Warner Chilcott PLC* ("*Doryx I*"), 2015 U.S. Dist. LEXIS 50026, at *23-29 (E.D. Pa. Apr. 16, 2015). And similar discovery was ordered in another case in this Circuit involving the same market for antidepressants at issue here. In *In re Wellbutrin XL Antitrust Litigation*, the court required plaintiffs to produce documents regarding *all* antidepressants that might compete with Wellbutrin (including Effexor XR). Order at 2, No. 08-cv-02431 (E.D. Pa. Mar. 12, 2010), Dkt. No. 175 (Exh. B-2); *see also In re Niaspan Antitrust Litig.*, 2018 U.S. Dist. LEXIS 55298, at *2 (E.D. Pa. Mar. 20, 2018) (ordering discovery on additional products in market).

---

[6] Plaintiffs seek to distinguish *Doryx II* by arguing that it was brought under Sherman Act Section 2. But Plaintiffs alleged Section 1 *and* Section 2 claims here. This case is therefore unlike *In re Aggrenox Antitrust Litigation*, 199 F. Supp. 3d 662 (D. Conn. 2016), which only involved Section 1. Moreover, at least one court in this Circuit has applied *Doryx II* to the same type of Section 1 claims at issue here, which also require defining a relevant market. *See In re Niaspan Antitrust Litig.*, 2018 U.S. Dist. LEXIS 55298, at *2 (E.D. Pa. Mar. 20, 2018).

Honorable Lois H. Goodman, U.S.M.J.　　　　　　　　　　　　　　Page 10
June 6, 2018

　　　In response, Plaintiffs cite district court decisions from other circuits, but these do not help Plaintiffs. *In re Loestrin 24 Fe Antitrust Litigation* held that the same "bull's-eye set" of discovery Defendants seek here was appropriate for 10 competing drugs unless the plaintiffs conceded disputed issues such as therapeutic interchangeability (which the plaintiffs did not do). 2017 U.S. Dist. LEXIS 38558, at *25 (D.R.I. Mar. 15, 2017). *In re Solodyn Antitrust Litigation* involved a request to expand discovery after the plaintiffs' production was already well-underway, while here Plaintiffs have not yet even agreed to search terms. 2016 U.S. Dist. LEXIS 162361, at *22 (D. Mass. Sept. 19, 2016). And, *In re Asacol Antitrust Litigation*, No. 15-cv-12730, ECF No. 257, at *4 (D. Mass. Jan. 3, 2017) (Appx. 4), and *Aggrenox*, 199 F. Supp. 3d 662, are not persuasive, particularly given the Third Circuit cases that allow this type of discovery. Indeed, even one of the cases cited by Plaintiffs rejected *Aggrenox* as an outlier case that improperly cut off discovery. *See Loestrin*, 2017 U.S. Dist. LEXIS 38558, at *19-21.

　　　While Plaintiffs argue that they are not obligated to produce the requested discovery because only price data is relevant to defining the market, the Third Circuit has rejected this proposition, holding that "[t]o determine if two products are in the same market, we ask if they are readily substitutable for one another, an inquiry that requires us to assess the reasonable interchangeability of use between a product and its substitute." *Doryx II*, 838 F.3d at 435. "The term '[i]nterchangeability implies that one product is roughly equivalent to another for the use to which it is put.' It also means that 'while there might be some degree of preference for … one [product] over the other, either would work effectively.'" *Id.* at 436 (citation omitted). Function and product qualities, *not only* price and cross-elasticity of demand, are relevant.[7]

　　　Plaintiffs also argue that only documents directly *comparing* an antidepressant to Effexor XR (which in Plaintiffs' view means that the document contains the word "Effexor") will be relevant to interchangeability. But in fact many documents will be relevant because they do *not* include the word "Effexor." In *Doryx,* the court found particularly important the fact that Doryx had been *replaced* on a formulary by other drugs, which demonstrated that Doryx and these other drugs were interchangeable. *Doryx I*, 2015 U.S. Dist. LEXIS 50026, at *25. If Effexor XR was not listed on a

---

[7] *See also Graco, Inc. v. PMC Global, Inc.*, 2012 U.S. Dist. LEXIS 188865, at *24-26 (D.N.J. Mar. 6, 2012) (Sheridan, J.) (in market analysis, various spray foam equipment products could "be distinguished . . . in terms of quality and function"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("product market [is] determined by the reasonable interchangeability of use," among other things).

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                                    Page 11
June 6, 2018

formulary because another antidepressant was preferred, that would be relevant and persuasive precisely because the word "Effexor" did *not* appear. Indeed, Defendants have identified a publicly-available document by Plaintiff Rite Aid that lists antidepressants for which Rite Aid offers discounts, and does not include Effexor XR.[8] Plaintiffs are certain to have additional such documents, and Defendants are entitled to review them.

   Plaintiffs also have refused to produce purchase and sales data regarding antidepressants, which is necessary even under their improperly limited method for defining a market solely by prices. *See, e.g.*, Req. to DPPs 56-57, 60; Req. to Retailers 56-57, 60; Req. to EPPs 83. Plaintiffs argue that Defendants do not need Plaintiffs' data because Defendants can reconstruct the prices through third party provider data ("IMS" data). However, pricing in the chain of pharmaceutical distribution is complex, with the ultimate price paid at each level of the chain dependent on not just the initial price paid but also credits, rebates, discounts, adjustments, chargebacks, coupons, and other pricing mechanisms that alter the ultimate price. *See, e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87, 107 (D. Mass 2008) ("drug pricing" is a "difficult area" with many "complexities"). While IMS data is a component in the analysis, it omits several price adjustments, such as coupons, and must be considered in light of the *actual* prices paid. Thus, Defendants need Plaintiffs' data to understand how prices *really* moved in response to product introductions—the very price-based analysis Plaintiffs say should be done here—*after* all adjustments.[9]

## B.    Plaintiffs Have Not Tried to Demonstrate a Substantial Burden

   Because the material requested by Defendants is critical to the case, only a substantial burden would justify curbing discovery. *Niaspan*, 2018 U.S. Dist. LEXIS 55298, at *2 (importance of discovery to market definition outweighed burden). Accordingly, Plaintiffs must make an actual showing of burden. *See P.V. v. Sch. Dist.*, 2012 U.S. Dist. LEXIS 27129, at *8 n.2 (E.D. Pa. Mar. 1, 2012). Yet Plaintiffs admit they have not even tested any search terms to assess the burden of the discovery sought. Instead, Plaintiffs simply assert that they are "veteran[s]" with a lot of

_____

[8]        https://www.riteaid.com/shop/info/pharmacy/prescription-savings/rite-aid-prescription-savings-program/directory-of-generic-medications.

[9] Plaintiffs suggest that Defendants must provide an explanation from an economic expert as to the relevance of this discovery in order to obtain such discovery. That is not correct. Third Circuit law is clear on the relevance of this discovery. And, it is premature to require expert disclosures at this stage.

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                        Page 12
June 6, 2018

experience, and the Court should therefore trust them that the more search terms a party runs, the more documents the party will need to review. Of course that is true, but it misses the point. Under Rule 26, the relevant question is proportionality. Plaintiffs' choice not to even try to demonstrate burden and to rely on their "experience" instead is not a substitute for the showing required by the Rules that the requested discovery is not proportional to the needs of *this* case.

In fact, courts consistently require plaintiffs to produce information regarding at least 10-12 products in these types of cases. *See, e.g.*, Order at 10-11, *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-md-2472 (D.R.I. Mar. 15, 2017), Dkt. No. 282 (Exh. B-3) (discovery ordered on ten additional drugs and generic equivalents); Order at 2, *Mylan Pharms. v. Warner Chilcott PLC*, No. 12-cv-3824 (E.D. Pa. Nov. 26, 2012), Dkt. No. 118 (Exh. B-4) (discovery ordered on nine additional drugs on top of three agreed to by plaintiffs). Indeed, in *Wellbutrin*, plaintiffs had to produce documents relating to virtually *all* antidepressants—including Effexor XR—because such discovery might show "that the scope of the market is broader than what plaintiffs allege." Order at 2, No. 08-cv-02431 (E.D. Pa. Mar. 12, 2010), Dkt. No. 175 (Exh. B-2). Moreover, in that case, Rochester Drug—one of the plaintiffs here—*offered* to "produce transaction price data from its database, showing the prices at which it sells approximately 36 other antidepressants." 268 F.R.D. 539, 544 (E.D. Pa. 2010). Plaintiffs cannot claim burden here with respect to *twelve* antidepressants in light of this precedent.

## Plaintiffs' Statement

Plaintiffs have offered to run eleven broad search terms. These include the name of brand and generic versions of Effexor, the brand and generic names of five additional products of Defendants' choosing, and a string of connected terms generally relating to "relevant market issues." Running these searches imposes a far greater burden than Plaintiffs have taken on in any other generic delay antitrust case (most involve two search terms). These eleven searches will retrieve – and Plaintiffs will produce – documents that compare Effexor to other drugs.

Yet Defendants ask the Court to require Plaintiffs to search for other documents that *do not* mention Effexor or venlafaxine. Defendants contend that these other drug documents will show therapeutic substitutability and help define a relevant market. But courts across the country routinely *deny* efforts to compel purchasers to produce additional documents for this purpose:

- In *Aggrenox*, the district court limited document discovery to branded Aggrenox and its generic, explaining that the broader "therapeutic market" had

EXHIBIT A

no bearing on any issue in the case; the Second Circuit denied the defendants 1292(b) petition. *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4203387, at *6 (D. Conn. Aug. 8, 2016) ("*Aggrenox*") *per app. denied*, *In re Aggrenox Antitrust Litig.,* No. 16-2864 [ECF No. 77] (2d Cir. Jan. 9, 2017) (Appx. 1).

- In *Asacol*, the district court denied the defendants' motion to compel discovery on nine other drugs, holding that the materials sought were cumulative of information more easily available from other sources and "will not assist the defendants in proving market share 'in any meaningful way' and would not 'provide much other than anecdotal evidence.'" *In re Asacol Antitrust Litig.*, No. 15-cv-12730 [ECF No. 257, at *4] (D. Mass. Jan. 3, 2017) ("*Asacol*") (Appx. 4).

- In *Solodyn*, the court found discovery of other drug information irrelevant, and denied it "in light of the likely additional burden and duplication of effort such an undertaking would require." *In re Solodyn Antitrust Litig.*, 2016 WL 6897809, at *1 (D. Mass. Sept. 19, 2016) ("*Solodyn*").

- In *Loestrin*, the court denied broad discovery of unrelated drug terms, holding instead that discovery must be limited to a "bulls'-eye set" of documents "tending to show documents that reflect ways in which therapeutically interchangeable oral contraceptives are also economically interchangeable". *In re Loestrin 24 Fe Antitrust Litigation*, 2017 WL 1491911 (D.R.I. Mar. 15, 2017) ("*Loestrin*").

Each of these courts recognized that a plaintiff's documents and data, regardless of their place in the distribution chain, are neither necessary nor useful for describing the relevant market.

## A.     Purchasers' Documents Will Not Show or Rebut Market Power

The Supreme Court has defined market power as "the ability to raise prices above those that would be charged in a competitive market," *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984). Where direct evidence of market power, *i.e.*, evidence that a defendant has set supracompetitive prices or excluded competition, is available, a plaintiff need not define the relevant market. Moreover, the Supreme Court's *Actavis* decision holds that a "large reverse payment," standing alone, is "a strong indication of market power" possessed by a brand manufacturer. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 157 (2013). Plaintiffs allege that direct evidence exists to show that Wyeth agreed to pay competitor Teva hundreds of millions of

EXHIBIT A

dollars to assist in delaying the entry of a cheaper generic version of Effexor, which would, "tend to eliminate the need formally to define a relevant market." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013).

If the jury concludes that the direct evidence *does* establish market power, then circumstantial evidence of a broader therapeutic market would not alter that conclusion. *See Aggrenox*, 2016 WL 4203387, at *5 (in undertaking the burden to prove competitive harms directly, plaintiffs "may succeed or fail, but if they succeed, a showing by defendants of competition in a broader market . . . does not eliminate the competitive harm and therefore provides no defense to liability").

## B.      The Documents Defendants Seek Cannot Help their Defense

This case is about Effexor and its AB-rated generic equivalents, not the therapeutic class of antidepressants generally.  There is no dispute that drugs other than Effexor treat depression, and therefore no reason for Plaintiffs to produce documents on every antidepressant to establish this.  Here, Plaintiffs will define the relevant market by showing that, in contrast to generic equivalents, the existence of such therapeutic alternatives does not constrain Wyeth's ability to charge supracompetitive prices without losing sales.  It is *economic* interchangeability, not mere therapeutic similarity, that governs a relevant market analysis. *See, e.g., In re Nexium,* 968 F. Supp. 2d at 387-88 ([T]he reasonable interchangeability of a set of products is not dependent on the mere similarity of their forms or functions; instead, such limits are drawn according to the cross-elasticity of demand.") (internal quote omitted); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc*., 386 F.3d 485, 496-99 (2d Cir. 2004) (relevant market limited to *generic* versions of warfarin sodium, excluding other blood thinners and even chemically-identical branded version of warfarin sodium); *La. Wholesale Drug Co., Inc. v. Sanofi-Aventis*, 2008 WL 169362, at *7 (S.D.N.Y. Jan. 18, 2008) (product market limited to branded and generic versions of rheumatoid arthritis drug Arava).

Controlling law in this Circuit recognizes that only products that exhibit substantial cross-price elasticity of demand with Effexor are to be included in the relevant product market. *See, e.g., SmithKline Corp. v. Eli Lilly & Co*., 575 F.2d 1056, 1063 (3d Cir. 1978) (despite similar uses, other antibiotics not in the same product market with cephalosporins, because other antibiotics did not exhibit sufficient cross-price elasticity of demand with cephalosporins); *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 437-38 & n.6 (3d Cir. 1997) (cross-price elasticity of demand defines a relevant market).  *See also Graco Inc. v. PMC Glob., Inc*., 2012 WL 762448, at *8 (D.N.J. Feb. 15, 2012) (Sheridan, J.) (relying on cross-elasticity

Honorable Lois H. Goodman, U.S.M.J.                                    Page 15
June 6, 2018

evidence and ruling that relevant market must be "defined by cross-elasticity of demand.").

In *Aggrenox*, the court limited discovery to branded Aggrenox and its generic. The court opined that, as a practical matter, the only 'relevant' market would be the market in which the challenged settlement agreement acted as an anticompetitive constraint. *Aggrenox*, 2016 WL 4203387, at *5; *id.* at *4 (citing IIB Areeda & Hovenkamp, Antitrust Law, ¶ 507 (3rd ed. 2007) (substitutability with other drugs shows a lack of market power only if it "effectively limit(s) the price . . . to the competitive level or something slightly above")). Thus, drugs that merely treat the same or similar ailments but do *not* constrain the competitive price of the branded drug at issue are necessarily *outside* the scope of the relevant product market. The *Aggrenox* court also held that, to the extent other drugs constrained Aggrenox pricing, the effect of that constraint would already be "priced in," *i.e.* apparent in the actual price of the brand drug at issue, making sales and pricing data about other drugs "redundant." *Id.* at *4.

Further, the notion that one branded or generic antidepressant can "substitute" for another is misleading. Neither pharmacists nor patients have the power to switch from one drug to another; physicians write prescriptions for specific drugs, so substitution is limited solely to the brand product or its generic. Even so, if a document mentions substitutability of Effexor and another drug, it will be produced.[10]

Most courts facing discovery motions on other drugs have denied them. The Defendants ignore these examples, placing all their eggs in the *Doryx* basket. But there, the *Doryx* plaintiff (a generic drug company, not a purchaser) failed to make "a serious effort to present direct evidence of Defendants' monopoly power." *Mylan Pharm. Inc. v. Warner Chilcott plc*, 838 F.3d 421, 434 (3d Cir. 2016). Conversely, here, the Plaintiffs will present direct evidence of monopoly power. Moreover, in *Doryx*, Warner Chilcott's relevant market experts never even used purchasers' data.

---

[10] Defendants claim that they will rely on "formularies" to show competition among antidepressants, but fail to say that *direct purchaser plaintiffs do not create formularies*. Formularies are typically created by pharmaceutical benefit managers and health plans; end-payor plaintiffs have already committed to producing their formularies. Further, formularies often can be obtained from public sources. The Rite Aid drug list to which Defendants cite is not a formulary, but a list of generic drugs in broad categories such as "Mental Health Drugs," a category that includes products used to treat a range of conditions such as anxiety, psychosis, bipolar disorder and Parkinson's.

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                                    Page 16
June 6, 2018

And *Doryx* did not involve a reverse payment, which as the Supreme Court ruled, is itself evidence of market power. Instead, Warner Chilcott and its expert relied on market-wide consumer data. *See Mylan Pharm. Inc. v. Warner Chilcott plc*, 2015 WL 1736957, at *10 (E.D. Pa. Apr. 16, 2015) (to prove cross-elasticity of demand, defendants produced *unrebutted* evidence of consumer switching based on an increase in the price of Doryx), *aff'd* 838 F.3d 421, 437 (defendants offered unrebutted expert testimony based on statistical analysis of consumer data). Purchaser documents were not used in *Wellbutrin XL either* for the purposes of analyzing a relevant market. *In re Wellbutrin XL Antitrust Litig.*, 268 F.R.D. 539, 544 & n.2 (E.D. Pa. 2010). Better sources of information exist.

### C.    Plaintiffs' Data Cannot Help Defendants

Defendants claim they will use Plaintiffs' purchase and sales data to "reconstruct prices paid" for Effexor and dozens of other antidepressants throughout the distribution chain. Defendants appear to propose to trace individual sales of Effexor (and other drugs) from manufacturer, to wholesaler, to retailer, to consumer (and third-party payor). Defendants do not offer an expert to explain why or how such a project would be performed. And Defendants cannot cite a single pharmaceutical antitrust case in which purchaser data was used to analyze the relevant market. As the court warned in *Arava*:

> *[I]f* defendant gives me an expert affidavit explaining how the expert plans to use this and why this is a better source than the national data, et cetera, *then* I will consider giving the data over …. Assuming that the testifying expert is willing to be on the hook for that, I would reconsider and *I could grant the information if, and only if, if the expert . . . testifies that she needs it to do a market share analysis or a market definitional analysis.*[11]

Furthermore, Defendants acknowledge that a more convenient, more complete, and easily accessible data sets exist. IMS Health is the leading provider of prescription drug data to the pharmaceutical industry. IMS's data summarizes sales and prices at wholesale and at retail. The prices that are calculated from IMS data reflect the market activity of all entities making use of all formularies. These data are used extensively by industry, government, academia, and litigation. *See In re Neurontin Mktg. & Sales Practices Litig.*, 2011 WL 3852254, at *32 (D. Mass. Aug.

---

[11] Hearing Tr. at 3, *La. Wholesale Drug Co., Inc. v. Sanofi-Aventis*, (S.D.N.Y. Mar. 4, 2008) (emphasis added) (Appx. 6).

EXHIBIT A

31, 2011) ("To perform her analysis, Dr. Rosenthal used 'gold standard' national data on Neurontin and other anti-epileptic drugs from IMS Health and Verispan."). The parties and their experts invariably will do the same here.

### D.    The Production Sought Would be Unduly Burdensome

Rule 26(b)(1) instructs parties, in construing relevance and proportionality, to consider "whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*. In recently amending the Rules to expressly incorporate this standard, the drafters did so "to encourage judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering the production of relevant information." *See Henry v. Morgan's Hotel Grp., Inc.,* 2016 WL 303114, at *3 (S.D.N.Y. Jan. 25, 2016) (internal quotes omitted).

Each named Plaintiff is a veteran of other pharmaceutical antitrust cases. Plaintiffs know from experience that as defendants' drug list grows, the burden of searching documents for unrelated products grows proportionately. Again, Defendants' proposed search would be for documents that *do not mention* Effexor or venlafaxine. In other cases, many of the same plaintiffs here have substantiated the burdens involved in such searching with detailed declarations. Some of defense counsel have been in those cases, too. While Plaintiffs have not burdened this record with additional paper, Plaintiffs are prepared to submit the same kinds of client and expert affidavits here.

The burden of producing documents through Defendants' other drug discovery demands extends well-beyond the parties. Already, the Defendants have served 16 subpoenas on non-party drug manufacturers, retailers, third-party payers, and PBMs demanding "information, analyses, studies, projections, investigations, or reports" concerning **72** "prescribed or over the counter ('OTC') . . . branded or generic [drugs] for the treatment of depression, general anxiety disorder, social anxiety disorder, panic attacks, and/or any other treatment." *See, e.g.,* Subpoena to Optum Rx, Inc. dated May 25, 2018 (Appx. 5). The Defendants' disproportionate discovery demands will needlessly burden the parties, non-parties, the record, and the Court.

EXHIBIT A

## IV. Plaintiffs Cannot Avoid Producing Business Information Merely by Labeling It "Downstream" Discovery

### Defendants' Statement

Defendants seek relevant business documents, such as documents regarding discussions of competition between different antidepressants and documents regarding the creation of formularies—information that is discoverable in virtually all antitrust cases.[12]  Plaintiffs seek to curb such discovery by erroneously labeling it as "downstream discovery."  There is a fundamental disconnect, however, between what the term "downstream discovery" actually refers to and the way in which Plaintiffs use that term here.  Under *Hanover Shoe*, Defendants cannot raise as a defense to a *federal* direct purchaser antitrust claim that the purchaser "passed on" their damages to customers by raising prices, though such defenses apply to indirect purchaser claims asserted under state law.[13]  Certain discovery regarding prices charged to a plaintiff's customers could therefore, in limited cases, be relevant *exclusively* to a foreclosed pass-on defense under federal law, and thus would not be relevant if only federal antitrust claims were at issue.  That is what the phrase "downstream discovery" typically means—discovery relevant solely to a pass-on defense which is not available under federal law.  But Plaintiffs seek to preclude discovery into all documents even remotely involving their customers, even where they are not related to a federal pass-on defense.

For example, Plaintiffs have refused to produce documents regarding: (1) organizational structure (DPP Resp. 1-2; Retailer Resp. 1-2; EPP Resp. 1-2), (2) competition among antidepressants (*e.g.*, DPP Resp. 33, 85; Retailer Resp. 5, 12, 48, 85), (3) formularies, which *Doryx* recognized as highly material to the relevant market

---

[12] The Requests at issue, as described in Exhibit A-2, are: Req. to DPPs 1-2, 8, 10, 13, 15, 16, 18-19, 23, 25, 33-35, 38-46, 49, 51-54, 57-59, 61, 73, 79-90, 101, 108, 112; Req. to Retail. 1-3, 5, 9-16, 18-20, 22-23, 25-28, 30-35, 38-41, 43-45, 48-49, 51-55, 57-59, 61-62, 65, 73, 79-87, 93-94, 97-117, 119-22, 124-27, 130; Req. to EPPs 47-48, 57-60, 62, 74, 79-80, 113-15, 117.

[13] Plaintiffs cite *In re K-Dur Antitrust Litigation*, but it involved only *federal* claims. 686 F.3d 197 (3d Cir. 2012); *see also In re Namenda Direct Purchaser Antitrust Litig.*, 2017 U.S. Dist. LEXIS 95796 (S.D.N.Y. Jun. 21, 2017) (same).  And *In re Niaspan Antitrust Litigation* simply noted that the "parties did not brief" whether state antitrust laws allowed a pass-on defense; here, that issue *has* been briefed. 2015 U.S. Dist. LEXIS 92534, at *5-7 (E.D. Pa. July 9, 2015).

EXHIBIT A

definition (*e.g.*, DPP Resp. 38; Retailer Resp. 38), (4) doctors' prescribing practices, which are relevant to the definition of the relevant market (*e.g.*, DPP Resp. 27, 28, 30; Retailer Resp. 20-21, 27, 30, 106; EPP Resp. 27-28, 30), (5) Plaintiffs' allegations in this case, including documents related to the alleged "nausea fraud" (*e.g.*, DPP Resp. 73; Retailer Resp. 65, 73; EPP Resp. 88-89), (6) Plaintiffs' adequacy to serve as class representatives (*e.g.*, DPP Resp. 44-45, 51-52, 86-90; Retailer Resp. 44-45, 51-52, 86-87; EPP Resp. 60, 110-111), (7) Plaintiffs' plan structure (for those Plaintiffs that are health plans) (*e.g.*, EPP Resp. 48-49, 57, 59-60, 62, 73, 113-17), and (8) alleged damages (*e.g.*, DPP Resp. 101-102; Retailer Resp. 124-125; EPP Resp. 118-19, 130-132). Plaintiffs claim that because these documents tangentially relate to their customers, they need not produce them. But, that is not what "downstream discovery" means.

Though Plaintiffs have objected to roughly *half* of Defendants' Requests on the basis of "downstream discovery," the only Requests that may relate to pass-on issues in any way are Requests to DPPs 41-42, 44, 57, and 61, Requests to Retailers 41-42, 44, 57, and 61, and Requests to EPPs 48, 57-60, 62, 80, and 114. But even if these Requests are relevant to pass-on issues, Plaintiffs should be compelled to produce this discovery anyway given the relevance to other critical issues in the case.

First, many states' antitrust laws either explicitly permit the assertion of a pass-on defense or provide that EPPs may only recover "actual damages," which courts have held are damages passed on to them and not then passed on to anyone else. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 U.S. Dist. LEXIS 182373, at *60-61 (N.D. Cal. Dec. 26, 2012) (under Minnesota law, "where multiple levels of purchasers have sued defendants alleging identical and/or overlapping claims, consideration of pass-on is necessary to avoid duplicative recovery"); *A & M Supply Co. v. Microsoft Corp.,* 252 Mich. App. 580, 584 (Mich. Ct. App. 2002); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 299 (Neb. 2006); *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 107-08 (Fla. Dist. Ct. App. 1996); D.C. Code Ann. § 28-4509(b); N.Y. Gen. Bus. Law § 340(6). EPPs must therefore show that (a) there was an overcharge to DPPs, (b) which in turn passed on the overcharge to the Retailers, (c) which passed on the overcharge to the EPPs, (d) which did not pass on the alleged overcharge to others.[14] *See, e.g.*, *In re*

---

[14] Plaintiffs suggest that they can ultimately avoid a pass-on defense through various damages methodologies. Though this argument is premature, Defendants would be glad to explain why such methodologies fail if it would be helpful to the Court. In short, these approaches hide the pass-on problem, rather than cure it.

EXHIBIT A

*Flash Memory Antitrust Litig.*, 2010 WL 2332081, at \*10 (N.D. Cal. June 9, 2010) (indirect purchasers must prove "defendant overcharged its Direct-Purchasers . . . and that those Direct-Purchasers then passed on the overcharges to indirect purchasers").[15] Defendants are entitled to take discovery into these issues.

Second, discovery regarding EPPs' pass-on of prescription drug costs through premiums is relevant to class certification because it shows that an individual, plan-by-plan inquiry is required to measure injury and that those individualized inquiries would predominate. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 138 F. Supp. 2d 357, 360 (E.D.N.Y. 2001) (health insurers pass on costs through premiums);[16] *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552, at \*9, 26 (E.D. Pa. Sept. 30, 2010) ("The impact of variable insurance plans affects whether many of the consumer plaintiffs suffered an injury."). Courts thus routinely permit such discovery *notwithstanding* that it might also be relevant to a federal pass-on defense. *See Doryx I*, 2015 LEXIS 50026, at \*14; *In re Suboxone Antitrust Litig.*, 2016 U.S. Dist. LEXIS 83499, at \*20-23 (E.D. Pa. June 28, 2016); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, 2006 U.S. Dist. LEXIS 89353, at \*13 (D.N.J. Sep. 7, 2006); Order, *In re Nexium Antitrust Litig.*, No. 12-MD-02409 (D. Mass. July 24, 2013), Dkt. No. 264 (Exh. B-5).

**Plaintiffs' Statement**

**A.     The Objectionable Requests Constitute Downstream Discovery**

In *Hanover Shoe Inc. v. United Shoe Mach. Corp.* and *Illinois Brick Co. v. Illinois*, the Supreme Court held that a direct purchaser in an antitrust case is injured to the full extent of the overcharge at the moment of purchase, and a defendant cannot assert as a defense any "pass on" of the overcharges to a plaintiff's customers. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Due to the unavailability of a "pass on" defense, downstream discovery of plaintiffs in antitrust cases is disfavored and is generally prohibited. *See, e.g., In re K-Dur Antitrust Litig.*, 686 F.3d 197, 221 (3d Cir. 2012) (plaintiffs' sales and profits not discoverable on adequacy of representation, damages

---

[15] Plaintiffs cite *California v. ARC America Corp.*, but there the Court *deferred* to the states on the scope of indirect purchaser claims. 490 U.S. 93, 103 (1989).

[16] Plaintiffs assert that because *Blue Cross* involved a federal claim, a pass-on defense was not permitted. But the court was clear that *if* such a defense were cognizable (as here), it could have been asserted against insurers such as EPPs.

EXHIBIT A

and indirect purchaser issues); *In re Niaspan Antitrust Litig.*, 2015 WL 4197590 (E.D. Pa. Jul. 9, 2015) (downstream discovery irrelevant in both the direct purchaser and indirect purchaser cases); *In re Namenda Direct Purchaser Antitrust Litig.*, 15-cv-07488-CM-JCF [ECF No. 276] (S.D.N.Y. June 21, 2017) (Appx. 7) (denying defendant's downstream requests for sales data and distribution related materials because the requested information was not relevant to class certification, damages, or any other issue in the case).

Defendants attempt to circumvent this prohibition by narrowly defining such discovery as "prices charged" by plaintiffs to their customers. But the cases define downstream discovery more broadly, covering any business activity below Plaintiffs on the chain of distribution. *In re Solodyn,* 2016 WL 6897809, at *1 ("In an antitrust case such as this one, discovery regarding insurance coverage, formularies, patient savings and discount cards, free samples, and the Retailer Plaintiffs' sales of branded and generic Solodyn is commonly referred to as "'downstream discovery.'"). Each of the requests Plaintiffs have objected to concern issues not related to Plaintiffs' purchasing, but their sales or customers.

Even if Defendants were correct that downstream discovery was limited to pricing, many of their Requests would still be objectionable. While Defendants portray the Requests as calling for general "Business Documents," nearly all call for pricing and sales related information. Examples include requests for transactional sales data as well as documents concerning customer contracts, customer contract negotiations, pharmaceutical distribution profitability analyses, inventory practices, costs to fill prescriptions and marketing efforts. *See e.g.,* Defendants' Req. to Retailers 41-42, 44-45, 48, 51-52, 61, 86-87, 124-125.

Defendants' citations are not to the contrary. In *Wellbutrin*, the Court clarified that the production of transactional data had not been required. *In re Wellbutrin XL Antitrust Litig.*, 268 F.R.D. 539, 544 & n.2 (E.D. Pa. 2010). In *Suboxone,* the court permitted discovery on the impact of the alleged product hop on the direct purchasers' ability to compete, an argument not made here. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* 2016 WL 3519618, at *6 (E.D. Pa. June 27, 2016). Defendants' remaining cases are similarly inapposite. *In re Terazosin Hydrochloride Antitrust Litig*, 220 F.R.D. 672 (S.D. Fla. 2004) (overcharges not passed on and did not concern downstream discovery); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, 2006 WL 6907107 (D.N.J. Sep. 7, 2006) (D.N.J. Sep. 7, 2006) (request for downstream discovery denied); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454 (D. Kan. 2006) (claimed need for downstream information not asserted by Defendants in this case); *Mylan Pharm. Inc. v. Warner Chilcott Pub. Ltd. Co.,*

**EXHIBIT A**

Honorable Lois H. Goodman, U.S.M.J.                                    Page 22
June 6, 2018

2015 WL 1736957 (E.D. Pa. Apr. 16, 2015) (did not concern a downstream discovery dispute); *In re Nexium Antitrust Litig.*, 12-MD-02409 (no stated bases for Court's order).

### B.    Each of Defendants' Justifications for Downstream Discovery Falls Flat

Aside from their unfounded product market argument, Defendants do not seriously argue that downstream discovery is relevant to the direct purchaser cases. Instead, they claim the information is pertinent to the *EPP* case. As an initial matter, Direct Purchaser Plaintiffs and Retailers are not parties to the EPP case. As non-parties, the discovery protections of Rule 45, not Rule 34, govern the analysis as it relates to DPPs and Retailers. *In re Broiler Chicken Antitrust Litig.*, 2018 WL 999899, at *3 (N.D. Ill. Feb. 21, 2018) (downstream discovery from direct purchasers for use in a parallel indirect purchaser case "might be analogized to subpoenas issued to non-parties" and "Rule 45, of course, provides more protection for the recipient of a third-party subpoena than Rule 34 provides to a party"). Moreover, downstream discovery is irrelevant for the EPP case, as well.

EPPs need not demonstrate a pass on of overcharges to prove antitrust injury or damages, so no direct purchaser sales information is required. Rather, EPPs must prove only that the prices they paid were greater than they would have paid absent the challenged conduct. *See, e.g.*, *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 229 (E.D. Pa. 2012) ("in a foreclosed competition case, impact can be measured in terms of what product the end-payor was actually forced to buy because of the delayed entry, versus what product(s) they would have purchased"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 344 (E.D. Mich. 2001) ("[A]n indirect purchaser must estimate only the 'but for' price that it should have paid, which is a far less exacting exercise than apportioning the overcharge throughout the entire chain of distribution.") (internal quotations omitted). This showing can be made through what is called a "bottom across" damage calculation, a methodology that does not require tracing overcharges. *Cardizem*, *id.* ("'Bottom across' means that the overcharge is determined by examining the price differential between the generic and the brand drug at the retail level only. Thus, there is no need to review 'pass-through' variations.").

Defendants' claim for EPPs' sales information to establish a "pass on" defense falls flat because there is no pass-on defense to an EPP claim. Courts have consistently rejected this argument because insurance premiums are not designed to recover funds already paid. *In re Solodyn,* 2016 WL 6897809, at *2 ("insurance premiums . . . are set by anticipating future projected costs, not to recover money that

EXHIBIT A

insurers paid in the past"); *In re Neurontin Mktg. & Sales Practices Litig*., 799 F. Supp. 2d 110, 120 (D. Mass. 2011) (rejecting defendants' "Hail Mary pass-on theory regarding increased premiums"). *Blue Cross & Blue Shield v. Philip Morris, Inc.,* 138 F. Supp. 2d 357, 361-65 (E.D.N.Y. 2001), holds that defendants are *not* allowed to use as an off-set to damages the fact that end-payors might pass their costs to customers in the form of higher premiums or employer contributions. (In fact, except for Blue Cross & Blue Shield of La., the institutional EPPs in this case are self-funded employer plans that do not charge "premiums" at all.) Employer contributions and premiums are forward-looking and calculated based on projected costs for the upcoming year for thousands of drugs, plus medical provider services. Those contributions do not mitigate the harm to EPPs, because EPPs were harmed the moment they paid the overcharge. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, 2017 WL 4621777, at *18 (D. Mass. Oct. 16, 2017). Thus, information relating to employer contributions and premiums and how those are calculated provide no useful information as damages or any other issue in the case.

Moreover, the "duplicative damages" argument is a red herring: direct purchasers are proceeding under federal law, while the EPPs are asserting state law claims. In *California v. ARC America Corporation*, the Supreme Court explicitly permitted recovery by end payors under state antitrust statutes. The authority Defendants cite concerned multiple claims under *state* law, not parallel claims under federal *and* state law, or is otherwise inapposite. *TFT-LCD (Flat Panel) Antitrust Litig*., 2012 WL 6709621 (N.D. Cal. 2012) (did not concern a federal claim); *A&M Supply Co. v. Microsoft Corp.*, 654 N.W. 2d 572, 586 (Mich. App. Ct. 2002) (EPPs damages proved with *publicly* available data); *In re Wholesale Elect. Anti-Trust Cases*, 147 Cal. App. 4th 1293 (2007) (concerned potential duplicative recovery deriving from California state statutes and the Federal Power Act and federal law preemption issues relating thereto); *In re Flash Memory Antitrust Litig*., 2010 WL 2332081 (N.D. Cal. June 9, 2010) (pass through not required for EPP claims); *Mack v. Bristol-Myers Squibb Co.* 673 So. 2d 100 (Fla. Dist. Ct. App. 1996) (concerned standing issues under Florida Unfair Trade Practices Act); *Clayworth v. Pfizer*, 49 Cal. 4th 758 (2010) (did not concern a federal claim); *Kanne v. Visa USA, Inc.* 272 Neb. 489 (2006) (the duplicative recovery at issue involved different markets).

## C. Substantial Burden Further Warrants the Denial of Defendants' Demand

Defendants' downstream requests would also impose disproportionate burdens, a fact Plaintiffs will support with declarations should the Court require. Many of the Plaintiffs have hundreds, some even thousands, of locations. For the Retailers in

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                    Page 24
June 6, 2018

particular, their businesses maintain separate departments and personnel for pharmaceutical procurement and downstream operations such as reimbursements, dispensing and other interactions with patients, insurers, pharmacy benefit managers and others.  Likewise, Defendants' request targets dozens of drugs, sold in hundreds of distinct forms.  Merely assembling this data would impose heavy burdens. *Broiler Chicken,* 2018 WL 999899, at *3 ("common sense supports the notion that responding to the extremely broad and granular downstream discovery requested by Defendants would be burdensome.").

## V.     **Plaintiffs Should Be Required to Produce Documents from Assignors**

### <u>Defendants' Statement</u>

Thirteen Plaintiffs are proceeding by way of assignment (collectively, the "Assignee Plaintiffs").  Assignee Plaintiffs made no direct purchases of Effexor XR from Wyeth, instead purchasing from wholesalers that purchased from Wyeth.  Thus, the assignors are the true direct purchasers and would ordinarily be required to bring their claims directly (and subject themselves to party discovery), while Assignee Plaintiffs are indirect purchasers and would not be permitted to bring a federal Sherman Act claim.  While such assignments are generally permissible, the corresponding obligation is that Assignee Plaintiffs must obtain from their assignors and produce documents responsive to Defendants' Requests.  Assignee Plaintiffs have an implied or explicit contractual right to produce these documents.

Plaintiffs nonetheless claim that they lack "the legal right to obtain the documents on demand" and thus lack custody or control over their assignors' documents.  They claim that Defendants should instead be forced to seek discovery from the wholesalers under the more demanding standards of Rule 45 rather than the more appropriate standards for party discovery under Rule 26.  If Plaintiffs are correct, then the assignments are null and void—as "[t]he claims being asserted are those of the original [purchasers (the wholesalers)] [and] cannot be asserted by an agent or assignee without the concomitant obligation to produce relevant discovery to defendants.  If plaintiff[s] and the assignees failed to obtain rights to insist on cooperation from their assignors in providing such discovery, and cannot persuade the [wholesalers] to cooperate now, that is their problem, not defendants'." *JP Morgan Chase Bank v. Winnick*, 228 F.R.D. 505, 507 (S.D.N.Y. 2005).  Indeed, it "would be unfair to the defendants to permit plaintiff[s] and the assignees to divorce the benefits of the claims from the obligations that come with the right to assert them, to the detriment of defendants." *Id.*; *see also In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 U.S. Dist. LEXIS 3542, at *16 (E.D. Tenn. Jan. 10, 2014); *Bank of New*

EXHIBIT A

*York v. Meridien Biao Bank Tanzania Ltd.*, 171 F.R.D. 135, 149 (S.D.N.Y. 1997). Accordingly, an assignee "bears the same discovery obligations that [the assignor] would carry had it remained the plaintiff." *Travelers Indem. Co. of Am. v. Kendrick Bros. Roofing, Inc.*, 2013 U.S. Dist. LEXIS 179545, at *5 (D. Idaho Dec. 18, 2013).[17]

## **Plaintiffs' Statement**

Assignee Plaintiffs cannot produce what they do not have. Plaintiffs' assignors are separate legal entities, and Assignee Plaintiffs do not have possession, custody or control of their assignors' documents. *See* Fed. R. Civ. P. 34(a). In the Third Circuit, a party has "control" of documents only if it has the legal right to obtain the documents on demand. *See Mercy Catholic Med. Ctr. v. Thompson,* 380 F.3d 142, 160 (3d Cir. 2004) ("In the Rule 34 context, control is defined as the legal right to obtain required documents on demand."). *See also Alexander v. F.B.I.,* 194 F.R.D. 299, 301 (D.D.C. 2000) ("'control,' which is defined not as possession, but as the *legal right to obtain documents on demand,* is the test as to whether production is required") (emphasis added). Contrary to Defendants' assertion, Plaintiffs have neither an implied nor an explicit contractual right to receive and produce documents responsive to Defendants' Requests from their assignors. For these same reasons, this same motion was denied in *In re Androgel Antitrust Litigation (II),* Order, 09-md-2084-TWT [ECF No. 489] (N.D. Ga. Nov. 8, 2011) (Appx. 3); Hrg. Tr. 49-50 [ECF No. 484] (Appx. 2) (denying motion to compel because "I don't believe under the law of this circuit that the drugstore chains have custody or control of the data that . . . the assignors may have").

Defendants rely on inapposite cases in which courts have faced situations where critical discovery was not in the possession of the assignee and the defendant could not obtain that discovery through compulsory process. In *JPMorgan Chase Bank v. Winnick,* 228 F.R.D. 505 (S.D.N.Y. 2005), for example, defendants sought discovery from assignors concerning their reliance on allegedly fraudulent representations, an essential element of the claim at issue. *Id.* at 506.

---

[17] Plaintiffs ask that this Court follow *Androgel* with respect to this issue. But in *Androgel*, fact discovery was already closed in that case when discovery was requested from the assignors and the court offered no reasoning for rejecting Defendants' motion, making it unclear whether the Court agreed with Plaintiffs' arguments, or simply refused to allow discovery beyond the deadline. Hrg. Tr. at 20, 49-50, *In re Androgel Antitrust Litig. (II),* No. 09-md-2084 (N.D. Ga. Nov. 8, 2011), Dkt. No. 484 (Ex. 1).

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                                    Page 26
June 6, 2018

     In *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 148 (S.D.N.Y. 1997), the assignor had affirmatively invoked the discovery power of the Court before assigning its claim. The assignor also had an interest in the outcome of the assigned claims. These cases have no application here.

     In *Skelaxin*, the court recognized that the plaintiffs did not have control of the requested assignor documents, but ordered the plaintiffs to serve a subpoena on their assignors. *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 129814 (E.D. Tenn. Jan. 10, 2014). Recognizing the difficulties with asking plaintiffs to negotiate the subpoenas with their own assignors, defendants then took over the negotiation process. The only impact of the order was that it directed who should initiate the subpoena process. Requiring Defendants to deal directly with the assignors is simply more efficient, and avoids potential disputes over whether Plaintiffs are being sufficient zealous in their pursuit of documents.

     The claims here raise issues that affect drug purchasers at every level of distribution; the discovery Defendants seek relates to issues that are not unique to the assignors or to the portion of their claims assigned to Plaintiffs, but to general industry matters. The assignments here simply transfer the claim from one level of distribution (a wholesaler) to the next (a retailer). *See, e.g., In re K-Dur Antitrust Litigation,* 338 F. Supp. 2d 517, 539 (D.N.J. 2004) ("express assignments of antitrust claims from a direct purchaser to an indirect purchaser are permissible"). Plaintiffs have already agreed to produce documents concerning these subjects from their own files. If Defendants want additional documents from the assignors on these matters, they should seek that discovery from the assignors directly.

## VI.   Plaintiffs Cannot Use Privilege to Shield Facts Relevant to Class Certification, the Filing of the Instant Litigation, or Damages

### Defendants' Statement

     Plaintiffs refuse to produce documents related to (a) class certification, (b) the filing of this litigation, and (c) damages, because in some cases the information may have been received from lawyers.[18] For example, Requests to EPPs 88-95 seek the factual basis for certain allegations in the EPPs' complaint, yet EPPs claim they need not respond, because the factual basis for each allegation is privileged. Not so.

_____

[18] The Requests at issue, as described in Exhibit A-3, are: Req. to DPPs 70-71, 88-90, 96, 98-99, 119; Req. to Retail. 64-65, 70-71, 137; Req. to EPPs 87-95, 98-102, 126-27, 129, 140, 142.

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                                    Page 27
June 6, 2018

Plaintiffs cannot shield relevant *facts* from discovery in this way.  "A litigant cannot shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that information came from a lawyer." *See, e.g.*, *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994).  A plaintiff is required to produce the factual basis on which it relies, and cannot hide such material by claiming privilege. And even if the information *were* privileged, Plaintiffs must log the responsive documents.[19]

### **Plaintiffs' Statement**

Defendants are seeking discovery of privileged documents, not of mere "facts." Plaintiffs object to producing documents created in anticipation of this litigation.  Fed. R. Civ. P. 26(b)(3)(A).  The strong rule protecting privileged documents may be overcome only in narrow circumstances not present here.  Defendants have not identified a substantial need for any discoverable "facts" that cannot be obtained or created from other sources or methods.  Fed. R. Civ. P. 26(b)(3)(A).  *See In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 667 (3rd Cir. 2003) ("extraordinary circumstances" required to justify discovery of the privileged information). Moreover, facts that may be contained in privileged documents *are* protected. The sole case the Defendants rely upon, *Rhone-Poulenc Rorer v. Home Indem. Co.*, 32 F.3d 851 (3rd Cir. 1994), was an insurance coverage matter, where the protected documents at issue were not created in anticipation of litigation.  Nonetheless, even in that instance the Third Circuit reversed the trial court's disclosure order.

Defendants have refused to agree to search terms, instead asking the Court to upend the typical order of discovery, ruling on privilege before production has been made.  *See* Fed. R. Civ. P. 26(b)(3)(A); *see also Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (parties should develop their own discovery rather than relying on "wits borrowed from the adversary").  Defendants' position is unreasonable and premature. Until custodial searches have been run and a privilege log is produced, these issues are not ripe.  *See* Fed. R. Civ. P. 26(b)(5) (production of privilege log "will enable other parties to assess the claim").

Defendants have made no showing that any facts are being withheld that would render protected work product or communications as their only source.  *See Hickman*,

---

[19] Plaintiffs say that this issue is not "ripe" "[u]ntil custodial searches have been run and a privilege log is produced."  But Plaintiffs *refuse* to run custodial searches or produce a privilege log.  That is why Defendants are moving here.

329 U.S. at 512 (finding that a "naked, general demand" is "insufficient to justify discovery"). Defendants' Requests to EPPs 88-95 seek documents relied upon in EPPs' complaint. Any documents quoted in the complaint are footnoted and publicly available. Any other documents relied on for the complaint would be work product. Defendants' Requests to EPPs 88, 89 and 102 seek assessments or analyses of the economic impact of the Wyeth/Teva settlement agreement, or analyses of the patent litigation. To the extent that Defendants are not seeking premature expert disclosures, they would be seeking attorney work product. Fed. R. Civ. P. 26(b)(4) ("Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert" absent "*exceptional circumstances* under which it is impracticable for the party to obtain facts or opinions") (emphasis added). Defendants further incorrectly include DPP Resp. 88-90 here because Plaintiffs' objections (including as to relevance) are not based on any claim of privilege.

## VII.   Plaintiffs May Not Limit the Relevant Time Period to Exclude the Periods Central to the Allegations in the Complaints

### Defendants' Statement

Plaintiffs have refused to provide any documents dated prior to January 1, 2008—shortly before the date on which their damages purportedly began—regardless of when the conduct at issue occurred. *See* Exh. A-4 (listing a sample of Requests). Plaintiffs claim that this limited date range—far shorter than what Plaintiffs requested from Defendants—is defensible because their documents become relevant only once damages begin to be incurred. Plaintiffs are wrong.

**Relevant product market:** For their own requests regarding relevant market, Plaintiffs have demanded documents dated as early as 1991. Defendants are asking Plaintiffs to search for such documents back to 2002, when the allegedly fraudulent patents issued. *See*, *e.g.*, Req. to DPPs 5, 12, 16-62, 79-87, 112, 118; Req. to Retail. 5, 16-62, 79-87, 97-127, 130, 136; Req. to EPPs: 5, 12, 16-86, 97, 103-112, 135, 141, 145-46, 148-55. In response, Plaintiffs say that *all* pre-2008 discovery necessarily focuses on Defendants' conduct rather than Plaintiffs' injury. But relevant market discovery has nothing to do with the defendant's conduct, but rather the scope of the market at the time of the conduct. Plaintiffs were participants in that market and should be ordered to produce documents on this issue from January 1, 2002 to January 1, 2012.

**Operation of market at time of settlement:** Defendants seek documents relating to the operation of the market in the years leading up to the Wyeth-Teva settlement, such as the ability of generics to enter/at risk launches (Req. to DPPs 7-8,

EXHIBIT A

Honorable Lois H. Goodman, U.S.M.J.                              Page 29
June 6, 2018

67-68; Req. to Retail. 7-8, 67-69; Req. to EPPs 7-8), the conditions under which a branded company would launch an authorized generic product (Req. to DPPs 67-68; Req. to Retail. 68; Req. to EPPs 92-93), and similar issues (Req. to DPPs 3-4, 6, 10, 110; Req. to Retail. 3-4, 6, 10, 128; Req. to EPPs 3-4, 6, 10, 133). Plaintiffs allege that certain events—such as the launch of an authorized generic—"would" or "should have" occurred based on their views about how the market "should" work. *See*, *e.g.*, DPP 2nd Amended Compl. ¶¶ 262, 269-70. Because Plaintiffs participated in that market, they likely have relevant documents addressing these issues and should be ordered to produce such documents from January 1, 2002 to January 1, 2012.

**Litigation-related materials:** Defendants seek documents concerning (1) the evidentiary basis for Plaintiffs' complaints (Req. to DPPs 63-66, 69; Req. to Retail. 63-66; Req. to EPPs 87-93), (2) Plaintiffs' awareness of the patents and the Wyeth-Teva patent litigation and settlement, which relate to whether Plaintiffs' claims are time-barred (Req. to DPPs 70-72, 74-78; Req. to Retail. 70-72, 74-78; Req. to EPPs 94-96, 98-102), and (3) the assignment of claims to Plaintiffs (Req. to DPPs 103-109; Req. to Retail. 88-94). *See also* Req. to DPPs 113-17, 119; Req. to Retail. 130-35, 137; Req. to EPPs 80-81, 136-40, 142. All such documents are relevant regardless of when they were created. Plaintiffs should be ordered to produce such documents from January 1, 2002 to the present.

**Launch of Effexor IR:** Defendants' Requests also address the impact of the Wyeth-Teva settlement on the market, such as the effect of generic Effexor on Plaintiffs' business (Req. to DPPs 14; Req. to Retail. 14; Req. to EPPs 14), and the procompetitive benefits of introducing generic Effexor (Req. to DPPs 11, 13, 15, 89; Req. to Retail. 11, 13, 15; Req. to EPPs 11, 13, 15, 119). These competitive effects do not begin in 2008, as Plaintiffs argue, but rather at the time the settlement allowed Teva to introduce a generic Effexor IR product in June 2006. Plaintiffs should be ordered to produce documents on this issue from January 1, 2006 to January 1, 2012, and data (which must continue through the damages period) (Req. to DPPs 60, 62; Req. to Retail. 60, 62; Req. to EPPs 86) from January 1, 2006 to December 31, 2017.

**Class certification and Damages:** Defendants agree that Plaintiffs need not produce class certification documents dated prior to January 1, 2008; however, the end-date for these documents should be December 31, 2017 to reflect the fact that class certification depends in part on Plaintiffs' current typicality and adequacy as class representatives and that damages are alleged to continue. *See* Req. to DPPs 9, 88, 90-96, 102; Req. to Retail. 9, 95-96; Req. to EPPs 9, 113-18, 120-29, 130-32, 144-47.

Honorable Lois H. Goodman, U.S.M.J.                                    Page 30
June 6, 2018

### Plaintiffs' Statement

Plaintiffs have agreed to produce responsive documents beginning January 2008, nearly six months before the start of the class period. Defendants demand that Plaintiffs produce documents back to 2002 – more than *six years* before the start of the class period. Even if requested discovery is marginally relevant, the court may proscribe discovery if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," Fed. R. Civ. P. 26(b)(2)(C).

Defendants have failed to show how their blunderbuss demands for documents that predate the claims in this case by six years will generate relevant discovery, or why the documents they purport to seek are not merely cumulative of documents Plaintiffs will produce from the period relevant to their claims, or that Defendants may find in their own files. Defendants do not cite a single case supporting the relevance of the documents they seek, and they do not identify any instance in which a Court has required class representatives to produce documents going back so far.

Defendants make unspecified demands that Plaintiffs search their files going back more than 15 years for documents concerning the "Operation of the market," the "Wyeth-Teva patent litigation," or the "Launch of Effexor IR" without any offer of proof that Plaintiffs, who are *drug purchasers*, with no role in the manufacture and launch of prescription drugs, would possess documents relevant to these subjects.

Finally, Defendants concede that Plaintiffs need not produce documents pre-dating the beginning of the class period concerning class certification, but insist that it is insufficient for the date range of Plaintiffs' production to end with the commencement of this action. However, Requests concerning subject matters such as the relevant product market, operation of the market at the time of the settlement, litigation-related materials and class certification and damages categories include documents that Plaintiffs object to producing. It is premature to adjudicate time periods before it has been decided whether such documents are subject to production in the first instance.

                                  Respectfully submitted,

                                  */s/ Peter S. Pearlman*

                                  Peter S. Pearlman

Enclosures

cc:     All Counsel of Record *(W/Encl. via ECF)*

# Exhibit B

# Exhibit B-1

EXHIBIT B-1



ONE RIVERFRONT PLAZA
1037 Raymond Blvd., Suite 600
Newark, New Jersey 07102

T: 973.757.1100
F: 973.757.1090

WALSH.LAW

Liza M. Walsh
Direct Dial: (973) 757-1101
lwalsh@walsh.law

July 6, 2018

**VIA ECF AND FIRST-CLASS MAIL**
Honorable Lois H. Goodman, U.S.M.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Bldg. & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

Re:     *In re Effexor XR Antitrust Litigation, Civil Action No. 11-5479 (PGS/LHG)*

Dear Judge Goodman:

This firm, together with White & Case LLP and Paul, Weiss LLP, represents Defendants Wyeth, Inc., Wyeth LLC, Wyeth Pharmaceuticals, Inc., Wyeth-Whitehall Pharmaceuticals LLC, and Wyeth Pharmaceuticals Company in the above referenced matter. We write to inform the Court of a recent opinion that addresses the proper standard for assessing a relevant market in a pharmaceutical context in the Third Circuit: Judge Harvey Bartle III's decision in *Federal Trade Commission v. AbbVie Inc.*, 14-cv-5151, 2018 U.S. Dist. LEXIS 109628 (E.D. Pa. June 29, 2018). This decision is relevant to Defendants' pending motion to compel Plaintiffs to produce documents and data regarding products that compete with Effexor XR and venlafaxine (Issue III in the parties' June 6, 2018 joint discovery letter). A copy of the opinion is attached for the Court's convenience. Wyeth respectfully directs the Court to pages **57-68, which reject the proposition that a relevant pharmaceutical market can be proven solely based on differences in price between a brand and a generic, and which instead make clear that the types of market evidence Defendants are seeking through their motion to compel, such as documents regarding how purchasers view the market, are relevant to and indeed often dispositive of a relevant market analysis in this Circuit.

We appreciate the Court's consideration and look forward to discussing these issues with Your Honor further.

Respectfully submitted,

*s/Liza M. Walsh*

Liza M. Walsh

Attachment
cc:     All Counsel of Record (via ECF)

# ATTACHMENT

No *Shepard's* Signal™
As of: July 5, 2018 7:18 PM Z

# *FTC v. AbbVie Inc.*

United States District Court for the Eastern District of Pennsylvania

June 29, 2018, Decided

CIVIL ACTION NO. 14-5151

**Reporter**
2018 U.S. Dist. LEXIS 109628 *

FEDERAL TRADE COMMISSION v. ABBVIE INC., et al.

## Core Terms

generic, FDA, patent, lawsuits, sham, rating, testosterone, sales, brand-name, injectables, launch, patients, products, defendants', infringement, penetration, manufacture, enhancers, disgorgement, pharmaceutical, gel, subjective intent, patent infringement, competitors, parties, notice, monopoly power, baseless, profits, relevant market

**Counsel: [*1]** For FEDERAL TRADE COMMISSION, Plaintiff: MARKUS MEIER, PATRICIA M MCDERMOTT, LEAD ATTORNEYS, GARTH HUSTON, HEATHER M. JOHNSON, JAMES H WEINGARTEN, JORDY J HUR, KARA L MONAHAN, LAUREN K. PEAY, MATTHEW B. WEPRIN, REBECCA L EGELAND, THOMAS D. MAYS, FEDERAL TRADE COMMISSION, WASHINGTON, DC; DANIEL S. BRADLEY, FTC, WASHINGTON, DC; PETER J. TAYLOR, U.S. FEDERAL TRADE COMMISSION, WASHINGTON, DC.

For ABBVIE INC, ABBOTT LABORATORIES, UNIMED PHARMACEUTICALS, LLC, Defendants: ADAM R. LAWTON, JEFFREY I. WEINBERGER, MARKUS BRAZILL, STUART N. SENATOR, LEAD ATTORNEYS, CHRISTOPHER T. HOLDING, MUNGER TOLLES & OLSON LLP, LOS ANGELES, CA; PAUL H. SAINT-ANTOINE, LEAD ATTORNEY, DRINKER, BIDDLE & REATH LLP, PHILADELPHIA, PA; RANDALL G. SOMMER, LEAD ATTORNEY, MUNGER, TOLLES & OLSON LLP, LOS ANGELES, CA; ELAINE J. GOLDENBERG, MUNGER TOLLES & OLSON LLP, WASHINGTON, DC; JOHN S. YI, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA.

For BESINS HEALTHCARE, INC., Defendant: GREGORY E. NEPPL, LIANE M. PETERSON, MELINDA F. LEVITT, LEAD ATTORNEYS, FOLEY & LARDNER LLP, WASHINGTON, DC; PAUL H. SAINT-

ANTOINE, LEAD ATTORNEY, DRINKER, BIDDLE & REATH LLP, PHILADELPHIA, PA; CHRISTOPHER T. HOLDING, GOODWIN PROCTER LLP, BOSTON, MA; **[*2]** JOHN S. YI, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA; MARKUS BRAZILL, STUART N. SENATOR, MUNGER TOLLES & OLSON LLP, LOS ANGELES, CA.

**Judges:** Harvey Bartle III, J.

**Opinion by:** Harvey Bartle III

## Opinion

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bartle, J.

The Federal Trade Commission ("FTC") has sued defendants AbbVie Inc., Abbott Laboratories, and Unimed Pharmaceuticals LLC (collectively, "AbbVie"), as well as Besins Healthcare, Inc. ("Besins"), for violation of *section 5(a)* of the *Federal Trade Commission Act ("FTC Act")*, *15 U.S.C. § 45(a)*, which prohibits "[u]nfair methods of competition in or affecting commerce."

AbbVie and Besins together own U.S. Patent No. 6,503,894 ("'894 patent") for a brand-name testosterone replacement drug, AndroGel 1%. In Count I of the complaint, the FTC alleges that AbbVie and Besins maintained an illegal monopoly through the filing of sham patent infringement lawsuits against two potential competitors, Teva Pharmaceuticals USA, Inc. ("Teva") and Perrigo Company ("Perrigo"), to delay entry into the market of their generic versions of AndroGel.[1]

---

[1] In count II of the complaint, the FTC alleged that the settlement between Teva and the other defendants constituted an improper restraint of trade in violation of the FTC Act. On

To prevail in this antitrust litigation, the FTC must prove that defendants possessed monopoly power in the relevant market and that defendants willfully acquired or maintained that power. See *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co., 838 F.3d 421, 433 (3d Cir. 2016)*. Here, the FTC asserts **[*3]** that defendants maintained their AndroGel monopoly through the filing of sham litigation against Teva and Perrigo. To prove its case, the FTC must establish: (1) the lawsuits filed by defendants against Teva and Perrigo were objectively baseless; (2) defendants subjectively intended to file such lawsuits; and (3) that defendants possessed monopoly power in the relevant market. See *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993)* ("PRE"); *In re Wellbutrin XL Antitrust Litig., 868 F.3d 132, 148-49 (3d Cir. 2017)*.

On September 15, 2017, this court ruled that defendants' infringement lawsuits against Teva and Perrigo were objectively baseless and entered summary judgment in favor of the FTC on this issue. See *FTC v. AbbVie Inc., No. 14-5151, 2017 U.S. Dist. LEXIS 149824, 2017 WL 4098688, at *11 (E.D. Pa. Sept. 15, 2017)* (Doc. # 300). Thereafter the court held an approximately three-week nonjury trial on the issues of subjective intent and monopoly power. The court now makes the following findings of fact and conclusions of law.

I

To understand the claim presented in this action, we first set forth the regulatory scheme that governs the testing and approval of new drugs in the United States. That framework is governed by the *Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, which is commonly known as the *Hatch-Waxman Act, 21 U.S.C. § 355* and *35 U.S.C. § 271*. See *Pub. L. No. 98-417, 98 Stat. 1585*.

A drug **[*4]** manufacturer seeking to market a new drug must obtain approval from the U.S. Food and Drug Administration ("FDA"). See *21 U.S.C. § 355(a)*. There are three pathways established by the FDCA and Hatch-Waxman: (1) a section 505(b)(1) New Drug

Application ("NDA"); (2) a section 505(b)(2) NDA; and (3) a section 505(j) Abbreviated New Drug Application ("ANDA").

An NDA is a full-length application containing information on the drug's safety and efficacy, an explanation of the drug's ingredients, a description of the methods used in the manufacture and packaging of the drug, samples of the proposed labeling, and samples of the drug itself. See id. *§ 355(b)(1)*. The NDA must also contain a list of any patents covering the drug. Id.

Once the FDA has approved a new brand-name drug, an applicant with a generic version of that drug can obtain approval through the use of abbreviated procedures. See *21 U.S.C. § 355(j)*. Most commonly, the applicant will file a section 505(j) ANDA stating, among other things, that the generic has the same active ingredients and is biologically and pharmacologically equivalent to the brand-name drug. Id. *§ 355(j)(2)(A)*. The applicant may then rely on the safety and efficacy data contained in the NDA for the brand-name drug. Id.

In the alternative, the applicant with a generic drug may file a section 505(b)(2) NDA, which is a **[*5]** hybrid between an ANDA and a full NDA. A section 505(b)(2) NDA is used for generics that have slight modifications from the brand-name drug. See *21 C.F.R. § 314.54*. The applicant must submit additional data to the FDA demonstrating that any differences between the brand-name drug and the generic will not affect safety and efficacy but can otherwise avoid the other studies necessary for a full NDA application. Id.; see also *Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 227 (3d Cir. 2013)*. Because the Hatch-Waxman Act allows the applicant to "piggy-back" on the efforts for the approval of the brand-name drug, its provisions "speed the introduction of low-cost generic drugs to market" and thereby promote drug competition. *FTC v. Actavis, Inc., 570 U.S. 136, 142, 133 S. Ct. 2223, 186 L. Ed. 2d 343 (2013)* (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 405, 132 S. Ct. 1670, 182 L. Ed. 2d 678 (2012)* (alteration omitted)).

Once the FDA approves a generic drug, the applicant may request from the FDA a therapeutic equivalence ("TE") rating. A TE rating is a code that reflects the FDA's determination regarding whether a generic product is pharmaceutically and biologically equivalent to the reference-listed brand-name drug. Products that are determined to be therapeutically equivalent are

---

May 6, 2015, this court granted the motion of defendants to dismiss count II of the complaint, as well as count I to the extent it was premised on the settlement agreements with Teva. As a result, Teva was dismissed as a defendant in this action and only the claim involving sham lawsuits in Count I remains.

assigned an "A" or "AB" rating. Generic products for which therapeutic equivalence cannot be determined are assigned a "B" or "BX" rating.[2] An "A" or "AB" rating is extremely [*6] desirable. Every state in the United States has generic substitution laws. See *Mylan Pharms. Inc., 838 F.3d at 428*. These laws "either permit or require pharmacists to dispense a therapeutically equivalent, lower-cost generic drug in place of a brand drug absent express direction from the prescribing physician that the prescription must be dispensed as written." Id. (internal quotation marks and citations omitted).

The Hatch-Waxman Act also provides specialized procedures for parties to resolve intellectual property disputes. In submitting an ANDA or section 505(b)(2) NDA, an applicant must certify that any patent currently in force for the referenced brand-name drug "is invalid or will not be infringed by the manufacture, use, or sale" of the proposed generic. *21 U.S.C. § 355(j)(2)(A)(vii)*. This certification is commonly referred to as a paragraph IV notice. *Actavis, 570 U.S. at 143*.

The paragraph IV notice "automatically counts as patent infringement" and thus often leads to an infringement suit by the patentee. Id. (citing *35 U.S.C. § 271(e)(2)(A)*). Upon receiving the paragraph IV notice, the patentee has 45 days to determine whether to file suit for infringement. *21 U.S.C. § 355(j)(5)(B)(iii)*. The notice often includes an offer of confidential access whereby outside counsel [*7] for the patentee may review the application submitted to the FDA by the generic applicant to facilitate a determination regarding infringement litigation. If the patentee files an infringement suit against a generic entity within this 45-day period, the FDA is required to withhold approval of

---

[2] "A" and "B" are the two general categories into which the FDA sorts drugs when evaluating therapeutic equivalence. Within these two categories are various subcategories depending on the type of product (i.e., oral, injectable, solution, or powder) and other factors. For our purposes we will focus on "AB," which means "actual or potential bioequivalence problems have been resolved with adequate in vivo and/or in vitro evidence supporting bioequivalence," and "BX," which is "specific drug products for which the data that have been reviewed by the Agency are insufficient to determine therapeutic equivalence." See U.S. Food & Drug Admin., Center for Drug Evaluation & Research, Approved Drug Products with Therapeutic Equivalence Evaluations, at xiii, xx (38th ed. 2018), https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#_ftn4 .

the generic drug for 30 months from receipt of the paragraph IV notice or until the infringement action is resolved in the district court, whichever occurs first. Id.

II

AndroGel is a brand-name transdermal testosterone gel product approved by the FDA for the treatment of hypogonadism, a clinical syndrome that results from failure of a man's body to produce adequate amounts of testosterone. It is estimated that this condition affects 2-6% of the adult male population in the United States. Hypogonadism is a lifelong condition which causes decreases in energy and libido, erectile dysfunction, and changes in body composition including decreased bone density. Patients with hypogonadism are typically treated with testosterone replacement therapy ("TRT") whereby exogenous testosterone is administered.

The first TRTs approved by the FDA were injectables in which testosterone was dissolved in a liquid and [*8] then injected into a muscle of the body. Injectable testosterones were introduced in the 1950s and have been available in generic form for decades. They are administered every one to three weeks. While many patients receive injections at their doctors' office, some patients opt to self-administer injections at home or visit clinics specializing in TRT commonly known as "Low-T" centers. Because they are available in generic form, injectables generally require a five to ten dollar patient copay on most insurance plans and thus are the least expensive treatment method for hypogonadism.

Testosterone injections typically require two needles: a withdrawal needle and an injection needle. The withdrawal needle is typically a 20-gauge wide bore and 1-inch long needle required to withdraw the testosterone from the glass vial. After withdrawal, the patient must switch to a 21- or 22-gauge narrow bore and 1.5-inch long needle to administer the injection. This needle must then be inserted deep into a muscle, typically the buttocks or thigh, until the needle is no longer visible. Because a deep intramuscular injection is required, this treatment method may cause pain and discomfort which will vary [*9] from patient to patient. Injectables generally provide an initial peak in testosterone level at the time of injection followed by troughs or valleys as the injection wears off. This variation in testosterone level may cause swings in mood, libido, and energy.

TRTs may also be administered through a gel or patch which is applied to the skin and thereby absorbed into the bloodstream. This group of products is known as topical testosterone replacement therapies or

transdermal testosterone replacement therapies ("TTRTs"). Androderm, the first testosterone patch, was released in the 1990s. It is applied once a day to the back, abdomen, thighs, or upper arms. The patch formulation delivers a steady level of testosterone without the peaks or valleys associated with injectables. It is relatively easy to apply, although the patch may cause skin irritation in some patients and may be visible depending on where it is applied. Testoderm, a testosterone patch worn on the scrotum, was also introduced in the 1990s.

AndroGel was launched in 2000 as the first FDA-approved testosterone gel. It is applied once a day to one or more application sites, including the upper arms, shoulders, and abdomen. AndroGel [*10] comes in two strengths: (1) 1%, which was the original formulation launched in June 2000; and (2) 1.62%, which was first sold in May 2011. At the time AndroGel 1% came on the market in 2000, it was available only in sachets. In 2004 it became available in a metered-dose pump. AbbVie discontinued manufacture of the AndroGel 1% pump in December 2013.

AndroGel 1% was developed through a collaboration between Unimed and various subsidiaries of Besins' parent company. At the time of its launch, AndroGel 1% was marketed and distributed by Solvay Pharmaceuticals, Inc. ("Solvay"), the parent company of Unimed. Abbott Laboratories acquired Solvay and Unimed in February 2010. At that time Solvay was renamed Abbott Products Inc. In January 2013, AbbVie assumed all of Abbott's proprietary pharmaceutical business, including AndroGel 1%.

As the first gel in the market, AndroGel achieved great commercial success and quickly became one of Solvay's "flagship" products. In 2009, AndroGel's U.S. net sales were approximately $604 million and in 2010, that number grew to $726 million. After AbbVie[3] acquired Solvay and Unimed in 2010, sales of AndroGel continued to grow, and AndroGel became one of AbbVie's [*11] blockbuster drugs. In 2011, U.S. net sales for AndroGel reached $874 billion and in 2012, U.S. net sales surpassed $1.15 billion. In 2013, AndroGel's U.S. net sales were approximately $1.035 billion while in 2014, net sales totaled $934 million. After entry of generic versions of AndroGel 1%, AndroGel U.S. net sales fell to $694 million in 2015. Throughout

this time, AbbVie maintained a high profit margin of approximately 65% on AndroGel.

Transdermal gels have several advantages over the other forms of TRTs. A gel is relatively easy for a patient to apply without the potential for pain or discomfort associated with an injection. It also allows the patient to maintain a steady testosterone level without peaks and troughs. As compared to the patch form of testosterone, it has a lower rate of irritation and is not visible.

Gels such as AndroGel, however, are not without some drawbacks. There is a serious but rare risk of secondary exposure associated with gels, whereby testosterone may be transferred from a patient to others, including women and children, through skin-to-skin contact. Precautions such as washing hands after application and covering the application site with a t-shirt can [*12] prevent such exposure. Gels may also cause skin irritation in some patients. Finally, some patients may dislike having to apply the gel daily.

After AndroGel was released in 2000, several other brand-name TTRTs were launched by competing pharmaceutical companies. Testim, a 1% gel available in a five gram tube, was approved in 2002. In 2011, two brand-name testosterone 2% gels were brought to market: (1) Fortesta, a metered-dose pump product applied to the thighs; and (2) Axiron, a solution that is dispensed from a metered-dose pump and is applied to the underarms using a silicon applicator. And in 2014 Vogelxo, another brand-name low-volume testosterone gel, was launched along with an authorized generic version of the same product.

In addition to injectables and TTRTs, several other forms of TRT have been approved by the FDA. Striant, a buccal testosterone tablet that is applied twice daily to gums, was released in 2003. Testopel, a pellet that is surgically inserted in the hip, buttocks, or thigh every three to six months, was approved in 2008. And in 2014 the FDA approved Natesto, a nasal testosterone spray that is administered three times a day.

AndroGel 1% is protected by the '894 patent. That [*13] patent is owned by Besins and by Unimed, which as discussed above, was a wholly-owned subsidiary of Solvay until 2010. Laboratoires Besins Iscovesco SA, a subsidiary ultimately owned by Besins' parent company and now known as Laboratoires Besins Iscovesco SAS ("LBI SAS"), licensed to Unimed certain intellectual property rights to AndroGel. In return, Unimed was obligated to pay a royalty on net sales of AndroGel. Under a separate supply agreement, LBI SAS agreed to

---

[3] As stated above, AbbVie acquired all of Abbott's proprietary pharmaceutical business in 2013. Hereafter we will refer to Abbott as "AbbVie."

manufacture and to sell to Unimed AndroGel products for sale and distribution by Unimed in the United States.[4]

We have previously discussed the prosecution history of the '894 patent in our September 15, 2017 Memorandum (Doc. # 300) and therefore need not restate it in detail here. See *AbbVie, 2017 U.S. Dist. LEXIS 149824, 2017 WL 4098688, at *1-4*. In summary, the initial patent application that resulted in the '894 patent claimed a pharmaceutical composition of a testosterone gel including a penetration enhancer, which according to the patent application "is an agent known to accelerate the delivery of the drug through the skin into the bloodstream." *2017 U.S. Dist. LEXIS 149824, [WL] at *1-2*. The patent application claimed all penetration enhancers including isopropyl myristate, the penetration enhancer actually used in AndroGel. *2017 U.S. Dist. LEXIS 149824, [WL] at *2*. The patent examiner **[*14]** at the U.S. Patent and Trademark Office ("PTO") rejected the claim which included all penetration enhancers. Id. Thereafter, Unimed and Besins submitted an amendment narrowing their claim encompassing all penetration enhancers to a claim naming only twenty-four specific penetration enhancers, including isopropyl myristate. *2017 U.S. Dist. LEXIS 149824, [WL] at *2-3*. After a series of additional amendments, Unimed and Besins further narrowed their claim to one penetration enhancer, isopropyl myristate, only. *2017 U.S. Dist. LEXIS 149824, [WL] at *3*. On this basis, the '894 patent was issued on January 7, 2003. *2017 U.S. Dist. LEXIS 149824, [WL] at *4*. It is scheduled to expire on January 6, 2020.

As is often the case with successful pharmaceutical products, generic manufacturers sought entry into the market to compete with AndroGel. In December 2008, Perrigo submitted to the FDA two ANDAs for a generic testosterone 1% gel in both pump and packet form. The ANDAs referenced AndroGel and the '894 patent. However, the Perrigo product contained isostearic acid as its penetration enhancer rather than AndroGel's isopropyl myristate claimed in the '894 patent.

Pursuant to the procedures established by the Hatch-Waxman Act, Perrigo in June 2009 served paragraph IV notices on both Unimed and Besins as co-owners of the '894 patent. In those notices, Perrigo **[*15]** disclosed

the filing of its ANDAs for a generic 1% testosterone gel. Perrigo further asserted that its ANDAs would not infringe the '894 patent for AndroGel because the Perrigo products did not contain "about 0.1% to about 5% isopropyl myristate," the sole penetration enhancer formulation claimed in the patent. Perrigo also stated in its notices that the prosecution history of the '894 patent would estop Unimed and Besins from filing a patent infringement claim. Finally, Perrigo offered to provide to outside counsel representing Unimed and Besins confidential access to the full ANDAs.

Thereafter Unimed and Besins, along with Unimed's parent Solvay, jointly retained the law firm of Finnegan, Henderson, Farabow, Garrett and Dunner, LLP ("Finnegan, Henderson") to assess the Perrigo paragraph IV notices and the Perrigo ANDAs. Finnegan, Henderson obtained confidential access to the full ANDAs and confirmed that Perrigo's ANDAs contained isostearic acid, not isopropyl myristate. Besins also separately retained the law firm of Foley and Lardner LLP ("Foley and Lardner"). Outside counsel at Foley and Lardner did not receive confidential access to the ANDAs.

On July 17, 2009, Solvay and Unimed issued a press release **[*16]** announcing that "[a]fter careful evaluation" the companies had decided not to file a patent infringement suit against Perrigo. The press release explained that the Perrigo product "contains a different formulation than the formulation protected by the AndroGel patent." It further stated that "[t]his distinction played a role in the company's decision not to file patent infringement litigation at this time" but "the company does not waive its right to initiate patent infringement litigation at a later stage based on new or additional facts and circumstances." The ultimate decision not to file suit was made by Solvay in-house attorneys Shannon Klinger, Peter Edwards, and Dominique Dussard. Besins also determined that it was "standing down" from bringing an infringement suit but did not join in the Solvay press release or issue its own public announcement.

Sometime in 2009, the FDA became aware of cases of accidental secondary exposure of children to TTRTs due to skin-to-skin transference from patients using these products. Based on this information, the FDA required safety-related labeling changes and a Risk Evaluation and Mitigation Strategy ("REMS") for transdermal testosterone gel **[*17]** products currently on the market. Thereafter Auxilium Pharmaceuticals, Inc., the manufacturer of Testim, submitted a citizen

---

[4] AbbVie and Besins later amended the license and supply agreements to include AndroGel 1.62%. Royalties on U.S. sales of AndroGel 1.62% are paid to LBI SAS or Besins Healthcare Luxembourg SARL ("BHL SARL").

petition to the FDA regarding a generic version of Testim. To facilitate the drug approval process, the FDA permits private entities to provide comments and opinions by filing citizen petitions. *21 C.F.R. § 10.30*. A petition can request that the FDA "issue, amend, or revoke a regulation or order or take or refrain from taking one other form of administrative action." Id.

In response to the Auxilium citizen petition, the FDA directed on August 26, 2009 that any application for a generic testosterone gel product containing a penetration enhancer different from the referenced brand-name drug would be required to be submitted as a section 505(b)(2) NDA rather than an ANDA. The application must also include certain additional safety studies regarding the risk of secondary exposure.

On April 9, 2010, AbbVie, now the owner of AndroGel, filed its own citizen petition with the FDA. In that petition, AbbVie noted the FDA's ruling in response to the Auxilium citizen petition regarding all generic testosterone products containing penetration enhancers different than those contained in the reference-listed brand-name **[*18]** drug. AbbVie thus sought assurance from the FDA that Perrigo would be required to resubmit its 2009 ANDAs referencing AndroGel as section 505(b)(2) NDAs. AbbVie also requested that Perrigo be directed to provide to the AndroGel patent holders a new paragraph IV notice. Finally, it asked that Perrigo be required to conduct transfer and hand-washing studies as set forth in the FDA's response to the Auxilium petition.

On October 4, 2010, the FDA granted in part and denied in part AbbVie's citizen petition. The FDA directed that any application by a generic manufacturer for a product referencing AndroGel that contained a different penetration enhancer must be submitted as a section 505(b)(2) NDA. It also agreed that the applicants would be required to submit new paragraph IV notices.

On January 13, 2011, Teva filed a section 505(b)(2) NDA for its generic version of AndroGel 1% which described a different penetration enhancer, isopropyl palmitate, than AbbVie used in its brand-name AndroGel. The application sought approval to manufacture and to distribute the product in two different sachet sizes as well as in a pump form. This application superseded an ANDA for generic testosterone that Teva had filed on December 29, 2008, prior to the FDA's ruling on the **[*19]** Auxilium citizen petition.

On March 16, 2011, Teva sent to Solvay, AbbVie,

Unimed, and Besins a paragraph IV notice regarding its section 505(b)(2) NDA. Teva asserted that its product did not infringe the '894 patent because "the Teva formulation does not contain isopropyl myristate," the penetration enhancer claimed in the '894 patent. Teva laid out the prosecution history of the '894 patent and its position that, because the claims of the '894 patent were narrowed to disclose only isopropyl myristate, "the prosecution history estops the patentees from asserting infringement under the doctrine of equivalents." Teva also offered confidential access to certain information regarding its section 505(b)(2) NDA to allow the patent holders to assess whether an infringement action would have merit.

AbbVie retained outside counsel at the law firm of Munger, Tolles and Olson LLP ("Munger Tolles") to evaluate the Teva paragraph IV notice. Counsel at Munger Tolles was provided with access to the Teva section 505(b)(2) NDA and provided in-house counsel at AbbVie with its opinion. Besins again retained Foley and Lardner to evaluate the notice. Foley and Lardner was supplied with confidential access to the NDA and submitted its analysis to Besins.

On April 29, 2011, within 45 days after receiving the paragraph IV notice, **[*20]** AbbVie, Unimed, and Besins commenced an action in the U.S. District Court for the District of Delaware alleging the Teva's product infringed the '894 patent.[5] See Abbott Prods., Inc. v. Teva Pharm. USA, Inc., No. 11-384 (D. Del. Apr. 29, 2011). The suit against Teva triggered the Hatch-Waxman automatic stay of FDA approval of the Teva product. Consequently, the FDA could not approve Teva's generic testosterone drug for 30 months after March 16, 2011 or until September 17, 2013 unless the district court resolved the lawsuit sooner.

The intellectual property ("IP") litigation group at AbbVie had direct accountability for patent litigation. Four in-house patent attorneys in that group had final responsibility for evaluating the Teva paragraph IV notice and made the decision to file the patent infringement suit against Teva: (1) Johanna Corbin; (2) Adam Chiss; (3) Anat Hakim; and (4) Jose Rivera. All of these attorneys had extensive experience in patent law and with AbbVie. Corbin is currently vice president of the IP group and the lead IP attorney at AbbVie who has worked in that group since 2005. Chiss was divisional

---

[5] As one witness explained at trial, most patent infringement suits are filed in either the District of Delaware or the District of New Jersey because "they tend to be slow-moving dockets."

vice president of IP litigation and before that had served as senior counsel in [*21] IP litigation. Anat Hakim was divisional vice president and associate general counsel of IP litigation at AbbVie and previously had been a partner at Foley and Lardner. Finally, Rivera was a divisional vice president of the IP group and had previously worked in private practice. The general counsel of AbbVie, Laura Schumacher, also signed off on the final decision. Schumacher has been with AbbVie since 2005. No business persons at AbbVie were involved in the decision to sue. At trial, AbbVie presented evidence that the decision whether to file a complaint is always made solely by the legal department and does not require approval from management.

As for Besins, the decision to sue was made by Thomas MacAllister, its in-house counsel. MacAllister is an experienced intellectual property attorney who previously worked as a patent examiner at the U.S. Patent and Trademark Office. Besins conferred with outside counsel as well as AbbVie about the Teva product and potential litigation. Like AbbVie, Besins or its agents had confidential access to the portions of Teva's NDA that disclosed the formulation of its product prior to filing the complaint against Teva. In addition, in-house counsel [*22] for Besins conferred with in-house counsel for AbbVie before making the decision to initiate the lawsuit.

Around this time AbbVie also was preparing for FDA approval and launch of its low-volume formulation of AndroGel, known as AndroGel 1.62%. The FDA issued final approval of brand-name AndroGel 1.62% on April 29, 2011, and AbbVie began selling it in May 2011. The 1.62% formulation is indicated for the same condition and has the same active ingredient but less total gel. Sales of AndroGel 1.62% grew more slowly after launch in 2011 than defendants initially anticipated but by June 2012 constituted the majority of total AndroGel sales. AndroGel 1.62% accounted for total AndroGel sales as follows: 57% during the last 7 months of 2012, 67% in 2013, 76% in 2014, and 83% in 2015.

In June 2011, Teva submitted a case status report proposing a schedule for early summary judgment proceedings in the patent infringement suit in the District of Delaware. AbbVie, Unimed, and Besins filed a supplemental case status report opposing any summary judgment proceedings. On August 1, 2011, before discovery had commenced, Teva filed a motion for summary judgment. Teva asserted that based on prosecution history [*23] estoppel there could be no viable claim of infringement of the '894 patent. On

October 25, 2011, the court set trial on the issue of prosecution history estoppel for May 21, 2012.

On August 18, 2011, AbbVie filed a citizen petition with the FDA requesting that it refrain from granting a therapeutic equivalence rating to section 505(b)(2) products referencing AndroGel, including Teva's testosterone product, or in the alternative, requesting that it assign the product a BX rating. If a BX rating was assigned, there could be no automatic substitution at the pharmacy under state law.

Meanwhile, on July 4, 2011 Perrigo re-filed with the FDA its application for approval of a generic testosterone 1% gel as a section 505(b)(2) NDA. On September 20, 2011, Perrigo sent AbbVie, Unimed, and Besins a new paragraph IV notice. As in its 2009 notice, Perrigo certified that the '894 patent was not infringed because its generic testosterone product did not contain "about 0.1% to 0.5% isopropyl myristate," the penetration enhancer claimed in the patent.

Perrigo's letter also explained that the prosecution history of the '894 patent precluded any valid infringement claim. Perrigo stated that "a lawsuit asserting the '894 patent against Perrigo would be objectively baseless and a sham, brought in bad [*24] faith for the improper purpose of, underlying inter alia, delaying Perrigo's NDA approval." It further asserted that "a bad faith motive for bringing such a suit would be particularly apparent in light of representations and admissions made, underlying inter alia, in [Solvay's] Friday, July 17, 2009 press release." Perrigo offered confidential access to certain information regarding the NDA. Again, AbbVie and Unimed retained Munger Tolles as outside counsel to analyze Perrigo's NDA. Foley and Lardner evaluated Perrigo's NDA on behalf of Besins and also issued its opinion to Besins.

On October 31, 2011, AbbVie, Unimed, and Besins filed suit in the District of New Jersey alleging that Perrigo's 1% testosterone gel infringed the '894 patent. See Abbott Prods., Inc. v. Perrigo Co., 11-6357 (D.N.J. Oct. 31, 2011). As in the Teva litigation, the filing of the complaint against Perrigo triggered an automatic 30-month stay under the Hatch-Waxman Act. Thus, absent a court ruling or settlement resolving the litigation, the stay would preclude final FDA approval of the Perrigo generic testosterone product until March 20, 2014.

The same four AbbVie in-house attorneys as had made the decision to sue Teva again made the decision [*25] to file the suit against Perrigo with approval from the same general counsel. They conferred with outside

counsel, who had confidential access to the Perrigo section 505(b)(2) NDA. No AbbVie business person was involved in the decision to file the Perrigo action. After consultation with AbbVie and outside counsel, Besins' same in-house attorney made the decision that it would join in bringing the Perrigo litigation.

AbbVie reached out to Teva to discuss an amicable resolution of the dispute before the complaint was filed in April 2011. Perry Siatis, an in-house attorney for AbbVie, was the main negotiator on behalf of AbbVie.[6] At that time, Siatis was Divisional Vice President of the IP strategy group and head intellectual property attorney at AbbVie. Although that initial contact did not lead to a settlement, AbbVie again raised the subject with Teva during an in-person meeting on October 28, 2011, three days after the court in the Teva litigation had set a trial date. Although Teva at the outset pushed for an entry date as early as September 17, 2013, the final date of the 30-month Hatch-Waxman stay, AbbVie countered with an entry date of January 1, 2015. AbbVie thereafter agreed to an entry date of December 27, [*26] 2014, which would allow Teva to make some sales in 2014. On December 20, 2011 the parties reached a final settlement in the Teva litigation, in which Teva received a license to launch its product beginning December 27, 2014.[7]

While the Teva negotiations were ongoing, settlement negotiations were taking place in the Perrigo litigation. Sometime on or before November 3, 2011, Siatis approached Perrigo to initiate settlement negotiations. On December 8, 2011 the parties executed a binding term sheet, which included the dismissal of all claims and counterclaims with prejudice. In addition, AbbVie agreed to pay Perrigo $2 million dollars as reasonable litigation expenses.

During the negotiations Perrigo pushed for an earlier entry date but was unsuccessful and ultimately accepted an offer from defendants of January 1, 2015. However, the settlement contained an acceleration clause whereby Perrigo would be permitted to launch if another generic came to market. Andrew Solomon,

general counsel for Perrigo, explained that the company had been monitoring the Teva litigation and thought there was "a very good probability Teva could prevail" at the trial scheduled for May 2012 and thereafter launch [*27] its product, so "that would provide a much earlier Perrigo license date." As a result of the Teva settlement, Perrigo's licensed entry date was moved up to December 27, 2014 under the acceleration clause.

On February 14, 2012, the FDA approved Teva's section 505(b)(2) NDA for the packet presentation of its TTRT product. During review of the application, the FDA had identified a potential safety concern with the packaging used in the pump presentation of the drug.[8] In response to this concern, Teva withdrew the pump presentation from its application. As a result, the FDA approved Teva's product in sachet form only.

After receiving FDA approval, Teva waited for the FDA Office of Generic Drugs to assign a TE rating for its product. On December 21, 2012, AbbVie filed a citizen petition supplement requesting that the FDA refrain from granting a TE rating to Teva's product or, in the alternative, grant it a BX rating.

Later, on January 31, 2013, the FDA approved Perrigo's section 505(b)(2) NDA for its generic version of AndroGel 1%. Thereafter the FDA considered a TE rating for Perrigo's generic product. During this period, AbbVie filed an additional citizen petition on December 11, 2013. The December 11, 2013 citizen petition supplemented the [*28] August 18, 2011 citizen petition and requested that the FDA issue a BX rating for Perrigo's product.

In the months before its December 27, 2014 licensed entry date approached, Perrigo took a number of steps to follow up with the FDA regarding its TE rating. Perrigo sent three letters to the FDA. It received no response other than being informed that the FDA needed more time to evaluate the therapeutic equivalence of the product.

Perrigo filed a lawsuit against the FDA in the United States District Court for the District of Columbia on March 21, 2014. See Perrigo Israel Pharm. Ltd. v. U.S. Food & Drug Admin., No. 14-475 (D.D.C. Mar. 21, 2014). Perrigo asserted that the FDA had engaged in

---

[6] Siatis had no involvement in the decision to sue either Teva or Perrigo for patent infringement.

[7] During this time AbbVie was negotiating with Teva regarding disputes related to two other drugs, Simcor and TriCor. Agreements related to Simcor and TriCor were executed on the same day as the AndroGel settlement. However, there is no evidence that these negotiations were linked to the AndroGel settlement.

[8] Specifically, during a meeting on June 27, 2011, the FDA recommended that Teva withdraw its pump configuration with the option to resubmit it as a post-approval amendment once the issue was resolved.

unreasonable delay. It requested that the court enter a mandatory injunction compelling the FDA to publish a TE rating for Perrigo's NDA product as soon as possible. On April 10, 2014, the FDA filed its first response to the lawsuit. The FDA contended that "Perrigo has itself obviated the need for a prompt decision by reaching an agreement with the innovator not to market until December 2014." The FDA further represented that it expected to issue a TE rating for Perrigo's product "by July 31, 2014—some [*29] five months before Perrigo's planned product launch."

Prior to the deadline, on July 23, 2014, the FDA determined that Perrigo's section 505(b)(2) NDA product was therapeutically equivalent to AndroGel and issued it an AB rating.[9] That same day, however, the FDA assigned a BX rating to Teva's product. Specifically, the FDA concluded that the data submitted by Teva was "insufficient to determine TE [therapeutic equivalence] to AndroGel 1%." As a result, under all state laws the Perrigo generic testosterone product would be auto-substitutable at the pharmacy for brand-name AndroGel 1% prescriptions, but the Teva product would not.

Perrigo launched its AB-rated generic version of AndroGel 1% on December 27, 2014, its licensed entry date under the settlement agreement with defendants. Perrigo would not have entered the market without first receiving a decision from the FDA on its TE rating. Perrigo achieved its goal to obtain an AB rating for its product and would have challenged the FDA had it received only a BX rating.

Teva, in contrast, never set in motion the sale of its generic testosterone replacement product. Timothy Crew, Teva's Commercial Operations Officer from the time that Teva filed its NDA until [*30] late 2012, was a strong proponent of bringing the Teva product to market even absent an AB rating. Crew identified a "'brand' push through managed care" marketing strategy in which Teva would go directly to managed care organizations and pharmacy benefit managers in an attempt to negotiate preferential formulary placement for a non-AB rated product and thereby influence physicians' prescribing decisions.[10] Crew considered

the Teva generic testosterone product his "pet project."

Teva underwent management changes in November 2012. Crew left the company, and Alan Oberman became the new Chief Executive Officer of Teva. Shortly thereafter, Maureen Cavanaugh, Vice President of Customer Operations and Marketing for Teva, recommended to Oberman that Teva not launch the BX rated product. Cavanaugh explained that Teva's generic group had no sales force and had never launched a non-AB rated retail pharmacy product. She further opined that a BX-rated product with no perceived advantage over brand-name AndroGel would capture only 10-11% of the brand-name product's sales and perhaps less than 5%.

Teva faced other obstacles to launching its BX-rated product. Teva had contracted with Cipla, [*31] an India-based company, to manufacture its generic testosterone replacement drug. Before it could begin the manufacturing process, Cipla required a $10 million capital expenditure from Teva, which could be paid up front or over time through a 35% royalty on sales. Cipla projected that it would require 12-24 months or more to achieve operational readiness. Pursuant to another contract, Teva was also required to pay a royalty of 5-7.5% on sales to a third company, BioSante.

As discussed above, Teva had received FDA approval for the sachet presentation of its product only. At the time that Teva withdrew the pump presentation from consideration by the FDA, pump sales made up 40-50% of AndroGel sales. Thus the failure to obtain approval for a pump product had a negative impact on the commercial viability of Teva's product.

Ultimately, on May 1, 2015, Teva transferred ownership of the 505(b)(2) NDA product and all intellectual property necessary to market the product to ANI Pharmaceuticals, Inc. ("ANI"), its development partner.

III

To prevail on its claim of illegal monopolization, the FTC must establish that defendants filed sham litigation against Teva and Perrigo as outlined by the Supreme [*32] Court in PRE. Whether litigation is a sham involves a two part test. We have already resolved the first part of the test, that is, that the lawsuits

---

[9] Perrigo voluntarily dismissed the lawsuit on July 24, 2014, one day after the FDA issued its TE rating to Perrigo.

[10] A formulary is a "listing of medications for which an insurer or managed care organization provides coverage." See Saltzman v. Indep. Blue Cross, 384 F. App'x 107, 109 n.3 (3d Cir. 2010) (citations omitted). Formularies generally divide

medications into tiers with different copays for each tier. See id. at 109. Typically, the first tier includes generic medications with the lowest copay, while higher tiers include brand-name drugs with higher copays. See id.

were objectively baseless in the sense that "no reasonable litigant could realistically expect success on the merits." *AbbVie Inc., 2017 U.S. Dist. LEXIS 149824, 2017 WL 4098688, at *4* (quoting *PRE, 508 U.S. at 60*). The second part of the test requires the court to decide whether defendants subjectively intended to interfere directly with a competitor's business interests by using the government process as an anticompetitive weapon. *PRE, 508 U.S. at 60-61*. Only if the lawsuits were both objectively and subjectively baseless will the FTC have demonstrated that defendants engaged in sham litigation.

As stated above, we have already determined that the lawsuits against Teva and Perrigo in 2011 were objectively baseless as a matter of law in light of the undisputed facts concerning the prosecution history of the '894 patent. See *AbbVie Inc., 2017 U.S. Dist. LEXIS 149824, 2017 WL 4098688, at *1-4, *11*. We found that Unimed and Besins secured the '894 patent only by amending their patent application from an initially broad claim covering all penetration enhancers to a narrow claim covering only one penetration enhancer— isopropyl myristate at a particular concentration. See *2017 U.S. Dist. LEXIS 149824, [WL] at *6-8, *10*. Instead of isopropyl myristate, Teva used isopropyl palmitate and **[*33]** Perrigo used isostearic acid as a penetration enhancer in their generic versions of AndroGel. We concluded that "any reasonable person who reads the prosecution history of the '894 patent can reach no other conclusion than that the applicants have purposefully and not tangentially excluded isopropyl palmitate and isostearic acid as penetration enhancers equivalent to isopropyl myristate." *2017 U.S. Dist. LEXIS 149824, [WL] at *11*.

We emphasized that "the purpose of prosecution history estoppel is to protect the patentees' competitors from patent infringement litigation based on the doctrine of equivalents if the prosecution history demonstrates that an equivalent not specifically disclosed in the patent has been purposefully and not tangentially excluded from its scope." *2017 U.S. Dist. LEXIS 149824, [WL] at *11*. Given the patent prosecution history for the '894 patent, AbbVie and Besins did not tangentially exclude all other penetration enhancers and could not reasonably have expected success on the merits in their suits against Teva and Perrigo alleging patent infringement under the doctrine of equivalents.[11] Id. Defendants cannot have it

both ways. They cannot, as they did here, purposely surrender claims to all penetration enhancers except one to obtain a patent and then claim infringement **[*34]** when a party uses a penetration enhancer that they deliberately surrendered. See *2017 U.S. Dist. LEXIS 149824, [WL] at *10-11*.

We now focus our inquiry on the subjective component of the FTC's sham litigation claim, which was one of the issues litigated in the nonjury trial held in this action. At the outset, we readily acknowledge that a plaintiff claiming that a lawsuit was a sham faces an uphill battle. The *First Amendment to the United States Constitution* prohibits Congress from making any law respecting "the right of the people . . . to petition the Government for a redress of grievances." *U.S. Const. amend. I*. It is well-established that the *First Amendment* right to petition the government includes the right to have access to the courts. *PRE, 508 U.S. at 56-57*; see also *U.S. Const. amend. I*. Under the Noerr-Pennington doctrine articulated by the Supreme Court, "[t]hose who petition [the] government for redress are generally immune from antitrust liability."[12] *PRE, 508 U.S. at 56*. Noerr-Pennington immunity, however, is not absolute. "[A]ctivity 'ostensibly directed toward influencing governmental action' does not qualify for [*First Amendment*] immunity if it 'is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" *Id. at 51* (quoting *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961)* (alterations in original)).

Later, in *City of Columbia v. Omni Outdoor* **[*35]** *Advertising, Inc.*, the Supreme Court explained:

_____

(Doc. # 438).

[12] The Noerr-Pennington doctrine originated from two separate antitrust cases, *United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965)* and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961)*. Pennington involved efforts by several companies and a union to lobby the Secretary of Labor regarding minimum wage regulations. *381 U.S. at 660*. In Noerr, a group of railroads engaged in a publicity campaign designed to foster the adoption of certain laws and regulations harmful to the trucking industry. *365 U.S. at 129-30*. The doctrine has since been extended to persons who petition the courts, in addition to legislatures and administrative agencies. See *Ca. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 509-10, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972)*.

_____

[11] Defendants have moved for reconsideration of that decision. On June 27, 2018, we denied the motion in a separate order

The 'sham' exception to Noerr encompasses situations in which persons use the governmental process—as opposed to the outcome of the process—as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of a license but simply in order to impose expense and delay.

*499 U.S. 365, 380, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991)* (emphasis omitted).

We must initially decide not only the type of proof but also the burden of proof which are required to establish subjective intent. The parties disagree regarding both. According to defendants, the FTC must show that they brought the patent infringement actions with actual knowledge that actions were baseless. The FTC, in contrast, asserts that actual knowledge or bad faith is not required under PRE. Instead, the FTC argues that the subjective baselessness inquiry concerns only "whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor." See *PRE, 508 U.S. at 60-61* (internal citation and quotation marks omitted). Accordingly, the FTC urges the court to focus on the "economic viability" of the lawsuit and whether defendants [*36] "sue[d] primarily for the benefit of collateral injuries inflicted through the use of legal process." *Id. at 65*.

Unfortunately, the Supreme Court in PRE did not elaborate on this issue. In that case, the Court of Appeals had affirmed an order granting summary judgment for the plaintiff on the defendant's counterclaim alleging a sham lawsuit. *Id. at 62-65*. The Supreme Court agreed with the Court of Appeals that the lawsuit was not objectively baseless and thus did not reach the subjective intent question. *Id. at 65-66*.

In support of its position, the FTC cites *Kilopass Techology, Inc. v. Sidense Corp., 738 F.3d 1302 (Fed. Cir. 2013)*. That case, however, involved a motion for attorneys' fees under *35 U.S.C. § 285*, which provides that a court "in exceptional cases may award reasonable attorneys' fees to the prevailing party." *738 F.3d at 1304, 1312*. The Federal Circuit held that "actual knowledge of baselessness is not required" and that "a defendant need only prove reckless conduct to satisfy the subjective component of the *§ 285* analysis." *Id. at 1310*. It further explained that courts may "dra[w] an inference of bad faith from circumstantial evidence thereof when a patentee pursues claims that are devoid of merit" and that "[o]bjective baselessness alone can

create a sufficient inference of bad faith to establish exceptionality under *§ 285*, unless [*37] the circumstances as a whole show a lack of recklessness on the patentee's part." *Id. at 1311, 1314*.

Since then, the Supreme Court has expressly distinguished the standard for a claim of sham litigation from that applicable to motions for attorneys' fees under *§ 285*. See *Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1757-58, 188 L. Ed. 2d 816 (2014)*. The Court reasoned that the Noerr-Pennington doctrine was created as "a narrow exception for 'sham litigation'—to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances." *Id. at 1757*. It further observed that "[t]he threat of antitrust liability . . . far more significantly chills the exercise of the right to petition than does the mere shifting of attorney's fees." Id. Thus the standard for fee-shifting, which is governed by the statutory language of *35 U.S.C. § 285*, is irrelevant to the subjective intent standard for sham litigation under PRE. Id.

Many of the authorities cited by the FTC are not helpful to our analysis regarding subjective intent. For example, in In re Flonase Antitrust Litigation, the defendant conceded that there was sufficient evidence for plaintiffs to survive summary judgment on subjective intent and as a result the court did not address the issue. *795 F. Supp. 2d 300, 311 (E.D. Pa. 2011)*. Other authorities cited by the FTC dealt with [*38] motions to dismiss and do not contain a fulsome analysis of the evidence required to support the subjective intent prong of PRE. See *Moldex Metric, Inc. v. 3M Co., No. 14-1821, 2015 U.S. Dist. LEXIS 15008, 2015 WL 520722, at *7, *9 (D. Minn. Feb. 9, 2015)*; *TransWeb, LLC v. 3M Innovative Props. Co., No. 10-4413, 2011 U.S. Dist. LEXIS 59095, 2011 WL 2181189, at *15 (D.N.J. June 1, 2011)*; *Rochester Drug Coop. v. Braintree Labs., 712 F. Supp. 2d 308, 316, 319-21 (D. Del. 2010)*; *In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 643-44 (E.D. Mich. 2000)*.

After review of the decisions cited by both parties, we conclude that the subjective intent required to overcome Noerr-Pennington immunity is not merely the intent to thwart competition. It is well-established that "the essence of a patent grant is the right to exclude others from profiting by the patented invention" and thereby to interfere with a competitor's business. See *Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 215, 100 S. Ct. 2601, 65 L. Ed. 2d 696 (1980)*. As our Court of Appeals has recognized, the Hatch-Waxman Act

"incentivizes brand-name drug manufacturers to promptly file patent infringement suits by rewarding them with a stay of up to 30 months if they do so" and therefore "[w]e are not inclined to penalize a brand-name manufacturer whose litigiousness was a product of Hatch-Waxman." *In re Wellbutrin, 868 F.3d at 157-58* (internal quotation marks and citation omitted). Knowledge that the filing of a lawsuit would trigger the automatic stay is not by itself evidence of a bad-faith motive. Id.; see also *In re Terazosin Hydrochloride Antitrust Litig., 335 F. Supp. 2d 1336, 1365 (S.D. Fla. 2004).*

As the Supreme Court noted in Omni Outdoor Advertising, a classic example of "sham" activity is the filing [*39] of frivolous objections to a license application with no expectation of prevailing but simply in order to impose expense and delay. See *499 U.S. at 380.* Clearly, a frivolous lawsuit under those same circumstances is also a sham. The sham exception under Noerr-Pennington, of course, is narrow so as not to infringe on a party's constitutional right to petition the government for redress of grievances. Consequently, we conclude that the FTC must prove that defendants had actual knowledge that the patent infringement suits here were baseless in order both to meet its burden under Omni Outdoor Advertising and PRE and to avoid interference with defendants' *First Amendment* rights.

The parties, as noted above, further disagree as to the burden of proof required to establish subjective intent. The FTC contends that it must simply satisfy a preponderance of the evidence standard, the general standard for civil antitrust claims. See, e.g., *LePage's, Inc. v. 3M, 324 F.3d 141, 166-69 (3d Cir. 2003).* Defendants counter that a finding of subjective intent demands clear and convincing evidence.

The Supreme Court has not addressed this question. Nor has our Court of Appeals. The Courts of Appeals for the Ninth and Seventh Circuits in decisions that predate PRE have both [*40] required clear and convincing evidence that defendants prosecuted actions in bad faith to satisfy the subjective prong of a sham litigation claim. See *Handgards, Inc. v. Ethicon, Inc., 743 F.2d 1282, 1288-93 (9th Cir. 1984); MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1155 (7th Cir. 1983).*

In support of their position that clear and convincing evidence is required, defendants point to *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp., 382 U.S. 172, 86 S. Ct. 347, 15 L. Ed.*

*2d 247 (1965).* There, the Supreme Court held that an allegation that the defendant "knowingly and willfully" obtained a patent through fraudulent representations to the Patent Office would not be entitled to Noerr-Pennington immunity for a subsequent lawsuit alleging infringement of that patent. *382 U.S. at 177-78.* The Federal Circuit has since specified that clear and convincing evidence is needed to establish a Walker Process monopolization claim. See *C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1364 (Fed. Cir. 1998).* It observed that "[t]he road to the Patent Office is so tortuous and patent litigation is usually so complex," that there must be "no less than clear, convincing proof of intentional fraud involving affirmative dishonesty." Id. (internal citation omitted).

The authorities cited by the FTC to support its position that a preponderance of the evidence is sufficient are not on point. Those cases concern the standard for an award of attorneys' fees in a patent case under 35 U.S.C. § 285, not the subjective intent [*41] standard for sham litigation antitrust claims. See, e.g., *Kilopass Tech., Inc., 738 F.3d at 1315-16.* As stated above, the Supreme Court has expressly distinguished sham litigation in the Noerr-Pennington context from motions brought under § 285. See *Octane Fitness, LLC, 134 S. Ct. at 1757-58.*

We conclude that the FTC must prove by clear and convincing evidence the subjective intent element of a sham litigation. We do so in light of the Federal Circuit's decision in C.R. Bard as well as the importance of the *First Amendment* right to petition the government for a redress of grievances as explained in Noerr, Pennington, and California Motor Transport Co.

Having determined that the FTC has the burden to establish by clear and convincing evidence that defendants had actual knowledge that their infringement suits against Teva and Perrigo were baseless, we now consider the evidence presented at trial and the reasonable inferences to be drawn therefrom.

The FTC puts great emphasis on the 2009 press release by Solvay on behalf of its subsidiary Unimed, co-owner of the '894 patent, before Solvay and Unimed were acquired by AbbVie in February 2010. The press release announced the companies' decision not to sue Perrigo for infringement of the '894 patent after Perrigo filed with the FDA its ANDA for a generic version of [*42] AndroGel. Solvay gave as its reason that the Perrigo product "contains a different formulation than the formulation protected by the AndroGel patent." The

FTC also presented evidence regarding a July 2009 email written by MacAllister, in-house counsel for Besins, stating that Besins, the co-owner of the '894 patent, was "standing down" from pursuing Perrigo for infringement.

None of the in-house AbbVie attorneys identified as the decision-makers regarding the 2011 suits against Teva and Perrigo were previously employed by Solvay or Unimed. As for Besins, it did not explain whether its decision not to pursue a patent infringement suit was based on the merits or was simply recognizing the reality that it alone could not initiate such a suit without Unimed, the co-owner of the '894 patent. See, e.g., *Int'l Nutrition Co. v. Horphag Research Ltd., 257 F.3d 1324, 1331 (Fed. Cir. 2001)*. While Solvay and its in-house attorneys certainly got it right in 2009, this evidence is not probative as to the subjective intent of defendants' decision-makers here some two years later in 2011.

Both parties also rely on various business planning documents to support their positions on subjective intent. The FTC, for example, points to an August 8, 2011 meeting attended by Jeffrey Stewart, then Vice President [*43] of U.S. Proprietary Pharmaceuticals at AbbVie, and several other AbbVie executives and in-house attorneys to discuss AndroGel. This meeting took place shortly after Teva filed its motion for summary judgment in the patent infringement case in which AbbVie had sued it. During that meeting Stewart, looking into the future, drew a chart depicting a dramatic erosion of AndroGel sales following entry of an AB-rated generic after a "lost case" eight months hence in April 2012, the month in which this court had scheduled a hearing to take place on Teva's summary judgment motion.

Thereafter, AbbVie created "AndroGel Scenarios" with various potential dates for generic entry, including: (1) November 2011, the date by which the FDA had agreed to review Teva's section 505(b)(2) NDA[13]; (2) April 2012, the date on which the summary judgment motion could be decided in the Teva matter; and (3) April 2013, an estimate of the date on which a trial on the merits may have concluded in the Teva matter. In an email on September 30, 2011, James Hynd, one of the AbbVie

executives responsible for the AndroGel franchise, characterized the April 2012 entry date as "[t]he most likely scenario."

Defendants, meanwhile, point to the [*44] official 2012 annual plan for AbbVie's U.S. Proprietary Pharmaceuticals Division. AbbVie began work on that plan in summer of 2011 and finalized it in late fall of 2011. In that plan, AbbVie forecasted increased sales for AndroGel. It also projected an increase in total "Selling, General, and Administrative" ("SG&A") spending for AndroGel from 2011 to 2012. While the plan "assumed LOE [loss of exclusivity]" for several other products, it made no mention of any loss of exclusivity for AndroGel. Defendants also highlight the AbbVie long range plan ("LRP") that was created in 2011. The LRP is a five to ten year business plan that is updated every year through a planning process that generally begins in January and ends in May. The LRP created in 2011 uses as the loss of exclusivity date for AndroGel August 31, 2015, the licensed entry date granted to two other generic competitors, Par Pharmaceutical and Watson Pharmaceuticals, Inc.

We do not find these and other similar business documents to be persuasive or even relevant to the issue of subjective intent. Significantly, none of these corporate documents, as far as we know, was created by or influenced anyone who played a role in the decisions [*45] to sue Teva and Perrigo for patent infringement. Nor is there any evidence in the record as to what, if anything, the decision-makers in the legal department told the business people or vice versa about the merits or prospects of the litigation. These corporate documents are simply not probative of the state of mind of the in-house attorneys who made the decisions to sue.

As evidence of their subjective good faith, defendants also rely on the fact that they obtained favorable settlements in their lawsuits against Teva and Perrigo. Specifically, defendants point out that they initially proposed to both Teva and Perrigo a market entry date of January 1, 2015, a date which extended far beyond the maximum 30-month Hatch-Waxman stays applicable to the two lawsuits. Although Teva and Perrigo countered on several occasions with earlier entry dates, defendants held firm to their initial offers in both negotiations. In the end, Teva and Perrigo secured an entry date of December 27, 2014 for their products, just days earlier than defendants' first proposals.[14]

---

[13] This is commonly known as the *Prescription Drug User Fee Act ("PDUFA")* date. Under that Act, the FDA collects a fee from companies applying for drug approval and, in exchange, the FDA provides a "goal date" by which it will review the application. See *21 U.S.C. § 379h*.

---

[14] As stated above, Perrigo ultimately agreed to an entry date

Defendants maintain that they would not have insisted on such a late entry date if they knew the infringement suits were frivolous or if [*46] they otherwise were motivated only to use the litigation process itself and the automatic Hatch-Waxman stay as an anti-competitive weapon. We find this argument unpersuasive.

Parties often settle litigation for a variety of reasons independent of the merits of the claims. It is true that the settlements prevented Teva and Perrigo from entering the market until after the automatic Hatch-Waxman stays would have expired. On the other hand, the settlements permitted Teva and Perrigo to enter the market years before the '894 patent was set to expire and before any other generic competitor could come to market. They also permitted Teva and Perrigo to limit their litigation costs, and Perrigo obtained $2 million from AbbVie for reasonable litigation expenses. Even frivolous lawsuits can be very costly to defend and to take to trial, especially when plaintiffs, such as the defendants here, have extensive resources.

Charles Cotesworth Pinckney's steadfast response, "not a six-pence, sir," in rejecting a request of French officials for a payment of money in the XYZ Affair, and Representative Robert Goodloe Harper's now famous toast in a similar vein, "Millions for Defense but not a Cent for Tribute," at [*47] a dinner in 1798 in Philadelphia, while admirable in many spheres of life, generally have no applicability in the real world when lawsuits are being settled. We find that the terms of the Teva and Perrigo settlements here do not support defendants' subjective good faith.

The FTC points to the various citizen petitions filed by AbbVie regarding the applications submitted by Teva and Perrigo for FDA approval and for TE ratings for its products. For all of these petitions, the FDA granted in part the relief requested by AbbVie. Because they were found to be at least partially meritorious, we do not consider the citizen petitions as evidence of any improper subjective intent by defendants.

The FTC further points to evidence that AbbVie attempted to accelerate the transition of patients from AndroGel 1% to AndroGel 1.62% in summer 2011. Again, there is no evidence that those who decided to bring the infringement actions against Teva and Perrigo played any role in this process.

It is, of course, the FTC which bears the burden of proof

_____

of January 1, 2015 but this date was moved to December 27, 2014 pursuant to an acceleration clause in the contract.

by clear and convincing evidence that defendants had the subjective intent to file sham infringement actions against Teva and Perrigo. In determining subjective [*48] intent, the court must zoom in on the individuals at AbbVie and Besins who made the decisions to file the infringement actions against Teva and Perrigo and discern what these individuals knew. The state of mind of individual decision-makers is of course imputed to the corporations for which they act. See, e.g., *In re Color Tile Inc., 475 F.3d 508, 513 (3d Cir. 2007).*

The individuals, as noted above, who made the decision on behalf of AbbVie on whether to file the objectively baseless lawsuits against Teva and Perrigo were four experienced patent attorneys with sign-off from the general counsel of AbbVie. The record reflects that no business executives were in any way involved—not even with a perfunctory sign-off. As for Besins, the decision to sue was likewise made by in-house counsel for the company. Again no business people participated in the decisions to sue or were otherwise involved.

As the finder of fact, the court may consider both direct and circumstantial evidence when evaluating defendants' subjective intent. See *Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 257-58 (3d Cir. 2010)* (citing *Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1199 (3d Cir. 1995))*. We may determine what weight and credence to give this evidence and may also draw reasonable inferences therefrom. See id. In making findings of fact, the court, like jurors, should not leave common sense at [*49] the courthouse steps.

Triers of fact are routinely called upon to determine a party's state of mind. *United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716-17, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)*. As our Supreme Court has recognized:

> The law often obliges finders of fact to inquire into a person's state of mind. . . . The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much as fact as anything else.

Id. (internal citations and quotations omitted). We routinely instruct juries to decide a person's intent in both criminal and civil proceedings:

> Often the state of mind . . . with which a person acts at any given time cannot be proved directly,

because one cannot read another person's mind and tell what he or she is thinking. However, [defendants'] state of mind can be proved indirectly from the surrounding circumstances. Thus, to determine [defendants'] state of mind . . . at a particular time, you may consider evidence about what [defendants] said, what [defendants] did and failed to do, how [defendants] acted, and all the other facts and circumstances shown by the evidence that may prove what was in [defendants'] mind **[*50]** at that time. . . .

You may also consider the natural and probable results or consequences of any acts [defendants] knowingly did, and whether it is reasonable to conclude that [defendants] intended those results or consequences. You may find, but you are not required to find, that [defendants] knew and intended the natural and probable consequences or results of acts [defendants] knowingly did. This means that if you find that an ordinary person in [defendants'] situation would have naturally realized that certain consequences would result from [defendants'] actions, then you may find, but you are not required to find, that [defendants] did know and did intend that those consequences would result from [defendants'] actions.

Third Circuit Model Criminal Jury Instructions § 5.01. This explanation is also reflected in our Circuit's model jury instructions for civil cases where intent is relevant, such as those under civil rights statutes. Those model instructions state that a plaintiff "is not required to produce direct evidence of intent" and that intent "may be inferred from the existence of other facts." See, e.g., Third Circuit Model Civil Jury Instructions § 5.1.2. Because of the difficulty of **[*51]** proving a person's state of mind, intent is usually a matter of inference from evidence in the record both in civil and criminal cases. See *Herman & MacLean v. Huddleston, 459 U.S. 375, 391 n.30, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983)*; *Resolution Tr. Corp. v. Fid. & Deposit Co. of Md., 205 F.3d 615, 642-43 (3d Cir. 2000)*; *McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir. 1979)*.

None of the attorneys who was a decision-maker at AbbVie testified at the trial. While in-house counsel for Besins did testify, he did not say a word about his reasoning for bringing suit against Teva and Perrigo. Defendants invoked the attorney-client privilege as well as the attorney work product doctrine and did not assert reliance on advice of outside counsel as an affirmative

defense.[15] Defendants have cited authority that we may not draw adverse inferences on subjective intent from a party's justifiable reliance on these privileges. We agree. We do not and will not draw any negative inference as to subjective intent based on defendants' decision to invoke the attorney-client privilege and the attorney work product doctrine and thereby to shroud certain information from view.[16] See *Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 479-80 n.25 (3d Cir. 2005)*.

With no direct evidence of the subjective intent of the decision-makers, we must decide whether their subjective intent to file a sham lawsuit has been proven by clear and convincing evidence from the surrounding circumstances and the natural and probable **[*52]** consequences of their knowing acts. It is unrefuted that the attorneys who decided to sue Teva and Perrigo for patent infringement were aware of the paragraph IV notices from Teva and Perrigo. In the paragraph IV notices, Teva and Perrigo declared that their products did not contain as a penetration enhancer isopropyl myristate in the particular concentration claimed in the '894 patent. Outside counsel for defendants had confidential access to the section 505(b)(2) NDAs of Teva and Perrigo, which included the penetration enhancers used by Teva and Perrigo. Both paragraph IV notices called to the attention of the decision-makers that any infringement actions by defendants would be barred by prosecution history estoppel. Perrigo went so far as to assert that any infringement suit against it would be a sham.

The decision-makers at AbbVie and Besins in 2011 knew that Teva and Perrigo used penetration enhancers

---

[15] The FTC has not challenged the general proposition that attorney-client privilege or the attorney work product doctrine applies but did engage in motion practice regarding whether certain documents were in fact shielded from discovery by these privileges. It also asserted in various pretrial motions and trial briefs that defendants waived these privileges to the extent defendants asserted that the in-house counsel who made the decision to sue acted in good faith.

[16] This is not an unusual situation. It is no different from that faced by courts every day in criminal trials, in which juries are instructed to make findings about intent but not to draw a negative inference based on a defendant's failure to testify. See *United States v. Waller, 654 F.3d 430, 435-38 (3d Cir. 2011)*. We also note that juries in criminal cases may rely on circumstantial evidence to find intent beyond a reasonable doubt, a standard higher than the clear and convincing standard applicable here. See *id. at 436*.

for their generic products which were distinct from the one penetration enhancer claimed in the '894 patent. We reasonably infer that the decision-makers also were aware of the prosecution history of the '894 patent and specifically that the patent application originally claimed all penetration enhancers including those in the Teva [*53] and Perrigo products and that those penetration enhancers used by Teva and Perrigo were ultimately excluded from the protection of the '894 patent. The prosecution history detailed that the original claims covered all penetration enhancers but were ultimately reduced to one, isopropyl myristate. This history is outlined in our prior summary judgment decision. See *AbbVie Inc., 2017 U.S. Dist. LEXIS 149824, 2017 WL 4098688, at \*4-11*. As we found there, "any reasonable person who reads the prosecution history of the '894 patent" would know that all penetration enhancers other than isopropyl myristate in particular concentrations were surrendered. *2017 U.S. Dist. LEXIS 149824, [WL] at \*11*.

The reason and motivation for the lawsuits against Teva and Perrigo are also proper considerations which inform our decision on subjective intent. See *Omni Outdoor Advertising, Inc., 499 U.S. at 380*. Regardless of what the business people knew or had in mind or what any of AbbVie's specific corporate documents or business people revealed, we reasonably infer that the patent attorneys, some of whom were long-time employees, were generally aware of the extensive financial success of AndroGel. It was no secret that AndroGel was a blockbuster product for defendants. It was bringing in hundreds of millions of dollars annually as of 2011 with a very high profit margin. Sales of AndroGel [*54] were $604 million, $726 million, and $874 million in 2009, 2010, and 2011 respectively. The patent attorneys also clearly recognized that the entry of generic versions of AndroGel with their much lower prices would quickly and significantly erode this ideal financial picture. Their reason and motivation for the filing of these objectively baseless actions against potential competitors was to staunch, at least for a time, this looming reversal of fortune.

In sum, all of the decision-makers, we reiterate, were very experienced patent attorneys, who also knew the extensive financial benefits to defendants if generic versions of AndroGel were kept or delayed from entry into the market. It is a compelling inference that they knew the law concerning the prosecution history estoppel and related principles and understood that prosecution history estoppel barred the infringement suits against Teva and Perrigo. They decided to file these lawsuits anyway. Since these experienced patent attorneys filed objectively baseless infringement lawsuits, it is reasonable to conclude that they intended the natural and probable consequences of acts they knowingly did. This leads ineluctably to an inference [*55] that the subjective intent of the decision-makers was to file sham lawsuits. We find by clear and convincing evidence that these attorneys had actual knowledge that the infringement lawsuits they initiated in 2011 against Teva in the United States District Court for the District of Delaware and against Perrigo in the United States District Court for the District of New Jersey were baseless and that they acted in bad faith. The only reason for the filing of these lawsuits was to impose expense and delay on Teva and Perrigo so as to block their entry into the TTRT market with lower price generics and to delay defendants' impending loss of hundreds of millions of dollars in AndroGel sales and profits. They had no expectation of prevailing in the lawsuits. See *Omni Outdoor Advertising, Inc., 499 U.S. at 380*. All the findings concerning subject intent are by clear and convincing evidence. The actions and intent of these AbbVie and Besins attorneys, of course, are binding on the defendants.

Again, we recognize the importance of the constitutional right to petition the Government for redress of grievances through the filing of lawsuits. For those reasons, this court understands its responsibility to act with caution before finding that [*56] any lawsuit was a sham. Regrettably, this is that exceptional case compelling such a finding.

IV

The FTC alleges that defendants have violated *section 5 of the FTC Act*, which prohibits "[u]nfair methods of competition in or affecting commerce." *15 U.S.C. § 45(a)*. The prohibitions under the FTC Act include, but are not limited to, conduct that violates the *Sherman Act, 15 U.S.C. §§ 1 et seq*. See, e.g., *FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454-55, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986)*. Specifically, the FTC claims that defendants had monopoly power in the TTRT market throughout the United States and unlawfully sought to maintain that power through the filing of the sham lawsuits against Teva and Perrigo so as to prevent or delay the entry into the market of much less expensive generic versions of AndroGel to the detriment of the consuming public.

Thus, to prove its claim the FTC must establish not only that defendants engaged in sham litigation but also that

the sham litigation was used to maintain monopoly power in the relevant market. *Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 (3d Cir. 2007)*. Monopoly power is "the ability to control prices and exclude competition in a given market." *Id.* "[A] patent does not necessarily confer market power upon the patentee" and therefore the FTC must prove that defendants in fact possessed monopoly power. *See Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 45, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006)*. Monopoly power is assessed as of the **[*57]** time of the anticompetitive conduct. *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 472-73, 481 (3d Cir. 1992)*.

The Supreme Court has ruled that questions of monopoly power must be resolved according the particular facts of each case and that "formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 466-67, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)*. Monopoly power may be proven through direct evidence of supra competitive prices and restricted output. *Mylan Pharms. Inc., 838 F.3d at 434*. In the alternative, monopoly power may be proven through indirect evidence. *Id. at 435*. Here, the FTC has presented no direct evidence of monopoly power but instead relies on indirect evidence to establish this part of its claim.[17]

To support a finding of monopoly power through indirect evidence, the FTC must show that: (1) defendants had market power in the relevant market; and (2) barriers existed to entry into that market. *Id.* Market power is in turn defined as "the power to raise prices above competitive levels without losing so many sales that the price increase is unprofitable." *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 445 n.2 (3d Cir. 1997)* (internal citation omitted). Market power can be inferred from a market share significantly greater than 55%. *Dentsply Int'l, Inc., 399 F.3d at 187* (citing *Fineman v. Armstrong World Indus., 980 F.2d 171, 201 (3d Cir. 1992))*. As our Court of Appeals has explained, the size of market share is a primary determinant of whether monopoly **[*58]** power exists. *Pa. Dental Ass'n*

*v. Med. Serv. Ass'n of Pa., 745 F.2d 248, 260 (3d Cir. 1984)*.

We must begin by defining the relevant market. *See Dentsply Intern., 399 F.3d at 187*. The definition of the relevant market "is a question of fact as to which the plaintiff bears the burden of proof." *Mylan Pharms. Inc., 838 F.3d at 435* (quoting *Broadcom Corp., 501 F.3d at 307*). The FTC must prove both the relevant product or products that comprise the market as well as the geographical area for the market. *See Queen City Pizza, Inc., 124 F.3d at 442*. There is no dispute here that the relevant geographic market encompasses the United States.

To determine whether products are in the same market, we ask "if they are readily substitutable for one another," an inquiry that requires us to assess "the reasonable interchangeability of use between a product and its substitute." *Mylan Pharms. Inc., 838 F.3d at 435* (internal citation omitted). The term "'[i]nterchangeability' implies that one product is roughly equivalent to another for the use to which it is put." *Id. at 436* (quoting *Allen—Myland, Inc. v. IBM Corp., 33 F.3d 194, 206 (3d Cir. 1994))*. It also means that "while there might be some degree of preference for . . . one [product] over the other, either would work effectively." *Id.* (quoting *Allen-Myland, Inc., 33 F.3d at 206* (alterations in original)). We also look to cross-elasticity of demand, which is defined as "[a] relationship between two products, usually substitutes for each other, in which a price change for one product affects the **[*59]** price of the other." *Id.* (internal citations omitted). "Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product [X] to changes in the price of a different product [Y]." *Id. at 437* (quoting *Queen City Pizza, Inc., 124 F.3d at 438 n.6*).

As the Supreme Court has recognized, "in some instances one brand of a product can constitute [the relevant] market." *Eastman Kodak Co., 504 U.S. at 482*. However, courts generally approve of single-product markets only "in rare circumstances." *Town Sound & Custom Tops, Inc., 959 F.2d at 480*; see also *Mylan Pharms., Inc. v. Warner Chilcott Pub. Ltd. Co., No. 12-3824, 2015 U.S. Dist. LEXIS 50026, 2015 WL 1736957, at *8 (E.D. Pa. Apr. 16, 2015)*.

The FTC first proposes what is in essence a single-product market: brand-name AndroGel 1% and brand-name AndroGel 1.62% and their generic equivalents. Within this market, defendants held 100% of sales until

---

[17] Direct evidence of monopoly power is "rare" and would require, among other things, evidence that defendants maintained abnormally high price-cost margins on AndroGel and that they restricted output. *See Mylan Pharms. Inc., 838 F.3d at 434-35 & n.53*. The FTC has not presented such evidence.

EXHIBIT B-1

Case 3:21-cv-00859-PGS-DEA Document 54 Filed 06/06/18 Page 72 of 84 PageID: 9825
2018 U.S. Dist. LEXIS 109628, *59

Page 18 of 30

entry of Perrigo's generic AndroGel 1% product. After that point, 85% of the AndroGel 1% market converted to generic versions of AndroGel 1% within 24 months, and 90% within 31 months.

In seeking to prove its proposed relevant market, the FTC relies on the expert testimony of Dr. Carl Shapiro, a professor at the Haas School of Business at the University of California at Berkley who previously served as a member of the President's Council of Economic Advisors. [*60] Dr. Shapiro performed the Hypothetical Monopolist Test ("HMT"). That test begins with a narrow set of products, called the candidate market, and asks whether a hypothetical monopolist selling those products could impose a small but significant non-transitory increase in price ("SSNIP"), which would be a 5% increase or more, without losing too many sales to make the price increase unprofitable. If the answer is yes, then the market is correctly defined because products outside the candidate market are not effective price constraints. If not, then the candidate market is too narrow and the relevant market includes other products.

Dr. Shapiro began with a candidate market of brand-name AndroGel and generic versions of AndroGel.[18] He explained that in this situation, the question under the HMT model is whether defendants, as the manufacturers and distributors of brand-name AndroGel, could prevent the price of AndroGel from falling more than 5% by excluding generic competition.

Using data provided by defendants, Dr. Shapiro first calculated the hypothetical monopoly price, which is the price defendants charged for AndroGel prior to generic entry. He then calculated the change in price for AndroGel [*61] after generic entry, using a weighted average price of brand-name and generic AndroGel.[19]

_____

[18] Dr. Shapiro explained that he included brand-name AndroGel 1.62% in his analysis because the delay in generic entry caused by the sham lawsuits provided defendants with additional time to convert AndroGel 1% sales to AndroGel 1.62%. Dr. Shapiro opined that excluding AndroGel 1.62% from the test market could lead to "artificial and misleading" results. This is consistent with AbbVie's own business projections, which predicted that entry of a generic 1% product would impact AndroGel 1.62% sales.

[19] Dr. Shapiro defines average weighted price as "the market price charged by the pharmaceutical companies" and opines that it "is the best way to measure the disparate impact on different customers [i.e., payors, pharmacy benefit managers, and pharmacies] because it measures 'the total payments that are involved.'"

Dr. Shapiro performed the test as of the time of the filing of the sham lawsuits in April 2011 and October 2011. He relied on projections of the effect of generic entry created by AbbVie, Teva, and Perrigo. Dr. Shapiro found that entry of an AB-rated generic would cause market prices for AndroGel to decline by at least 41% and that entry of a BX-rated generic would cause a decline of 11%. Based on these calculations, Dr. Shapiro concluded that a hypothetical monopolist of brand-name and generic AndroGel could profitably impose a price increase of more than 5% by excluding competition. Thus, he opines that AndroGel and its generic counterparts constitute the appropriate relevant market for our analysis.

To support Dr. Shapiro's reliance on the HMT, the FTC points to our Court of Appeal's decision in _FTC v. Penn State Hershey Medical Center, 838 F.3d 327 (3d Cir. 2016)_. There, the district court applied the HMT to determine the relevant geographic market in evaluating whether a hospital merger violated the antitrust laws. _Id. at 344-45_. On appeal, the Court concluded that the district court failed to formulate and apply the test. Id. There is no indication that the HMT [*62] test is required or even applicable in a monopolization case such as this.

We find that the analysis used by our Court of Appeals in Mylan is the appropriate one here. In that case, the Court observed that "the pharmaceutical market functions in a unique way." _838 F.3d at 428_. Specifically, it stated:

> [I]n a well-functioning market, a consumer selects and pays for a product after evaluating the price and quality of the product. In the prescription drug market, by contrast, the doctor selects the drug, which creates a certain separation between the buyer and the manufacturer. Moreover, in most cases, a third-party, such as a health insurance company, pays for the drug. As a result, consumer buying behavior may have less of an impact on manufacturer pricing than it otherwise would in a traditional open market.

Id. (internal citations and quotation marks omitted).

Due to the vastly different costs associated with launching generic products as compared to brand-name products, generics can be priced considerably lower than brand-name products.[20] AB-rated generics are

_____

[20] Generics generally may forgo certain research and

often priced at a substantial discount far exceeding 5%. This is the result of an intentional regulatory framework promulgated under the Federal **[*63]** *Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 et seq.*, and the Hatch-Waxman Act which provides incentives for innovators that develop brand-name drugs while also encouraging the introduction of low-cost generic drugs to the market. See *Actavis, Inc., 570 U.S. at 142*. Under this regulatory scheme, application of the HMT would result in a market limited to a brand-name drug and its AB-rated generic in almost every instance.[21] See *In re Remeron Direct Purchaser Antitrust Litig., 367 F. Supp. 2d 675, 682 (D.N.J. 2005)*. This approach thus "would render most brand name pharmaceutical companies as per se monopolists prior to generic entry." See *Id. at 683*.

The facts of Mylan further support our decision. There, the Court of Appeals rejected the plaintiff's contention that the market consisted of only Doryx, a specific brand-name tetracycline approved for the treatment of acne and its generic equivalent. *Mylan Pharms. Inc., 838 F.3d at 436*. It instead agreed with the district court that "the market was much broader and consisted of all oral tetracyclines prescribed to treat acne." Id. In reaching that conclusion, the Court looked to the degree of reasonable interchangeability and cross-elasticity of demand between oral tetracyclines. *Id. at 435-36*. It did not apply the HMT. See Id. We therefore reject the FTC's proposed single-product market as defined under the HMT.

In the **[*64]** alternative, the FTC proposes a product market consisting of all topical testosterone replacement therapies (as stated above, "TTRTs"). While defendants argue for a broader market including injectables, they do not disagree that TTRTs are part of that market. The TTRTs include the following products:

Patches
• Testoderm (launched in 1994)
• Androderm (launched in 1995)

Gels and Solutions
• AndroGel 1% (launched in 2000)

---

development, marketing, and other costs that a brand-name product must incur to launch. See *In re Remeron Direct Purchaser Antitrust Litig., 367 F. Supp. 2d 675, 682 (D.N.J. 2005)*.

[21] Furthermore, as Dr. Shapiro himself has recognized, the HMT may also lead to relatively narrow markets that would exclude some competing products when gross margins are high, which is the case in the pharmaceutical industry.

• Testim (launched in 2002)
• AndroGel 1.62% (launched in 2011)
• Axiron (launched in 2011)
• Fortesta (launched in 2011)
• Vogelxo (launched in 2014, along with an authorized generic of the same product)

Buccal Tablets
• Striant (launched in 2003)[22]

The evidence overwhelmingly demonstrates that all TTRTs, including AndroGel, are reasonably interchangeable. All TTRTs contain the same active ingredient, testosterone. All are approved by the FDA for the treatment of hypogonadism. Furthermore, all TTRTs are consistent with guidelines for the treatment of hypogonadism promulgated by the Endocrine Society, the oldest and largest professional body dedicated to the advancement of clinical care and research in the field of endocrinology.

Defendants presented evidence that some patients have **[*65]** switched between AndroGel and other TTRTs. Defendants' economic expert Dr. Pierre Cremieux presented data from OptumHealth Care Solutions, Inc. showing insurance claims for 18 million patients nationwide, which included 46,000 patients who filed a prescription for AndroGel in the five years preceding generic entry. That dataset demonstrated that 25.8% of all AndroGel patients also used another TTRT product. The OptumHealth data is commonly used in the pharmaceutical industry and has been the basis for hundreds of peer-reviewed publications.

It is true that the various TTRTs may have relative advantages and disadvantages and that an individual patient may prefer one product over another. For instance, some patients may prefer AndroGel over Testim due to Testim's "musky" scent. Certain patients may dislike Fortesta, which is applied to the front and inner thighs, as compared to AndroGel, which is applied to the upper arms, shoulders, and abdomen. However, "[i]nterchangeability is defined by rough equivalence, not perfect correspondence." *Mylan Pharm., Inc., 2015 U.S. Dist. LEXIS 50026, 2015 WL 1736957, at *10* (citing *Queen City Pizza, Inc., 124 F.3d at 436*). Even if more patients prefer AndroGel to other TTRTs, the "test for a relevant market is not commodities reasonably interchangeable by a **[*66]** particular plaintiff, but

---

[22] Natesto, a testosterone nasal spray, was approved by the FDA in 2014 but was not marketed until 2015, after the time period at issue here.

'commodities reasonably interchangeable by consumers for the same purposes.'" *Queen City Pizza, Inc., 124 F.3d at 438* (quoting *United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S. Ct. 994, 100 L. Ed. 1264 (1956))*. There is no dispute that, as stated above, all TTRTs contain the same active ingredient and all are approved by the FDA as safe and effective for the treatment of hypogonadism. Accordingly, the fact that certain patients may prefer AndroGel over other TTRTs does not defeat a finding of interchangeability.

Mylan also requires an analysis of cross-elasticity of demand in determining what products are in the relevant market. *838 F.3d at 437*. The record demonstrates and no party disputes that there is cross-elasticity of demand between all TTRTs. During the relevant time period, AndroGel competed on price within the TTRT market by offering rebates to payors to obtain better formulary placement and thereby encourage doctors to prescribe AndroGel. Between 2011 and 2014, AbbVie paid $438 million in rebates to payors, an amount which represented 18.9% of gross sales for AndroGel. Despite these rebates, AndroGel lost several accounts to other TTRTs. Effective July 1, 2011, United Healthcare removed AndroGel from its formulary in favor of Testim, which resulted in a loss of approximately $80 million **[\*67]** in sales for AndroGel. When Axiron and Fortesta, two low volume testosterone gels, entered the market in early 2011, rebates on TTRTs increased and AndroGel lost additional business. As of January 1, 2013, CVS Caremark removed AndroGel from its formulary in favor of Fortesta, which resulted in approximately $300 million in lost revenue. And in February 2013, TriCare removed AndroGel from preferred formulary status and replaced it with Fortesta. AbbVie also competed with other TTRTs by developing a copay assistance program. Under that program, AbbVie would bear a portion of a patient's copay, thereby lowering the actual out-of-pocket cost to the patient and encouraging the patient to fill his or her prescription for AndroGel. The other manufacturers of TTRTs also utilized such programs to increase sales. Nonetheless, as will be shown, AndroGel continued to have hundreds of millions of dollars in sales and huge profit margins and retained a high of 71.5% and never lower than in excess of 60% of the TTRT market from 2011 through 2014.

The evidence presented at trial demonstrated that the pharmaceutical companies within the TTRT market spent significant amounts of money on promotional activity **[\*68]** to compete for sales. AbbVie employed a sales force of over 1,000 employees to promote its AndroGel franchise and spent significant money on maintaining that sales force. Sales representatives for AndroGel were compensated based in part on their sales compared to other TTRTs. AbbVie also invested in direct-to-consumer media advertising, including in television, print, and internet.

AbbVie itself viewed other TTRTs as competitors to AndroGel. During trial, several AbbVie employees testified that they considered Testim, Axiron, Fortesta, and other TTRTs to be AndroGel's competitors. In addition, many documents introduced into evidence demonstrate that AbbVie tracked the TTRT market and considered other TTRTs as competitors. In particular, AbbVie reported to its Board of Directors as well as to investors regarding AndroGel's sales within the TTRT market. All of this evidence supports our finding that there is cross-elasticity of demand between AndroGel and other TTRTs.

Defendants counter that the relevant market should be defined to include not only TTRTs but also all testosterone replacement therapies (as stated above, "TRTs"), that is TTRTs plus injectables.[23] We reject this position. It **[\*69]** is true that injectables contain testosterone, the same active ingredient as AndroGel. It is also true that injectables, like AndroGel, are approved by the FDA as safe and effective for the treatment of hypogonadism. In addition, defendants introduced evidence of some patient switching between AndroGel and injectables.

Some patients prefer AndroGel to injectables due to a fear of needles and the associated potential for pain and discomfort. To administer the injection, a 1.5 inch-long needle must be inserted deep into a muscle, typically the buttocks or thigh, until the needle is no longer visible. Yet some prefer injectables to AndroGel because of the peak in testosterone levels that injectables initially provide. On the other hand, some patients dislike the peaks and troughs associated with injectables and thus prefer the steady dosing provided by AndroGel. However, as noted earlier, individual patient preferences will not defeat a finding of interchangeability as long as there is "rough equivalence" between the products. *Mylan Pharm., Inc., 2015 U.S. Dist. LEXIS 50026, 2015 WL 1736957, at \*10*; see also *Queen City Pizza, Inc., 124 F.3d at 438*. Thus, there is reasonable interchangeability of use

---

[23] Defendants exclude oral formulations of testosterone, which are distinguishable in efficacy and potential side effects and are generally not recommended within the medical community.

between AndroGel and injectables.

But even assuming reasonable interchangeability, there is little **[\*70]** cross-elasticity of demand between AndroGel and injectables to include injectables in the relevant market. As noted above, "[c]ross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product [X] to changes in the price of a different product [Y]." *Mylan Pharms. Inc., 838 F.3d at 437* (quoting *Queen City Pizza, Inc., 124 F.3d at 438 n.6*).

Injectables entered the market decades before AndroGel launched in 2000 and the vast majority are generics. As a result, injectables enjoyed the most favorable formulary status with the lowest copay, typically $5-$10 per injection. During the relevant period, the wholesale acquisition cost of injectables was two to three times lower than that of AndroGel. Since launch, AbbVie has consistently raised AndroGel's wholesale acquisition cost, despite the fact that injectables were available at a fraction of the cost. James Hynd, one of the principal AbbVie executives responsible for the AndroGel franchise, confirmed that AbbVie did not price AndroGel against injectables. For example, AbbVie did not offer rebates to payors in an attempt to match the price of injectables.

Furthermore, AbbVie documents show that while **[\*71]** the company tracked injectable sales, it did not consider injectables as direct competition to AndroGel. Hynd believed that injectable patients were "not our [AndroGel] patient type."[24] Similarly, Frank Jaeger, Director of Marketing for AndroGel from 2010 through 2014, testified that AbbVie did not consider injectables as competition and that the company believed based on market research that it could not transition injectable patients to AndroGel. Instead, as stated above, Jaeger and others identified TTRTs such as Axiron, Fortesta and Testim as AndroGel's true competitors. We credit this testimony of Hynd and Jaeger.

Defendants produced an internal AbbVie document stating that a rise in the copay for AndroGel was correlated with an increase in injectables' sales. However, there is no evidence of the underlying

analysis supporting the statement and thus no way to evaluate whether there was in fact a causal relationship between the two events. Moreover, this statement focuses on copays, which are patients' out-of-pocket costs, and does not account for the other levels of pricing applicable in the pharmaceutical industry, such as the amount paid by insurance companies and other payors. **[\*72]** In contrast to this statement, the record demonstrates that AbbVie attributed the increase in injectables' sales to a variety of factors, including patient preference, the existence of "Low-T" Centers, and the disproportionate negative publicity testosterone gels received after reports associating TTRTs with heightened cardiovascular risk.

For similar reasons, the patient switching study introduced by Dr. Cremieux is also not evidence of cross-elasticity of demand between AndroGel and injectables. That study does not contain information regarding the reasoning behind the patients' choices. Those patients who moved between injectables and AndroGel may have done so for a variety of reasons, including side effects, personal preferences, and reports of cardiovascular risks from TTRTs, as well as price. Because cross-elasticity of demand focuses on the relationship between pricing for products, evidence of switching for other or unknown reasons is irrelevant to our inquiry on this issue. See *Mylan Pharms. Inc., 838 F.3d at 437*.

Accordingly, we find that all TTRTs including AndroGel had both interchangeability of use and cross-elasticity of demand during the relevant time period. In contrast, there was not the cross-elasticity **[\*73]** of demand between TTRTs and injectables so as to include injectables within the relevant market.[25] We therefore define the relevant market as the market for all TTRTs, that is all transdermal testosterone replacement therapies within the United States.

We now turn to the question of whether defendants possessed monopoly power in the defined market. To support a finding of monopoly power, the FTC must prove that defendants had a dominant share in the relevant market and that there were significant barriers to entry into that market. *Broadcom Corp., 501 F.3d at*

---

[24] While Hynd testified that he changed his view and began to recognize injectables as competition, he did not do so until 2014, well after the sham lawsuits were filed and when entry of generic versions of AndroGel was imminent. We do not find credible his change of view.

[25] The TRT market would also include subcutaneous pellets such as Testopel, which constitute a de minimis share of the TRT market. There was no evidence presented at trial regarding cross-elasticity of demand between AndroGel and this product. Pellets, like injectables, are not part of the relevant market here.

*307*. Generally, as noted, a market share significantly larger than 55% is required to establish prima facie market power. See *Dentsply Int'l, Inc., 399 F.3d at 187*. Barriers to entry include "regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Broadcom Corp., 501 F.3d at 307*.

In the TTRT market, AndroGel was by far the most-prescribed product and was widely-recognized as the "market leader" from before 2011 through 2014.[26] In 2011, AndroGel's annual U.S. net sales exceeded $870 million. By 2012, annual U.S. net sales for the AndroGel franchise grew to $1.152 billion. In 2013, AndroGel's U.S. net sales were **[*74]** approximately $1.035 billion. And in 2014, AndroGel U.S. net sales totaled $934 million. These sales figures are calculated after payment of millions of dollars in rebates and the loss of some accounts.

AndroGel's share of the TTRT market was 71.5% at the time that the first sham lawsuit against Teva was filed in April 2011 and 63.6% at the time that the sham lawsuit against Perrigo was filed at the end of October 2011. Thereafter AndroGel's share remained above 60% until the end of 2014, when Perrigo's generic 1% testosterone product entered the market. The closest competitor, Testim, had a share of only approximately 20% of the TTRT market at the time of the filing of the first sham lawsuit, but thereafter its share dropped to approximately 12%. Axiron was launched on March 28, 2011 and had captured approximately 14% of the TTRT market by April 2014. No other TTRT product ever held 10% or more of the market during the period from April 2, 2011 through the end of 2014.

AndroGel's market share was always more than four times larger than the market share of any of its brand-name competitors, except for a short period when its market percentage was slightly smaller, but still over three **[*75]** times the market share of Testim. AbbVie was able to maintain its share of the TTRT market with a profit margin of over 65% during the relevant period, even with huge rebates. It was also able to increase the wholesale acquisition cost for AndroGel throughout this time period. We find based on this data that AndroGel had a dominant share of the TTRT market from April 2011 through December 2014.

---

[26] The medical experts for both sides testified that they have prescribed AndroGel for hypogonadism more than any other product.

The monopoly power of AndroGel is supported by the significant barriers to entry into the TTRT market. See *Mylan Pharms. Inc., 838 F.3d at 435*. First, any prospective entrant with a brand-name drug must invest large amounts of time and capital in research and development. There are then significant technical and regulatory requirements in the prescription pharmaceutical market that do not exist with respect to ordinary consumer products. Brand-name products must obtain FDA approval through the submission of an NDA. This process may be lengthy. Among other things, the prospective entrant must demonstrate the capability to manufacture, process, and package the pharmaceutical product in a manner that is adequate "to preserve its identity, strength, quality, and purity." *21 U.S.C. § 355(d)*; see also Id. *§§ 355(b)(1)*, *(c)(4)*. During the FDA approval process, third parties **[*76]** including competitors may file citizen petitions to request that the FDA "issue, amend, or revoke a regulation or order or take or refrain from taking any other form of administrative action" on the NDA, as happened here. See *21 C.F.R. § 10.30*. This may further prolong the approval process.

Once approved, the brand-name drug company generally does not attempt to market directly to patients, the ultimate users. Instead, it must convince physicians to prescribe the drug to patients. This requires a significant and knowledgeable sales force that generally meets with physicians individually. The sale and marketing of prescription drugs is highly regulated. See generally *21 U.S.C. § 331*. For example, the sales force is not permitted to claim that its company's product is better or more effective than a competitor's product, nor is it permitted to promote the drug for uses other than those contained in the drug's labeling. Id.; see also *In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 239-40 (3d Cir. 2012)*. The company must also ensure that pharmacies will stock the drug and that third-party payors will reimburse for it. This requires a team of skilled employees who can negotiate contracts with insurance companies and other payors. If the company seeks patent protection, which is not uncommon, **[*77]** it must endure the rigorous patent approval process before the Patent and Trademark Office.

While the Hatch-Waxman Act provides streamlined procedures for the approval of generic products through the filing of an ANDA or section 505(b)(2) NDA, the FDA may ask for additional information and testing as happened here with Perrigo and Teva. The drug once approved must undergo a further process before a

different group at the FDA to obtain a therapeutic equivalence ("TE") rating so that the generic drug developer may take advantage of state auto-substitution laws. Again, Teva and Perrigo both confronted this hurdle.

There can be additional obstacles for generic drug companies where, as here, a brand-name drug manufacturer holds a patent for the reference-listed drug. Generic entrants must also consider the possibility of patent infringement litigation by the owner of the referenced brand-name drug and the accompanying delay caused by the automatic thirty-month stay under the Hatch-Waxman Act before entry into the market, as occurred here.

In short, a prospective entrant to the pharmaceutical market whether with a brand-name drug or a generic drug has significant capital, technical, regulatory, and legal barriers to overcome **[*78]** before being able to enter the TTRT market. Again, this is a far cry from entry into a market to sell an ordinary consumer product. As demonstrated by the record, Teva and Perrigo encountered these barriers, and Teva ultimately decided not to launch its generic testosterone 1% product when it did not receive an AB rating from the FDA.

In order to counter the existence of barriers to entry, defendants reference the fact that three brand-name TTRT products entered the market between 2011 and 2014: (1) Fortesta, manufactured by Endo Pharmaceuticals (February 28, 2011); (2) Axiron, manufactured by Eli Lilly and Co. (March 28, 2011); and (3) Vogelxo, manufactured by Upsher-Smith Laboratories, Inc. (July 2014).[27] These products, however, each maintained a relatively small share of the market compared to AndroGel as discussed in more detail above. Specifically, during the relevant time period Axiron achieved a high of only approximately 14% of the TTRT market, while Fortesta and Volgelxo each held under 10% of the market. Consequently, they did not pose significant competition to defendants' monopolistic conduct.

The barriers enumerated above are sufficiently high to be a factor in our finding **[*79]** of monopoly power. See _Broadcom Corp., 501 F.3d at 307_. The purpose of the FDCA, of course, is to protect the public from products that are not safe and effective. See, e.g., _Wyeth v._

_Levine, 555 U.S. 555, 566-67, 574, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009)_. The barrier to entry into a prescription drug market is rightly a stringent one to ensure that this salutary goal is achieved.[28]

In sum, we find that the FTC has proven that defendants had a dominant share of the TTRT market in the relevant period and that significant barriers existed for entry into that market. The FTC has established the actual market reality that defendants possessed monopoly power and illegally and willfully maintained that monopoly power through the filing of sham litigation. This sham litigation delayed the entry of much less expensive competitive generic products into the TTRT market to the detriment of consumers and protected the defendants against loss of hundreds of millions of dollars in sales and profits.

V

We now move to the issue of the appropriate relief. The FTC seeks equitable relief in the form of disgorgement by defendants of profits which the FTC seeks to return to consumers through the establishment of a fund for this purpose. It also seeks an injunction.

Defendants first contend that _section 13(b) of the FTC Act_ does not **[*80]** permit the FTC to seek equitable monetary relief such as disgorgement. This section provides that the FTC "may bring suit in a district court of the United States to enjoin any such act or practice . . . [and] in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction." _15 U.S.C. § 53(b)_. Defendants assert that because _section 13(b)_ simply references relief in the form of an "injunction," the court may not order disgorgement.

---

[27] An authorized generic of Vogelxo was also launched at the same time as the brand-name product.

[28] Defendants cited _Barr Laboratories, Inc. v. Abbott Laboratories, 978 F.2d 98 (3d Cir. 1992)_. This case is inapposite. In that private antitrust action, plaintiff claimed attempted monopolization involving oral erythromycin products, which are prescription antibiotics. _978 F.2d at 102_. Unlike the present action, _Barr_ did not involve a patent. _Id._ In _Barr_, there were 32 manufacturers and defendant Abbott only held a high of 51.19% of the market in one year. _Id. at 103_. During the relevant time period the number of products competing for sales increased from 111 to 176. _Id._ Under the circumstances, the Court held that barriers to entry remained low and ultimately concluded that no attempted monopolization existed. _Id. at 113-14_. In contrast, the evidence before the court in this pending action demonstrates that the barriers were significant to entry into the TTRT market.

In support of their position, defendants cite *Kokesh v. SEC, 137 S. Ct. 1635, 198 L. Ed. 2d 86 (2017)*. Kokesh addressed the narrow question of whether the five-year statute of limitations in *28 U.S.C. § 2462* applied "to claims for disgorgement imposed as a sanction for violating a federal securities law." *137 S. Ct. at 1639*. According to defendants, Kokesh stands for the proposition that disgorgement is punitive in nature and thus not included among the equitable remedies authorized under the FTC Act. Kokesh, however, did not involve *section 13(b)* but instead dealt with federal securities law. Moreover, the Supreme Court specifically declined to address whether courts possessed authority to order disgorgement in SEC enforcement proceedings. See *id. at 1642, n.3*. We will not stretch Kokesh beyond its holding and will not read it to prevent the court from granting **[*81]** the well-established equitable relief of disgorgement.

The Supreme Court, in Mitchell v. Robert De Mario Jewelry, Inc., held that the provision of the *Fair Labor Standards Act*, which specifically authorized courts to restrain violations, includes the power to order reimbursement for loss of wages for unlawful discharge or discrimination. *361 U.S. 288, 296, 80 S. Ct. 332, 4 L. Ed. 2d 323 (1960)*. The Supreme Court aptly stated:

> When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of statutory purposes. As this Court long ago recognized, "there is inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature."

*Id. at 291-92* (quoting *Clark v. Smith, 38 U.S. 195, 203, 10 L. Ed. 123 (1839))*. This language in our view is equally applicable here to the FTC Act. Id.; see also *United States v. Lane Labs-USA, Inc., 427 F.3d 219, 223 (3d Cir. 2005)*.

The weight of authority, in accordance with Mitchell, supports the conclusion that the grant of authority in *section 13(b)* to provide injunctive relief includes the full range of equitable remedies, including the power to order a defendant to disgorge illegally obtained funds. See, e.g., *FTC v. Cephalon, Inc., 100 F. Supp. 3d 433, 437-39 (E.D. Pa. 2015)* (Goldberg, J.). Our Court of Appeals has expressed agreement **[*82]** with this position. *FTC v. Magazine Solns., LLC, 432 F. App'x 155, 158 n.2 (3d Cir. 2011)*. This is in line with other appellate precedent in this Circuit, which states that disgorgement "is an equitable remedy meant to prevent

the wrongdoer from enriching himself by his wrongs." *Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 415 & n.3 (3d Cir. 2013)* (quoting *SEC v. Huffman, 996 F.2d 800, 802 (5th Cir. 1993))*.

If the defendants' position about *section 13(b)* is correct, the monopolist will be able to retain its ill-gotten gains and simply face an injunction against future wrongdoing but even then only if the wrongdoing is continuing or is likely to continue. This interpretation would eviscerate the FTC Act. As our Court of Appeals has stated, "if the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, then we are obligated to construe [the] statute[] sensibly and [to] avoid constructions which yield absurd or unjust results." *Douglass v. Convergent Outsourcing, 765 F.3d 299, 302 (3d Cir. 2014)* (internal quotation marks and citations omitted). We reject defendants' argument concerning our authority to order disgorgement under *section 13(b) of the FTC Act.*

Because disgorgement aims to prevent unjust enrichment, a "court may exercise its equitable power only over the property causally related to the wrongdoing." *Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp., 991 F.2d 71, 78-79 (3d Cir. 1993)* (quoting *SEC v. First City Fin. Corp., 890 F.2d 1215, 1231, 281 U.S. App. D.C. 410 (D.C. Cir. 1989))*. Courts determine the appropriate amount of equitable monetary relief using a two-step burden shifting **[*83]** framework. First, the government must "establish[] a reasonable approximation of the profits tainted by the violation." SEC *v. Teo, 746 F.3d 90, 107 (3d Cir. 2014)*. This requires that the FTC meet a "but-for" standard of causation. *Id. at 105*. The burden of going forward then shifts to the defendant to provide "evidence that the [government's] approximation of profits was unreasonable." *Id. at 107-08*. At this point, the defendant may "point[] to intervening events" that break the chain of causation. *Id. at 105-06* (quoting *First City Fin. Corp., 890 F.2d at 1232*). Under this standard, "doubts concerning the determination of disgorgements are to be resolved against the defrauding party." SEC *v. Hughes Capital Corp., 917 F. Supp. 1080, 1085 (D.N.J. 1996)*; see also *First City Fin. Corp., 890 F.2d at 1231-32*.

To determine the appropriate amount of equitable monetary relief to be awarded here, we must make findings about what would have happened absent the sham lawsuits filed by defendants. See *First City Fin. Corp., 890 F.2d at 1231-32*. The FTC's expert, Dr. Shapiro, constructed a counterfactual world relying on

contemporaneous evidence as well as his expert economic analysis. He determined that but for the lawsuits: (1) Teva would have entered the market with a BX-rated product in June 2012; (2) Perrigo would have entered with an AB-rated product in June 2013; and (3) that entry of a generic version of AndroGel 1% would have affected sales of **[*84]** AndroGel 1.62%. He calculated defendants' "incremental revenue," which is the difference between defendants' actual revenue and their counterfactual revenue from June 2012 through the present. Dr. Shapiro then deducted defendants' incremental costs associated with the excess revenue to determine defendants' financial gain attributable to the sham litigation. He determined that this financial gain was $1.35 billion as of the end of March 2018. He opined that this financial gain will continue to accrue until entry of a generic version of AndroGel 1.62%. The FTC also seeks prejudgment interest on this financial gain, compounded quarterly at interest rates promulgated by the Internal Revenue Service ("IRS"). See *26 C.F.R. § 301.6621-1*.

Defendants dispute the FTC's assumptions regarding the entry of Teva and Perrigo as well as the FTC's assumption that entry of a generic 1% would have impacted sales of AndroGel 1.62%. Defendants argue that even absent the sham litigation, Teva would not have entered the market. They concede that Perrigo may have entered the market earlier than it did absent any sham lawsuit but assert that the earliest Perrigo would have entered would have been August 2014. Defendants admit, **[*85]** as they must, that delay in entry of generic 1% would have harmed consumers.

We must decide when, if ever, Teva would have entered the market in the "but-for" world. In the real world, Teva submitted to the FDA on January 13, 2011 a section 505(b)(2) NDA for its generic version of AndroGel 1% in pump and packet forms. Shortly thereafter, defendants filed their sham lawsuit against Teva. In December 2011, Teva entered into a settlement agreement with defendants and thereby agreed to a licensed entry date of December 27, 2014. On February 14, 2012, Teva received FDA approval of its section 505(b)(2) NDA for the packet presentation of its product only. In July 2014, Teva received from the FDA a BX rating on its product due to discrepancies with the analytical work in Teva's bioequivalence study. Thereafter, Teva decided not to launch its product.

The FTC asserts that, but for the sham lawsuit filed by defendants, Teva would have entered the market with a BX-rated testosterone 1% product in June 2012. The

FTC concedes that the filing of the sham lawsuit by defendants did not impact the timing of Teva's FDA approval. Thereafter, the FTC posits that Teva would have continued to move forward with preparations for its launch while waiting for its **[*86]** TE rating. The FTC estimates it would have taken 12-13 months from the time it submitted its section 505(b)(2) NDA to the FDA for Teva to achieve operational readiness.

Defendants dispute whether Teva would have entered the market at all with a BX rating. Teva's generic drug division has never launched a BX-rated retail pharmaceutical product. It has not done so because Teva's generic business model relies on auto-substitution at pharmacies. Without auto-substitution, Teva would have to hire a sales force to promote its BX-rated product. As demonstrated by internal analyses created by Teva, a BX-rated generic without a perceived advantage in the market, such as Teva's product, generally captures only 5% or less of the brand-name product's sales. For this reason, BX-rated generics are rare.

While Tim Crew, Teva's former Commercial Operations Officer, was in particular a strong proponent of a BX-rated launch, Crew left Teva in 2012. Alan Oberman, the Teva executive who replaced Crew, was not a proponent of a BX-rated launch. Maureen Cavanaugh, Vice President of Customer Operations and Marketing for Teva, testified that she, along with the rest of her team, made the recommendation to Teva management to abandon plans for the launch **[*87]** of the testosterone product. She further stated that she did so not because of defendants' infringement litigation but because of Teva's inability to commercialize the product effectively. We find her testimony to be credible.

In addition to its failure to obtain an AB rating, Teva faced other obstacles to the profitable launch of its product. In July 2011, at the suggestion of the FDA, Teva withdrew the pump presentation of its product from consideration due to packaging issues. As a result, the Teva product was approved in packet form only. The pump was preferred by patients over packets because of ease of use. Teva estimated that this setback cut its potential sales opportunity by over 50%. If it intended to continue to pursue a pump presentation for its product, Teva would need to reformulate and then resubmit its section 505(b)(2) NDA to the FDA for consideration. This would have involved significant additional time and expense, and still may have not been successful.

Teva also faced serious manufacturing issues for its

testosterone 1% product. It planned to use Cipla, a contract manufacturer based in India, to manufacture its testosterone 1% gel. Cipla demanded that Teva provide approximately $10 million for construction [*88] of manufacturing facilities. Teva had the option of making payment in the form of an up-front capital expenditure or over time as a 35% royalty on sales. Teva never reached an agreement with Cipla regarding this investment. The evidence shows that Teva ultimately refused to make this investment unless the FDA issued an AB rating to its product. Cipla could not move forward with preparations for manufacturing until an agreement was reached.

After considering the evidence presented, the FTC has not established that, but for defendants' sham litigation, Teva would have launched its product in June 2012 or at any time thereafter. We find that Teva's failure to launch was due to other intervening events described above and that the sham litigation against it was not a cause. Accordingly, we will not consider any "but-for" entry date of Teva into the TTRT market when calculating defendants' illegal financial gains.

There remains the question of when Perrigo would have entered the market absent defendants' sham litigation against it. In the real world, Perrigo had a December 27, 2014 licensed entry date for its generic version of AndroGel 1% under its settlement with defendants. The FDA approved [*89] Perrigo's section 505(b)(2) NDA on January 31, 2013 and thereafter Perrigo waited for a TE rating for its drug. Nearly eighteen months elapsed before the FDA granted its generic TTRT an AB rating. During this time, Perrigo submitted three letters to the FDA, dated April 18, 2013, September 13, 2013, and February 18, 2014, requesting that the FDA issue an AB rating. The last letter threatened litigation if the FDA failed to act by March 19, 2014 and enclosed a draft complaint. On March 21, 2014, Perrigo filed a lawsuit against the FDA in the United States District Court for the District of Columbia alleging violation of the FDCA and the *Administrative Procedures Act* based on the FDA's allegedly unreasonable delay in assigning a TE rating to its product. See Perrigo Israel Pharm. Ltd. v. U.S. Food & Drug Admin., No. 14-475 (D.D.C. Mar. 21, 2014).

On April 10, 2014, the FDA filed a response to Perrigo's motion for a speedy hearing. The FDA asserted that "Perrigo itself has obviated the need for a prompt decision by reaching an agreement with the innovator not to market until December 2014." The FDA further stated that it would issue a TE rating for Perrigo's

product by July 31, 2014, some five months before [*90] Perrigo's planned launch. In the end, the FDA issued an AB rating to Perrigo on July 23, 2014, and thereafter Perrigo voluntarily dismissed its lawsuit. Perrigo launched its product on December 27, 2014.

We acknowledge that there is no statutory, regulatory, or other deadline within which the FDA is mandated to issue a TE rating. The time that the FDA needs to consider a TE rating depends on the specific facts of each situation, including the reason why the application for approval of a generic drug was submitted as a section 505(b)(2) NDA rather than an ANDA.

It is apparent from the lawsuit Perrigo brought against the FDA that the FDA knew of Perrigo's December 27, 2014 licensed entry date under the settlement agreement. As a result, it had no compelling need, as it implied in its court papers, to grant the TE rating long before Perrigo's entry date. We find that the FDA, absent the sham litigation and the resultant settlement agreement, would not have delayed the issuance of an AB rating for Perrigo's generic drug for nearly eighteen months after approval of its section 505(b)(2) NDA. The FDA is presumed to act in the public interest, which includes the mission of benefitting consumers by approving the entry of safe and effective lower-cost [*91] generic drugs into the market. Every month that the FDA would have delayed in issuing a TE rating to a generic drug that was otherwise ready and able to launch would have caused significant financial harm to consumers.

Dr. Kenneth Phelps, the FTC's regulatory expert, testified that in his experience it takes no more than one month for the FDA to assign a TE rating for a section 505(b)(2) drug. The FTC's economic expert, Dr. Shapiro, estimated that, but for the sham litigation, Perrigo would have received its TE rating approximately four months from the date of FDA approval of its section 505(b)(2) NDA. He relied on the approximated four months' time lapse in the real world between Perrigo's filing of the lawsuit against the FDA and the FDA's issuance of the TE rating.

Defendants further point to citizen's petitions filed by AbbVie regarding TE ratings to assert that the FDA would not have issued a TE rating to Perrigo sooner. On August 18, 2011, AbbVie filed a citizen's petition requesting that the FDA conduct notice-and-comment rulemaking to establish procedures for its assignment of TE ratings for drugs approved under section 505(b)(2). That petition did not relate specifically to Perrigo but

rather to general procedures for TE ratings. Contrary [*92] to defendants' position, there is no indication that the FDA refrained from issuing TE ratings for generic drugs while this petition was pending. Later in a supplement filed on December 11, 2013, AbbVie requested that the FDA assign a BX rating to Perrigo's product. The FDA ultimately responded to this citizen petition in July 2014 at the same time it issued Perrigo's TE rating. However, a June 2013 launch would have been six months before AbbVie filed its supplemental citizen petition, and therefore we find that this supplemental citizen petition would not have delayed Perrigo's launch in the "but-for" world. Thus, the defendants' citizen petition would not have affected Perrigo's "but-for" entry date.

We find that absent the sham lawsuit, Perrigo would have received its AB rating in June 2013 and would have launched its AB-rated generic product at that time. We reject defendants' contention that Perrigo would not have launched its product until August 2014.

The parties next dispute the effect of the sham litigation on sales of AndroGel 1.62%. In his damages model, Dr. Shapiro opines that entry of a generic version of AndroGel 1% would have caused the market share of AndroGel 1.62% [*93] to plateau. According to Dr. Shapiro, the delay of generic 1% entrants caused by the sham litigation allowed defendants to transition more patients from brand-name AndroGel 1% to brand-name AndroGel 1.62% and thus avoid auto-substitution for generic versions of AndroGel 1%. We agree. Consequently, Dr. Shapiro properly includes a portion of defendants' profits from AndroGel 1.62% in his calculation of excess profits.

In the real world, AndroGel 1.62% accounted for total AndroGel sales as follows: 57% during the last 7 months of 2012, 67% in 2013, 76% in 2014, 83% in 2015 and 2016, and 82% in 2017. In the "but-for" world, the FTC asserts that AndroGel 1.62%'s share of total AndroGel sales would have frozen at the time that the first generic version of AndroGel 1% entered the market. We have already determined that but for the sham litigation, Perrigo would have entered the market in June 2013. It follows and we find that the share for AndroGel 1.62% would have frozen at approximately 67%.[29]

In response, defendants contend that AndroGel 1.62% is "superior" to AndroGel 1% and thus prescribers will chose AndroGel 1.62% regardless of the availability of a generic version of AndroGel 1%.[30] In support [*94] of their position, they point out that AndroGel 1.62% is not subject to auto-substitution for a generic version of AndroGel 1%. They further maintain that sales of AndroGel 1.62% have come not only from patients who previously used AndroGel 1% but also from patients who used other TRTs or who are new to treatment for hypogonadism. Defendants cite OptumHealth data showing that from the launch of AndroGel 1.62% through March 2016, only 28.1% of AndroGel 1.62% patients had filled an AndroGel 1% prescription within the 12 months preceding their first AndroGel 1.62% prescription. The other sales came from patients who were previously using other TRTs or were new to testosterone replacement therapy. Defendants therefore reason that sales of AndroGel 1.62% would not have been impacted by earlier entry of a generic version of AndroGel 1%. We disagree.

We find in favor of the FTC on this issue. The record shows that sales of AndroGel 1.62% grew more slowly after launch than defendants initially anticipated. Around the time of the filing of the sham lawsuits, defendants were concerned about the impact that entry of a generic version of AndroGel 1% would have on sales for AndroGel 1.62%. Contemporaneous [*95] forecasts created by AbbVie during the relevant time period predicted that entry of a generic version of AndroGel 1% would not only erode sales for brand-name AndroGel 1% but would also cause sales of brand-name AndroGel 1.62% to plateau or even decline. For example, in the fall of 2011, AbbVie forecast that sales of AndroGel 1.62% would decrease approximately 30-35% after entry of an AB-rated generic version of AndroGel 1%. In 2014, AbbVie similarly predicted that AndroGel 1.62% could lose 20-27% of its sales after entry of a generic version of AndroGel 1%. Again, in the real world, AndroGel 1.62%'s share of AndroGel sales did in fact plateau after Perrigo entered the market in December 2014, although by that time AndroGel 1.62%'s share of the total AndroGel market had reached 83%.

The filing of the sham lawsuits allowed defendants additional time to increase sales for AndroGel 1.62%

---

[29] As discussed above, the FTC initially took the position that Teva would have entered the market in 2012 with a BX-rated generic version of AndroGel 1%. This would freeze AndroGel 1.62%'s share of the AndroGel market at 51%, which is what the FTC asserts the share would have been during the last

seven months of 2012.

[30] AndroGel 1.62% has the same active ingredients and effects as AndroGel 1%, but simply requires half the volume of gel. It thus has a quicker drying time and therefore less risk of transference.

without any competition from a lower priced generic version of AndroGel 1%. Although AndroGel 1% and AndroGel 1.62% are distinct products, both include the same active ingredient and are indicated for the same purpose, that is, to treat hypogonadism. The only significant difference in the record between [*96] the two drugs is that AndroGel 1.62% requires a smaller volume of gel. As stated above, AndroGel 1% and AndroGel 1.62% compete within the TTRT market, both with each other as well as with all other TTRTs. Under these circumstances, we find that the filing of the sham lawsuits and the resulting delay in generic entry increased defendants' profits on not only AndroGel 1% but also on AndroGel 1.62%.

The parties further dispute the end date for calculation of defendants' profits subject to disgorgement. As stated above, only profits with a causal connection to the wrongdoing are subject to disgorgement. See *Commodity Futures Trading Comm'n, 991 F.2d at 78-79.* This court has discretion to order disgorgement of profits for the time period in which the effects on the market of defendants' wrongful conduct were continuing, even after the entry of Perrigo at the end of 2014. See id. On the other hand, we must not award disgorgement of profits where the causal connection to defendants' wrongdoing has become too attenuated or remote. See *Teo, 746 F.3d at 106*; *SEC v. MacDonald, 699 F.2d 47, 53-55 (1st Cir. 1983)*.

The FTC takes the position that defendants' financial gain due to the sham lawsuits is ongoing at the rate of $6 million per month until the time in the future when a generic version of AndroGel 1.62% enters [*97] the market. We reject this position and instead will award disgorgement of profits through August 2017 only. By that time, Perrigo's generic version of AndroGel 1% had been on the market for 2.5 years and had achieved its maximum penetration rate of approximately 91% of brand-name AndroGel 1% sales. The effect of defendants' wrongful conduct on the TTRT market had largely subsided. We find that any award of disgorgement after that date would be speculative.

Defendants are liable for disgorgement in the amount of $448 million in profits. This amount reflects defendants' financial gain due to the sham lawsuits from June 2013 when Perrigo would have entered the TTRT market through August 2017. In addition, the FTC is entitled to prejudgment interest calculated at the interest rates set forth by the IRS for underpayments. *26 C.F.R. § 301.6621-1*; see also *Teo, 746 F.3d at 109-10*. In reaching this award, we are guided by the Supreme

Court's direction that antitrust cases must be resolved according to the "particular facts disclosed by the record" rather than "formalistic distinctions." *Eastman Kodak Co., 504 U.S. at 467-68* (internal citations omitted). We also keep in mind the purpose of our equitable power to grant disgorgement, which is not to provide an award of damages [*98] at law but instead to deter violations of antitrust law and to prevent the unjust enrichment of defendants. See *Teo, 746 F.3d at 105-06*.

We must also decide how liability for the disgorgement award should be apportioned between defendants AbbVie and Besins. Besins contends that it is immune from equitable monetary relief for its violations of antitrust law because it never received any profits from AndroGel. Instead, royalties on U.S. sales of AndroGel were paid to its European corporate affiliate now known as Laboratoires Besins Iscovesco SAS ("LBI SAS") or to another Besins entity, Besins Healthcare Luxemborg SARL ("BHL SARL"). Here, the FTC has named Besins Healthcare, Inc. (as stated above, "Besins") as a defendant.

Besins is one of the entities that instituted the sham lawsuits against Teva and Perrigo. As co-owner of the '894 patent, the sham lawsuits could not have been filed without Besins. See *Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1468 (Fed. Cir. 1998)*. We have already determined that Besins, along with AbbVie, filed these objectively baseless lawsuits with actual knowledge that the suits lacked merit with no expectation of prevailing and with the intent to impose expense and delay on Teva and Perrigo and to impede at least for a time the expected loss by defendants [*99] of hundreds of millions of dollars in sales. As we discussed above, counsel for Besins was an experienced patent lawyer who had access to the paragraph IV notices, the patent prosecution history, and the analysis of outside counsel who had full access to the Teva and Perrigo section 505(b)(2) NDAs. He nonetheless made the decision with the requisite subjective intent to join in these objectively baseless lawsuits. Under these circumstances it is appropriate to impose disgorgement on Besins for its role in filing the sham lawsuits.

It is well established that "disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset". *SEC v. McGee, 895 F. Supp. 2d 669, 689 (E.D. Pa. 2012)* (quoting *SEC v. Banner Fund Int'l, 211 F.3d 602, 617, 341 U.S. App. D.C. 175 (D.C. Cir. 2000))*. A wrongdoer such as Besins "may be

ordered to disgorge not only the unlawful gains that accrue to the wrongdoer directly, but also the benefit that accrues to third parties whose gains can be attributed to the wrongdoer's conduct." See *SEC v. Contorinis, 743 F.3d 296, 302 (2d Cir. 2014)*. This result obtains because the purpose of equitable disgorgement is both to deprive a wrongdoer of its unjust enrichment as well as to deter others from violating the law. *Teo, 746 F.3d at 105* (citing *SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997))*.

To accept Besins' position would be tantamount to allowing Besins **[*100]** to enrich unjustly its corporate affiliate through the filing of sham lawsuits. See *Contorinis, 743 F.3d at 301-04, 307*. It would also "perpetuate rather than correct an inequity." *Banner Fund Int'l, 211 F.3d at 617*. The Besins entity named as a defendant here is the party that co-owned the '894 patent and the party that filed the sham actions. It is of no import that Besins may have chosen to direct profits from its wrongdoing to affiliated corporate entities LBI SAS and BHL SARL.

Joint and several liability for disgorgement is appropriate "when two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." *Hughes Capital Corp., 124 F.3d at 455*. Nonetheless, a court may apportion liability among tortfeasors when it is reasonable and practical to do so, such as when the recipients of ill-gotten profits and the amount each received can be determined from the record. *Id. at 455*. Besins' European affiliates were paid royalties in the amount of 8% of the U.S. net sales of AndroGel through the end of March 2015. As of April 1, 2015, that royalty rate was reduced to 5%. We therefore will apportion liability in those percentages to Besins for the disgorgement award of $448 million plus prejudgment interest according to those percentages.

VI

In addition to disgorgement, **[*101]** the FTC seeks an injunction that in its view would prevent or deter defendants from engaging in similar misconduct in the future. Specifically, the FTC urges an injunction: (1) to prohibit the filing of any claims of patent infringement based on the '894 patent by a product that does not include about 0.1% to about 5% isopropyl myristate; (2) to prohibit defendants from filing any other sham litigation; (3) to prohibit defendants from engaging in any action that misuses government processes for anticompetitive purposes; and (4) to require defendants to certify that any patent infringement litigation or other

use of governmental processes has an objectively reasonable basis.

The FTC further contends that an injunction is necessary to restore competitive market conditions. It seeks to compel defendants to license AndroGel 1.62% to one or more generic competitors. It also would command defendants to manufacture and deliver to these generic competitors a supply of generic AndroGel 1.62% until those competitors are independently able to manufacture the drug themselves.

*Section 13(b) of the FTC Act* allows the FTC to obtain injunctive relief when a defendant "is violating, or is about to violate, any provision of law enforced by **[*102]** the Federal Trade Commission." *15 U.S.C. § 53(b)*. As our Supreme Court has recognized, "[t]he purpose of an injunction is to prevent future violations." *United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)* (citing *Swift & Co. v. United States, 276 U.S. 311, 326, 48 S. Ct. 311, 72 L. Ed. 587 (1928))*. Accordingly, the FTC must demonstrate that there is a "cognizable danger of recurrent violation." Id.; see also *Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 765 n.3, 114 S. Ct. 2516, 129 L. Ed. 2d 593 (1994)*. As the moving party, the FTC bears the burden to prove that injunctive relief is warranted. See *W. T. Grant Co., 345 U.S. at 633*.

The FTC has proven that defendants filed two sham infringement lawsuits, one against Teva in April 2011 and another against Perrigo in October 2011. Defendants were able to exclude competition illegally in the TTRT market from June 2013 until the end of December 2014 as a result of sham litigation and the settlement of sham litigation. Nonetheless, the FTC has presented no evidence that defendants are currently violating antitrust laws or about to violate antitrust laws. Generic versions of AndroGel have now been on the market for over three years. AndroGel 1%'s share of the market has shrunk since entry of Perrigo, and the '894 patent expires on January 6, 2020. The FTC has not alleged that defendants have filed any other sham lawsuits.[31] The fact that defendants filed two such lawsuits, without more, does not establish that

---

[31] The FTC has advised the court that since the filing of the lawsuits against Teva and Perrigo in 2011, defendants have filed numerous other patent infringement suits against competitors, including seven lawsuits related to the '894 patent. The FTC has presented no evidence that these lawsuits were shams, and therefore they do not provide support for the injunctive relief sought here.

defendants have a **[\*103]** pattern or practice doing so. On this record there is no basis to conclude that defendants' misconduct is likely to reoccur.

We are also concerned that the injunction sought by the FTC is overbroad and punitive in nature. Because it would implicate defendants' *First Amendment* right to petition the government, the injunction must "burden no more speech than necessary to serve a significant government interest." *Madsen, 512 U.S. at 765*. The injunction sought by the FTC involves the defendants' ability to file patent infringement suits or otherwise to use the governmental process with respect to any patent. Given the fact that the '894 patent was the only patent at issue here and there is no evidence that defendants filed sham litigation or otherwise abused the government process with regard to other patents, the injunctive relief sought by the FTC does not meet the test set forth in <u>Madsen</u>.

We also see no basis to enter an injunction mandating defendants to license to generic competitors its intellectual property rights to AndroGel 1.62%. There is no evidence that sale of AndroGel 1.62% is currently violating, or will violate, *section 5 of the FTC Act.*

Accordingly, no injunction will be entered.

VII

Based on defendants' violation of *section 5 of the FTC Act*, the court awards equitable monetary **[\*104]** relief in favor of the FTC and against the defendants in the amount of $448 million, which represents disgorgement of defendants' ill-gotten profits from June 2013, when Perrigo would have entered the TTRT market, through August 2017. The FTC is also entitled to prejudgment interest on this award, calculated at the interest rates set forth by the IRS for underpayments as discussed above. <u>See</u> *26 C.F.R. § 301.6621-1*. Liability will be apportioned between AbbVie and Besins according to the royalty rates agreed upon by the parties, which were 8% through March 31, 2015 and thereafter 5%.

The parties shall confer and if possible submit to the court for consideration a joint proposed form of judgment and if the parties cannot agree each party shall submit a proposed form of judgment. The court will enter a judgment after conferring with the parties.

BY THE COURT:

/s/ Harvey Bartle III, J.

<u>ORDER</u>

AND NOW, this 29th day of June, 2018, the court having filed its Findings of Fact and Conclusions of Law, it is hereby ORDERED that:

(1) the parties shall submit to the court, on or before July 13, 2018, a proposed joint form of judgment and if the parties cannot agree, each party shall submit a proposed form of judgment by that **[\*105]** date; and

(2) a conference with counsel for the parties concerning the form of judgment to be entered shall take place in chambers on Tuesday, July 17, 2018 at 10:30 a.m.

BY THE COURT:

/s/ Harvey Bartle III, J.

*End of Document*

# Exhibit B-2

EXHIBIT B-2



HANGLEY
ARONCHICK
SEGAL
PUDLIN
& SCHILLER

ATTORNEYS AT LAW / A PROFESSIONAL CORPORATION

One Logan Square
27th Floor
Philadelphia, PA 19103-6933
215.568.0300/facsimile

www.hangley.com

PHILADELPHIA, PA

CHERRY HILL, NJ

HARRISBURG, PA

NORRISTOWN, PA

Barry L. Refsin
Direct Dial: 215.496.7031
E-mail: brefsin@hangley.com

July 9, 2018

**Via ECF and FIRST CLASS MAIL**

Honorable Lois H. Goodman, U.S.M.J.
United States District Court for the District of
New Jersey
Clarkson S. Fisher Bldg. & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

Re:     *In re Effexor XR Antitrust Litigation*, Civil Action No. 11-5479 (PGS/LHG)

Dear Judge Goodman:

I am writing on behalf of the Retailer Plaintiffs in response to Ms. Walsh's July 6, 2018 letter providing the recent opinion of Judge Bartle in *Federal Trade Commission v. AbbVie Inc.*, 14-cv-5151, 2018 U.S. Dist. LEXIS 109628 (E.D. Pa. June 29, 2018). Ms. Walsh's letter asserts that the opinion supports the expansive market discovery that Defendants seek in their motion to compel. It does not. *AbbVie* does not refer to a single document about non-AB rated therapeutic equivalents of the type sought from the Retailer Plaintiffs by Defendants in their motion. Moreover, with respect to the question of whether that discovery is proportional to the needs of this case, *In the Matter of Impax Laboratories, Inc.*, FTC Dkt. No. 9373 (FTC May 18, 2018), another recent decision involving the FTC, far better defines the legal market power analysis that should apply in this reverse payment case. I am attaching a copy of that opinion by ALJ D. Michael Chappel. The relevant discussions of market power and market definition appear at pages 96-97 and 139-41.

Judge Bartle's market power analysis in *AbbVie* differs from the one that should apply in this case in several critical respects. First, the only claim tried in *AbbVie* was a monopolization claim based on sham litigation. It did not involve a reverse payment like this case and *Impax Laboratories*. Second, while *AbbVie* recognized that monopoly power could be proven through direct evidence, the FTC in *AbbVie* did not present any such direct evidence. 2018 U.S. Dist. LEXIS 109628, at *57. Plaintiffs here intend to present direct evidence that Wyeth profitably increased and maintained the price of Effexor XR above the competitive price prior to the entry of generic Effexor XR. Third, no party in *AbbVie* disputed that there was cross-elasticity of

Honorable Lois H. Goodman, U.S.M.J.
July 9, 2018
Page 2

demand between all testosterone replacement therapies. *Id.* at *66. The existence of substantial cross price elasticity between Effexor XR and any antidepressant other than generic Effexor XR is an issue that plaintiffs will dispute in this case.

In contrast, *Impax Laboratories* explains the kind of market power analysis that should apply here. Unlike *AbbVie* and the principal case on which it relies, *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 433 (3d Cir. 2016) ("*Doryx*"), *Impax Laboratories* involved a reverse payment. In considering the role of market definition in such a case, it explicitly adopted the rule of reason analysis of the Third Circuit in *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 395 (3d Cir. 2015). As Judge Chappel recognized: "Nowhere in the *King Drug* framework for determining the likelihood of anticompetitive effects . . . does the appellate court direct the district court to define the relevant market. Slip Op. at 97. Rather, Judge Chappel concluded consistent with *King Drug* that "in the context of a settlement of patent litigation arising under the peculiar framework of the Hatch-Waxman Act, which promotes generic competition and facilitates patent challenges, and where a valid patent gives the brand holder a legal monopoly, the appropriate market in which to assess the anticompetitive effects of a reverse payment settlement agreement is the market that is the subject of that agreement – the branded pharmaceutical product and its generic equivalents." *Id.*

As *Impax Laboratories* further recognized, this conclusion follows from the Supreme Court's recognition in *Actavis* that "the 'size of the payment from a branded drug manufacturer to a prospective generic is itself a strong indicator of power' – namely, the power to charge prices higher than the competitive level." Slip Op. at 139-40 (quoting *FTC v. Actavis*, 133 S. Ct. 2223, 2236 (2013)). *See also id.* (citing *In re Loestrin 24 Fe Antitrust Litigation*, 814 F.3d 538, 552 n.12 (1st Cir. 2016), *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 664 (D. Conn. 2016), and *In re Cipro Cases I & II*, 348 P.3d 845, 869 (Cal. 2015), for the same point).

Thus, because the evidence will include direct evidence of market power including the large payment that Wyeth made to delay generic Effexor XR, the broad discovery concerning all antidepressants that Defendants seek is not proportional to the needs of this case. The more limited searches that Plaintiffs propose in the parties' joint letter of June 6, 2018 is more appropriate given the law governing market power in reverse payment cases.

Respectfully,

s/ *Barry L. Refsin*

Barry L. Refsin

Attachment

cc:   All Counsel of Record (via ECF)

**PUBLIC**

**UNITED STATES OF AMERICA**
**FEDERAL TRADE COMMISSION**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

_____

**DOCKET NO. 9373**
_____

**In the Matter of**

**IMPAX LABORATORIES, INC.,**
**a corporation**

**Respondent.**

_____

**INITIAL DECISION**
_____

**D. Michael Chappell**
**Chief Administrative Law Judge**

**Date:  May 18, 2018**

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................. 1
    A.     Summary of Complaint and Answer ................................................ 1
    B.     Procedural History ......................................................................... 1
    C.     Evidence ......................................................................................... 4
    D.     Summary of Initial Decision ........................................................... 6

II.     **FINDINGS OF FACT** ......................................................................... 8
    A.     Background ..................................................................................... 8
       1.     Jurisdiction .......................................................................... 8
       2.     Hatch-Waxman framework ................................................... 8
       3.     Competition between brand and generic manufacturers ...... 11
       4.     Opioids ............................................................................... 12
    B.     Context for the Endo-Impax Litigation and Settlement ................. 12
       1.     Opana ER ............................................................................ 12
       2.     Endo's initial patents for Opana ER ................................... 13
       3.     Overview of Endo-Impax litigation and settlement ............. 14
          a.     Impax's Abbreviated New Drug Applications ............ 14
          b.     The filing of the Endo-Impax patent litigation and
             FDA approval of Impax's ANDA ................................ 15
          c.     Summary of proceedings ........................................... 15
       4.     Costs of litigation ............................................................... 16
       5.     Other Endo litigation on initial Opana ER patents ............. 17
       6.     Endo's market power .......................................................... 18
       7.     Endo's plan to reformulate Opana ER ............................... 18
    C.     The Challenged Agreement .......................................................... 21
       1.     Preliminary negotiations .................................................... 21
       2.     The Settlement and License Agreement .............................. 22
          a.     Overview of relevant provisions ................................ 22
          b.     Negotiations of the SLA ............................................ 23
             i.     Initial term sheet ............................................. 23
             ii.     Impax's counteroffer ....................................... 24
             iii.     Rejection of acceleration trigger and development
                of the Endo Credit .......................................... 25
             iv.     Finalizing the SLA .......................................... 27
                (a)     No-AG provision and Endo Credit ..................... 27
                (b)     Scope of patent license ..................................... 28
          c.     Value transferred to Impax under the SLA ................. 29
             i.     No-AG provision ............................................. 29

i

EXHIBIT B-2

|  |  | ii. | Endo Credit | 32 |
|  |  |  | (a) | Purpose of the Endo Credit | 33 |
|  |  |  | (b) | Dollar value of the Endo Credit at the time of settlement | 35 |
|  |  |  | (c) | 2013 payment under the Endo Credit | 36 |
|  |  | iii. | Complaint Counsel's expert's valuations | 38 |
|  | 3. | The Development and Co-Promotion Agreement | 38 |
|  | a. | Overview of relevant provisions | 38 |
|  | b. | Background to the DCA | 39 |
|  |  | i. | Endo's reliance on collaboration agreements | 39 |
|  |  | ii. | Endo's interests in neurology products and Parkinson's disease treatments | 40 |
|  |  | iii. | Impax's efforts to develop Parkinson's disease treatments | 40 |
|  | c. | Negotiations of the DCA | 42 |
|  |  | i. | Background to the negotiations | 42 |
|  |  | ii. | Negotiations resume in May 2010 | 43 |
|  | d. | Relationship between IPX-066 and IPX-203 | 46 |
|  | e. | Due diligence efforts by Endo | 48 |
|  |  | i. | Review of information regarding IPX-203 | 48 |
|  |  | ii. | Review of information regarding IPX-066 | 48 |
|  |  | iii. | Sufficiency of time and information | 49 |
|  | f. | Endo's valuation of IPX-203 | 50 |
|  |  | i. | Commercial aspects | 50 |
|  |  | ii. | Medical aspects | 51 |
|  |  | iii. | Allocation of risk | 52 |
|  | g. | Impax's valuation of IPX-203 and the DCA | 53 |
|  | h. | Impax's efforts to develop IPX-203 | 54 |
|  | i. | Termination of the DCA | 55 |
|  | j. | Complaint Counsel's experts' opinions | 57 |
|  |  | i. | Bona fide product collaboration | 58 |
|  |  | ii. | Due diligence | 59 |
|  |  | iii. | Valuation | 59 |
| D. | Anticompetitive Effects | 60 |
|  | 1. | Harm to competition | 60 |
|  | 2. | At-risk launch | 62 |
|  | a. | At-risk launches generally | 62 |
|  | b. | Impax's history of at-risk launches | 63 |
|  | c. | Impax's process for approval of an at-risk launch | 64 |

|   | d. | Impax did not seek or receive Board approval for an at-risk launch of generic Opana ER | 66 |
|   | e. | Impax's launch preparedness efforts | 68 |
|   |   | i. Impax's general preparedness practices | 68 |
|   |   | ii. Impax's launch preparedness efforts for generic Opana ER | 69 |
|   | f. | Economic disincentives | 72 |
|   | g. | Complaint Counsel's experts | 73 |
| 3. |   | Launch after litigation | 73 |
| E. | Procompetitive Benefits | | 75 |
| 1. | Broad license agreement | | 75 |
| 2. | Endo's additional patents and patent litigation | | 76 |
|   | a. | The Johnson Matthey Patent | 76 |
|   | b. | The '060, '122, and '216 patents and New York litigation | 76 |
|   | c. | The '737 and '779 patents and Delaware litigation | 77 |
|   | d. | The Endo v. Impax New Jersey litigation | 78 |
| 3. | Effect of the broad license agreement | | 78 |

III. ANALYSIS .......................................................................................... 80
A. Overview of the Case ........................................................................ 80
    1. The Hatch-Waxman Act ............................................................. 81
    2. Generic drug competition .......................................................... 83
    3. Endo-Impax patent litigation and settlement ............................ 84
B. Overview of Applicable Law ........................................................... 86
    1. Introduction ............................................................................... 86
    2. Antitrust scrutiny of reverse payment settlements: *Actavis* ...... 87
    3. Rule of reason framework generally .......................................... 90
    4. Reverse payment cases .............................................................. 92
    5. Contentions of the parties as to structure for rule of reason analysis ...................................................................................... 95
    6. Relevant market ......................................................................... 96
    7. Conclusion ................................................................................. 97
C. Anticompetitive Harm ..................................................................... 100
    1. Economic theory of anticompetitive harm ................................ 101
    2. Size of the payment ................................................................... 102
        a. Applicable legal principles ................................................ 102
        b. Valuation ........................................................................... 104
            i. No-AG provision ...................................................... 104

|  |  | ii. | Endo Credit ................................................................. | 107 |

ii. Endo Credit .................................................................................. 107
    (a) Purpose of Endo Credit ............................................ 107
    (b) Monetary value of Endo Credit................................ 110
    (c) 2013 payment under Endo Credit ...................... 113
  c. Conclusion as to valuation of reverse payment ........................ 114
3. Scale in relation to litigation costs ............................................................ 114
4. Justifications for reverse payment ............................................................. 115
  a. Legal principles........................................................................ 115
  b. Payment under the SLA ........................................................... 117
    i. Contentions of the parties ............................................. 117
    ii. Analysis......................................................................... 117
    iii. Conclusion .................................................................... 119
  c. Payment under the DCA ........................................................... 120
    i. Overview........................................................................ 120
    ii. Summary of facts .......................................................... 121
      (a) Background facts ................................................ 121
      (b) Negotiations ...................................................... 123
      (c) Relationship between IPX-066 and IPX-203 ...................................................... 126
      (d) Endo's evaluation of product collaboration for IPX-203 ........................................... 127
      (e) Value to Impax of collaboration for IPX-203 ........................................................ 129
      (f) Impax's continued efforts to develop IPX-203 ...................................................... 129
      (g) Termination of the DCA ................................... 131
    iii. Conclusion .................................................................... 132
    iv. Complaint Counsel's arguments as to lack of justification ................................................... 133
      (a) Asserted "switch" from IPX-066 to IPX-203 ..................................................... 133
      (b) Due diligence ..................................................... 134
      (c) Expert opinions ................................................. 135
      (d) Conclusion ......................................................... 138
5. Conclusion on initial burden of proof.................................................... 138
D. Market Power.......................................................................................... 139
E. Procompetitive Benefits......................................................................... 141
1. Overview................................................................................................. 141
2. Relevant provisions............................................................................... 142
3. Post-settlement patents and patent litigation......................................... 143
4. Effect of broad license agreement.......................................................... 144

5.      Analysis .................................................................................... 144

    a.     Procompetitive benefits ................................................. 144

    b.     Less restrictive alternative ............................................ 146

F.     Balancing of Anticompetitive and Procompetitive Effects ............................ 147

    1.      Entry by at-risk launch ............................................................ 148

        a.     Background ...................................................................... 148

        b.     Analysis ............................................................................ 150

        c.     Complaint Counsel's arguments ................................... 152

           i.     Consideration of at-risk launch ................................... 152

           ii.    Launch preparedness ........................................ 153

        d.     Conclusion regarding at-risk launch ........................... 154

    2.      Entry after litigation ................................................................ 155

    3.      Weighing of anticompetitive effects against procompetitive benefits ........................................................................................ 156

G.    Conclusion ........................................................................................ 158

IV.     SUMMARY OF CONCLUSIONS OF LAW ................................................. 159

ORDER ........................................................................................................ 162

EXHIBIT B-2

# I.    INTRODUCTION

## A.    Summary of Complaint and Answer

The Administrative Complaint in this case ("Complaint"), issued by the Federal Trade Commission ("FTC" or "Commission") on January 19, 2017, alleges that a reverse payment settlement agreement between Respondent Impax Laboratories, Inc. ("Impax" or "Respondent") and Endo Pharmaceuticals Inc. ("Endo") was an anticompetitive agreement in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act").  Complaint ¶¶ 1, 3.  The Complaint alleges that, through a settlement agreement entered into in June 2010 (the "Challenged Agreement" or the "Endo-Impax Settlement"), Impax, a generic drug manufacturer, agreed to abandon its legal challenge to patents held by Endo for a branded drug manufactured by Endo (Opana ER) and to forego launching its generic version of Opana ER until January 2013, in exchange for a large, unjustified "reverse payment" from Endo.  Complaint ¶¶ 1, 3.  According to the Complaint, the purpose and effect of the Endo-Impax Settlement was to ensure that Endo would not face generic competition for Opana ER until January 2013.  Complaint ¶ 4.

Respondent filed its Answer and Defenses ("Answer") to the Complaint on February 7, 2017.  Respondent denied most material allegations in the Complaint and further asserted ten affirmative defenses, including its Eighth Defense, which averred that the challenged conduct had substantial procompetitive justifications, benefited consumers, and avoided infringement of valid patents, and that these procompetitive justifications have outweighed any alleged anticompetitive effects.  Answer at 21.

## B.    Procedural History

Although the Complaint challenges an agreement between Impax and Endo, Endo is not a party to this enforcement action.  As a result of a federal court action against Endo and others arising from a patent settlement in connection with Lidoderm, another product manufactured by Endo, Endo settled with the FTC and agreed to a stipulated order and permanent injunction that apparently resolved any FTC concerns regarding the conduct of Endo in this case.  *See Federal Trade Commission v. Endo Pharms*, No. 17-cv-00312 (N.D. Cal. Feb. 2, 2017).  Accordingly, this litigation proceeded only against Impax.

EXHIBIT B-2

On August 10, 2017, Complaint Counsel filed a motion for partial summary decision with the Commission, requesting that the Commission declare that certain procompetitive justifications are not legally cognizable defenses to the conduct challenged in the Complaint, pursuant to the Supreme Court's decision in *FTC v. Actavis,* 133 S. Ct. 2223 (2013). *In re Impax Labs, Inc*., 2017 FTC LEXIS 130, at \*11. Specifically, Complaint Counsel sought to preclude three arguments as to procompetitive benefits: (1) that the Endo-Impax Settlement enabled Impax to enter prior to expiration of various existing and future Endo patents; (2) that the Endo-Impax Settlement provided Impax with certainty that it could launch its generic products free from the risk of infringing Endo's existing and future patents; and (3) that the Endo-Impax Settlement enabled Impax to continue selling its generic product, while other potential generic sellers of Opana ER were enjoined due to a court ruling that two Endo patents obtained after the Endo-Impax Settlement were valid and infringed by such sellers. *Id.* at \*15 (Oct. 27, 2017). Complaint Counsel sought an order foreclosing Impax from making arguments to justify or otherwise defend the Endo-Impax Settlement on those bases. *Id.*

Under the Commission's Rules of Practice, the motion was not decided by the Administrative Law Judge ("ALJ"), but by the Commission.[1] By Order issued October 27, 2017, the Commission denied Complaint Counsel's motion. *Id.* at \*33. The Commission reasoned that the motion was premature because: (1) Respondent had not yet fully articulated the bases for its assertion of procompetitive justifications, *Id.* at \*15-18; and (2) the structure of the rule of reason for a reverse-payment settlement should be determined based on briefing and a factual record at

---

[1] The Commission amended Rule 3.22 of its Rules of Practice in 2009 to allow "the Commission to decide legal questions and articulate applicable law when the parties raise purely legal issues." Proposed rule amendments; request for public comment, 73 Fed. Reg. 58,832, 58,836 (Oct. 7, 2008). "[C]ommenters (including the [Section of Antitrust Law of the American Bar Association ('Section')], criticized the [Commission's] proposed Rule change as unfairly invading the province of the independent ALJ and compromising the Commission's dual roles as prosecutor and adjudicator." Interim final rules with request for comment, 74 Fed. Reg. 1804, 1809 (Jan. 13, 2009). "For example, the Section argued that the proposed changes . . . could raise concerns about the impartiality and fairness of the Part 3 proceeding by permitting the Commission to adjudicate dispositive issues, including motions to dismiss challenging the facial sufficiency of a complaint, shortly after the Commission has voted out the complaint finding that it has 'reason to believe' there was a law violation, without the benefit of an opinion by an independent ALJ." *Id.* A joint comment from former FTC Chairman Robert Pitofsky and Michael N. Sohn "similarly argued that the proposed rules, including Rule 3.22, would arguably infringe on the fairness of the Part 3 proceeding if the Commission more frequently 'invades what has heretofore been the province of an independent ALJ.'" *Id.* Dismissing these objections, the Commission amended its Rules of Practice to give to itself the authority to decide "[m]otions to dismiss filed before the evidentiary hearing, motions to strike, and motions for summary decision[.]" 16 C.F.R. § 3.22(a).

trial.  *Id.* at *18, *26-27.  The Commission stated:  "Without the facts before us, and an understanding of how the parties intend to marshal those facts, a formulation that unnecessarily establishes the law of the case risks straight-jacketing the proceeding in ways that impede effective inquiry and appropriate resolution."  *Id.* at *26-27.  The Commission concluded: "What is needed at this time is development of a record, ordering of that record under a proposed rule-of-reason framework, and, ultimately, briefing of disputed issues concerning the appropriateness of that framework and of its application to the facts presented."  *Id.* at *32-33.

The evidentiary hearing began on October 24, 2017 and was completed on November 14, 2017.  The hearing record was closed by Order dated November 17, 2017.[2]  Complaint Counsel and Respondent ("the parties") filed concurrent post-trial briefs and proposed findings of fact on December 20, 2017.

By Order issued January 5, 2018, Endo was permitted to intervene in this action for the limited purpose of responding to Complaint Counsel's Post-Trial Brief and Proposed Order and opposing (1) any findings related to the alleged competitive effects of a 2017 settlement agreement between Endo and Impax and (2) any remedy that would order the nullification of that 2017 settlement, or otherwise affect Endo's rights under that agreement.  Endo's brief on these issues, filed on January 16, 2018, has been considered.

Rule 3.51(a) of the Commission's Rules of Practice states that "[t]he Administrative Law Judge shall file an initial decision within 70 days after the filing of the last filed initial or reply proposed findings of fact, conclusions of law and order . . . ."  16 C.F.R. § 3.51(a).  The parties filed replies to each other's proposed findings of fact, conclusions of law, and post-trial briefs and to Endo's January 16, 2018 brief on February 7, 2018.[3]  Closing arguments were held on February 15, 2018.

---

[2] Over 1,250 exhibits were admitted into evidence, 37 witnesses testified, either live or by deposition, and there are 3,066 pages of trial transcript.  The parties' post-trial briefs, proposed findings of fact and conclusions of law, reply briefs and replies to proposed findings of fact and conclusions of law total 2,869 pages.

[3] The Commission's January 19, 2018 order extended the deadline for the parties to file their concurrent reply briefs and replies to proposed findings to February 7, 2018.

Seventy days from the last filed reply proposed findings and conclusions and briefs was April 18, 2018, and, absent an order pursuant to Rule 3.51, the Initial Decision was to be filed on or before April 18, 2018. Based on the voluminous and complex record in this matter, an Order was issued on April 6, 2018, finding good cause for extending the time period for filing the Initial Decision by 30 days. Accordingly, issuance of this Initial Decision by May 18, 2018 is in compliance with Commission Rule 3.51(a).

## C.    Evidence

This Initial Decision is based on a consideration of the whole record relevant to the issues, including the exhibits properly admitted into evidence, deposition transcripts, and the transcripts of testimony at trial, and addresses the material issues of fact and law. The briefs and proposed findings of fact and conclusions of law, and the replies thereto, submitted by the parties, and all contentions and arguments therein were thoroughly reviewed and considered.

Proposed findings of fact submitted by the parties but not accepted in this Initial Decision were rejected, either because they were not supported by the evidence or because they were not dispositive or material to the determination of the merits of the case. Similarly, legal contentions and arguments of the parties that are not addressed in this Initial Decision were rejected, because they lacked support in fact or law, were not material, or were otherwise lacking in merit.[4] In addition, all expert opinion evidence submitted in this case has been fully reviewed and considered. Except as expressly relied on or adopted in this Initial Decision, such opinions have been rejected, as either unreliable, unsupported by the facts, or unnecessary to the findings and conclusions herein.

---

[4] Ruling upon a decision of the Interstate Commerce Commission, and interpreting language in the Administrative Procedure Act that is almost identical to language in Commission Rule 3.51(c)(1), the United States Supreme Court held that "[b]y the express terms of [that Act], the Commission is not required to make subordinate findings on every collateral contention advanced, but only upon those issues of fact, law, or discretion which are 'material.'" *Minneapolis & St. Louis Ry. Co. v. United States*, 361 U.S. 173, 193-94 (1959). *Accord Stauffer Labs., Inc. v. FTC*, 343 F.2d 75, 82 (9th Cir. 1965). *See also Borek Motor Sales, Inc. v. NLRB*, 425 F.2d 677, 681 (7th Cir. 1970) (holding that it is adequate for the Board to indicate that it had considered each of the company's exceptions, even if only some of the exceptions were discussed, and stating that "[m]ore than that is not demanded by the [APA] and would place a severe burden upon the agency"). Furthermore, the Commission has held that ALJs are not required to discuss the testimony of each witness or all exhibits that are presented during the administrative adjudication. *In re Amrep Corp.*, 102 F.T.C. 1362, 1670, 1983 FTC LEXIS 17, at *566-67 (Nov. 2, 1983).

Under Commission Rule 3.51(c)(1), "[a]n initial decision shall be based on a consideration of the whole record relevant to the issues decided, and shall be supported by reliable and probative evidence." 16 C.F.R. § 3.51(c)(1); *see In re Chicago Bridge & Iron Co.*, 138 F.T.C. 1024, 1027 n.4, 2005 FTC LEXIS 215, at *3 n.4 (Jan. 6, 2005). Under the Administrative Procedure Act ("APA"), an ALJ may not issue an order "except on consideration of the whole record or those parts thereof cited by a Party and supported by and in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556(d). All findings of fact in this Initial Decision are supported by reliable, probative, and substantial evidence. Citations to specific numbered findings of fact in this Initial Decision are designated by "F."[5]

The parties' burdens of proof are governed by Commission Rule 3.43(a), Section 556(d) of the APA and case law. Pursuant to Commission Rule 3.43(a), "[c]ounsel representing the Commission . . . shall have the burden of proof, but the proponent of any factual proposition shall be required to sustain the burden of proof with respect thereto." 16 C.F.R. § 3.43(a). Under the APA, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). The APA, "which is applicable to administrative adjudicatory proceedings unless otherwise provided by statute, establishes '. . . the traditional preponderance-of-the evidence standard.'" *In re Rambus, Inc.*, 2006 FTC LEXIS 101, at *45 (Aug. 20, 2006) (quoting *Steadman v. SEC*, 450 U.S. 91, 95-102 (1981)), *rev'd on other grounds*, 522 F.3d 456 (D.C. Cir. 2008)).

---

[5] References to the record are abbreviated as follows:

CX – Complaint Counsel's Exhibit
RX – Respondent's Exhibit
JX – Joint Exhibit
Tr. – Transcript of testimony before the Administrative Law Judge
Dep. – Transcript of Deposition
IHT – Transcript of Investigational Hearing
CCB – Complaint Counsel's Post-Trial Brief
CCRB – Complaint Counsel's Post-Trial Reply Brief
CCFF – Complaint Counsel's Proposed Findings of Fact
CCRRFF – Complaint Counsel's Reply to Respondent's Proposed Findings of Fact
RB – Respondent's Post-Trial Brief
RFF – Respondent's Proposed Findings of Fact

Pursuant to Commission Rule 3.45(b), several orders were issued in this case granting *in camera* treatment to material, after finding, in accordance with the Rule, that its public disclosure would likely result in a clearly defined, serious injury to the entity requesting *in camera* treatment or that the material constituted "sensitive personal information," as that term is defined in Commission Rule 3.45(b).  In addition, when the parties sought to elicit testimony at trial that revealed information that had been granted *in camera* treatment, the hearing went into an *in camera* session.

Commission Rule 3.45(a) allows the ALJ "to grant *in camera* treatment for information at the time it is offered into evidence subject to a later determination by the [administrative] law judge or the Commission that public disclosure is required in the interests of facilitating public understanding of their subsequent decisions."  *In re Bristol-Myers Co.*, Nos. 8917-19, 90 F.T.C. 455, 457, 1977 FTC LEXIS 25, at *6 (Nov. 11, 1977).  As the Commission later reaffirmed in another leading case on *in camera* treatment, since "in some instances the ALJ or Commission cannot know that a certain piece of information may be critical to the public understanding of agency action until the Initial Decision or the Opinion of the Commission is issued, the Commission and the ALJs retain the power to reassess prior *in camera* rulings at the time of publication of decisions."  *In re General Foods Corp.*, No. 9085, 95 F.T.C. 352, 356 n.7; 1980 FTC LEXIS 99, at *12 n.7 (March 10, 1980).  Thus, in instances where a document or trial testimony had been given *in camera* treatment, but the portion of the material cited to in this Initial Decision does not in fact require *in camera* treatment, such material is disclosed in the public version of this Initial Decision, pursuant to Commission Rule 3.45(a) (the ALJ "may disclose such *in camera* material to the extent necessary for the proper disposition of the proceeding").  Where *in camera* information is used in this Initial Decision, it is indicated in bold font and braces ("{  }") in the *in camera* version and is redacted from the public version of the Initial Decision, in accordance with Commission Rule 3.45(e).

### D.    Summary of Initial Decision

This decision arises from the first Part III administrative trial involving a reverse payment patent settlement agreement since the Supreme Court's decision in *FTC v. Actavis*, 133 S. Ct. 2223 (2013).  The evidence shows that, under the Challenged Agreement, Endo provided Impax

with a reverse payment, the purpose and effect of which was to induce Impax to give up its patent challenge and agree not to launch a generic Opana ER until January 2013. Payment by a patent holder to a generic challenger to induce the generic challenger to drop its challenge and agree to stay out of the market, rather than face the risk of patent invalidation and resulting generic competition, is an anticompetitive harm under *Actavis*.

Under the facts of this case, however, the magnitude and extent of any anticompetitive harm is largely theoretical, based on an inference that, absent the Challenged Agreement, Impax's entry date, and therefore generic competition, would have been earlier than January 2013. The evidence shows that such earlier entry was unlikely. Moreover, even if, absent the Challenged Agreement, Impax would have entered the market substantially earlier than January 2013, the evidence demonstrates that the Challenged Agreement provided real and substantial procompetitive benefits to consumers that outweigh any anticompetitive effect. Among other things, the Challenged Agreement granted Impax a broad patent license covering Endo's existing and subsequently-acquired Opana ER-related patents, which has enabled Impax to sell generic Opana ER without interruption since launching its product in January 2013, while all other potential generic drug manufacturers have been enjoined by patent litigation. Indeed, Impax's product is not only the sole generic oxymorphone ER product available to consumers, but the only available oxymorphone ER product.

Weighing the anticompetitive harm and the procompetitive benefits, the evidence fails to prove that the Challenged Agreement was anticompetitive on balance. Rather, the evidence proves that the procompetitive benefits of the Challenged Agreement outweigh the anticompetitive harm. Thus, the evidence fails to demonstrate that the Challenged Agreement constituted an unreasonable restraint of trade. Accordingly, the evidence fails to prove a violation of Section 5 of the FTC Act. The Complaint must, therefore, be DISMISSED.

## II.  FINDINGS OF FACT

### A.  Background

#### 1.  Jurisdiction

1.  Impax Laboratories, Inc. ("Impax") is a for-profit corporation with its principal place of business at 30831 Huntwood Avenue, Hayward, California.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-001 ¶ 1).

2.  In addition to its Hayward, California headquarters, Impax operates out of its facilities in Middlesex, New Jersey, among other locations.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-001 ¶ 2).

3.  Impax engages in the business of, among other things, developing, manufacturing, and marketing generic pharmaceutical drugs ("generics" or "generic drugs").  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-001 ¶ 3).

4.  Impax is a corporation, as "corporation" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-001 ¶ 4).

5.  Impax has engaged in, and continues to engage in, commerce and activities affecting commerce in each of the fifty states in the United States and the District of Columbia, as the term "commerce" is defined by Section 1 of the Federal Trade Commission Act, 15 U.S.C. § 44.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-001-02 ¶ 5).

#### 2.  Hatch-Waxman framework

6.  The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 21 U.S.C. §§ 355(b)(2) and 355(j) and 35 U.S.C. § 271(e), establishes procedures designed to facilitate competition from lower-priced generic drugs, while maintaining incentives for pharmaceutical companies to invest in developing new drugs.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-002-03 ¶ 12).

7.  A company seeking to market a new pharmaceutical product must file a New Drug Application ("NDA") with the U.S. Food and Drug Administration ("FDA") demonstrating the safety and efficacy of the new product.  21 U.S.C. § 355.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-003 ¶ 13).

8.  NDA-based products generally are referred to as "brand-name drugs," "branded drugs," or "brand drugs."  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-003 ¶ 14).

9.      The FDA requires NDA holders to identify patents that the NDA holder believes could reasonably be asserted against a generic company that makes, uses, or sells a generic version of the branded drug. 21 C.F.R. § 314.53. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-003 ¶ 15).

10.      The NDA holder must submit these patents for listing in an FDA publication entitled *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the Orange Book) within 30 days of issuance of the patent or within 30 days after approval of the NDA. 21 C.F.R. § 314.53. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-003 ¶ 16).

11.      A company seeking to market a generic version of a branded drug may file an Abbreviated New Drug Application ("ANDA") with the FDA. 21 U.S.C. § 355(j). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-003 ¶ 17).

12.      The generic applicant must demonstrate that its generic drug is therapeutically equivalent to the brand-name drug that it references and for which it seeks to be a generic substitute. 21 U.S.C. § 355(j)(2)(A)(iv). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-003 ¶ 18).

13.      Upon showing that the generic drug is therapeutically equivalent to the approved branded drug, the generic company may rely on the studies submitted in connection with the approved branded drug's NDA to establish that the generic drug is safe and effective. 21 U.S.C. § 355(j)(2)(A). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-003-04 ¶ 19).

14.      The FDA assigns a generic drug an "AB" rating if it is therapeutically equivalent to a brand-name drug. An AB-rated generic drug is the same as a brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use. A generic drug must also contain identical amounts of the same active ingredient(s) as the brand-name drug, although its inactive ingredients may vary. FDA, *Approved Drug Products with Therapeutic Equivalence Evaluations*, Preface § 1.7. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-004 ¶ 20).

15.      When a brand-name drug is covered by one or more patents listed in the Orange Book, a company seeking to market a generic version of that drug before the patents expire must make a "Paragraph IV certification" in its ANDA certifying that the patents are invalid, unenforceable, and/or will not be infringed by the generic drug. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-004 ¶ 21).

16.      If an ANDA filer makes a Paragraph IV certification, it must notify the patent holder of its certification and the factual and legal bases for its assertion(s) that the relevant patent is invalid, unenforceable, and/or not infringed. 21 U.S.C. § 355(j)(2)(B). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-004 ¶ 22).

17.    If the patent holder initiates a patent infringement suit against an ANDA filer within 45 days of receiving such notice (F. 16), the FDA may not grant final approval of the ANDA until the earliest of: (1) patent expiration date; (2) district court resolution of the patent litigation in favor of the generic company; or (3) the expiration of an automatic 30-month stay. 21 U.S.C. § 355(j)(5)(B)(iii). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-004 ¶ 23).

18.    When a generic drug otherwise meets the FDA's criteria for approval but final approval is blocked by statute or regulation, such as the Hatch-Waxman 30-month stay, the FDA may tentatively approve the relevant ANDA. 21 U.S.C. § 355(j)(5)(B)(iv). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 24).

19.    Tentative approval of an ANDA by the FDA does not permit an ANDA filer to market its generic version of the drug. 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(BB). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 25).

20.    The FDA can issue final approval of a tentatively-approved drug once the 30-month stay expires. 21 U.S.C. § 355(j)(5)(B)(iii). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 26).

21.    The Hatch-Waxman Act provides the first generic company or companies filing an ANDA containing a Paragraph IV certification ("first filer") to a particular branded drug with a period referred to as the "180-day exclusivity" or "first-filer exclusivity" period. During this 180-day exclusivity period, no other generic manufacturer can sell its version of that particular branded drug. 21 U.S.C. § 355(j)(5)(B)(iv). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 27; Second Set of Joint Stipulations, JX003 ¶ 7).

22.    A brand drug company can market a generic version of its own brand product at any time, including during the first filer's exclusivity period. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 28).

23.    For a brand drug company to market a generic version of its own brand product, no ANDA is necessary because the brand company already has approval to sell the drug under its NDA. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 29).

24.    Brand drug companies' generic versions of their own brand products commonly are known as "authorized generics" ("AGs"). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 30).

25.    An authorized generic is chemically identical to the brand drug, but is sold as a generic product, typically through either the brand company's subsidiary or through a third party. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 31).

### 3.    Competition between brand and generic manufacturers

26.   A patient can obtain a prescription drug only if a doctor (or someone who is authorized to write prescriptions) writes a prescription for that drug.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 11).

27.   Doctors who select the medications they prescribe for their patients do not pay for the medications.  Generally, when selecting appropriate medications for patients, doctors' primary concerns are efficacy and safety, rather than the cost of medications.  (CX5002 (Savage Expert Report at 063-64 ¶ 177, 180); Savage, Tr. 770-71; Michna, Tr. 2187-88; CX4046 (Michna, Dep. at 148-49)).

28.   The patient, or in most cases a third-party payor such as a public or private health insurer, pays for the drug.  These purchasers often have little input over what drug is actually prescribed, because physicians ultimately select and prescribe appropriate drug therapies.  (CX5000 (Noll Expert Report at 031 ¶ 67); CX5002 (Savage Expert Report at 063 ¶ 177)).

29.   All 50 states and the District of Columbia have drug substitution laws that encourage and facilitate substitution of lower-cost AB-rated generic drugs for branded drugs.  When a pharmacist fills a prescription written for a branded drug, these laws allow or require the pharmacist to dispense an AB-rated generic version of the drug instead of the more expensive branded drug, unless a physician directs or the patient requests otherwise.  Conversely, these laws generally do not permit a pharmacist to substitute a non-AB-rated generic for a branded drug unless the physician specifically prescribes it by writing the chemical name of the drug, rather than the brand name, on the prescription.  (Second Set of Joint Stipulations, JX003 ¶ 72).

30.   Because of the price advantages of generic drugs over branded drugs, many third-party payors of prescription drugs (e.g., health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their branded counterparts.  (CX5000 (Noll Expert Report at 030-32 ¶¶ 65, 67-69); CX6052 at 084-85).

31.   Generic manufacturers typically charge lower prices than branded drug sellers.  The first one or two generic products are typically offered at a 10% to 25% discount off the price of the branded product.  Subsequent generic entry creates greater price competition which typically leads to discounts between 50% to 80% off the brand price.  (CX5000 (Noll Expert Report at 048 ¶ 104); CX2607 (Lortie Decl. at 012 ¶ 29); CX6055 at 010).

32.   Automatic substitution of the generic drug for the branded drug is the primary way that generic companies make their sales.  (Mengler, Tr. 522; Engle, Tr. 1703).

### 4. Opioids

33. Opioid medications ("opioids") are prescription drugs indicated for the treatment of moderate to severe pain. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶ 2; Savage, Tr. 700-01).

34. Opioids are derived from opium. (Michna, Tr. 2104).

35. There are three types of opioids: ultra-fast-acting, immediate-release, and extended-release. (Michna, Tr. 2105; *see* Savage, Tr. 693).

36. Ultra-fast-acting opioids are medications that are absorbed through the mouth and have an initial onset of pain relief in about fifteen minutes. They are used to treat pain that comes on very suddenly and that may dissipate within an hour. (Michna, Tr. 2105).

37. Immediate-release ("IR") opioids are short-acting pain medications that take effect within 30 to 45 minutes of ingestion and tend to last 3 to 6 hours. They are used to treat acute, short-lived pain as well as chronic pain. (Michna, Tr. 2106, 2118; Savage, Tr. 693, 702, 705).

38. Extended-release ("ER") opioids provide continuous levels of medication in a patient's blood over several hours, with effects lasting from 8 to 24 hours, and in the case of transdermal applications – patches that deliver medication through the skin – up to 7 days. (Michna, Tr. 2106; *see* Savage, Tr. 702).

39. Extended-release opioids have been pharmacologically formulated to provide gradual release of the opioid medication. In particular, the physical chemical structure of the tablet, capsule, or bead provides for slower release of the medication and, in turn, more gradual absorption by the body. (Savage, Tr. 693, 704-05).

40. Extended-release opioids generally are used for patients with sustained pain lasting longer than 12 to 24 hours, as well as chronic pain that requires relief 24 hours a day. (Savage, Tr. 705).

### B. Context for the Endo-Impax Litigation and Settlement

#### 1. Opana ER

41. Oxymorphone belongs to the class of drugs known as opioids. It is a semi-synthetic opioid used to relieve pain. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶¶ 1-2).

42. The FDA first approved oxymorphone to relieve pain in 1960. (Second Set of Joint Stipulations, JX003 ¶ 1).

43.     Opana ER is an extended-release formulation of oxymorphone.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶ 3).

44.     Opana ER is used to treat pain for a wide variety of conditions, ranging from chronic back problems to pain caused by cancer.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶ 5).

45.     Endo Pharmaceuticals Inc. ("Endo") and Penwest Pharmaceuticals ("Penwest") collaborated on the development and commercialization of Opana ER.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-011 ¶ 47).

46.     The FDA approved Endo's NDA for Opana ER (NDA No. 021610) in June 2006 "for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time."  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶ 4).

47.     In July 2006, Endo announced the commercial availability of Opana ER.  At the time of launch in 2006, Opana ER was the only extended-release version of oxymorphone on the market.[6]  (Second Set of Joint Stipulations, JX003 ¶ 3).

48.     Endo ultimately offered Opana ER in seven dosage strengths (5, 7.5, 10, 15, 20, 30 and 40 milligram ("mg")).  (Second Set of Joint Stipulations, JX003 ¶ 3).

## 2.      Endo's initial patents for Opana ER

49.     When Endo launched Opana ER in 2006, it listed a single patent in the Orange Book as covering Opana ER:  U.S. Patent No. 5,128,143 ("the '143 patent").  (CX3242 at 003).

50.     The '143 patent was set to expire in September 2008.  (Second Set of Joint Stipulations, JX003 ¶ 4; CX3242 at 003).

51.     In October 2007, Endo listed three additional patents in the Orange Book as covering Opana ER:  U.S. Patent Nos. 7,276,250 ("the '250 patent"), 5,662,933 ("the '933 patent"), and 5,958,456 ("the '456 patent") ("the initial patents").  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶ 9).

52.     Endo listed the '250 patent in the Orange Book on October 2, 2007.  The '250 patent will expire in February 2023.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶¶ 9-10; Snowden, Tr. 351).

53.     Endo listed the '933 and '456 patents on October 19, 2007.  The '933 and '456 patents expired in September 2013.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶¶ 9-10; Snowden, Tr. 351).

---

[6] As set forth in F. 110, Endo introduced a reformulated version of Opana ER in 2012.  Unless otherwise specified, the term "Opana ER" as used herein refers to original Opana ER.

54. The '250, '933, and '456 patents all pertain to the controlled-release mechanism of the oxymorphone formulation.  (Second Set of Joint Stipulations, JX003 ¶ 6).

### 3. Overview of Endo-Impax litigation and settlement

#### a. Impax's Abbreviated New Drug Applications

55. In June 2007, Impax filed an Abbreviated New Drug Application (No. 79-087) for a generic version of Opana ER, also referred to as generic oxymorphone ER.[7]  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 11; Second Set of Joint Stipulations, JX003 ¶ 4).

56. As of June 2007, the '143 patent was the only patent listed in the Orange Book as covering Opana ER.  (Second Set of Joint Stipulations, JX003 ¶ 4; CX2967 at 014, 017).

57. Impax's June 2007 ANDA utilized a Paragraph III certification for the '143 patent.  A Paragraph III certification meant that Impax's ANDA would be eligible for FDA approval upon the '143 patent's expiration in September 2008.  (Second Set of Joint Stipulations, JX003 ¶ 4; CX2967 at 017).

58. Following Endo's listing of additional patents in the Orange Book in October 2007 (F. 51-53), Impax amended its ANDA to include Paragraph IV certifications for the '250, '933, and '456 patents.  With respect to the '250, '933 and '456 patents, Impax certified that, "in its opinion and to the best of its knowledge," those patents were "invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the oxymorphone hydrochloride extended-release tablets for which" Impax's ANDA had been submitted.  Impax was the first company to file an ANDA with Paragraph IV certifications for the 5, 10, 20, 30, and 40 mg dosages strengths of Opana ER.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶¶ 12, 13; Second Set of Joint Stipulations, JX003 ¶ 7; Snowden, Tr. 355).

59. On November 23, 2007, the FDA accepted Impax's ANDA with an amendment to include Paragraph IV certifications for the '250, '933, and '456 patents.  (Second Set of Joint Stipulations, JX003 ¶ 7).

60. On December 13, 2007, Impax sent Endo notice of its Paragraph IV certifications for the '250, '933, and '456 patents.  In its notice, Impax asserted that its product did not infringe these patents.  (Second Set of Joint Stipulations, JX003 ¶ 8; Snowden, Tr. 355, 413; CX2714).

---

[7] Endo and Impax both refer to a generic version of Endo's Opana ER as either "generic Opana ER" or "generic oxymorphone ER" interchangeably.

### b. The filing of the Endo-Impax patent litigation and FDA approval of Impax's ANDA

61. On January 25, 2008, Endo and Penwest filed a patent infringement lawsuit against Impax in the federal district court in Delaware, alleging that Impax's ANDA for generic oxymorphone ER infringed Endo's '456 and '933 patents ("Endo-Impax patent litigation"). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 15; Snowden, Tr. 413-14).

62. The filing of the Endo-Impax patent litigation triggered a statutory 30-month stay, meaning that the FDA could not approve Impax's ANDA until the earlier of the expiration of 30 months or resolution of the patent dispute in Impax's favor. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 15).

63. The 30-month stay was set to expire on June 14, 2010. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 16).

64. The FDA granted tentative approval to Impax's ANDA on May 13, 2010. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 17).

65. Tentative FDA approval is effectively the last step in an ANDA filer's approval efforts. (Koch, Tr. 340-41; *see* Snowden, Tr. 417-18 (tentative approval from FDA "suggest[s] that Impax was almost certain to get final approval at the conclusion of the 30-month stay")).

66. Impax received final approval for Impax's generic oxymorphone ER product on the 5, 10, 20, and 40 mg dosage strengths on June 14, 2010, upon expiration of the statutory 30-month stay. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-008 ¶ 21).

67. The FDA granted final approval to Impax's ANDA for the 30 mg dosage strength of generic oxymorphone ER on July 22, 2010. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-008 ¶ 22).

### c. Summary of proceedings

68. In the Endo-Impax patent litigation, Endo alleged that Impax's generic oxymorphone ER infringed Endo's '456 and '933 patents. Endo did not allege that Impax's generic oxymorphone ER infringed Endo's '250 patent. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 15; Snowden, Tr. 415-16; CX0304 at 002 ¶ 5).

69. Impax sought to transfer the Endo-Impax patent litigation from the federal district court in Delaware to the federal district court in New Jersey because the Delaware court was overloaded and Impax hoped the case would move faster in New Jersey. The court granted Impax's request and transferred the case to the federal district court in New Jersey. (Snowden, Tr. 357-58).

15

70.　The district court presiding over the Endo-Impax patent litigation held claim construction hearings on December 21, 2009 and March 19, 2010.  (Second Set of Joint Stipulations, JX003 ¶ 18).

71.　On April 5, 2010, the court in the Endo-Impax patent litigation issued an amended order on claim construction.  The court adopted the constructions for "hydrophobic material" and "sustained release" proposed by Endo, and the parties stipulated to the construction of "homopolysaccharide."  (Second Set of Joint Stipulations, JX003 ¶ 19).

72.　On May 19, 2010, the court scheduled the Endo-Impax patent infringement trial to begin on June 3, 2010 and continue through June 17, 2010.  (Second Set of Joint Stipulations, JX003 ¶ 22).

73.　The trial in the Endo-Impax patent litigation began on June 3, 2010.  (Second Set of Joint Stipulations, JX003 ¶ 24; Figg, Tr. 1906; Hoxie, Tr. 2767).

74.　On June 8, 2010, the Endo-Impax patent litigation was settled and the parties entered into the Settlement and License Agreement ("SLA") and the Development and Co-Promotion Agreement ("DCA").  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007-08 ¶¶ 18-19; Second Set of Joint Stipulations, JX003 ¶ 26).

75.　The SLA incorporates the DCA.  (Second Set of Joint Stipulations, JX003 ¶ 69).  The SLA and the DCA are referred to collectively in this Initial Decision as the "Challenged Agreement" or the "Endo-Impax Settlement."

76.　At the time that Endo and Impax settled their patent litigation, the outcome of Endo's patent infringement suit was uncertain.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-008 ¶ 20; Second Set of Joint Stipulations, JX003 ¶ 26).

### 4.　Costs of litigation

77.　Although litigation costs vary substantially among cases, a survey by the American Intellectual Property Lawyers Association estimated that the median litigation cost for all patent cases with more than $25 million at stake averages about $5.5 million for each party.  When such a case is handled by firms with more than 76 attorneys, the median litigation cost averages approximately $7 million for each party.  (CX5000 (Noll Expert Report at 108 ¶ 247 & n.278)).

78.　At the time of the Endo-Impax Settlement, which occurred during trial, Endo had spent between $6 and $7 million and Impax had spent about $4.7 million on litigation in the infringement case.  (CX2696 at 013-14; CX3212 at 009-10; CX5000 (Noll Expert Report at 108 ¶ 247)).

79.　The top end of the range that Impax uses in its budgeting process to estimate costs for a generic patent litigation is about $3 to $4 million per litigation.  This $3 to $4 million estimate represents total expenses from the start of litigation to completion and is based

primarily on expenses for outside counsel, such as hourly attorneys' fees. Impax might also allocate some expenses for its internal legal department's work on patent litigation, but those are minor amounts. (Reasons, Tr. 1221-22).

80. During a public earnings conference call in November 2011, Impax's then-chief financial officer ("CFO") stated that Impax had "lowered [its] patent litigation expense guidance for the full year for 2011 from $13 million to $10 million primarily due to recent settlements" and that Impax was going to save $3 million in litigation expenses because of settlements, including the Endo settlement. (Koch, Tr. 262-63; CX2703 at 004).

81. A reasonable estimate of the combined saved litigation costs for both Endo and Impax for settling the patent litigation in June 2010 is approximately $5 million. (F. 77-80; Noll, Tr. 1463).

### 5.     Other Endo litigation on initial Opana ER patents

82. Eight companies submitted ANDAs seeking approval to market a generic version of Opana ER. Each company included a Paragraph IV certification asserting that its proposed generic product did not infringe Endo's patents and/or that Endo's patents were invalid or unenforceable. (Second Set of Joint Stipulations, JX003 ¶ 5; CX2607 at 008-09 (Lortie Decl. ¶ 24)).

83. In addition to suing Impax (F. 61), Endo sued all other Opana ER ANDA filers, alleging infringement of one or more of Endo's initial patents. Those suits settled, with the generic companies receiving patent licenses covering only the patents-in-suit. (Snowden, Tr. 440; RX441; RX442; RX443; CX3192).

84. Actavis South Atlantic LLC ("Actavis") filed its ANDA on February 14, 2008 covering all dosage strengths of Opana ER. Actavis was the first to file an ANDA for the 7.5 and 15 mg dosages of Opana ER. (Second Set of Joint Stipulations, JX003 ¶ 12; Snowden, Tr. 370; CX6039 at 003).

85. In March 2008, Endo sued Actavis, alleging that Actavis' ANDA covering the 5, 10, 20, and 40 mg dosages of generic oxymorphone ER infringed the '456 and '933 patents. (Second Set of Joint Stipulations, JX003 ¶ 13).

86. In July 2008, after Actavis amended its ANDA to include the 7.5, 15, and 30 mg dosages of generic oxymorphone ER, Endo filed a second suit against Actavis, alleging that Actavis' ANDA for those dosages infringed the '456 and '933 patents. (Second Set of Joint Stipulations, JX003 ¶ 14).

87. Effective February 20, 2009, Actavis settled the patent litigation with Endo relating to generic Opana ER and received a license to the litigated patents starting no later than July 15, 2011. (Second Set of Joint Stipulations, JX003 ¶ 15; CX3383 (Actavis settlement); Snowden, Tr. 370-71).

88. Actavis launched its 7.5 and 15 mg generic Opana ER products, for which it possessed first-filer exclusivity, in July 2011. (CX4034 (Rogerson, Dep. at 13)).

89. Actavis launched its 5, 10, 20, 30, and 40 mg generic Opana ER products on September 17, 2013, several months after the expiration of Impax's first-filer exclusivity. (CX2973; *see* CX4034 (Rogerson, Dep. at 13)).

### 6. Endo's market power

90. At the time Endo entered into the Endo-Impax Settlement in June 2010, Endo had 100% of the market share for oxymorphone ER. (CX5000 (Noll Expert Report at 083 ¶ 189)).

91. In the pharmaceutical industry, brand-name drug patent holders have the ability to exclude firms from the market in the sense that they are entitled by law to delay competitive entry by generic manufacturers. (CX5000 (Noll Expert Report at 086 ¶ 199)).

92. Barriers to entry in the pharmaceutical industry include intellectual property rights, such as patents, and regulatory impediments, such as provisions of the Hatch-Waxman Act (F. 93). (Noll, Tr. 1408; CX5000 (Noll Expert Report at 084-85 ¶ 194)).

93. The regulatory procedures imposed by the Hatch-Waxman Act allow a brand-name drug to be protected against entry in two ways. First, if a branded drug company files a patent infringement suit against a Paragraph IV ANDA filer, the Hatch-Waxman Act provides a 30-month stay before the FDA can approve the ANDA. Second, non-first-filer Paragraph IV ANDA applicants have to wait at least 180 days after the first filer has entered before they can enter a market. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-004 ¶ 23; CX5000 (Noll Expert Report at 084-85 ¶ 194)).

94. The 30-month stay imposed by the Hatch-Waxman Act (F. 93) benefited Endo in the form of a regulatory entry barrier to the market for oxymorphone ER. (CX5000 (Noll Expert Report at 086-87 ¶ 194)).

95. Because the Paragraph IV procedures of Hatch-Waxman prevent entry by the first-filer generic for up to 30 months after a generic firm files an ANDA and by other generics for another 180 days, the patents at issue in the Impax infringement case gave Endo the power to exclude competitors even if its patents eventually were found not to be valid or infringed. (CX5000 (Noll Expert Report at 086-87 ¶ 199)).

### 7. Endo's plan to reformulate Opana ER

96. Since 2007, Endo had been working on a reformulated "crush-resistant" version of Opana ER ("reformulated Opana ER") to replace the original version. Reformulated Opana ER was also referred to internally by Endo as EN3288 and Revopan. (CX3214 at 015; CX3199 at 046; RX007 at 0001).

18

97.    Introducing a reformulated Opana ER was a potential way for Endo to preserve the value of its Opana ER franchise even after generics became available for original Opana ER. (CX3205 at 001 ("There is also a life cycle management (LCM) imperative for Endo's Opana ER franchise. . . .  To ensure we continue to protect the franchise in the face of loss of regulatory exclusivity in June 2009, a TRF [tamper-resistant formulation] of ER will be important to secure.  Without this LCM strategy, Opana ER is expected to lose about 70% of its sales within six months if generic entry occurs.")).

98.    Reformulating Opana ER would extend the life of the brand through additional patent protection and other possible roadblocks for potential generic competitors.  (CX2724 at 005 (forecasting up to four years of "organic exclusivity" and retaining all Opana ER sales if launched with labeling claims and ahead of generics); CX3205 at 001; CX3251).

99.    In order to maximize the value of reformulated Opana ER, Endo's goal was to launch the reformulated product before the entry of a generic for original Opana ER, with sufficient time to transition patients from original Opana ER to reformulated Opana ER.  Endo forecasted peak-year sales of more than $199 million in 2016 if reformulated Opana ER beat generics and was the first to enter the market.  If, however, reformulated Opana ER was launched after generic entry, estimated peak annual sales in 2016 were $10 million. (CX2578 at 008-09 (Dec. 11, 2007 Opana Brand LCM Update, stating that Endo's "Priority #1" was to "Beat Generics by 1 Year")).

100.   Endo forecasted that launching reformulated Opana ER ahead of a launch of a generic for original Opana ER would result in an increased demand for the reformulated product because patients will have been transitioned to the reformulated product.  (CX2724 at 006; CX2578 at 008-09; CX4025 (Bingol, Dep. at 95-96)).

101.   Endo forecasted significant erosion of its Opana ER franchise if Endo was unable to get reformulated Opana ER approved in a timely manner.  If Endo launched reformulated Opana ER at the same time that a generic for original Opana ER came onto the market, reformulated Opana ER would capture at most 30% to 32% of Endo's sales of original Opana ER.  (CX1106 at 004; CX2724 at 006 (generic entry would result in steep drop in Opana ER sales unless EN3288 were approved with tamper resistance claims ahead of generic entry); CX1320 at 003 (projecting only $11.9 million in Oxy TRF revenues for 2011); 007 (forecasting rapid generic erosion upon generic entry in July 2011); 024 ("Oxymorphone TRF conversion from OPANA ER base volume:  30% to 32% conversion of base volume; Conversion curve begins at launch (July 2011); Peak conversion (30%) reached in 40 months")).

102.   Endo planned to remove original Opana ER from the market after introducing reformulated Opana ER.  (CX1108 at 008 (noting that "it is likely that removal of Opana ER will be a condition of Revopan approval by FDA" and assuming launch of Revopan in February 2011 and ending shipment of Opana ER by October 2011)).

103.   Launching reformulated Opana ER as far ahead as possible of generic entry on original Opana ER would allow Endo to separate the reformulated brand product from potential

generics with a reasonable amount of time to make the conversion and create the most value. (CX4025 (Bingol, Dep. at 63-64); CX2578 at 009).

104.  Endo wanted to introduce reformulated Opana ER as soon as possible. (CX4025 (Bingol, Dep. at 32); Bingol, Tr. 1295 ("the quicker you get to market, the better")).

105.  In 2010, Endo forecasted filing its application for approval of reformulated Opana ER with the FDA during the third quarter of 2010 and that the approval process would take between four and ten months. Depending on various assumptions, Endo forecasted launching reformulated Opana ER sometime in 2011. (CX2575 at 004; CX1108 at 008 (assuming launch in February 2011); CX3038 at 001 (projecting range for launch between December 2010 and June 2011); *see also* CX2573 at 004 (projecting May 2011 launch); CX2724 at 005 (projecting range for launch between January and September 2011)).

106.  Endo understood that patients cannot be switched immediately from one long-acting opioid to another because physicians are "very careful as they adjust dosages" for patients. Endo sought "an orderly and phased transition from one product to the other so [it] made sure [it wasn't] leaving any current patients in a difficult situation." Such a transition would take about six to nine months. (CX4019 (Lortie, Dep. at 39-42, 156-57); Mengler, Tr. 530-31).

107.  Endo's plan to reformulate Opana ER and transition the market to the new product, prior to entry of a generic original Opana ER, would be adversely affected if Impax launched its generic at risk[8] in June 2010. (CX2724 at 001).

108.  If Impax launched a generic Opana ER at risk, Endo planned to launch an authorized generic for original Opana ER. (CX2576 at 003 ("We will launch on word/action of first generic competitor."); CX2581 at 001 ("Endo is prepared to launch an authorized generic if another generic is approved first."); CX2573 at 004 (Endo planned a "[l]aunch of authorized generic" in the event that Impax launched at risk); CX3007 at 003 ("If Impax launches, Endo will launch its authorized generic . . .")).

109.  Endo did not intend to launch both a reformulated Opana ER and an authorized generic of original Opana ER at the same time. This is because it would have been "very difficult [for Endo] to justify" having a crushable authorized generic on the market at the same time as a crush-proof reformulation. Endo "intended to replace one product with the other, and that would be the only [Opana ER] product that [Endo] had on the market." (CX4019 (Lortie, Dep. at 117-18); Bingol, Tr. 1338-39; *see also* CX1108 at 008 (Endo forecast noting that "it is likely that removal of Opana ER will be a condition of Revopan approval by FDA")).

110.  In March 2012, Endo stopped distributing original Opana ER and launched reformulated Opana ER. (Second Set of Joint Stipulations, JX003 ¶ 33; CX4017 (Levin, Dep. 139)).

---

[8] An "at-risk launch" is further explained in F. 451-464.

111.  On June 8, 2017, the FDA publicly requested that Endo voluntarily withdraw its reformulated Opana ER product from the marketplace. On September 1, 2017, Endo ceased sales of reformulated Opana ER. (Second Set of Joint Stipulations, JX003 ¶¶ 55, 57).

### C.  The Challenged Agreement

#### 1.  Preliminary negotiations

112.  Impax and Endo first attempted to settle their patent dispute in the fall of 2009, before the claim construction hearing in the Endo-Impax patent litigation. (RX359; RX285; Second Set of Joint Stipulations, JX003 ¶¶ 16-17).

113.  At the time of the settlement negotiations (fall 2009 until settlement on June 8, 2010), Larry Hsu was Impax's chief executive officer ("CEO"), Chris Mengler was president of Impax's generics division, Margaret Snowden was Impax's vice president of intellectual property litigation and licensing, and Arthur Koch was Impax's CFO. Mr. Mengler was Impax's lead settlement negotiator until he was replaced as the lead negotiator by Mr. Koch and Ms. Snowden on June 4, 2010. (Koch, Tr. 217-18, 227-30, 310-11, 322-23; Snowden, Tr. 362).

114.  At the time of the settlement negotiations (fall 2009 until settlement on June 8, 2010), Guy Donatiello was Endo's senior vice president of intellectual property and Alan Levin was Endo's CFO. Mr. Donatiello and Mr. Levin were the principal negotiators for Endo. (Snowden, Tr. 362, 373-74).

115.  Impax was aware during settlement discussions with Endo in the fall of 2009 that Endo already had agreed to a July 15, 2011 entry date for Actavis' generic oxymorphone ER dosages. (CX4003 (Snowden, IHT at 56-57); CX0309 at 001-02).

116.  Settlement discussions between Endo and Impax in the fall of 2009 included potential generic entry dates. Specifically, Ms. Snowden proposed to Mr. Donatiello that Impax should be able to enter around July 2011 or possibly December 2011 or January 2012, to approximate the midpoint between the expiration of the 30-month stay in June 2010 (F. 63) and the expiration of the asserted patents in September 2013 (F. 53). Mr. Donatiello rejected Ms. Snowden's proposal, arguing that Impax's entry date should be around the midpoint between the conclusion of litigation through appeal and patent expiration. (CX4003 (Snowden, IHT at 56-57); Snowden, Tr. 418-20; Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-006 ¶ 10).

117.  Settlement discussions between Endo and Impax in the fall of 2009 included discussions of a potential product collaboration. (*See* II.C.3).

118.  Settlement discussions between Endo and Impax that had commenced in the fall of 2009 ended after a conference call on December 7, 2009. (CX1301 at 112).

119. Impax and Endo resumed settlement discussions in mid-May 2010, approximately one month before the June 14, 2010 expiration of the 30-month stay of Impax's ANDA imposed by the Hatch-Waxman Act and approximately three weeks before the scheduled June 3, 2010 trial in the Endo-Impax patent litigation. (Snowden, Tr. 418; CX0310 at 004; CX1301 at 112; F. 63, 73).

120. On or about May 14, 2010, Endo became aware that Impax had received tentative FDA approval for generic Opana ER, based on a press release issued by Impax. Endo had a discussion with its outside counsel the same day regarding the status of settlement discussions with Impax. (CX1307 at 001; CX1301 at 112).

121. In an internal Impax email between Dr. Hsu and Mr. Mengler on May 14, 2010, Dr. Hsu hypothesized a settlement with Endo with a January 2011 launch and a no-AG provision,[9] to which Mr. Mengler replied that he would "love" a settlement. (CX0505 at 001).

122. On May 17, 2010, Mr. Donatiello of Endo contacted Ms. Snowden of Impax by voicemail and email to resume settlement discussions. That afternoon, Ms. Snowden and Mr. Donatiello discussed a potential settlement for the first time since December 2009. (CX0310 at 004; RX316 at 0001; CX4003 (Snowden, IHT at 83-84)).

123. The SLA and the DCA were negotiated together, with contract terms for both agreements discussed in the same documents exchanged between Endo and Impax. (Koch, Tr. 244; *see, e.g.*, CX0320; RX565; CX0406 at 001; CX0407 at 001-02; CX3183 at 001).

### 2. The Settlement and License Agreement

#### a. Overview of relevant provisions

124. Under the SLA, Impax agreed not to launch its generic oxymorphone ER product until January 1, 2013. (RX364 at 0001-02, 0009 (executed SLA §§ 1.1, 4.1(a)) (granting license and defining the "Commencement Date")).

125. Under the SLA, Endo granted Impax a license both to the initial Opana ER patents (defined in the SLA as the '933, '456, and '250 patents and any reissuances thereof), and to "any patents and patent applications owned by Endo or Penwest . . . that cover or could potentially cover the manufacture, use, sale, offer for sale, importation, marketing or distribution of products . . . that are the subject of the Impax ANDA . . . ." (RX364 at 0009 (SLA § 4.1(a)); Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-009-10 ¶ 35).

126. Under the SLA, Endo provided Impax with a "covenant not to sue," which prohibited Endo and its affiliates from suing Impax for patent infringement on any of the patents

[9] A no-AG provision, also referred to as a no-AG agreement, is a provision through which a brand-name drug company agrees not to launch an authorized generic in competition with the generic drug company's product during the 180-day exclusivity period. (Koch, Tr. 235; Snowden, Tr. 392).

licensed pursuant to section 4.1(a) (F. 125).  (RX364 at 010 (SLA § 4.1(b)); *see also* Figg, Tr. 1963-64; Hoxie, Tr. 2885).

127. Under the SLA, the license granted by Endo to Impax to sell generic Opana ER was exclusive during Impax's 180-day first-filer exclusivity period for the five dosage strengths for which Impax had filed an ANDA.  This exclusive license grant meant that Endo could not sell an authorized generic product of these five dosages until Impax's 180-day exclusivity period ended.  (RX364 at 0010-11 (SLA § 4.1(c)); CX3164 at 009-10).

128. Under the SLA, Impax would be obligated to pay Endo a 28.5% royalty on Impax's generic Opana ER sales during Impax's 180-day exclusivity period in the event that sales of Opana ER grew by a specific percentage prior to Impax's entry.  Specifically, the royalty was owed if Opana ER sales in the quarter before Impax's licensed entry "exceed[ed] $46,973,081 compounded quarterly at an annual rate of ten percent . . . ."  Otherwise, Impax had no obligation to pay a royalty.   (RX364 at 0012 (SLA § 4.3)).

129. Under the SLA, pursuant to a provision titled "Endo Credit," Endo would be obligated to make a cash payment to Impax in the event Endo's Opana ER dollar sales (as calculated by units multiplied by the wholesale acquisition cost ("WAC") fell by more than 50% from the "Quarterly Peak" (the highest sales quarter between Q3'2010 and Q3'2012) to the fourth quarter of 2012 (the quarter before Impax would be permitted to launch its generic oxymorphone ER product).  RX364 at 0003-06, 0012 (SLA §§ 1.1, 4.4, definitions of "Endo Credit," "Market Share Profit Factor," "Market Share Profit Value," "Pre-Impax Amount," "Prescription Sales," "Quarterly Peak," and "Trigger Threshold")).

130. In January 2013, Impax launched generic oxymorphone ER in the 5, 10, 20, 30, and 40 mg dosage strengths per the terms of the SLA.  (Second Set of Joint Stipulations, JX003 ¶ 40).

### b.    Negotiations of the SLA

### i.    Initial term sheet

131. On May 26, 2010, Mr. Donatiello of Endo sent to Mr. Mengler and Ms. Snowden of Impax two term sheets.[10]  Endo's initial term sheet for the SLA included a proposed license agreement with a no-AG provision.  Specifically, the proposed license agreement provided that Impax would have an "Exclusivity Period" of 180 days for each of the dosages for which Impax held first-to-file exclusivity (5, 10, 20, 30, and 40 mg), during which Impax's license "would be exclusive as to all but (i) Opana ER®-branded products that are not sold as generic products and (ii) generic products covered by prior license agreements executed as of the effective date of the License Agreement with Impax." (CX0320 at 009-10).

---

[10] The May 26, 2010 term sheet relating to the DCA is discussed in F. 294.

132.  Endo's May 26, 2010 initial term sheet for the SLA included a proposed license agreement that granted Impax a license to sell generic Opana ER with a commencement date of March 10, 2013 and provided that Impax would not enter the market prior to that commencement date. (CX0320 at 009).

133.  Delaying Impax's entry was valuable to Endo. Endo calculated that "[e]ach month that generics are delayed beyond June 2010 is worth ~$20 million in net sales per month." Endo forecasted that if Impax launched its generic in July 2010, Endo would lose approximately $100 million in branded Opana ER sales during the first six months Impax was on the market. Endo forecasted that it would lose 85% of its branded Opana ER sales within three months of generic entry. (CX1106 at 005; CX3445 at 001, 002; CX1320 at 007).

134.  The proposed license agreement included with Endo's May 26, 2010 initial term sheet for the SLA was limited to the then-issued Opana ER patents (defined as the '933, '456 and '250 patents), and any issued continuations thereof. (CX0320 at 006-07, 009-10).

135.  The proposed license agreement included with Endo's May 26, 2010 initial term sheet for the SLA contained a provision requiring Impax to pay royalties to Endo at a rate of 35% on Impax's gross sales of generic Opana ER during Impax's 180-day exclusivity period, if Endo's gross sales of Opana ER during the three full calendar months before Impax's entry date exceeded a certain specified dollar amount. (CX0320 at 010).

### ii.  Impax's counteroffer

136.  Impax responded to Endo's May 26, 2010 initial term sheets (F. 131) on May 27, 2010, with a counteroffer. (RX318).

137.  Impax's May 27, 2010 counteroffer to Endo, transmitted by Mr. Mengler to Mr. Levin of Endo, provided for a generic launch date of January 1, 2013, "with no authorized generic and certain acceleration triggers, including market degradation to any alternate product." (RX318 at 0001; Koch, Tr. 237-38; Snowden, Tr. 432; Mengler, Tr. 532).

138.  An acceleration provision or trigger for market degradation would allow Impax to launch its generic oxymorphone ER product earlier than January 1, 2013 in the event that Opana ER brand sales fell by a certain amount or percentage. (CX4010 (Mengler, IHT at 33-34)).

139.  Impax wanted a market acceleration provision as "protection in case Endo had any intentions of moving the market to a next-generation product." Impax had included similar provisions in other patent settlements with brand companies. (CX4032 (Snowden, Dep. at 104); CX4003 (Snowden, IHT at 121-22)).

140.  Although Impax did not have specific information about Endo's plans to reformulate Opana ER, Impax was concerned that Endo had "a secret plan to damage the market"

with the introduction of a reformulated Opana ER product.  (CX0217 at 001; *see* Snowden, Tr. 433-34; Mengler, Tr. 569-70; CX4017 (Levin, Dep. at 118)).

141.    Impax had seen analyst reports suggesting that Endo was working on crush-resistant drugs generally.  (CX2540 at 001; Mengler, Tr. 579-80).

142.    In light of concern about opioid abuse, the FDA encouraged opioid manufacturers to "figure out a way to make them tamper-resistant [and] the primary manner in which companies were doing that was to make the tablet in such a manner that [it] couldn't be crushed."  (Mengler, Tr. 569).

143.    Impax was aware that Purdue Pharma, L.P., the manufacturer of OxyContin, had introduced a reformulated, crush-resistant version of its product and was withdrawing its original formulation.  (Mengler, Tr. 569; CX4017 (Levin, Dep. at 118-19)).

144.    Impax's May 27, 2010 counteroffer to Endo revised Endo's formula for calculating royalties to Endo in connection with the license to sell generic Opana ER by raising the amount of gross sales that would trigger a royalty payment, and revising the royalty calculation.  (RX318 at 0001).

145.    After receiving Impax's May 27, 2010 counteroffer, Mr. Levin of Endo responded by email that the parties were "[c]learly . . . too far apart" and suggested a conference call among Mr. Mengler and Ms. Snowden for Impax, and Mr. Levin and Mr. Donatiello for Endo.  (CX1305 at 001).

146.    Negotiators for Endo and Impax conferred by telephone on May 27, 2010, and over the weekend of May 28 and 29, 2010.  (CX1301 at 113; CX310 at 005).

        **iii.**      **Rejection of acceleration trigger and development of the Endo Credit**

147.    Endo opposed the concept of accelerated entry and rejected Impax's request for a market acceleration trigger.  Endo insisted to Impax "that they had no interest in" moving the market to a crush-resistant version of Opana ER and "they weren't planning to." (CX4032 (Snowden, Dep. at 104, 106-07); Snowden, Tr. 385; CX4014 (Hsu, IHT at 85-87)).

148.    Endo's rejection of an acceleration trigger increased Impax's concern that Endo was going to switch the market to a crush-resistant version of Opana ER.  (Mengler, Tr. 568).

149.    Because the proposed settlement provided for "a period of time between the date of [FDA] approval and the . . . launch [in] January [2013].  [Impax was] worried about the control the brand had over their product during that time, and [Impax was] looking for a way to gain – take back some of that control away from the brand."  (Koch, Tr. 240-41).

150.    Mr. Mengler responded to Endo's insistence that Endo was not planning to move the market to a crush-resistant version of Opana ER that, "if you're telling me the truth and the product is really going to grow, well, you know, there will be something in it for you as well [and] if you're not telling me the truth, you're going to pay me what I would have made anyway." (CX4010 (Mengler, IHT at 35-36); *see also* CX4026 (Nguyen, Dep. at 164-66) (the "gist" of the Endo Credit was "Mr. Mengler basically telling Endo to put its money where its mouth was")).

151.    At an in-person meeting among negotiators for Endo and Impax held on June 1, 2010, Endo proposed to Impax that "if the product declines by more than 50%, [Impax] would be entitled to a 'make good' payment such that [Impax's] potential profits would equal to 50%." (RX387 at 0001 (June 1, 2010 Mengler internal email recapping the "current proposal"); *see also* CX0310 at 005).

152.    On June 1, 2010, Mr. Mengler of Impax, in an internal email to Dr. Hsu, Ms. Snowden and others, described the current proposal as including a generic launch date of February 1, 2013, with acceleration triggers. In addition, "[i]f the product grows beyond certain levels, we pay them [a percentage of profits] during the six month exclusivity . . . [I]f the product declines by more than 50%, we would be entitled to a 'make good' payment such that our potential profits would equal to 50%." Mr. Mengler stated his opinion that he "still like[s] January" for the agreed generic launch date and that "[t]he make-good trigger is too low. A similar arrangement with, say a 75% number might be quite attractive." (RX387).

153.    Once Endo refused to agree to an acceleration trigger, and agreed instead to the concept of a make-whole payment, Impax stopped pursuing an acceleration trigger. (CX4018 (Koch Dep. at 71); Snowden, Tr. 385).

154.    On the afternoon of June 3, 2010, negotiators for Endo and Impax reached an agreement in principle for settling the litigation. That same day, in an internal email from Mr. Mengler of Impax to Dr. Hsu, Ms. Snowden, Mr. Koch, and others, Mr. Mengler described the key provisions for the SLA. Generic launch would be January 1, 2013. The royalty provisions were further adjusted and "[i]f the units decline by more than 50% from peak at launch, make whole provisions kick in that protect the downside." (CX0407 at 001-02; CX3334 at 001 (Mr. Levin reporting that Endo had "reached a handshake agreement with Impax); CX4012 (Donatiello, IHT at 139) ("Endo and Impax reached an agreement in princip[le] around midday on June 3rd."); CX0114 at 001 (June 3, 2010, email from Mengler reporting that "[i]t seems all parties internally are good to go").

155.    On June 4, 2010, Mr. Mengler was replaced as Impax's lead negotiator by Mr. Koch and Ms. Snowden. After an internal Impax management discussion that day, at the instruction of Impax management, Mr. Koch and Ms. Snowden had a conference call with Endo in which they proposed dropping the existing terms for the SLA and DCA, and entering into a "simple settlement" with the same July 15, 2011 entry date that Endo provided to Actavis in their settlement. (CX4032 (Snowden, Dep. at 97-99); Snowden, Tr. 372-74; CX507 at 001).

156. In response to Impax's June 4, 2010 proposal for a simple settlement with a July 15, 2011 entry date (F. 155), Mr. Levin of Endo expressed anger that the terms of the deal he had negotiated with Mr. Mengler were not being honored, refused Impax's request, and insisted on reverting back to the deal he had negotiated with Mr. Mengler. (CX4032 (Snowden, Dep. at 99-102); Snowden, Tr. 374-75).

### iv. Finalizing the SLA

#### (a) No-AG provision and Endo Credit

157. Between June 4 and June 7, 2010, Endo and Impax exchanged numerous drafts, and redlined revisions thereto, of the SLA. (*See, e.g.*, CX0323 (June 4, 2010 Endo first draft); CX0324 (June 5, 2010 Impax revisions); CX2771 (June 6, 2010 Endo revisions); CX1813 (June 7, 2010 Endo revisions); CX2767 (June 7, 2010 Impax revisions); RX336 (June 7 Impax revisions); RX322 (June 7 Endo revisions); RX364 (SLA)).

158. Each draft of the SLA exchanged by Endo and Impax, as well as the final executed SLA, provided for an entry date of January 1, 2013. (*See, e.g.*, CX0323 § 1.1 (definition of "Commencement Date"), § 4.1(a); CX0324 (same); CX2771 (same); CX1813 (same); CX2767 (same); RX336 (same); RX364 (SLA)).

159. Endo's initial term sheet to Impax, provided on May 26, 2010, as well as each settlement draft exchanged by Endo and Impax, contained a no-AG provision. (*See, e.g.*, F. 131; CX0323 § 4.1(c); CX0324; CX2771; CX1813; CX2767; RX336; RX364 (SLA)).

160. Endo drafted the first iteration of the make-whole provision, which was included in the first draft of the SLA Endo sent to Impax on Friday June 4, 2010 as section 4.4 of the SLA. Under Endo's proposal, Endo's obligation to pay Impax a cash amount would be triggered if the amount of oxymorphone active pharmaceutical ingredient ("API") shipped in the Opana ER strengths for which Impax was first to file fell below a set threshold from the peak consecutive three-month sales period between the SLA's effective date and the fourth quarter of 2012. The amount Endo would ultimately be obligated to pay depended on Impax's sales during its 180-day exclusivity period. Generally, the lower Impax's net profits during the exclusivity period, the lower the amount Endo was obligated to pay. (CX0323 at 001, 005-07, 012 (June 4, 2010 draft SLA § 1.1 (definitions of "Impax's Net Profit," "Impax Product," "Exclusivity Period," "Pre-Impax Amount," "Three Month Shipment Amount," and "Trigger Threshold"), § 4.4).

161. Roberto Cuca, Endo's vice president of financial planning and analysis, was tasked with developing a provision that became known as "the Endo Credit" (F. 95-96). Mr. Cuca's "goal was to make the provision be as beneficial to Endo as possible." Mr. Cuca looked for ways to "improve the economic effect of this provision to Endo." (CX4035 (Cuca, Dep. at 68-69, 96-97); Cuca, Tr. 612, 614-15).

162.   On Saturday, June 5, 2010, counsel for Impax sent a revised draft of the SLA to Endo. Impax renamed Endo's section 4.4 the "Endo Credit" and proposed two changes to Endo's proposal.  First, Endo's obligation to pay the Endo Credit would be dependent on a decline of 50% or more in Opana ER unit sales rather than API.  Second, if Endo's obligation to pay was triggered, the amount to be paid would not rely on Impax's actual sales of generic oxymorphone ER during its exclusivity period, but rather on the revenues Impax would have expected to make during the exclusivity period had Endo not switched the market.  To approximate this expected amount, the formula incorporated the generic substitution rate (90%), the generic price (75% of the WAC brand price), and the length of the exclusivity period (50%, or half a year or 180 days).  (CX0324 at 001, 045 (June 5, 2010 draft SLA § 4.4, definitions of "Endo Credit," "Market Share Factor," "Market Share Value," "Pre-Impax Amount," "Trigger Threshold," and "Quarterly Peak.").)

163.   On Sunday, June 6, 2010, Endo responded to Impax's proposal for the Endo Credit with two additional changes.  First, Endo proposed that its obligation to pay the Endo Credit would be dependent on a decline of 50% or more in Opana ER dollar sales, as calculated by multiplying unit sales by the wholesale acquisition cost (WAC), instead of unit sales. Second, Endo wanted the amount to reflect Impax's expected profits during the exclusivity period, rather than Impax's expected revenues, which would effectively reduce any amount to be paid to Impax under the Endo Credit.  (CX2771 at 001, 005-07, 014 (June 6, 2010 draft SLA § 1.1 (definitions of "Endo Credit," "Market Share Profit Factor," "Market Share Profit Value," "Pre-Impax Amount," "Prescription Sales," and "Quarterly Peak"), § 4.4; Cuca, Tr. 639).  *See also* CX4035 (Cuca, Dep. at 105-06) ("[T]hat is one of the ways that the Endo team would have negotiated to make it more financially favorable to Endo.")).

164.   Endo believed that incorporating Impax's net profit margin into the Endo Credit was consistent with the objective of "trying to make [Impax] whole at the bottom line, so at their profit line, whereas the prior provision would have made them whole at the revenue line and actually would have advantaged them as compared to what was trying to be achieved."  (Cuca, Tr. 638-39).

165.   Impax agreed to the two changes to the Endo Credit proposed by Endo in Endo's June 6, 2010 revised draft to Impax.  (CX2767 at 004, 006-07, 013 (June 7, 2010 Impax draft SLA § 4.4, definitions of "Endo Credit," "Market Share Profit Factor," "Market Share Profit Value," "Pre-Impax Amount," "Prescription Sales," and "Quarterly Peak"); RX364 at 0003-06, 0012 (SLA § 1.1 (definitions of "Endo Credit," "Market Share Profit Factor," "Market Share Profit Value," "Pre-Impax Amount," "Prescription Sales," and "Quarterly Peak"), § 4.4).

**(b)     Scope of patent license**

166.   Both Endo's May 26, 2010 initial term sheet for the SLA and Endo's June 4, 2010 first draft of the SLA limited Impax's license to the three patents then listed in the Orange Book for Opana ER (the '933, '456, and '250 patents).  (CX0320 at 006-07, 009-10 (May

26, 2010 Endo term sheets); CX0323 at 006, 010 (June 4, 2010 draft SLA §§ 1.1, 4.1(a))).

167.    At the time the negotiations were being conducted, Impax was aware that Endo had additional pending patent applications relating to Opana ER and recognized that Endo could acquire still other patents.  (RX398 at 001; RX568; Mengler, Tr. 571-72; Snowden, Tr. 440, 442-43; *see also* Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-010 ¶ 36).

168.    Given the possible effects of Endo's additional patent applications relating to Opana ER, a reasonable litigant would have been concerned with Endo's future patents.  (Figg, Tr. 1938).

169.    On June 5, 2010, Impax proposed broadening the patent license in the SLA to "any patents and patent applications owned by or licensed to Endo . . . that cover or could potentially cover" Impax's generic oxymorphone ER product.  (CX0324 at 030 (June 5, 2010 Impax revised draft of SLA § 4.1(a)); *see also* CX4026 (Nguyen, Dep. at 153-55) (testifying that the June 5 SLA draft expanded the scope of the patent license); CX4012 (Donatiello, IHT at 93)).

170.    Endo accepted Impax's language, referenced in F. 169.  (CX2771 (June 6 Endo revisions); CX1813 (June 7 Endo revisions); CX2767 (June 7 Impax revisions); RX336 (June 7 Impax revisions); RX322 (June 6 Endo revisions)).

### c.      Value transferred to Impax under the SLA

### i.      No-AG provision

171.    First-filer exclusivity (F. 21) is very valuable to a generic drug manufacturer.  First-filer exclusivity gives the first filer 180 days, or "six months of runway," before any potential entry by another generic and helps the generic company make more money.  (Koch, Tr. 232-33).

172.    A first-filer generic manufacturer makes a substantial portion of its profits during the 180-day exclusivity period.  The introduction of an authorized generic during that exclusivity period reduces the value of the exclusivity period by causing lower prices and fewer sales for the first filer.  (Reasons, Tr. 1213-15; Koch, Tr. 232-33).

173.    Impax was the first company to file an ANDA with Paragraph IV certifications for the 5, 10, 20, 30, and 40 mg dosages of oxymorphone ER, which comprised all of the dosages of Opana ER except the 7.5 and 15 mg dosages.  The five doses as to which Impax was the first to file constitute the five most popular dosages of Opana ER, comprising 95% of Endo's Opana ER sales.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 13; Mengler, Tr. 525; Koch, Tr. 231-32; Snowden, Tr. 354, 414).

174. As the first filer on the 5, 10, 20, 30 and 40 mg dosages of oxymorphone ER, Impax was entitled to 180 days of generic exclusivity. During that 180 days, no other ANDA filer could market a generic version of Opana ER because the applicable statute does not allow the FDA to give final approval to any other ANDA filer during that 180-day time period. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-007 ¶ 14; Second Set of Joint Stipulations, JX003 ¶ 7; Snowden, Tr. 414; *see also* Mengler, Tr. 522-23).

175. The term "authorized generic" is a term of art used in the pharmaceutical industry to describe a generic that is made available for sale using the brand company's New Drug Application approval. An authorized generic is generally launched by the brand company or another company licensed by the brand company. Launching an authorized generic helps a company partially recoup sales of the branded product that are lost to generic competition. (Mengler, Tr. 523; Koch, Tr. 233; Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶¶ 28-31; Reasons, Tr. 1211-12).

176. The 180-day exclusivity period does not prevent the brand company from launching an authorized generic. The brand company, if it chooses, can launch an authorized generic during the 180-day exclusivity period and compete with the first-filing generic during that period. (Mengler, Tr. 523-24; *see also* Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-005 ¶ 28; Second Set of Joint Stipulations, JX003 ¶ 7).

177. Having an authorized generic competitor during the 180-day exclusivity period generally results in a decrease in the first filer's prices of approximately 30 to 35%. The first filer's share of the generic market will also be reduced as the first generic manufacturer will have to split the sales with the authorized generic manufacturer. (Reasons, Tr. 1213-14; Mengler Tr. 524).

178. Endo, as the holder of the approved NDA for Opana ER, could market its own authorized generic version of Opana ER during Impax's exclusivity period. (Second Set of Joint Stipulations, JX003 ¶ 7).

179. Impax was aware that an authorized generic would adversely impact Impax's market share and profits. (CX0514 at 004 (5/16/2010 email from Chris Mengler attaching 5-year forecast 2010 showing Impax with less than 100% of the generic market share within the 180-day exclusivity period); CX2825 at 008 (2/11/2010 email from Ted Smolenski attaching 5-year forecast 2010 showing same)).

180. If there were no authorized generic, then Impax would be the only generic product on the market during its 180-day exclusivity period and could charge a higher price for generic Opana ER compared to a marketplace that had two companies selling generic products. (Reasons, Tr. 1215; Snowden, Tr. 392).

181. Impax executives estimated that if Endo launched an authorized generic when Impax entered the market, Endo's authorized generic would capture as much as half of sales of generic Opana ER and cause substantially lower generic prices during the exclusivity

period than would be the case if Impax sold the only generic.  (CX4037 (Smolenski, Dep. at 53-54); CX4002 (Smolenksi, IHT at 80-81); CX0202 at 001).

182.    Impax would generally seek a no-AG provision as an element of negotiating a settlement agreement with a brand manufacturer.  The absence of an authorized generic would mean more control for the generic company, and control can often lead to higher profits for the generic company.  (Koch, Tr. 234).

183.    Mr. Mengler, Impax's primary negotiator with Endo, believed that getting a no-AG provision would be beneficial to Impax.  Along with obtaining the earliest possible entry date, a no-AG agreement is among the more important things that Impax would seek in a negotiation in order to get the best possible deal for Impax.  (Mengler, Tr. 526).

184.    A six-month no-AG provision was one of the terms included as part of the Endo-Impax settlement throughout the settlement negotiations.  (F. 159).

185.    The no-AG provision in the SLA prohibited Endo from selling an authorized generic product for any of the five specified dosages as to which Impax was first to file until after Impax's 180-day exclusivity period ended.  (F. 127; RX364 at 0010-11 (SLA § 4.1(c)).

186.    At time of the execution of the SLA, Impax did not know whether, absent the settlement, Endo would launch an authorized generic.  (CX3164 at 019-20).

187.    The no-AG provision in the SLA guaranteed to Impax that Impax, as the first to file on generic Opana ER, would be the only seller of generic Opana ER during its first 180 days on the market and would not face competition from an Endo authorized generic.  (Snowden, Tr. 392; CX0320 at 009-10; CX4003 (Snowden, IHT at 111-13)).

188.    The no-AG provision in the SLA was worth substantial value to Impax when the SLA was executed because the no-AG provision ensured that Impax would face no generic competition during the 180-day exclusivity period and would earn greater profits by not having to share generic sales with an Endo authorized generic.  (CX5000 (Noll Expert Report at 153-55 ¶¶ 346-48); Noll, Tr. 1452-54).

189.    In 2010, Impax forecasted the effect of an authorized generic by Endo on Impax's expected generic sales.  In what Impax referred to as the "upside" scenario, Impax assumed that Endo's authorized generic Opana ER would enter about two months after Impax's launch of generic Opana ER.  Under the upside scenario, Impax's share of generic sales was estimated to fall to 60% and Impax's average price was estimated to fall by 36% (from 55% of brand WAC to 35%).  Under what Impax referred to as its "base" scenario, Impax assumed that Endo's authorized generic Opana ER would enter simultaneously with Impax, would capture half of the market, and would cause prices to fall by the same 36%.  (CX4037 (Smolenski, Dep. at 147-50, 166); CX0004 at 005-19; CX0222 at 004-11; CX2825 at 008-17; CX2830 at 004-09; CX2831 at 003-08; CX2853 at 007-15).

31

190.    Complaint Counsel's economic expert, Professor Roger Noll, applying Impax's forecasts in 2010 (F. 189), calculated that under Impax's upside scenario, entry by an authorized generic during Impax's 180-day exclusivity period would cause Impax's revenues to fall by 61.6%, or approximately $23 million. Under Impax's "base" assumptions (F. 189), entry by an authorized generic during Impax's 180-day exclusivity period would cause Impax's revenues to fall by 68%, or approximately $33 million. (CX5000 (Noll Expert Report at 155 ¶ 350)).

191.    In May 2010, Todd Engle, of Impax's sales and marketing team, prepared an analysis for Dr. Hsu and Mr. Mengler of the effect of an authorized generic on Impax's profits during Impax's 180-day exclusivity period, which projected lost profits in the amount of $24.5 million if an AG entered within two to four weeks after Impax's launch of generic oxymorphone ER. (CX2753 at 004 (six month lost profits model for oxymorphone ER, predicting profits of $53 million with no AG, and $28.5 million with AG)).

192.    On June 1, 2010, Endo approximated the revenues it would gain from launching an authorized generic of Opana ER, if Impax launched at risk and Endo launched its authorized generic on July 1, 2010, to be $25 million. (CX1314).

193.    The no-AG provision in the SLA was worth between $23 and $33 million in projected sales revenue to Impax at the time Impax entered into the SLA. F. 189-191.

194.    The no-AG provision had substantial value to Impax even if original Opana ER sales grew so much that Impax ended up having to pay a royalty to Endo, pursuant to the SLA. If Endo's sales of original Opana ER reached a sufficiently high level prior to Impax's generic entry, Impax would be obligated to pay a royalty to Endo in the amount of 28.5% of Impax's net sales of generic Opana ER. Because the royalty percentage is lower than the expected decline in Impax's revenue attributable to competition from an AG, Impax's revenues with the no-AG provision and a royalty are always higher than revenues with competition from an AG and no royalty. In all cases, Impax would benefit more from being the only seller of a generic oxymorphone ER product, than it would be required to pay Endo in royalties. (RX364 at 0012 (SLA § 4.3); CX5001 (Bazerman Expert Report at 026 ¶ 51); CX5000 (Noll Expert Report at 155-56 ¶¶ 350-51); Mengler, Tr. 533).

### ii.    Endo Credit

195.    Under section 4.4 of the SLA, titled "Endo Credit," Endo agreed to pay Impax an amount, determined by a mathematical formula, in the event that prescription sales of Opana ER declined by more than 50% from the quarterly peak sales during the time period from July 2010 to September 2012. (RX364 at 0003-06, 0012 (SLA §§ 1.1, 4.4) ("If the "Pre-Impax Amount is less than the Trigger Threshold, then Endo shall pay to Impax the Endo Credit"); CX3164 at 010-11).

196.    The formula for calculating the Endo Credit incorporates a number of factors that relate to Impax's sales of generic Opana ER multiplied by the market opportunity for the generic product in the quarter of peak sales. The agreement defines Impax's "Market

Share Profit Value" as the product of (1) an assumed generic substitution rate for original Opana ER (90%), (2) an assumed net realized generic price discounted from the brand-name price (75%), (3) an assumed generic profit margin (87.5%), (4) 50% (expressing the 180-day exclusivity period as half of a year), and (5) the annualized sales of Opana ER during the quarter of peak sales for Opana ER during the period from the third quarter of 2010 to the third quarter of 2012 divided by 100. (RX364 at 0003 ("Endo Credit" definition), 0004 ("Market Share Profit Factor" definition & "Market Share Profit Value" definition), 0005 ("Pre-Impax Amount" definition), 0005-06 ("Quarterly Peak" definition), 0006 ("Trigger Threshold" definition), 0012 ("Endo Credit" provision)).

### (a)    Purpose of the Endo Credit

197.    The Endo Credit was designed to "back-up" the value of the no-AG provision and provide value to Impax regardless of whether Endo launched a reformulated version of Opana ER. (F. 198-215).

198.    When brand companies introduce a reformulated drug, they often cease marketing and selling the original product. They can also withdraw the original product's reference-listed drug designation, preventing generic products from having AB-rated status. (CX4003 (Snowden, IHT at 30-31); CX4014 (Hsu, IHT at 152)).

199.    By introducing a reformulated drug, the brand company can greatly reduce the opportunity for generic versions of the original drug since those generic products are no longer bioequivalent to – and not subject to automatic substitution in place of – the reformulated product. (Snowden, Tr. 434; CX4030 (Hsu, Dep. at 108); Koch, Tr. 238 (reformulation can "switch patients away from the brand product" as to which Impax has the generic "in favor of a line extension" not covered by the ANDA)).

200.    Impax's generic Opana ER would not be AB-rated to a reformulated Opana ER product. (Mengler, Tr. 528).

201.    Protecting the market for Impax's entry date was a priority for Impax. (Snowden, Tr. 490).

202.    Because "the generic would rely on the . . . automatic substitution in the pharmacy," not having a reference brand product means that pharmacists "can't substitute" the generic for the branded drug. (CX4014 (Hsu, IHT at 152)).

203.    For a generic drug to be sold where there is no branded drug for which it is automatically substituted, doctors must actually write out a prescription for the generic product. (CX4014 (Hsu, IHT at 152); CX4004 (Engle, IHT at 221)).

204.    If Endo were to move to a reformulated Opana ER, then Impax's market opportunity for its generic product would be significantly reduced or even zero, because Opana ER in its original form disappears or becomes insignificant. (Snowden, Tr. 434; Mengler, Tr. 527).

205. Mr. Mengler was concerned that reformulation was an effort by Endo to "subvert the value of the deal" he was trying to put together to get Impax's product on the market. (Mengler, Tr. 526-27).

206. If Endo did destroy the market for Impax's generic Opana ER, Mr. Mengler wanted Impax "to be made whole for the profits that [Impax] would have otherwise achieved." (Mengler, Tr. 533).

207. If "the market changed substantially before the date that the parties agreed that Impax could launch," the provision "would be a way of making Impax whole." (Cuca, Tr. 617; CX4035 (Cuca, Dep. at 69-70) ("If sales of Opana ER had decreased," the provision would "kind of fix that . . . [b]y making a true-up payment to Impax. . . . The true-up payment would correct for the loss in the value of the market that had occurred before the generic entry date.")).

208. Getting downside protection for Impax in the event Endo reformulated Opana ER was "super, super important" to Impax's primary negotiator of the Endo-Impax Settlement. According to Mr. Mengler, "something that didn't protect us from the downside was . . . a deal-breaker." (Mengler, Tr. 535-36; CX4010 (Mengler, IHT at 44)).

209. A sharp decline in the sales of branded Opana ER before Impax's generic launch would decrease the value of the no-AG provision that Impax agreed to with Endo, because the total market potential for generic Opana ER would be decreasing. The Endo Credit payment was designed to "correct for the loss in the value of the market that had occurred before the generic entry date." (Reasons, Tr. 1218; CX4035 (Cuca, Dep. at 69-70)).

210. If the market for Opana ER did not decline, the value of the no-AG provision would be higher, but if the market did decline, the Endo Credit provision was designed to provide Impax with a payment. (Reasons, Tr. 1218-19; CX4020 (Reasons, Dep. at 55-56)).

211. The Endo Credit was designed as insurance against the risk of Endo reformulating Opana ER. If the market for Opana ER did not decline, the value of the no-AG provision would be higher, but if Endo effected a "switchout" to reformulated Opana ER, then the Endo Credit provision was designed to provide Impax with a payment. (Koch, Tr. 265-66; Reasons, Tr. 1218-19; CX4020 (Reasons, Dep. at 55-56)).

212. If Endo's obligation to pay the Endo Credit were triggered, based on declining sales of Opana ER prior to Impax's generic entry, the calculations of the Endo Credit were designed to approximate the net profits Impax would have expected to make during its six-month exclusivity period, with no AG. The provision achieved this by basing the calculation in part on the expected generic substitution rate (90%), the expected generic price (75% of the brand WAC price), Impax's net profit margin (87.5%), and the length of the no-AG exclusivity period (50%, or 180 days expressed as half a year). (RX364 at 0004 (SLA § 4.4, definitions of "Market Share Profit Value"); see also Cuca, Tr. 635-37). By including Impax's net profit margin rather than just looking to Impax's expected

revenues, any amount Endo would be required to pay was reduced by 12.5%.  (RX364 at 0004 (SLA § 4.4, definitions of "Market Share Profit Value"); Cuca, Tr. 640-41).

213. The Endo Credit provision "was intended to insulate" Impax from the risk of substantial decrease in Opana ER sales prior to the agreed generic entry date.  The goal was, "if the market changed substantially before the date that the parties agreed that Impax could launch, there would be a way of making Impax whole" by providing Impax with the profits that Impax otherwise would have achieved during its 180-day exclusivity period, had a change in the marketplace not occurred.  (Cuca, Tr. 617; CX4035 (Cuca, Dep. at 81-82); Mengler, Tr. 533).

214. The Endo Credit provision was designed to provide an approximation of the profits that Impax would have earned from sales of generic Opana ER during Impax's six-month exclusivity period, based on pricing, share and other assumptions.  (CX4010 (Mengler, IHT at 36-37); CX4035 (Cuca, Dep. at 69-70) ("If sales of Opana ER had decreased," the provision would "kind of fix that . . . [b]y making a true-up payment to Impax. . . .  The true-up payment would correct for the loss in the value of the market that had occurred before the generic entry date.")).

215. During a November 2011 earnings call, Impax's CFO, Mr. Koch, who also helped negotiate the SLA, discounted the impact of Endo switching Opana ER to a new formulation because of the terms of the Endo-Impax Settlement, stating:  "Fortunately, though, we do have [downside] protection built into the agreement so we should have a reasonable outcome almost no matter what happens."  (Koch, Tr. 264-65; CX2703 at 012-13).

### (b)    Dollar value of the Endo Credit at the time of settlement

216. The dollar value of the Endo Credit was uncertain at the time of settlement.  The dollar value was contingent on unknown future events that were outside of Impax's control, such as the figure for quarterly peak sales for Opana ER prior to generic entry, which was the biggest "input" in the Endo Credit formula.  (Cuca, Tr. 629; Snowden, Tr. 437-38).

217. The formula that determined any Endo Credit payment required (1) determining Endo's quarterly peak sales between July 2010 and September 2012; (2) determining the "Pre-Impax amount" of Opana ER sales, meaning the sales of Opana ER in the fourth quarter of 2012, immediately prior to Impax's January 2013 generic entry; (3) comparing the quarterly peak number to the pre-Impax amount, and determining if the pre-Impax amount is less than 50%, which triggered a payment obligation; and (4) multiplying the difference between the quarterly peak number and the pre-Impax number by a specified amount to calculate the final sum due.  Each of these formula inputs was unknown at the time of settlement.  (Snowden, Tr. 437-38; *see* RX364 at 006; Engle, Tr. 1749-50).

218. Impax did not forecast a payment under the Endo Credit in Impax's business forecasts.  (Mengler, Tr. 582; CX4038 (Engle, Dep. at 187-88)).

219. Financial projections by Endo and Impax at the time of the settlement anticipated continued growth in Opana ER sales. (CX0222 at 003-11 (Impax forecasts for Opana ER); CX2530 at 007-08 (Endo forecasts for Opana ER)).

220. Prior to the settlement, Mr. Cuca ran some calculations for the Endo Credit formula to "make sure that it was producing outputs that [he] thought it was supposed to be producing." Using the Excel program, Mr. Cuca spent approximately five minutes entering potential "peak sales" figures into the Endo Credit formula to make sure it produced a sensible result. These calculations produced a range of payouts, including a possible zero payment. For the "peak sales" input, Mr. Cuca relied on Endo sales forecasts. (Cuca, Tr. 628-31; CX4035 (Cuca, Dep. 79-84)).

221. Prior to the settlement, Impax's director of market planning, Ted Smolenski, told Mr. Mengler that there were certain circumstances under which the Endo Credit would not result in a payment to Impax, including a situation in which Endo would withdraw its NDA for original Opana ER and time the elimination of sales in such a way that the Endo Credit would result in zero payment. Mr. Mengler decided not to pursue the issue further because he did not deem the potential to be likely enough to be "worth the energy" to try to "correct for it in the agreement." (Mengler, Tr. 589-90; CX4037 (Smolenski, Dep. at 253); *see also* CX0219 at 001 (Smolenski email to Hsu describing "downside scenario as probably unlikely" and stating that Mengler viewed the "potential downside scenario" as "so unlikely it wasn't worth worrying about")).

222. The amount of any payment under the Endo Credit could not be estimated before learning the quarterly peak sales of Opana ER between July 2010 and September 2012. (Cuca, Tr. 668-69).

223. Endo first reported a liability under the Endo Credit in May 2012. (RX494 at 0007 (Endo SEC Form 8-K from May 1, 2012); CX4017 (Levin, Dep. at 140-41)).

224. In or about May 2012, Endo took a pre-tax charge in the amount of $110 million "to reflect a one-time payment that the company now expects to make to Impax per the terms of Endo's 2010 settlement and license agreement with Impax." (RX117 at 0021 (Endo SEC Form 10-Q for 1Q12 showing $110 million "[a]ccrual for payment to Impax related to sales of Opana ER")).

### (c)   2013 payment under the Endo Credit

225. Endo filed a supplemental New Drug Application (No. 201655) for a reformulated version of Opana ER ("reformulated Opana ER") in July 2010. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-011 ¶ 48; CX3189).

226. The FDA approved Endo's supplemental NDA for a reformulated version of Opana ER in December 2011. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-011 ¶ 48).

227. At the end of 2011, after discovering manufacturing deficiencies, the FDA shut down the plant where Novartis Consumer Health, Inc. ("Novartis"), another pharmaceutical company, manufactured original Opana ER for Endo. The shutdown of the Novartis plant caused a supply disruption for original Opana ER and required Endo to scale up its manufacturing of reformulated Opana ER. (CX4017 (Levin, Dep. at 136-39)).

228. The Novartis plant shutdown at the end of 2011 created a "supply chain crisis" for original Opana ER. (CX4017 (Levin, Dep. at 136-39); *see* RX094 at 0003-04; RX563 at 0001; RX139 at 0001).

229. In or about February 2012, the FDA ordered Endo to cease selling original Opana ER in order to avoid consumer confusion. Specifically, the FDA informed Endo that "once any tablets of CRF [crush-resistant formulation] were sold, [Endo] could no longer sell any tablets of the old formulation." (CX4017 (Levin, Dep. at 138-39, 155); RX100 at 0001; RX094 at 0004).

230. In March 2012, Endo stopped distributing original Opana ER and launched reformulated Opana ER. (Second Set of Joint Stipulations, JX003 ¶ 33; CX4017 (Levin, Dep. 139)).

231. It was not until after the Novartis supply disruption in late 2011, the FDA's order to stop selling original Opana ER in February 2012, and the launching of reformulated Opana ER in March 2012, that Endo first concluded that it would have to make a payment under the Endo Credit provision. The first time Endo knew that its sales of Opana ER would be zero was in the last quarter of 2012, after the supply interruption caused by the Novartis plant shutdown. (Cuca, Tr. 665, 671, 677; Reasons, Tr. 1203, 1229; RX039; RX094 at 0003-06).

232. On May 31, 2012, Endo requested that the FDA move original Opana ER to the Orange Book Discontinued List. (Second Set of Joint Stipulations, JX003 ¶ 34).

233. In August 2012, Endo filed multiple citizen petitions with the FDA, in which Endo argued that the FDA should (1) determine that original Opana ER was discontinued for safety reasons and could no longer serve as a reference-listed drug for any ANDA; (2) refuse to approve any ANDA pending for original Opana ER; and (3) withdraw any already-granted approvals for original Opana ER ANDAs. (Snowden, Tr. 476-77, 479-80; CX3203 (Endo's citizen petitions); Second Set of Joint Stipulations, JX003 ¶ 34).

234. Impax formally responded to the petition and offered scientific evidence that the discontinuation of Endo's original Opana ER was unrelated to safety or effectiveness. (Snowden, Tr. 480).

235. The FDA concluded that Endo did not withdraw original Opana ER for safety or efficacy reasons. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-012 ¶ 51).

236.    On January 18, 2013, Ms. Snowden, Impax's vice president for intellectual property litigation and licensing, provided Endo with written documentation supporting payment under the Endo Credit provision in the amount of $102,049,199.64. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-011 ¶ 45; Snowden, Tr. 386-89; CX0332 at 007-08).

237.    On April 18, 2013, pursuant to section 4.4 of the SLA, Impax received a payment from Endo in the amount of $102,049,199.64. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-011 ¶ 46; Reasons, Tr. 1204; CX0333; CX1301 at 007).

### iii.    Complaint Counsel's expert's valuations

238.    Complaint Counsel's economic expert, Professor Noll devised four examples of what the potential value of the no-AG and Endo Credit could be to Impax based on assumptions as to future events. Professor Noll did not attach any probabilities to the assumed events occurring. (Noll, Tr. 1613, 1650-51; CX5000 (Noll Expert Report at 240 Appendix F)).

239.    Professor Noll's purported calculations of the value of the Endo Credit (F. 238) were based on discounting the amount of the actual payment under the Endo Credit in 2013. (CX5000 (Noll Expert Report at 169)).

240.    Professor Noll did not calculate the expected value of the Endo Credit at the time of settlement. (Noll, Tr. 1591, 1613, 1651-52; Addanki, Tr. 2384).

241.    Professor Noll acknowledged that he had not seen any documents predating June 2010 in which either Impax or Endo estimated the value for the Endo Credit. (Noll, Tr. 1611).

242.    Professor Noll acknowledged that whether the Endo Credit would be paid, or the amount that would be paid, depended on contingent events and that there was a possibility that Impax would not receive any payment under the Endo Credit. (Noll, Tr. 1611-12).

243.    Although Professor Noll acknowledged that it is important to take agreements as a whole, Professor Noll did not consider the value of the patent license rights Impax received under the SLA. (Noll, Tr. 1648).

### 3.    The Development and Co-Promotion Agreement

### a.    Overview of relevant provisions

244.    On June 7, 2010, Endo and Impax executed a Development and Co-Promotion Agreement ("DCA") with respect to a Parkinson's disease treatment known internally at Impax as IPX-203. (Snowden, Tr. 397-99; Nestor, Tr. 2935; RX365 (executed DCA)).

245.    The DCA was executed simultaneously with the SLA and is incorporated into the SLA. (RX312; CX0326; Second Set of Joint Stipulations, JX003 ¶ 69).

246. Under the DCA, Impax and Endo agreed to collaborate with respect to the development and marketing of a potential treatment for Parkinson's disease using an extended release, orally administered product containing a combination of levodopa and carbidopa. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-010 ¶ 37).

247. Endo agreed to pay Impax an "Upfront Payment" of $10 million within five days of the agreement's effective date. The $10 million payment was guaranteed and non-refundable. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-010 ¶ 39; Snowden, Tr. 399-400).

248. The DCA contained the possibility that Endo would make up to $30 million in additional "Milestone Payments" for achieving specified milestone events in the development and commercialization of the product. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-010 ¶ 40; Snowden, Tr. 408).

249. Under the DCA, Impax and Endo agreed to share promotional responsibilities, with Impax promoting IPX-203 to its network of neurologists, and Endo promoting IPX-203 to its network of non-neurologists, including primary care physicians who prescribe Parkinson's disease medications. (RX365).

250. If the target product, IPX-203, was successfully commercialized, Endo would be entitled to a share of the profits. Specifically, Endo would receive a co-promotion fee equal to 100% of gross margins on sales resulting from prescriptions by non-neurologists. (RX365 ¶ 3.4).

251. On June 24, 2010, Endo wired a payment of $10 million to Impax in accordance with section 3.1 of the DCA. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-011 ¶ 44).

252. Upon receipt of Endo's $10 million payment, Impax deferred the accounting of the money, attributing it as an investment related to research and development work that would be accomplished in the future. (Reasons, Tr. 1242-43).

253. Impax and Endo terminated the DCA by mutual agreement effective December 23, 2015. At the time of termination, the development had not met any of the milestones that would have required additional payment from Endo and Endo made no additional payments to Impax. (Joint Stipulations of Jurisdiction, Law, and Fact, and Authenticity, JX001-011 ¶ 43; Snowden, Tr. 461).

### b.  Background to the DCA

#### i.  Endo's reliance on collaboration agreements

254. Endo generally does not research or discover new drug molecules on its own. Instead, it acquires and licenses drugs from other pharmaceutical companies. This means that Endo

enters many collaboration agreements with other pharmaceutical companies. (Cobuzzi, Tr. 2513-15).

255. Endo's collaboration agreements with other pharmaceutical companies can relate to drugs at every stage of the development lifecycle, including early-stage development agreements. Because Endo had "no discovery pipeline . . . in place," Endo would enter "very early, very speculative agreements." (Cobuzzi, Tr. 2516).

256. In connection with a collaboration agreement, Endo identifies therapeutic areas of interest and companies that own promising drug molecules in those areas and enters into early-stage development deals. Endo also regularly licenses technology from and collaborates with other companies for more developed products. For Opana ER, Endo licensed the necessary technology to make both original and reformulated Opana ER. (Cobuzzi, Tr. 2516-17).

ii.    Endo's interests in neurology products and Parkinson's disease treatments

257. In 2005, the areas of significant interest to Endo were pain, neurology, areas of movement disorders, including Parkinson's disease, and gastroenterology. (Cobuzzi, Tr. 2518).

258. By 2010, although Endo's focus had shifted away from pain and neurology to urology, endocrinology, and oncology, Endo's sales force still had a focus on pain and neurology and Endo was interested in products that were compatible with Endo's existing products and sales efforts. (Cobuzzi, Tr. 2518-19).

259. In 2010, Endo was selling Frova, which Endo marketed to neurologists and primary care physicians who treat migraine sufferers. (Cobuzzi, Tr. 2519-21).

260. For a number of years, Endo sold an immediate-release Parkinson's disease drug known as Sinemet, which was the original formulation of carbidopa and levodopa. (Cobuzzi, Tr. 2524; Nestor, Tr. 2938; CX1007 at 001).

261. In the 2010 timeframe, Endo evaluated collaborations with other companies related to treatments for Parkinson's disease. This included exploring potential Parkinson's disease collaboration opportunities with an Italian company called Newron, which had multiple Parkinson's disease products, and conducting due diligence on a Parkinson's disease product with a novel mechanism of action that was owned by a Finnish company. (Cobuzzi, Tr. 2520-22).

iii.    Impax's efforts to develop Parkinson's disease treatments

262. Impax, formed in 1995, is a manufacturer of generic pharmaceutical drugs. Impax

created a separate brand division to manufacture and sell its own branded drugs in 2006. (Koch, Tr. 219-20; Nestor, Tr. 2926, 2929; CX4014 (Hsu Dep. at 9)).

263.     When Impax's brand division was founded in 2006, it focused its efforts on central nervous system and neurology products, with a specific focus on improved treatments for Parkinson's disease. As part of this focus, Impax's brand division also concentrated on developing a network of relationships with neurology physicians. (Nestor, Tr. 2929-31).

264.     Impax promoted other companies' products to the neurology community, including Carbitol, an epilepsy product, and licensed Zoming, a migraine drug created by AstraZeneca. Impax did so because it "wanted to begin the process of developing those relationships with the neurology physicians." (Nestor, Tr. 2931-32).

265.     The "gold standard" treatment for Parkinson's disease is a combination of carbidopa and levodopa molecules. (Nestor, Tr. 2929).

266.     The majority of carbidopa-levodopa medications are available only in immediate-release formulations. (Nestor, Tr. 2929).

267.     Immediate release carbidopa-levodopa requires frequent dosing and often results in patients losing control of their motor skills as they experience rapid increases and decreases in the concentration of medicine in their bodies, especially as the disease progresses. (Nestor, Tr. 2929-30, 2939).

268.     Impax's first attempt to develop an extended-release carbidopa-levodopa treatment for Parkinson's disease was known as Vadova. That product was intended to combine carbidopa-levodopa with controlled-release technology to give a much smoother effect to the amount of medication in Parkinson's patients' blood, providing for more control over motor symptoms. Vadova was never fully developed or marketed. (Nestor, Tr. 2926-27, 2929-30).

269.     Impax's second attempt to develop an extended-release Parkinson's disease medication was IPX-066. (Nestor, Tr. 2930-31).

270.     IPX-066 was a combination of carbidopa and levodopa that had been formulated to extend the release profile of Parkinson's disease drugs. (Cobuzzi, Tr. 2524; *see* Reasons, Tr. 1236).

271.     As with Vadova, IPX-066 was intended to better treat Parkinson's patients by allowing for less frequent and more consistent dosing of up to six hours, as well as more consistent motor symptom control. (Nestor, Tr. 2930-31; *see* RX247).

272.     By significantly extending the absorption of the drug, IPX-066 would provide "significant improvement of the patient's quality of life." (CX4014 (Hsu, IHT at 38-39)).

273. IPX-066 had reached Phase III clinical trials[11] in 2010 and was marketed under the name Rytary in 2015. (Snowden, Tr. 401; Nestor, Tr. 2930-31).

274. By 2010, Impax had begun efforts to develop a "next generation" of IPX-066. The goal of the next-generation product, which was first designated as IPX-066a and later became known as IPX-203, was to further improve treatment to Parkinson's patients by extending dosing time even longer than IPX-066. (Cobuzzi, Tr. 2599; Nestor, Tr. 2935-36; *see* RX247).

### c. Negotiations of the DCA

### i. Background to the negotiations

275. In early 2009, Impax approached Endo about a collaboration with respect to Endo's central nervous system drug Frova, which treats migraine headaches. (RX393 at 0014; *see* Nestor, Tr. 2932; Koch, Tr. 318-19; CX4036 (Fatholahi, Dep. at 51-52)).

276. Impax was interested in collaborating with Endo on Frova because the product fit with Impax's focus on central nervous system and neurology products. (Snowden, Tr. 453-54; Nestor, Tr. 2929).

277. Endo rejected Impax's proposal to collaborate on Frova in the early 2009 discussions (F. 275). (Nestor, Tr. 2932).

278. In late 2009, after Endo and Impax began discussions relating to the settlement of the Opana ER patent litigation (F. 112), Shawn Fatholahi, the head of sales and marketing for Impax's brand division, contacted Ms. Snowden to express his interest in a co-development arrangement with Endo on Frova. (Snowden, Tr. 346, 454-55).

279. In October 2009, Impax and Endo discussed a potential business collaboration on Frova and executed a non-disclosure agreement in connection with those discussions. (Snowden, Tr. 455-56; RX359; CX1816).

280. The discussions between Impax and Endo relating to Frova did not result in a collaboration agreement. (Snowden, Tr. 495).

281. In the fall of 2009, in the course of Endo's and Impax's discussions relating to the settlement of the Opana ER patent litigation, Endo became aware of Impax's efforts to develop drugs for Parkinson's disease and expressed an interest. (Koch, Tr. 323-24).

282. In December 2009, Endo and Impax ended their discussions on a potential settlement of the '456 and '933 patent infringement litigation. (Second Set of Joint Stipulations, JX003 ¶ 17).

---

[11] Phase III of clinical development is the last stage of development before submitting a drug application for approval to the FDA. (Nestor, Tr. 3003).

ii.      **Negotiations resume in May 2010**

283.   On May 17, 2010, Endo and Impax resumed discussions on the potential settlement of the '456 and '933 patent infringement litigation.  (Second Set of Joint Stipulations, JX003 ¶ 21).

284.   After discussions relating to settlement of the Opana ER litigation resumed on May 17, 2010, Impax and Endo began discussing a potential joint development agreement and Endo expressed an interest in marketing IPX-066.  (CX0310 at 004; CX4003 (Snowden, IHT at 89-90); Koch, Tr. 320, 323-24).

285.   On May 19, 2010, in conjunction with the discussion of a potential collaboration agreement, Mr. Donatiello of Endo confirmed to Ms. Snowden and Mr. Mengler of Impax that the confidential disclosure agreement Endo and Impax had entered as part of negotiations in October 2009 (F. 279) was still in effect.  (CX2966 at 002; CX1816 at 001).

286.   Between May 17 and 26, 2010, Impax and Endo held two conference calls and exchanged numerous emails and materials regarding IPX-066.  (CX2966; RX272 at 0001-03, 0005-08; CX1301 at 112-13; CX0310 at 004-05).

287.   At Endo, the senior vice president of corporate development, Dr. Robert Cobuzzi, and his team of employees were responsible for evaluating potential pharmaceutical business deals for further development.  Dr. Cobuzzi first learned about a potential collaboration with Impax on IPX-066 from Endo's chief financial officer, Mr. Levin, who was not part of the corporate development group.  Dr. Cobuzzi was not involved in the SLA negotiations, and was only vaguely aware of them.  (Cobuzzi, Tr. 2513, 2567-68, 2584).

288.   On May 19, 2010, David Paterson, Impax's vice president of business development, provided initial written materials on IPX-066 to Dr. Cobuzzi, including a presentation entitled "IPX066:  Licensing Opportunity For Parkinson's Disease."  The presentation touted the clinical benefits of IPX-066 over Sinemet, the leading carbidopa-levodopa brand product, and projected a launch of IPX-066 in the United States in the second half of 2012.  (CX2966 at 001, 003, 038, 040-45, 73).

289.   On May 20, 2010, Dr. Cobuzzi directed his team of employees to work on an opportunity evaluation worksheet ("OEW") to assess a potential collaboration with Impax on IPX-066.  Dr. Cobuzzi noted that IPX-066 will be positioned with Frova, that it is a known molecule, that Endo has looked at the space before, and that it fits with Frova.  (CX1006 at 001).

290.   On May 21, 2010, Endo asked an outside consulting firm to provide guidance about the potential value of IPX-066, stating:  "There is no time for market research on this as we need the forecast by Wed. of next week (that's right, it's not a typo!!) . . . .  No detailed proposal is needed at this point given the extremely tight timelines . . . ."  (RX072; Cobuzzi, Tr. 2587).

291.    On May 22, 2010, Dr. Paterson of Impax provided Dr. Cobuzzi and a number of additional Endo employees access to a "data room" with "a large amount of IPX-066 related documents." The documents covered: (i) intellectual property/legal; (ii) chemistry, manufacturing, and controls; (iii) commercial; (iv) regulatory; (v) clinical; (vi) clinical pharmacology; and (vii) Impax's unredacted confidential presentation on IPX-066. (RX272 at 0001).

292.    On May 25, 2010, the outside consulting firm hired by Endo (F. 290), informed Dr. Cobuzzi that: its best estimate of peak U.S. revenue for IPX-066 was ███████████████; the data suggest that IPX-066 will be superior to a comparator drug; and although the current market is heavily genericized, "we think that if the final data continue to show a ███████████████████████ ████████, neurologists will push through payer barriers to the drug for at least some of their patients." (RX072, *in camera*).

293.    On May 25, 2010, Dr. Cobuzzi directed his staff to help in the assessment of IPX-066, stating: "It is a controlled-release formulation of carbidopa-levodopa for Parkinson's disease that benefits by ██████████████████. We have very little time for this evaluation . . . . All of the information is available in an e-dataroom . . . . As this is an area we know well as a company both in terms of past evaluations, and by virtue of the fact that we previously held the rights to IR Sinemet, this should not be a difficult evaluation." (CX1007 at 001, *in camera*).

294.    On May 26, 2010, Mr. Donatiello of Endo sent to Mr. Mengler and Ms. Snowden of Impax two term sheets.[12] The initial term sheet for what evolved into the DCA proposed an option agreement concerning IPX-066 "and all improvements, modifications, derivatives, formulations and line extensions thereof." The term sheet gave Endo the option to receive either the right to co-promote the product to non-neurologists within the United States or to purchase an exclusive license to the product in the United States. Endo would pay Impax a $10 million "Option Fee" upon signing the agreement and a $5 million milestone fee upon the FDA's acceptance of the NDA for the product. If Endo exercised the option to co-promote, Endo would receive a fee of 50% "on the net sales" from prescriptions by non-neurologists in the United States. If Endo exercised the option for a license, Endo would pay Impax a one-time license fee based on projected sales. (RX565 at 0002; CX320 at 002-05).

295.    On May 27, 2010, Mr. Mengler responded to the May 26, 2010 term sheet (F. 294) that any collaboration would be "for a product I will designate as [IPX]-066a. This is our next generation of [IPX]-066. We have significant data and can name the product at signing." Impax set out milestone payments for the collaboration, beginning with a payment at signing of $3 million, and followed by up to six additional payments of increasing amounts based on reaching specified milestones, for a total of $60 million. (RX318 at 0001 (Impax's response to Endo's initial term sheet) (proposed milestones as follows: signing ($3 million); Phase II initiation ($4 million); Phase II completion ($6

_____
[12] The May 26, 2010 term sheet relating to the SLA is discussed in F. 131.

44

million); Phase III initiation ($8 million); Phase III completion ($11 million); application filing ($13 million); FDA approval ($15 million)).

296. Following a June 1, 2010 in-person meeting between Endo and Impax, internal Impax emails referred to the deal structure for the co-development of IPX-066a.  (RX387 at 0001; CX0406 at 001; CX1011).

297. In an internal Impax email dated June 1, 2010, Mr. Mengler described the "current proposal . . . [w]ith regard to the R&D collaboration" for "project 066a:  milestone funding totaling 40M" including $5 million at signing.  Mr. Mengler stated his opinion that he "like[s] the 40M.  5M guaranteed and the rest is success based.  A lot of this depends on how successful we think this program will be – and how much the program will cost."  (RX387 at 0001).

298. On June 2, 2010, Mr. Levin of Endo clarified to Impax that Endo's offer for IPX-066a was for an upfront payment of $10 million and a single additional milestone payment of $5 million upon successful completion of Phase II.  If Endo elected to exclusively in-license the compound, Endo would pay Impax five times the projected first four years of sales (rather than three years) as well as give Impax a co-promote on 10% of the total promotion effort.  (CX1011).

299. In an internal Impax email dated June 3, 2010, Mr. Mengler stated that the current proposal for the R&D collaboration was a total of $20 million, with half ($10 million) upfront.  (CX0114 at 001).

300. On June 3, 2010, Mr. Mengler of Impax and Mr. Levin of Endo reached an agreement in principle on the SLA and the DCA.  (CX3334 at 001; CX0412 (Donatiello, IHT at 139)).

301. After Endo rejected Impax's June 4, 2010 proposal for a simple settlement with a July 15, 2011 entry date for Impax's generic version of Opana ER and no compensation terms (F. 155-156), Impax dropped its request for such a settlement and sought Endo's agreement to an increase in the milestone payments under the DCA.  (F. 302, 306; Snowden, Tr. 378-80; CX4032 (Snowden, Dep. at 197-99)).

302. On June 4, 2010, Mr. Koch proposed to Endo new terms for the IPX-066a development agreement, with Endo paying Impax $10 million upfront, $20 million more in development milestones, and an additional $10 million if annual sales were projected to exceed $150 million within the product's first ten years on the market.  (CX0410 at 001-02).

303. In a June 4, 2010 email, Impax informed Endo that IPX-203 was the product that had been designated as IPX-066a and provided Endo with additional information on IPX-203. (CX1311).

304. In an internal Endo email dated June 4, 2010, Mr. Levin stated that he received a call from Impax "looking to recut the economics on the R&D collaboration."  (CX1311).

EXHIBIT B-2

305. In an internal Impax email dated June 4, 2010, Mr. Koch expressed his belief that Mr. Mengler had "dropped" the milestones for the product collaboration too dramatically from the prior proposal of $40 million. Mr. Koch agreed with the proposal's including a $10 million upfront payment. (CX407 at 001).

306. On June 4, 2010, Impax and Endo exchanged first drafts of the SLA and the DCA. After exchanging the first drafts, Impax and Endo continued to negotiate the language of the documents, exchanging numerous drafts and holding at least ten teleconferences between June 4 and June 7, 2010. (CX4003 (Snowden, IHT at 137-38); RX406 at 0001; CX1301 at 114-18; CX0310 at 006-11).

307. On June 7, 2010, Dr. Cobuzzi provided the final opportunity evaluation worksheet on IPX-203 to Endo's executive team, stating: "I believe this OEW provides adequate and fair representation of what I would define as a good deal for Endo." (CX2748).

308. On June 7, 2010, an execution version of the DCA was circulated. (CX0326).

### d. Relationship between IPX-066 and IPX-203

309. In 2010, Impax was not looking for a partner in the United States for IPX-066 because Impax planned to market the product domestically on its own, utilizing its established neurologist network. (Snowden, Tr. 456-57; Koch, Tr. 319-20; CX4036 (Fatholahi, Dep. at 77, 80) (Impax "could effectively market [IPX-]066 here in the U.S. ourselves and didn't need any assistance.")).

310. In 2010, Impax had already shouldered all development risks and development costs of IPX-066. Therefore, it made little sense to Impax to share potential profits from the drug with a partner. (Nestor, Tr. 2941-42).

311. Dr. Michael Nestor, the head of Impax's brand division,[13] was "absolutely not" willing to consider an agreement with Endo regarding IPX-066. (Nestor, Tr. 3054-55).

312. Impax ultimately engaged GlaxoSmithKline ("Glaxo") as a partner for marketing IPX-066 outside the United States and Taiwan. Glaxo would assist with the regulatory and infrastructure hurdles associated with commercializing a product outside the United States and Taiwan and could ensure the commercialization process proceeded in non-U.S. markets. (Nestor, Tr. 2942-43).

313. In response to Endo's May 26, 2010 proposal for an agreement concerning IPX-066 and all improvements, modifications, derivatives, and line extensions thereof (F. 294), Impax countered on May 27, 2010 that any collaboration would be for IPX-066a. (F. 295; *see also* Snowden, Tr. 405-06 (testifying that "Endo was interested in the Parkinson's space and wanted the deal to cover both products, the original IPX-066 and the follow-on

---

[13] As president of the brand division, Dr. Nestor had to approve any co-development and co-promotion agreement. (Nestor, Tr. 3054-55).

product, but Impax wasn't interested in doing the deal on IPX-066. So there wasn't actually . . . a switch as much as Endo was trying to negotiate for both product rights and Impax was only interested in doing product rights on the one product.")).

314. IPX-066a, which later became known as IPX-203 (F. 303), was Impax's "next generation" version of IPX-066 and was a planned carbidopa-levodopa-based product that Impax hoped would improve the treatment of Parkinson's disease symptoms and also have favorable dosing over IPX-066. (Reasons, Tr. 1236; *see* Koch, Tr. 320; Nestor, Tr. 2935).

315. At the time of the DCA negotiations, IPX-203 was in the beginning of the formulation stage. Impax had not landed on a final formulation for the product, but, based on the opinion of Dr. Suneel Gupta, the chief scientific officer at Impax in 2010, Impax believed that the product concept for IPX-203 would be "doable." (Nestor, Tr. 2946, 3030-31; RX387 at 0001).

316. Dr. Gupta had expertise in reformulating existing chemical compounds to create commercial and clinical improvements through reformulation and "is renowned for taking existing compounds and reformulating them and turning those products into very successful drugs in the marketplace that meet significant medical need[s]." When Dr. Gupta tells Impax management that a product concept is "doable," they believe him and rely on his judgment. (CX4033 (Nestor, Dep. at 80-83)).

317. Impax's expertise has long been the development of extended-release technologies, which gives it "the basis of knowledge to know what kinds of things to look for in a formulation that would give you" longer effective time for a Parkinson's disease medication. Such expertise is "a very important asset for" Impax and allows it to regularly "take advantage of that [controlled-release] technology" to compete successfully. (Nestor, Tr. 2955-56; *see* CX4014 (Hsu, IHT at 10, 30) (Impax is "a company specialized in the controlled release" of medications.)).

318. Impax was already planning to withdraw promotion and sampling of IPX-066 (Rytary) once IPX-203 reached the market, allowing patients to continue successful use of IPX-066 while avoiding any division of Impax's sales force between multiple Parkinson's disease products. This was consistent with the commercial goal of extending the IPX-066 franchise. (Nestor, Tr. 2935-37).

319. The ultimate goal of IPX-203 was to further extend the amount of time patients have control over their motor symptoms after taking the medication. (Nestor, Tr. 2935 ("the whole idea behind this product . . . is to be able to even extend more the effective time that a patient is on IPX-203, meaning that they have a longer period of time when their motor control symptoms are under control"); CX4014 (Hsu, IHT at 39)).

320. IPX-203 would also employ a "much more simplified" dosing regimen than IPX-066, making it more intuitive for neurologists to prescribe the product. (Nestor, Tr. 2994).

321.  Impax projected that the total cost of development for IPX-203 would be between $80 and $100 million.  The projected costs were a "natural extrapolation" of the development costs incurred in connection with IPX-066.  (Nestor, Tr. 2944-45; Koch, Tr. 321; RX387 at 0001).

### e.  Due diligence efforts by Endo

#### i.  Review of information regarding IPX-203

322.  Impax provided Endo with information regarding Impax's research into the IPX-203 product concept and about how IPX-203 would improve upon existing Parkinson's disease therapies, including IPX-066.  (RX377; Cobuzzi, Tr. 2525-26, 2602).

323.  The information Impax provided on IPX-203 made clear that IPX-066 and IPX-203 were intended to be ███████████████████████████████████.  (Cobuzzi, Tr. 2530, *in camera*).

324.  IPX-203 was intended to be a modification of carbidopa and levodopa, a well-known combination treatment for Parkinson's disease.  (CX1209 at 003; Nestor, Tr. 3004; Cobuzzi, Tr. 2524).

325.  Levodopa generally is not well absorbed in the colon.  (Cobuzzi, Tr. 2535).

326.  IPX-203 would have ████████████████████████████████ ████████████████ (Nestor, Tr. 2950-51, 2957, *in camera*; Cobuzzi, Tr. 2529-30, 2538, *in camera*).

327.  The information Impax provided on IPX-203 ███████████████████ ████████████████████████████████████████.  (Cobuzzi, Tr. 2530, 2534-35, *in camera*; *see* RX377 at 0031, 0040-41, *in camera*).

#### ii.  Review of information regarding IPX-066

328.  Impax sent IPX-066 materials to Endo to "help [Endo] frame their evaluation of the market environment into which IPX-203 could be launched as a successor to IPX-066." (Cobuzzi, Tr. 2539; RX376 at 0001; *see* RX272 at 0001; RX080 at 0006 ("IPX-066 affords a reasonable surrogate for IPX-203 given the anticipated similarities in constituents and formulation.")).

329.  Impax sent IPX-066 materials to Endo because (1) Impax had already established a data room regarding IPX-066 when it sought a partner to market the product outside the United States, and (2) IPX-203 was a follow-on product to IPX-066; therefore "the foundational aspects of what was in the data room about IPX-066 were relative to the kind of product we envisioned IPX-203 ultimately to be, which is an extended release

carbidopa-levodopa formulation that would offer clinically meaningful benefit[s] over and above what the current standard of care was." (Nestor, Tr. 3055-56).

330. The materials Impax provided regarding IPX-066 aided Endo's assessment of IPX-203 "tremendously." Dr. Cobuzzi explained that IPX-066 was relevant to his assessment of IPX-203 because, among other reasons, both products would contain carbidopa and levodopa, and the only difference was ███████████████████████, "which we viewed as being relatively simple, although it does change the chemistry." (Cobuzzi, Tr. 2625, 2539-40, *in camera*).

331. Julie McHugh, Endo's chief operating officer at the time of settlement and the individual responsible for assessing the commercial opportunity of any product, deemed IPX-066 an appropriate commercial proxy for assessing IPX-203. (CX2772 at 001; Cobuzzi, Tr. 2541-42).

332. The IPX-066 materials, as well as Endo's experience with other Parkinson's disease treatments, suggested that the successful development of IPX-203 would more effectively treat Parkinson's disease symptoms. (Cobuzzi, Tr. 2634-35).

333. The materials Impax provided regarding IPX-066 showed that IPX-066 was forecasted to have ██████████ in sales by 2019. (RX376 at 0050, *in camera*).

334. Endo used those forecasts (F. 333) to calculate "conservative estimates" for IPX-203 sales. (CX2780 at 001; *see* RX080 at 0011-12; CX2533 at 001 ("I think we can hold to the original forecast assumptions with a shift out in the sales line to reflect the 2017 launch versus the 2013 launch with IMPAX-066.")).

335. Endo's reliance on information about a related drug when evaluating IPX-203 was not unusual. Endo relies on information about one pharmaceutical asset to assess another, related pharmaceutical asset "all the time." (Cobuzzi, Tr. 2624).

336. When information about related pharmaceutical assets is available, it is "much easier" to evaluate a proposed drug than it is to evaluate a new chemical entity on its own. (Cobuzzi, Tr. 2625).

### iii.    Sufficiency of time and information

337. Dr. Robert Cobuzzi was the head of Endo's corporate development group as well as the lead scientist on the team that evaluated the commercial and scientific merits of the DCA with Impax. (Cobuzzi, Tr. 2523).

338. Dr. Cobuzzi and his team conducted Endo's due diligence review of the DCA. (Cobuzzi, Tr. 2547-48).

339. Dr. Cobuzzi holds a Ph.D. in molecular and cellular biochemistry and wrote his dissertation on Parkinson's disease. (Cobuzzi, Tr. 2511-12).

340. Dr. Cobuzzi's team included at least one other scientist with a background in Parkinson's disease treatments. Dr. Kevin Pong, who was in charge of evaluating Endo's scientific licenses, had a "significant amount of experience" in the area of Parkinson's disease treatments. (Cobuzzi, Tr. 2512-13).

341. Endo also employed an outside consulting firm to provide guidance about the potential value of IPX-066. (RX072).

342. Dr. Cobuzzi believes that Endo had sufficient time to assess IPX-203 before entering into the DCA, particularly in light of Dr. Cobuzzi's and Endo's familiarity with Parkinson's disease treatments (F. 257-261, 293) and the detailed nature of the information Impax provided on IPX-066 (F. 328-332). (Cobuzzi, Tr. 2543, 2563, 2625).

343. In his May 25, 2010 email to the Endo team performing due diligence on a potential Parkinson's disease treatment collaboration with Impax, Dr. Cobuzzi wrote: "this is an area we know well as a company both in terms of past evaluations, and by virtue of the fact that we previously held the rights to IR Sinemet [another Parkinson's disease treatment], this should not be a difficult evaluation." (CX1007 at 001; Cobuzzi, Tr. 2547-48).

344. Endo knew "the underlying molecules, the carbidopa and levodopa, and we looked at a number of Parkinson's opportunities in the past, so we knew the general landscape of the area in which we were looking at this as a commercial opportunity." (Cobuzzi, Tr. 2548-49).

345. Taken together, Dr. Cobuzzi believed that Endo had adequate time and "the information [it] needed" to evaluate the DCA properly. (Cobuzzi, Tr. 2563).

### f. Endo's valuation of IPX-203

346. Any time Endo considers a pharmaceutical collaboration, it completes an OEW (opportunity evaluation worksheet), which is Endo's standard method of assessing the science, medical information, commercial opportunity, and related financial considerations behind a potential collaboration project. (Cobuzzi, Tr. 2540-41, 2546-47).

347. In Endo's OEW on IPX-203, Dr. Cobuzzi and his team concluded that Endo should enter the DCA. Dr. Cobuzzi made that recommendation to Endo's CEO, CFO, and board of directors. (Cobuzzi, Tr. 2544, 2561; CX2748 at 001).

### i. Commercial aspects

348. Endo's OEW on IPX-203 stated that the DCA was "a good deal for Endo." (CX2748 at 001; *see* Cobuzzi, Tr. 2545-46, 2554; CX4017 (Levin, Dep. at 166-67)).

349. Dr. Cobuzzi recommended the DCA as "an exciting opportunity for Endo" because it

"further builds our product pipeline for the future with a drug candidate that fits with our commercial footprint." (CX1209 at 001; Cobuzzi, Tr. 2549-50).

350. In 2010, Endo did not have many products in its commercial pipeline and did not have the capacity to develop new products in-house. (Cobuzzi, Tr. 2515, 2562).

351. Endo's OEW on IPX-203 stated: "[m]arket research provided by Impax is similar to work done several years ago by Endo in evaluating other [Parkinson's disease] related opportunities." (CX1209 at 011).

352. Endo also analyzed the net present value of its initial investment under the DCA. Endo generally requires a 10% rate of return on its investment before agreeing to a development and co-promotion deal. (Cobuzzi, Tr. 2561).

353. Endo determined that the DCA and IPX-203 had a "very reasonable rate of return" of ███████████████████████████. (Cobuzzi, Tr. 2560, *in camera*; CX1209 at 018, *in camera* (estimating net present value of the DCA to be ██████████████████ ███████████████); RX080 at 0017, *in camera*).

354. Endo thought it could realize the type of return referenced in F. 353, even though the market for Parkinson's disease treatments was heavily genericized, because IPX-203 would offer a superior product. (CX2748 at 0012; Cobuzzi, Tr. 2622-23).

355. Dr. Cobuzzi explained that "the better [a product] is for the patient or the end user, the more likely they are to want it, need it, or use it," and the more likely that doctors will prescribe the new compound. (Cobuzzi, Tr. 2536-37).

### ii.  Medical aspects

356. Endo's OEW on IPX-203 stated that market research "indicate[d] that most physicians who treat [Parkinson's] patients are generally satisfied by existing treatment options with two exceptions: 1) existing treatments do not modify the course of the disease, they only palliate symptoms; and, 2) existing drugs begin to lose effectiveness within 10-15 years after initiation of therapy due to the development of feedback inhibition and other biochemical mechanisms that can be classified loosely as 'resistance.' Other unmet needs include a need for better control of efficacy over time . . . ." (CX1209 at 011).

357. IPX-203 was intended to address the second exception described in F. 356. Specifically, it would extend the period of time over which the drug is absorbed, which would allow doctors to lower the doses needed for effective treatment. Over time, lower doses would also prevent the drug from losing effectiveness in patients. (Cobuzzi, Tr. 2555; *see* Nestor, Tr. 2935 ("the whole idea behind this product . . . is to be able to even extend more the effective time that a patient is on IPX-203, meaning that they have a longer period of time when their motor control symptoms are under control")).

358. Endo's OEW on IPX-203 (F. 356) explained that "IPX066 has been developed by Impax to address physician[s'] desire for a superior long-acting carbidopa-levodopa product, and IPX-203 represents a still greater improvement in pharmaceutical profile with a value proposition that includes faster onset of action, superior management of motor fluctuations and convenient oral dosing in a simplified regimen that could require no more than twice-daily administration, and in some cases even once-daily administration." (CX1209 at 012).

359. Taking the drug less frequently would be particularly beneficial for Parkinson's patients, who can have trouble "even picking up the pill." (Cobuzzi, Tr. 2557).

360. Dr. Cobuzzi and his team concluded that the attributes ascribed in F. 357-359 (to lower doses and taking drugs less frequently) would make IPX-203 a "greater improvement in disease control and ease of use relative to" IPX-066. (RX080 at 0011).

361. Dr. Cobuzzi and his team concluded that IPX-203 "had the opportunity to move very quickly through development" and "was an exciting compound in that it was made up of . . . two compounds that have already been approved by the FDA . . . ." (CX4017 (Levin, Dep. at 166-67)).

362. Dr. Cobuzzi and his team concluded that there was "a higher than average probability that we might be able to get this drug approved if they were able to make the modification" envisioned in the IPX-203 product concept. (Cobuzzi, Tr. 2537-38).

363. Dr. Cobuzzi believed that IPX-203 had a path to approval that would successfully bring IPX-203 to the market. (Cobuzzi, Tr. 2552).

### iii. Allocation of risk

364. Endo's OEW analysis on IPX-203 explained to Endo's board of directors that the DCA's "deal structure acceptably mitigates Endo's exposure despite the early development stage." (CX1209 at 003; Cobuzzi, Tr. 2543-44 (noting that most of the risk under the DCA was borne by Impax)).

365. One way in which the DCA mitigated risks to Endo is that Endo had to make a single contribution to Impax's development work and would make additional payments only if the "risk associated with proving the concept would have been retired" through successful completion of development milestones such as Phase II clinical trials. Thus, Endo knew its maximum development costs up front even though "[d]rug development is extremely expensive." (Cobuzzi, Tr. 2543-44, 2558; see CX1209 at 003).

366. A second way in which the DCA mitigated risks to Endo is that it did not require Endo to perform any development work or otherwise expend internal resources. (Cobuzzi, Tr. 2558-59, 2627-28).

367. A third way in which the DCA mitigated risks to Endo is that Endo retained the same

profit-sharing rights no matter how much time or money Impax expended on IPX-203's development. (Cobuzzi, Tr. 2564, 2627-28).

368. These factors (F. 365-367) left Endo "comfortable" with the collaboration from the perspective of risk. (Cobuzzi, Tr. 2543-44).

369. Dr. Cobuzzi believed that the profit-sharing rights Endo received under the DCA justified Endo's payment obligations. (Cobuzzi, Tr. 2564).

370. Compared to other collaboration agreements, Endo's $10 million investment to buy into the IPX-203 opportunity was "not an uncharacteristically large amount of money." (Cobuzzi, Tr. 2559).

## g. Impax's valuation of IPX-203 and the DCA

371. Dr. Michael Nestor, president of Impax's brand division, noted in 2010 that he "would hate to have to sell" IPX-203 since the product was envisioned as a better product than, and "a potential franchise extender for," IPX-066. (RX387 at 0001).

372. In negotiating the DCA, Impax initially wanted to retain any profits flowing from prescriptions written by high-prescribing non-neurologists – which were the profits Endo sought under the DCA – because of the "significant" amount of money those prescriptions represented. (RX405 at 0001; *see* CX4033 (Nestor, Dep. at 123); CX1009 at 008 (non-neurologists "manage about 40%" of Parkinson's patients)).

373. Impax knew that there were at least "a couple of thousand physicians who were primary care physicians that prescribed Parkinson's patients, somewhat like a neurologist. So that was the audience that we had envisioned promoting IPX-203 to." (Nestor, Tr. 2948).

374. With the DCA, Impax "got a partner who would fund some of the costs to get [IPX-203] approved." (Koch, Tr. 321).

375. In 2010, Impax did not have the money to begin working on the clinical research for IPX-203. Impax could not fund the IPX-203 project internally because its shareholders did not "want to see large sums of money being spent over an extended time period on a single product. They were accustomed to R&D investments being made on many individual products that you bring to market as a generic." (Nestor, Tr. 3052-53).

376. Impax needed external funding to move the IPX-203 product forward in development and explored a number of possible funding approaches, including seeking money from venture capital firms. (Nestor, Tr. 2941, 3052-53).

377. When the idea was raised of obtaining funding for IPX-203 through a co-development program with Endo, Impax's brand drug development team was "very excited about that." (Nestor, Tr. 2941).

### h.  Impax's efforts to develop IPX-203

378. As early as November 2009, Impax had reviewed ████████████████████
████████████████████████████████. (Nestor, Tr. 2952-53, *in camera*; RX247, *in camera*).

379. Following execution of the DCA, Impax devoted substantial efforts to IPX-203's development. Impax personnel have spent over ████████████ working on IPX-203 since June 2010. (Nestor, Tr. 2970-71, *in camera*; RX241, *in camera*).

380. In 2010, Impax commissioned preclinical pharmacokinetic studies testing several relevant compounds and began laboratory research. (RX241; RX242).

381. In the course of its development efforts, Impax explored various IPX-203 formulations in an effort to achieve the desired clinical outcome. This involved multiple rounds of pharmacokinetic studies of various formulations to assess their pharmacokinetic profiles, a metric that spoke directly to the clinical improvement Impax was seeking to achieve with the program. (Nestor, Tr. 2961-62; CX0310 at 26-27; RX242; CX3166 at 039-42).

382. Impax completed pharmacokinetic studies of IPX-203 no later than 2012. Impax then conducted additional pharmacokinetic studies and completed Phase I clinical trials. (RX242 (Tab 2012); CX3166 at 039-42; Nestor, Tr. 2957; RX157 at 0020).

383. Impax manufactured a clinical supply of IPX-203, developed protocols for Phase II clinical trials, submitted those protocols to the FDA, and secured FDA approval for efficacy and safety studies in November 2014. (RX157 at 0020).

384. Further development work on IPX-203 was delayed after Impax experienced delays in the development of IPX-066, the brand drug IPX-203 was intended to extend and improve upon. (Reasons, Tr. 1237-38; CX4021 (Ben-Maimon, Dep. at 145) (IPX-066 development was delayed for a "[c]ouple years"); CX4033 (Nestor, Dep. at 135-36)).

385. Bryan Reasons, Impax's current chief financial officer, explained that when IPX-066 was delayed, "resources were put to focus on the approval of Rytary [IPX-066] so that we could get that to market, grow that . . . commercially, and it would also be beneficial to . . . when we launched the next generation of [IPX]-203." (Reasons, Tr. 1237-38).

386. Further development work on IPX-203 was also delayed after Impax received an FDA Warning Letter in 2011 relating to Impax's manufacturing processes, which caused Impax to direct its scientific staff to spend their time helping the operations people correct the deficiencies that the FDA noted in its last inspection. (Nestor, Tr. 2968, 2985-86).

387. Impax's research and development team "worked to help remediate" any issues identified by the FDA and to prepare for "the FDA to come in and do their re-inspection," which

meant that "nothing was going to go forward until such time as we got over that hurdle." (Nestor, Tr. 2985-88).

388. Notwithstanding the delays (F. 387) and the DCA's termination (F. 389), Impax has continued development work on IPX-203. (Nestor, Tr. 2970).

389. IPX-203 is currently Impax's "lead compound on the brand side of [its] R&D programs. It's really our strategy to continue to grow and extend the duration of our Parkinson's franchise." (Reasons, Tr. 1238).

390. Impax has now completed Phase II clinical trials for IPX-203 and plans to begin Phase III clinical trials at the beginning of 2018. (Nestor, Tr. 2978; Reasons, Tr. 1238).

391. Phase II clinical trials of IPX-203 revealed a statistically significant improvement in treatment over IPX-066 and other existing treatments, reducing the amount of time Parkinson's patients are without control over their motor symptoms. (Nestor, Tr. 2978).

392. The Phase II clinical trials of IPX-203 suggest that it will offer an improvement of over two hours in motor symptom control when compared to immediate-release carbidopa-levodopa treatments and one hour of improvement over IPX-066. (Nestor, Tr. 2984-85; *see also* RX208 at 0015-16).

393. An improvement of over two hours in motor symptom control over existing medications is a "terrific result" that is "highly statistically significant" and "clinically meaningful." (Nestor, Tr. 2978-79, 2984-85).

394. The Phase II clinical results of IPX-203 suggest that Parkinson's patients will have "their symptoms . . . under control for a longer time period," which is "a very important thing" for patients. (Nestor, Tr. 2937, 2966).

395. Impax also sought, and the FDA granted, a special protocol assessment for further clinical trials of IPX-203 in 2017. A special protocol assessment is an agreement between a pharmaceutical company and the FDA regarding the design of clinical trials. When a special protocol assessment is in place, the FDA will not question the trial designs in Phase III clinical trials, which "takes an element of risk out of a new drug application review." (Nestor, Tr. 3001-02).

### i.    Termination of the DCA

396. Impax's IPX-203 development efforts revealed that the formulation of IPX-203 contemplated by the DCA could not achieve the intended clinical benefits. (Snowden, Tr. 459-60; *see* Nestor, Tr. 2960-61).

397. Between 2014 and 2015, Impax's research team determined it could not achieve the desired product profile with a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ formulation. Impax

consequently began pursuing alternative approaches to an extended-release formulation of carbidopa and levodopa. (Snowden, Tr. 459-60; Nestor, Tr. 2960-61).

398.    After extensive research and testing, 

. (Nestor, Tr. 2961-62, *in camera*).

399.    In 2014, Impax filed an Investigational New Drug Application with the FDA regarding ███████████████████████████████████, which the FDA accepted. (Nestor, Tr. 2963, *in camera*).

400.    Although the specific formulation of IPX-203 changed, Impax still viewed ████ ████████████████████████████████████ it had been developing since 2009 "[b]ecause it was all towards the same end. It still involved carbidopa-levodopa. It was just a variation in formulation." (Nestor, Tr. 2962, *in camera*).

401.    Under the terms of the DCA, Impax and Endo formed a joint development committee that was to meet four times a year. These meetings were intended to be "[e]ssentially a progress report on clinical development by Impax." (Nestor, Tr. 3036-37; RX365 at 0016-17 (DCA §§ 7.2, 7.3); CX3345 at 006).

402.    As of 2014, the joint development committee had not met. Michael Nestor, the president of Impax's brand division, explained that Impax really had nothing to discuss with Endo until the formulation work was settled. Once Impax's formulation work had reached that point, Impax met with Endo in 2015 regarding the status of Impax's IPX-203 development work. (CX3165; Nestor, Tr. 2963-64, 2967-69; CX4033 (Nestor, Dep. at 163-64)).

403.    In April 2015, Impax approached Endo to update it on the status of Impax's IPX-203 development work, including the change in formulation strategy. Impax made a presentation describing Impax's formulation testing and results and ████████ ███████████████████████. (Nestor, Tr. 2963-64, *in camera*; RX208, *in camera*).

404.    Impax viewed the presentation (F. 403) as a "precursor" to the joint development committee meetings called for by the DCA. (Nestor, Tr. 2967; CX4033 (Nestor, Dep. at 164)).

405.    Endo and Impax "had not had a meeting of the joint development committee" before 2015 "because, quite frankly, we really had nothing to discuss with them" until the formulation work was settled. (Nestor, Tr. 2967-69; *see* CX4033 (Nestor, Dep. at 163-64)).

406.    Indeed, Impax "had to make sure we had a formulation first and that we were ready to go

into the clinic" before meetings of the joint development committee "would be relevant." (CX4033 (Nestor, Dep. at 163-64); *see* Nestor, Tr. 2967-68).

407. By 2015, Impax had sufficient formulation research, as well as ███████████ ███████████████████████████████████████████████████████, to report to Endo. (Nestor, Tr. 2963, *in camera*).

408. During the parties' April 2015 discussion (F. 403), Impax offered to amend the DCA so that the DCA would cover the ████████████████████ to IPX-203. (Nestor, Tr. 3057, *in camera*; CX2928 at 013, *in camera*).

409. Impax was prepared to amend the DCA to include the new formulation of IPX-203 because it wanted to work with Endo in order to move the drug forward and Impax believed the new formulation would give it "an avenue through which we could continue the development of IPX-203." (Nestor, Tr. 3056-57).

410. Endo initially agreed to the proposed amendment (F. 408), noting that it "would like to maintain or even increase [its] involvement with the development program . . . as [it] remain[ed] optimistic this will be a successfully differentiated product, which Endo looks forward to the opportunity to co-promote . . . with Impax." (RX218 at 0001; *see* Snowden, Tr. 459-60).

411. Following Endo's initial agreement (F. 410), Impax consequently prepared an amendment to the DCA and expected the parties to continue collaborating on IPX-203. (Snowden, Tr. 458-59; *see* CX2747).

412. Endo subsequently informed Impax that Endo had "decided not to amend the existing agreement" and would no longer "participat[e] in [the] program," but did not provide any explanation. (CX2747).

413. Endo's decision surprised Impax because "fairly recently" Endo "had said the opposite, that they were interested in continuing forward with the program and amending the agreement." (Snowden, Tr. 460-61; RX221 at 0001 (Endo's decision not to amend DCA was "a surprise")).

414. Because Endo retracted its initial expression of interest in amending the DCA to cover the new formulation for IPX-203, Impax and Endo terminated the DCA by mutual agreement effective December 23, 2015. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-011 ¶ 43); Snowden, Tr. 407; RX219 at 0001-02; RX198 at 0005-07 (termination agreement)).

### j. Complaint Counsel's experts' opinions

415. Complaint Counsel's expert in pharmaceutical business development agreements, Dr. John Geltosky, has worked on a handful of development deals in their early stages and has never negotiated a development and co-promotion agreement similar to the DCA.

The majority of Dr. Geltosky's experience with pharmaceutical collaboration agreements relates to his employment with large pharmaceutical companies and Dr. Geltosky admitted that he could not speak to how the universe of small or mid-sized pharmaceutical companies approach partnerships for early-stage products. (Geltosky, Tr. 1141-45).

416. Dr. Geltosky acknowledged that Endo's senior vice president of corporate development (Dr. Cobuzzi) is better qualified to assess the strategic fit of the DCA for Endo than he is. (Geltosky, Tr. 1163).

### i. Bona fide product collaboration

417. Dr. Geltosky did not offer an opinion regarding whether the DCA was a bona fide scientific collaboration or whether Endo exercised good business judgement in entering the DCA. (Geltosky, Tr. 1125-28).

418. Dr. Geltosky acknowledged that the DCA was a way for Impax and Endo to share both risks and costs associated with developing IPX-203. (Geltosky, Tr. 1135).

419. Dr. Geltosky did not offer an opinion regarding whether Endo or Impax bore more of the risk under the DCA and did not quantify any risk related to the DCA or opine what the appropriate payment would be to reflect that risk. (Geltosky, Tr. 1138, 1147).

420. Dr. Geltosky acknowledged that at the time of settlement, Impax estimated costs for the development of IPX-203 to be between $80 and $100 million, that Impax had to cover all development costs in excess of Endo's specified milestone contributions, no matter how much the development work cost, and that Endo's risks and costs associated with developing IPX-203 were limited to the milestone payments. (Geltosky, Tr. 1136-38).

421. Dr. Geltosky's opinion that IPX-203 did not fit within Endo's strategic area of focus was based on his review of certain Endo documents provided to him by Complaint Counsel, which did not list Parkinson's disease as an area of interest, and one of which stated that Endo was interested in near-term revenue generators. In reaching that opinion, Dr. Geltosky did not consider other deals contemplated or completed by Endo. Dr. Geltosky did not have contact with the individuals involved in evaluating the DCA. (Geltosky, Tr. 1159-61).

422. Dr. Geltosky acknowledged that Endo has entered into very-early, discovery-stage pharmaceutical partnership deals and that pharmaceutical companies enter early-stage development deals "all the time." (Geltosky, Tr. 1145-46).

423. Dr. Geltosky offered no criticism of Impax's behavior with regard to the DCA. (Geltosky, Tr. 1183).

## ii.     Due diligence

424.     Dr. Geltosky reached an opinion of Endo's due diligence efforts in evaluating the DCA based on one document provided to him by Complaint Counsel.  (Geltosky, Tr. 1159).

425.     Dr. Geltosky admits that Impax provided Endo with comprehensive information regarding IPX-066, including clinical information regarding safety and efficacy, intellectual property, technical due diligence, and financial analysis.  (Geltosky, Tr. 1156-58; RX272 at 0005-08).

426.     Dr. Geltosky admits that information about IPX-066 provides useful information for IPX-203 because IPX-203 was a follow-on drug, because the two products could compete, and because, in modeling how IPX-203 might perform in the market, Impax and Endo needed to use IPX-066 as a benchmark.  (Geltosky, Tr. 1153-56).

427.     Dr. Geltosky did not offer an opinion on whether Endo exercised good business judgment in its due diligence of the DCA.  (Geltosky, Tr. 1128).

## iii.     Valuation

428.     Dr. Geltosky has never performed a financial valuation of a pharmaceutical collaboration.  (Geltosky, Tr. 1179-80).

429.     Dr. Geltosky did not conduct any valuation analysis of the DCA, did not calculate a net present value of the DCA at the time it was executed, and did not conduct any other form of empirical analysis regarding the DCA.  (Geltosky, Tr. 1125, 1133).

430.     Dr. Geltosky did not offer any opinion about the actual value of the DCA to Endo.  (Geltosky, Tr. 1125).

431.     Dr. Geltosky did not compare the payment terms in the DCA to the payment terms in other pharmaceutical collaboration agreements.  (Geltosky, Tr. 1139-40).

432.     Dr. Geltosky did not address the actual value of the profit-sharing rights acquired by Endo or whether Endo's profit-sharing rights justified its DCA payment obligations.  (Geltosky, Tr. 1124-25).

433.     Dr. Geltosky agreed that Endo's profit-sharing rights remained the same regardless of the development costs incurred by Impax.  (Geltosky, Tr. 1137-38).

434.     Dr. Geltosky did not offer an opinion regarding whether the profit-sharing provisions in the DCA favored Impax or Endo.  (Geltosky, Tr. 1138).

435.     Complaint Counsel's economic expert, Professor Noll, acknowledged that, if a payment from a brand company to a generic company is used to purchase a bundle of rights at a fair market price, the payment is justified.  (Noll, Tr. 1620).

436. Professor Noll did not independently analyze the DCA to determine whether it was justified, had value to either party, or represented an overpayment. (Noll, Tr. 1456, 1581-82).

437. Professor Noll relied on Dr. Geltosky's "analysis of the degree to which the $10 million payment and co-development deal represented the acquisition of an asset that was approximately valued at a $10 million price." (Noll, Tr. 1582).

438. Professor Noll agreed that if Dr. Geltosky did not offer an opinion regarding the actual value of the DCA to Endo at the time it was executed, then Professor Noll "would not include the $10 million as part of the large payment that was unjustified." (Noll, Tr. 1585-86).

439. Professor Noll agreed that if Dr. Geltosky did not provide a "sufficiently well-documented rationale for the conclusion that the payment [under the DCA] was unjustified, then you would pull [the DCA] out of the case." (Noll, Tr. 1582-83).

### D. Anticompetitive Effects

#### 1. Harm to competition

440. A basic economic principle is that consumers benefit from increased competition in the form of lower prices and increased choice. (CX5000 (Noll Expert Report at 011 ¶ 24, *see also* at 109-10 ¶ 250)).

441. Harm to competition occurs when the conduct of firms on one side of a market (usually sellers) inflict harm on participants on the other side of the market (usually consumers). Harm to competition is not limited to the certain elimination of competition, but also includes eliminating the possibility that participants on the other side of the market will have the opportunity to experience the benefits of competition, such as lower prices. (CX5000 (Noll Expert Report at 011 ¶ 24)).

442. Normally when a generic drug launches, the competition between the brand-name firm and the generic firm causes the price of the drug to drop, which is a benefit to consumers. Reverse payment settlements can harm consumers, to the extent that the settlement extends the period in which the brand-name firm is the only seller of a drug, by requiring the generic firm to forego entering at an earlier date. (CX5000 (Noll Expert Report at 118, 132 ¶¶ 268, 300); Noll, Tr. 1425-27).

443. A reverse payment settlement replaces the possibility of successful generic entry with a certainty. To this extent, the brand-name firm is buying an insurance policy by which it pays the generic firm a premium in exchange for the generic firm guaranteeing it will not compete prior to the date specified in the settlement of the patent litigation. (CX5000 (Noll Expert Report at 118 ¶ 268); Noll, Tr. 1427-28).

444.    Payment to an alleged patent infringer, in exchange for a certain entry date, converts the possibility of substantial loss of profits for the patent-holder, due to generic competition, into the certainty that it will continue to earn profits as the sole seller of the drug until the entry date agreed to in the settlement of the patent litigation.  (CX5000 (Noll Expert Report at 104 ¶ 239)).

445.    By eliminating the possibility of generic competition for a period of time, reverse payment settlements interfere with the competitive process and can harm consumers by depriving them of the possible benefits of increased competition in the period prior to the entry date provided under the settlement agreement.  (Noll, Tr. 1422-23; CX5000 (Noll Expert Report at 119 ¶ 269)).

446.    A large reverse payment can imply that the market entry date in the settlement agreement is later than the date that the patent holder expected the alleged patent infringer would enter the market since it is unlikely that a patent holder would agree by a settlement to pay an alleged patent infringer anything more than saved litigation costs, only to obtain entry on the date the alleged patent infringer would have entered anyway.  (CX5000 (Noll Expert Report at 103-04 ¶ 238); *see also* Bazerman, Tr. 873-74; CX5001 (Bazerman Expert Report at 006 ¶ 10) ("[L]itigation costs to the parties increase the viability of a negotiated agreement, as both parties save these costs if they can negotiate an agreement.")).

447.    A brand-name pharmaceutical firm has an economic incentive to pay the generic firm as part of a settlement if the payment is less than the profits the brand firm would earn during the period before the agreed-upon entry date of the generic product.  (CX5000 (Noll Expert Report at 124-26 ¶¶ 280, 284-85); CX5001 (Bazerman Expert Report at 023 ¶ 46) (stating that it is a "common pattern" in the pharmaceutical industry that the brand company's gains from not facing generic competition are greater than the costs to the generic for agreeing not to sell a generic product)).

448.    A generic pharmaceutical firm has an economic incentive to enter into reverse payment settlements.  By agreeing not to launch its generic product for some period of time, the generic firm loses profits it would earn on sales of its generic product.  However, if the brand-name firm compensates the generic firm with a sufficiently large payment, the generic firm will be willing to postpone its launch until a later date.  (CX5000 (Noll Expert Report at 128-29 ¶¶ 290-92)).

449.    The Hatch-Waxman regulatory framework creates additional incentives for pharmaceutical companies to enter into reverse payments.  Because of the 180-day exclusivity period granted to first filers (*see* F. 21), by settling with the first filer, the brand company not only eliminates the possibility of entry by the first filer during the period before the generic firm's product's entry date in the agreement, but also eliminates the possibility of market entry for six months beyond this period by other potential generic drug competitors.  (CX5000 (Noll Expert Report at 104 ¶ 239)).

## 2. At-risk launch

450. Impax would not have launched its generic Opana ER at risk. (F. 451-548).

### a. At-risk launches generally

451. Launching a generic product before a non-appealable decision in patent litigation is commonly known as an "at-risk launch." (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-008 ¶ 23; *see* Koch, Tr. 246; Bingol, Tr. 1282; Hoxie, Tr. 2831).

452. An at-risk launch can occur any time after FDA final approval, including (1) before a district court decision, (2) after a district court decision but before an appellate decision by the Federal Circuit, or (3) after a Federal Circuit opinion if the case is remanded or otherwise continues. (Hoxie, Tr. 2810-11; CX4021 (Ben-Maimon, Dep. at 133-34); CX4026 (Nguyen, Dep. at 47-48)).

453. If a generic company launches a product before a non-appealable court decision or patent expiration, brand companies can be awarded damages, as measured by the brand seller's own lost profits rather than by the generic seller's earned profits. Lost profits are measured by the profits the patent owner would have made on sales of its branded product but for the launch of the generic product. Damages can be trebled if the infringement is found to be willful, for instance, if the generic product was launched before a district court ruled on the patent dispute. (Koch, Tr. 286-87; Figg, Tr. 1921-23; Hoxie, Tr. 2782; CX4030 (Hsu, Dep. at 48-49)).

454. Generic companies often risk far more in infringement liability than they earn from each sale when launching at risk. (Koch, Tr. 286-87; CX4021 (Ben-Maimon, Dep. at 159) (at-risk launches could result in generic "pay[ing] more to the brand company than [generic] made"); *see also* CX4039 (Noll, Dep. at 74)).

455. The risk of damages for launching at risk represent "bet-the-company" stakes and can "take [away] the solvency of the company entirely." Damages can be in the billions of dollars if the sales of the branded drug are high enough. The profits that the brand company loses would almost always be greater than the total revenues that the generic company receives. (Koch, Tr. 287; Hoxie, Tr. 2782; Figg, Tr. 1922-23; *see* CX4030 (Hsu, Dep. at 43) ("the risk can be huge depending on the size of the product and depending on whether we're first to file")).

456. A first filer's launch of a generic product triggers the beginning of the 180-day exclusivity period, which is "extremely valuable." If the generic launches at risk and is enjoined from making sales, the generic forfeits some of its 180-day exclusivity because the 180-day time period would continue to run during the period the generic is enjoined. Even if the injunction was eventually lifted or the infringer prevailed in the underlying patent litigation, the patent infringer could never recover the forfeited part of its 180-day exclusivity period. (Snowden, Tr. 503-04; Figg, Tr. 1923-24; Hoxie, Tr. 2754, 2778-80; CX4021 (Ben-Maimon, Dep. at 164-65)).

457.   If the branded company wins its action against a generic company that has launched at risk and the generic's actions are deemed "exceptional," courts may award attorney's fees to the brand company.  (Figg, Tr. 1924).

458.   At-risk launches are fairly uncommon across the entire pharmaceutical industry.  (Figg, Tr. 1924-26).

459.   At-risk launches are most common when there are multiple ANDA filers who have received approval from the FDA, no ANDA filer has exclusivity, and there subsequently is a race to the market by generic firms.  (Hoxie, Tr. 2704-05).

460.   When at-risk launches do occur, they generally are undertaken by large pharmaceutical companies that can absorb significant financial risk in the event they are found to infringe.  (Figg, Tr. 1925).

461.   Complaint Counsel's expert, Professor Noll, identified 48 at-risk launches over a 15-year period (August 2001 thru April 2015).  Twenty-one of those forty-eight at-risk launches were conducted by Teva, which Professor Noll explains, "is by far the most likely company to do at-risk launches."  (Noll, Tr. 1607-09; CX5004 (Noll Rebuttal Expert Report at 92-99)).

462.   Teva is a "very large pharmaceutical company" and, as a result, can undertake at-risk launches more regularly.  (Figg, Tr. 1925; *see also* Hoxie, Tr. 2820 (Complaint Counsel's expert noting that Teva has "a high willingness to take risks" and "a greater appetite for risk than others.")).

463.   Of the 48 at-risk launches identified by Professor Noll (F. 461), only 4 were conducted by companies with less than $1 billion in revenue.  (Noll, Tr. 1609).

464.   Mr. Hoxie agreed with industry analysts who empirically analyzed at-risk launches between 2003 and 2009 that, generally, "at-risk launches are fairly uncommon."  (Hoxie, Tr. 2827-28).

### b.     Impax's history of at-risk launches

465.   Impax is a small pharmaceutical company.  In 2010, Impax's revenues were less than $1 billion.  (Koch, Tr. 275, 287; *see* Figg, Tr. 1925; CX3278 at 45 (Impax 2010 Annual Report)).

466.   Impax is "incredibly conservative" with respect to at-risk launches.  (CX4021 (Ben-Maimon, Dep. at 34); *see* Koch, Tr. 287).

467.   Mr. Koch, Impax's CFO at the time of the Endo-Impax Settlement, explained that "being a small company," Impax "could not bet the company on any one product."  (Koch, Tr. 275; *see* CX4018 (Koch, Dep. at 97) (describing risks as "huge")).

468. Impax only "infrequently" considers the possibility of an at-risk launch. (Koch, Tr. 246-47).

469. Prior to the Endo-Impax patent litigation, Impax had launched a product at risk only once. That at-risk launch was for one dosage strength of a generic version of oxycodone. Impax limited its risk of damages by capping its potential sales at $25 million. Impax launched at risk only after it received a favorable district court decision holding the relevant patents unenforceable and after Teva, the first ANDA filer for the relevant dosage, had launched at risk six months earlier. (Koch, Tr. 274-75; Snowden, Tr. 425-26).

470. The risks to a second generic company launching at risk are lower than the risks associated with an initial at-risk launch because (1) the second generic company does not have first-filer exclusivity at stake, and (2) the patent holder may have a harder time arguing that damages are the result of any one particular generic company's sales. (Hoxie, Tr. 2817-18).

471. Since the Endo-Impax Settlement in 2010, Impax has considered possible at-risk launches. Only one of those launches occurred, and only in a limited manner. (Snowden, Tr. 466-67; CX2927 at 014-19).

472. Impax's one post-settlement at-risk launch involved a drug called azelastine, a nasal spray antihistamine. Impax and Perrigo, the ANDA holder and marketer of azelastine, entered a partnership agreement through which Impax would share development costs and litigation expenses in return for a share of the drug's profits. In 2014, Perrigo notified Impax that it intended to launch azelastine at risk. Under the terms of the Impax-Perrigo partnership agreement, Impax could participate in the launch and earn a share of the profits or could not participate, in which case Perrigo would receive all azelastine profits. Impax participated in Perrigo's at-risk launch, but limited its exposure to potential damages by capping its participation at 150,000 units. (Snowden, Tr. 462-65; CX4021 (Ben-Maimon, Dep. at 37-39, 153); CX2689 (minutes of special meeting of Impax Board)).

### c. Impax's process for approval of an at-risk launch

473. It is an absolute prerequisite for Impax's board of directors to formally approve any at-risk launch. (Koch, Tr. 276-77 ("every at-risk launch is a board-level decision"); Snowden, Tr. 426; CX4030 (Hsu, Dep. at 128); CX4021 (Ben-Maimon, Dep. at 160)).

474. Many steps take place before at an-risk launch is formally approved by Impax's board of directors. F. 474-483.

475. Impax's process for evaluating a possible at-risk launch starts with Impax's new product committee, which evaluates the science, marketing opportunity, and legal issues related to the drug under consideration for an at-risk launch. If Impax's new product committee

recommends an at-risk launch, Impax's research and development team conducts further due diligence regarding the drug. (Koch, Tr. 276).

476.  When evaluating whether to launch a product at risk, Impax's in-house legal team conducts an analysis regarding the specifics, including any pending patent litigation between Impax and the brand company, and the strength of the underlying patents. (Koch, Tr. 276; CX4021 (Ben-Maimon, Dep. at 166)).

477.  When evaluating whether to launch a product at risk, Impax's division heads, including those from the legal, marketing, and operations departments, and from the generics division, meet with Impax's CFO to formulate a risk analysis profile. Impax's CFO must present a risk analysis profile to Impax's executive committee, which has to approve any at-risk launch. (Koch, Tr. 276-77).

478.  Impax's CEO must approve any decision to launch at risk. (CX4030 (Hsu, Dep. at 127); CX4021 (Ben-Maimon, Dep. at 167-68)).

479.  If Impax's CEO and executive committee approve a possible at-risk launch, a presentation is made to Impax's board of directors by Impax's CFO, legal department, president of the generics division, and the manufacturing department ("Board presentation"). (Koch, Tr. 277; *see* CX2689; CX3223).

480.  The Board presentation includes background on the product, the basis for the executive committee's decision to propose an at-risk launch, and a resolution seeking the Board's vote on the matter. (Koch, Tr. 277).

481.  Impax's board of directors must formally authorize any at-risk launch. (Koch, Tr. 276-77 ("every at-risk launch is a board-level decision"); Snowden, Tr. 426; CX4021 (Ben-Maimon, Dep. at 160)).

482.  For an at-risk launch, Impax has "to have sign off from the Board, because we're such a small company, and a launch at risk would . . . potentially cause our company problems if we were hit with damages, big damages." (CX4026 (Nguyen, Dep. at 55-56)).

483.  If the Board formally authorizes an at-risk launch, the Board approval is recorded in the board of director's minute book. (Koch, Tr. 286).

484.  In the case of azelastine, the nasal spray antihistamine that Impax did launch at risk (F. 472), Impax's senior management, including the president of Impax's generics business, Impax's general counsel, and Impax's in-house attorney responsible for intellectual property, made a presentation and recommendation regarding a limited at-risk launch at a special board of directors meeting. A resolution was then placed before the Board, and the Board voted to approve the resolution. (Snowden, Tr. 463-66; CX4021 (Ben-Maimon, Dep. at 153-54); CX2689 (minutes of special meeting of Impax Board regarding azelastine)).

485. Impax would not launch a product at risk if it did not have Board approval. (Snowden, Tr. 470).

### d. Impax did not seek or receive Board approval for an at-risk launch of generic Opana ER

486. Impax did not seek or receive Board approval for an at-risk launch of Opana ER. (F. 487-502).

487. Impax's senior management never decided to pursue an at-risk launch of generic Opana ER. (Mengler, Tr. 547-48, 584; Koch, Tr. 299, 324-25; Snowden, Tr. 470-71).

488. In 2010, senior management was looking at possible scenarios and modeled an at-risk launch to forecast how that might impact Impax's budget if the decision to launch at risk were made. (Koch, Tr. 299-300; see CX4014 (Hsu, IHT at 129-30) ("We could settle, we could launch at risk, we could do many other things, and as the job of CEO, I just have to, you know, lay out everything, get prepared so I don't get accused by the board and say, well, wait a minute, how come you didn't prepare for plan B?")).

489. On May 9, 2010, Impax's CEO, Dr. Hsu, informed Mr. Koch, Impax's CFO, that "[i]t's unlikely we will launch Opana ER this year (I actually prefer not to launch this year for obvious reason[s])." (RX297 at 0002).

490. In response to an internal Impax email reporting that on May 13, 2010, the FDA granted tentative approval to Impax's ANDA for generic Opana ER (F. 64), Dr. Hsu stated that Impax would most likely "make launch decision based on court decision on the PI." (CX2929 at 001; Koch, Tr. 310).

491. After the FDA granted tentative approval to Impax's ANDA for generic Opana ER (F. 64), when customers inquired about the status of Impax's Opana ER product, on May 17, 2010, Todd Engle, a senior member of Impax's sales and marketing team, told members of the Impax sales team that "[a] launch decision has not been made yet. There is nothing we can tell the customers yet." (Engle, Tr. 1778-79; RX323 at 0001).

492. Impax told the court presiding over the Endo-Impax patent litigation on May 20, 2010 that Impax would not launch at risk during trial. (Snowden, Tr. 471-72; RX251).

493. Mr. Mengler, president of Impax's generics division, created a presentation for the May 2010 board of directors meeting, in which he listed an at-risk launch of oxymorphone as a "current assumption" for the purpose of projecting sales of oxymorphone ER. Mr. Mengler's assumptions with respect to possible sales numbers did not "imply or mean that any legal decision ha[d] been made to clear the way for a launch." (CX2662 at 012; Koch, Tr. 337-38; Mengler, Tr. 552-53).

494.   The minutes of the meeting of the board of directors meeting on May 25 and 26, 2010 note that Mr. Mengler "expressed the view that [o]xymorphone was a good candidate for an at-risk launch."  (CX2663 at 001).

495.   Mr. Mengler raised oxymorphone ER at the May 2010 Board meeting to put oxymorphone ER "on the radar" of the Board and to "alert the board as to the product being out there that might get to the point of an at-risk launch."  Mr. Mengler discussed potential revenues from oxymorphone ER and told the Board that he thought oxymorphone ER "was a great market opportunity" because it was a "very rapidly growing product."  (Mengler, Tr. 584-85; Koch, Tr. 294-95, 300-01).

496.   Mr. Koch, who wrote the minutes of the meeting of the board of directors meeting on May 25 and 26, 2010, explained that Mr. Mengler was communicating his evaluation of the oxymorphone market and sharing that information with the Board because senior management was unsure of what direction it would "ultimately take and . . . [did not] want to come back to the board seeking an at-risk launch with them never having heard of it before."  (Koch, Tr. 301).

497.   Dr. Hsu explained that senior management "want[s] to alert the board that we are considering this [as] one of the scenario[s] so that if we do come up with a final recommendation to the board, there will be no surprise. . . . [T]his is very typical."  (CX4030 (Hsu, Dep. at 82)).

498.   Impax's senior management did not make a recommendation to the Board for an at-risk launch, did not discuss the risk or benefits of an at-risk launch, and did not ask the Board to approve an at-risk launch at the May 25 and 26, 2010 Board meeting.  (Koch, Tr. 295, 299; Mengler, Tr. 584-85; Snowden, Tr. 470-71; CX4030 (Hsu, Dep. at 85)).

499.   There was no substantive discussion of an at-risk launch at the May 2010 board of directors meeting.  (Koch, Tr. 295; Mengler, Tr. 584).

500.   If a recommendation, discussion, or approval to launch at risk had been made to or by the board of directors, it would have been "very carefully" recorded in detailed Board meeting minutes, and would include the at-risk launch discussion, the resolution regarding the possible launch, a formal request for a vote, and the actual Board vote about the at-risk launch.  No such meeting minutes exist.  (Koch, Tr. 289-90, 297-98 ("I would have written the resolution, and there was no resolution for oxymorphone.")).

501.   As of June 8, 2010, the Impax board of directors had not been asked to vote on whether or not to launch generic oxymorphone ER at risk.  (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-009 ¶ 29; Koch, Tr. 299; CX4030 (Hsu, Dep. at 85)).

502.   The board of directors never voted on or approved an at-risk launch of generic oxymorphone ER.  (CX4030 (Hsu, Dep. at 85); Koch, Tr. 298-99).

e. **Impax's launch preparedness efforts**

i. **Impax's general preparedness practices**

503. Impax generally strives to have its products that have been filed with Paragraph IV certifications ready to launch after the expiration of the Hatch-Waxman Act's 30-month stay. (Engle, Tr. 1768-69).

504. Impax's supply chain department is responsible for producing and packaging Impax's products. Joseph Camargo was Impax's vice president of the supply chain group from 2006 through 2011. (Camargo, Tr. 950-51).

505. Each month, the supply chain group receives from Impax's marketing department a product forecast for the next 18 months which the supply chain group uses to begin routine launch planning. (Camargo, Tr. 958; CX4023 (Hildenbrand, Dep. at 78-79)).

506. When a product is 18 months away from its earliest theoretical launch, the supply chain group begins prelaunch preparation activities. (Camargo, Tr. 958; CX4023 (Hildenbrand, Dep. at 9-12, 79)).

507. Impax uses a computer system called Enterprise Resource Planning ("ERP") and a product launch checklist to plan and track product production projects within the 18-month planning horizon. The ERP system tracks the purchasing of materials, shop floor activities, financials associated with paying suppliers, and other planning activities based on projected batch sizes, necessary materials, and how the product is produced. (Camargo, Tr. 959-61).

508. Once a product is uploaded into the ERP system, the supply chain group undertakes the following tasks: requests a quota from the U.S. Drug Enforcement Agency ("DEA") to purchase any active pharmaceutical ingredients ("API") that are controlled substances; purchases the API and other unique materials necessary to produce the finished product; conducts "process validation" (F. 510) to prove that Impax's manufacturing process is repeatable and makes the product in a satisfactory manner; and produces a "launch inventory build" to ensure that Impax has enough product to meet expected demand on the launchable date. (Camargo, Tr. 964-68).

509. The supply chain group holds monthly meetings called "launch coordination meetings" to assess the status of any products in the 18-month planning horizon, which are chaired by Impax's vice president of supply chain and attended by representatives of all departments who have responsibilities related to the planning of a product launch, including the marketing, purchasing, and regulatory departments. (Camargo, Tr. 962-63).

510. Process validation is an FDA requirement imposed on all pharmaceutical manufacturers to prove that their manufacturing processes are satisfactory and repeatable. Every product must undergo successful process validation before it can be launched. (Camargo, Tr. 966-67; Koch, Tr. 270).

511. Impax's practice is to begin process validation six months before FDA approval of the relevant drug is expected, even if the product is the subject of active litigation.  (Koch, Tr. 269-70; CX3278 at 101 (Impax's 2010 10-K report:  "When the Company concludes FDA approval is expected within approximately six months, the Company will generally begin to schedule manufacturing process validation studies as required by the FDA to demonstrate the production process can be scaled up to manufacture commercial batches.").

512. Impax may build pre-launch quantities of the products in its planning pipeline before either FDA approval is granted or a formal launch decision is made.  (CX3278 at 101 (Impax's 2010 10-K report:  "the Company may build quantities of pre-launch inventories of certain products pending required final FDA approval and/or resolution of patent infringement litigation, when, in the Company's assessment, such action is appropriate to increase the commercial opportunity, FDA approval is expected in the near term, and/or the litigation will be resolved in the Company's favor.")).

513. Impax generally builds pre-launch quantities of products because it takes months to build up launch inventory.  (CX4030 (Hsu, Dep. at 42); Koch, Tr. 270-71).

514. Impax considers its production of pre-launch quantities "routine" and consistent with industry practice.  (Koch, Tr. 271; CX3278 at 100-01).

515. By having pre-launch quantities ready, Impax is able to "increase the commercial opportunity" for its drugs and have the option of launching if the decision to launch is made.  (CX3278 at 100-01; CX4030 (Hsu, Dep. at 86)).

516. Because Impax's operations team prepares products for launch before FDA approval or a formal decision about launch timing, it is not unusual for Impax to discard and write off some of the products and raw materials in its inventory.  (Camargo, Tr. 1020-21, 1033 (discarding of products or materials was "a matter of course pretty much every month"); Koch, Tr. 273 (writing off and destroying product is a routine and "small cost" of doing business in the generic industry)).

### ii.    Impax's launch preparedness efforts for generic Opana ER

517. Impax's operations team sought to be ready to launch its generic oxymorphone ER product at the expiration of the Hatch-Waxman Act's 30-month stay, June 14, 2010.  (Mengler, Tr. 558; Engle, Tr. 1769).

518. To meet a June 2010 launch date, Impax began planning oxymorphone ER production in 2009.  (Camargo, Tr. 969).

519. The supply chain group created master data for oxymorphone ER in its ERP system to

manage production capacity and materials planning and put oxymorphone ER on its product launch checklist to coordinate all launch-related activities. (Camargo, Tr. 1006).

520. In June 2009, the supply chain group acknowledged that the "odds of launching [oxymorphone in June 2010] when the 30-month stay expires may be low." Mr. Camargo explained that "it didn't seem likely to me that we would actually launch" in mid-2010 because the company "tended to shy away from" at-risk launches and oxymorphone ER would have been an at-risk launch given the ongoing litigation. (RX181; Camargo, Tr. 1009-10).

521. Impax undertook its normal launch preparations for oxymorphone ER to be prepared for a potentially "very lucrative" situation, even if the odds of an actual launch in June 2010 were low because the "upside [was] substantial and . . . we may want to plan for" it. (RX181; *see* Camargo, Tr. 1008-10).

522. Because oxymorphone, the API for generic Opana ER, is a controlled substance, purchasing oxymorphone is regulated by the DEA. (Camargo, Tr. 965; CX4027 (Anthony, Dep. at 13-14, 150-51)).

523. Impax requested a procurement quota from the DEA for oxymorphone, a necessary step before it could purchase oxymorphone API for any reason, including to conduct process validation of its oxymorphone ER product. (Camargo, Tr. 974, 1013).

524. Impax was initially allotted 9.0 kg (of anhydrous base) of procurement quota for oxymorphone for 2010 by the DEA. The initial allotment of oxymorphone quota was for product development manufacturing. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX-001-008 ¶ 24; CX4027 (Anthony, Dep. at 145-48)).

525. On January 18, 2010, Impax submitted a request for additional oxymorphone procurement quota to the DEA, which was approved. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX-001-008 ¶¶ 25-26).

526. On April 15, 2010, Impax submitted another request for additional oxymorphone procurement quota to the DEA, which was approved. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX-001-008-009 ¶¶ 27, 30).

527. Impax conducted process validation for oxymorphone ER in 2010. (Camargo, Tr. 1011-12).

528. Impax used a matrix approach for conducting process validation for its generic Opana ER product. A matrix approach to process validation takes less time, reduces the amount of product produced during the validation process, and ultimately reduces the costs incurred by Impax. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX-001-009 ¶ 31; Camargo, Tr. 1012-13).

529. As of May 20, 2010, Impax had completed process validation for the 5 mg, 10 mg, 20 mg, and 40 mg dosages of generic oxymorphone ER. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX-001-008 ¶ 28).

530. The process validation batches that Impax had built were not sufficient to meet the market demand for a full launch. (Koch, Tr. 292-93).

531. As a general practice, after process validation is complete, the Impax operations team does not build launch inventory without management approval. (Camargo, Tr. 1015-16; RX186 at 0004).

532. In the case of oxymorphone ER, the Impax operations team never received instructions from senior management to begin a launch inventory build. (Camargo, Tr. 1016-17, 1020; CX2898-001 (internal Impax email from Mr. Camargo on May 12, 2010: "[W]e will not commence the launch inventory build until we receive direction to do so from senior mgmt."); RX186 at 0004 (we "await management decision to proceed with 8-lot launch inventory build."); Engle, Tr. 1778-79; RX323 at 0001 (internal Impax email from Mr. Engle on May 17, 2010: "There has been no decision yet to complete the launch build.")).

533. Impax never actually completed a launch inventory build in support of an oxymorphone ER launch. (Camargo, Tr. 1020).

534. By May 28, 2010, Impax's operations team had still not produced enough oxymorphone ER to support a product launch. (Engle, Tr. 1783; CX0006 at 001 (internal Impax email from Todd Engle, Impax's vice president of sales and marketing for the generics division, to Impax's operations team that Impax would need at least one additional lot of 20 mg and three additional lots of 40 mg oxymorphone ER to meet sales estimates for even one month of sales)).

535. Having less than one month's worth of product would have prohibited a product launch because Impax would "rapidly run out of product, and most likely . . . would have started to incur penalties from [its] customers for not delivering on time." (Engle, Tr. 1784-85).

536. The time required to produce the necessary amount of oxymorphone ER would have made a product launch soon after FDA approval in mid-June 2010 impossible. (Engle, Tr. 1780).

537. Impax had solicited letters of intent from four customers asking customers for their good faith estimate of how much product they likely would buy if generic oxymorphone ER came on the market, but Impax did not have any pricing contracts or agreements to purchase with those customers. (CX2868 at 001; CX2882; Engle, Tr. 1780-81, 1797-98).

538. Prior to the Endo-Impax Settlement, Impax's inventory included finished goods of

generic oxymorphone ER, including three lots of 10 mg, as well as bright stock[14] of generic oxymorphone ER, including three lots of 5 mg, one lot of 20 mg, and two lots of 40 mg dosage strengths. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX-001-009 ¶ 32).

539. Based on the cost of materials and labor, the total value of Impax's manufactured oxymorphone ER at the time of Endo-Impax Settlement was $1,387,883. (Camargo, Tr. 994-95).

540. Following the Endo-Impax Settlement in June 2010, Impax accounted for the oxymorphone ER product as likely to be rejected because the product could not be used and the finished goods eventually were destroyed. (Camargo, Tr. 998; Koch, Tr. 273).

541. In June 2010, Impax also possessed oxymorphone API that had not been incorporated into any finished products which may have been used later to manufacture other products. (Camargo, Tr. 1022; CX2928 at 015).

542. Because Impax seeks to be prepared for all possible outcomes, discarding product "falls under the category of cost of doing business in weighing all your options." (CX4004 (Engle, IHT at 181); *see also* Engle, Tr. 1785-86 ("Throwing away product or discarding product in about a 1.5 million range happens frequently and it – it's not unusual."); Camargo, Tr. 1020-21, 1033 (discarding products or materials was "a matter of course pretty much every month"); Koch, Tr. 273 (discarding and writing off product is a routine and "small cost" of doing business)).

543. Impax wrote off over $1 million worth of non-oxymorphone ER products in April 2010, and $560,000 worth of non-oxymorphone ER product in June 2010. Impax also discarded and wrote off roughly $25 million in finished product in 2017. (CX2905 at 003; CX2896 at 002-03; Camargo, Tr. 1023-24; Engle, Tr. 1786).

### f. Economic disincentives

544. Had Impax launched a generic version of Opana ER at risk, Impax's potential liability for damages would have exceeded any profits Impax realized from the launch. (Addanki, Tr. 2379-80; F. 545-546).

545. Impax projected a total of $28 million in potential oxymorphone ER sales over six months in 2010 following an at-risk launch. (CX2662 at 015).

546. Based on Endo documents indicating that at the time of the Endo-Impax Settlement Endo's Opana ER net sales were $20 million per month and an assumption that Endo had a 90% profit margin on those sales such that Endo's profits were $18 million per month, if Impax sold a month's worth of Opana ER at risk, and if Impax took 50% of Endo's sales, Impax could be risking as much as $9 million per month or $54 million for six

---

[14] Bright stock is product that has been manufactured and placed in bottles, but has not been labeled yet. (Koch, Tr. 253).

months of sales.  If Endo showed that Impax's infringement was willful and was awarded treble damages, Impax could be risking as much as $162 million for six months of sales. (CX1106 at 005; Hoxie, Tr. 2784-92).

547.   The 180-day exclusivity period starts from the day of launch.  If Impax launched at risk and then was subsequently enjoined, the 180-day exclusivity period would continue to run and Impax would forfeit that part of the 180-day exclusivity period.  (Addanki, Tr. 2380-81).

548.   Because of these economic disincentives for an at-risk launch by Impax (F. 544-547), it "was perfectly reasonable for Impax to view a launch at risk as a losing proposition." (Addanki, Tr. 2380).

### g.      Complaint Counsel's experts

549.   Although Mr. Hoxie identified risks to Impax of an at-risk launch, he did not quantify the risk to Impax from an at-risk launch, conduct a risk-benefit analysis for an at-risk launch by Impax, or evaluate the magnitude of potential lost-profit damages that Impax would have faced if it launched at risk.  (Hoxie, Tr. 2760, 2769-70, 2782-83, 2910).

550.   Mr. Hoxie did not opine that an at-risk launch would have been a reasonable risk from Impax's perspective.  (Hoxie, Tr. 2808).

551.   Professor Noll, Complaint Counsel's economic expert, did not analyze Impax's economic incentives to determine whether it was economically rational for Impax to launch at risk. (Noll, Tr. 1601-02).

552.   Professor Noll testified that an at-risk launch was a hypothetical possibility, but did not offer an opinion about whether Impax would have launched at risk or when it would have done so, and did not conduct any economic analysis to determine if a launch at risk would have been good, bad, or economically rational for Impax.  (Noll, Tr. 1600-06).

### 3.      Launch after litigation

553.   At the time of the Endo-Impax Settlement, the outcome of the Endo-Impax patent litigation was uncertain.  (RX548 (Figg Expert Report at 0030-31 ¶ 69)).

554.   The outcome of the Endo-Impax patent litigation on appeal, if there was one, was also uncertain.  (Figg, Tr. 2007-08, 2046; CX4045 (Figg, Dep. at 132); CX5007 (Hoxie Rebuttal Expert Report at 043 ¶ 79)).

555.   If Impax and Endo had not entered into the Endo-Impax Settlement, the trial in the patent litigation would have continued.  (Snowden, Tr. 400-01).

556.   Following a trial in the Endo-Impax patent litigation, the parties would have had to wait for the district court to issue findings of fact, conclusions of law, and an order.  Based on

a review of Hatch-Waxman cases from the district court of New Jersey conducted by Impax's patent litigation expert, Mr. Figg, a decision would have been issued approximately four to five months after completion of trial, in or around November 2010. (Figg, Tr. 1906-07, 2027-28).

557.    Mr. Figg is an attorney specializing in intellectual property, primarily involving the chemical, pharmaceutical, healthcare and biotechnology industries.  Mr. Figg has practiced patent law since 1978 and his principal emphasis is patent litigation.  He has served as lead counsel in numerous complex patent litigation matters, including Hatch-Waxman litigation, in federal district court and the Federal Circuit Court of Appeals.. (Figg, Tr. 1810; RX548 (Figg Expert Report at 006-08 ¶¶ 6-10)).

558.    Regardless of when the district court would have issued its decision in the Endo-Impax litigation, an appeal was likely, and would take 30 days to be docketed in the Federal Circuit Court of Appeals.  (Figg, Tr. 1908).

559.    Based on statistics maintained by the Federal Circuit and reviewed by Mr. Figg, the median time from docketing to final decision was approximately eleven months in 2010 and 2011.  Applying these statistics, Mr. Figg estimated that an appellate decision in the Endo-Impax patent litigation would have been issued in November 2011.  This estimate is "very conservative" because the median time from docketing to a final decision includes settlements and summary affirmances.  (Figg, Tr. 1908-09).

560.    The Federal Circuit is generous with briefing extensions, which increases the time it takes to receive a decision.  (Figg, Tr. 1909-10).

561.    If Impax had lost at the trial level, the "centerpiece" of the appeal would have been the trial court's claim construction ruling.  Impax would have had "substantial arguments" regarding that ruling on appeal.  (Figg, Tr. 1911-12; Hoxie, Tr. 2694).

562.    If the appellate court agreed with Impax's arguments regarding the district court's claim construction, it is likely that the appellate court would remand to the trial court for further development of the evidentiary issues.  This is because the parties would need to litigate infringement and validity under Impax's construction of the claims.  Because the trial court's claim construction ruling was in favor of Endo, Endo never developed a record that Impax infringed its patents under Impax's construction of the claims.  Absent a record on the issue of infringement and validity, the Federal Circuit would not decide these issues itself, but would instead direct such decision to the trial court via remand. (Figg, Tr. 1912-13).

563.    If the appellate court ruled in favor of Impax and remanded the case to the trial court, the evidentiary proceedings on remand would likely have taken up to 18 months to complete, and therefore would not be concluded until a date close to January 2013.  (Figg, Tr. 1914-15, 1973).

564.    If Impax had lost in the Federal Circuit, Impax would be enjoined and would not have

been able to launch its oxymorphone ER product until the expiration of the patents in September 2013. (Figg, Tr. 1915, 1973).

### E. Procompetitive Benefits

#### 1. Broad license agreement

565. In settlement negotiations with brand companies, Impax would regularly seek a broad patent license whenever it intended to launch and continue to sell its generic product indefinitely, in order to provide Impax with as much flexibility as possible. In any negotiation where the brand company tried to narrow the scope to the patents being litigated, Impax was "very firm," explaining that "this is not about the patents being litigated. This is about a product, and we want the ability to operate." (CX4026 (Nguyen, Dep. at 155-58)).

566. For Impax, every "agreement has to cover all the patent[s], not just the patent [at issue] today, but cover all future patent[s] as well . . . [O]therwise you end up with [a] launch [of] the product and still have to be under the [patent] risk, and that doesn't really help [Impax]." (CX4014 (Hsu, IHT at 116)).

567. The SLA contains a broad license agreement and a covenant not to sue that covered all patents "that would ever be owned by [Endo and Penwest] that would cover the Impax product, so the patents that existed at the time as well as future patents" were covered. (Snowden, Tr. 439; RX364 at 009).

568. Section 4.1(a) of the SLA grants Impax a license both to the "Opana ER Patents" (defined in the SLA as the '933, '456, and '250 patents and any reissuances thereof) and to "any patents and patent applications owned by Endo or Penwest . . . that cover or could potentially cover the manufacture, use, sale, offer for sale, importation, marketing or distribution of products . . . that are the subject of the Impax ANDA . . . ." (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-009-10 ¶ 35).

569. The Settlement and License Agreement identified "the patent applications (and any patents issued thereunder)" as the "Pending Applications." (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-010 ¶ 36).

570. In section 4.1(b) of the SLA, Endo provided Impax with a covenant not to sue, which prohibited Endo and its affiliates from suing Impax for patent infringement on any of the patents licensed pursuant to section 4.1(a) (F. 568-569). This provision meant that Endo could not sue Impax for infringement of Endo's patents listed in the Orange Book at the time of settlement, as well as any continuations, continuations in part, or divisions of those patents, or patent applications owned or controlled by Endo that could cover the product described in Impax's ANDA for original Opana ER. (RX364 at 0010 (SLA); *see also* Figg, Tr. 1964; Hoxie, Tr. 2885).

## 2. Endo's additional patents and patent litigation

571. After entering into the SLA, Endo obtained additional patents and patent licenses that it has asserted cover both original and reformulated Opana ER (the "after-acquired patents"). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-012 ¶ 55).

572. At the time of the Endo-Impax Settlement, some of the after-acquired patents (F. 571) were pending and it was uncertain whether any new patents would issue. (Snowden, Tr. 440, 442-43; CX3455 at 022-23).

### a. The Johnson Matthey Patent

573. Endo acquired its first post-settlement patent – U.S. Patent No. 7,851,482 – from Johnson Matthey in March 2012 (the "Johnson Matthey patent"). (Snowden, Tr. 442-43; RX127; Addanki, Tr. 2362; Figg, Tr. 1949).

574. The Johnson Matthey patent addressed a process for making a purified type of oxymorphone and was issued in December 2010. (Snowden, Tr. 443; CX4017 (Levin, Dep. at 150-51); CX3329 at 006).

### b. The '060, '122, and '216 patents and New York litigation

575. The Patent and Trademark Office issued U.S. Patent Nos. 8,309,060 and 8,309,122 to Endo on November 13, 2012 ("the '060 and '122 patents"). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-012 ¶ 56).

576. The Patent and Trademark Office issued U.S. Patent No. 8,329,216 to Endo on December 11, 2012 ("the '216 patent"). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-012 ¶ 57).

577. In December 2012, Endo began asserting the '060, '122, and '216 patents against drug manufacturers seeking to market generic versions of both original and reformulated Opana ER. At that time, Endo did not assert these patents against Impax's generic version of original Opana ER. Endo did, however, assert these patents against Impax's generic version of reformulated Opana ER, as to which Impax had filed an ANDA. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-012-13 ¶ 58; Snowden, Tr. 440-41, 444-45).

578. In August 2015, the district court for the southern district of New York held that the '122 and '216 patents were not invalid and were infringed by other companies' generic versions of original Opana ER and by generic versions of reformulated Opana ER, including Impax's version of reformulated Opana ER. The court issued an injunction barring all defendants except Impax from selling their generic versions of original Opana

ER until 2023. That ruling is currently on appeal to the Federal Circuit. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-013 ¶ 62; Snowden, Tr. 444-45).

### c.    The '737 and '779 patents and Delaware litigation

579.  The U.S. Patent and Trademark Office issued U.S. Patent No. 8,808,737 to Endo on August 19, 2014 ("the '737 patent"). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-013 ¶ 59).

580.  The U.S. Patent and Trademark Office issued U.S. Patent No. 8,871,779 on October 28, 2014 ("the '779 patent"). (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-013 ¶ 60).

581.  Endo also acquired an exclusive field-of-use license to U.S. Patent No. 8,871,779 from Mallinckrodt. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-013 ¶ 61).

582.  The '779 patent specifies the maximum levels of impurity that can be contained in the active pharmaceutical ingredient for generic Opana ER. (Figg, Tr. 1965).

583.  Endo asserted the '737 and '779 patents in litigation in the district court of Delaware against drug manufacturers seeking to market both original and reformulated Opana ER. (Snowden, Tr. 450-51).

584.  Endo did not assert these patents (F. 583) against Impax's generic version of original Opana ER because of the SLA's broad license provision, but did assert them with respect to Impax's ANDA for a generic version of reformulated Opana ER. (Snowden, Tr. 450).

585.  In November 2015, the federal district court in Delaware held that the '737 patent was invalid. The ruling is currently on appeal to the Federal Circuit. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-013 ¶ 63).

586.  In October 2016, the federal district court in Delaware held that the '779 patent was not invalid and was infringed by a generic version of reformulated Opana ER. That ruling is currently on appeal to the Federal Circuit. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-013 ¶ 64; *see* Snowden, Tr. 441).

587.  In August 2017, the district court in Delaware ruled that the '779 patent was not invalid following a bench trial against certain ANDA filers. In September 2017, Judge Andrews entered a final order, enjoining all defendants from selling generic Opana ER until the patents expire in 2029. (Second Set of Joint Stipulations, JX003 ¶¶ 56, 58; RX544; RX575).

588.  The '779 patent expires in 2029. (Snowden, Tr. 451).

#### d. The Endo v. Impax New Jersey litigation

589. On May 4, 2016, Endo filed a lawsuit against Impax in federal district court in New Jersey, alleging that Impax was in breach of the SLA for failing to negotiate with Endo in good faith a royalty for three after acquired patents – the '122, '216 and '737 patents. Endo included claims for patent infringement in its complaint, predicated on the alleged breach and termination of the contract, which would have terminated Impax's license under the SLA. (CX2976; Figg, Tr. 2050-51).

590. On August 5, 2017, Endo and Impax resolved the New Jersey litigation (F. 589) regarding the breach of the SLA by entering into a Contract Settlement Agreement. (CX3275).

591. The August 5, 2017 Contract Settlement Agreement (F. 590) includes █████████ ████████████████████████████████████████████████████████. (CX3275 at 011-15, *in camera*).

### 3. Effect of the broad license agreement

592. The broad patent license and covenant not to sue provided in the SLA (collectively, the "broad patent license" or "broad license agreement") gave Impax freedom to operate "[u]nder both the litigated patents as well as future patents that Endo might obtain in this area." (Figg, Tr. 1936-37).

593. The broad license agreement in the SLA gave Impax protection against any future patents being asserted against Impax and potentially preventing continued sales of Impax's generic version of original Opana ER. (Addanki, Tr. 2376).

594. The January 2013 entry date and the broad license agreement in the SLA allowed Impax to launch its product eight months before the original patents expired and sixteen years before the after-acquired patents expired, and to "continue with the sale of that product right up to the present day because . . . Endo did not sue Impax for infringement of the second wave patents or the third wave patents for the original Opana ER product." (Figg, Tr. 1971-72; *see* Noll, Tr. 1674).

595. Although every other Opana ER ANDA filer settled patent claims asserted by Endo related to Opana ER, no other drug manufacturer negotiated rights to future Opana ER patents similar to the broad license agreement that Impax obtained in the SLA. (RX441; RX442; RX443; CX3192; *see* Snowden, Tr. 440; Figg, Tr. 1939-40, 1947; Hoxie, Tr. 2714, 2886).

596. Taken together, Endo's acquisition and litigation of additional patents (F. 575-588) has led to all generic manufacturers other than Impax being enjoined from selling a generic version of Opana ER until Endo's patents expire. Impax's product is the only generic Opana ER available to consumers. (Snowden, Tr. 440-42).

597. Impax has sold generic Opana ER without interruption since launching its product in January 2013.  (Snowden, Tr. 476).

598. Impax's product is now the only oxymorphone ER product available to consumers.  (Second Set of Joint Stipulations, JX003 ¶ 59; Figg, Tr. 1972).

599. Complaint Counsel's economic expert, Professor Noll, admits that consumers are better off today because Impax is selling oxymorphone ER.  (Noll, Tr. 1669).

600. The "real-world effect" of the SLA is that "there is a product on the market and available to consumers today that would not be there had Impax not had the foresight to negotiate licenses to future patents."  (Figg, Tr. 1975-76).

EXHIBIT B-2

## III.    ANALYSIS

### A.    Overview of the Case

This is the FTC's first administrative enforcement action challenging an alleged reverse payment patent settlement agreement since the Supreme Court's decision in *FTC v. Actavis*, 133 S. Ct. 2223 (2013).  A reverse payment settlement refers to when a patent holder sues another company for patent infringement and the patent litigation is settled with a payment from the patent holder to the claimed infringer and an agreement from the claimed infringer to stay out of the market until a certain date.  *In re Lipitor Antitrust Litig*., 2018 U.S. App. LEXIS 93, *5-6 (3rd Cir. Jan. 3, 2018).  A distinguishing feature of a reverse payment settlement is that the period in which the patent challenger agrees to stay out of the market falls within the term of the patent at issue, when the patent holder would normally enjoy a government-conferred monopoly. *Id.* at *6.  "[M]ost if not all reverse payment settlement agreements arise in the context of pharmaceutical drug regulation, and specifically in the context of suits brought under statutory provisions allowing a generic drug manufacturer (seeking speedy marketing approval) to challenge the validity of a patent owned by an already-approved brand-name[15] drug owner." *Actavis*, 133 S. Ct. at 2227.

Prior to 2013, the federal courts of appeal disagreed as to how to assess the legality of reverse payment settlement agreements.  Some circuits followed the "scope-of-the-patent" test, which held that "absent sham litigation or fraud in obtaining the patent, a reverse payment settlement is immune from antitrust attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of the patent."  *FTC v. Watson Pharms., Inc.*, 677 F.3d 1298, 1312 (11th Cir. 2012); *accord In re Ciprofloxacin Hydrochloride Antitrust Litig.* ("*Cipro*"), 544 F.3d 1323, 1336 (Fed. Cir. 2008); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 212-13 (2d Cir. 2006).  The Third Circuit, in *In re K-Dur Antitrust Litigation*, held that reverse payment settlement agreements were presumed unlawful, although the presumption could be rebutted by showing that the payment (1) was for a purpose other than delayed entry or (2) offered some pro-competitive benefit.  686 F.3d 197, 218 (3d Cir. 2012), *vacated by, remanded by Merck & Co. v.*

---

[15] The terms "brand-name drugs," "branded drugs," or "brand drugs" are used interchangeably by the courts and the parties and in this Initial Decision.

*La. Wholesale Drug Co.*, 133 S. Ct. 2849 (2013), *Upsher-Smith Labs., Inc. v. La. Wholesale Drug Co.*, 133 S. Ct. 2849 (2013). The Supreme Court, in *FTC v. Actavis*, resolved the split in the circuit courts, holding that reverse payment patent settlements are not immune from antitrust scrutiny, anticompetitive effects should not be presumed from the presence of a reverse payment alone, and that reverse payment settlements are to be evaluated under the rule of reason, as more fully explained in Section III.B.2, below.

Antitrust inquiries "must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 411 (2004). The distinctive features of the pharmaceutical industry provide the context for assessing the agreement challenged in this case.

### 1. The Hatch-Waxman Act

The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*., as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 21 U.S.C. §§ 355(b)(2) and 355(j) and 35 U.S.C. § 271(e), establishes procedures designed to facilitate competition from lower-priced generic drugs, while maintaining incentives for pharmaceutical companies to invest in developing new drugs.

A company seeking to market a new pharmaceutical product must file a New Drug Application ("NDA") with the U.S. Food and Drug Administration ("FDA"), demonstrating the safety and efficacy of the new product. 21 U.S.C. § 355. Pursuant to the Hatch-Waxman Act, the FDA requires a company seeking to market a new pharmaceutical product to identify any patents that the company believes reasonably could be asserted against a generic company that makes, uses, or sells a generic version of the branded product. *See* 21 U.S.C. §§ 355(b)(1) and (c)(2); 21 C.F.R. §§ 314.53(b) and (c)(2). These patents are listed in an FDA publication titled, "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book"). *See King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 395 (3d Cir. 2015).

A company seeking to market a generic version of a branded drug may file an Abbreviated New Drug Application ("ANDA") with the FDA. 21 U.S.C. § 355(j); *Actavis*, 133 S. Ct. at 2228. The generic applicant must demonstrate that its generic drug is therapeutically equivalent to the brand-name drug that it references and for which it seeks to be a generic substitute. *Id.* When the brand-name drug is covered by one or more patents listed in the Orange Book, a company seeking to market a generic version before the patents expire must make a "Paragraph IV certification" in its ANDA certifying that the listed patents are invalid, unenforceable, and/or will not be infringed by the generic drug. *Id.* If a company makes a Paragraph IV certification, it must notify the patent holder of the filing of its ANDA. *King Drug*, 791 F.3d at 395 n.7.

If the brand-name drug company initiates a patent infringement suit within 45 days of an ANDA filing, the FDA must withhold approval of the generic drug for at least 30 months while the parties litigate the validity or infringement of the patent. *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 241 (3d Cir. 2017), *cert. denied,* 138 S. Ct. 983, 984 (2018) (citing *Actavis*, 133 S. Ct. at 2228; 21 U.S.C. § 355(j)(5)(B)(iii)). If a court decides the infringement claim within this 30-month period, then the FDA will follow that determination. *Id.* However, if the litigation is still proceeding at the end of the 30-month period, the FDA may give its approval to the generic drug manufacturer to begin marketing a generic version of the drug. *Id.* The generic manufacturer then has the option to launch "at risk," meaning that, if the ongoing court proceeding ultimately determines that the patent was valid and infringed, the generic manufacturer will be liable for the brand-name manufacturer's lost profits despite the FDA's approval. *Id.* (citing *King Drug*, 791 F.3d at 396 n.8).

The Hatch-Waxman framework grants the first company to file a Paragraph IV certification ("first filer") a 180-day period of market exclusivity, beginning on the first day of its commercial marketing. *Actavis*, 133 S. Ct. at 2229. The FDA may not grant final approval to any subsequent ANDA filer until the first filer's exclusivity period expires or is forfeited. *Id.* "If the first-to-file generic manufacturer can overcome any patent obstacle and bring the generic to market, this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars.'" *Id.* (citation omitted).

Although the 180-day exclusivity period enables the first filer to sell its product without competition from other generic companies, it does not prevent the brand-name drug manufacturer from selling its own "authorized generic." *King Drug*, 791 F.3d at 393. An authorized generic, or "AG," is a non-branded version of a brand-name drug that is produced by the brand-name company itself. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 158 n.37 (3d Cir. 2017). Brand-name companies often introduce AGs to recoup some of the losses they face once a generic drug has entered the market. *See King Drug*, 791 F.3d at 405.

### 2. Generic drug competition

Generic drugs are unique sources of competition for their brand-name drug counterparts. *See New York v. Actavis PLC*, 787 F.3d 638, 655-56 (2nd Cir. 2015). Generic drugs that are "therapeutically equivalent" to their brand-name counterpart receive an "AB" rating from the FDA. An AB-rated generic drug is the same as a brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use. F. 14. A generic drug must also contain identical amounts of the same active ingredient(s) as the brand-name drug, although its inactive ingredients may vary. F. 14.

An AB-rated generic drug may be automatically substituted for the brand-name drug at the pharmacy counter. F. 29. All 50 states and the District of Columbia have enacted laws that either permit or require a pharmacist to substitute an AB-rated generic drug for the brand-name drug, unless a physician directs or the patient requests otherwise. F. 29.

Generic manufacturers typically charge lower prices than branded drug sellers. F. 31 (The first one or two generic products are typically offered at a 10% to 25% discount to the branded product. Subsequent generic entry creates greater price competition, which typically leads to discounts between 50% to 80% off the brand price). Automatic substitution of the generic drug for the branded drug is the primary way that generic drug companies make their sales. F. 32. Because of the price advantages of generic drugs over branded drugs, many third-party payors of prescription drugs (e.g., health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their branded counterparts. F. 30.

### 3.     Endo-Impax patent litigation and settlement

The FTC's Complaint challenges the agreement entered into between Respondent Impax Laboratories, Inc. ("Impax" or "Respondent") and Endo Pharmaceuticals Inc. ("Endo") to settle patent litigation brought by Endo against Impax ("Endo-Impax patent litigation"). The Endo-Impax patent litigation arose in connection with Endo's branded product, Opana ER.

Opana ER is an extended release form of oxymorphone hydrochloride marketed for the relief of moderate to severe pain. F. 46. Endo's NDA for Opana ER was approved by the FDA in June 2006, and Endo launched the product the following month.[16] F. 46-47. In October 2007, Endo listed three additional patents in the Orange Book as covering Opana ER: U.S. Patent Nos. 7,276,250 ("the '250 patent"), 5,662,933 ("the '933 patent"), and 5,958,456 ("the '456 patent"). F. 51-53.

In November 2007, Impax filed an ANDA seeking to market a generic version of Opana ER and submitted a Paragraph IV certification certifying that Endo's patents were not valid and/or would not be infringed by Impax's generic drug. F. 58-59. Impax was the first to file an ANDA for the 5, 10, 20, 30, and 40 milligram ("mg") dosage strengths of Opana ER. F. 173. Thus, Impax was entitled, upon obtaining FDA approval, to a 180-day period of exclusivity for those dosage strengths without competition from other ANDA filers. F. 174.

On January 25, 2008, Endo sued Impax, alleging that Impax's ANDA for generic oxymorphone ER infringed Endo's '456 and '933 patents. F. 61. This suit triggered the statutory 30-month stay, meaning that the FDA could not approve Impax's ANDA until the earlier of the expiration of 30 months or resolution of the patent dispute in Impax's favor. F. 62. The 30-month stay was set to expire on June 14, 2010. F. 63.

After Impax filed its ANDA, other generic companies, including Actavis South Atlantic LLC ("Actavis"), filed ANDAs seeking to market generic versions of Opana ER before the expiration of Endo's patents. F. 82, 84. Endo sued each ANDA filer for alleged patent infringement. F. 83, 85-86.

---

[16] When Endo launched Opana ER in 2006, it only listed a single patent in the Orange Book as covering Opana ER, U.S. Patent No. 5,128,143 ("the '143 patent"). F. 49. The '143 patent was set to expire in September 2008. F. 50.

On May 13, 2010, a month before the 30-month stay was set to expire, the FDA granted tentative approval to Impax's ANDA.  F. 63-64.  Impax received final approval on the 5, 10, 20, and 40 mg dosage strengths of generic Opana ER on June 14, 2010, upon expiration of the statutory 30-month stay, and was granted final approval by the FDA for the 30 mg dosage strength on July 22, 2010.  F. 66-67.  Pursuant to the Hatch-Waxman framework, once Impax received final approval from the FDA, Impax had the option to launch its generic oxymorphone ER product "at risk."  F. 66-67, 451-452.

On June 3, 2010, the trial in the patent litigation between Endo and Impax began.  F. 73.  The parties settled the patent litigation on June 8, 2010 by entering into two agreements:  a Settlement and License Agreement ("SLA") and (2) a Development and Co-Promotion Agreement ("DCA") (collectively, the "Endo-Impax Settlement" or the "Challenged Agreement").  F. 74.  The DCA was executed simultaneously with the SLA and is incorporated into the SLA.  F. 75, 245.

In summary, pursuant to the SLA, Endo granted Impax a license to the '933, '456, and '250 patents, as well as any additional patents then pending or subsequently issued that could cover Impax's generic oxymorphone ER product ("licensed patents"), and Impax agreed not to launch its generic oxymorphone product before January 1, 2013.  F. 124-125.  Endo also agreed not to sue Impax for patent infringement with respect to any of the licensed patents.  F. 126.  In addition, Endo agreed in the SLA that Impax's license to sell generic Opana ER would be exclusive during Impax's 180-day first-filer exclusivity period, meaning that Endo agreed not to sell an authorized generic for Opana ER (in the five dosage strengths covered by Impax's ANDA) until Impax's 180-day exclusivity period ended (the "no-AG provision").  F. 127.  Furthermore, pursuant to a provision titled "Endo Credit," Endo would be obligated to make a cash payment to Impax in the event Endo's Opana ER dollar sales fell by more than 50% of their quarterly peak, prior to Impax's entering the market with its generic drug.  F. 129.  In addition, the SLA obligated Impax to pay Endo a 28.5% royalty on Impax's generic Opana ER sales during Impax's 180-day exclusivity period in the event that sales of Opana ER grew by a specific percentage.  F. 128.

Under the DCA, Impax and Endo agreed to collaborate with respect to the development and marketing of a potential treatment for Parkinson's disease, IPX-203. F. 244, 246. Endo agreed to make an upfront payment to Impax of $10 million and to make additional "milestone payments" for achieving specified milestone events in the development and commercialization of the product. F. 247-248. If the product was successfully commercialized, Endo would be entitled to a share of the profits resulting from prescriptions by non-neurologists. F. 250. While Endo agreed to take on some of the costs for the development of IPX-203, with a cap on its contributions based on accomplished milestones, Impax was responsible for all IPX-203 development work. F. 248, 365-366.

### B.    Overview of Applicable Law

#### 1.    Introduction

The Complaint charges that the Endo-Impax Settlement constitutes an agreement to restrain competition and is an unfair trade practice in violation of Section 5(a) of the FTC Act. Complaint ¶¶ 101, 102.[17]  The FTC Act's prohibition of unfair methods of competition encompasses violations of Section 1 of the Sherman Act. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 762 & n.3 (1999). "[T]he analysis under § 5 of the FTC Act is the same . . . as it would be under § 1 of the Sherman Act." *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 32 (D.C. Cir. 2005); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 451-52 (1986). Accordingly, Sherman Act jurisprudence is appropriately relied upon in determining whether challenged conduct violates Section 5 of the FTC Act. *Cal. Dental Ass'n*, 526 U.S. at 762 n.3; *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 824 (6th Cir. 2011).

---

[17] Section 5(a)(2) of the FTC Act gives the Commission jurisdiction "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce . . . ." 15 U.S.C. § 45(a)(2); *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1327 n.2 (7th Cir. 1981). Respondent develops, manufactures, and markets pharmaceutical drugs. F. 3. Respondent is a corporation, as "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Respondent's challenged activities relating to the sale of pharmaceutical drugs are in or affect commerce in the United States, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44. F. 1-5. The parties have stipulated that the FTC has jurisdiction over the subject matter of this proceeding and over Respondent Impax. (Joint Stipulations of Jurisdiction, Law, Fact, and Authenticity, JX001-002 ¶ 7). Thus, the Commission has jurisdiction over Respondent and the subject matter of this proceeding, pursuant to Section 5 of the FTC Act.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ."  15 U.S.C. § 1.[18]  Despite its broad language, the ban on contracts in restraint of trade extends only to unreasonable restraints of trade, i.e., restraints that unreasonably restrain competition.  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

### 2.  Antitrust scrutiny of reverse payment settlements: *Actavis*

In *Actavis*, the Supreme Court held that reverse payment patent settlements are not immune from antitrust scrutiny, can sometimes violate the antitrust laws, and are to be evaluated under the rule of reason.  By way of background, the FTC's complaint in *Actavis* had alleged that the defendants violated Section 5 of the FTC Act "by unlawfully agreeing 'to share in [the brand-name drug manufacturers'] monopoly profits, abandon their patent challenges, and refrain from launching their low-cost generic products to compete with [the brand-name drug] for nine years.'"  *Actavis*, 133 S. Ct. at 2230 (citation omitted).  The district court held that the allegations did not set forth an antitrust law violation, and dismissed the complaint.  *In re Androgel Antitrust Litig., (No. II)*, 687 F. Supp. 2d 1371, 1379 (N.D. Ga. 2010).

On appeal by the FTC, the Court of Appeals for the Eleventh Circuit affirmed.  *Watson Pharms.*, 677 F.3d 1298.  The appellate court held that patent holders have a "lawful right to exclude others from the market," and that a patent "conveys the right to cripple competition."  *Id.* at 1307, 1310 (internal quotation marks omitted).  The appellate court further reasoned that the public policy in favor of settling litigation weighs against requiring parties to continue to litigate in order to avoid any antitrust liability.  *Id.* at 1313-14.  *See also e.g., Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1072 (11th Cir. 2005) (stating that "[t]he general policy of the law is to favor the settlement of litigation, and the policy extends to the settlement of patent infringement suits"); *Cipro*, 544 F.3d at 1333 (highlighting the "long-standing policy in the law in favor of settlements, . . . [which] extends to patent infringement litigation").

---

[18] There is no dispute in this case that there was a contract, combination, or conspiracy.  The patent litigation between Endo and Impax relating to Impax's generic Opana ER was settled by agreement of the parties on June 8, 2010.  F. 74.  "[C]oncerted action may be amply demonstrated by an express agreement."  *United States v. Delta Dental*, 943 F. Supp. 172, 175 (D.R.I. 1996).

The Supreme Court reversed the lower court's dismissal of the FTC's complaint, holding that "reverse payment settlements . . . can sometimes violate the antitrust laws." *Actavis*, 133 S. Ct. at 2227. It rejected the appellate court's scope-of-the-patent test, reasoning that "to refer . . . simply to what the holder of a valid patent could do does not by itself answer the antitrust question. The patent . . . may or may not be valid, and may or may not be infringed." *Id.* at 2230-31. Thus, even though a patent, if valid and infringed, would confer a right to charge supracompetitive prices and exclude competitors, this fact does not "immunize the agreement from antitrust attack." *Id*. at 2230. Rather, "patent and antitrust policies are both relevant in determining the 'scope of the patent monopoly' – and consequently antitrust law immunity – that is conferred by a patent." *Id.* at 2231. The question of antitrust legality can be answered by "considering traditional antitrust factors such as likely anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances, such as here those related to patents." *Id.* at 2231. Furthermore, the Supreme Court held that the fear "that antitrust scrutiny of a reverse payment agreement would require the parties to litigate the validity of the patent in order to demonstrate what would have happened to competition in the absence of the settlement," should not be determinative. *Id*. at 2234.

The Court stated that "five sets of considerations lead [the Court] to conclude that the FTC should have been given the opportunity to prove its antitrust claim": (1) reverse payment settlements have the "potential for genuine adverse effects on competition"; (2) such anticompetitive consequences "will at least sometimes prove unjustified"; (3) patent holders often possess market power; (4) litigating patent validity may not be necessary in order to determine whether a settlement is legal under antitrust laws, as "large and unexplained" reverse payment settlements indicate that the patent holder has doubts about the patent's ability to withstand scrutiny; and (5) parties can still settle patent litigation, despite the risk of antitrust scrutiny, by avoiding reverse payment settlements. *Actavis*, 133 S. Ct. at 2234-37.

Regarding the "potential for genuine adverse effects on competition," the Court explained that a reverse payment settlement can amount to "a purchase by the patentee of the exclusive right to sell its product, a right it already claims but would lose if the patent litigation were to continue and the patent were held invalid or not infringed by the generic product." *Id.* at 2234.

88

In such case, the patent holder loses any supracompetitive profits it would have obtained for the remaining life of the patent, which "then would flow in large part to consumers in the form of lower prices." *Id.*

However, a settlement that provides a "payment in return for staying out of the market – simply keeps prices at patentee-set levels, . . . while dividing that return between the challenged patentee and the patent challenger." *Id.* at 2234-35. In that instance, "[t]he patentee and the challenger gain; the consumer loses." *Id.* at 2235. The Court was clear that the relevant anticompetitive harm potentially posed by reverse payment settlements is that the payment is used by the patent holder to avoid the risk of patent invalidation and the resulting generic competition that such patent invalidation would enable. *Id.* at 2236. *See also id.* (stating that the relevant "anticompetitive consequence" is the patent holder's agreement to share supracompetitive profits with the patent challenger, "rather than face what might have been a competitive market . . .").

In addition, the Court reasoned that a large and unexplained payment suggests that "the patentee has serious doubts about the patent's survival." *Id*. at 2236. The Court therefore rejected the notion that it would necessarily be required to litigate the validity of the patent in order to resolve the antitrust claim, stating that "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself." *Id.* at 2236-37 (citing 12 Areeda ¶ 2046, at 350-52).

The Court summarized the considerations supporting antitrust scrutiny of reverse payment settlements as follows:

> In sum, a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects; one who makes such a payment may be unable to explain and to justify it; such a firm or individual may well possess market power derived from the patent; a court, by examining the size of the payment, may well be able to assess its likely anticompetitive effects along with its potential justifications without litigating the validity of the patent; and parties may well find ways to settle patent disputes without the use of reverse payments. In our view, these considerations, taken together, outweigh the single strong

consideration – the desirability of settlements – that led the Eleventh Circuit to provide near-automatic antitrust immunity to reverse payment settlements.

*Id.* at 2237.

Finally, the Court expressly rejected the FTC's argument that reverse payment settlement agreements "are presumptively unlawful and that courts reviewing such agreements should proceed via a 'quick look' approach, rather than applying a 'rule of reason.'" *Id.* at 2237. "That is because the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Id.*

### 3. Rule of reason framework generally

*Actavis* holds that the rule of reason applies to evaluating the legality of a reverse payment settlement agreement. 133 S. Ct. at 2237. The rule of reason inquiry asks "whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 343 (1982). A full rule of reason analysis may include an analysis of "'the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.'" *Realcomp*, 635 F.3d at 825 (citations omitted).

"'[T]here is always something of a sliding scale in appraising reasonableness,' [and] 'the quality of proof required should vary with the circumstances.'" *Cal. Dental Ass'n*, 526 U.S. at 780 (quoting 7 Areeda ¶ 1507, at 402 (1986)); *Actavis*, 133 S. Ct. at 2237-38. *See also Cal. Dental Ass'n*, 526 U.S. at 781 (holding that rule of reason analysis looks to "the circumstances, details, and logic of a restraint"). As the Court indicated in *Actavis*, trial courts should "structure antitrust litigation so as to avoid, on the one hand, the use of antitrust theories too abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or theory irrespective of the minimal light it may shed on the basic question – that of the presence of significant unjustified anticompetitive consequences." *Actavis*, 133 S. Ct. at 2238.

90

Under the traditional burden-shifting framework of the rule of reason, the plaintiff bears the initial burden of proving that the challenged agreement "produced adverse, anti-competitive effects within the relevant product and geographic markets." *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). *See also Cipro*, 544 F.3d at 1331-32 (The first step in a rule of reason analysis is for the plaintiff to show that the challenged action has had an actual adverse effect on competition in the relevant market.); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004) (same).

The burden of proving anticompetitive effects in a traditional rule of reason case may be met by proving actual anticompetitive effects in the relevant market, or by "an indirect showing based on a demonstration of defendant's market power, which when combined with the anticompetitive nature of the restraints, provides the necessary confidence to predict the likelihood of anticompetitive effects." *In re Realcomp II, Ltd.*, 2009 FTC LEXIS 250, at *90 (Oct. 30, 2009) (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (plaintiff has "two independent means by which to satisfy the adverse-effect requirement" – direct proof of "actual adverse effect on competition" or "indirectly by establishing . . . sufficient market power to cause an adverse effect on competition"); *Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998) ("[P]laintiff may establish anticompetitive effect indirectly by proving that the defendant possessed the requisite market power within a defined market or directly by showing actual anticompetitive effects.").

If the plaintiff meets its burden of demonstrating anticompetitive effects, the burden shifts to the defendant to prove procompetitive justifications for the challenged restraint. *Realcomp*, 635 F.3d at 825; *Polygram*, 416 F.3d at 36. "If the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner." *Law*, 134 F.3d at 1019. "Ultimately, if these steps are met, the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable." *Id*. The plaintiff bears the overall burden of establishing that the challenged restraints "engendered a net harm" to competition in the relevant market. *Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 957-58 (9th Cir. 2000).

91

### 4.       Reverse payment cases

A number of courts have addressed the structure for a rule of reason analysis in the reverse payment context, but with somewhat inconsistent results.  *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 669 (D. Conn. 2016) (noting that "[v]arious district courts have struggled to fill the gaps that *Actavis* left open, and not always with consistent results.")  Moreover, these courts have opined on a rule of reason framework in the context of motions to dismiss and motions for summary judgment, but have not been called upon to apply the rule of reason to a complete evidentiary record developed after trial.[19]

The Court of Appeals for the Third Circuit described a rule of reason framework in *King Drug*, stating:

> The *Actavis* Court provided initial guidance on how to structure rule-of-reason litigation in the reverse payment context.  The Court explained that such antitrust questions must be answered "by considering traditional antitrust factors such as likely anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances, such as here those related to patents."  *Actavis,* 133 S. Ct. at 2231.

> First, to prove anticompetitive effects, the plaintiff must prove payment for delay, or, in other words, payment to prevent the risk of competition.  "[T]he likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification."  *Actavis*, 133 S. Ct. at 2237.

> Second, the burden then shifts to the defendant to show "that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason."  *Id.* at 2235-36. The reverse payment, for example, may amount to no more than a rough approximation of the litigation expenses saved through the settlement.  That payment may reflect compensation for other services that the generic has promised to perform – such as distributing the patented item or helping to develop a market for that item. There may be other justifications.  *Id.* at 2236.  The Court

---

[19] *In re Nexium (Esomeprazole) Antitrust Litigation*, which was a private cause of action, appears to be the first post-*Actavis* case to be submitted to a jury.  *See Am. Sales Co., LLC v. AstraZeneca LP (In re Nexium (Esomeprazole) Antitrust Litig.)*, 842 F.3d 34, 39 (1st Cir. 2016).  The appellate court's review of the special verdict form provided to the jury does not clearly address the elements of a rule of reason analysis, for purposes of the instant case.  *Nexium*, 842 F.3d at 50, 60 (holding that jury's answers to special verdict form questions on market power, "large and unjustified" payment, and anticompetitive effects, indicated jury found an antitrust violation).

does not foreclose other justifications, and we need not decide today what those
other justifications might be.

Finally, the plaintiff will have the opportunity to rebut the defendant's
explanation.

791 F.3d at 412.  The court remanded to the district court "to proceed with the litigation under
the traditional rule of reason, tailored, as necessary, to the circumstances of th[e] case."  *Id.*

In *In re K-Dur Antitrust Litigation*, 2016 U.S. Dist. LEXIS 22982 (D.N.J. Feb. 25, 2016),
after examining *Actavis* and subsequent cases, the court adopted the following burden-shifting
framework:

"To make out a prima facie case that a challenged agreement is an unlawful
restraint of trade, a plaintiff must show the agreement contains both a limit on the
generic challenger's entry into the market and compensation from the patentee to
the challenger.  The defendants bear the burden of . . . coming forward with
evidence of litigation costs or valuable collateral products or services that might
explain the compensation; if the defendants do so, the plaintiff has the burden of
demonstrating the compensation exceeds the reasonable value of these.  If a prima
facie case has been made out, the defendants may come forward with additional
justifications to demonstrate the settlement agreement nevertheless is
procompetitive.  A plaintiff who can dispel these justifications has carried the
burden of demonstrating the settlement agreement is an unreasonable restraint of
trade . . . ."

*Id.* at *46 (quoting *In re Cipro Cases I & II*, 348 P.3d 845, 871 (Cal. 2015)).  *See also K-Dur*,
2016 U.S. Dist. LEXIS 22982, at *44 ("[T]he burden must be on Plaintiffs to show that the
settlement delayed the generic company's entry onto the market, that the brand-name company
paid the generic company consideration of some kind, and that the consideration exchanged in
the settlement exceeded the estimated cost of litigation and the costs of other services and
products, in order to establish a prima facie case.").

The approach in *In re Nexium*, 42 F. Supp. 3d 231, 262-63 (D. Mass 2014), is somewhat
similar to that of *K-Dur*.  The court in *Nexium,* evaluating a motion for summary judgment, held
that, for the initial burden, the plaintiff must present evidence that the brand-name manufacturer
"made a payment to a generic manufacturer that exceeded anticipated future litigation costs,
exceeded the costs of other services, and lacked 'any other convincing justification.'"  *Id*. at 262

(quoting *Actavis*, 133 S. Ct. at 2237).  Once this showing is made, the burden then shifts to the

defendant to show a justification for the payment, "such as avoided litigation costs or fair value

for services . . . ." *Id*. (quoting *Actavis*, 133 S. Ct. at 2236).  If the defendant justifies the

payment, then "the burden shifts back to the [p]laintiff[] to establish, under the rule of reason,

that the settlement is nevertheless anticompetitive on balance." *Id*. at 262-63.

Incorporating elements of both *King Drug* and *Nexium*, the district court in *In re Loestrin*

*24 Fe Antitrust Litigation*, 261 F. Supp. 3d 307 (D.R.I. Aug. 8, 2017), held that the rule of reason

in a reverse payment case is applied in a three-step process:

> [A] plaintiff must first "prove anticompetitive effects," by demonstrating "a
> payment for delay, or, in other words, payment to prevent the risk of
> competition." *King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d
> 388, 412 (3d Cir. 2015) ("*Lamictal*"), cert. denied, 137 S. Ct. 446, 196 L. Ed. 2d
> 328 (2016) (citing *Actavis*, 133 S. Ct. at 2235-36).  "[T]he likelihood of a reverse
> payment bringing about anticompetitive effects depends upon its size, its scale in
> relation to the payor's anticipated future litigation costs, its independence
> from other services for which it might represent payment, and the lack of any
> other convincing justification." *Actavis*, 133 S. Ct. at 2237.  Second, if the
> plaintiffs satisfy the first step, "the burden then shifts to the [d]efendants to show
> that a challenged payment was justified by some precompetitive objective"; and
> third, "the burden shifts back to the [p]laintiffs to establish, under the rule of
> reason, that the settlement is nevertheless anticompetitive on balance." *In re
> Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 262-63 (D. Mass.
> 2014) ("*Nexium II*").

*Id*. at 329.

The district court in *King Drug Company of Florence v. Cephalon*, *Inc.* ("*Cephalon*"), 88

F. Supp. 3d 402 (E.D. Pa. 2015), adopted a somewhat different approach.  There, the court held

that in order to meet the initial burden of proving anticompetitive effects, the plaintiff must

demonstrate that the brand-name company made a "large" payment in the settlement agreement

and that the brand-name company had market power.  *Id*. at 414.  The court held that, for

purposes of avoiding summary judgment, a payment is sufficiently "large" if there is evidence

that the payment exceeded saved litigation costs and a reasonable jury could find that the

payment was significant enough to induce the generic company to stay off the market.  *Id*. at

417.  If the plaintiff meets this burden, the burden shifts to the defendant to demonstrate

94

procompetitive justifications for the reverse payment. *Id.* at 416. The plaintiff "must then rebut those justifications and establish that the 'restraint is not reasonably necessary to achieve the stated objective.'" *Id.* "If the plaintiff provides evidence to rebut the defendant's justifications, the fact-finder will then weigh the anticompetitive and procompetitive effects, as in other rule of reason cases." *Id.*

### 5. Contentions of the parties as to structure for rule of reason analysis

Complaint Counsel acknowledges that it has the initial burden of proving anticompetitive effects. CCB at 21. Complaint Counsel contends that it meets its initial burden by proving that Endo induced Impax to accept a share of Endo's monopoly profits in exchange for staying out of the market. Complaint Counsel urges that this is demonstrated by proof that: (1) Endo made a large reverse payment to Impax; and (2) Endo possessed market power. CCB at 23-24, citing *Cephalon*. According to Complaint Counsel, if it proves a large payment and market power, the burden then shifts to Respondent to prove a "legitimate, cognizable justification" for the payment. CCB at 28. Complaint Counsel contends next that if Respondent fails to justify the reverse payment, the antitrust inquiry ends and the agreement is condemned. If Respondent justifies the reverse payment, according to Complaint Counsel, Complaint Counsel may prevail by showing that the reverse payment was not reasonably necessary to achieve the stated objectives, and only if Complaint Counsel fails to make this showing is there any weighing of anticompetitive and procompetitive effects.

Complaint Counsel further asserts that it has no obligation to show that the Challenged Agreement resulted in increased prices for consumers or other payors, or caused an actual delay in the onset of generic competition. Complaint Counsel argues that under *Actavis*, the relevant anticompetitive harm is paying the generic challenger to drop its patent challenge and stay out of the market, thereby avoiding the risk of competition from a finding of patent invalidation or non-infringement. Complaint Counsel further contends that such an agreement harms the competitive process.

Respondent contends that for Complaint Counsel to prove that the Challenged Agreement constitutes an unreasonable restraint under the rule of reason, Complaint Counsel must prove: (1) that the alleged reverse payment was both "large" and "unjustified"; (2) that Endo had

monopoly power in a properly defined relevant market; (3) that the Challenged Agreement caused actual anticompetitive effects; and (4) that any alleged less restrictive alternative to the Challenged Agreement was actually feasible.  Respondent further contends that the assessment of procompetitive justifications is not limited to justifications for the payment itself, but that the rule of reason considers procompetitive benefits arising from the Challenged Agreement as a whole.  Moreover, Respondent asserts, in order to prevail, Complaint Counsel must prove that the asserted anticompetitive effects outweigh the procompetitive benefits.

###### 6.    Relevant market

In a traditional rule-of-reason case, the relevant market must be defined to allow a court "to determine the effect that an allegedly illegal act has on competition."  *Southeast Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 613 (8th Cir. 2011); *see also Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006).[20]  However, several post-*Actavis* cases have evaluated anticompetitive effects of reverse payment agreements without a separate determination of the relevant market.  *E.g., King Drug*, 791 F.3d at 410 (describing the "market the agreement is said to have protected"); *Wellbutrin*, 868 F.3d 132 at 165 (no mention of relevant market other than stating that the branded drug company's patent prevented market entry by the generic); *Lipitor*, 868 F.3d at 250, 258 (referring only to the "patentee's market").  As explained in *In re Cipro Cases I & II*, although "[p]roving that a restraint has anticompetitive effects often requires the plaintiff to "'delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly,'" i.e., has market power . . . .  [P]roof of a sufficiently large payment is a surrogate" in reverse payment settlement cases.  348 P.3d at 869 (citations omitted).

In *King Drug*, the Court of Appeals for the Third Circuit, after stating that *Actavis* explained that antitrust questions must be answered "'by considering traditional antitrust factors such as likely anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances, such as here those related to patents,'" *Actavis*, 133 S. Ct. at 2231, laid out its own rule of reason framework to use in a

---

[20] An antitrust market is comprised of a relevant geographic market and a relevant product market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  The parties have stipulated that the relevant geographic market is the United States.  Joint Stipulations of Jurisdiction, Law, and Fact, and Authenticity, JX001-002 ¶ 10.

reverse payment case. *King Drug*, 791 F.3d at 412. Nowhere in the *King Drug* framework for determining the likelihood of anticompetitive effects, summarized above, does the appellate court direct the district court to define the relevant market. *Id.* Instead, it invited the district court to "proceed with the litigation under the traditional rule of reason, tailored, as necessary, to the circumstances of this case." *Id.* at 412.

As stated by one district court in a reverse payment settlement case, evidence of market power will be available "even without an express articulation of the relevant market definition." *Aggrenox Antitrust Litig.*, 199 F. Supp. 3d at 665.[21] "[A]s a practical matter, the only 'relevant' market in this case, and in similar cases brought under *FTC v. Actavis*, will be the market in which the challenged settlement agreement allegedly acted as an anticompetitive restraint: that is, in this case, it will be implicitly defined by the scope of the disputed patent." *Id.* at 665-66. It is also noteworthy that while *Actavis* itself did not expressly identify the relevant market, it did refer to patent settlements as "allowing the generic manufacturer to enter *the patentee's market*." *Actavis*, 133 S. Ct. at 2237 (emphasis added).

Thus, in the context of a settlement of patent litigation arising under the peculiar framework of the Hatch-Waxman Act, which promotes generic competition and facilitates patent challenges, and where a valid patent gives the brand holder a legal monopoly, the appropriate market in which to assess the anticompetitive effects of a reverse payment settlement agreement is the market that is the subject of that agreement – the branded pharmaceutical product and its generic equivalents. Accordingly, in the instant case, the relevant market is the market for oxymorphone ER, branded and generic, which is the market that mattered to Impax and Endo, the parties to the Challenged Agreement.

**7.    Conclusion**

Having fully considered *Actavis*, subsequent court decisions, and the parties' arguments, the rule of reason analysis to be applied in the instant case will proceed as set forth below.

---

[21] The district court certified the ruling regarding the relevance of evidence pertaining to the substitutability of other drugs for the product at issue for interlocutory appeal. *Aggrenox*, 199 F. Supp. 3d at 670. The court of appeals declined to provide interlocutory review. *In re Aggrenox Antitrust Litig.*, Case 3.14-md-02516-SRU (2nd Cir. Jan. 9, 2017).

First, in order to determine whether the evidence shows any anticompetitive effect in connection with the Challenged Agreement, the analysis will determine whether the Endo-Impax Settlement provided "payment for delay, or, in other words, payment to prevent the risk of competition." *King Drug,* 791 F.3d at 412. The analysis will consider direct evidence from the parties' settlement negotiations, as well as inferences reasonably drawn from the payment's "size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Actavis*, 133 S. Ct. at 2237; *King Drug*, 791 F.3d at 412. *See* Aaron Edlin, The *Actavis* Inference, 67 Rutgers U. L. Rev. 585, 587, 592 (2015) (stating that under *Actavis*, a "reasonable inference of harm to consumers from lessened competition . . . can be established by identifying a large and otherwise unexplained payment of cash or something else of value made by the patent holder to the alleged infringer in exchange for that firm's agreement not to enter the market for some period of time. . . . [An antitrust plaintiff may also] prove by direct evidence that "the patent holder paid the alleged infringer to delay its entry into the market and thereby restrict competition . . . e.g., if there is other contemporaneous evidence indicating that the purpose and effect of a reverse payment was to delay entry.").

The formulation of the initial burden set forth in *Cephalon*, upon which Complaint Counsel relies, to the extent it holds that anticompetitive effects can be demonstrated solely by proof of a large payment and market power, has not been adopted by any other court[22] and presents an unduly truncated burden of proof. *See Actavis*, 133 S. Ct. at 2238 (noting that trial courts should avoid "the use of antitrust theories too abbreviated to permit proper analysis"). *Realcomp* states that the rationale for substituting proof of market power for proof of actual anticompetitive effects is that proof of market power "when combined with the anticompetitive nature of the [challenged] restraints, provides the necessary confidence to predict the likelihood of anticompetitive effects." 2009 FTC LEXIS 250, at *90. However, *Actavis* does not hold that a "large" reverse payment is anticompetitive "by nature." Rather, it is a large *and unjustified* reverse payment that "can bring with it the risk of significant anticompetitive effects." *Actavis*,

---

[22] Although the Third Circuit in *King Drug* cited the *Cephalon* case in a footnote, it is unclear for what proposition. Furthermore, *King Drug's* articulation of the initial burden of proving anticompetitive effects is clearly different than that set forth in *Cephalon.*

133 S. Ct. at 2237 (emphasis added).  Furthermore, in the context of a reverse payment patent settlement, proof of market power adds little in the way of burden because, as explained further in Section III.D. below, a large payment is already a strong indicator of market power. [23] *Actavis,* 133 S. Ct. at 2236.  Accordingly, the formulation of the initial burden set forth in *Cephalon* is rejected.

For the second step of the rule of reason inquiry, the analysis will consider evidence of procompetitive effects arising from the Endo-Impax Settlement.  Consistent with the traditional rule of reason framework, the burden of proving such effects is properly placed on Respondent. *Realcomp*, 635 F.3d at 825; *Polygram*, 416 F.3d at 36 (holding that if the plaintiff meets its burden of demonstrating anticompetitive effects, the burden shifts to the defendant to prove procompetitive justifications for the challenged restraint).

Complaint Counsel's position that the only relevant procompetitive justifications are those that justify the reverse payment, thereby barring all other evidence of procompetitive benefits from the settlement and condemning the settlement on the basis of the reverse payment alone, is inconsistent with *Actavis* and the rule of reason generally.  *Actavis* expressly identified "redeeming virtues" of a patent settlement as among the "traditional antitrust factors" that can be considered in evaluating antitrust legality.  *Actavis*, 133 S. Ct. at 2231.  *See also K-Dur*, 2016 U.S. Dist. LEXIS 22982, at *46 ("If a prima facie case has been made out, the defendants may come forward with additional justifications to demonstrate the settlement agreement nevertheless is procompetitive.  A plaintiff who can dispel these justifications has carried the burden of demonstrating the settlement agreement is an unreasonable restraint of trade . . ."); *see also In re Impax Labs, Inc*., 2017 FTC LEXIS 130, at *29-32 (Oct. 27, 2017) (refusing to bar evidence and argument concerning post-settlement events).  Focusing only on the reverse payment, without any consideration of offsetting procompetitive benefits arising from the settlement, conflates the initial burden of proving anticompetitive effects with the ultimate burden of proving that an agreement is, on the whole, an unreasonable restraint of trade.  The "restraint" in a reverse payment settlement agreement is not the payment alone, but the use of the payment to restrain potential generic competition.  Simply put, to condemn an agreement based on the reverse

---

[23] It is noteworthy that market power was not even at issue in *Cephalon*, as the defendants there had "not challenged [p]laintiffs' ability to demonstrate market power."  *Cephalon*, 88 F. Supp. 3d at 419.

payment term alone is an approach that is "too abbreviated to permit proper analysis." *Actavis*, 133 S. Ct. at 2238.

Third, the analysis will consider whether the evidence proves that the demonstrated procompetitive benefits of the Endo-Impax Settlement could have been achieved with a less restrictive agreement.

Fourth, the analysis will weigh the demonstrated anticompetitive effects against the demonstrated procompetitive effects to determine whether the Challenged Agreement is anticompetitive on balance. Such balancing properly considers the extent to which the Endo-Impax Settlement delayed generic competition. *See Impax Labs*, 2017 FTC LEXIS 130, at *29. As recognized in *In re Cipro Cases I & II,* under *Actavis*, "the relevant benchmark in evaluating reverse payment patent settlements should be no different from the benchmark in evaluating any other challenged agreement: What would the state of competition have been without the agreement?" 348 P.3d at 863.

The analysis now turns to the application of the foregoing principles to the record in this case.

### C. Anticompetitive Harm

*Actavis* explains that a brand patent holder's use of a payment to induce a generic challenger to drop its patent challenge and agree to stay out of the market, rather than face the risk of patent invalidation and resulting generic competition, is an anticompetitive harm. *Actavis*, 133 S. Ct. at 2236 (for shorthand purposes, alternatively referred to as payment to "prevent" or to "eliminate" the risk of competition). *See also King Drug*, 791 F.3d at 403 (holding that, under *Actavis*, harm occurs when the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger, rather than face what might have been a competitive market). Complaint Counsel has the initial burden of proving anticompetitive harm which, as noted above, in the reverse-payment context, means the burden of proving that the Endo-Impax Settlement included payment to prevent the risk of competition. Complaint Counsel has met this initial burden, as explained below.

## 1.    Economic theory of anticompetitive harm

A basic economic principle is that consumers benefit from increased competition in the form of lower prices and increased choice.  F. 440.  Harm to competition is not limited to the certain elimination of competition, but also includes eliminating the possibility that participants on the other side of the market will have the opportunity to experience the benefits of competition, such as lower prices.  F. 441.

Normally, when a generic drug manufacturer launches a generic version of a branded drug, the competition between the brand-name firm and the generic firm causes the price of the drug to drop, which is a benefit to consumers.  F. 442.  Reverse payment settlements can harm consumers, to the extent that, by requiring the generic company to forego the possibility of entering at an earlier date, the settlement extends the period in which the brand-name manufacturer is the only seller of a drug.  F. 442.[24]  Moreover, a large reverse payment can imply that the market entry date in the settlement agreement is later than the date that the patent holder expected the alleged patent infringer to enter the market.  This is based on the theory that it is unlikely that a patent holder would agree by settlement to pay an alleged patent infringer anything more than saved litigation costs, only to obtain entry on the date the alleged patent infringer would have entered anyway.  F. 446.

A reverse-payment settlement replaces the possibility of entry by the generic drug with the certainty that generic competition will not occur prior to an agreed date.  F. 443.  To this extent, the brand-name firm is buying an insurance policy, by which it pays the generic company a premium in exchange for the generic firm's guaranteeing it will not compete prior to the date specified in the settlement.  F. 443.  Payment to an alleged infringer, in exchange for a certain entry date, converts the possibility of substantial loss of profits for the patent-holder, due to generic competition, into the certainty that the brand manufacturer will continue to earn profits as the sole seller of the drug, until the agreed entry date set by the settlement.  F. 444.  By eliminating the possibility of generic competition for a period of time, reverse-payment settlements interfere with the competitive process and can harm consumers by depriving them of

---

[24] This theory of economic harm assumes that issues of patent validity and/or infringement were pending and unresolved at the time of settlement.

the possible benefits of increased competition in the period prior to the entry date provided under the settlement.  F. 445.

A brand-name pharmaceutical firm has an economic incentive to pay the generic firm as part of a settlement, to the extent that the payment is less than the profits the brand firm would earn during the period before the agreed-upon generic entry date.  F. 447.  A generic pharmaceutical firm also has an economic incentive to enter into reverse-payment settlements. F. 448.  While the generic firm stands to lose profits it would have earned by launching prior to the agreed-upon date, a sufficiently large payment can compensate for that loss and thereby induce the generic company to forego the opportunity to launch earlier than the agreed-upon date.  F. 448.

### 2. Size of the payment

#### a. Applicable legal principles

Under *Actavis*, the size of the reverse payment is central to the antitrust inquiry, and therefore the reviewing court or factfinder must measure the value of the payment.  *Rochester Drug Co-Operative, Inc. v. Warner Chilcott Co. (In re Loestrin 24 Fe Antitrust Litig.)*, 814 F.3d 538, 551-52 (1st Cir. 2016).  While *Actavis* refers to "large" and "unexplained," or "unjustified," payments as being material to the evaluation of a reverse payment settlement, the Court did not specify what makes a payment "large."  *Cephalon*, 88 F. Supp. 3d at 416 ("*Actavis* did not identify any specific formula for determining whether a reverse payment is sufficiently large.").

The fact-finder must determine the value of the reverse payment in order to determine the payment's size.  *Loestrin*, 814 F.3d at 551-52.  Valuing the payment is particularly important in the case of non-cash payments, such as the no-AG provision challenged in the instant case. Although it is settled that *Actavis* applies to non-cash payments, *see, e.g.*, *King Drug*, 791 F.3d at 403; *Loestrin*, 814 F.3d at 549-50, there must be a reliable calculation of the payment's value. *Lipitor*, 868 F.3d at 255 (upholding complaint based on plausible allegations that non-monetary payment was worth "hundreds of millions of dollars," noting that "more detailed, advanced calculations related to those allegations" come later in the proceeding); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 244 (D. Conn. 2015) ("[C]ourts interpreting *Actavis*, while holding

102

that reverse 'payments' are not limited to cash transfers, have observed the importance of the court's ability to calculate the value of any nonmonetary payments . . .").  Furthermore, the value of the payment must be assessed at the time the parties entered into the settlement.  *Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d at 337 ("The deal must be valued at the time the parties entered the deal . . .").

In addition, the size of a reverse payment is properly determined by considering the total compensation provided under the settlement, as a whole, rather than examining each component of the settlement in a piecemeal fashion.  *Loestrin*, 261 F. Supp. 3d at 331.  *See also In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 718 (N.D. Ill. 2016) (refusing to assess components of the settlement in a "piecemeal fashion" to determine whether "each individual payment fails to rise to the level of a large and unjustified payment" in favor of "determin[ing] whether, when taken as a whole, the total payment . . . was large and unjustified").  This is particularly true where, as here, the Challenged Agreement consists of both the SLA and the DCA, executed the same day.  *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 752 (E.D. Pa. 2014) ("[D]efendants may not improperly 'dismember' [the complaint] by examining each of the three settlement agreements in isolation.  Rather, the Licensing Agreement must be read in conjunction with the Co-Promotion and Manufacturing Agreements executed that same day.").

The fact that a payment exceeds saved litigation costs is a relevant benchmark in assessing whether a payment is "large," but it is not dispositive.  Even if a payment exceeds saved litigation costs, "the *Actavis* factors – the size of the payments, their scale in relation to litigation costs, their independence from other services for which they might be fair consideration, and any other convincing justification – still matter."  *Aggrenox*, 94 F. Supp. 3d at 243.

*Actavis* noted that a large payment may provide "strong evidence that the patentee seeks to induce the generic challenger to abandon its claim with a share of its monopoly profits . . . ." 133 S. Ct. at 2235.  Interpreting *Actavis*, a number of courts have considered whether the payment induced the patent challenger to drop its patent challenge and stay out of the market until the agreed date.  *See King Drug*, 791 F. 3d at 411 (upholding allegations of anticompetitive harm, noting that the promise of no authorized-generic competition during the generic's 180-day

exclusivity period was alleged to have induced the generic to drop the patent challenge and thereby enabled the brand to avoid the risk of patent invalidation); *Loestrin*, 814 F.3d at 550 (holding that *Actavis* applies to payments that "induce the generic to abandon a patent challenge"). *See also Cephalon*, 88 F. Supp. 3d at 417 (holding that, in addition to considering whether a payment exceeded saved litigation costs, determination of "large" payment must also consider whether the payment was sufficiently large to induce the generic to forfeit its claim and agree to stay off the market).

With the foregoing principles in mind, the analysis now assesses the value of the reverse payment provided under the Endo-Impax Settlement.

### b.     Valuation

The Endo-Impax Settlement provided a cash payment in the amount of $10 million, pursuant to the terms of the DCA. F. 247. In addition to the $10 million cash payment under the DCA, pursuant to the terms of the SLA, as further explained below, the Endo-Impax Settlement included a non-cash payment, in the form of a no-AG provision, under which Endo agreed not to compete with Impax during Impax's 180-day exclusivity period by launching an authorized generic. In addition, the Endo-Impax Settlement provided Impax with security for the value conveyed by the no-AG provision in the form of the Endo Credit.

### i.     No-AG provision

Impax was the first company to file an ANDA with Paragraph IV certifications for the 5, 10, 20, 30, and 40 mg dosage strengths of oxymorphone ER. F. 58. As the first filer on these dosages, Impax would be entitled to a 180-day exclusivity period as to the five most popular dosages of Opana ER, comprising 95% of Endo's Opana ER sales. F. 173-174. However, Impax's 180-day exclusivity period was not a bar to Endo's launching an authorized generic during that exclusivity period because the Hatch-Waxman Act does not prevent a brand-name drug company from launching an authorized generic. F. 21-22, 176. At the time Endo and Impax reached a settlement of their patent litigation, Impax did not know whether or not, absent the settlement, Endo would launch an authorized generic. F. 186. The no-AG provision

guaranteed to Impax that Impax would be the only seller of generic Opana ER during its first 180 days on the market and would not face competition from an Endo authorized generic.  F. 187.

The no-AG provision was valuable to Impax.  Impax would generally seek a no-AG provision as part of a settlement agreement with a brand-name drug manufacturer.  F. 182.  Indeed, along with obtaining the earliest possible entry date, a no-AG agreement is among the more important things that Impax would seek in a negotiation.  F. 183.  A first-filer generic manufacturer makes a substantial portion of its profits during the 180-day exclusivity period, and the introduction of an authorized generic during that exclusivity period reduces the value of the exclusivity period, by causing lower prices and fewer sales for the first filer.  F. 172.

Impax witnesses acknowledged that the absence of an authorized generic means more control for the generic company, which can often lead to higher profits for the generic company.  F. 182.  Conversely, the introduction of an authorized generic during the exclusivity period reduces the value of the 180-day exclusivity period, by causing lower prices and fewer sales for the first filer.  F. 172.  Specifically, as Impax witnesses testified, an authorized generic competitor during the 180-day exclusivity period generally results in a price decrease of approximately 30 to 35%, and reduces the generic company's share of generic sales.  F. 177.  Impax executives estimated that if Endo launched an authorized generic when Impax entered the market, Endo's authorized generic would capture as much as half of the sales of generic Opana ER and cause substantially lower generic prices during the exclusivity period than would be the case if Impax was the only generic seller.  F. 181.

In May 2010, Todd Engle, of Impax's sales and marketing team, prepared an analysis that projected lost profits in the amount of $24.5 million if an Endo AG entered within two to four weeks after Impax's launch of generic oxymorphone ER.  F. 191.  In addition, in 2010, Impax forecasted the effect of an Endo AG on Impax's expected generic sales.  F. 189.  In what Impax referred to as the "upside" scenario, Impax assumed that Endo's authorized generic Opana ER would enter the market about two months after Impax's launch of generic Opana ER.  F. 189.  Under the upside scenario, Impax's share of generic sales was estimated to fall to 60% and Impax's average price was estimated to fall by 36%.  F. 189.  In what Impax referred to as its "base" scenario, Impax assumed that Endo's authorized generic Opana ER would enter the

market simultaneously with Impax.  Under the base scenario, it was estimated that Endo would capture half of the market and that prices would fall by the same 36%.  F. 189.

Employing the figures from Impax's 2010 forecasts, Complaint Counsel's economic expert witness, Professor Roger Noll, calculated that:  (1) under Impax's upside scenario, market entry by an authorized generic during Impax's 180-day exclusivity period would cause Impax's revenues to fall by approximately $23 million; and (2) under Impax's base assumptions, market entry by an authorized generic during Impax's 180-day exclusivity period would cause Impax's revenues to fall by approximately $33 million.  F. 190.

Respondent contends that, notwithstanding the value to Impax, the no-AG provision had little value to Endo because Endo offered the no-AG agreement as part of its initial settlement offer to Impax.  *See* F. 131.  However, this fact does not compel the inference that the no-AG agreement was worthless to Endo.  Moreover, evidence contemporaneous to the parties' negotiations shows that Endo estimated that, if Impax launched at risk, Endo could recoup $25 million in lost revenues by launching an authorized generic to compete with Impax.  F. 192; *see also* F. 175.

Respondent also contends that it was not guaranteed to receive the value of the no-AG agreement because Endo was planning to reformulate Opana ER and remove original Opana ER from the market, which could render the no-AG agreement illusory and potentially defeat Impax's generic market opportunity entirely.  However, the evidence shows that Endo agreed to compensate Impax for this possibility, and to insure the value of the no-AG provision, by agreeing to the Endo Credit, as further explained in subsection 2.b.ii below.

Based on the foregoing, the no-AG provision in the SLA was worth between $23 and $33 million in projected sales revenue to Impax at the time Impax entered into the SLA.  F. 193.  By agreeing not to compete with Impax through launching an authorized generic, Endo was promising to provide Impax with a monopoly on generic sales of Opana ER during Impax's 180-day exclusivity period, which would enable Impax to charge a higher price for generic Opana ER compared to a market that had two companies selling generic products.  F. 187-189, 191.  *See also* F. 190 (expert opinion that the no-AG provision provided substantial value to Impax when

the SLA was executed by ensuring that Impax would face no generic competition during its 180-day exclusivity period and would thereby earn greater profits on its generic sales).

### ii.    Endo Credit

Under section 4.4 of the SLA, titled "Endo Credit," Endo agreed to make a cash payment to Impax in the event that Endo's Opana ER sales fell by more than 50% from the "Quarterly Peak" (defined as the highest sales quarter between the third quarter of 2010 and the third quarter of 2012) to the fourth quarter of 2012 (the last quarter before the agreed generic entry date of January 2013).  F. 195.  The formula for calculating the Endo Credit incorporates a number of factors that relate to Impax's sales of generic Opana ER, multiplied by the market opportunity for the generic product in the quarter of peak sales.  F. 196.  Specifically, the agreement relies on Impax's "Market Share Profit Value," defined as the product of (1) an assumed generic substitution rate for original Opana ER (90%), (2) an assumed net realized generic price discounted from the brand-name price (75%), (3) an assumed generic profit margin (87.5%), (4) 50% (expressing the 180-day exclusivity period as half of a year), and (5) the annualized sales of Opana ER during the quarter of peak sales for Opana ER during the period from the third quarter of 2010 to the third quarter of 2012, divided by 100.[25]  F. 196.

### (a)    Purpose of Endo Credit

As further explained below, the intent and the design of the Endo Credit were to provide Impax with a payment approximating the profits Impax would lose if, during the two and a half year time period between the June 2010 settlement and the agreed January 2013 Impax entry date, Endo launched a reformulated version of Opana ER in such a way as to substantially eliminate the market for original Opana ER.  In this scenario, Impax stood to lose the value of its 180-day exclusivity period, including the generic monopoly during this period that Endo promised to Impax in the no-AG provision.  The Endo Credit was designed to make Impax whole for this potential loss.  To understand the role of the Endo Credit in the reverse payment conferred to Impax under the Endo-Impax Settlement, a review of the parties' negotiations is helpful.

---

[25] Although in 2013, the Endo Credit formula yielded a payment to Impax in the amount of $102 million, this is not the appropriate measure of the value of the Endo Credit, for the reasons explained in subsection b.ii.(c) below.

Endo sent Impax an initial term sheet for the SLA on May 26, 2010.  F. 131.  The initial term sheet for the SLA included, among other things, a no-AG provision and a generic entry date of March 2013.  F. 131-132.  Impax accepted the no-AG offer, but counter-offered a generic entry date of January 1, 2013, plus "certain acceleration triggers, including market degradation to any alternate product."  F. 136-137.  An acceleration trigger for market degradation would have allowed Impax to launch its generic oxymorphone ER product earlier than January 1, 2013, in the event that Opana ER brand sales fell by a certain amount or percentage.  F. 138.

Impax wanted a market acceleration trigger as "protection in case Endo had any intentions of moving the market to a next-generation product."  F. 139.  Impax had included similar provisions in other patent settlements with brand companies.  F. 139.  Although Impax did not have specific information about Endo's plans to reformulate Opana ER, Impax had seen analyst reports suggesting that Endo was working on crush-resistant drugs generally.[26]  F. 140-141.  Impax was aware that the FDA had been encouraging opioid manufacturers to make opioids tamper-resistant, which companies were accomplishing primarily by manufacturing tablets that could not be crushed.  F. 142.  Impax was also aware that Purdue Pharma, L.P., the manufacturer of the brand-name drug OxyContin, had introduced a reformulated, crush-resistant version of its product and was withdrawing its original formulation.  F. 143.

Pharmacists are allowed or sometimes required to dispense an AB-rated generic version of a drug instead of the more expensive branded drug, unless a physician directs or the patient requests otherwise.  F. 29.  Automatic substitution of the generic drug for the branded drug is the primary way that generics make their sales.  F. 32.  When brand companies introduce a reformulated drug, they often cease marketing and selling the original product.  F. 198.  They can also withdraw the original product's reference-listed drug designation, preventing generic products from having AB-rated status.  F. 198.  By introducing a reformulated drug, the brand company can greatly reduce the ability of generic companies to sell generic versions of the original drug because those generic products are no longer bioequivalent to – and not subject to automatic substitution in place of – the reformulated product.  F. 199.  For a generic drug to be

---

[26] At the time of settlement, Endo had not filed any supplemental NDAs for a reformulated version of Opana ER. F. 226.  Relevant facts regarding Endo's launching of a reformulated Opana ER are further addressed in subsection b.ii.(c) below.

sold where there is no branded drug for which it is automatically substituted, doctors must actually write out a prescription for the generic product. F. 202-203.

If Endo reformulated Opana ER, Impax's generic Opana ER would not be AB-rated to the reformulated Opana ER product. F. 200. To the extent that original Opana ER disappeared or became insignificant, Impax's opportunity to sell a generic Opana ER would be significantly reduced or even eliminated. F. 204. Impax was concerned that Endo would be able to "subvert the value of the deal" being negotiated by introducing a reformulated version of Opana ER. F. 205.

Endo rejected the concept of accelerated entry for Impax and rejected Impax's demand for a market acceleration trigger. F. 147. This increased Impax's concern that Endo was going to switch the market to a crush-resistant version of Opana ER, notwithstanding Endo's denial of such a plan. F. 148. When Endo insisted to Impax that Endo was not planning to move the market to a crush-resistant version of Opana ER, Impax told Endo, "if you're not telling me the truth, you're going to pay me what I would have made anyway." F. 150. If Endo did destroy the market for Impax's generic Opana ER, Impax wanted "to be made whole for the profits that [it] would have otherwise achieved." F. 206. *See also e.g.*, F. 207, 213 (If "the market changed substantially before the date that the parties agreed that Impax could launch," the provision "would be a way of making Impax whole"); F. 151-152 (describing the then-current proposal as including a "make good" payment). Once Endo refused to agree to an acceleration trigger, and agreed instead to the concept of a make-whole payment, Impax stopped pursuing an acceleration trigger. F. 153. Thereafter, Endo and Impax proceeded instead to finalize the terms of this "make-good" or "make-whole" provision, which eventually became the Endo Credit. F. 154, 160-165. In addition, Endo agreed to a January 2013 generic entry date for Impax. F. 154.

As Impax's then-CFO, Arthur Koch, explained, Impax was "worried about the control" Endo would have during the two and a half year time period before the agreed launch date of January 2013, and was "looking for a way to gain – take back some of that control away from the brand." F. 149. Impax's goal was, "if the market changed substantially before the date that the parties agreed that Impax could launch, there would be a way of making Impax whole" by

providing Impax with the profits that Impax otherwise would have achieved during its 180-day exclusivity period.  F. 213.

Impax described the make-whole provision as "protect[ing] the downside."  F. 154; *see also* F. 208.  If Endo's obligation to pay the Endo Credit were triggered, based on declining sales of Opana ER prior to Impax's generic entry, the calculations of the Endo Credit were designed to approximate the net profits Impax would have expected to make during its six-month exclusivity period, with no AG.  F. 212; *see also* F. 214.  Getting this downside protection for Impax in the event Endo reformulated Opana ER was "super, super important" to Impax's primary negotiator, Mr. Mengler, who testified that "something that didn't protect us from the downside was . . . a deal-breaker."  F. 208.

If the market for Opana ER did not decline, the value of the no-AG provision would be higher.  F. 210.  A sharp decline in the sales of original Opana ER before Impax's generic launch, however, would decrease the value of the no-AG provision, because the total market potential for generic Opana ER would decrease.  F. 209.  The Endo Credit would then "correct for the loss in the value of the market that had occurred before the generic entry date."  F. 209.  In this way, the Endo Credit was designed as insurance against the risk of Endo reformulating Opana ER, and thereby degrading the market for Impax's generic drug.  F. 211.  *See also* F. 213 (The Endo Credit provision "was intended to insulate" Impax from the risk of a substantial decrease in Opana ER sales prior to the agreed generic entry date.).

In summary, the Endo Credit was designed to "back-up" the value of the no-AG provision and provide value to Impax regardless of whether Endo reformulated Opana ER.  F. 197.  *See also* F. 215 (Impax CFO Mr. Koch in 2011 characterizing the settlement as having "protection [against reformulation] built into the agreement so we should have a reasonable outcome almost no matter what happens").

### (b)  Monetary value of Endo Credit

The evidence shows that the monetary value of the Endo Credit was uncertain at the time of settlement and was contingent on unknown future events that were outside of Impax's control,

such as the figure for quarterly peak sales for Opana ER prior to generic entry, which was the biggest "input" in the Endo Credit formula. F. 216.

Complaint Counsel's economic expert witness, Professor Noll, devised four scenarios to approximate the value of the no-AG provision and the Endo Credit at the time of the settlement, and opined that the value ranged from $16.5 to $62 million, depending on his assumptions regarding the sales of Opana ER in the years after the settlement. *See* CX5000 at 240 (Noll Expert Report Appendix F). Professor Noll failed to adequately describe or explain the bases for his assumptions or his calculations, either in his expert report, or in his testimony. Without an understandable and verifiable basis for his estimates, the estimates are unsupported, are conclusory at best, and are, thus, rejected.

Respondent contends that the Endo Credit should be deemed to have added no value to the Endo-Impax Settlement because, by virtue of the contingent nature of the Endo Credit, the Endo Credit did not actually "guarantee" a payment to Impax. Respondent asserts that it was possible that Endo could time the introduction of reformulated Opana ER so as to avoid any payment obligation under the Endo Credit, while still diluting Impax's sales of generic original Opana ER (referred to by Respondent as a "late switch" strategy). Respondent relies on evidence that, prior to the settlement, Impax's director of market planning, Ted Smolenski, told Chris Mengler, Impax's principal negotiator, that there were certain circumstances under which the Endo Credit would not result in a payment to Impax, including a situation in which Endo would withdraw its NDA for original Opana ER and time the elimination of sales in such a way that the Endo Credit would result in zero payment. F. 221. *See also* F. 220 (preliminary calculations by Mr. Cuca of Endo included potential for zero payment under Endo Credit). However, Mr. Smolenski considered this "downside" scenario unlikely to occur. Moreover, Mr. Mengler decided not to pursue the issue further because he did not deem the potential to be likely enough to try to correct for it. F. 221.

Even if there was a theoretical possibility of a zero payment under the Endo Credit, the notion that Impax bargained to obtain a zero payment under the Endo Credit is implausible. It is also against the weight of the evidence, including evidence that the Endo Credit formula was designed to provide an approximation of the net profits Impax would have expected to make

during its six-month exclusivity period, with no AG; Impax viewed the Endo Credit provision as "super, super important" and a "deal-breaker"; Impax viewed the Endo Credit as insurance; and Impax expected a "reasonable outcome almost no matter what happens." F. 208, 212, 214-215. Moreover, Impax gave up its request for an acceleration trigger in exchange for the Endo Credit. F. 150-154. In summary, the facts belie the assertion that Impax bargained to obtain nothing.

In addition, the evidence does not support Respondent's assertion that Endo was in fact planning the above-mentioned "late switch" strategy for introducing reformulated Opana ER in order to avoid payment under the Endo Credit. Respondent points to evidence that Endo's 2012 budget contemplated a launch date for reformulated Opana ER of August 2012, with a full conversion of the market from original Opana ER to reformulated Opana ER within two to three months, while continuing sales of original Opana ER into the last quarter of 2012. RX094 at 0003. However, the Endo document cited by Respondent clearly states that "significant uncertainties existed around manufacturing capabilities, market acceptance and our ability to transition to the new formulation." *Id.* The document notes that Endo was "particularly concerned with [transition time], as [Endo] knew that Purdue's OxyContin transition took 6 months." *Id.* In fact, an orderly transition from original Opana ER to reformulated Opana ER was expected to take about six to nine months. F. 106.

Moreover, even if sales of original Opana ER continued into the fourth quarter of 2012, it does not follow that this would enable Endo to avoid any payment under the Endo Credit. A cash payment under the Endo Credit was to be triggered if Endo's original Opana ER dollar sales in the fourth quarter of 2012 fell by more than 50% from the "Quarterly Peak" (the highest sales quarter between the third quarter of 2010 and the third quarter of 2012). F. 129, 195. Having some sales of original Opana ER in the fourth quarter of 2012 would not necessarily be sufficient to avoid triggering an Endo Credit payment. Rather, to avoid triggering an Endo Credit payment, the total dollar sales of original Opana ER in the fourth quarter of 2012 would need to be at least 50% of the Quarterly Peak sales.

The weight of the evidence is that, at the time of the settlement, Endo's principal interest in the timing of the launch of reformulated Opana ER was to launch as soon as possible, and sufficiently ahead of entry of a generic for original Opana ER to maximize the value of its

112

reformulated product.  F. 99-104.  The assertion that Endo's priority was instead to avoid payment under the Endo Credit is unsupported and unconvincing, and is, therefore, rejected.

(c)      <b>2013 payment under Endo Credit</b>

On April 18, 2013, Impax received a payment pursuant to the Endo Credit in the amount of $102 million.  F. 237.  This amount is not, however, the proper measure of the value of the Endo Credit, which must be measured as of the date of settlement.  *Loestrin*, 261 F. Supp. 3d at 337.  To the extent that any of Professor Noll's estimates of the value of the Endo Credit at the time of settlement are based upon discounting the value of the Endo Credit payment made in 2013 (F. 239) such valuation would be improper and provides an additional reason to reject those estimates.

Furthermore, the evidence shows that the amount of money that Endo eventually paid under the Endo Credit was a function of a number of unforeseen factors that were outside of Impax's control.  F. 216, 227-235.  At the end of 2011, after discovering manufacturing deficiencies, the FDA shut down the plant where Novartis Consumer Health, Inc. ("Novartis"), another pharmaceutical company, manufactured original Opana ER for Endo.  F. 227.  The shutdown of the Novartis plant caused a supply chain crisis for Opana ER.  F. 228.  Thereafter, in or about February 2012, the FDA ordered Endo to cease selling original Opana ER in order to avoid consumer confusion with Endo's reformulated Opana ER, which had just been approved by the FDA in December 2011.  F. 225-226, 229.  Accordingly, Endo stopped distributing original Opana ER and launched reformulated Opana ER in March 2012.  F. 230.[27]  It was not until after the Novartis supply disruption in late 2011, the FDA's order to stop selling original Opana ER in February 2012, and the launching of reformulated (crush-resistant) Opana ER in March 2012, that Endo first concluded that it would have to make a payment under the Endo Credit provision.  In fact, the first time Endo knew that its sales of Opana ER would be zero was in the last quarter of 2012, after the supply interruption caused by the Novartis plant shutdown.

---

[27] Endo also took steps to have original Opana ER removed from the market.  In August 2012, Endo filed multiple citizen petitions with the FDA, in which Endo argued that the FDA should (1) determine that original Opana ER was discontinued for safety reasons and could no longer serve as a reference-listed drug for any ANDA; (2) refuse to approve any ANDA pending for original Opana ER; and (3) withdraw any already-granted approvals for original Opana ER ANDAs.  F. 233.  Impax formally responded to the petition and offered scientific evidence that the discontinuation of Endo's original Opana ER was unrelated to safety or effectiveness.  F. 234.  The FDA concluded that Endo did not withdraw original Opana ER for safety or efficacy reasons.  F. 235.

113

F. 231. There is no basis in the record for concluding that anyone at the time of settlement did foresee, or reasonably could have foreseen, the occurrence of all these events.

Although $102 million is not the appropriate measure of the value of the Endo Credit at the time of settlement, the fact that a payment was made confirms the purpose of the Endo Credit. As noted above in Section III.C.2.b.ii.(b), the purpose of the Endo Credit was to provide Impax the profits it would have received as the sole seller of generic Opana ER during its 180-day exclusivity period, with no AG, in the event of a sharp decline in the market. To the extent that the 2013 Endo Credit payment includes the value of such profits, the Endo Credit payment fulfilled its purpose.

### c.    Conclusion as to valuation of reverse payment

Based on the foregoing, the evidence proves that, at the time of settlement, the value of the no-AG provision, as secured by the Endo Credit, was between $23 and $33 million in projected sales, and the actual value of the cash payment under the DCA was $10 million, for a total reverse payment under the SLA and DCA of between $33 and $43 million.

### 3.    Scale in relation to litigation costs

Although litigation costs vary substantially among cases, a survey by the American Intellectual Property Lawyers Association estimated that the median litigation cost for all patent cases with more than $25 million at stake averages about $5.5 million for each party. F. 77. When such a case is handled by a large firm (with more than 76 attorneys), the median litigation cost average is somewhat higher, at approximately $7 million for each party. F. 77.

The top end of the range that Impax uses in its budgeting process to estimate costs for generic patent litigation is about $3 to $4 million per case. This $3 to $4 million estimate represents total expenses from the start of litigation to completion and is based primarily on expenses for outside counsel, such as hourly attorneys' fees. F. 79. In November 2011, Impax represented in a public earnings conference call that it was saving $3 million in litigation expenses because of recent settlements, including the Endo settlement. F. 80. At the time of the Endo-Impax Settlement, which occurred during the patent trial, Endo had spent between $6 and $7 million and Impax had spent about $4.7 million on litigation in the infringement case. F. 78.

Based on the foregoing, a reasonable estimate of the combined saved litigation costs for both Endo and Impax for settling the patent litigation in June 2010 is approximately $5 million. F. 81.  As set forth above, the value of the no-AG provision, secured by the Endo Credit, was between $23 and $33 million, based on projected sales revenue to Impax, and the actual value of the cash payment under the DCA was $10 million, for a total reverse payment under the SLA and DCA of between $33 and $43 million.  Therefore, the value of the reverse payment substantially exceeded the estimated saved litigation costs.

### 4.    Justifications for reverse payment

#### a.    Legal principles

*Actavis* holds that a reverse payment can be justified as "compensation for other services that the generic has promised to perform – such as distributing the patented item or helping to develop a market for that item.  There may be other justifications."  *Actavis*, 133 S. Ct. at 2236. *See also id* at 2237 (holding that likelihood of anticompetitive effects in connection with reverse payment settlement depends on, among other things, "independence from other services for which it might represent payment, *and the lack of any other convincing justification*") (emphasis added).  Clearly, *Actavis* did not limit the types of justifications for a reverse payment that can be asserted.  *See also King Drug*, 791 F.3d at 412 ("The Court does not foreclose other justifications.").

The parties dispute who has the burden of proof on the issue of justification, with each party placing the burden of proof on the other party.  Complaint Counsel points to language in *Actavis* stating that "[a]n antitrust defendant may show . . . that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason," 133 S. Ct. at 2236, and argues this shows that the defendant bears the burden of proving that a payment was justified.  However, *Actavis* also cites "the lack of any … convincing justification" as an element of proving anticompetitive effects, 133 S. Ct. at 2237, which indicates that the burden of proving that a payment was unjustified should fall on the plaintiff.

Post-*Actavis* cases have held that the plaintiff challenging a reverse patent settlement must allege plausible facts to support a conclusion that an alleged reverse payment was large and unjustified. *Loestrin*, 814 F.3d at 552. In addition, it has been held that when a defendant comes forward with evidence of justifications for the payment, the burden is on the plaintiff to prove that the asserted justifications are unsupported. *Cipro Cases I & II*, 348 P.3d at 871 (citing *Polygram*, 416 F.3d at 37-38). *See also K-Dur*, 2016 U.S. Dist. LEXIS 22982, at *46 (holding that plaintiff must "dispel" justifications offered by defendant). As the court in *In re Cipro Cases I & II* explained, if a plaintiff dispels all justifications explaining the reverse payment, "the conclusion follows that the settlement payment must include, in part, consideration for additional delay in entering the market." 348 P.3d at 871. *See also In re Aggrenox Antitrust Litig.*, 2015 U.S. Dist. LEXIS 94516, at *37 (D. Conn. July 21, 2015) (holding that an antitrust violation requires proof, among other things, "that the settlement included a large and unjustified reverse payment giving rise to an inference of payment in order to avoid the risk of competition"). Other post-*Actavis* cases have held that the burden is on the defendant to prove the justifications for the payment. *See, e.g., King Drug*, 791 F.3d at 412; *Cephalon*, 88 F. Supp. 3d at 416. *See also Lipitor*, 868 F.3d at 256-57 (rejecting the argument that the complaint's allegations of lack of justification were insufficient, stating that *Actavis* "clearly placed the onus of explaining or justifying a large reverse payment on antitrust defendants").

In the instant case, the parties have vigorously litigated the question of justification for the reverse payment and have developed a complete record on the issue. Notwithstanding Complaint Counsel's assertion that the burden of proving justification is on Respondent, Complaint Counsel nevertheless asserts that the reverse payment was unjustified, and offers evidence and argument in an effort to support that claim (*see, e.g.*, CCB at 27-31, CCFF Section XII). Regardless of which party has the ultimate burden of proof on the issue of justification for the payment, as discussed in detail below, the evidence proves that, of the total payment provided to Impax under the Endo-Impax Settlement: (1) the payment conferred to Impax by the no-AG and Endo Credit provisions of the SLA was unjustified; and (2) the $10 million payment to Impax pursuant to the DCA was justified.

116

### b.    Payment under the SLA

### i.    Contentions of the parties

Respondent argues that, even if the no-AG and Endo Credit provisions of the SLA conferred a large reverse payment to Impax, the payment was not unjustified because the payment was not provided "in return for staying out of the market." RB at 60.[28] Respondent points to evidence that the no-AG provision was included in Endo's initial offer and that during negotiations, the entry date moved back from Endo's initial proposed entry date of March 2013, to the agreed entry date in the settlement of January 2013. Respondent further argues that the Endo Credit was not tied to the negotiation of the entry date, but rather was coupled with a royalty provision in the SLA designed to (1) encourage Endo to support sales of Opana ER in the time period between the date of the settlement and the date set for entry of Impax's generic product, and (2) discourage Endo from transitioning to a reformulated Opana ER product. Respondent refers to this as a "carrot and stick." RB at 61.

Complaint Counsel contends that the no-AG and Endo Credit provisions are unjustified. Complaint Counsel argues that these provisions were directly linked to the January 2013 entry date provided under the Endo-Impax Settlement, and the fact that the entry date in the settlement was slightly earlier than the March 2013 entry date initially proposed by Endo does not justify these provisions. Further, Complaint Counsel argues, Respondent's assertion that the Endo Credit was part of a "carrot and stick" designed to discourage Endo from transitioning to a reformulated product is legally non-cognizable and factually unsupported.

### ii.    Analysis

Evidence from the parties' negotiations readily supports the conclusion that the reverse payment conferred to Impax by the no-AG provision, secured by the Endo Credit, was directly linked to negotiation of the generic entry date as compensation to Impax for giving up its patent challenge and committing not to launch a generic Opana ER until January 2013. Endo's initial offer included a no-AG provision, but this initial offer was not sufficient to induce Impax to

---

[28] Respondent does not assert that the reverse payment conferred to Impax by the no-AG and Endo Credit provisions of the SLA reflects compensation for services provided to Endo by Impax.

settle the patent litigation and agree to the March 2013 entry date proposed by Endo.  F. 131-132.
Impax accepted the no-AG provision, but counter-proposed a January 2013 entry date, plus an
acceleration trigger that would allow for entry prior to January 2013 in the event of a degradation
of the market for Opana ER prior to Impax's entry.  F. 136-139.  Endo would not agree to an
acceleration trigger, but agreed instead to pay Impax a "make-good" payment, the Endo-Credit,
and further agreed to the January 2013 entry date requested by Impax.  F. 147, 151, 154.  Once
Endo and Impax agreed on the concept of a make-good payment, the parties reached an
agreement in principle on the SLA.  F. 147-154.

    When weighed against the foregoing evidence, the facts that the no-AG provision was
included in Endo's initial offer, and that the January 2013 entry date ultimately agreed to was
two months earlier than the March 2013 date Endo initially offered, are not significant.
Moreover, the issue is not whether the January 2013 entry date in the settlement was earlier than
the date Endo initially offered, but whether the no-AG provision, as secured by the Endo Credit,
was effectively payment by Endo to Impax for agreeing to drop its patent challenge and commit
to staying out of the market *prior to* January 2013.  *See Actavis*, 133 S. Ct. at 2237 (noting that
parties may settle with an agreed entry date "without the patentee paying the challenger to stay
out prior to that point").  *See also King Drug*, 791 F.3d at 408 (holding that the question is
whether entry might have been earlier, and/or the risk of competition not eliminated, had the
reverse payment not been tendered).  Viewed as a whole, the evidence supports the conclusion
that the reverse payment conferred to Impax by the no-AG provision, secured by the Endo
Credit, was unjustified.

    Respondent's contention that the Endo Credit is not unjustified because it was part of a
"carrot and stick" strategy is without merit for several reasons.  First, the evidence does not
support Respondent's assertion that the Endo Credit and the royalty provision were "coupled."
The evidence shows that a royalty proposal was made by Endo, as part of its initial term sheet for
the SLA on May 26, 2010.  F. 135.  The proposal for a "make-good" payment did not occur until
on or about June 1, 2010, and was not reduced to writing until June 4, 2010.  F. 151, 160.
Second, the assertion that the Endo Credit was part of a "carrot and stick" design is against the
weight of the evidence, which shows that the Endo Credit was intended as a "make-whole"
provision, to provide Impax with the profits Impax would have earned during its 180-day

exclusivity period, with no AG, if Endo switched the market to a reformulated Opana ER. *See* Section III.C.2.b.ii.(a) above. While Respondent points to deposition and trial testimony to support the characterization of the Endo Credit as part of a "carrot and stick," *see* RFF 195-198, the phrase does not appear in contemporaneous documents from the parties' negotiations. Third, the assertion that the royalty provision was a "carrot" is unconvincing because the royalty imposed costs on Endo in the form of lost sales from its agreement not to launch an authorized generic. Under the SLA, Impax would be obligated to pay Endo a 28.5% royalty on Impax's generic Opana ER sales during Impax's 180-day exclusivity period only in the event that sales of Opana ER in the calendar quarter prior to Impax's entry grew by a specific percentage. F. 128, 194. However, if sales grew enough to require a royalty payment to Endo, the no-AG provision operated to prevent Endo from selling an AG into this increased market. *See* F. 127. Thus, while pursuant to the royalty provision, Endo would receive 28.5% of profits from Impax's generic sales, pursuant to the no-AG provision, Endo still would lose 100% of profits it could have earned from sales of an Endo AG. Moreover, even if Opana ER sales reached a sufficiently high level prior to Impax's generic entry to trigger royalty payments, Impax would be the only seller of a generic oxymorphone ER product, pursuant to the no-AG provision. F. 127-128, 194. Impax stood to gain more in sales of generic oxymorphone ER than Impax would lose in royalty payments. F. 194. For all these reasons, Respondent's contention that the Endo Credit is not unjustified because it was part of a "carrot and stick" strategy is rejected.[29]

### iii.    Conclusion

As explained above, the evidence supports the conclusion that the reverse payment conferred to Impax under the SLA by the no-AG provision, secured by the Endo Credit, was unjustified. The analysis now examines justification for the payment made to Impax under the DCA.

---

[29] Because Respondent's "carrot and stick" justification is contrary to the weight of the evidence, it is not necessary to address Complaint Counsel's argument that such justification is not legally cognizable.

### c.     Payment under the DCA

#### i.     Overview

On June 7, 2010, Endo and Impax executed a Development and Co-Promotion Agreement with respect to a Parkinson's disease treatment known internally at Impax as IPX-203.  F. 244.  The DCA was executed simultaneously with the SLA and is incorporated into the SLA.  F. 245.  Under the DCA, Impax and Endo agreed to collaborate with respect to the development and marketing of a potential treatment for Parkinson's disease using an extended release, orally administered product containing a combination of levodopa and carbidopa. F. 246.

The DCA provided for an upfront payment of $10 million by Endo to Impax, and the possibility of payment of up to $30 million more, based on achieving specified milestone events in the development and commercialization of the product.  F. 247-248.  Impax and Endo agreed to share promotional responsibilities, with Impax promoting IPX-203 to its network of neurologists, and Endo promoting IPX-203 to its network of non-neurologists, including primary care physicians who prescribe Parkinson's disease medications.  F. 249.  If the target product was successfully commercialized, Endo would be entitled to a share of the profits.  F. 250. Specifically, Endo would receive a co-promotion fee equal to 100% of gross margins on sales resulting from prescriptions by non-neurologists.  F. 250.  Endo paid Impax the $10 million upfront payment on June 24, 2010.  F. 250.

Respondent contends that the $10 million payment by Endo to Impax under the DCA was justified as fair value for profit-sharing rights Endo received under the DCA.[30]  Respondent asserts that the evidence shows that Endo was interested in Parkinson's disease treatments; Endo's team was familiar with Parkinson's disease treatments; Endo analyzed the merits of the product collaboration; and Endo concluded that the DCA had financial and commercial merit for Endo.  In addition, Respondent asserts that, among other things, the DCA entitled Endo to a

---

[30] Respondent makes a single assertion in its brief that the $10 million paid under the DCA reflected fair value compensation for services by Impax.  RB at 42.  However, Respondent does not expand on the assertion, articulate what services it was to provide to Endo in exchange for the $10 million payment, or point to any evidence supporting the assertion.  Accordingly, the assertion has not been sufficiently raised to warrant consideration.  *See United States. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

share of profits without obligating Endo to perform any resource-intensive formulation or development work, the DCA capped Endo's total financial obligations, and, beyond the $10 million investment, Endo's obligations were contingent on Impax achieving specific milestones, regardless of how much it cost Impax to achieve those milestones.

Complaint Counsel contends that the $10 million payment from Endo to Impax under the DCA was not justified by Endo's profit-sharing rights. According to Complaint Counsel, the evidence demonstrates that the payment was not part of a bona fide product collaboration, but was instead payment for Impax's agreement under the SLA not to enter the market with its generic Opana ER until January 2013. In support of this argument, Complaint Counsel relies on expert opinion to contend that the DCA and the SLA were not independent agreements, because they were negotiated and executed together, and because, as adversaries, Endo and Impax would be unlikely to collaborate, but for the settlement discussions. In addition, Complaint Counsel asserts that the evidence shows that Endo did not have a genuine interest in developing the drug that was the subject of the collaboration.

Furthermore, relying on expert opinion, Complaint Counsel argues that the negotiation process was unusual in comparison to industry standards, particularly with regard to Endo's due diligence. Complaint Counsel asserts that the evidence shows that Endo offered the same $10 million upfront payment at the beginning of negotiations of the DCA, despite a change in the product under discussion. Complaint Counsel further asserts that $10 million was an unusually large payment to make upfront, in light of the drug's early stage of development at the time the DCA was signed.

### ii. Summary of facts

The detailed facts concerning the DCA are set forth in Section II.C.3 and are summarized below.

### (a) Background facts

Endo has entered into many collaboration agreements with other pharmaceutical companies. F. 254. These include early-stage development deals, and potentially speculative deals. F. 255. This is because Endo generally does not research or discover new drug molecules

on its own and instead acquires and licenses drugs from other pharmaceutical companies.
F. 254.  In connection with a collaboration agreement, Endo identifies therapeutic areas of
interest and companies that own promising drug molecules in those areas and enters into early-
stage development deals.  F. 256.  Endo also regularly licenses technology from and collaborates
with other companies for more developed products.  F. 256.  For example, for Opana ER, Endo
licensed the necessary technology to make both original and reformulated Opana ER.  F. 256.
Endo's collaboration agreements with other pharmaceutical companies could relate to drugs at
every stage of the development lifecycle, including early-stage development agreements.  F. 255.
Because Endo had no pipeline in place to discover new drugs on its own, Endo would enter into
"very early, very speculative agreements."  F. 255.

Beginning in 2005, Endo's significant areas of interest included pain, neurology, and
movement disorders, including Parkinson's disease treatments.  F. 257.  In the 2010 timeframe,
Endo evaluated collaborations with other companies related to treatments for Parkinson's
disease.  These included exploring potential Parkinson's disease collaboration opportunities with
an Italian company called Newron, which had multiple Parkinson's disease products, and
conducting due diligence on a Parkinson's disease product with a novel mechanism of action that
was owned by a Finnish company.  F. 261.  For a number of years, Endo sold an immediate-
release Parkinson's disease drug known as Sinemet, which was the original formulation of
carbidopa and levodopa.[31]  F. 260.  Thus, the evidence demonstrates that Endo had both an
interest in Parkinson's disease treatments and knowledge about such treatments through its
experience with Sinemet.

Impax also had a long-standing interest in Parkinson's disease treatments.  When Impax's
brand division was founded in 2006, it focused its efforts on central nervous system and
neurology products, with a specific focus on improved treatments for Parkinson's disease.
F. 263.  As part of its focus on central nervous system and neurology products, Impax's brand
division also concentrated on developing a network of relationships with neurology physicians.
F. 263.  In addition, in furtherance of its interest in Parkinson's disease treatment, Impax had
undertaken attempts to develop an extended release drug for treatment of Parkinson's disease.

---

[31] A combination of carbidopa and levodopa molecules is the "gold standard" treatment for Parkinson's disease.
F. 265.

F. 268-276.  The majority of carbidopa-levodopa medications are available only in immediate-release formulations, which requires frequent dosing and often results in patients' losing control of their motor skills as they experience rapid increases and decreases in the concentration of medicine in their bodies, especially as the disease progresses.  F. 266-267.

Impax's first attempt to develop an extended-release carbidopa-levodopa treatment for Parkinson's disease was known as Vadova.  F. 268.  That product was intended to combine carbidopa-levodopa with controlled-release technology to give a much smoother effect to the amount of medication in Parkinson's disease patients' blood, providing for more control over motor symptoms.  F. 268.  Vadova was never fully developed or marketed.  F. 268.

Impax's second attempt to develop an extended-release Parkinson's disease medication was known as IPX-066, which was a combination of carbidopa and levodopa that had been formulated to extend the release profile of Parkinson's disease drugs.  F. 269-270.  As with Vadova, IPX-066 was intended to better treat Parkinson's disease patients by allowing for less frequent and more consistent dosing of up to six hours, as well as more consistent motor symptom control.  F. 271.  By significantly extending the absorption of the drug, IPX-066 would provide "significant improvement of the patient's quality of life."  F. 272.  IPX-066 had reached Phase III clinical trials in 2010 and was marketed under the name Rytary in 2015.  F. 273.

By 2010, Impax had also begun efforts to develop a "next generation" of IPX-066. F. 274.  The goal of the next-generation product, which was originally designated by Impax as IPX-066a and later designated as IPX-203, was to further improve treatment for Parkinson's disease patients by extending dosing time even longer than IPX-066.  F. 274.

### (b)      Negotiations

In early 2009, Impax approached Endo about a collaboration with respect to Endo's central nervous system drug Frova, which treats migraine headaches.  F. 275-276.  Endo declined.  F. 277.  Although Endo and Impax again discussed a potential product collaboration on Frova in late 2009, in connection with discussions about settlement of the Endo-Impax patent litigation, these discussions did not result in a collaboration agreement.  F. 278-280.  However, in the course of these discussions, Endo became aware of Impax's efforts to develop drugs for

Parkinson's disease and expressed an interest.  F. 281.  Subsequently, in May 2010, after discussions regarding settlement of the Endo-Impax patent litigation resumed, Impax and Endo began discussing a potential joint development agreement and Endo expressed an interest in marketing IPX-066.  F. 283-284.

At Endo, the senior vice president of corporate development, Dr. Robert Cobuzzi, and his team of employees were responsible for evaluating potential pharmaceutical business deals for further development.  F. 287.  Between May 17 and 26, 2010, the date of Endo's initial term sheet for the DCA (F. 294), Impax and Endo held two conference calls and exchanged numerous emails and materials regarding IPX-066, including a presentation on the clinical benefits of IPX-066 over Sinemet, which at that time was the leading carbidopa-levodopa brand product.  F. 286, 288.

On May 20, 2010, Dr. Cobuzzi directed his team to work on an opportunity evaluation worksheet ("OEW") to assess a potential collaboration with Impax on IPX-066.  F. 289.  An OEW is Endo's standard method of assessing the science, medical information, commercial opportunity, and related financial considerations behind a potential collaboration project.  F. 346.  Any time Endo considers a pharmaceutical collaboration, it completes an OEW.  F. 346.

On May 21, 2010, Endo asked an outside consulting firm to provide guidance about the potential value of IPX-066.  F. 290.  In addition, on May 22, 2010, Dr. Paterson, Impax's vice president of business development, provided Dr. Cobuzzi and a number of additional Endo employees access to a "data room" with a large amount of IPX-066 related documents, covering: (i) intellectual property/legal; (ii) chemistry, manufacturing, and controls; (iii) commercial; (iv) regulatory; (v) clinical; (vi) clinical pharmacology; and (vii) Impax's unredacted confidential presentation on IPX-066.  F. 291.

On May 26, 2010, Endo sent Impax an initial term sheet for an option agreement concerning IPX-066 "and all improvements, modifications, derivatives, formulations and line extensions thereof."  F. 294.  Under this proposal, Endo would have the option to receive either the right to co-promote the product to non-neurologists within the United States or to purchase an exclusive license to the product in the United States.  F. 294.  Endo would pay Impax a $10

million option fee upon signing the agreement and a $5 million milestone fee upon the FDA's acceptance of the NDA for the product. F. 294. If Endo exercised the option to co-promote the product, Endo would receive a fee of "50% on the net sales" from prescriptions by non-neurologists in the United States. F. 294. If Endo exercised the option for a license, Endo would pay Impax a fee based on projected sales. F. 294.

Endo's May 26 proposal was not acceptable to Impax. As Impax's vice president of intellectual property litigation and licensing, Margaret Snowden, explained: "Endo was interested in the Parkinson's space and wanted the deal to cover both products, the original IPX-066 and the follow-on product, but Impax wasn't interested in doing the deal on IPX-066." F. 313. Dr. Michael Nestor, the head of Impax's brand division, was "absolutely not" willing to consider an agreement with Endo regarding IPX-066. F. 311. In 2010, Impax had already shouldered all development risks and development costs for IPX-066 and it made little sense to Impax to share potential profits from the drug with a partner. F. 310. Furthermore, in 2010, Impax was not looking for a partner in the United States for IPX-066 because Impax planned to market the product domestically on its own, utilizing its established neurologist network. F. 309.

Accordingly, Impax made a counter-offer to Endo on May 27, 2010 for a research and development collaboration for what Impax referred to as IPX-066a, its "next generation" of IPX-066. F. 295, 313-314. Impax advised Endo that Impax would name this product "at signing." F. 295. IPX-066a, which later became known as IPX-203, was a planned carbidopa-levodopa-based product that Impax hoped would improve the treatment of symptoms and also have more favorable dosing as compared to IPX-066. F. 314.

Contrary to the inferences urged by Complaint Counsel, designation of IPX-066a was not a "late switch" by Impax from IPX-066, but a rejection by Impax of Endo's proposal for a deal for both IPX-066 and IPX-066a, and a counterproposal by Impax for a collaboration for IPX-066a only. Impax had initially sent IPX-066 materials to Endo to review in order to "help [Endo] frame their evaluation of the market environment into which IPX-203 could be launched as a successor to IPX-066." F. 328. When Impax sought a partner to market the product outside the United States, it had already established a data room regarding IPX-066. F. 329. Because

IPX-203 was a follow-on product to IPX-066, the foundational information in the data room regarding IPX-066 was relevant to show Impax's plans for IPX-203. F. 329.

Impax's May 27, 2010 counter-offer for a collaboration for IPX-066a included an upfront payment at signing of $3 million, and six additional milestone payments, tied to the initiation and completion of Phases II and III development and final FDA approval, for a total of $60 million. F. 295. Over the next ten days, Endo and Impax traded proposals regarding the timing and total amount of the payments under the DCA, which culminated in the final DCA terms, summarized above. F. 296-308. On June 4, 2010, Impax named IPX-203 as the product previously designated as IPX-066a. F. 303. Impax also provided additional information to Endo regarding Impax's research into the IPX-203 product concept, and about how IPX-203 would improve upon existing Parkinson's disease therapies, including IPX-066. F. 322.

### (c) Relationship between IPX-066 and IPX-203

IPX-203 was intended to be a modification of carbidopa and levodopa, a well-known combination treatment for Parkinson's disease. F. 324. Levodopa generally is not well absorbed in the colon. F. 325. The information Impax provided on IPX-203 made clear that IPX-066 and IPX-203 were intended to be ███████████████████████████. F. 323. IPX-203 would have ████████████████████████████████████ ███████████. F. 326. The information Impax provided Endo on IPX-203 ████████ ████████████████████████████████████████████████████ █████████████████████████████████████. F. 327.



Although IPX-203 was in the beginning of the formulation stage, Impax reasonably relied on Dr. Suneel Gupta, the chief scientific officer at Impax in 2010, who believed that the product concept for IPX-203 was "doable." F. 315-316. As early as November 2009, Impax had reviewed ████████████████████████████████████████████████████. F. 378. Dr. Gupta had expertise in reformulating existing chemical compounds to create commercial and clinical improvements through reformulation and "is renowned for taking existing compounds and reformulating them and turning those products into very successful drugs in the marketplace that meet significant medical need[s]." F. 316. When Dr. Gupta tells

126

Impax management that a product concept is "doable," Impax's senior management believes him and relies on his judgment.  F. 316.  Moreover, Impax's expertise has long been the development of extended-release technologies.  F. 317.

The ultimate goal of IPX-203 was to further extend the amount of time patients have control over their motor symptoms after taking the medication.  F. 319.  IPX-203 would also employ a "much more simplified" dosing regimen than IPX-066, making it more intuitive for doctors to prescribe the product.  F. 320.  Impax projected that the total cost of development for IPX-203 would be between $80 and $100 million by 2017, based on a "natural extrapolation" of the development costs incurred by IPX-066.  F. 321.

Impax was planning to withdraw promotion and sampling of IPX-066 (Rytary) once IPX-203 reached the market.  F. 318.  This would allow patients to continue successful use of IPX-066 while avoiding any division of Impax's sales force between multiple Parkinson's disease products, which was consistent with the commercial goal of extending the IPX-066 franchise.  F. 318.

### (d)    Endo's evaluation of product collaboration for IPX-203

Endo carefully evaluated the commercial, medical, and risk allocation aspects of the DCA.  On June 7, 2010, Dr. Cobuzzi provided the final OEW on IPX-203 to Endo's executive team.  F. 307.  In terms of the commercial aspects of the DCA, Endo's OEW on IPX-203 stated that the DCA was "a good deal for Endo."  F. 307.  Endo analyzed the net present value of its initial investment under the DCA and determined that the DCA and IPX-203 had a "very reasonable rate of return" of ▮▮▮▮ under base case assumptions, and a net present value of ▮▮▮▮▮.  F. 352-353.  Such a return would exceed Endo's general requirement of a 10% rate of return on a development and co-promotion deal.  F. 352.  Endo thought it could realize this return, notwithstanding that Parkinson's disease treatments were heavily genericized, because IPX-203 would offer a superior product to other generics.  F. 354.  In addition, Dr. Cobuzzi recommended the DCA as "an exciting opportunity for Endo" because it "further builds [Endo's] product pipeline for the future with a drug candidate that fits with [Endo's] commercial

footprint."  F. 349.  Endo did not have many products in its commercial pipeline in 2010, and did not have the capacity to develop new products in-house.  F. 350.

Endo's evaluation of the medical aspects of IPX-203 concluded that IPX-203 would extend the period of time over which the drug is absorbed, which would allow doctors to lower the doses needed for effective treatment.  F. 357.  This would provide an opportunity to address doctor dissatisfaction with existing drugs that tend to begin to lose effectiveness within 10 to 15 years after initiation of therapy, and would meet a need for better control of efficacy over time. F. 356.  Endo's OEW for IPX-203 also noted that IPX-203 represented a further improvement over IPX-066, including "faster onset of action, superior management of motor fluctuations and convenient oral dosing in a simplified regimen that could require no more than twice-daily administration, and in some cases even once-daily administration."  F. 358.  Taking the drug less frequently would be particularly beneficial for Parkinson's disease patients, who can have trouble "even picking up the pill."  F. 359.  Endo's evaluation team concluded that IPX-203 could move very quickly through development and "was an exciting compound in that it was made up of . . . two compounds that have already been approved by the FDA."  F. 361.  Endo reasonably believed that there was a path to obtaining FDA approval and bringing IPX-203 to market.  F. 361-363.

Endo also evaluated how risk was allocated under the DCA.  Endo's analysis in the OEW on IPX-203 explained to Endo's board of directors that the DCA's "deal structure acceptably mitigates Endo's exposure despite the early development stage."  F. 364.  Endo was entitled to share in the profits from IPX-203 without performing any development work or otherwise expending internal resources.  F. 365-366.  Moreover, Endo retained the same profit-sharing rights no matter how much Impax spent on IPX-203's development, which Impax had projected could amount to $100 million by 2017.  F. 321, 367.  In addition, Endo was obligated to make only a single contribution ($10 million) to Impax's development work.  Endo would be required to make any additional milestone payments only to the extent that there was successful completion of development milestones, such as Phase II clinical trials.  F. 365.  Furthermore, the $10 million single investment to buy into the IPX-203 opportunity was "not an uncharacteristically large amount of money" to Endo, compared to other collaboration

agreements.  F. 370.  Accordingly, Endo was "comfortable" with the collaboration from the perspective of risk.  F. 368.

Dr. Cobuzzi believed that the profit-sharing rights Endo received under the DCA justified Endo's payment obligations.  F. 369.  Dr. Cobuzzi and his team concluded that Endo should enter into the DCA and Dr. Cobuzzi made that recommendation to Endo's CEO, CFO, and board of directors.  F. 347.

### (e)      Value to Impax of collaboration for IPX-203

In 2010, Impax did not have the money to begin working on the clinical research for IPX-203.  F. 375.  Impax could not fund the project internally because its shareholders did not "want to see large sums of money being spent over an extended time period on a single product.  They were accustomed to [research and development] investments being made on many individual products that you bring to market as a generic."  F. 375.  Thus, Impax needed external funding to move the development of IPX-203 forward, and explored a number of options, including seeking money from venture capital firms.  F. 376.  Impax's brand drug development team was "very excited" about the idea of funding IPX-203 through a co-development program with Endo. F. 377.

In negotiating the DCA, Impax initially wanted to retain any profits flowing from prescriptions written by high-prescribing non-neurologists – which were the profits Endo sought and eventually obtained under the DCA – because of the "significant" amount of money those prescriptions represented.  F. 372.  Impax envisioned promoting IPX-203 to at least "a couple of thousand physicians who were primary care physicians that prescribed [medications to] Parkinson's patients . . . ."  F. 373.  Nevertheless, in order to get funding through a co-development program with Endo, Impax agreed to give up a share of the profits for IPX-203.

### (f)      Impax's continued efforts to develop IPX-203

Since executing the DCA in June 2010, Impax has devoted substantial efforts to IPX-203's development, including over ▮▮▮▮▮▮▮▮ in employee hours spent working on IPX-203.  F. 379.  In 2010, Impax commissioned preclinical pharmacokinetic studies testing several

relevant compounds and began laboratory research. F. 380. Impax undertook multiple rounds of pharmacokinetic studies to test various IPX-203 formulations in an effort to assess clinical improvements, which were completed as of 2012. F. 381. Since then, Impax conducted additional pharmacokinetic studies and completed Phase I clinical trials. F. 382. Impax manufactured a clinical supply of IPX-203, developed protocols for Phase II clinical trials, submitted those protocols to the FDA, and secured FDA approval for efficacy and safety studies in November 2014. F. 383.

Further development work on IPX-203 was delayed for approximately two years after Impax experienced delays in the development of IPX-066, the drug IPX-203 was intended to extend and improve upon. F. 384. When IPX-066 was delayed, resources were shifted to getting IPX-066 approved and to market. F. 385. Growing the market for IPX-066 would benefit IPX-203. F. 385. Further development work on IPX-203 was also delayed after Impax received an FDA Warning Letter in 2011 relating to Impax's manufacturing processes, which caused Impax to direct its scientific staff to spend their time helping the operations people correct the deficiencies that the FDA noted in its last inspection. F. 386. IPX-203 development was not going to go forward until Impax "got over that hurdle." F. 387.

Notwithstanding the delays and the DCA's termination (discussed below), Impax has continued development work on IPX-203. F. 388. IPX-203 is currently the leading compound in research and development in Impax's brand division. F. 389. Impax has completed Phase II clinical trials for IPX-203, which showed a statistically significant improvement in treatment over IPX-066 and other existing treatments, reducing the amount of time Parkinson's disease patients are without control over their motor symptoms, as compared to both immediate-release carbidopa-levodopa treatments and IPX-066. F. 390-391. Phase II trials suggest that IPX-203 will offer an improvement of over two hours in motor symptom control when compared to immediate-release carbidopa-levodopa treatments and one hour of improvement over IPX-066. F. 392. An improvement of over two hours in motor symptom control over existing medications is a "terrific result" that is "highly statistically significant" and "clinically meaningful." F. 393. Having symptoms under control for a longer time period is "a very important thing" for patients. F. 394. Impax plans to begin Phase III clinical trials in 2018. F. 390.

Impax's IPX-203 development efforts revealed that the formulation of IPX-203 contemplated by the DCA could not achieve the intended clinical benefits.  F. 396.  Between 2014 and 2015, Impax's research team determined that it could not achieve the desired product profile with a ▋▋▋▋▋▋▋▋▋▋▋▋▋ formulation.  F. 397.  Impax consequently began pursuing alternative approaches to an extended-release formulation of carbidopa and levodopa. F. 397.

After extensive research and testing, ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.
F. 398.  In April 2015, Impax approached Endo to update it on the status of Impax's IPX-203 development work, including the change in formulation strategy, and made a presentation describing Impax's formulation testing and results and ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. F. 403.[32]

### (g)     Termination of the DCA

Although the specific formulation of IPX-203 changed, Impax still viewed ▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ it had been developing since 2009 "[b]ecause it was all towards the same end.  It still involved carbidopa-levodopa.  It was just a variation in formulation."  F. 400.  During the April 2015 meeting between Impax and Endo at which Impax updated Endo on the change in formulation strategy, Impax offered to amend the DCA so that the DCA would cover the ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. F. 403, 408.

Impax was prepared to amend the DCA to include the new formulation of IPX-203 in the DCA because it wanted to work with Endo in order to move the drug forward and believed the new formulation would give it "an avenue through which we could continue the development of IPX-203."  F. 409.  Endo initially agreed to the proposed amendment, noting that it "would like to maintain or even increase [its] involvement with the development program . . . as [it] remain[ed] optimistic this will be a successfully differentiated product, which Endo looks



---

[32] In 2014, Impax filed an Investigational New Drug Application with the FDA regarding ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋, which the FDA accepted.  F. 399.

forward to the opportunity to co-promote . . . with Impax." F. 410.  However, Endo subsequently informed Impax that Endo had decided not to amend the existing agreement and would no longer participate in co-development program, which surprised Impax.  F. 412.  Endo did not provide an explanation.  F. 412.

Because Endo retracted its initial expression of interest in amending the DCA to cover the new formulation for IPX-203, Impax and Endo terminated the DCA by mutual agreement, effective December 23, 2015.  F. 414.

### iii.    Conclusion

The evidence, summarized above and detailed in Section II.C.3, proves that the DCA was a bona fide product development collaboration, and that the $10 million payment was justified by the profit-sharing rights given to Endo under the DCA.  The product collaboration for IPX-203 was consistent with Endo's and Impax's business interests.  Both Endo and Impax had a history of interest in Parkinson's disease treatments, and Endo had entered into many collaboration agreements with other pharmaceutical companies, including risky early stage development collaborations.  Impax required outside funding to advance the development of IPX-203, which Impax projected could cost between $80 and $100 million by 2017.  Moreover, Impax continued its development efforts regarding IPX-203 for years after executing the DCA, which further indicates that the DCA was a bona fide agreement.

In addition, substantial weight is properly given to the fact that Endo analyzed the commercial and medical merits of co-promoting IPX-203, as well as the risk allocation under the DCA, and concluded that the DCA was a "good deal" for Endo.  The record supports Endo's conclusion, including the facts that Endo would receive its share of the profits without performing any development work; Endo did not consider the upfront payment of $10 million to be uncharacteristically large; and the projected rate of return ███████ was nearly ███████ Endo's minimum requirements for a co-development deal.

### iv.    Complaint Counsel's arguments as to lack of justification

All of Complaint Counsel's arguments in support of a conclusion that the $10 million payment was unjustified have been fully reviewed, and have been rejected as either contrary to the weight of the evidence or insufficiently supported.[33]  Only a few of Complaint Counsel's arguments require further elaboration, and are discussed below.

### (a)    Asserted "switch" from IPX-066 to IPX-203

Complaint Counsel asserts that the evidence shows that the $10 million upfront payment in the DCA was the same as the amount of the payment in Endo's initial offer, despite a "switch" from IPX-066 to IPX-203, which, according to Complaint Counsel, reduced the value of the deal to Endo.  Thus, Complaint Counsel argues, the $10 million upfront payment was not in fact an exchange for value received by Endo under the DCA.  However, the evidence shows that, while Endo's initial term sheet included a $10 million upfront payment for a proposed deal on IPX-066, it also contained more limited profit-sharing terms than those agreed upon in the DCA.  Under Endo's May 26, 2010 initial term sheet co-promote proposal, Endo would receive 50% of the profits from sales generated by non-neurologists.  F. 294.  Under the final DCA, Endo received a right to 100% of those profits.  F. 250.  Moreover, as explained in Section III.C.4.c.ii.(b) above, designation of IPX-066a (IPX-203) was not a "switch" by Impax from IPX-066, but a rejection by Impax of Endo's proposal for a deal regarding both IPX-066 and IPX-203, and a counterproposal by Impax for a collaboration on IPX-203 only.  The evidence shows that Impax was never interested in partnering on IPX-066.  Thus, Complaint Counsel's assertion that this "switch" shows the payment was unjustified is rejected.

---

[33] For example, Complaint Counsel contends that Endo and Impax "understood" the DCA to be a payment for the Opana settlement, relying on two documents.  Neither document warrants the inference urged by Complaint Counsel.  The first document, an internal Endo document drafted by Dr. Cobuzzi, listed the "license deal completed with Impax" as adding "topline revenue for Opana."  CX1701 at 005.  However, although given the opportunity, Complaint Counsel did not elicit any testimony from Dr. Cobuzzi on the meaning of this document.  The second document, an internal Impax document, listed $10 million as cash flow from the "Endo Settlement."  However, when this document was shown to Impax's former CFO, Mr. Koch, he testified that he did not recognize the document, that it did not appear to be an accounting document, that other aspects of the document were inconsistent with Impax's common budgeting practices, and that it could have been referring to the research and development collaboration.  CX2701 at 004; CX4018 (Koch, Dep. at 147-48).  Furthermore, Complaint Counsel's assertion that the parties "understood" the DCA to be a payment for delay is not only unsupported, but is also against the weight of the evidence, which, as set forth above, demonstrates that the DCA was a bona fide product collaboration.

### (b) Due diligence

Complaint Counsel contends that Endo did not perform appropriate due diligence as to the merits of IPX-203 or the DCA.  However, the evidence shows that Impax provided Endo with information regarding Impax's research into the IPX-203 product concept and about how IPX-203 would improve upon existing Parkinson's disease therapies, including IPX-066.  F. 322.  Impax had provided information to Endo about IPX-066, and the information Impax provided on IPX-203 made clear that IPX-066 and IPX-203 were intended to be ███████████████████ ████████████████████.  F. 323.

In addition, the materials Impax sent to Endo to review regarding IPX-066 were, as stated by Dr. Cobuzzi, "tremendously" helpful to Endo in assessing IPX-203.  F. 330.  As Dr. Cobuzzi explained, both IPX-066 and IPX-203 were based on carbidopa and levodopa.  The only difference in IPX-203 ██████████████████████████, which Endo viewed as "relatively simple," notwithstanding that this was a change in the chemistry.  F. 330.  Endo's chief operating officer at the time of settlement and the individual responsible for assessing the commercial opportunity of any product, also deemed IPX-066 an appropriate commercial proxy for assessing IPX-203.  F. 331.  The IPX-066 materials, as well as Endo's experience with other Parkinson's disease treatments, including Sinemet, suggested to Endo that the successful development of IPX-203 would more effectively treat Parkinson's disease symptoms.  F. 260, 332, 343.  Endo's reliance on information about a related drug when evaluating IPX-203 was not unusual.  F. 335.  Rather, the evidence shows that Endo routinely relied on information about one pharmaceutical asset to assess another, related pharmaceutical asset.  F. 335.  Indeed, when information about related pharmaceutical assets is available, it is "much easier" to evaluate a proposed drug than it is to evaluate a new chemical entity on its own.  F. 336.

Finally, as noted above, Dr. Cobuzzi was the lead scientist on the team that evaluated the commercial and scientific merits of the DCA for Endo.  F. 337.  Dr. Cobuzzi holds a Ph.D. in molecular and cellular biochemistry and wrote his dissertation on Parkinson's disease.  F. 339.  In addition, Dr. Cobuzzi's team included at least one other scientist with a background in Parkinson's disease treatments, Dr. Kevin Pong.  F. 340.  Dr. Pong, who was in charge of evaluating Endo's scientific licenses, had a "significant amount of experience" in the area of

Parkinson's disease treatments. F. 340. Endo knew the underlying molecules, the carbidopa and levodopa, had looked at a number of Parkinson's disease opportunities in the past, and knew the general commercial landscape. F. 344. Dr. Cobuzzi's belief that Endo had sufficient time to assess IPX-203 before entering into the DCA is entitled to substantial weight, given his qualifications, his and Endo's familiarity with Parkinson's disease treatments, and the detailed nature of the information Impax provided on IPX-066. F. 342-345. Accordingly, Complaint Counsel's assertion that Endo did not perform proper due diligence with regard to the DCA is rejected.

### (c)     Expert opinions

Complaint Counsel's argument that the $10 million payment under the DCA was unjustified because it was negotiated as part of the patent litigation settlement discussions, not as a standalone agreement, is based largely on the opinion of its proffered expert in negotiations, Professor Max Bazerman. Professor Bazerman opined that the adversarial relationship between Impax and Endo would have made independently negotiating the DCA highly unlikely, unless the business transaction was linked to settlement discussions. CX5001 (Bazerman Expert Report at 021-22 ¶ 43). This opinion ignores the significant facts that Impax and Endo had discussed a potential collaboration on Frova (another central nervous system drug) in early 2009, months before settlement discussions began (F. 275), that Endo had been looking for an opportunity in the Parkinson's disease area for a number of years (F. 257-261), and that Impax had been exploring a number of approaches to get external funding to move the IPX-203 product forward in development (F. 376). Even though the evidence shows that the DCA was negotiated and executed contemporaneously with the SLA and is incorporated into the SLA (F. 123, 245), this neither compels the conclusion that the $10 million payment under the DCA was unjustified, nor precludes the conclusion that the $10 million payment under the DCA was justified as fair value for the profit-sharing rights Endo received under the DCA.

Complaint Counsel's argument that the $10 million payment under the DCA should be deemed unjustified because the DCA was not consistent with Endo's, or the industry's, usual business development practice, is based largely on the opinion of its proffered expert in

pharmaceutical business development, Dr. John Geltosky.[34]  Although he opined that Endo did not perform a comprehensive and integrated due diligence analysis of IPX-203 before agreeing to the terms of the DCA (CX5003 (Geltosky Expert Report at 023-24 ¶ 37)), Dr. Geltosky did not offer an opinion regarding whether Endo exercised good business judgement in its due diligence.  F. 427.  Furthermore, Dr. Geltosky admitted that information about IPX-066 provided useful information for IPX-203 and that Impax provided Endo with comprehensive information regarding IPX-066, including clinical information regarding safety and efficacy, intellectual property, technical due diligence, and financial analysis.  F. 425-426.  The opinion offered by Dr. Geltosky is outweighed by documentary evidence and fact witness testimony summarized above showing the sufficiency of the due diligence steps taken by Endo.

In addition, although Dr. Geltosky testified that the DCA was not consistent with the normal practice in the pharmaceutical industry, he did not offer an opinion regarding whether the DCA was a bona fide scientific collaboration or whether Endo exercised good business judgement in entering the DCA.  F. 417.  Indeed, Dr. Geltosky acknowledged that Endo's senior vice president of corporate development (Dr. Cobuzzi) is better qualified to assess the strategic fit of the DCA for Endo than he is.  F. 416.

Expert opinion that a process was unusual for the industry, even if accepted, does not warrant the inference that the DCA was a pretext, and not a bona fide side deal for value, because such inference would be contrary to the weight of the evidence showing that the DCA was justified as fair value for profit-sharing rights.  *See Schering*, 402 F.3d at 1069-71; *In re Schering-Plough Corp.*, 2002 FTC LEXIS 40 at **254-55 (June 27, 2002), *rev'd by In re Schering-Plough Corp.*, 2003 FTC LEXIS 187 (2003), *rev'd by Schering-Plough*, 402 F.3d 1056.  In *Schering*, the FTC argued that a $60 million payment from a branded drug manufacturer to a generic drug manufacturer, pursuant to a patent litigation settlement agreement through which the branded drug company obtained licenses for the generic company's products,

---

[34] Dr. Geltosky has worked on a handful of development deals in their early stages and has never negotiated a development and co-promotion agreement similar to the DCA.  The majority of Dr. Geltosky's experience with pharmaceutical collaboration agreements relates to his employment with large pharmaceutical companies and Dr. Geltosky admitted that he could not speak to how the universe of small or mid-sized pharmaceutical companies approach partnerships for early-stage products.  F. 415.

was not a bona fide royalty payment, but instead was an inducement for the agreement by the generic to delay generic entry. 402 F.3d at 1068. Complaint Counsel in the administrative litigation had relied on expert opinion that the parties' diligence was "strikingly superficial," *Schering*, 2002 FTC LEXIS 40, at **254-55, and "fell astonishingly short of industry standards." *Schering*, 402 F.3d at 1069. The Court of Appeals in *Schering* rejected these arguments, and held that "substantial and overwhelming evidence" weighed against the conclusion that the licenses were not worth the payment made and were exchanged for delay. *Id.* at 1070-71.

The evidence presented in *Schering* is analogous to the evidence in the instant case. Similar to the brand drug manufacturer in *Schering*, Endo had a demonstrated, ongoing interest in the type of product that was the subject of the collaboration, F. 257-261; *see Schering*, 402 F.3d at 1069, and was well-familiar with the relevant commercial environment. F. 337-345; *see Schering*, 2002 FTC LEXIS 40, at **251-52. And, as in *Schering*, Complaint Counsel's experts' criticisms of the diligence process in the instant case did "nothing to refute that [the brand's] payments [for the licensed products were] a fair price." F. 428-436; *see Schering*, 402 F.3d at 1071.

Dr. Geltosky also opined that the payment structure of the DCA was unusual because, in his opinion, the DCA payment structure was "frontloaded" with a large upfront payment with decreasing milestone payments, while early-stage development deals are typically "backloaded." However, Dr. Geltosky did not compare the payment terms in the DCA to the payment terms in other pharmaceutical collaboration agreement agreements. F. 431. Moreover, expert opinion that the payment was "unusual" does not warrant an inference that the payment was unjustified. For purposes of justification, the issue is whether the payment was fair value for what was received. Dr. Geltosky did not opine on that value. F. 430, 432.

Indeed, Dr. Geltosky did not conduct any valuation analysis of the DCA, did not calculate a net present value of the DCA at the time it was executed, and did not conduct any other form of empirical analysis regarding the DCA. F. 429. Dr. Geltosky did not offer any opinion about the actual value of the DCA to Endo and did not address the actual value of the profit-sharing rights acquired by Endo or whether Endo's profit-sharing rights justified its DCA payment obligations. F. 430, 432. *See also* F. 417, 419, 421, 427, 434. These shortcomings

137

incurably undermine Dr. Geltosky's opinions. *See Schering*, 402 F.3d at 1069 (stating that the court was "troubled" by expert opinion that a payment was "grossly excessive" and that Schering's due diligence fell short of industry standards, where the expert had "arrived at his conclusions without preforming a quantitative analysis" of the licensed products).

Moreover, Complaint Counsel's economic expert, Professor Noll, who relied on Dr. Geltosky's "analysis of the degree to which the $10 million payment and co-development deal represented the acquisition of an asset that was approximately valued at a $10 million price," agreed that if Dr. Geltosky did not offer an opinion regarding the actual value of the DCA to Endo at the time it was executed, then Professor Noll "would not include the $10 million as part of the large payment that was unjustified." F. 437-438. Professor Noll also acknowledged that, if a payment from a brand company to a generic company is used to purchase a bundle of rights at a fair market price, the payment is justified. F. 435. Indeed, Professor Noll testified that if Dr. Geltosky did not provide a "sufficiently well-documented rationale for the conclusion that the payment was unjustified, then you would pull [the DCA] out of the case." F. 439.

### (d)     Conclusion

As explained above, the evidence proves that the $10 million payment made by Endo to Impax under the DCA was justified as fair value for profit-sharing rights Endo received under the DCA.

### 5.     Conclusion on initial burden of proof

Of the total reverse payment conferred under the Endo-Impax Settlement, the $10 million payment under the DCA was justified. However, the value conferred to Impax by the no-AG provision of the SLA, secured by the Endo Credit, totaling $23 to $33 million in projected sales revenue for Impax, was an unjustified reverse payment. The value of this unjustified reverse payment substantially exceeded the estimated saved litigation costs. In addition, the evidence supports the inference that Endo and Impax agreed to this reverse payment as an inducement to Impax, to compensate Impax for giving up its patent challenge and committing not to launch a generic Opana ER until January 2013. Therefore, based on the totality of the record, viewed as a whole, the evidence supports the inference that the SLA included a payment to prevent the risk

of competition. Accordingly, Complaint Counsel has met its initial burden of proving an anticompetitive harm.

### D. Market Power

Market power is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). It is unclear whether proof of market power is a necessary element of a reverse payment settlement challenge. Although *Actavis* referred to market power as one of several traditional antitrust considerations, market power is not expressly included among the factors listed in *Actavis* as determining the likelihood of anticompetitive effects. *Actavis*, 133 S. Ct. at 2237 (stating that "likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification"); *see also King Drug*, 791 F.3d at 412 (same). Regardless of whether proof of market power is mandatory, in the instant case the evidence supports the conclusion that Endo had market power in the relevant oxymorphone ER market at the time of the Endo-Impax Settlement, as explained below.

By their nature, pharmaceutical patents often carry with them market power. *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 755 (E.D. Pa. 2015), *aff'd* 868 F.3d 132 (3d Cir. 2017). As the court explained in *Aggrenox*, a patent "grant[s] the legal right to exclude generic competition and the practical ability to profitably charge higher prices than generic competitors would charge." 199 F. Supp. 3d at 668. *Accord Lipitor*, 2018 U.S. App. LEXIS 93, at *6 ("A distinguishing feature of a reverse settlement is that the bargained-for abstention period falls within the term of the patent at issue, when the patent holder would normally enjoy a government-conferred monopoly.").

*Actavis* recognizes that market power is often associated with a pharmaceutical patent, and further holds that proof of that power, derived from the patent, can be found in the reverse payment settlement itself:

> [W]here a reverse payment threatens to work unjustified anticompetitive harm, the patentee likely possesses the power to bring that harm about in practice. At least, the "size of the payment from a branded drug manufacturer to a prospective

139

generic is itself a strong indicator of power" – namely, the power to charge prices higher than the competitive level. An important patent itself helps to assure such power. Neither is a firm without that power likely to pay "large sums" to induce "others to stay out of its market."

*Id.* at 2236 (citations omitted). *Accord Loestrin*, 814 F.3d at 552 n.12 ("*Actavis* explains how to evaluate the market power question: 'the size of the payment from a branded drug manufacturer to a prospective generic is itself a strong indicator of power.'"). The court in *In re Cipro Cases I & II* further explained:

> Logically, a patentee would not pay others to stay out of the market unless it had sufficient market power to recoup its payments through supracompetitive pricing. Consequently, proof of a reverse payment in excess of litigation costs and collateral products and services raises a presumption that the settling patentee has market power sufficient for the settlement to generate significant anticompetitive effects.

348 P.3d at 869. *See also Aggrenox*, 199 F. Supp. 3d. at 662 (stating that, while it is conceivable that a patent might be worthless, "[i]t is vanishingly unlikely . . . that a large reverse payment would be made in such a case, which is why a large reverse payment is such a strong indicator of market power").

In the instant case, as held in Section III.C.2.c above, the evidence proves that Endo made an unjustified reverse payment to Impax that was sufficiently large to induce Impax to drop its patent challenge and agree not to enter the relevant oxymorphone ER market until January 2013. Under *Actavis*, this is strong proof of Endo's market power in the relevant market.

Other evidence also supports the conclusion that Endo had market power in the relevant oxymorphone ER market. The evidence shows that in 2010, Endo had a 100% share of the market for oxymorphone ER. F. 90. In addition to the intellectual property barriers to entry associated with Endo's patents, there are regulatory barriers created by the Hatch-Waxman Act. F. 92. For instance, the Hatch-Waxman Act imposes a 30-month stay on FDA approval of an ANDA, if a branded drug company files a patent infringement suit against a Paragraph IV ANDA filer. F. 93. Moreover, the first filer's 180-day exclusivity period provided by the Hatch-Waxman Act serves as a barrier to entry by barring later ANDA filers from entering until the

period expires. F. 93. These barriers gave Endo the power to exclude competitors even if its patents eventually were found not to be valid or infringed. F. 95.

Based on the foregoing, the evidence demonstrates that Endo had market power in the relevant market for oxymorphone ER. The analysis next turns to the procompetitive benefits of the SLA.

### E. Procompetitive Benefits

#### 1. Overview

Respondent argues that the SLA granted Impax a broad patent license, which enabled Impax to sell its generic Opana ER uninterrupted since Impax entered the market in January 2013, while all other generic manufacturers have been enjoined as a result of patent infringement litigation by Endo. Respondent argues that, therefore, the SLA provided substantial procompetitive benefits.

Complaint Counsel's opposing argument – that Respondent's asserted procompetitive benefits cannot be considered because the only legally cognizable procompetitive effects are those that arise from the reverse payment – is without merit, as explained in Section III.B.7 above. The "restraint" at issue in a reverse payment settlement case is not the payment itself, but the use of the payment in such a way as to restrain the onset of generic competition. Thus, procompetitive benefits arising in connection with the settlement agreement as a whole are properly considered as part of a well-structured rule of reason analysis. *See K-Dur*, 2016 U.S. Dist. LEXIS 22982, at *46 ("If a prima facie case has been made out, the defendants may come forward with additional justifications to demonstrate the settlement agreement nevertheless is procompetitive."); *Cipro Cases I & II*, 348 P.3d at 871 (same); *see also In re Impax*, 2017 FTC LEXIS 130, at *27-33 (Commission rejecting Complaint Counsel's request to preclude consideration of entry prior to termination of patent and effect of post-settlement events as potential procompetitive justifications).

141

## 2.    Relevant provisions

The SLA granted Impax a broad patent license and a covenant not to sue that covered not just the Opana ER patents owned by Endo at the time of the Endo-Impax patent litigation, but all patents "that would ever be owned by [Endo] that would cover the Impax product."  F. 567. Specifically, pursuant to section 4.1(a) of the SLA, Impax obtained a license to the '933, '456, and '250 patents, and to any pending patents "that cover or could potentially cover the manufacture, use, sale, offer for sale, importation, marketing or distribution of" Impax's generic Opana ER product (collectively, the "licensed patents").  F. 568-569.

Furthermore, section 4.1(b) of the SLA included a "covenant not to sue," which prohibited Endo and its affiliates from suing Impax for patent infringement on any of the licensed patents.  F. 570.  This provision meant that Endo could not sue Impax for infringement based on Endo's Opana ER patents listed in the Orange Book at the time of settlement, as well as any continuations, continuations in part, or divisions of those patents or patent applications owned or controlled by Endo, that could cover Impax's generic Opana ER.  F. 570.  (The broad patent license and covenant not to sue provided in the SLA are at times referred to collectively herein as the "broad license agreement" or "broad patent license.")

Impax would regularly seek a broad patent license in its settlement negotiations with brand-name drug companies whenever it intended to launch and continue to sell its generic product indefinitely, in order to provide Impax with as much flexibility as possible.  F. 565.  In any negotiation where the brand company tried to narrow the scope to the patents being litigated, Impax was "very firm," explaining that "this is not about the patents being litigated.  This is about a product, and we want the ability to operate."  F. 565.  For Impax, every settlement agreement must cover all the patents that could affect the generic product, existing and future, "otherwise you end up with [a] launch [of] the product and still have to be under the [patent] risk, and that doesn't really help [Impax]."  F. 566.

Given the possible effects of Endo's additional patent applications relating to Opana ER, a reasonable litigant would have been concerned with Endo's future patents.  F. 168.  Consistent with Impax's regular practice, in the Endo-Impax negotiations, Impax proposed broadening the

142

patent license that Endo had offered in the SLA to include "any patents and patent applications owned by or licensed to Endo . . . that cover or could potentially cover" Impax's generic oxymorphone ER product. F. 169. Endo accepted Impax's proposed language. F. 170.

### 3.   Post-settlement patents and patent litigation

After entering into the SLA, Endo obtained additional patents and patent licenses that it has asserted cover both original and reformulated Opana ER (the "after-acquired patents"). F. 571. Endo acquired its first post-settlement patent – U.S. Patent No. 7,851,482 – from Johnson Matthey in March 2012 (the "Johnson Matthey patent"). F. 573. In addition, between November 2012 and October 2014, the Patent and Trademark Office issued the following patents to Endo: Patent Nos. 8,309,060 ("the '060 patent"); 8,309,122 ("the '122 patent"); Patent No. 8,329,216 ("the '216 patent"); Patent No. 8,808,737 ("the '737 patent"); and Patent No. 8,871,779 ("the '779 patent"). F. 575-576, 579-581.

In December 2012, Endo began asserting the '060, '122, and '216 patents in litigation against drug manufacturers seeking to market generic versions of both original and reformulated Opana ER. F. 577. At that time, Endo did not assert these patents against Impax's generic version of original Opana ER. F. 577. Endo did, however, assert these patents against a generic version of reformulated (crush-resistant) Opana ER, which was covered by an ANDA filed by Impax. F. 577. In August 2015, the district court for the southern district of New York held that the '122 and '216 patents were not invalid and were infringed by other companies' generic versions of original Opana ER and by all companies', including Impax's, generic versions of reformulated Opana ER. F. 578. That court issued an injunction barring all defendants, except Impax, from selling their generic versions of original Opana ER until 2023. That ruling is currently on appeal to the Federal Circuit. F. 578.

In addition, Endo asserted the '737 and '779 patents in litigation in the district court of Delaware against drug manufacturers seeking to market generic versions of both original and reformulated Opana ER. F. 583. Endo did not assert these patents against Impax's generic version of original Opana ER because of the SLA's broad patent license; however, Endo did assert the patents against Impax's ANDA for a generic version of reformulated (crush-resistant) Opana ER. F. 584. In October 2016, the Delaware court held that the '779 patent was not

invalid and was infringed by a generic version of reformulated Opana ER.  F. 586.  That ruling is currently on appeal to the Federal Circuit.  F. 586.  In August 2017, the Delaware court again ruled that the '779 patent was not invalid, following a bench trial against other ANDA filers. F. 587.  In September 2017, the Delaware court entered its final order, enjoining all defendants from selling generic Opana ER until the last of Endo's patents expires in 2029.  F. 587-588.

### 4.    Effect of broad license agreement

The broad license agreement gave Impax protection against any of Endo's future patents being asserted against Impax for its generic version of original Opana ER.  F. 593.  Thus, these provisions gave Impax freedom to sell its generic Opana ER under both the litigated patents and any future patents that Endo might obtain in this product area.  F. 592.  The January 2013 entry date provided in the SLA, together with the broad license agreement, enabled a generic Opana ER to enter the market eight months before the original patents expired, and sixteen years before Endo's after-acquired patents expired, and to continue with the sale of that product up to the present day, without threat of patent infringement litigation relating to original Opana ER. F. 594.

Impax's product is the only generic Opana ER available to consumers.  F. 596.  Although every other Opana ER ANDA filer settled patent claims asserted by Endo related to Opana ER, no other drug manufacturer negotiated rights to future Opana ER patents similar to the broad license agreement that Impax obtained in the SLA.  F. 595.  Endo's acquisition and successful litigation of additional patents has led to all generic manufacturers, other than Impax, being enjoined from selling a generic version of Opana ER until the last of Endo's patents expires in 2029.  F. 588, 596.  Impax, in contrast, has sold generic Opana ER without interruption since launching its product in January 2013.  F. 597.

### 5.    Analysis

#### a.    Procompetitive benefits

The Supreme Court has held that "enabl[ing] a product to be marketed which might otherwise be unavailable . . . widen[s] consumer choice . . . and hence can be viewed as procompetitive."  *NCAA v. Board of Regents*, 468 U.S. 85, 102 (1984); *accord Brown Univ.*, 5

F.3d at 675 ("Enhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a procompetitive benefit.").

The evidence shows that Endo's acquisition of additional patents, and successful assertion of those additional patents in litigation, has led to all generic manufacturers, other than Impax, being enjoined from selling a generic version of Opana ER until the last of Endo's patents expires in 2029.  F. 592-598.  This is clear evidence of the strength of the after-acquired patents, and supports the inference that, absent the SLA, such after-acquired patents also would have been successfully asserted to enjoin Impax from selling generic Opana ER – even if Impax had gone to trial and won its challenge to the patents at issue in the Endo-Impax patent litigation. Instead, as a result of the broad license agreement in the SLA, Impax has sold generic Opana ER without interruption since launching the product in January 2013.  F. 598.  This is despite Endo's efforts, through filing FDA citizen petitions with the FDA, to have original Opana ER removed from the market for alleged safety reasons.  F. 233-235.

The case of *In re Wellbutrin XL Antitrust Litigation* is additional authority supporting the conclusion that the broad patent license in the SLA is procompetitive.  In *Wellbutrin*, as part of a reverse payment patent settlement, the brand drug manufacturer, GlaxoSmithKline ("GSK"), granted to the generic manufacturers a sublicense to certain patents (the "Andrx patents") acquired by GSK in connection with the settlement of a separate patent lawsuit among GSK, Andrx, and the generic manufacturers.  133 F. Supp. 3d at 737, 747.  The Andrx patents were not due to expire for 15 more years.  *Id*. at 759.  The court held that the sublicense provided under the settlement agreement was a cognizable procompetitive justification for the agreement because the sublicense "eliminat[ed] an independent and substantial hurdle to generic entry" and removed "the possibility that Andrx could prevent generic Wellbutrin XL from being marketed for the 15 years remaining on its patent."  *Id.* at 758-59.  The court further held that the plaintiffs had failed to present a genuine factual dispute as to this procompetitive justification.  *Id.*

In the instant case, as in *Wellbutrin*, Impax negotiated for a broad license agreement in order to ensure that it had the freedom to sell generic Opana ER without concern of patent infringement liability going forward.  F. 167, 169, 565-566.  In addition, as in *Wellbutrin*, the SLA eliminated a separate, and substantial, hurdle that Endo could have imposed on Impax's

sale of generic Opana ER by asserting after-acquired patents against Impax – patents that Endo successfully did assert against other generic manufacturers.  F. 575-587.

In summary, the evidence proves that consumers have benefitted from the SLA by having uninterrupted and continuous access to generic Opana ER since January 2013. The real-world effect of the SLA is that there is a product on the market and available to consumers today that would not be there had Impax not had the foresight to negotiate licenses to future patents.  F. 600.  This is procompetitive.  *See NCAA*, 468 U.S. at 102; *Brown Univ.*, 5 F.3d at 675.

Furthermore, the Challenged Agreement settled litigation, which is favored in the law. *American Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986) ("Few public policies are as well established as the principle that courts should favor voluntary settlements of litigation by the parties to a dispute."); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982) (noting "the paramount policy of encouraging settlements").  Although *Actavis* held that the policy in favor of settlement was not a sufficient reason to bar antitrust review, *see* Section III.B.2 above, nothing in the language of *Actavis* holds that this factor is precluded from consideration.  In addition, the fact that the SLA enabled Impax to enter the market prior to the expiration of Endo's Opana ER patents, while not dispositive, can be considered in assessing the competitive consequences of the Challenged Agreement.  *See In re Impax*, 2017 FTC LEXIS 130, at *29.  In the instant case, the SLA enabled Impax to enter the market in January 2013, nine months before expiration of the initial Opana ER patents in September 2013, and sixteen years before the expiration of Endo's after-acquired patents in 2029.

For all the foregoing reasons, Respondent has met its burden of proving that the SLA had procompetitive benefits.

### b.    Less restrictive alternative

Because Respondent has met its burden of proving that the SLA had procompetitive benefits, the burden shifts to Complaint Counsel to demonstrate that these benefits could have been achieved with a less restrictive settlement agreement.  *See Law*, 134 F.3d at 1019.

Complaint Counsel contends that Endo and Impax could have entered into a settlement that did not include any payment to stay off the market. However, Complaint Counsel fails to demonstrate that such hypothetical settlement could have, or would have, included the broad patent license.[35] Accordingly, Complaint Counsel has failed to meet its burden of proving that the demonstrated procompetitive benefits of the SLA in this case could have been achieved through a less restrictive settlement agreement.

The final step of the rule of reason analysis, set forth below, weighs the anticompetitive and procompetitive effects of the SLA, to determine whether, on balance, the agreement is anticompetitive.

## F.      Balancing of Anticompetitive and Procompetitive Effects

Where the evidence proves that an agreement poses both anticompetitive harm and procompetitive benefits, "the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable." *Law*, 134 F.3d at 1019. Plaintiffs have the burden of establishing that "the settlement is nevertheless anticompetitive on balance." *Nexium*, 42 F. Supp. 3d at 262-63; *Loestrin*, 261 F. Supp. 3d at 329.

As the court recognized in *In re Cipro Cases I & II*, "the relevant benchmark in evaluating reverse payment patent settlements should be no different from the benchmark in evaluating any other challenged agreement: What would the state of competition have been without the agreement?" 348 P.3d at 863. Regardless of whether Complaint Counsel must prove actual delay in the onset of generic competition to meet its initial burden as to anticompetitive effect, it is appropriate to assess the magnitude and/or extent of delayed generic competition in order to balance anticompetitive harm against demonstrated procompetitive benefits. *See Impax Labs*, 2017 FTC LEXIS 130, at *29-30 (holding that a settlement providing for entry prior to patent expiration  might be found to enable generic competition on or prior to the entry date that would have resulted, on average, from litigating the patent suit to conclusion,

---

[35] With respect to the likelihood of a hypothetical alternative settlement with no reverse payment and an entry date earlier than January 2013, it is noteworthy that Impax twice proposed a simple settlement with a 2011 entry date and no reverse payment, which Endo rejected. F. 116, 155.

which "[a]t a minimum . . . affects the magnitude of any anticompetitive effect"). Complaint Counsel bears the overall burden of establishing that the Challenged Agreement "engendered a net harm." *Cal. Dental Ass'n*, 224 F.3d at 957-58.

Respondent argues that the Endo-Impax Settlement expedited generic competition, as compared to litigating the Endo-Impax patent dispute, regardless of the eventual outcome of that litigation. Respondent asserts that even if Impax had prevailed, the Endo-Impax patent litigation would have delayed generic competition until as late as January 2013.

Complaint Counsel urges rejection of Respondent's evidence as to the expected duration of the patent litigation. Complaint Counsel further argues that, regardless of when the underlying litigation might have ended, the evidence proves that, absent the Endo-Impax Settlement, Impax might have launched its generic Opana ER "at risk" to compete with Endo as early as June 2010, after Impax received final FDA approval of its generic Opana ER. These arguments are analyzed below.[36]

### 1.    Entry by at-risk launch

#### a.    Background

As explained in Section III.A.3 above, Endo's patent infringement suit against Impax, filed on January 25, 2008, triggered the Hatch-Waxman 30-month stay on approval of Impax's ANDA for generic oxymorphone ER, meaning that the FDA could not approve Impax's ANDA until the earlier of the expiration of 30 months or resolution of the patent dispute in Impax's favor. F. 61-62. If litigation is still pending at the end of the 30-month period, the FDA may give its approval to the generic drug manufacturer to begin marketing a generic version of the drug. *Lipitor*, 868 F.3d at 241; 21 U.S.C. § 355(j)(5)(B)(iii). Pursuant to the Hatch-Waxman framework, once Impax received final approval from the FDA in June 2010, Impax had the option to launch its generic oxymorphone ER product "at risk." F. 66-67, 451-452.

---

[36] It is undisputed that the outcome of the Endo-Impax patent litigation was uncertain at the time of settlement. F. 553. The duration of continued litigation, as the alternative to the Endo-Impax Settlement, is relevant to the magnitude and/or extent of the anticompetitive effects of the Endo-Impax Settlement. Such analysis does not require, and does not include, an assessment of the merits of the underlying patent dispute. *See Actavis*, 133 S. Ct. at 2236 (stating that "it is normally not necessary to litigate patent validity to answer the antitrust question").

EXHIBIT B-2

Launching at risk refers to the risk of liability for the brand-name manufacturer's lost profits, if the generic challenger launches its product prior to a non-appealable decision in the underlying patent litigation and ultimately loses its patent challenge.  F. 452-453; *Lipitor*, 868 F.3d at 241; *King Drug*, 791 F.3d at 396 n.8.  Lost profits are measured by the profits the patent owner would have made on sales of its branded product, but for the launch of the generic product.  F. 453.  Damages can be trebled if the infringement is found to be willful, for instance, if the generic product is launched before the district court rules on the patent dispute.  F. 453.  In addition, if the brand company wins its action against a generic company that has launched at risk and the generic company's actions are deemed "exceptional," courts may award attorney's fees to the brand company.  F. 457.

Generic companies often risk far more in infringement liability than they earn from each sale when launching at risk.  F. 454.  Damages are not measured by the generic's sales revenue, but by the profits the brand company would have earned on such sales.  F. 454.  Thus, potential damages for launching at risk can represent "bet-the-company" stakes and can "take [away] the solvency of the company entirely."  F. 455.  Damages can be in the billions of dollars, if the sales of the branded drug are high enough, and "would almost always be greater than the total revenues that the generic company receives" from launching at risk.  F. 455.

Moreover, launching at risk jeopardizes a first filer's 180-day exclusivity period, which is "extremely valuable."  F. 456.  If the generic company launches at risk and is enjoined from making sales, the generic company forfeits some of its 180-day exclusivity because the 180-day time period continues to run during the period the generic is enjoined.  F. 456.  Even if the injunction is eventually lifted or the infringer prevails in the underlying patent litigation, the patent infringer can never recover the forfeited part of its 180-day exclusivity period.  F. 456.

At-risk launches are fairly uncommon across the entire pharmaceutical industry.  F. 458.  At-risk launches are most common when there are multiple ANDA filers who have received approval from the FDA, no ANDA filer has exclusivity, and there subsequently is a race to the market by generic firms.  F. 459.  When at-risk launches do occur, they generally are undertaken by large pharmaceutical companies that can absorb significant financial risk in the event they are found to infringe.  F. 460.  Complaint Counsel's expert witness, Professor Noll, identified 48 at-

risk launches over a 15-year period (August 2001 thru April 2015).  Twenty-one of those forty-eight at-risk launches were conducted by Teva, which, Professor Noll explains, "is by far the most likely company to do at-risk launches."  F. 461.  Teva is a "very large pharmaceutical company" and, as a result, can undertake at-risk launches more regularly.  F. 462.  Of the 48 at-risk launches identified by Professor Noll, only 4 were conducted by companies with less than $1 billion in revenue.  F. 463.  Impax's revenues in 2010 were less than $1 billion.  F. 465.

### b.      Analysis

The evidence supports the conclusion that Impax would not have launched its generic Opana ER at risk, as further explained below.  F. 451-548.

First, the evidence supports the conclusion that it would have been economically disadvantageous for Impax to launch its generic Opana ER at risk.  Unlike the overwhelming majority of companies that Professor Noll identified as undertaking at-risk launches, Impax is a small pharmaceutical company, with revenues in 2010 of less than $1 billion.  F. 463, 465.  Mr. Koch, Impax's CFO at the time of the Endo-Impax Settlement, explained that "being a small company," Impax "could not bet the company on any one product."  F. 467.  The potential liability for damages from launching a generic version of Opana ER at risk would have exceeded any profits Impax realized from the launch.  F. 544.  Impax's potential liability for Endo's lost profits could total as much as $54 million for six months of sales.  F. 546.  If it was ultimately determined that Impax's infringement was willful and Endo was awarded treble damages, Impax could be liable for as much as $162 million for six months of sales.  F. 546.  In contrast to this potential liability, potential sales of oxymorphone ER over six months in 2010, based on an at-risk launch, as projected by Impax, would total only $28 million.  F. 545.  In addition, if Impax launched at risk and was then enjoined, Impax would forfeit part of its 180-day exclusivity period.  F. 547.  Under these circumstances, it "was perfectly reasonable for Impax to view a launch at risk as a losing proposition."  F. 548.

Second, Impax had no relevant history of at-risk launches.  Impax is "incredibly conservative" with respect to at-risk launches and only "infrequently" considers the possibility.  F. 466-468.  Prior to the Endo-Impax patent litigation, Impax had launched a product at risk only once.  F. 469.  That at-risk launch was for one dosage strength of a generic version of

oxycodone.  F. 469.  Impax limited its risk of damages by capping its potential sales at $25 million, which, in turn, limited the lost profits it would have had to pay to the branded drug company.  F. 469.  In fact, Impax launched at risk only after it received a favorable district court decision holding the relevant patents unenforceable and after Teva, the first ANDA filer for the relevant dosage, had launched at risk six months earlier.  F. 469.  Since the Endo-Impax Settlement in 2010, Impax has undertaken only one at-risk launch, and did so in a limited manner.  F. 471.  Specifically, Impax and Perrigo, the ANDA holder and marketer of a nasal spray antihistamine named azelastine, entered a partnership agreement through which Impax would share development costs and litigation expenses in return for a share of the drug's profits. F. 472.  In 2014, Perrigo notified Impax that it intended to launch azelastine at risk.  F. 472. Under the terms of the Impax-Perrigo partnership agreement, Impax could participate in the launch and earn a share of the profits or could not participate, in which case Perrigo would receive all azelastine profits.  F. 472.  Impax participated in Perrigo's at-risk launch, but limited its exposure to potential damages by capping its participation at 150,000 units.  F. 472.

Third, Impax did not seek, or obtain, approval for an at-risk launch from Impax's board of directors, which was an absolute prerequisite.  F. 473, 481, 486.  *See, e.g.*, F. 482 (Impax has "to have sign off from the Board, because [Impax is] such a small company, and a launch at risk would . . . potentially cause [the] company problems" if found liable for substantial damages). Indeed, Impax has an extensive internal process for evaluating an at-risk launch, including a detailed review of the potential product launch by Impax's new product committee, legal team, marketing team, operations department, and division heads.  F. 474-477.  Thereafter, Impax's CFO must present a risk analysis profile to Impax's executive committee, which has to approve any at-risk launch.  F. 477.  Impax's CEO also must approve any decision to launch at risk. F. 478.  If Impax's CEO and executive committee approve a possible at-risk launch, a presentation is made to Impax's board of directors by Impax's CFO, legal department, president of the generics division, and the manufacturing department.  F. 479-480.  Thus, in the case of azelastine, discussed above, Impax senior management, including the president of Impax's generics business, Impax's general counsel, and Impax's in-house attorney responsible for intellectual property, made a presentation and a recommendation regarding the at-risk launch at a special board of directors meeting.  F. 484.  A resolution was then placed before the Board, and

the Board voted to approve the resolution.  F. 484.  With respect to generic Opana ER, in contrast, Impax's senior management never decided to pursue an at-risk launch, and the question was never submitted to the board for approval.  F. 486-487.

### c.    Complaint Counsel's arguments

The evidence fails to prove Complaint Counsel's assertion that, absent a settlement of the Endo-Impax patent litigation, Impax would have launched its generic Opana ER at risk, as explained below.

### i.    Consideration of at-risk launch

Complaint Counsel argues that Impax was "considering" an at-risk launch in 2010.  CCB at 45-46.  Even if true, however, this fact does not warrant an inference that Impax planned to launch at risk, or was likely to launch at risk.  Such an inference is against the weight of the contrary evidence, summarized above, that supports the conclusion that Impax was not going to launch its generic Opana ER at risk.

Moreover, the evidence upon which Complaint Counsel relies to support is argument lacks probative weight.  Complaint Counsel points to evidence that Mr. Mengler, president of Impax's generics division, created a presentation for the May 2010 board of directors meeting, in which he listed an at-risk launch of oxymorphone as a "current assumption" for projecting sales of oxymorphone ER, and that according to the minutes of the meeting, Mr. Mengler "expressed the view that [o]xymorphone was a good candidate for an at-risk launch."  F. 493-494.  However, Mr. Mengler's assumptions with respect to possible sales numbers did not "imply or mean that any legal decision ha[d] been made to clear the way for a launch."  F. 493.  There was no substantive discussion of an at-risk launch at the May 2010 board of directors meeting; and Impax's senior management did not make a recommendation to the board for an at-risk launch, did not discuss the risk or benefits of an at-risk launch, and did not ask the board to approve an at-risk launch at the May 2010 board meeting.  F. 498-499.  In 2010, senior management was looking at various possible scenarios and modeled an at-risk launch to forecast how that might impact Impax's budget if the decision to launch at risk were made.  F. 488.  Mr. Mengler raised oxymorphone ER at the May 2010 Board meeting to put oxymorphone ER "on the radar" of the

Board and to "alert the board as to the product being out there that might get to the point of an at-risk launch." F. 495. As Impax's CEO, Dr. Hsu, explained, senior management "want[s] to alert the board that we are considering this [as] one of the scenario[s] so that if we do come up with a final recommendation to the board, there will be no surprise. . . . [T]his is very typical." F. 497. Impax's then CFO, Mr. Koch, who wrote the minutes of the meeting of the May 2010 board of directors meeting, explained that Mr. Mengler was communicating his evaluation of the oxymorphone market and sharing that information with the Board because senior management was unsure of what direction it would "ultimately take and . . . [did not] want to come back to the board seeking an at-risk launch with them never having heard of it before." F. 496.

### ii.    Launch preparedness

Complaint Counsel also argues that Impax prepared a "launch inventory build" in 2010, and argues that such evidence shows that Impax was planning to launch at risk. This argument is not supported by the evidence.

The evidence shows that it was Impax's general practice to have its products that have been filed with Paragraph IV certifications ready to launch after the expiration of the Hatch-Waxman Act's 30-month stay. F. 503. When a product is 18 months away from its earliest theoretical launch, Impax's supply chain group begins prelaunch preparation activities. F. 506. This includes requesting a quota from the U.S. Drug Enforcement Agency ("DEA") to purchase any active pharmaceutical ingredients ("API") that are controlled substances; purchasing the API and other unique materials necessary to produce the finished product; conducting "process validation" to prove that Impax's manufacturing process is repeatable and makes the product in a satisfactory manner; and producing a "launch inventory build," to ensure that Impax has enough product to meet expected demand on the launchable date. F. 508.

The evidence further shows that Impax's practice is to begin process validation six months before FDA approval of the relevant drug is expected, even if the product is the subject of active litigation. F. 511. Impax may build pre-launch quantities of products in its planning pipeline before either FDA approval is granted or a formal launch decision is made. F. 512. Impax considers its production of pre-launch quantities "routine" and consistent with industry practice. F. 514. Moreover, because Impax's operations team prepares products for launch

before FDA approval or a formal decision about launch timing, it is not unusual for Impax to discard and write off some of the products and raw materials in its inventory.  F. 516, 542-543.

Consistent with Impax's general practice, Impax's operations team sought to be ready to launch its generic oxymorphone ER product at the expiration of the Hatch-Waxman Act's 30-month stay on June 14, 2010.  F. 503, 517.  Impax requested a procurement quota from the DEA for oxymorphone, which was a necessary step before it could purchase oxymorphone API for any reason, including to conduct process validation of its oxymorphone ER product.  F. 523. The initial allotment of oxymorphone quota was for product development manufacturing. F. 524.  In January 2010 and in April 2010, Impax submitted additional requests for oxymorphone procurement quota, which were approved.  F. 525-526.  By May 20, 2010, Impax had completed process validation for the 5 mg, 10 mg, 20 mg, and 40 mg dosages of generic oxymorphone ER.  F. 529.  These process validation batches that Impax had built were not sufficient, however, to meet the market demand for a full launch ("launch inventory").  F. 530. The time required to produce the necessary amount of oxymorphone ER would have made a product launch soon after FDA approval in mid-June 2010 impossible.  F. 536.

Moreover, Impax never completed a launch inventory build for its oxymorphone ER product.  F. 533.  Impax's operations team does not build launch inventory without management approval.  F. 531.  In the case of oxymorphone ER, the Impax operations team never even received instructions from senior management to begin a launch inventory build.  F. 532. Although Impax had solicited letters of intent from four customers asking customers for their good faith estimate of how much product they likely would buy if generic oxymorphone ER came on the market, Impax did not have any pricing contracts or agreements to purchase with those customers.  F. 537.

### d.    Conclusion regarding at-risk launch

The evidence supports the conclusion that, absent a settlement, Impax would not have launched its generic Opana ER at risk, and fails to prove Complaint Counsel's assertion that, absent a settlement of the Endo-Impax patent litigation, Impax might have launched its generic Opana ER at risk.

154

## 2.    Entry after litigation

If Impax and Endo had not settled, their patent litigation would have continued.  F. 555.
Respondent's contention as to when the patent litigation would likely have concluded relies on
the opinions of its intellectual property expert, E. Anthony Figg.  Mr. Figg's extensive
experience in litigating patent matters in the federal courts makes him well qualified to opine on
this issue.  Mr. Figg is an attorney specializing in intellectual property, primarily involving the
chemical, pharmaceutical, healthcare and biotechnology industries.  His principal emphasis is
patent litigation.  He has served as lead counsel in numerous complex patent litigation matters,
including Hatch-Waxman litigation, in federal district court and the Federal Circuit Court of
Appeals, among other venues.  Mr. Figg has practiced patent law since 1978.  F. 557.
Accordingly, Mr. Figg's opinions on the likely duration of the Endo-Impax patent litigation are
entitled to, and are given, substantial weight.  Complaint Counsel's arguments that Mr. Figg's
opinions on this issue should be rejected as unreliable and/or against the weight of the evidence
(*see, e.g.*, CCRB 73-74; CCRRFF 1075-1091) have been considered and have been determined
to be without merit.

The evidence shows that, following a trial in the Endo-Impax patent litigation, the parties
would have had to wait for the district court to issue findings of fact, conclusions of law, and an
order.  Based on Mr. Figg's review of Hatch-Waxman cases from the district court in New
Jersey, a decision would have been issued approximately four to five months after completion of
trial, in or around November 2010.  F. 556.  Regardless of when the district court would have
issued its decision in the Endo-Impax patent litigation, however, an appeal was likely, and would
take 30 days to be docketed in the Federal Circuit Court of Appeals.  F. 588.  Based on Mr.
Figg's review of statistics maintained by the Federal Circuit, the median time from docketing an
appeal to issuance of a final decision was approximately 11 months in 2010 and 2011.  F. 559.
Applying these statistics, Mr. Figg estimated that an appellate decision in the Endo-Impax
litigation would have been issued in November 2011.  F. 559.  Mr. Figg's estimate of a
November 2011 issuance of an appellate decision is "very conservative," however, because the
median time from docketing to a final decision, reported in the Federal Circuit statistics, includes
settlements and summary affirmances.  F. 559.  In addition, the Federal Circuit is generous with
briefing extensions, which increases the time it takes to receive a decision.  F. 560.

Moreover, if Impax had lost at the trial level, the "centerpiece" of the appeal would have been the trial court's claim construction ruling, issued on April 5, 2010, which adopted Endo's proposed constructions for "hydrophobic material" and "sustained release." F. 71, 561. Impax would have had substantial arguments regarding this ruling on appeal. F. 561. If the appellate court agreed with Impax's arguments, it is likely that the appellate court would remand to the trial court for further development of the evidentiary issues. F. 562. This is because the parties would need to litigate infringement and validity under Impax's construction of the claims. F. 562. Because the trial court's claim construction ruling was in favor of Endo, Endo never developed a record that Impax infringed its patents under Impax's construction of the claims. F. 562. Thus, lacking a record on the issue of infringement and validity, the Federal Circuit would not decide these issues itself, but would instead direct such decision to the trial court via remand. F. 562. If the appellate court ruled in favor of Impax and remanded the case to the trial court, the evidentiary proceedings on remand would likely have taken up to 18 months to complete, and therefore would not be concluded until a date close to January 2013. F. 563. If Impax lost the appeal in the Federal Circuit, Impax would have been enjoined and would not have been able to launch its oxymorphone ER product until Endo's patents expired in September 2013. F. 564.

In conclusion, as explained above, the evidence proves that, absent the settlement, ongoing litigation would have prevented Impax's entry until November 2011 at the earliest, and more likely until a date close to January 2013, assuming Impax ultimately prevailed. If Impax ultimately lost its patent challenge against Endo, Impax would not have been able to launch its oxymorphone ER product until the litigated patents expired in September 2013.

### 3.      Weighing of anticompetitive effects against procompetitive benefits

As explained in detail in Section III.C., the evidence proves that the Endo-Impax Settlement included payment to prevent the risk of competition, which, under *Actavis*, is an anticompetitive harm. Under the facts of the instant case, however, the magnitude or extent of such harm is largely theoretical, based on an inference that Impax's entry date, and therefore generic competition, would have been earlier than January 2013, had the reverse payment not induced the settlement. *See, e.g.*, CCB at 47 (asserting that Challenged Agreement "eliminated

156

risk" of generic competition "for over two years").  Although the Endo-Impax Settlement foreclosed the hypothetical possibility of Impax launching its generic Opana ER earlier than the date set forth in the SLA – either at risk or after litigation – the fact is that such earlier entry was unlikely.  Moreover, pursuing litigation, which was the alternative to the Endo-Impax Settlement, would not have guaranteed the continued availability of Impax's generic Opana ER, even if Impax had prevailed on its patent claim, because, as explained in Section III.E., it is likely that Endo would have successfully asserted after-acquired patents to enjoin Impax, as it had against all other sellers of generic Opana ER.

In contrast to the largely theoretical anticompetitive harm asserted by Complaint Counsel, the real world procompetitive benefits of the Endo-Impax Settlement are substantial.  As detailed in Section III.E, the January 2013 entry date provided in the SLA, together with the broad patent license provisions, enabled a generic Opana ER to enter the market eight months before Endo's original Opana ER patents expired, and sixteen years before Endo's after-acquired patents expired, and to continue selling generic Opana ER up to the present day, without threat of patent infringement litigation relating to original Opana ER.  F. 592-596.  Impax has sold generic Opana ER without interruption for more than five years, since launching its product in January 2013.  F. 597.  Furthermore, Impax's product is not only the sole generic oxymorphone product available to consumers, F. 596, but the only available oxymorphone ER product.[37]  F. 598.  These actual consumer benefits outweigh the theoretical anticompetitive harm demonstrated in this case.  Indeed, Complaint Counsel's economic expert witness, Professor Noll, admits that consumers are better off today because Impax is selling oxymorphone ER.  F. 599.  These actual consumer benefits are even more pronounced if it is accepted, as Complaint Counsel urges, that patients cannot readily switch to an alternative long acting opioid.  *See*, *e.g.*, CCFF Section VIII.E., F.

Even if it is assumed that Impax would have entered the market as early as June 2010, and that the settlement therefore delayed generic entry (and extended Endo's patent monopoly) for two and a half years, the demonstrated consumer benefits of the settlement still outweigh the

---

[37] In March 2012, after a supply disruption affecting production of original Opana ER, Endo launched reformulated Opana ER and, at the direction of FDA, stopped distributing original Opana ER.  F. 227-230.  On September 1, 2017, at the request of FDA, Endo also ceased sales of reformulated Opana ER.  F. 111.

anticompetitive harm because the settlement enabled and allowed uninterrupted and continuous access to generic Opana ER for more than five years.  Similarly, to the extent that Complaint Counsel argues that the no-AG provision of the SLA deprived consumers of the benefit of competition from an Endo authorized generic drug, such harm would be limited to the duration of the 180-day exclusivity period to which the no-AG provision applied, and is far outweighed by the more than five years of uninterrupted and continuous access to generic Opana ER.

Accordingly, having weighed and balanced the anticompetitive effects and the procompetitive benefits of the Endo-Impax Settlement, the evidence fails to prove the "presence of significant unjustified anticompetitive consequences,"  *Actavis*, 133 S. Ct. at 2238, or that the agreement "engendered a net harm."  *Cal. Dental Ass'n*, 224 F.3d at 957-58.  Rather, the evidence proves that the Endo-Impax Settlement was, on balance, procompetitive.  Thus, the evidence fails to demonstrate that Endo-Impax Settlement constituted an unreasonable restraint of trade.

### G.    Conclusion

Having fully considered the applicable law, the arguments of the parties, and the entire record in this case, and for all the foregoing reasons, the evidence fails to prove a violation of Section 5 of the FTC Act.

Therefore, the Complaint must be DISMISSED.

## IV.    SUMMARY OF CONCLUSIONS OF LAW

1.    Complaint Counsel bears the burden of proving jurisdiction and liability by a preponderance of evidence.

2.    Respondent is a corporation, as "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

3.    Respondent's challenged activities relating to the sale of pharmaceutical drugs are in or affect commerce in the United States, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4.    The Commission has jurisdiction over Respondent and the subject matter of this proceeding, pursuant to Section 5 of the FTC Act.

5.    The FTC Act's prohibition of unfair methods of competition under Section 5 of the FTC Act encompasses violations of Section 1 of the Sherman Act.

6.    Section 1 of the Sherman Act prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States. 15 U.S.C. § 1.

7.    Despite its broad language, the ban on contracts in restraint of trade extends only to unreasonable restraints of trade, i.e., restraints that impair competition.

8.    The Supreme Court, in *FTC v. Actavis*, 133 S. Ct. 2223 (2013), held that reverse payment patent settlements are not immune from antitrust scrutiny, anticompetitive effects should not be presumed from the presence of a reverse payment alone, and that reverse payment settlements are to be evaluated under the rule of reason.

9.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*., as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 21 U.S.C. §§ 355(b)(2) and 355(j) and 35 U.S.C. § 271(e), establishes procedures designed to facilitate competition from lower-priced generic drugs, while maintaining incentives for pharmaceutical companies to invest in developing new drugs.

10.   In a traditional rule-of-reason case, the relevant market must be defined to allow a court to determine the effect that an allegedly illegal act has on competition.  However, where a settlement of patent litigation arises in the context of the peculiar framework of the Hatch-Waxman Act, and where a valid patent gives the brand holder a legal monopoly, the appropriate market in which to assess the anticompetitive effects of a reverse payment settlement agreement is the market that is the subject of that agreement – the branded pharmaceutical product and its generic equivalents.

11.    The relevant market in which to analyze the effects of the Challenged Agreement in the instant case is the market for oxymorphone ER, branded and generic, which is the market that mattered to Impax and Endo, the parties to the Challenged Agreement.

12.    In a rule of reason analysis, Complaint Counsel has the initial burden of proving anticompetitive effects.

13.    A brand patent holder's use of a payment to induce a generic challenger to drop its patent challenge and agree to stay out of the market, rather than face the risk of patent invalidation and resulting generic competition, is an anticompetitive harm under *Actavis*.

14.    To meet the initial burden of proving anticompetitive effects in a reverse payment case, Complaint Counsel must prove payment for delay, or, in other words, payment to prevent the risk of competition.  The likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification.

15.    Under *Actavis*, a reasonable inference of harm to consumers from lessened competition can be established by identifying a large and otherwise unexplained payment of cash or something else of value made by the patent holder to the alleged infringer in exchange for that firm's agreement not to enter the market for some period of time, or by direct evidence that the patent holder paid the alleged infringer to delay its entry into the market and thereby restrict competition, e.g., evidence indicating that the purpose and effect of a reverse payment was to delay entry.

16.    The formulation of the initial burden of proving anticompetitive effects in a reverse payment case set forth in *King Drug Company of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402 (E.D. Pa. 2015), upon which Complaint Counsel relies, is rejected, to the extent it holds that anticompetitive effects can be demonstrated solely by proof of a large payment and market power.  This formulation has not been adopted by any other court and presents an unduly truncated burden of proof.

17.    *Actavis* did not state that a "large" reverse payment is by nature anticompetitive.  Under *Actavis*, it is a large *and unjustified* payment that can bring the risk of anticompetitive effects.

18.    By their nature, pharmaceutical patents often carry with them market power.  A valid patent grants the legal right to exclude generic competition and the practical ability to profitably charge higher prices than generic competitors would charge.

19.    If the initial burden of proving anticompetitive effects is met, the Respondent in a reverse payment case may demonstrate that the Challenged Agreement had offsetting procompetitive benefits.

20. Complaint Counsel's position that the only relevant procompetitive justifications are those that justify the reverse payment, thereby barring all other evidence of procompetitive benefits from the settlement and condemning the settlement on the basis of the reverse payment alone, is inconsistent with *Actavis* and the rule of reason generally.

21. Procompetitive benefits arising in connection with a reverse payment settlement agreement as a whole are properly considered as part of a well-structured rule of reason analysis.

22. Enabling a product to be marketed that might otherwise be unavailable widens consumer choice and is therefore procompetitive.

23. The fact that a reverse payment settlement agreement allows generic entry prior to patent expiration, while not dispositive, can be considered in assessing the competitive consequences of the agreement.

24. Where the evidence proves that an agreement poses both anticompetitive harm and procompetitive benefits, the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable.

25. Where the evidence proves that an agreement poses both anticompetitive harm and procompetitive benefits, Complaint Counsel has the burden of establishing that the settlement is nevertheless anticompetitive on balance.

26. The relevant benchmark in evaluating reverse payment patent settlements should be no different from the benchmark in evaluating any other challenged agreement: What would the state of competition have been without the agreement?

27. It is appropriate to assess the magnitude and/or extent of delayed generic competition attributable to a reverse payment settlement agreement in order to balance anticompetitive harm against demonstrated procompetitive benefits.

28. A settlement providing for entry prior to patent expiration might enable generic competition on or prior to the entry date that would have resulted, on average, from litigating the patent suit to conclusion, which at a minimum affects the magnitude of any anticompetitive effect.

29. Based on weighing and balancing the anticompetitive effects and the procompetitive benefits of the Challenged Agreement, the evidence fails to prove the presence of significant unjustified anticompetitive consequences, or that the agreement engendered a net harm.

30. The evidence fails to demonstrate that the Challenged Agreement constituted an unreasonable restraint of trade.

31.     The evidence fails to prove a violation of Section 5 of the FTC Act.

32.     This Initial Decision makes no findings concerning alleged competitive effects of the 2017 settlement agreement between Endo and Impax, and Endo's arguments as intervenor opposing any remedy that would order the nullification or otherwise affect Endo's rights under that agreement are moot.

## ORDER

For the reasons stated above, IT IS ORDERED that the Complaint be, and hereby is, DISMISSED.

ORDERED:

D. Michael Chappell
Chief Administrative Law Judge

Date:  May 18, 2018

# Exhibit B-3

# COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP

COUNSELLORS AT LAW

PARK 80 WEST - PLAZA ONE 250 PEHLE AVE. SUITE 401 SADDLE BROOK N.J. 07663 201-845-9600 FAX 201-845-9423

General E-mail: clphk@njlawfirm.com
Internet Address: www.njlawfirm.com

PETER S. PEARLMAN, ESQ.   Email: psp@njlawfirm.com
Direct Dial: 551-497-7131 / Cell Phone: 201-709-0597

July 9, 2018

**VIA ECF AND FIRST-CLASS MAIL**
Honorable Lois H. Goodman, U.S.M.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Bldg. & U.S. Courthouse
402 East State Street, Room 7050
Trenton, New Jersey 08608

> Re:   *In Re Effexor XR Antitrust Litigation*
> Civil Action No.: 3:11-cv-5479 (PGS/LHG) (Lead)

Dear Judge Goodman:

I represent the Direct Purchaser Plaintiffs in the above-referenced matter, and write on behalf of the Direct Purchaser Plaintiffs and the Endpayor Plaintiffs. This responds to Wyeth's submission of Judge Bartle's decision in *Federal Trade Commission v. AbbVie Inc.*, 14-cv-5151, 2018 U.S. Dist. LEXIS 109628 (E.D. Pa. June 29, 2018).

The pages of *AbbVie* to which Wyeth invites the Court demonstrate clearly that Judge Bartle did not rely upon a single document or piece of testimony from any drug wholesaler, retail pharmacy, or endpayor in deciding the relevant market issue. Judge Bartle instead cites testimony and documents produced by AbbVie only. The *AbbVie* opinion does discuss formularies and rebate information from endpayors like insurance companies and pharmacy benefit managers, but those were from AbbVie itself. *See id.* at *65-69. In any event, in *Effexor* the end payors have agreed to produce that information.

Judge Bartle also made crystal clear that anecdotal evidence relating to the preferences of particular endpayors is irrelevant to the relevant market. Rather, the relevant inquiry is the behavior of endpayor consumers generally, *see id.* at *65, 69, and that inquiry is limited to behavior with respect to price. *Id.* at 72. That is why his opinion in *AbbVie* relies on documents produced by the brand drug company in *AbbVie*, not the documents from individual participants in the marketplace.

Moreover, according to the *AbbVie* opinion, AbbVie's expert, Dr. Cremieux, relied on a data set from a company called Optum that is commercially available (*id.* at *65), but, like Judge Bartle, not on a single document from any wholesaler, retail pharmacy, or endpayor. Likewise, here in *Effexor*, Wyeth has not claimed its expert will use wholesaler, retail pharmacy, or endpayor documents or testimony.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Honorable Lois H. Goodman, U.S.M.J.
July 9, 2018
Page 2


       This is Plaintiffs' whole point.  Regardless of how the market power question is analyzed (by the direct evidence method that FTC expressly did not pursue in *AbbVie* (*id.* at *57, n.17) or by the indirect method of proving a relevant market favored by Wyeth), Wyeth and this Court will derive zero benefit from documents in the possession of plaintiff wholesalers, retail pharmacies, or endpayors.

       *AbbVie* demonstrates clearly that there is no benefit to Plaintiffs' documents that justifies the burden from the broader searching Wyeth inexplicably seeks.

                     Respectfully submitted,

                     */s/ Peter S. Pearlman*

                     Peter S. Pearlman

PSP:mds

cc:    All Counsel of Record *(Via ECF)*

# Exhibit C

# Exhibit C-1

**EXHIBIT C-1**

**OBJECTIONS TO PRODUCT MARKET REQUESTS**

| | **DPP Responses and Objections re: Product Market** | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 1 | Documents sufficient to show Your organizational or business structure, including that of Your subsidiaries or affiliates, and the commercial relationships between and among You and Your subsidiaries or affiliates and any changes thereto since January 1, 2007. | Refuse to produce any organizational charts other than those from pharmacy departments. |
| 2 | Organizational charts, personnel directories, telephone directories, and electronic mail user and address lists sufficient to show all personnel:<br>a. with any responsibility for the purchase or sale of pharmaceutical products, including but not limited to any Cholesterol Treatments, and all employees to whom they report directly or indirectly;<br>b. with any responsibility for the purchase or reimbursement of any Cholesterol Treatment;<br>c. with any responsibility for negotiating any rebates or overall discounts with parties from whom You purchase Cholesterol Treatments;<br>d. with any responsibility for Pharmacy operations, including those administering any policies or practices related to therapeutic substitution; and<br>e. all senior management to whom the individuals identified in (b)-(d) report directly or indirectly. | Refuse to produce any organizational charts other than those from their pharmacy departments. |
| 5 | All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to:<br>a. All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium.<br>b. All Documents concerning patients' ability or willingness to switch from Lipitor to any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 11 | All Documents concerning the promotion, marketing, or sales of Atorvastatin Calcium and/or any other Cholesterol Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 12 | All Documents concerning any communication with any Defendant relating to any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 13 | All analyses, studies, reports, forecasts, or budgets concerning Atorvastatin Calcium and/or any other Cholesterol Treatment sold in the United States. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 14 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Cholesterol Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 15 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 16 | All Documents concerning the factors that a physician or health care provider considers or may consider in deciding which Cholesterol Treatment to prescribe, including but not limited to efficacy, formulation, dosage, availability of extended release formulations, side effects, patient tolerance, patient adherence, price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 17 | All Documents concerning comparisons between and among different Cholesterol Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 18 | All Documents concerning the sale of, market share of, or competition between or among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 19 | All Documents concerning any policies, procedures, or standards concerning the prescribing of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 20 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 21 | All Documents concerning any assessment by You or anyone else of the efficacy of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| No. | Request Text | DPPs' Position |
|---|---|---|
| | **DPP Responses and Objections re: Product Market** | |
| 22 | All Documents concerning the dosing regimens for and/or methods of administration of any Cholesterol Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 23 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 24 | All Documents regarding any potential entry of an AB-rated generic version of Lipitor and/or any other Cholesterol Treatment, including those listed in Appendix A. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 25 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 26 | All Documents concerning switching between Cholesterol Treatments, including the frequency, safety, effectiveness, or reasons for switching or not switching from one Cholesterol Treatment to another. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 27 | All Documents concerning switching between any Cholesterol Treatments occurring at the Pharmacy, with or without physician notification. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 28 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 29 | All Documents concerning the relative price or cost of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 32 | A copy of each formulary or drug list on which any Cholesterol Treatment is listed. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 33 | All Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 34 | All Documents concerning the consideration of (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to Lipitor and/or Generic Atorvastatin Calcium, including all Documents that compare or contrast Lipitor and/or Generic Atorvastatin Calcium to any other product. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 35 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Atorvastatin Calcium and/or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 36 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 37 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Atorvastatin Calcium, or any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 38 | All contracts and/or agreements between You and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Atorvastatin Calcium or any other Cholesterol Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 41 | All Documents concerning Your policies, procedures, plans, and/or strategies for purchasing generic pharmaceuticals when they become available. | Refuse to produce any documents other than those specifically referencing Lipitor/AB-rated generic Lipitor. |
| 42 | All Documents pertaining to Your strategies, policies or practices for stocking and/or inventory of brand name prescription drugs, including documents relating to which doses or pharmaceuticals to stock that could be relevant to or applied to Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/AB-rated generic Lipitor; Refuse to produce any non-purchase related documents. |
| 43 | All opinions, comparisons, studies, or analyses describing any practice, custom, or policy of selling pharmaceuticals on a cost-plus basis that could be relevant to or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 45 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |

**EXHIBIT C-1**

| DPP Responses and Objections re: Product Market | | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 46 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 47 | All Documents related to any price adjustment given to any purchaser concerning any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 48 | Any of Your communications regarding formularies or preferred drug lists referencing any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 49 | All Documents sufficient to identify any Cholesterol Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents. |
| 50 | For all purchases of Atorvastatin Calcium and/or any other Cholesterol Treatment by You during the Relevant Time Period, data extracted from the electronic databases, data summaries, or purchase records You maintain identifying in a tab-, comma-, or semi-colon delimited ASCII flat text file or similar electronic format sufficient to identify: (a) from whom it was purchased; (b) the quantities You purchased; (c) the dosage strength(s); (d) the package size(s); (e) the NDC code(s); (f) the prices You paid, including gross and net prices; (g) the dates of Your purchase(s); (h) any credits, rebates, discounts or other adjustments to price You received; (i) any chargebacks You processed; and (j) any terms of sales governing Your purchases; or, if Your records do not contain all of the requested information, all Documents sufficient to show such information. | Refuse to produce any data other than that referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related data. |
| 51 | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Atorvastatin Calcium and/or any other Cholesterol Treatment by You during the Relevant Time Period in transaction-by-transaction format, as follows: | Refuse to produce any documents. |

EXHIBIT C-1

| No. | Request Text | DPPs' Position |
|---|---|---|
| | **DPP Responses and Objections re: Product Market** | |
| a | All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |
| b | All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |
| c | All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; | Refuse to produce any documents. |
| d | Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| e | The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |
| 52 | All Documents concerning any changes in coverage for any Cholesterol Treatment, including but not limited to removing any Cholesterol Treatment from formularies or listing of any Cholesterol Treatment in a different formulary tier. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 53 | All correspondence with any Mail Order Pharmacy concerning Cholesterol Treatment, including but not limited to:<br>a. Documents sufficient to show reimbursement rates or schedules;<br>b. Documents sufficient to show volume of purchases of Cholesterol Treatments by mail order;<br>c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Atorvastatin Calcium or any other Cholesterol Treatment to consumers. | Refuse to produce any documents. |
| 54 | Documents sufficient to show, by package size, dosage form and seller:<br>a. Each purchase by You of Cholesterol Treatments;<br>b. The gross dollar expenditures in connection with each of Your purchases of these products;<br>c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products;<br>d. The net dollar expenditures in connection with each of Your purchases of these products; and<br>e. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents. |

| No. | Request Text | DPPs' Position |
|---|---|---|
| | **DPP Responses and Objections re: Product Market** | |
| 55 | With respect to each Mail Order Pharmacy through which You sold any Atorvastatin Calcium to consumers, please provide Documents sufficient to show:<br>a. The identity and location of the Mail Order Pharmacy;<br>b. The Mail Order Pharmacy's purchase of Atorvastatin Calcium, or any Cholesterol Treatment, including Documents reflecting the date you sold to the Mail Order Pharmacy. | Refuse to produce any documents. |
| 56 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Atorvastatin Calcium and/or any other Cholesterol Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), during the Relevant Time Period, as follows:<br>a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price;<br>b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price;<br>c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; and<br>d. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents. |
| 73 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 74 | All Documents concerning generic or therapeutic substitution of Cholesterol Treatments, including any analyses or discussions of the impact on price or availability for other Cholesterol Treatments and the effectiveness of such substitution. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 75 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Cholesterol Treatment to any generic Cholesterol Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| | DPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 76 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Cholesterol Treatment to another brand name Cholesterol Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 77 | All Documents concerning generic or therapeutic substitution involving Cholesterol Treatments, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 78 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Cholesterol Treatments to generic and/or lower-cost alternative Cholesterol Treatments. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 79 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Cholesterol Treatment may follow to compete with an AB-rated generic equivalent Cholesterol Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 80 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |

| DPP Responses and Objections re: Product Market | | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| 81 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment | Refuse to produce any documents. |
| 105 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Cholesterol Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 111 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Cholesterol Treatment, including Lipitor or any potential generic thereof. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 1 | Documents sufficient to show Your organizational or business structure, including that of Your subsidiaries or affiliates, and the commercial relationships between and among You and Your subsidiaries or affiliates and any changes thereto since January 1, 2005. | Refuse to produce any organizational charts other than those from pharmacy purchasing departments. |
| 2 | Organizational charts, personnel directories, telephone directories, and electronic mail user and address lists sufficient to show all personnel:<br>a. with any responsibility for the purchase or sale of pharmaceutical products, including but not limited to any Cholesterol Treatments, and all employees to whom they report directly or indirectly;<br>b. with any responsibility for the purchase or reimbursement of any Cholesterol Treatment;<br>c. with any responsibility for negotiating any rebates or overall discounts with parties from whom You purchase Cholesterol Treatments;<br>d. with any responsibility for Pharmacy operations, including those administering any policies or practices related to therapeutic substitution; and<br>e. all senior management to whom the individuals identified in (b)-(d) report directly or indirectly. | Refuse to produce any organizational charts other than those from their pharmacy purchasing departments. |
| 5 | All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to:<br>a. All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium.<br>b. All Documents concerning patients' ability or willingness to switch from Lipitor to any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 11 | All Documents concerning the promotion, marketing, or sales of Atorvastatin Calcium and/or any other Cholesterol Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Will only produce documents received; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 12 | All Documents concerning any communication with any Defendant relating to any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 13 | All analyses, studies, reports, forecasts, or budgets concerning Atorvastatin Calcium and/or any other Cholesterol Treatment sold in the United States. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 14 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Cholesterol Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 15 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 16 | All Documents concerning the factors that a physician or health care provider considers or may consider in deciding which Cholesterol Treatment to prescribe, including but not limited to efficacy, formulation, dosage, availability of extended release formulations, side effects, patient tolerance, patient adherence, price, brand name, and patents. | Refuse to produce any documents. |
| 17 | All Documents concerning comparisons between and among different Cholesterol Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 18 | All Documents concerning the sale of, market share of, or competition between or among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |

EXHIBIT C-1

| Retailer Responses and Objections re: Product Market | | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 19 | All Documents concerning any policies, procedures, or standards concerning the prescribing of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 20 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 21 | All Documents concerning any assessment by You or anyone else of the efficacy of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 22 | All Documents concerning the dosing regimens for and/or methods of administration of any Cholesterol Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 23 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 24 | All Documents regarding any potential entry of an AB-rated generic version of Lipitor and/or any other Cholesterol Treatment, including those listed in Appendix A. | Refuse to produce any documents other than those specifically referencing Lipitor/AB-rated generic Lipitor. |
| 25 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 26 | All Documents concerning switching between Cholesterol Treatments, including the frequency, safety, effectiveness, or reasons for switching or not switching from one Cholesterol Treatment to another. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

**EXHIBIT C-1**

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 27 | All Documents concerning switching between any Cholesterol Treatments occurring at the Pharmacy, with or without physician notification. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 28 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Cholesterol Treatments. | Refuse to produce any documents. |
| 29 | All Documents concerning the relative price or cost of Cholesterol Treatments. | Refuse to produce any documents. |
| 32 | A copy of each formulary or drug list on which any Cholesterol Treatment is listed. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 33 | All Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 34 | All Documents concerning the consideration of (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to Lipitor and/or Generic Atorvastatin Calcium, including all Documents that compare or contrast Lipitor and/or Generic Atorvastatin Calcium to any other product. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 35 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Atorvastatin Calcium and/or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 36 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 37 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Atorvastatin Calcium, or any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

EXHIBIT C-1

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 38 | All contracts and/or agreements between You (or Your assignor) and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Atorvastatin Calcium or any other Cholesterol Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 41 | All Documents concerning Your policies, procedures, plans, and/or strategies for purchasing generic pharmaceuticals when they become available. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 42 | All Documents pertaining to Your strategies, policies or practices for stocking and/or inventory of brand name prescription drugs, including documents relating to which doses or pharmaceuticals to stock that could be relevant to or applied to Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 44 | All Documents pertaining to any strategy of Arbitrage and/or the timing of Your purchases in connection with the purchase of brand name prescription drugs. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 45 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 46 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 47 | All Documents related to any price adjustment given to any purchaser concerning any Cholesterol Treatment. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 48 | Any of Your communications regarding formularies or preferred drug lists referencing any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 49 | All Documents sufficient to identify any Cholesterol Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents other than those specifically referencing Lipitor/AB-rated generic Lipitor; Refuse to produce any non-purchase related documents. |
| 50 | For all purchases of Atorvastatin Calcium and/or any other Cholesterol Treatment by You during the Relevant Time Period, data extracted from the electronic databases, data summaries, or purchase records You maintain identifying in a tab-, comma-, or semi-colon delimited ASCII flat text file or similar electronic format sufficient to identify: (a) from whom it was purchased; (b) the quantities You purchased; (c) the dosage strength(s); (d) the package size(s); (e) the NDC code(s); (f) the prices You paid, including gross and net prices; (g) the dates of Your purchase(s); (h) any credits, rebates, discounts or other adjustments to price You received; (i) any chargebacks You processed; and (j) any terms of sales governing Your purchases; or, if Your records do not contain all of the requested information, all Documents sufficient to show such information. | Refuse to produce any documents other than those specifically referencing Lipitor/ AB-rated generic Lipitor; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 51 | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Atorvastatin Calcium and/or any other Cholesterol Treatment by You during the Relevant Time Period in transaction-by-transaction format, as follows: | Refuse to produce any documents. |

| **Retailer Responses and Objections re: Product Market** |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| a | All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |
| b | All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |
| c | All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; | Refuse to produce any documents. |
| d | Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| e | The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |
| 52 | All Documents concerning any changes in coverage for any Cholesterol Treatment, including but not limited to removing any Cholesterol Treatment from formularies or listing of any Cholesterol Treatment in a different formulary tier. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 53 | All correspondence with any Mail Order Pharmacy concerning Cholesterol Treatment, including but not limited to:<br>a. Documents sufficient to show reimbursement rates or schedules;<br>b. Documents sufficient to show volume of purchases of Cholesterol Treatments by mail order;<br>c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Atorvastatin Calcium or any other Cholesterol Treatment to consumers. | Refuse to produce any documents. |
| 54 | Documents sufficient to show, by package size, dosage form and seller:<br>a. Each purchase by You of Cholesterol Treatments;<br>b. The gross dollar expenditures in connection with each of Your purchases of these products;<br>c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products;<br>d. The net dollar expenditures in connection with each of Your purchases of these products; and<br>e. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents other than those specifically referencing Lipitor/AB-rated generic Lipitor; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |

| Retailer Responses and Objections re: Product Market | | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 55 | With respect to each Mail Order Pharmacy through which You sold any Atorvastatin Calcium to consumers, please provide Documents sufficient to show:<br>a. The identity and location of the Mail Order Pharmacy;<br>b. The Mail Order Pharmacy's purchase of Atorvastatin Calcium, or any Cholesterol Treatment, including Documents reflecting the date you sold to the Mail Order Pharmacy. | Refuse to produce any documents. |
| 56 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Atorvastatin Calcium and/or any other Cholesterol Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), during the Relevant Time Period, as follows:<br>a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price;<br>b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price;<br>c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; and d. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents. |
| 76 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 77 | All Documents concerning generic or therapeutic substitution of Cholesterol Treatments, including any analyses or discussions of the impact on price or availability for other Cholesterol Treatments and the effectiveness of such substitution. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 78 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Cholesterol Treatment to any generic Cholesterol Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 79 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Cholesterol Treatment to another brand Cholesterol Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 80 | All Documents concerning generic or therapeutic substitution generally, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 81 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Cholesterol Treatments to generic and/or lower-cost alternative Cholesterol. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 82 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Cholesterol Treatment may follow to compete with an AB-rated generic equivalent Cholesterol Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |
| 83 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 84 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |
| 94 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, all Documents showing each iteration of the Plan design, including but not limited to (i) whether the Plan is provided on a fee-for-service basis, as part of staff model HMO, IPA HMO, point-of-service HMO, Preferred Provider Organization, or Managed Indemnity product, or on some other basis; (ii) the premium or other payment charged to any person or other entity for coverage under the Plan; (iii) the pharmaceutical coverage, including but not limited to caps or limitations on coverage, cost sharing, step-therapy protocols, prior authorization requirements, the use of mail order (and the terms and conditions thereof); (iv) the use of an In-House Pharmacy; (v) the use of formularies, or preferred drug lists, including efforts to ensure or enhance formulary compliance, such as physician incentives or NDC lockouts; (vi) and the use of capitation or financial incentives at the physician or pharmacy level. | Refuse to produce any documents other than formularies specifically referencing Lipitor/Atorvastatin; Refuse to conduct an independent search for such documents; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 95 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, the summary of plan benefits or other Documents used to describe the benefits and scope of coverage of each Plan and each Group entitled to coverage under each Plan for each year. | Refuse to produce any documents. |
| 96 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to describe any subcontracting or delegation by You of the management, operation, or administration of the pharmacy benefit of any Plan to any other parties, the identity of those parties, the terms of Your agreements with those parties, and any amendments thereto. | Refuse to produce any documents. |
| 97 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show how You, from the beginning of the Relevant Time Period through the present, have determined the pharmaceutical coverage for Atorvastatin Calcium and any other Cholesterol Treatment,including but not limited to caps or limitations on coverage, cost sharing, step-care protocols, prior authorization requirements, or other limitations on coverage. | Refuse to produce any documents. |

EXHIBIT C-1

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 98 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show, from the beginning of the Relevant Time Period through the present, the method for determining a Plan's cost sharing, deductibles, exclusions from coverage, caps or limitations on coverage, and reimbursements to be paid to pharmacies for filling prescriptions for Plan members, including all Documents that concern coverage for Atorvastatin Calcium and any other Cholesterol Treatment. | Refuse to produce any documents. |
| 99 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents concerning the coverage provided by the Plan to Plan Members for Atorvastatin Calcium or any other Cholesterol Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions. | Refuse to produce any documents. |
| 100 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents concerning to coverage provided by the Plan to Plan Members for Atorvastatin Calcium or any other Cholesterol Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions, from the Relevant Time Period through the present. | Refuse to produce any documents. |
| 101 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show the coverage (including cost-sharing, deductibles, exclusions, limitations, and caps on coverage) provided by the Plan to Plan Members for each drug and all medical treatments or therapies that may be reasonable substitutes for Atorvastatin Calcium. | Refuse to produce any documents. |
| 102 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show any changes to coverage provided by the Plan to Plan Members for Atorvastatin Calcium or any other Cholesterol Treatment, and any other medical treatments or therapies that may be reasonable substitutes for Atorvastatin Calcium. | Refuse to produce any documents. |
| 103 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, all Documents concerning Your policies, practices, or procedures to encourage health care providers, physicians, pharmacists, pharmacies, hospitals, and/or other health care providers to authorize or engage in therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) with respect to Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 104 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, and that utilize formularies or preferred drug lists, all Documents concerning Your policies, practices, or procedures for creating, maintaining, promulgating, and updating the formulary or preferred drug list, including but not limited to policies, practices and procedures for determining the pharmaceutical products to be included thereon, from the beginning of the Relevant Time Period through the present. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 105 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, and that utilize formularies or preferred drug lists, all Documents, concerning the review, analysis, or consideration of Atorvastatin Calcium and any other Cholesterol Treatment, for inclusion thereon, including all Documents that compare or contrast Atorvastatin Calcium to any other product. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 106 | All Documents from the beginning of the Relevant Time Period through the present concerning Your use of step edits or step therapy, including but not limited to Documents concerning Your review, analysis, and consideration of implementing step edits or step therapy on Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents. |
| 111 | All Documents concerning any guidelines, instructions, manuals, materials, processes, or procedures used by or provided to any pharmacy and therapeutics ("P&T") committee, formulary review committee, financial review committee, or similar bodies with input into decisions regarding formulary listings, preferred drug listings, coverage restrictions, caps on coverage, or similar limitations. | Refuse to produce any documents. |
| 112 | All Documents concerning the evaluation, consideration, analysis or discussion of Atorvastatin Calcium or any other Cholesterol Treatment by any P&T committee, formulary review committee, financial review committee, or similar bodies with input into decisions regarding formulary listings, preferred drug listings, coverage restrictions, caps on coverage, or similar limitations, including but not limited to minutes of meetings, reports of results, and Documents considered. | Refuse to produce any documents. |
| 113 | Documents sufficient to show the membership of each P&T committee, formulary review committee, financial review committee, or similar body that evaluated, considered, analyzed, or discussed Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents. |

**EXHIBIT C-1**

| | Retailer Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 115 | All Documents concerning any agreement with any drug manufacturer concerning Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/AB-rated generic Lipitor; Refuse to produce any non-purchase related documents. |
| 120 | All Documents concerning reports in Consumer Reports' Best Buy Drugs regarding Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents. |
| 127 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Cholesterol Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents other than those specifically referencing Lipitor/AB-rated generic Lipitor. |
| 133 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Cholesterol Treatment, including Lipitor or any potential generic thereof. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents that pertain to sales and profits. |

EXHIBIT C-1

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| No. | Request Text | EPPs' Position |
| 1 | Documents sufficient to show Your organizational or business structure, including that of Your subsidiaries or affiliates, and commercial relationships between and among You and Your subsidiaries or affiliates, unions, local organizations, and national organizations, as well as any changes thereto since January 1, 2005. | Refuse to produce any organizational charts other than those from departments responsible for the payment or reimbursement of atorvastatin calcium. |
| 2 | Organizational charts, personnel directories, telephone directories, and electronic mail user and address lists sufficient to show all personnel:<br>a. with any responsibility for the purchase or sale of pharmaceutical products, including but not limited to any Cholesterol Treatments, and all employees to whom they report directly or indirectly;<br>b. with any responsibility for the purchase or reimbursement of any Cholesterol Treatment;<br>c. with any responsibility for management of Your health and welfare fund;<br>d. with any responsibility for the management of Your Plans;<br>e. with any responsibility for the determination of premiums, negotiated monies and/or employee contributions; and<br>f. all senior management to whom the individuals identified in (c)-(f) report directly or indirectly. | Refuse to produce any organizational charts other than those from departments responsible for the payment or reimbursement of atorvastatin calcium. |
| 5 | All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium, including any assessments or analyses of any potential or actual effect of this switching on Your sales. including but not limited to:<br>a. All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium.<br>b. All Documents concerning patients' ability or willingness to switch from Lipitor to any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 11 | All Documents concerning the promotion, marketing, or sales of Atorvastatin Calcium and/or any other Cholesterol Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 12 | All Documents concerning any communication with any Defendant relating to any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 13 | All analyses, studies, reports, forecasts, or budgets concerning Atorvastatin Calcium and/or any other Cholesterol Treatment sold in the United States. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

**EXHIBIT C-1**

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 14 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Cholesterol Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 15 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 16 | All Documents concerning the factors that a physician or health care provider considers or may consider in deciding which Cholesterol Treatment to prescribe, including but not limited to efficacy, formulation, dosage, availability of extended release formulations, side effects, patient tolerance, patient adherence, price, brand name, and patents. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 17 | All Documents concerning comparisons between and among different Cholesterol Treatments, including but not limited to any analyses of actual, projected, or claimed benefit, harm, improvement, therapeutic equivalence, similarity or difference between or among them. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 18 | All Documents concerning the sale of, market share of, or competition between or among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 19 | All Documents concerning any policies, procedures, or standards concerning the prescribing of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 20 | All Documents concerning any actual or potential substitution or interchangeability between and among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic), including "off label" uses. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 21 | All Documents concerning any assessment by You or anyone else of the efficacy of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 22 | All Documents concerning the dosing regimens for and/or methods of administration of any Cholesterol Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 23 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| No. | EPP Responses and Objections re: Product Market | |
|---|---|---|
| | Request Text | EPPs' Position |
| 24 | All Documents regarding any potential entry of an AB-rated generic version of Lipitor and/or any other Cholesterol Treatment, including those listed in Appendix A. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 25 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 26 | All Documents concerning switching between Cholesterol Treatments, including the frequency, safety, effectiveness, or reasons for switching or not switching from one Cholesterol Treatment to another. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 27 | All Documents concerning switching between any Cholesterol Treatments occurring at the Pharmacy, with or without physician notification. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 28 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 29 | All Documents concerning the relative price or cost of Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 30 | All Documents comparing Lipitor with any other Cholesterol Treatment, including but not limited to Documents concerning efficacy, safety, and cost. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-cost related documents. |
| 31 | All Documents comparing Lipitor with Generic Atorvastatin Calcium for the preventing heart attacks, strokes, and chest pain, lowering cholesterol, lowering triglycerides, slowing the progress of heart disease, and/or any other treatment for which Lipitor is indicated or prescribed. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 32 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Atorvastatin Calcium and/or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

**EXHIBIT C-1**

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 33 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any documents other than agreements with pharmacy benefit managers ("PBM"); Refuse to produce any documents concerning the negotiation of PBM agreements. |
| 34 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Atorvastatin Calcium, or any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 35 | All contracts and/or agreements between You and Pharmacies, Pharmacy buying groups, Pharmacy benefit managers, third-party payors, concerning Your purchases and reimbursements of Atorvastatin Calcium or any other Cholesterol Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 38 | A copy of each formulary or drug list on which any Cholesterol Treatments is listed. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 39 | All Documents concerning the consideration of (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to Lipitor and/or Generic Atorvastatin Calcium, including all Documents that compare or contrast Lipitor and/or Generic Atorvastatin Calcium to any other product. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 40 | All Documents sufficient to identify any Cholesterol Treatment which you have purchased or for which you have provided reimbursement. | Refuse to produce any documents. |
| 41 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatments, Documents sufficient to show Your determination of the premiums, negotiated monies, and/or employer contributions required by the Plan, including, but not limited to, all Documents concerning the determination of the premium, negotiated monies, and/or employer contributions required for (1) prescription drug coverage generally and (2) Atorvastatin Calcium and any other Cholesterol Treatments. | Refuse to produce any documents. |
| 42 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatments, Documents sufficient to show each state in which the Plan provides or has provided coverage. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

EXHIBIT C-1

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 43 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatments, Documents sufficient to describe the benefits and scope of coverage of the Plan and each group entitled to coverage under it for each year. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 44 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show for each year, the number of Plan Members enrolled in each Plan, their geographic distribution (by state), and the number of Plan Members who received benefits in connection with any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 45 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, the summary of plan benefits or other Documents used to describe the benefits and scope of coverage of each Plan and each Group entitled to coverage under each Plan for each year. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 46 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to describe any subcontracting or delegation by You of the management, operation, or administration of the Pharmacy benefit of any Plan to any other parties, the identity of those parties, the terms of Your agreements with those parties, and any amendments thereto. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 47 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show any risk sharing or other agreements between You and any Pharmacy benefit manager, self-funded Plan, insurance company, third party administrator, actuarial advisor/consultant, financial advisor/consultant, investment advisor/consultant, or other entity with regard to the Pharmacy benefit. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 48 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, all Documents showing each iteration of the Plan design, including but not limited to, whether the Plan is provided on a fee-for-service basis, as part of staff model HMO, IPA HMO, point-of-service HMO, Preferred Provider Organization, or Managed Indemnity product, or on some other basis; the premium, negotiated monies, and/or employer contributions structure; the Pharmacy coverage, including but not limited to caps or limitations on coverage, cost sharing, step-care protocols, prior authorization requirements, the use of mail order (and the terms and conditions thereof); the use of an In-House Pharmacy; the use of formularies, formulary compliance policies, preferred drug lists, physician incentives, or NDC lockouts; the use of capitation at the physician or Pharmacy level; and the use of mechanisms, if any, to ensure formulary compliance. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

## EPP Responses and Objections re: Product Market

| No. | Request Text | EPPs' Position |
|---|---|---|
| 49 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show how You determine or have determined the Pharmacy coverage for Atorvastatin Calcium and other Cholesterol Treatments, including but not limited to caps or limitations on coverage, cost-sharing, step-care protocols, prior authorization requirements, or other limitations on coverage. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 50 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the premiums, negotiated monies, and/or employer contributions collected in connection with the Plan, and the portion of total premiums, negotiated monies, and/or employer contributions associated with the various categories of coverage provided, including the Pharmacy benefit and amounts associated or related with Your providing coverage for Atorvastatin Calcium, and any other Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any premium related documents. |
| 51 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the amounts You spent in providing coverage in connection with the Plan, and, the total associated with the Pharmacy benefit and the amount associated with Your providing coverage for Atorvastatin Calcium and any other Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 52 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show Your financial status at the end of each Plan year and the operating performance for each Plan year, including Your assets and liabilities at the end of each year, cash flows into and out of the fund over the course of each year, any target balance for the fund set by management overseeing the fund, and overall profit and loss or similar financial statements each year. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any premium related documents. |
| 53 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the profitability or increases in net assets of the Plan or the Pharmacy component thereof, including all Documents concerning the profitability of Your providing coverage for Atorvastatin Calcium and any other Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any premium related documents. |
| 54 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the Plan's method of determining cost sharing, such as co-pays or deductibles to be paid by groups or Plan Members; exclusions from coverage; caps or limitations on coverage; and reimbursements to be paid to pharmacies for filling prescriptions for Plan Members, including all Documents that concern coverage for Atorvastatin Calcium and any Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

EXHIBIT C-1

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 55 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, all Documents concerning Your efforts to notify any governmental agency, or obtain any governmental agency's approval of, premiums, negotiated monies, and/or employer contributions to be charged by You for coverage under the Plan. | Refuse to produce any documents. |
| 56 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the coverage and all changes to coverage provided by the Plan to Plan Members including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 57 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the coverage (including cost-sharing, deductibles, exclusions, limitations, and caps on coverage) provided by the Plan to Plan Members for each drug and all medical treatments or therapies that may be reasonable substitutes for Atorvastatin Calcium. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 58 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show any changes to coverage provided by the Plan to Plan Members for any Cholesterol Treatment, and any other medical treatments or therapies that may be reasonable substitutes for Atorvastatin Calcium. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 59 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, all Documents concerning Your policies or procedures to encourage health care providers, physicians, pharmacists, pharmacies, hospitals, and/or other health care providers to authorize or engage in therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) with respect to Atorvastatin Calcium or any other Cholesterol Treatments, and the effectiveness of such policies and procedures. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 60 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment that utilizes formularies or preferred drug lists, all Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or preferred drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 61 | For each Plan that utilizes formularies or preferred drug lists and under which You provide or have provided coverage for any Cholesterol Treatment, all Documents concerning the review, analysis, or consideration of Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 62 | All Documents concerning Your use of step edits or step therapy, including but not limited to Documents concerning Your review, analysis, and consideration of implementing step edits or step therapy on any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| No. | Request Text | EPPs' Position |
|---|---|---|
| 63 | For purchases or reimbursements of any Cholesterol Treatment:<br>a. Each of Your reimbursements for prescriptions filled by Plan Members (by Plan Member, date, and amount);<br>b. Documents sufficient to show to whom payment was made and where; and<br>c. Any co-pay, co-insurance or deductible paid by the Plan Member. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 64 | With respect to each Pharmacy You reimbursed or otherwise paid in connection with the dispensing of any Cholesterol Treatment, please provide:<br>a. Documents sufficient to show the identity and location of the Pharmacy;<br>b. All agreements between You and the Pharmacy, including any amendment thereto and all Documents concerning the enrollment of the Pharmacy as a participating Pharmacy;<br>c. Documents sufficient to show reimbursement rates or schedules;<br>d. Documents sufficient to show Your maximum allowable costs or reimbursement rates;<br>e. All correspondence with the Pharmacy concerning Atorvastatin Calcium or any other Cholesterol Treatment;<br>f. Documents sufficient to show (by date, location, and Plan affiliation) the amount of Atorvastatin Calcium or any other Cholesterol Treatment (in unit and dollar terms) dispensed by the Pharmacy to Plan Members; and<br>g. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made by You to the Pharmacy (by date, location, and Plan affiliation) in connection with the Pharmacy's dispensing of Atorvastatin Calcium or any other Cholesterol Treatment to Plan Members. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 66 | With respect to each In-House Pharmacy through which You dispensed Atorvastatin Calcium, or any Cholesterol Treatment to Plan Members, please provide Documents sufficient to show:<br>a. The identity and location of the In-House Pharmacy; and<br>b. The In-House Pharmacy's dispensing of Atorvastatin Calcium or any Cholesterol Treatment, including Documents reflecting the date the product was dispensed, the dosage form, the co-pay, co-insurance or deductible paid by the Plan Member, and any other consideration You received. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 67 | All Documents reflecting Your policies and procedures concerning the purchase, coverage, or reimbursement of Plan Members for brand name pharmaceutical products when generic alternatives, including both therapeutic alternatives and therapeutic equivalents, are available. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 68 | All Documents from the beginning of the Relevant Time Period through the present concerning Your rate of therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) for all of Your Plans and the effectiveness of any efforts to encourage either such substitution. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

EXHIBIT C-1

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 69 | All Documents concerning any changes in coverage for Atorvastatin Calcium or any Cholesterol Treatment, including but not limited to, removing Atorvastatin Calcium from formularies or listing Atorvastatin Calcium in a different formulary tier. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 70 | All Documents concerning the actual or projected costs or utilization rates for Atorvastatin Calcium or any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 71 | All Documents showing the actual, projected, or estimated prescription drug cost for each of Your Plans for Atorvastatin Calcium or any Cholesterol Treatment, including but not limited to any Documents and data concerning any calculation or estimate of such costs. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 75 | All correspondence with any Mail Order Pharmacy concerning Cholesterol Treatment, including but not limited to: a. Documents sufficient to show reimbursement rates or schedules; b. Documents sufficient to show volume of purchases of Cholesterol Treatments by mail order; c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Atorvastatin Calcium or any other Cholesterol Treatment to consumers. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 76 | Documents sufficient to show, by package size, dosage form and seller: a. Each purchase by You of Cholesterol Treatments; b. The gross dollar expenditures in connection with each of Your purchases of these products; c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products; d. The net dollar expenditures in connection with each of Your purchases of these products; and e. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 78 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Atorvastatin Calcium and/or any other Cholesterol Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), from January 1, 2005 to December 31, 2013, as follows: a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price; b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price; c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; and d. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

EXHIBIT C-1

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 97 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 98 | All Documents concerning generic or therapeutic substitution of Cholesterol Treatments, including any analyses or discussions of the impact on price or availability for other Cholesterol Treatments and the effectiveness of such substitution. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 99 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from a brand name Cholesterol Treatment to any generic Cholesterol Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 100 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Cholesterol Treatment to another brand name Cholesterol Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 101 | All Documents concerning generic or therapeutic substitution involving Cholesterol Treatments, including any analyses or discussions of the impact on price or availability for drugs. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 102 | To the extent any Plaintiff has or had a Therapeutic Interchange Program or similar program concerning therapeutic interchange, or participated in one sponsored by an insurer or PBM, documents concerning the circumstances under which pharmacists may use such therapeutic interchange programs to switch patients from brand name Cholesterol Treatments to generic and/or lower-cost alternative Cholesterol Treatments. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

EXHIBIT C-1

## EPP Responses and Objections re: Product Market

| No. | Request Text | EPPs' Position |
|---|---|---|
| 103 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Cholesterol Treatment may follow to compete with an AB-rated generic equivalent Cholesterol Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 106 | All Documents concerning the services provided by or made available to You by any Pharmacy benefit manager, claims administrator, insurance provider, actuary, or health benefits consultant concerning any Cholesterol Treatment, including but not limited to any agreements between You and such vendors. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 126 | All Documents concerning any real, perceived, expected, considered, or anticipated efforts or attempts by Defendants to delay, prevent, block, thwart, or otherwise forestall generic competition for Lipitor. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 128 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Cholesterol Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 134 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Cholesterol Treatment, including Lipitor or any potential generic thereof. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 138 | All Documents relating to any purchase or acquisition by Individual EPPs of any Cholesterol Treatment from any Pharmacy or any other source, including but not limited to receipts, checks, credit card receipts or bills, prescriptions, insurance claims, explanation of benefits, or reimbursement forms. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 139 | Documents sufficient to show the amount paid by Individual EPPs for each purchase or acquisition of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 141 | Documents sufficient to identify the physician or other medical professionals who treated Individual EPPs for the condition that precipitated the prescription of any Cholesterol Treatment. | Refuse to produce any documents. |
| 142 | All Documents that reflect or refer to any payment or reimbursement by any insurance, indemnification, prescription benefit, or health plan for purchases by Individual EPPs of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

| | EPP Responses and Objections re: Product Market | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 145 | All Documents relating to the factors that did or may influence Individual EPPs' purchasing decisions with respect to any Cholesterol Treatment, including the role of price, brand name, patents, side effects, dosing regimen, or other factors influencing such decisions. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 146 | Documents concerning Individual EPPs' switch or failure to switch between and among any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 147 | Documents sufficient to show duration of Individual EPPs' use or non-use of Atorvastatin Calcium, and/or any other Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |
| 148 | Documents concerning Individual EPPs' use of co-pay coupons, free samples, or other financial assistance in connection with his use of any Cholesterol Treatment. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin; Refuse to produce any non-purchase related documents. |

# Exhibit C-2

**EXHIBIT C-2**

**OBJECTIONS TO PHYSICIAN IDENTIFICATION REQUEST**

| No. | EPP Responses and Objections re: Physician Identification | |
|---|---|---|
| | Request Text | EPPs' Position |
| 141 | Documents sufficient to identify the physician or other medical professionals who treated Individual EPPs for the condition that precipitated the prescription of any Cholesterol Treatment. | Refuse to produce any documents. |

# Exhibit C-3

**EXHIBIT C-3**

**OBJECTIONS TO BUSINESS INFORMATION REQUESTS**

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 8 | All Documents concerning the introduction of Generic Atorvastatin Calcium into the United States, including but not limited to Documents concerning Your awareness, understanding, or expectations regarding (a) the identity of any potential manufacturer of Generic Atorvastatin Calcium; (b) the status of any ANDA concerning Generic Atorvastatin Calcium; (c) any impediments to or delays in the launch of Generic Atorvastatin Calcium (including but not limited to manufacturer problems and related issues); (d) the expected date for market entry for Generic Atorvastatin Calcium; (e) the expected market share of penetration rate of Generic Atorvastatin Calcium; and (f) the expected price of Generic Atorvastatin Calcium. | Refuse to produce any non-purchase related documents. |
| 9 | All Documents regarding the impact of the introduction of Generic Atorvastatin Calcium on Your business, including but not limited to any assessments of sales, pricing, or volume changes resulting from such introduction. | Refuse to produce any non-purchase related documents. |
| 10 | All Documents regarding plans or strategies for responding to the introduction of Generic Atorvastatin Calcium. | Refuse to produce any non-purchase related documents. |
| 35 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Atorvastatin Calcium and/or any other Cholesterol Treatment. | Refuse to produce any non-purchase related documents. |
| 37 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Atorvastatin Calcium, or any Cholesterol Treatment. | Refuse to produce any non-purchase related documents. |
| 38 | All contracts and/or agreements between You and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Atorvastatin Calcium or any other Cholesterol Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 39 | All contracts and/or agreements related to Your generic source/formulary program with any Pharmacy and/or Pharmacy buying group customers. | Refuse to produce any documents. |
| 45 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |

**EXHIBIT C-3**

| DPP Responses and Objections re: Business Information | | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 46 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 47 | All Documents related to any price adjustment given to any purchaser concerning any Cholesterol Treatment. | Refuse to produce any documents. |
| 51 | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Atorvastatin Calcium and/or any other Cholesterol Treatment by You during the Relevant Time Period in transaction-by-transaction format, as follows: | Refuse to produce any documents. |
| a | All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |

**EXHIBIT C-3**

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| b | All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |
| c | All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; | Refuse to produce any documents. |
| d | Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |

EXHIBIT C-3

| | DPP Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| e | The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |
| 80 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |
| 81 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |
| 82 | All Documents, irrespective of date, concerning whether any of the Putative Class Members' distribution and/or servicing of sales of Lipitor would be more or less profitable than distribution and/or servicing of Generic Atorvastatin Calcium. | Refuse to produce any documents. |

**EXHIBIT C-3**

| No. | DPP Responses and Objections re: Business Information | |
|---|---|---|
| | **Request Text** | **DPPs' Position** |
| 83 | All Documents, irrespective of date, concerning whether any of the putative class members' distribution and/or servicing of sales of brand-name pharmaceuticals would be more or less profitable than distribution and/or servicing of generic versions of brand-name pharmaceuticals. | Refuse to produce any documents. |

EXHIBIT C-3

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 5 | All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium, including any assessments or analyses of any potential or actual effect of this switching on Your sales, including but not limited to:<br>a. All Documents concerning patients' ability or willingness to switch from Lipitor to Generic Atorvastatin Calcium.<br>b. All Documents concerning patients' ability or willingness to switch from Lipitor to any other Cholesterol Treatment. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 11 | All Documents concerning the promotion, marketing, or sales of Atorvastatin Calcium and/or any other Cholesterol Treatment, including but not limited to all advertising, press releases, announcements, solicitations, articles, speech or lecture texts, sales presentations, brochures, proposals, and catalogs, including all drafts or earlier versions of any of the above. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 14 | All Documents concerning the purchasing, coverage, or reimbursement decisions of purchasers or payors (including but not limited to wholesalers, retail pharmacies, hospitals, plans, insurers, and individual consumers) with respect to any Cholesterol Treatment, including the role of price, brand name, and patents. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 15 | All Documents concerning the types of conditions or indications for which physicians or health care providers have prescribed or may prescribe any Cholesterol Treatment. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 17 | All Documents concerning the sale of, market share of, or competition between or among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 18 | All Documents concerning the sale of, market share of, or competition between or among (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment (whether branded or generic) in the United States, including but not limited to information, analyses, studies, projections, investigations, or reports concerning the actual, potential, expected, or projected sales of such products or substitution among them. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 22 | All Documents concerning the dosing regimens for and/or methods of administration of any Cholesterol Treatment, whether labeled, physician-directed, pharmacist-directed, or otherwise. | Refuse to produce any documents exclusively related to pricing, margin, or profitability information. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 23 | All Documents concerning any comparisons between or among different dosage strengths, dosage forms, dosing regimens, active ingredients, side effects, adverse events, and formulations of Cholesterol Treatments. | Refuse to produce any documents exclusively related to pricing, margin, or profitability information. |
| 25 | All Documents concerning communications with physicians, health care providers, hospitals, pharmacies, pharmacy benefit managers, governmental organizations, health insurers, professional organizations, or publication editors concerning the relative safety and effectiveness of any Cholesterol Treatment. | Refuse to produce any documents exclusively related to pricing, margin, or profitability information. |
| 28 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Cholesterol Treatments. | Refuse to produce any documents. |
| 29 | All Documents concerning the relative price or cost of Cholesterol Treatments. | Refuse to produce any documents. |
| 32 | A copy of each formulary or drug list on which any Cholesterol Treatment is listed. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 33 | All Documents concerning Your policies or procedures for creating, maintaining, promulgating, and updating the formulary or drug list, including but not limited to policies and procedures for determining the pharmaceutical products to be included thereon. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 34 | All Documents concerning the consideration of (i) Lipitor, (ii) Generic Atorvastatin Calcium, and/or (iii) any other Cholesterol Treatment for inclusion on any formulary or drug list, and other pharmaceutical products You have discussed, analyzed, or considered as substitutes to Lipitor and/or Generic Atorvastatin Calcium, including all Documents that compare or contrast Lipitor and/or Generic Atorvastatin Calcium to any other product. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 35 | All contracts, agreements, and understandings between You and any other party, including any Defendant, related to the purchase, sale, or reimbursement of Atorvastatin Calcium and/or any other Cholesterol Treatment. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 38 | All contracts and/or agreements between You (or Your assignor) and any national account customers, pharmacies, pharmacy buying groups, pharmacy benefit managers, third-party payors, or institutional customers, concerning Your sales of Atorvastatin Calcium or any other Cholesterol Treatments for the Relevant Period, including those contracts that are not drug specific or limited to pharmaceuticals. | Refuse to produce any documents. |
| 39 | All contracts and/or agreements related to Your generic source/formulary program with any Pharmacy and/or Pharmacy buying group customers. | Refuse to produce any documents. |

EXHIBIT C-3

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 42 | All Documents pertaining to Your strategies, policies or practices for stocking and/or inventory of brand name prescription drugs, including documents relating to which doses or pharmaceuticals to stock that could be relevant to or applied to Cholesterol Treatments. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 43 | All opinions, comparisons, studies, or analyses describing any practice, custom, or policy of selling pharmaceuticals on a cost-plus basis that could be relevant to or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 44 | All Documents pertaining to any strategy of Arbitrage and/or the timing of Your purchases in connection with the purchase of brand name prescription drugs. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 45 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 46 | All Documents relating to any analysis of the profitability of distributing, and/or servicing the distribution of, generic pharmaceuticals, including any financial modeling or analyses You have conducted or received that could be used for or applied to Cholesterol Treatments. | Refuse to produce any documents. |
| 47 | All Documents related to any price adjustment given to any purchaser concerning any Cholesterol Treatment. | Refuse to produce any documents. |
| 48 | Any of Your communications regarding formularies or preferred drug lists referencing any Cholesterol Treatment. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 50 | For all purchases of Atorvastatin Calcium and/or any other Cholesterol Treatment by You during the Relevant Time Period, data extracted from the electronic databases, data summaries, or purchase records You maintain identifying in a tab-, comma-, or semi-colon delimited ASCII flat text file or similar electronic format sufficient to identify: (a) from whom it was purchased; (b) the quantities You purchased; (c) the dosage strength(s); (d) the package size(s); (e) the NDC code(s); (f) the prices You paid, including gross and net prices; (g) the dates of Your purchase(s); (h) any credits, rebates, discounts or other adjustments to price You received; (i) any chargebacks You processed; and (j) any terms of sales governing Your purchases; or, if Your records do not contain all of the requested information, all Documents sufficient to show such information. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |

| No. | Request Text | Retailers' Position |
|-----|--------------|---------------------|
| header: **Retailer Responses and Objections re: Business Information** | | |

| No. | Request Text | Retailers' Position |
|-----|--------------|---------------------|
| 51 | Electronic data in a tab-, comma-, or semicolon-delimited ASCII flat text file or similar electronic format sufficient to identify sales of Atorvastatin Calcium and/or any other Cholesterol Treatment by You during the Relevant Time Period in transaction-by-transaction format, as follows: | Refuse to produce any documents. |
| a | All direct sales/invoice transactions (as well as any discounts or any other price adjustments or offsets contained in the transaction data) including the following fields: (i) price or dollar amount, (ii) source of the transaction price, (iii) number of units sold, (iv) returned or otherwise affected by the transaction, (v) unit of measure, (vi) date of transaction, (vii) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.), (viii) NDC, (ix) UPC, (x) SKU, (xi) pharmaceutical description, (xii) pharmaceutical form, (xiii) pharmaceutical strength, (xiv) package size in extended units per package, (xv) customer name, (xvi) customer number, (xvii) customer address, (xviii) customer class of trade code and the description of that code (all such customer information being provided for both the bill-to customer and the ship-to customer), and (xix) the customer's parent company (if the data identify a subsidiary, corporate affiliate, division, satellite office, distribution center, warehouse, or the like). | Refuse to produce any documents. |
| b | All data relating to chargebacks, rebates, discounts, and other consideration given or accrued, including the following fields: (i) each transaction, including the date thereof; (ii) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom You paid, or on whose behalf You accrued, the chargeback, rebate, discount, and/or other consideration; (iii) the name and address of, and all unique codes or identifiers for, the persons, firms, corporations, or other business entities that made the purchases in respect of which You paid or accrued the chargeback, rebate, discount, or other consideration; (iv) the sales, or group of sales, upon which the rebate, discount, or other consideration is based, including: (aa) the number of units of the particular pharmaceutical sold, by package size, SKU, UPC, NDC, and any and all other unique codes or other identifiers for each sale or other transaction; (bb) the bill-to customer; (cc) the ship-to customer; (dd) the dates of the sales, or group of sales; (ee) the invoice amount in dollars for the sales or group of sales; (ff) the amount of the chargeback, rebate, discount, or other consideration paid or accrued; and (gg) the contract, agreement, or other basis upon which the chargeback, rebate, discount, or other consideration is calculated. | Refuse to produce any documents. |

**EXHIBIT C-3**

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| c | All administrative fee transactions including: (i) fee amount paid, (ii) date of payment, (iii) date or date range of sales relating to the fee that was paid, (iv) information sufficient to identify the type of administrative fee (if applicable), (v) customer name, (vi) customer number, (vii) customer address, and (viii) customer class of trade code and the description of that code; | Refuse to produce any documents. |
| d | Any other paid or accrued discounts, rebates, chargebacks, billbacks, unit adjustments, price adjustments, shelf-stock price adjustments, returns, third-party returns, error corrections, free goods, nominally-priced goods, and all other transaction types not reflected in the above (a through c), whether created or maintained daily, monthly, quarterly, or at some other periodicity. | Refuse to produce any documents. |
| e | The complete documentation for all items above (a through d) including (i) lookup tables, (ii) data dictionaries, (iii) lists of fields, (iv) descriptions of information contained in those fields (e.g., field lengths, formats, etc.), and (v) descriptions of any codes used in any fields (such as class of trade designations, etc.), including but not limited to (aa) a separate pharmaceutical list, including NDC, SKU, UPC, pharmaceutical description, and package size; (bb) a separate table that lists, for each "bill-to customer" and "ship-to customer," the customer number, parent customer number, customer group number, customer identity, contact information, address, and class of trade (e.g., SIC code); (cc) a separate table listing and defining each transaction code, abbreviation, or other field or entry code, and indicating (i) whether quantity values for each transaction type should be included in calculating net quantity sold, or should be ignored because they do not affect net quantity sold, and (ii) how negative unit and dollar values should be treated in calculating net quantities and dollar amounts; (dd) all datasets and calculations used (i) to determine accrued rebates and/or chargebacks and/or (ii) to periodically reconcile accrued rebates and/or chargebacks with actual rebates and/or chargebacks; (vi) return and/or exchange policies; and (vii) payment terms. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 53 | All correspondence with any Mail Order Pharmacy concerning Cholesterol Treatment, including but not limited to:<br>a. Documents sufficient to show reimbursement rates or schedules;<br>b. Documents sufficient to show volume of purchases of Cholesterol Treatments by mail order;<br>c. Documents sufficient to show the reimbursement or other payments, including dispensing fees, made to the Pharmacies (by date, location, and plan affiliation) in connection with the Pharmacy's dispensing of Atorvastatin Calcium or any other Cholesterol Treatment to consumers. | Refuse to produce any documents. |
| 54 | Documents sufficient to show, by package size, dosage form and seller:<br>a. Each purchase by You of Cholesterol Treatments;<br>b. The gross dollar expenditures in connection with each of Your purchases of these products;<br>c. All credits, discounts, rebates, or other adjustments to price in connection with each of Your purchases of these products;<br>d. The net dollar expenditures in connection with each of Your purchases of these products; and<br>e. The gross and net prices You paid in connection with each of Your purchases of these products. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 55 | With respect to each Mail Order Pharmacy through which You sold any Atorvastatin Calcium to consumers, please provide Documents sufficient to show:<br>a. The identity and location of the Mail Order Pharmacy;<br>b. The Mail Order Pharmacy's purchase of Atorvastatin Calcium, or any Cholesterol Treatment, including Documents reflecting the date you sold to the Mail Order Pharmacy. | Refuse to produce any documents. |

EXHIBIT C-3

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 56 | Data generated or provided by IMS and Verispan in whatever format it was received from IMS or Verispan for Atorvastatin Calcium and/or any other Cholesterol Treatment (if available, with data broken out by manufacturer, form, strength, NDC and channel), during the Relevant Time Period, as follows: a. IMS National Prescription Audit data, including TRx, NRx, extended units, retail sales dollars and retail sales price; b. IMS National Sales Perspective data, including total units, extended units, total sales dollars and price; c. Verispan Vector One National (VONA) data, including TRx, NRx, extended units, retail sales dollars, and retail sales price; and d. National Disease and Therapeutic Index (NDTI data). | Refuse to produce any documents. |
| 58 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreement. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 59 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of the market impact of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessment of the effect of any agreement on the relevant drug's unit and dollar sales, price, market share, or reimbursement. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 76 | All Documents relating to any generic or therapeutic substitution program, policy, or plan that You have implemented or considered implementing for Cholesterol Treatments. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 79 | All Documents concerning any strategies, tactics, procedures, programs, Plan designs, or other efforts evaluated, considered, or employed by You to convert or shift utilization, whether before or after a prescription has been written, from one brand name Cholesterol Treatment to another brand Cholesterol Treatment. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |

EXHIBIT C-3

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 82 | All Documents concerning any analysis, evaluation, or consideration of the strategies that a manufacturer of a brand name Cholesterol Treatment may follow to compete with an AB-rated generic equivalent Cholesterol Treatment, including but not limited to the use of co-pay or co-insurance assistance and discount or rebate contracts. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |
| 83 | All Documents, irrespective of date, concerning any analysis of the profitability of distributing, and/or servicing the distribution of, generic Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |
| 84 | All Documents concerning any analysis of the profitability of distributing, and/or servicing the distribution of, brand-name Cholesterol Treatments, including any financial modeling or analyses You have conducted or received. For avoidance of doubt, this request calls for any such Documents that would have been applicable to Cholesterol Treatments, whether or not such documents were prepared specifically for Cholesterol Treatments or any particular Cholesterol Treatment. | Refuse to produce any documents. |
| 90 | If You base any claims on an assignment, Documents sufficient to show, for all periods for which You claim damages, each agreement in place between Your Assignor and any customer of Your Assignor that directly or indirectly specified the terms of sale for Lipitor or Generic Atorvastatin Calcium. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 94 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, all Documents showing each iteration of the Plan design, including but not limited to (i) whether the Plan is provided on a fee-for-service basis, as part of staff model HMO, IPA HMO, point-of-service HMO, Preferred Provider Organization, or Managed Indemnity product, or on some other basis; (ii) the premium or other payment charged to any person or other entity for coverage under the Plan; (iii) the pharmaceutical coverage, including but not limited to caps or limitations on coverage, cost sharing, step-therapy protocols, prior authorization requirements, the use of mail order (and the terms and conditions thereof); (iv) the use of an In-House Pharmacy; (v) the use of formularies, or preferred drug lists, including efforts to ensure or enhance formulary compliance, such as physician incentives or NDC lockouts; (vi) and the use of capitation or financial incentives at the physician or pharmacy level. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |
| 95 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, the summary of plan benefits or other Documents used to describe the benefits and scope of coverage of each Plan and each Group entitled to coverage under each Plan for each year. | Refuse to produce any documents. |
| 96 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to describe any subcontracting or delegation by You of the management, operation, or administration of the pharmacy benefit of any Plan to any other parties, the identity of those parties, the terms of Your agreements with those parties, and any amendments thereto. | Refuse to produce any documents. |
| 97 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show how You, from the beginning of the Relevant Time Period through the present, have determined the pharmaceutical coverage for Atorvastatin Calcium and any other Cholesterol Treatment,including but not limited to caps or limitations on coverage, cost sharing, step-care protocols, prior authorization requirements, or other limitations on coverage. | Refuse to produce any documents. |

EXHIBIT C-3

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 98 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show, from the beginning of the Relevant Time Period through the present, the method for determining a Plan's cost sharing, deductibles, exclusions from coverage, caps or limitations on coverage, and reimbursements to be paid to pharmacies for filling prescriptions for Plan members, including all Documents that concern coverage for Atorvastatin Calcium and any other Cholesterol Treatment. | Refuse to produce any documents. |
| 99 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents concerning the coverage provided by the Plan to Plan Members for Atorvastatin Calcium or any other Cholesterol Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions. | Refuse to produce any documents. |
| 100 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents concerning the any changes to coverage provided by the Plan to Plan Members for Atorvastatin Calcium or any other Cholesterol Treatment, including any Documents reflecting cost sharing, deductibles, caps, limitations, or exclusions, from the Relevant Time Period through the present. | Refuse to produce any documents. |
| 101 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show the coverage (including cost-sharing, deductibles, exclusions, limitations, and caps on coverage) provided by the Plan to Plan Members for each drug and all medical treatments or therapies that may be reasonable substitutes for Atorvastatin Calcium. | Refuse to produce any documents. |
| 102 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, Documents sufficient to show any changes to coverage provided by the Plan to Plan Members for Atorvastatin Calcium or any other Cholesterol Treatment, and any other medical treatments or therapies that may be reasonable substitutes for Atorvastatin Calcium. | Refuse to produce any documents. |

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 103 | With respect to each of Your Plans that provides or has provided coverage for Atorvastatin Calcium or any other Cholesterol Treatment, all Documents concerning Your policies, practices, or procedures to encourage health care providers, physicians, pharmacists, pharmacies, hospitals, and/or other health care providers to authorize or engage in therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) with respect to Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents. |
| 106 | All Documents from the beginning of the Relevant Time Period through the present concerning Your use of step edits or step therapy, including but not limited to Documents concerning Your review, analysis, and consideration of implementing step edits or step therapy on Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents. |
| 107 | All Documents concerning Your policies, practices, or procedures, including but not limited to the use of co-pay tiers, pharmacy incentives, or physician incentives, to encourage therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand). | Refuse to produce any documents. |
| 108 | All Documents reflecting Your policies and procedures concerning the purchase, coverage, or reimbursement of Plan Members for brand name pharmaceutical products when generic alternatives, including both therapeutic alternatives and therapeutic equivalents, are available. | Refuse to produce any documents. |
| 109 | All Documents from the beginning of the Relevant Time Period through the present concerning Your rate of therapeutic substitution (either brand for brand or generic for brand) and/or generic substitution (generic for equivalent brand) for all of Your Plans and the effectiveness of any efforts to encourage either such substitution. | Refuse to produce any documents. |
| 119 | All Documents concerning any agreement with or policies applicable to any pharmacy regarding customer-service or other work performed by pharmacists. | Refuse to produce any documents. |
| 121 | Documents sufficient to show the cost for You to fill a prescription at any of Your In-house or mail-order pharmacies. | Refuse to produce any documents. |
| 122 | Documents concerning the effectiveness and/or performance of Your in-house or mail-order pharmacies, and retail pharmacies in driving utilization from one pharmaceutical product to another pharmaceutical product. | Refuse to produce any documents. |
| 123 | Documents sufficient to show all pharmaceutical drugs for which one of Your Plans requires or previously required a (i) prior authorization or (ii) a step-edit or step therapy requirement and the effectiveness of each strategy. | Refuse to produce any documents. |

**EXHIBIT C-3**

| | Retailer Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 124 | Documents sufficient to show from the beginning of the Relevant Time Period through the present each Plan that did not cover Atorvastatin Calcium and the year in which Atorvastatin Calcium was not covered. | Refuse to produce any documents. |
| 127 | All Documents concerning any programs or services offered by You to pharmaceutical manufacturers of Cholesterol Treatments related to the promotion or marketing of pharmaceuticals or increasing patient awareness for a pharmaceutical, including any contracts, term sheets or other agreements entered into by You related to such programs or services. | Refuse to produce any documents concerning retail sales volumes, retail pricing, and/or profitability. |

| | EPP Responses and Objections re: Business Information | |
|---|---|---|
| **No.** | **Request Text** | **EPPs' Position** |
| 33 | All Documents concerning contractual negotiations between You and Defendants, or any other party, related to the purchase of Atorvastatin Calcium or any other Cholesterol Treatment. | Refuse to produce any documents concerning the negotiation of PBM agreements. |
| 41 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatments, Documents sufficient to show Your determination of the premiums, negotiated monies, and/or employer contributions required by the Plan, including, but not limited to, all Documents concerning the determination of the premium, negotiated monies, and/or employer contributions required for (1) prescription drug coverage generally and (2) Atorvastatin Calcium and any other Cholesterol Treatments. | Refuse to produce any documents. |
| 50 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the premiums, negotiated monies, and/or employer contributions collected in connection with the Plan, and the portion of total premiums, negotiated monies, and/or employer contributions associated with the various categories of coverage provided, including the Pharmacy benefit and amounts associated or related with Your providing coverage for Atorvastatin Calcium, and any other Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 51 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the amounts You spent in providing coverage in connection with the Plan, and, the total associated with the Pharmacy benefit and the amount associated with Your providing coverage for Atorvastatin Calcium and any other Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 52 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show Your financial status at the end of each Plan year and the operating performance for each Plan year, including Your assets and liabilities at the end of each year, cash flows into and out of the fund over the course of each year, any target balance for the fund set by management overseeing the fund, and overall profit and loss or similar financial statements each year. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 53 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, Documents sufficient to show the profitability or increases in net assets of the Plan or the Pharmacy component thereof, including all Documents concerning the profitability of Your providing coverage for Atorvastatin Calcium and any other Cholesterol Treatments. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |

**EXHIBIT C-3**

| No. | Request Text | EPPs' Position |
|---|---|---|
| | **EPP Responses and Objections re: Business Information** | |
| 55 | For each Plan under which You provide or have provided coverage for any Cholesterol Treatment, all Documents concerning Your efforts to notify any governmental agency, or obtain any governmental agency's approval of, premiums, negotiated monies, and/or employer contributions to be charged by You for coverage under the Plan. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 72 | All Documents related to the cost or projected cost of changes in prescription drug coverage considered or implemented by You. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 73 | Documents sufficient to show Your policies, procedures, and practices for experience rating, prospective rating, retrospective rating, deficit recovery charges, risk corridors, or other tools for recovering health care costs through premiums or other payments charged to any person or entity for coverage under any of Your Plans. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 107 | All Documents concerning meetings of Fund trustees, including but not limited to minutes, presentations, reports, or analyses prepared in connection with any trustee meeting. | Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 108 | All Documents concerning communications regarding projected or targeted balances for Your Fund. | Refuse to produce any documents. |
| 109 | Your trust agreements and any amendments thereto. | Refuse to produce any documents. |

# Exhibit C-4

**EXHIBIT C-4**

**OBJECTIONS TO ASSIGNMENT REQUESTS**

| | DPP Responses and Objections re: Assignment | |
|---|---|---|
| **No.** | **Request Text** | **DPPs' Position** |
| 96 | All Documents, irrespective of date, governing or concerning any assignment to You or by You to any other person/entity of any claim asserted in the Complaint. | Refuse to produce documents or communications between DPPs and their assignors/assignees relating to the assignment. |
| 97 | All communications, irrespective of date, concerning any assignment to You or by You regarding any claim asserted in the Complaint, including but not limited to communications between assignee(s) (including its counsel) and the Assignor(s) concerning: (a) assignment of claims; (b) the rights of assignee to an assignment of claims; (c) the merits of the assigned claims; and (d) any obligations assignee owes the Assignor for the assignment of claims and this obligation. | Refuse to produce documents or communications between DPPs and their assignors/assignees relating to the assignment. |
| 98 | All correspondence with any Assignor in this case regarding the assignment, irrespective of date, including all drafts of the assignment, negotiations of the terms of the assignment, and any side agreements or related agreements concerning the assignment. | Refuse to produce documents or communications between DPPs and their assignors/assignees relating to the assignment. |
| 99 | All Documents concerning any consideration paid, or promised to You, or received by You, for the assignment on which You base Your claims in this litigation. | Refuse to produce documents or communications between DPPs and their assignors/assignees relating to the assignment. |
| 100 | All correspondence, irrespective of date, with any Assignor concerning this litigation or the allegations in the Complaint, irrespective of date. | Refuse to produce documents or communications between DPPs and their assignors/assignees relating to the assignment. |
| 101 | If You base any claims on an assignment, Documents sufficient to show, for all periods for which You claim damages, each agreement in place between Your Assignor and any customer of Your Assignor that directly or indirectly specified the terms of sale for Lipitor or Generic Atorvastatin Calcium. | Refuse to produce documents of DPPs' assignors. |
| 102 | If You base any claims on an assignment, Documents sufficient to show each sale of Lipitor or Generic Atorvastatin Calcium by Your assignor for all periods for which You claim damage, including the date, sale price, quantity sold, and identities of the buyer and seller. | Refuse to produce documents of DPPs' assignors. |

EXHIBIT C-4

| | Retailer Responses and Objections re: Assignment | |
|---|---|---|
| **No.** | **Request Text** | **Retailers' Position** |
| 40 | All contracts and/or agreements in Your possession, custody or control, between You (or Your Assignor) and any pharmaceutical wholesaler including, but not limited to Your assignors, e.g., McKesson, Cardinal, AmerisourceBergen, and Kerr Co. | Refuse to produce any non-assignment related contracts or agreements entered into with their assignors or other pharmaceutical wholesalers. |
| 85 | All Documents, irrespective of date, governing or concerning any assignment to You or by You to any other person/entity of any claim asserted in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints. | Refuse to produce documents or communications between Retailers and their assignors/assignees relating to the assignment. |
| 86 | All communications, irrespective of date, concerning any assignment to You or by You regarding any claim asserted in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including but not limited to communications between assignee(s) (including its counsel) and the Assignor(s) concerning: (a) assignment of claims; (b) the rights of assignee to an assignment of claims; (c) the merits of the assigned claims; and (d) any obligations assignee owes the Assignor(s) for the assignment of claims and this obligation. | Refuse to produce documents or communications between Retailers and their assignors/assignees relating to the assignment. |
| 87 | All correspondence, irrespective of date, with any Assignor in this case regarding the assignment, including all drafts of the assignment, negotiations of the terms of the assignment, and any side agreements or related agreements concerning the assignment. | Refuse to produce documents or communications between Retailers and their assignors/assignees relating to the assignment. |
| 88 | All Documents concerning any consideration paid, or promised to You, or received by You, for the assignment on which You base Your claims in this litigation. | Refuse to produce documents or communications between Retailers and their assignors/assignees relating to the assignment. |
| 89 | All correspondence, irrespective of date, with any Assignor concerning this litigation or the allegations in the Complaint. | Refuse to produce documents or communications between Retailers and their assignors/assignees relating to the assignment. |
| 90 | If You base any claims on an assignment, Documents sufficient to show, for all periods for which You claim damages, each agreement in place between Your Assignor and any customer of Your Assignor that directly or indirectly specified the terms of sale for Lipitor or Generic Atorvastatin Calcium. | Refuse to produce documents of Retailers' assignors. |
| 91 | If You base any claims on an assignment, Documents sufficient to show each sale of Lipitor by Your Assignor for all periods for which You claim damage, including the date, sale price, quantity sold, and identities of the buyer and seller or Generic Atorvastatin Calcium. | Refuse to produce documents of Retailers' assignors. |

# Exhibit C-5

**EXHIBIT C-5**

**OBJECTIONS TO PRODUCING CLASS CERTIFICATION AND LITIGATION-RELATED DOCUMENTS**

| DPP Responses and Objections re: Class Certification and Litigation | | |
|---|---|---|
| No. | Request Text | DPPs' Position |
| 63 | All Documents concerning the Pfizer-Ranbaxy Patent Litigation, including without limitation any Document concerning the date upon which, or the circumstances under which You or Your outside counsel first became aware of the litigation. | Refuse to produce any documents. |
| 89 | All Documents concerning any efforts by attorneys for Direct Purchaser Plaintiffs to locate or recruit any plaintiff or potential plaintiff in connection with this case. | Refuse to produce any documents. |
| 91 | Documents sufficient to show Your participation in any other litigation as a class representative. | Refuse to produce any documents. |

EXHIBIT C-5

| | Retailer Responses and Objections re: Class Certification and Litigation | |
|---|---|---|
| No. | Request Text | Retailers' Position |
| 58 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessments related to the fair market value of any consideration exchanged related to such agreement. | Refuse to produce any documents unless found in Retailers' purchasing departments. |
| 59 | All Documents, irrespective of date, concerning any assessment, analysis or evaluation by You of the market impact of any agreement referenced in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, including any assessment of the effect of any agreement on the relevant drug's unit and dollar sales, price, market share, or reimbursement. | Refuse to produce any documents unless found in Retailers' purchasing departments. |
| 66 | All Documents concerning the Pfizer-Ranbaxy Patent Litigation, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the litigation. | Refuse to produce any documents concerning when counsel became aware of the Pfizer-Ranbaxy Patent Litigation. |
| 67 | All Documents concerning the Pfizer-Ranbaxy Settlement Agreement, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the settlement. | Refuse to produce any documents concerning when counsel became aware of the Pfizer-Ranbaxy Settlement Agreement. |
| 133 | All Documents concerning any communication between or among You and any other Plaintiff concerning any Cholesterol Treatment, including Lipitor or any potential generic thereof. | Refuse to produce any documents not pertaining to sales or profits; Refuse to produce any documents other than those specifically referencing Lipitor/Atorvastatin. |
| 134 | All Documents that refer, concern, or relate to the claims, defenses, and/or subject matter of this litigation. | Refuse to produce any documents concerning the claims, defenses, and/or subject matter of the litigation not otherwise requested in Defendants' Requests. |

**EXHIBIT C-5**

| | EPP Responses and Objections re: Class Certification and Litigation | |
|---|---|---|
| No. | Request Text | EPPs' Position |
| 87 | All Documents concerning the Pfizer-Ranbaxy Patent Litigation, including without limitation any Document concerning the date upon which, or the circumstances under which, You or Your outside counsel first became aware of the litigation. | Refuse to produce any documents. |
| 119 | All Documents concerning any efforts by attorneys for End-Payor Plaintiffs to locate or recruit any plaintiff or potential plaintiff in connection with this case. | Refuse to produce any documents. |
| 120 | All Documents concerning Your assessment of Your adequacy to serve as a class representative in this action. | Refuse to produce any documents. |
| 121 | Documents sufficient to show Your participation in any other litigation as a class representative. | Refuse to produce any documents. |
| 122 | All Documents that show or tend to show that common issues predominate over individual ones, that this lawsuit is manageable as a class action, or that the class action choice is the superior means of resolving Your claims. | Refuse to produce any documents. |

# Exhibit C-6

**EXHIBIT C-6**

**PARTIES' POSITIONS ON THE RELEVANT TIME PERIOD**

**(REPRESENTATIVE REQUESTS)**

| No. | Request Text | Plaintiffs' Position | Defendants' Position |
|---|---|---|---|
| | **DPP Responses and Objections re: Relevant Time Period** | | |
| | **Relevant Product Market** | | |
| 12 | All Documents concerning any communication with any Defendant relating to any Cholesterol Treatment. | January 1, 2010 to December 31, 2013 | January 1, 2005 to December 31, 2013 |
| 28 | All Documents concerning the impact of price (including out of pocket costs or co-pays) on a patient's choice between different Cholesterol Treatments. | January 1, 2010 to December 31, 2013 | January 1, 2005 to December 31, 2013 |
| | **Litigation Related Materials** | | |
| 60 | All Documents, irrespective of date, concerning Your allegations that "Pfizer gave substantial inducements to Ranbaxy to secure the delay of Ranbaxy's generic atorvastatin calcium," including but not limited to Your allegations in Paragraph 7 of the Complaint. | January 1, 2010 to December 31, 2013 | March 24, 2008 to December 31, 2013 |
| 98 | All correspondence with any Assignor in this case regarding the assignment, irrespective of date, including all drafts of the assignment, negotiations of the terms of the assignment, and any side agreements or related agreements concerning the assignment. | January 1, 2010 to December 31, 2013 | March 24, 2008 to December 31, 2013 |
| | **Class Certification and Damages** | | |
| 82 | All Documents, irrespective of date, concerning whether any of the Putative Class Members' distribution and/or servicing of sales of Lipitor would be more or less profitable than distribution and/or servicing of Generic Atorvastatin Calcium. | January 1, 2010 to December 31, 2013 | January 1, 2010 to December 31, 2017 |
| 95 | All Documents, irrespective of date, concerning Your proposed method of allocating damages claimed by You among members of the proposed class. | January 1, 2010 to December 31, 2013 | January 1, 2010 to December 31, 2017 |

EXHIBIT C-6

| Retailer Responses and Objections re: Relevant Time Period | | | |
|---|---|---|---|
| **Relevant Product Market** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 37 | All contracts and/or agreements related to rebates, chargebacks, discounts, or any other adjustment to price concerning Atorvastatin Calcium, or any Cholesterol Treatment. | March 24, 2008 to December 31, 2013 | January 1, 2005 to December 31, 2013 |
| 49 | All Documents sufficient to identify any Cholesterol Treatment which you have purchased or for which you have provided reimbursement. | March 24, 2008 to December 31, 2013 | January 1, 2005 to December 31, 2013 |
| **Litigation Related Materials** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 57 | All Documents referred to, quoted, paraphrased, or excerpted in the Rite Aid, Walgreen, Meijer or Giant Eagle Complaints, or otherwise relied upon as the basis for any allegation in the Complaint. | March 24, 2008 to December 31, 2013 | March 24, 2008 to December 31, 2013 |
| 88 | All Documents concerning any consideration paid, or promised to You, or received by You, for the assignment on which You base Your claims in this litigation. | March 24, 2008 to December 31, 2013 | March 24, 2008 to December 31, 2013 |
| **Class Certification and Damages** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 92 | All Documents, irrespective of date, concerning injury and damages claimed by You in this case and any data used in calculating such injury and damages. | March 24, 2008 to December 31, 2013 | January 1, 2010 to December 31, 2017 |
| 93 | All Documents, irrespective of date, relating to any method of computation for injury or damages sustained by You, Your insureds, members, beneficiaries, or plan participants as a result of Defendants' conduct as alleged in the Complaint. | March 24, 2008 to December 31, 2013 | January 1, 2010 to December 31, 2017 |

**EXHIBIT C-6**

| EPP Responses and Objections re: Relevant Time Period | | | |
|---|---|---|---|
| **Relevant Product Market** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 26 | All Documents concerning switching between Cholesterol Treatments, including the frequency, safety, effectiveness, or reasons for switching or not switching from one Cholesterol Treatment to another. | January 1, 2010 to December 31, 2013 | January 1, 2005 to December 31, 2013 |
| 40 | All Documents sufficient to identify any Cholesterol Treatment which you have purchased or for which you have provided reimbursement. | January 1, 2010 to December 31, 2013 | January 1, 2005 to December 31, 2013 |
| **Litigation Related Materials** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 82 | All Documents, irrespective of date, concerning Your allegations that "Pfizer provided substantial unexplained payments and other valuable financial inducements to Ranbaxy, a generic manufacturer, in exchange for Ranbaxy's agreement to delay generic competition," including but not limited to Your allegations in Paragraphs 4, 17-18, 313, 323, 326-62, 380 of the Complaint. | January 1, 2010 to December 31, 2013 | March 24, 2008 to December 31, 2013 |
| 92 | All Documents concerning any Paragraph IV Notifications concerning Atorvastatin Calcium. | January 1, 2010 to December 31, 2013 | March 24, 2008 to December 31, 2013 |
| **Class Certification and Damages** | | | |
| **No.** | **Request Text** | **Plaintiffs' Position** | **Defendants' Position** |
| 115 | All Documents, irrespective of date, reflecting or concerning communications between You and any putative class members, or their employees, agents, or assignees, concerning this litigation or any allegations in the Complaint. | January 1, 2010 to December 31, 2013 | January 1, 2010 to December 31, 2017 |
| 124 | All Documents, irrespective of date, relating to any method of computation for injury or damages sustained by You, Your insureds, members, beneficiaries, or plan participants, or any member of the alleged class as a result of Defendants' conduct as alleged in the Complaint. | January 1, 2010 to December 31, 2013 | January 1, 2010 to December 31, 2017 |

# Exhibit D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| IN RE LOESTRIN 24 FE ANTITRUST | : | |
| LITIGATION | : | MDL No. 2472 |
| | : | |
| THIS DOCUMENT RELATES TO: | : | Master File No. 1:13-md-2472-S-PAS |
| ALL ACTIONS | : | |

## MEMORANDUM AND ORDER

PATRICIA A. SULLIVAN, United States Magistrate Judge.

In this case, filed in the wake of the Supreme Court's seminal decision in FTC v. Actavis, 133 S. Ct. 2223 (2013), Plaintiffs, who are direct and indirect purchasers of a branded oral contraceptive known as Loestrin 24 Fe ("Loestrin 24"), seek antitrust damages and injunctive relief based on what they allege was a large and unjustified reverse payment settlement resolving patent litigation, as well as fraud on the Patent and Trademark Office in procuring the patent covering Loestrin 24, improper Orange Book listing, sham litigation, and an unlawful product hop.[1]  Before the Court for determination is Defendants' motion to compel product market

---

[1] The claims described in the operative complaints may be briefly summarized.  Defendant Warner Chilcott ("Warner") is the drug manufacturer that owns the patent covering Loestrin 24.  After Defendant Watson Pharmaceuticals, Inc. ("Watson") filed its notice of intent to introduce a generic version of Loestrin 24, Warner sued for patent infringement.  The parties settled on condition that Watson delay entry of its generic version; in exchange, Watson got favorable promotional deals, as well as the promise that Warner would not introduce its own generic version of Loestrin 24.  Next, Defendant Lupin Pharmaceuticals, Inc. ("Lupin") announced its intent to introduce a generic version of Loestrin 24; again, Warner sued and, again, the parties settled, agreeing that Lupin would delay the introduction of its generic Loestrin 24 in exchange for attorneys' fees and other benefits to Lupin.  Warner used the purchased delay to push its Loestrin 24 prescriptions to Minastrin 24 Fe ("Minastrin"), which would not face generic competition for several years.  See generally In re Loestrin 24 Fe Antitrust Litig., 814 F.3d 538, 541-42 (1st Cir. 2016).

Federal antitrust claims challenging these settlement agreements, as well as Defendant Warner's conduct during the patent prosecution, Warner's patent defense against Watson and Lupin, and a purported product hopping scheme, as violative of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, were brought by several large pharmaceutical and grocery companies, which are retail purchasers of Loestrin 24 (CVS Pharmacy, Inc., Rite Aid Corp., Rite Aid Hdqtrs Corp., Walgreen Co., The Kroger Co., Safeway Inc., HEB Grocery Co. L.P., Albertson's LLC) ("Retail Plaintiffs"), as well as by putative classes of Direct Purchaser Plaintiffs ("DPPs"), which comprise companies that purchase drugs, including Loestrin 24, and other products for resale or distribution.  Claims seeking injunctive relief under § 2 of the Sherman Act and damages and injunctive relief under the antitrust laws and common law of unjust enrichment of various states were brought by putative classes of End Payor Plaintiffs ("EPPs"); they consist of

discovery.  Defendants seek documents related to the economic substitutability of Loestrin 24

and its AB-rated generic equivalents and ten other therapeutically interchangeable oral

contraceptives.  ECF No. 244.

## I.    Introduction

Defendants seek what they describe as a targeted set of qualitative documents regarding

the pricing, sales and marketing of ten oral contraceptives that they claim[2] are therapeutically

interchangeable with Loestrin 24.  They are: Alesse, Beyaz, Femcon/Ovcon, Nordette, Ortho

Cyclen, Ortho Tri Cyclen, Ortho Tri Cyclen Lo, Ortho-Cept/Desogen, Yasmin, and Yaz.

Defendants do not seek data sets reflecting Plaintiffs' purchases or sales of these products,

conceding that nationwide data sets are more readily available and are sufficient to satisfy their

need for market data.  Nor do they seek so-called "down-stream" discovery – that is, discovery

that would be relevant to the development of the pass-on defense made largely unavailable by

<u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977), and <u>Hanover Shoe, Inc. v. United Machine</u>

<u>Corp.</u>, 392 U.S. 481 (1968).  Instead, their focus is on documents relevant to economic

substitutability among Loestrin 24, its AB-rated equivalents, and these therapeutically

interchangeable oral contraceptives.

Defendants argue that the documents they seek will allow them to show that Plaintiffs

strategized about and/or were able to adjust their marketing, promotions, formularies and

---

health and welfare benefit plans, which have indirectly purchased, paid for, and reimbursed the purchase of Loestrin 24, and individuals who purchased or paid some or all of the purchase price of Loestrin 24.  All of the claims arise in the context of the regulatory framework established by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585, commonly known as the Hatch-Waxman Act.

[2] The Retail Plaintiffs do not dispute that the listed oral contraceptives are therapeutically interchangeable with Loestrin 24.  ECF No. 256 at 6.  EPPs acknowledge that there are therapeutic alternatives to Loestrin 24, but do not specifically acknowledge that the ten drugs proposed by Defendants are among them.  ECF No. 257 at 6.  DPPs argue that therapeutic substitutability is irrelevant but also complex if viewed from the perspective of whether patients can switch from one product to another.  ECF No. 262 at 15 & n.37.  Like EPPs, they do not concede that the ten drugs listed by Defendants are necessarily therapeutically interchangeable, nor do they expressly assert that they are not.

insurance plans to permit or encourage the substitution of lower-price oral contraceptives for Loestrin 24, resulting in robust price competition. They contend that the requests are limited to product marketing and promotional strategies, communications with PBMs about encouraging patients to ask for cheaper alternatives, and formularies, including documents reflecting discussions of formulary tiers or other adjustments for the purpose of pushing consumers to cheaper therapeutically interchangeable oral contraceptives. Supported by two declarations from an economist, Dr. Sumanth Addanki, ECF Nos. 245-3 ¶¶ 6-7; 272-2 ¶ 8,[3] Defendants assert that these documents will inform the analysis of economic substitutability for the purpose of defining the relevant product market, which they contend is an essential building block of their defense that the settlements in issue did not run afoul of state or federal antitrust laws.

Plaintiffs disagree. They ask the Court to deny the motion because the requested documents are totally irrelevant and therefore disproportionately burdensome to produce. Citing Judge Stefan Underhill's thoughtful decision in In re Aggrenox Antitrust Litigation, 199 F. Supp. 3d 662 (D. Conn. 2016), they argue that their claim is laser-focused on the market for Loestrin 24 and its AB-rated generic equivalents. They allege that Defendant Warner's patent gave it market power in that market, that the market power can readily be proven by establishing that Loestrin 24 was sold at a supracompetitive price, which is direct evidence of market power, and that the market power was illegally exercised through large reverse payment settlements with Watson and Lupin for the purpose of delaying generic entry and sustaining Warner's ability to

---

[3] Plaintiffs counter with the declaration of an equally well-credentialed economist, Dr. Meredith Rosenthal, who avers that the documents sought are neither "necessary or sufficient" for a determination of the antitrust market in issue. ECF No. 263-5 ¶¶ 9, 26. While such an averment may well be pertinent at a later phase of the case (particularly at summary judgment or trial), the only question for a threshold discovery dispute is whether the documents are relevant to Plaintiffs' claims (Dr. Rosenthal says they are not) or to Defendants' defenses (Dr. Addanki says they are).

continue to earn monopoly profits, shared with Watson and Lupin under the terms of the settlements.

Relying on the <u>Aggrenox</u> holding that <u>Actavis</u> progeny may be structured by trial courts to proceed in a streamlined and focused fashion, <u>id.</u> at 669, Plaintiffs contend that the only questions affecting liability are whether the Loestrin 24 patent created market power and whether Defendants acted wrongfully to extend the patent monopoly beyond its valid life. Therefore, the existence of a broader product market, however competitive it may be, has no bearing on the issues in the case. <u>Id.</u> at 667-68. Because the effect of competition with economically substitutable oral contraceptives is already baked into the price of Loestrin 24,[4] Defendants do not need the requested discovery. <u>Id.</u> at 667. To order it, Plaintiffs argue, would impose a disproportionate burden contrary to the directive of Fed. R. Civ. P. 26(b)(1).

## II.  Law and Analysis

### A.  <u>Relevance</u>

In <u>Actavis</u>, the Supreme Court focused on the "complexities," holding that "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification," as well as that "[t]he existence and degree of any anticompetitive consequence may also vary as among industries." 133 S. Ct. at 2237. <u>Actavis</u> makes clear that reverse payment settlements <u>may</u> amount to the illegal use of market power in the narrow market for the branded drug and its AB-rated generic equivalent. <u>Id.</u> at 2227, 2234. However, the Court

---

[4] This proposition derives from the so-called "Cellophane Fallacy," an economic principle positing that proof that substitutes will enter a market in response to a meaningful price increase does not prove that the pre-increase price was set at a competitive level. <u>Aggrenox</u>, 199 F. Supp. 3d at 667. Rather, cross-elasticity of demand among certain drugs "may . . . be the product of monopoly power rather than a belief on the part of consumers that the products are good substitutes for one another." <u>United States v. Eastman Kodak Co.</u>, 63 F.3d 95, 105 (2d Cir. 1992).

eschewed the FTC's urging that that it adopt a truncated decisional framework. <u>Id.</u> at 2237 (rejecting "quick look" or *per se* approach). Rather, it decreed that, for the present, the traditional rule-of-reason framework should be deployed and directed lower courts to structure the approach to these cases "so as to avoid, on the one hand, the use of antitrust theories too abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or theory irrespective of the minimal light it may shed on the basic question – that of the presence of significant unjustified anticompetitive consequences." <u>Id.</u> at 2238. As our Circuit observed, "<u>Actavis</u> left many questions unanswered as to how these cases would be litigated and "le[ft] to the lower courts the structuring of the present rule-of-reason antitrust litigation." <u>In re Loestrin 24 Fe Antitrust Litig.</u>, 814 F.3d 538, 545 (1st Cir. 2016) (quoting <u>Actavis</u>, 133 S. Ct. at 2238).

Developed almost a century ago in <u>Chicago Board of Trade v. United States</u>, 246 U.S. 231 (1918), the rule of reason directs courts to look at an agreement to reduce or exclude competition to determine whether its adverse competitive effects are offset by countervailing procompetitive virtues. <u>FTC v. Ind. Fed'n of Dentists</u>, 476 U.S. 447, 459 (1986). In applying the rule of reason, similar to an analysis under § 2 of the Sherman Act, courts should inquire "into market definition and market power . . . to determine whether an arrangement has the potential for genuine adverse effects on competition, [as] 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" <u>Id.</u> at 460-61 (quoting 7 P. Areeda, <u>Antitrust Law</u> ¶ 1511, p. 429 (1986)). In <u>In re Nexium (Esomeprazole) Antitrust Litigation</u>, 42 F. Supp. 3d 231 (D. Mass. 2014), <u>aff'd</u>, 842 F.3d 34 (1st Cir. 2016), the district court summarized the shifting burdens in a rule of reason/monopolization reverse payment case as follows: first, the plaintiffs must present evidence that the accused brand made a settlement payment to a generic that

EXHIBIT D

exceeded anticipated future litigation costs and lacked "any other convincing justification,"

Actavis, 133 S. Ct. at 2237; next, the burden shifts to the defendants to show that the challenged

payment was justified by some procompetitive objective; then, the burden shifts back to the

plaintiffs to establish, under the rule of reason, that the settlement is nevertheless anticompetitive

on balance. Nexium, 42 F. Supp. 3d at 262-63.

Traditionally, the examination of anticompetitive effects relies on the definition of the

relevant product market in which they occur. Id. at 263 (citing Addamax Corp. v. Open

Software Found., Inc., 888 F. Supp. 274, 283 (D. Mass. 1995) ("To state a Sherman Act claim

under the rule of reason, [plaintiff] bears the initial burden of establishing that [defendant's]

actions have 'an actual adverse effect on competition as a whole in the relevant market.'")

(quoting Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543

(2d Cir. 1993))). That inquiry in turn examines the reasonable economic interchangeability of a

set of products, looking not at the similarity of their forms or functions, but rather at "the extent

to which purchasers will accept substitute products in instances of price fluctuation and other

changes." George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547, 552 (1st

Cir. 1974); see Bayer Schering Pharma AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 575 (S.D.N.Y.

2011) (product market limited to two oral contraceptives (Yaz and Yasmin) not plausible in light

of interchangeable alternatives; claim of conspiracy in violation of § 1 of Sherman Act

dismissed).

Plaintiffs contend that the Loestrin 24 molecules (nonethindrone acetate and ethinyl

estradiol) constitute the market. They may – or may not – turn out to be right. Consistent with

this claim, their complaints each include averments alleging that, to the extent that proof of

monopoly power requires defining a relevant product market, that market is limited to Loestrin

EXHIBIT D

24 and its AB-rated equivalents.  ECF No. 164 ¶ 303 (also includes Minastrin in market

definition); ECF No. 165 ¶ 303; ECF No. 174 ¶ 179; ECF No. 175 ¶ 182.  Defendants argue

vigorously that this snapshot of the market ignores the economic reality that Loestrin 24's price

is disciplined by actual price competition with an array of other oral contraceptives.  They seek

the documents to allow them to rebut Plaintiffs' averments with evidence that the relevant

product market is oral contraceptives that are economically interchangeable with Loestrin 24 and

its AB-rated equivalents.  Contrary to the Aggrenox holding that proof of a supracompetitive

price and an unduly "large" reverse payment are susceptible of simple proof, they contend that

they need the requested discovery to explain the real market dynamic to the fact finder so that

their rebuttal showing that the price was competitive and the reverse payment was not "large"

can be understood in the context of a highly competitive product market in which many

therapeutically interchangeable oral contraceptives compete.

　　　　Courts should be wary of conflating the scope of discovery (permitting inquiry regarding

what is relevant to both claims and defenses) with what is plausibly alleged in a complaint

(ignoring the answer and affirmative defenses), what may be ruled out of the case at summary

judgment or what should be excluded from the evidence offered at trial.  For example, a court

may permit a complaint to proceed past a motion to dismiss by finding plausible a pleading

alleging a narrow relevant market limited to the brand and its AB-rated equivalents.  E.g., In re

Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 387-88 (D. Mass. 2013).  That

does not mean that discovery in such a case must be limited to that narrow market.  Compare

Meijer, Inc. v. Warner Chilcott Holdings, Co., III, Ltd., 245 F.R.D. 26, 31, 33 (D.D.C. 2007)

(product market discovery regarding Ovcon and potentially substitutable contraceptives ordered

to be provided because broader product market definition raised as defense), with Meijer, Inc. v.

Barr Pharms., Inc., 572 F. Supp. 2d 38, 62 (D.D.C. 2008) (jury could find relevant market

limited to Ovcon and its AB-rated equivalents).  In at least one case, broader product market

discovery regarding substitutes resulted in evidence that persuaded the court to reject the single

drug market based on robust economic competition.  Mylan v. Warner Chilcott Pub. Ltd. Co.,

838 F.3d 421, 436-38 (3d Cir. 2016) (affirming summary judgment in favor of defendants in

Doryx antitrust case).  And, except for Aggrenox, when such discovery has been denied, it was

not because the issue of the relevant product market was deemed entirely irrelevant, but rather

because the specific documents requested were found to be cumulative of information more

easily available from other sources.  E.g., In re Asacol Antitrust Litig., Civil Action No. 15-

12730-DJC, slip op. at 4 (D. Mass. Jan. 3, 2017) (filed in this case at ECF No. 258-4).

       Based on my review of the decisions presented by the parties, apart from Aggrenox, no

post-Actavis court has denied a timely motion to compel documents pertaining to product market

definition in a reverse payment case on grounds that the entire subject of economically

interchangeable substitutes for the brand and its AB-rated equivalents is irrelevant.  See In re

Asacol Antitrust Litig., slip op. at 4 (discovery regarding potentially substitutable products

assumed to seek relevant information but denied because not proportional); In re Suboxone

(Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., No. 13-MD-2445, 2016 WL

3519618, at *7 (E.D. Pa. June 28, 2016) (overruling magistrate judge's denial of motion to

compel documents to permit defendants to develop record on competition with other market

participants; "without the benefit of a fully developed record, rulings regarding the market

dynamic in this context would be premature and speculative"); In re Wellbutrin XL Antitrust

Litig., No. 2:08-cv-02431-MAM (E.D. Pa. Mar. 12, 2010) (product market documents relevant

to competition with other antidepressants ordered to be produced) (filed in this case at ECF No.

EXHIBIT D

245-2); Meijer, Inc., 245 F.R.D. at 30-33 (discovery regarding contraceptives interchangeable with Ovcon ordered to be produced).

That leaves Aggrenox. Unsurprisingly, when asked to "let a hundred flowers bloom,"[5] in the three years since Actavis was decided, trial courts have tried an array of "structures" to tackle the potentially gargantuan proof problems posed by reverse payment settlement antitrust litigation. E.g., In re Nexium (Esomeprazole) Antitrust Litig., 309 F.R.D. 107, 135 (D. Mass. 2015), aff'd, 842 F.3d 34 (1st Cir. 2016) (one hundred forty-nine page opinion describing trial court's approach to first post-Actavis reverse payment settlement claim tried to jury); In re Loestrin 24 Fe Antitrust Litig., 45 F. Supp. 3d 180, 195 (D.R.I. 2014) (adopting interpretation that Actavis requires cash consideration, but inviting parties to request interlocutory appeal under 28 U.S.C. § 1292(b)), vacated, 814 F.3d 538 (1st Cir. 2016). Perhaps the most creative, "edgy," as the parties before me described it, Aggrenox holds that not just the discovery, but also the evidence to be presented for the duration of the case, should be limited to the branded drug and its AB-rated equivalents. It relies on a sophisticated analysis of the law, as applied in the unique setting of a reverse payment settlement case, finding that there is no need to articulate a relevant market definition when direct evidence of market power is available. 199 F. Supp. 3d at 669 & n.4 ("The relevant market serves merely as a proxy for market power when direct evidence of market power is unavailable. Where direct evidence of market power is available, however, a plaintiff need not attempt to define the relevant market.") (quoting In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d at 388 n.19). In recognition that his order was an experiment worthy of early appellate review, Judge Underhill certified it for discretionary appeal pursuant to

---

[5] "Let a hundred flowers bloom and a hundred schools of thought contend." English Oxford Living Dictionaries, https://en.oxforddictionaries.com/definition/hundred_flowers (viewed on Mar. 15, 2017) (attributed to 1956 speech of Chinese Communist Party Chairman Mao Zedong by https://en.wikipedia.org/wiki/Hundred_Flowers_Campaign).

28 U.S.C. § 1291(b). Aggrenox explains this unusual step, noting that "the economic issues discussed above are relatively technical, and their application to antitrust law is not without debate, nor is the caselaw touching on them uniform." Id. at 670. The Second Circuit Court of Appeals declined to accept the appeal. In re Aggrenox Antitrust Litig., 16-2864 (2d Cir. Jan. 9, 2017).

Aggrenox has a seductively binary elegance – either the price was supracompetitive or it was not; either the settlement was an excessive payment to exclude competition or it was not. Time may prove that Aggrenox lays out the right way to structure reverse payment antitrust litigation under the Hatch-Waxman Act. If so, its very spareness will render litigation challenging anticompetitive reverse payment settlements manageable, with the salutary effect of deterring illegal arrangements that adversely impact prices of drugs that are critical for the patients, who are the ultimate consumers.

Nevertheless, I decline to take such a leap for a threshold discovery issue, which is all that has been referred to me. See 28 U.S.C. § 636(b)(1)(A). My job is not to establish the decisional infrastructure for this case; that task remains with the able District Judge to whom the case is assigned.[6] Rather, I am guided by Magistrate Judge Judith Dein, who wrote at an analogous procedural point in the life cycle of a reverse payment settlement antitrust case: "the complex issue of the relevant product market is not appropriately decided in the context of the instant motion to compel." In re Asacol Antitrust Litigation, slip op. at 2; see Meijer, Inc., 245 F.R.D. at 31 (magistrate judge declines to determine motion to compel based on what later may be admissible; information about other contraceptives relevant and discoverable). Under the cases interpreting the traditional rule of reason, documents related to the parties' competing

---

[6] My discovery decision should not be read as a rejection of the analytical framework adopted in Aggrenox. To the contrary, as the case proceeds, the parties remain free to propose to the Court that Aggrenox-based streamlining is appropriate and should be adopted.

versions of the relevant product market are relevant. To the extent that the burden of producing

them is not out of proportion to their degree of relevance, they must be produced.

I turn next to the question of proportionality.

### B.    <u>Proportionality</u>

Plaintiffs have agreed to produce documents that contain the terms "Loestrin" and

"Minastrin," which may include documents that discuss interchangeability; based on relevancy,

they refuse to search for interchangeability documents that name one of the other ten oral

contraceptives but omit the terms "Loestrin" and "Minastrin." Defendants point out that, if their

hypothetical larger product market is a viable construct, Loestrin 24 is a bit player; therefore,

documents strategizing about economic interchangeability of oral contraceptives are likely to

name the other oral contraceptives, which are used by a higher percentage of women, and not to

mention Loestrin 24 or Minastrin. Because the parties' meet-and-confer discussions regarding

these documents have been premised on Plaintiffs' assertion of the relevancy objection, the

parties have yet to roll up their collective sleeves to confer about what search terms, custodians,

time frame, locations to be searched or other parameters affecting the burden imposed by the

requested discovery render the discovery proportional in light of its relevancy to the issue for

which it is sought. Defendants have made clear that everything is up for discussion, including

the list of oral contraceptives. They have offered a time frame compromise and are willing to

tighten up the list of custodians. They have made plain that they do not seek documents located

at individual pharmacies. With all of these details in flux, it is premature for the Court to issue

an order mandating specific discovery. Instead, I provide several points of guidance below, and

invite the parties to return to the Court for an informal conference followed by a motion, if their

**EXHIBIT D**

meet and confer is not successful in resolving their differences.  See Interim Case Management

Order Number 5 (ECF No. 236) ¶ 4.

First, it is axiomatic that Plaintiffs need not produce information that is not in their

possession, custody or control; the corollary to the axiom is that a search-term-based query for

what is not there is both burdensome and disproportional.  See Meijer, Inc., 245 F.R.D. at 33.

Retail Plaintiffs and EPPs argue that some of the requested documents simply do not exist or

exist only randomly, such as because an employee may have randomly procured a copy of a

publicly available formulary.  They point out that it would be disproportionately burdensome to

run searches through the files of multiple custodians to seek what not only is a needle in a

haystack, but also is remotely relevant, in that the random occurrence of a stray document has

little bearing on the theme (economic interchangeability) that justified the search.  I agree.  In

their meet-and-confer conferences, the parties should work on developing boundaries to avoid

such a resource-wasting exercise, mindful that the Loestrin 24/Minastrin-focused discovery that

Plaintiffs have already agreed to provide may well reveal clues about the degree to which a

search focused only on the other oral contraceptives will turn up documents related to economic

substitutability of such drugs with Loestrin 24 and its AB-rated equivalents.

Second, it is not clear whether the parties agree that the ten oral contraceptives that are

the subject of this motion are therapeutically interchangeable in that they are prescribed for the

same indication and the same patient population.  See n.2 *supra*.  Therapeutic interchangeability

is a threshold issue in that Defendants' relevant request is for documents that strategize about or

discuss how therapeutically interchangeable oral contraceptives may be or are economically

substitutable for Loestrin 24 and its AB-rated generic equivalents.  While Plaintiffs are right that

documents focused exclusively on medical analyses of the science underlying the proposition

that the ten oral contraceptives are therapeutic substitutes for Loestrin 24 are only remotely relevant, Defendants are right that they need to know about therapeutic substitutability to properly focus their economic substitutability inquiry. This should be resolvable by a meet and confer. That is, the parties should be able to agree which oral contraceptives to target for product market discovery tailored to the bull's-eye set – documents that reflect ways in which therapeutically interchangeable oral contraceptives are also economically interchangeable in that patients can be steered to the least expensive among an array of therapeutic substitutes. Moreover, therapeutic interchangeability becomes squarely relevant if proof of economic substitutability is to be rebutted by the argument that the products are not therapeutically interchangeable. However, to the extent that therapeutic interchangeability is undisputed, searches that are exclusively focused on the therapeutic effects of the molecules in each of the ten oral contraceptives are disproportional and should be carved out.

Third, DPPs have presented persuasive declarations (ECF No. 263-1 through -4) that describe their offer to search using ingredient hormones as search terms, rather than the names of the ten listed drugs. They contend that this approach should provide Defendants with most, if not all, of what they need and avoid the burden of screening the overinclusive set that would be derived from use of the search terms Defendants propose. This plaint is compelling, but buried in the relevancy/irrelevancy debate that was the gravamen of the motion. With relevancy clarified, the parties should revisit these issues. Unless Defendants' search terms will yield results that are demonstrably relevant and not cumulative, the Court will not be inclined to order the time-wasting and burdensome searching described in these declarations.

## III.    Conclusion

Plaintiffs' objection based on relevancy is overruled and Defendants' motion to compel product market discovery (ECF No. 244) is granted, without prejudice to Plaintiffs' assertion of disproportionality as described herein.

So ordered.


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
March 15, 2017