# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

In re LIPITOR ANTITRUST LITIGATION

Civil Action No. 3:12-cv-2389 (PGS)(DEA)

**MEMORANDUM
AND ORDER**

**SHERIDAN, U.S.D.J.**

Presently before the Court is Defendants Pfizer Inc., Pfizer Manufacturing Limited, Pfizer Ireland Pharmaceuticals, Warner-Lambert Co., and Warner-Lambert Co. LLC's Motion for Judgment on the Pleadings pursuant Federal Rule of Civil Procedure 12(c), regarding End-Payor Plaintiffs' Second Amended Consolidated Complaint. (ECF No. 755). This case arises from allegations that two drug companies, Pfizer and Ranbaxy, engaged in an anticompetitive scheme that prevented the generic drug of Lipitor from entering the market. Plaintiffs are end-payor purchasers (hereinafter "EPP") who claim to have paid inflated costs for the brand-named drug, Lipitor, due to, among other things, a delayed entry provision included in Pfizer and Ranbaxy's settlement agreement. Unlike the Direct Purchaser Plaintiffs, who assert claims under the Sherman Act, the EPPs base their claims on their respective state's antitrust and consumer protection acts.

## BACKGROUND

### I. Parties

Plaintiffs are a collection of organizations including insurance carriers, Taft-Hartley funds, municipalities, and individuals, who have been indirectly affected by Defendants' alleged schemes. For example, jointly administered Taft-Hartley fund and employee welfare benefit

plaintiffs include: A.F.L.-A.G.C. Building Trades Welfare Plan, a self-insured health and welfare benefit plan in Alabama (*Id.* at ¶ 24); New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund, a Taft-Hartley fund (*Id.* at ¶ 26); Bakers Local 433 Health Fund of South Dakota; and Minnesota's Twin Cities Bakery Workers Health and Welfare Fund. (*Id.* at ¶¶ 28-29).

Health insurance carrier plaintiffs include: Louisiana Health Services Indemnity Company d/b/a Bluecross/Blueshield of Louisiana, a corporation licensed to conduct business in Louisiana that provides health benefits to covered members (*Id.* at ¶ 27); Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund, a governmental health insurance plan that provides health and major medical insurance to active and retired Fort Lauderdale police officers and their dependents. (*Id.* at ¶ 30).

Municipality plaintiffs include: the Mayor and City Council of Baltimore, Maryland (*Id.* at ¶ 25), and the City of Providence, Rhode Island, both municipal corporations with self-insured health and welfare benefit plans. (*Id.* at ¶ 31).

Finally, the six individual plaintiffs are Edward Czarnecki, a Wisconsin resident; Emilie Heinle, a North Dakota resident; Andrew Livenzey from Massachusetts; Edward Ellenson from Hawaii; Jean Ellyne Dougan, an Arkansas resident; and Nancy Billington of Montana (*Id.* at ¶¶ 32-37).

All plaintiffs claim to have purchased or provided partial payment for some of, or the entire price of, Lipitor or its generic version. (*Id.* at ¶¶ 24-46). Plaintiffs contend that they were all injured as a result of Defendants' anticompetitive schemes, since they paid a premium for the medication. (*Id.*).

Defendants in this case are Pfizer and Ranbaxy. (*Id.* at ¶¶ 38-46).  Pfizer Inc., Pfizer Ireland Pharmaceuticals, and Warner-Lambert Company are collectively referred to as Pfizer. (*Id.* at ¶¶ 38-42).  Pfizer Inc. is the parent company of Pfizer Ireland Pharmaceuticals, an Irish unlimited liability company that is a wholly owned, indirect subsidiary of Pfizer Inc. (*Id.* at ¶¶ 38-39).  Pfizer acquired Warner-Lambert Company in 2000. (*Id.* at ¶ 40).  According to the Complaint, reference to Warner-Lambert also includes, but is not limited to, Warner-Lambert employees Bruce D. Roth, Joan Thierstein, and Jerry F. Janssen. (*Id.* at ¶ 41).  In addition, the Complaint names Defendants Ranbaxy Laboratories Limited, Ranbaxy Inc., and Ranbaxy Pharmaceuticals Inc. collectively as Ranbaxy. (*Id.* at ¶¶ 43-46).  Ranbaxy Laboratories Limited is an Indian corporation that wholly owns Ranbaxy Inc., which has a place of business in New Jersey. (*Id.* at ¶¶ 43-49).

## II. Facts

In the Complaint, EPPs identify several anticompetitive schemes that purportedly give rise to the present lawsuit.  Specifically, Plaintiffs allege that Defendants fraudulently obtained a second, duplicative, patent from the United States Patent and Trademark Office (PTO); listed that patent in the book of Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book"); engaged in sham litigation relating to the second patent; filed a sham citizen petition with the FDA; entered into an unlawful reverse payment agreement with Ranbaxy; and manipulated the statutorily created 180 day first-to-file period[1] to sustain Pfizer's and Ranbaxy's exclusivity and collectively prevent other generic companies from entering the market.  The Court discusses each allegation in turn.

---

[1] 21 U.S.C. § 355(j)(5)(B)(iv).

*1. Walker Process and Fraudulent Orange Book Allegations*

EPPs first present a *Walker Process*[2] claim against Pfizer, based on Pfizer's enforcement of an invalid patent and fraudulent listing of the patent in the Orange Book. By way of background, Warner-Lambert, which was later acquired by Pfizer in 2000, applied for the Original Lipitor Patent on March 30, 1986 and subsequently received Patent No. 4,681,893 ('893 Patent) on July 21, 1987. (*Id.* at ¶¶ 95, 104). The Original Lipitor Patent was for a racemic mixture, which contains equal amounts of two enantiomers that inhibit the production of cholesterol. (*Id.* at ¶ 7). Enantiomers are made of mirrored images of stereoisomers, which are two or more compounds with the same atoms but arranged differently. (*Id.* at ¶¶ 85-86). In a racemic mixture, it is common for one enantiomer to have all or most of the biological activity, while the other is largely inactive. (*Id.* at ¶ 89).

According to the Complaint, the compounds in the '893 Patent were not limited to any particular stereochemistry; instead, the structure included four different stereoisomers possibilities: R-trans, S-trans, R-cis, and S-cis isomers. (*Id.* at ¶ 103). Even though the '893 Patent covered the multiple possibilities, Warner-Lambert focused on developing the R-trans enantiomer of the compound, in calcium salt form, which would eventually be sold as Lipitor. (*Id.* at ¶¶ 106-07). Warner-Lambert achieved patent extensions and regulatory exclusivities that postponed the patent's expiration from May 30, 2006 to March 24, 2010. (*Id.* at ¶ 104).

On July 21, 1989, Warner-Lambert applied for a patent to specifically protect the R-trans enantiomer, which later became the '995 Enantiomer Patent. (*Id.* at ¶ 126). According to the Complaint, Warner-Lambert had to prove the R-trans enantiomer's activity had a "surprising" or "unexpected" characteristic to procure a subsequent patent; put differently, they had to justify why

---

[2] *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

the proposed patent was not already protected by the by the '893 Patent. (*Id.* at ¶ 109).  Plaintiffs allege Warner-Lambert tasked its senior management with finding "something that could be mischaracterized as surprising." (*Id.* at ¶¶ 110-14).  Warner-Lambert included a table in the '995 Patent application to demonstrate the surprising results that the R-trans enantiomer was one hundred times more active than the S-trans enantiomer and ten times more active than the racemic mixture. (*Id.* at ¶ 128).  However, Plaintiffs claim that one skilled in the art would know "one enantiomer is the 'active' isomer, while the other is 'inactive,' and thus the active enantiomer is about twice as active as the racemic mixture." (*Id.* at ¶ 121).  Further, the Complaint states Warner-Lambert would have known, through testing and experimentation, that the R enantiomer was likely to be the active isomer. (*Id.* at ¶ 122).  Plaintiffs allege that Warner-Lambert failed to calculate the average result from its various tests and, instead, "cherry-picked from among the results [of the tests] in order to generate a table that supported its claim of 'surprising activity.'" (*Id.* at ¶ 135).  As a result, the data Warner-Lambert provided in its application was allegedly both false and misleading, since the R-trans enantiomer is approximately twice as active as the racemic mixture, not ten times. (*Id.* at ¶ 133).

The PTO originally rejected the '995 Patent application, since the invention was already covered and anticipated by the claims in the previously procured '893 Patent. (*Id.* at ¶ 153).  Under patent law, a patent application can be rejected "if the differences between the subject matters sought to be patented and the prior art [are] such that the subject matter as a whole would have been obvious at the time of the invention was made to a person having ordinary skill in the art to which said subject matter pertains." (*Id.* at ¶ 154).  In response to the PTO's rejection, Warner-Lambert then requested to amend its application to provide a declaration by Dr. Bruce Roth, who participated in developing Lipitor, in support of the newfound information regarding the R-trans

enantiomer's activity. (*Id.* at ¶¶ 159-60). In his declaration, Roth asserted that the available data "shows the activity of [the R-trans enantiomer] is *surprising and unexpected* because if the [S-trans enantiomer] is accepted as inactive, the activity of [the R-trans enantiomer] would be expected to be only twice that of the racemic mixture" and not the ten times that occurred. (*Id.* at ¶¶ 165-66). Warner-Lambert argued the surprising nature of this information overcomes the obvious inclusion under the '893 Patent and, thus, warrants the issuance of the '995 Patent. (*Id.* at ¶ 161). Plaintiffs contend the data presented to the PTO, including the Roth Declaration were knowingly false and misleading and used to fraudulently convince the PTO to procure the new patent. (*Id.* at ¶¶ 133, 165, 170-74). Persuaded by the data submitted, the PTO eventually issued the '995 Enantiomer Patent on December 28, 1993. (*Id.* at ¶ 182).

As a result of its two approved patents, Warner-Lambert submitted a new drug application to the FDA for Lipitor, which was approved on December 17, 1996. (*Id.* at ¶ 201). Warner-Lambert then listed both the '893 Original Lipitor Patent and the '995 Enantiomer Patent in the Orange Book, which expired on May 30, 2006 and December 28, 2010, respectively. (*Id.* at ¶¶ 203-04). Thereafter, it applied for an extension of the '893 Original Lipitor Patent to account for the difference in time between the issuance of the patent covering the active ingredient in the new drug and the FDA's approval of that drug. (*Id.* at ¶¶ 206-08). As a result, the PTO postponed '893 Patent's expiration until March 24, 2010. (*Id.* at ¶ 213).

*2. Sham Litigation and Citizen Petition Allegations*

Plaintiffs next contend Defendants engaged in sham litigation against Ranbaxy. On August 19, 2002, Ranbaxy filed an Abbreviated New Drug Application (ANDA) to sell a generic version of Lipitor. (*Id.* at ¶¶ 221-22). While Ranbaxy verified their generic version would not violate any of the Lipitor patents, Pfizer, who had acquired Warner-Lambert by this time, filed a patent

6

infringement lawsuit against Ranbaxy on February 21, 2003 for allegedly infringing on the '893 and '995 Patents. (*Id.* at ¶¶ 223-24).  In the pre-trial proceedings, Pfizer attempted to amend its complaint to include process patent infringement claims;  however, their motion was denied since these patents could not be listed in the Orange Book and, therefore, were not a basis for the suit.[3] (*Id.* at ¶¶ 226-27).  On appeal from the District of Delaware, the Federal Circuit ruled in Pfizer's favor, finding that Ranbaxy's product infringed on the '893 Patent. However, it also dismissed Pfizer's '995 Patent infringement claim since it had an improper dependent claim structure. (*Id.* at ¶ 232).  As a result, Ranbaxy had to wait until the expiration of the '893 Patent in March 2010, before selling its generic version. (*Id.* at ¶¶ 232, 234).

Plaintiffs contend since the '995 Patent was fraudulently obtained, the patent infringement litigation against Ranbaxy was a baseless sham, that was intended to interfere with the introduction of Ranbaxy's generic drug into the market. (*Id.* at ¶ 230).

Plaintiffs also allege that Pfizer filed a baseless citizen petition with the FDA, in further attempt to delay the entry of generic versions of Lipitor. (*Id.* at ¶ 235).  According to the Complaint, Ranbaxy's ANDA could have received FDA approval in August 2005, thereby creating generic competition. (*Id.* at ¶¶ 236-38).  However, a month beforehand, July 2005, Pfizer sent a letter to the FDA, in an attempt to further delay the entry to generic versions of Lipitor. (*Id.* at ¶ 239).  Four months later, November 7, 2005, Pfizer re-filed this letter, as a citizen petition, alleging that the generic brand's use of "amorphous atorvastatin calcium" could be "susceptible to higher levels of

---

[3] In July 2000 and August 2001, Warner-Lambert acquired Patent Nos. 6,274,740 ('740 Patent) and 6,087,511 ('511 Patent). (*Id.* at ¶ 219). According to the Complaint, "[b]oth the '740 and '511 Patents are process patents, which claim a specific process for making amorphous atorvastatin calcium using crystalline Form I atorvastatin as a starting material." (*Id.*).  However, while the Process Patents were valid and enforceable, they had no exclusionary effect. (*Id.* at ¶ 308).  Put differently, the Process Patents could not be used to exclude any generic brands of Lipitor from the market. (*Id.*).

impurities" than Pfizer's crystalline version; as such, Pfizer averred that Ranbaxy's application needed to be carefully scrutinized and reviewed with considerable skepticism. (*Id.* at ¶¶ 241-42). However, Plaintiffs claim Pfizer had also used amorphous versions in their testing and development of Lipitor and, therefore, knew that it could be, and had been, safely made. (*Id.* at ¶¶ 242-46). As such these purported safety concerns were unfounded. (*Id.*). Further, Pfizer knew from its earlier litigation with Ranbaxy that Ranbaxy's generic drug was amorphous, rather than crystalline. (*Id.*). According to Plaintiffs, the FDA's previous decisions expressly indicated that special or additional scrutiny would not be applied when reviewing an ANDA, when a different form was used; instead, the stability of a drug, not its substance, would be the key focus in measuring the drug's quality. (*Id.* at ¶ 251). As such, given Pfizer's knowledge that amorphous versions posed no safety risks, as well as the FDA's approach to treating ANDA claims, Plaintiffs claim the petition was a baseless attempt to delay generic competition. (*Id.* at ¶¶ 261-66).

*3. Reverse Settlement Allegations*

Finally, Plaintiffs challenge the validity of a reverse settlement agreement made between Pfizer and Ranbaxy, after Pfizer attempted to obtain reissuance of the '995 Patent. (*Id.* at ¶ 323). To correct the invalidation of the '995 Patent, Pfizer applied for its reissuance in 2007 and conceded that the data included in its original application, concerning the R-trans enantiomer's effectiveness, contained significant errors. (*Id.* at ¶¶ 274-76). Therefore, it would no longer rely on this information in its reissuance proceedings. (*Id.* at ¶ 283). Without this information, Ranbaxy filed a protest with the PTO, contending that the content of the '995 Patent was "anticipated, obvious, [and] constituted double-patenting." (*Id.* at ¶¶ 279, 284). As a result, the PTO issued a non-final rejection of Pfizer's reissuance application, since it "had before it no scientific basis to conclude the enantiomer claims were anything other than obvious over the '893 Patent." (*Id.* at ¶

285, 293). Given Pfizer's failure to receive approval for the '995 Patent, there was a strong possibility that generic brand drugs would enter the market upon expiration of the '893 Patent in March 2010. (*Id.* at ¶¶ 287-88, 294).

While Pfizer struggled to obtain a reissuance of the '995 Patent in 2008, it was later discovered that Ranbaxy may have infringed on another patented drug, Accupril, and, therefore, Pfizer had a potential patent infringement claim worth millions of dollars in damages. (*Id.* at ¶¶ 311-12). According to the Complaint, upon learning of this information "Pfizer needed a stage to disguise a reverse payment to Ranbaxy in order to buy Ranbaxy's agreement to delay launching of its generic version of Lipitor. If there were a pending court case against Ranbaxy involving Lipitor, Pfizer could settle with Ranbaxy through a reverse payment and (unlawfully) extend its Lipitor market exclusivity"; however, when Pfizer learned of Ranbaxy's potential Accupril infringement, there was no active litigation pending. (*Id.* at ¶ 313).

Irrespective of its reasoning, it is undisputed that Pfizer filed a complaint against Ranbaxy in March 2008 for infringing on Process Patents of the '740 and '511 Patents. (*Id.* at ¶¶ 314-315). However, as mentioned above, a court had already ruled that these patents were not exclusionary and, therefore, provided no basis for relief. (*Id.* at ¶¶ 308, 316). This being said, less than three months after the suit was filed, the parties entered into a reverse settlement agreement, whereby Ranbaxy would refrain from manufacturing or selling generic Lipitor until November 30, 2011. (*Id.* at ¶¶ 315, 323-26). According to the Complaint, Pfizer and Ranbaxy disguised this agreement as a way to settle the process patent litigation when, in actuality, it was a "pretext for its true anticompetitive goals and accomplishments." (*Id.* at ¶¶ 323-24). Under the terms of the agreement, Ranbaxy paid Pfizer $1 million and Pfizer dismissed its multi-million dollar patent infringement claims based on Ranbaxy's generic version of Accupril. (*Id.* at ¶ 327). In addition, Ranbaxy was

permitted the right to market its generic version of Lipitor in some foreign markets. (*Id.*). Further, Ranbaxy did not waive its market exclusivity right to be the first to file an ANDA for Lipitor; thereby preventing other generic competition from entering the market until after November 30, 2011. (*Id.* at ¶¶ 363-65). In return, Ranbaxy also ceased challenging Pfizer's reissuance of the '995 Patent. (*Id.* at ¶ 366). As a result, the PTO eventually granted reissuance of the '995 Patent, relying in part on Lipitor's commercial success to prove the patent could not have been obvious and, therefore, was not covered by the '893 Original Lipitor Patent. (*Id.* at ¶ 414).

Plaintiffs contend the accumulation of Pfizer's conduct demonstrates an anticompetitive scheme to prevent generic brands from interfering with Lipitor's market share and, as a result, Pfizer's profitability. (*Id.* at ¶ 446). Had Pfizer not fraudulently procured the '995 Patent, Plaintiffs claim there would have been no basis for its reissuance. (*Id.*). In addition, Ranbaxy only stopped protesting the '995 patent after it entered a reverse settlement agreement with Pfizer. (*Id.*). If not for these circumstances, the EPPs contend that generic versions of Lipitor would have been able to enter into the market much earlier. (*Id.* at ¶ 447).

Plaintiffs bring this case on behalf of themselves and all End-Payor class members to recover damages, calculated by the increased price they had to pay due to Pfizer's conduct in delaying the market entry of generic Lipitor. (*Id.* at ¶ 486). The class contains individuals or entities who purchased or paid for Lipitor and/or its generic version for consumption by themselves, their families, or members, employees, insureds, participants, or beneficiaries in Arizona, California, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah,

West Virginia, Wisconsin, and the District of Columbia. (*Id.* at ¶ 487). The Class sues for overage damages occurred from March 24, 2010 until the effects of Defendants' conduct cease. (*Id.*).

The Complaint outlines four different claims for relief in the class action. The first is for monopolization under state law against Pfizer. (*Id.* at ¶ 497). The conduct giving rise to this claim is the fraudulent obtainment of the '995 Patent, its listing in the Orange Book, its sham litigation and citizen petition, the reissuance of the patent, and the unlawful reverse settlement agreement with Ranbaxy. (*Id.* at ¶ 500). The same factual allegations and theories asserted in Count I are again alleged in Count II against all Defendants. (*Id.* at ¶ 511). In Count III, Plaintiffs allege conspiracy to restrain of trade against all Defendants. (*Id.* at ¶¶ 527, 530). Finally, Plaintiffs allege a claim unfair or deceptive trade practices against all Defendants. (*Id.* at ¶ 546). Plaintiffs contend that as a result of Pfizer's anticompetitive acts or practices, Plaintiffs and the Class were deprived of the opportunity to obtain a less expensive, generic equivalent to Lipitor. (*Id.* at ¶ 547). As such, Plaintiffs seek compensation from Defendants in the form of damages.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits a party to dismiss a suit "[a]fter the pleadings are closed . . . but early enough not to delay trial." Fed. R. Civ. P. 12(c). "A Rule 12(c) motion for judgment on the pleadings is treated like a motion to dismiss under Rule 12(b)(6)." *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 324 (D.N.J. 1999). Under either rule, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Id.* For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, 100 F. Supp. 3d 405, 407 (D.N.J. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d

868 (2009)).  As such, "[a] complaint should not be dismissed unless it appears beyond doubt that 'the facts alleged in the complaint, even if true, fail to support the claim.'" *Syncsort Inc.*, 50 F. Supp. 2d at 325.

**ANALYSIS**

Defendants presently challenge EPPs' Complaint on four separate bases.  First, Defendants contend that EPPs' Complaint should be dismissed in its entirety based on federal preemption principles.  Second, Defendants argue that certain states require pre-filing notices that Plaintiffs failed to comply with and proscribe class actions under their respective consumer protection statutes.  Third, Defendants aver that EPPs' state antitrust claims fail because they lack standing and fail to plead a concerted act.  Finally, Defendants challenge EPPs' consumer protection claims for failing to comply with various state consumer protection law requirements.  The Court addresses each challenge in turn.

## I. Federal Law Preemption

Defendants first seek dismissal of all of Plaintiffs' state law claims, since their state law claims are preempted by federal law. Plaintiffs respond, contending that because their claims are based on antitrust and consumer fraud theories, preemption is inapplicable.

"Federal patent law preempts state law claims to the extent that state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in enacting the patent laws." *Wawrzynski v. H.J. Heinz Co.*, 574 F. App'x 99, 102 (3d Cir. 2014) (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)).  Notably, "district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. No State court shall have jurisdiction over any claim for relief arising under any Act of Congress relating to patents, plant variety

12

protection, or copyrights." 28 U.S.C. § 1338(a). "Under § 1338(a), then, jurisdiction extends 'only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.'" *In re Lipitor Antitrust Litig.*, 855 F.3d 126, 143 (3d Cir. 2017) (quoting *Christianson v. Colt Industr. Operating Corp.*, 486 U.S. 800, 809 (1986)). As such, the Court is tasked with determining whether the plaintiff's claims "arise under" patent law. *Id.* at 144. "[I]f on the face of a well-pleaded complaint there are reasons completely unrelated to the provisions and purposes of the patent laws why the plaintiff may or may not be entitled to the relief it seeks," then the claims do not "arise under" patent law. *Id.* (internal quotation marks and citations omitted).

Defendants present three theories supporting their position that Plaintiffs' state law claims are preempted. First, because Plaintiffs' claims are based on the purportedly fraudulent procurement and enforcement of the '995 patent, they must demonstrate that the patent is invalid or unenforceable, which is preempted under federal patent law. Second, to the extent that Plaintiffs' antitrust claims are based on the reverse settlement agreement, they are preempted since they must demonstrate the validity of the generic patents, which necessarily implicates patent law. Finally, Defendants contend that Plaintiffs' "sham" citizen petition claim is preempted, since it must demonstrate the validity of the generic patents, which, again, implicates patent law.

*1. Fraudulent Patent Procurement and Enforcement*

Turning first to Defendants' federal patent preemption argument, Defendants argue that Plaintiffs' state law claims require them to plead and prove that the patent is invalid or unenforceable under federal patent law. According to Defendants, the allegations in Plaintiffs'

13

complaint that trigger federal patent law include: (1) the fraudulent procurement of the '995 patent (2) the fraudulent patent listing of the '995 Patent in the FDA's Orange Book; and (3) the "sham" litigation against Ranbaxy, seeking to enforce the '995 Patent, in addition to its two process patents. Defendants, citing little or no supporting case law, contend that these allegations require first knowing whether the patent at issue is invalid or unenforceable. If the patent was valid, then the obtainment and enforcement of same would be lawful. As such, Defendants argue that because federal patent law is necessary to support these theories, they are preempted by federal law.

However, Defendants' arguments are in direct contravention with the Third Circuit's recent holding in *Lipitor*, 855 F.3d at 126.[4] In *Lipitor*, the Third Circuit explicitly held that the present matter does not "arise under" federal patent law. The Third Circuit held that although a resolution of a substantial question of federal patent law is necessary for a fraudulent patent claim, that alone is not sufficient to establish that the Federal Circuit has jurisdiction. *Id.* at 143. The court explained that unless every theory of the claim requires resolution of a substantial question of federal law, it does not "arise under" federal patent law and, therefore, the Third Circuit has jurisdiction. *Id.* The court interpreted "arises under" to mean that every theory of the claim requires the resolution of a substantial question of federal law, if it does not, federal patent law will not preempt. *Id.* Here, even if the allegations in the Complaint present substantial questions of patent law, because the antitrust allegations and sham citizen petition do not, this case does not arise under federal patent law for purposes of federal patent preemption. *Id.* (quoting *Christianson*, 486 U.S. at 812).

Moreover, federal patent law does not preempt a state law claim in which a patent law issue is implicated if "the state law cause of action [i.] includes additional elements not found in the

---

[4] Defendants appear to be leading the Court down the same path where it was the last time – no sense putting my fingers over the fire a second time.

federal patent law cause of action and [ii.] is not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law." *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1473 (Fed. Cir. 1998). In *Dow*, the defendant was issued a patent that disclosed certain wire and cable devices manufactured using a particular insulating polymer. *Id.* at 1471. At about the same time, the plaintiff introduced its own line of polymer products and filed a complaint contending that its polymer did not infringe on the defendants' patent since the defendants' patent was invalid and unenforceable. *Id.* at 1471-72. In addition, the plaintiff asserted a state-law unfair competition claim, alleging that that the defendant obtained its patent through inequitable conduct before the PTO. *Id.*

Finding patent preemption inapplicable, the Federal Circuit explained that there are three objectives for patent law: (1) to provide an incentive to invent; (2) to promote the full disclosure of inventions; and (3) to ensure "that which is in the public domain cannot be removed therefrom by action of the states." *Id.* at 1474 (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480-81 (1974)). With these objectives in mind, the *Dow* court held that when the state law cause of action includes additional elements not found in the federal patent law and state law is not an obstacle to the objectives of federal patent law, it is not preempted even if patent law is implicated. *Id.* at 1473. As such, the Federal Circuit held that because the state law unfair competition claim included additional elements not found in federal patent law and did not otherwise conflict with the objectives of federal patent law, its claims were not preempted. *Id.* at 1478-79.

Here, as in *Dow*, the EPPs state antitrust and consumer protection claims require proof of elements not found in a patent cause of action. As discussed earlier, the purpose for patent protection is to provide an incentive to invent, to promote the full disclosure of inventions and to ensure "that which is in the public domain cannot be removed therefrom by action of the states."

Antitrust and consumer protection law protect consumers from being overcharged for products, which is a wholly different goal than patent law.

This is also consistent with the Court's decision in *In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2015 U.S. Dist. LEXIS 177541 (D.N.J. Oct. 29, 2015), where the court held that even if a state court must adjudicate a question of federal patent law, it is not preempted if it includes additional elements not part of a federal cause of action. *Id.* at *61-63. In *Thalomid*, the plaintiffs, who were indirect purchasers, alleged that the defendants created an antitrust scheme by obtaining patents through fraud on the PTO and bringing sham lawsuits to delay generic brands from entering the market. *Id.* at *4-5. As is the case here, the defendants argued that the plaintiffs' antitrust claims should be preempted by federal patent law since they alleged that they obtained the patents through unjust conduct with the PTO. *Id.* at *61-62. Relying on *Dow*, the court held that even if a question of federal patent law must be adjudicated, the state law claim is not preempted, as long as it contains additional elements not part of a federal patent cause of action. *Id.* Finding the allegations were also premised on bad faith in the marketplace (an element not required in patent law) the Court reasoned that federal patent preemption was not warranted.

Here, similar to *Thalomid*, the EPPs allege that the patents were obtained through fraud on the PTO, Pfizer improperly listed the '995 patent in the Orange Book, the generic drug was delayed entry because of sham litigation, a baseless Citizens Petition was filed, and a reverse payment settlement agreement was negotiated to prolong a monopoly. As such, because EPPs claims are predicated on claims wholly separate from the federal patent law, they are not preempted.

*2. Antitrust Allegations*

Defendants next argue that because Plaintiffs' antitrust claims arise from the reverse settlement agreement, it implicates federal patent law and, therefore, must be preempted.

Defendants rely principally on the Third Circuit's decision in *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d Cir. 2017) for support.   In *Wellbutrin*, the Third Circuit held that in order to allege an antitrust injury, based on the reverse settlement agreement between pharmaceutical companies, it is the plaintiffs' burden to demonstrate that "but for" this agreement, the generic drug would have entered the market sooner. *Id.* at 164-65.   As such, if a regulatory scheme or patent law would otherwise prevent the generic drug from market entry, there can be no antitrust injury. *Id.*  Here, Defendants argue that because Plaintiffs must demonstrate that the generic patents would have entered the market, but for the settlement, this necessarily implicates patent law.

In *Wellbutrin* the defendant obtained FDA approval for bupropion hydrochloride, which was marketed as "Wellbutrin." *Id.* at 145. Between September 2004 and May 2005, four generic manufacturers filed ANDAs, requesting authorization to market generic versions of Wellbutrin. *Id.* On February 9, 2007, the parties entered into a settlement agreement, which included a pay-for-delay scheme, wherein the defendants agreed to not launch their own authorized generic version of the drug for 180 days and, in return, the generic manufacturer would not launch a low dosage generic version of the drug until an agreed triggering event. *Id.* at 146, 162. In May 2008, the plaintiffs filed suit, alleging that the defendants conspired with generic manufacturers to prevent a generic version of the drug from entering the market. *Id.* at 146. The Third Circuit held that because there was a patent blocking the generic versions' launch, the settlement agreement did not cause the injury. *Id.* at 165. Put differently, the Third Circuit explained that the plaintiffs were unable to prove that "but for" the defendants' settlement agreement, the generic drug would have entered the market, since a patent blocking the generic versions would have nevertheless created the same effect. *Id.*

The Court rejects Defendants' expansive reading of *Wellbutrin* to hold that antitrust claims, based on reverse settlement agreements, are preempted by federal patent law. *Wellbutrin* simply sets forth considerations to be made when presented with an issue of antitrust standing, based on reverse settlement agreements. At no point in its decision did the Third Circuit mention that such an issue would trigger federal patent preemption. *See Wellbutrin*, 868 F.3d at 163-70. As such, while an antitrust claim may relate to patent issues, it is not always the case that it is necessary to explore its validity. Secondly, as noted above in *Lipitor*, the Third Circuit has already held that this case was not preempted by federal law, since Plaintiffs' claims are predicated on theories of antitrust, not patent law. *Lipitor*, 855 F.3d at 146. As such, because Plaintiffs' antitrust claims do not implicate federal patent law, the Court will not dismiss these claims based on preemption. Finally, *Wellbutrin* was decided at summary judgment, where the district court had before it a full and complete record and was, therefore, capable of making determinations not presently available at the pleading stage. For these reasons, the Court finds Defendants' arguments, relying on *Wellbutrin*, premature.

### 3. Federal Patent Law Preemption of the Citizen Petition

Lastly, Defendants argue that Plaintiffs' claim that Defendants filed sham citizen petition with the FDA is also preempted. By way of background, a citizen petition is a written request made by an interested person to the FDA, asking the agency to "issue, amend, or revoke a regulation or order, or take or refrain from taking any other forms of administrative action." 21 C.F.R. §§ 10.25, 10.30. Here, Defendants make a similar "but for" argument as discussed above in *Wellbutrin* and contend that before addressing the merits of the sham citizen petition claim, Plaintiffs must first prove that the challenged patent was invalid, because if it is valid, then the patent, and not the citizen petition, prevented market entry of the generic brands.

18

This argument fails for two reasons. First, *Lipitor* expressly held that federal patent law is not implicated by a citizen petition claim, "whether [an FDA] petition was a sham is an issue independent of patent law." *Lipitor*, 855 F.3d at 146 (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686 (2d Cir. 2009)). In any event, even if a citizen petition claim did implicate federal patent law, the Third Circuit has made clear that unless *every* theory of the claim requires the resolution of a substantial question of federal law, it does not "arise under" federal patent law. *Id.* Therefore, as discussed above, since this case does not "arise under" federal patent law, preemption is not appropriate.

Alternatively, Defendants argue that the federal law governing the FDA preempts Plaintiffs' sham citizen petition claim. Here, Defendants rely primarily on the Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). In *Buckman*, the Supreme Court held that fraud-on-the-FDA claims are preempted by federal law. *Id.* at 353. In that case, the defendants made two attempts to obtain FDA approval to market their bone screws, for spinal surgery. *Id.* at 346. After the FDA denied approval twice, the defendants made a third application with a more limited use, this time indicating that its use for the long bones in the arms and legs, which finally received FDA approval. *Id.* Thereafter, the plaintiffs sued under state law, alleging that the defendants made fraudulent representations to the FDA as to the intended use of their product. *Id.* at 343-47. The Supreme Court held that federal law preempted the state law claims, since an apparent conflict existed between the state law claims and federal law. *Id.* at 348, 353. The Supreme Court explained, "[the] conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the [FDA], and that this authority is used by the [FDA] to achieve a somewhat delicate balance of statutory objectives." *Id.* Allowing state law claims would distort the balance sought by the FDA and is, therefore,

19

preempted by federal law. *Id.* Relying on *Buckman*, Defendants contend that Plaintiffs' sham citizen petition claim is akin to a fraud-on-the-FDA claim and should therefore be preempted.

However, courts that have been presented with this issue have narrowed the scope of *Buckman's* holding, concluding that preemption is inapplicable where the plaintiffs assert antitrust and consumer protection claims, in addition to a fraud-on-the-FDA claim. *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 220-21 (S.D.N.Y. 2012). In *DDAVP*, the Southern District of New York held that "claims mak[ing] 'freestanding allegations of wrongdoing apart from the defendant's purported failure to comply with FDA disclosure requirements'' are sufficiently pled and, therefore, not preempted. *Id.* (quoting *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 95 (2d Cir. 2006)). Here, Plaintiffs allege freestanding allegations, under state antitrust and consumer protection laws, that are not preempted. For example, the EPPs allege that reverse-payment settlement agreement gives rise to their state claims, which is wholly different from alleging a failure to comply with the FDA. In response, Defendants contend that "*DDAVP* unjustifiably narrows the holding of *Buckman*" and request that the Court "decline to follow its holding." However, the Court finds the reasoning in *DDAVP* persuasive. *Buckman* was concerned that fraud-on-the-FDA claims, based on state law, would interfere with the FDA's statutory scheme; however, to apply that principle to claims unrelated to FDA authority would be to severely limit the theories of relief that parties could seek. As such, this Court finds that the sham citizen petition claim is not preempted by the federal FDA law.

To sum up, the Court declines to dismiss any of Plaintiff's claims based on preemption principles.

## II. Notice Challenges and Permissibility of Pursuing Class Claims

Defendants next make several challenges to EPPs' state antitrust and consumer protection claims. First, Defendants contend that EPPs failed to satisfy the pre-filing notice requirements mandated in states that require the same. Second, Defendants argue that Illinois, Montana, Tennessee, and Utah explicitly prohibit the use of class actions to enforce the rights created therein. The Court discusses each challenge in turn.

*1. Pre-Filing Notice Requirements*

Because the Arizona, Hawaii, Nevada, and Utah antitrust laws have notice requirements, Defendants contend that EPPs' antitrust claims in these states must be dismissed since EPPs failed to give proper notice.[5] Defendants' argument is based on the language of the respective state statutes, requiring any antitrust plaintiff to serve that state attorney general a copy of the complaint. *See* Ariz. Rev. Stat. § 44-1415; Haw. Rev. Stat. § 480-13.3; Nev. Rev. Stat. Ann. § 598A.210(3); Utah Code Ann. § 76-10-3109(9).

Hawaii's antitrust statutes proscribes "[u]nfair methods of competition *and* unfair or deceptive acts or practices in the conduct of or any trade or commerce." Haw. Rev. Stat. § 480-2 (emphasis added). Section 480-13.3 sets forth procedural requirements that must be met for a putative class of indirect purchasers alleging unfair methods of competition under Section 480-2. First, the class plaintiffs, within seven days of filing the lawsuit, must serve a copy of the complaint, and all supporting material, with the Hawaii attorney general, who retains sole

---

[5] It should be noted that during oral argument, EPPs' attorney contended that notice was provided, "I'm the one who gave notice in this case; I gave – first of all we gave a demand to the defendants back in 2012, with respect to all states . . . so that has been fulfilled." (Tr. of June 25, 2018 Hearing at 58:35-59:4). To me, this meant Plaintiffs gave notice in accordance with the state statutes. I have no reason to disbelieve Plaintiffs' counsel, who is an officer of the Court. However, no competent proof supporting this assertion has been provided to the Court.

discretion for determining whether the State will move forward with the action or file its own action. Haw. Rev. Stat. §§ 480-13.3(a)(1), (4).  If the Hawaii attorney general declines to proceed with the action, the class plaintiffs then have the right to move forward. Haw. Rev. Stat. § 480-13.3(a)(5)(c).[6]

Like Hawaii, the Utah Antitrust Act requires notice be made to its attorney general. Specifically, the Act states, "[t]he attorney general shall be notified by the plaintiff about the filing of any class action involving antitrust violations that includes plaintiffs from this state.  The attorney general shall receive a copy of each filing from each plaintiff.  The attorney general may, in his or her discretion, intervene or file amicus briefs in the case, and may be heard on the question of the fairness or appropriateness of any proposed settlement agreement." Utah Code Ann. § 76-10-3109(9).

Similarly, both Arizona and Nevada's antitrust statutes require the putative class plaintiff to provide notice to their respective attorney generals.  Specifically, the Arizona Uniform Antitrust Act states that "[a] person filing a complaint, counterclaim or answer for any violation of the provisions of this article shall simultaneously with the filing of the pleading in the superior court or, in the case of pendent state law claims in the federal court, serve a copy of the complaint, counterclaim or answer on the attorney general. Proof of service on the attorney general shall be filed with the court." Ariz. Rev. Stat. § 44-1415(a).  Under Nevada's Unfair Trade Practices Act, "[a]ny person commencing an action for any violation of the provisions of this chapter shall,

---

[6]  Courts have understood this notice requirement to apply only to claims of "unfair methods of competition," not "unfair or deceptive acts or practices"; however, neither party addresses this distinction. *See In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 243-33 (M.D. Pa. 2010); *In re Flash Memory Litigation*, 643 F. Supp. 2d 1133, 1168 (N.D. Cal. 2009).

22

simultaneously with the filing of the complaint with the court, mail a copy of the complaint to the Attorney General." Nev. Rev. Stat. Ann. § 598A.210(3).

Finally, both the West Virginia and Massachusetts consumer protection statutes include pre-filing notice provisions. Specifically, the West Virginia Consumer Credit Protection Act provides consumers who are victims to unfair, deceptive, and fraudulent business practices with a cause of action. W. Va. Code § 46A-6-106(a). However, prior to initiating suit, a consumer must first inform the seller, in writing, of the alleged violation. W. Va. Code § 46A-6-106(b). Courts have interpreted this statute as a "mandatory prerequisite[]" to commencing a consumer protection claim under the Act. *Harrison v. Porsche Cars N. Am., Inc.*, No. 15-0381, 2016 W. Va. LEXIS 245, at *5 (W.Va. 2016); *see also Stanley v. Huntington Nat'l Bank*, No.11-54, 2012 U.S. Dist. LEXIS 9448, at *20-21 (N.D.W.Va. Jan. 27, 2012). Likewise, the Massachusetts Consumer Protection Act requires that "[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent." Mass. Gen. Laws. Ch. 93A, § 9(3). "The statutory notice requirement is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'" *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 19 (1st Cir. 2004) (quoting *Entrialgo v. Twin City Dodge, Inc.*, 333 N.E.2d 202, 204 (Mass. 1975)).

### 2. State Consumer Protection Class Bars

Defendants next contend that EPPs' Montana, Tennessee, and Utah[7] consumer fraud claims must be dismissed, since these states prohibit class actions. Each of these statutes contain language

---

[7] Defendants also make a similar argument for Plaintiff's Illinois consumer protection claims; however, being that the Illinois Consumer Fraud & Deceptive Business Practice Act does not

proscribing the use of class actions to enforce the rights provided therein. *See* Mont. Code Ann. § 30-14-133(1) ("A consumer who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by [the Consumer Protection Act] may bring an individual but not a class action"); Tenn. Code Ann. § 47-18-109(a)(1) ("Any person who suffers an ascertainable loss . . . as a result of . . . an unfair or deceptive act or practice . . . may bring an action individually to recover actual damages"); and Utah Code Ann. § 13-11-19(2) ("A consumer who suffers loss as a result of a violation of this chapter may recover, but not in a class action, actual damages or $2,000, whichever is greater, plus court costs.").

Here, EPPs do not contest the meaning of the above-mentioned statutory provisions; instead, relying on *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010), EPPs contend these statutory provisions are preempted by Federal Rule of Civil Procedure 23, since "federal procedural rules control over conflicting state rules."

*3. The Shady Grove Decision*[8]

To properly analyze Defendants' motion, the Court must determine whether the discussed notice requirements and class action bars are procedural or substantive.   It is blackletter law that that federal courts sitting in diversity jurisdiction must utilize federal procedural law and state substantive law.  *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).   Therefore, if these states' notice requirements and class action bars are substantive in nature, they apply and must be followed in federal court. *See Shady Grove*, 559 U.S. at 410.  However, there is no bright line

---

explicitly bar class actions, the Court finds it more appropriate to consider the substantive arguments Defendants present later.

[8] At the outset, it should be noted that neither party provided any post-*Shady Grove* analysis or discussion to support their position.

24

between procedural and substantive law and, thus, the distinction is difficult to determine, especially since these two categories are not mutually exclusive. *Godin v. Schencks*, 629 F.3d 79, 86 (1st Cir. 2010).

In interpreting *Erie,* the Supreme Court explained that a federal law will only be procedural and, thus, applicable, if the case's outcome would be the same in both federal and state courts. *Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945). This is consistent with *Erie*'s "twin aims" to avoid forum shopping and the inequitable administration of law. *Id*. at 111-12. The Supreme Court further elaborated that before a court can consider *Erie*'s outcome determinative test, it must first determine whether there is a direct conflict between the federal and state laws in question. *See Hanna v. Plumer*, 380 U.S. 460, 470-74 (1965). If there is a conflict, the federal law must be used, unless it is deemed unconstitutional or outside the scope of the Rules Enabling Act, 28 U.S.C. § 2072(b), which prohibits the use of federal laws if they "abridge, enlarge, or modify any [state] substantive right." *Id*. If there is not a conflict, the outcome determinative test is utilized to determine the whether to apply state or federal law. *Id* This test has been refined as an inquiry into "whether the scope of the Federal Rule . . . is sufficiently broad to control the issue before the court." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980). Only if the federal law is sufficiently broad, will the court then continue with the *Hanna* analysis.

Most recently, the Supreme Court was presented with a similar issue that is before the Court. In *Shady Grove*, the Supreme Court was tasked with determining whether Federal Rule of Civil Procedure 23 or a New York law controlled if a class action may proceed in federal court. 559 U.S. at 396. The New York law at issue prohibited the use of class actions to recover a "penalty" or statutory minimum damages. N.Y. Civ. Prac. Law Ann. (CPLR) § 901(b). In *Shady Grove*, the class members met the prerequisites of Rule 23, but sued under Section 901(b) to

25

recover unpaid interest from Allstate, which was classified as a "penalty" and, therefore, not permitted under the New York law. *Id.* at 397.  In determining which of the two rules applied, the Supreme Court had to answer two related questions: first, whether the New York rule and Rule 23 addressed the same issue; and, if so, whether Rule 23 was within its statutory authority under the Rules Enabling Act. *Id.* at 398 (citing *Burlington N. R. Co. v. Woods*, 480 U.S. 1, 4-5 (1987); *Hanna*, 380 U.S. at 463-64).  In doing so, a majority of the Court concluded that Rule 23's conflict with the New York law was "unavoidable" and could not fairly be read to not "control the issue." *Id.* at 406 n.8.  As such, because the New York rule attempted to answer the same question, the Court held "it cannot apply in diversity suits unless Rule 23 is ultra vires." *Id.* at 398-99.  Turning to the second inquiry, however, no majority was able to come to an agreed standard.  Writing for three justices, Justice Scalia explained that "it is not the substantive or procedural nature of the affected state law that matters, but the substantive or procedural nature of the Federal Rule." *Id.* at 410.  As such, the validity of a Federal Rule turns on whether it regulates procedure, if it does, it is lawfully authorized by the Rules Enabling Act. *Id.*

However, in his concurring opinion, Justice Stevens criticized the plurality's categorical approach, at step two, that any federal rule that "really regulates procedure" is a sufficient basis for preempting a conflicting state law. *Id.* at 421-29 (Stevens, J., concurring in part and concurring in judgment).  Instead, in Justice Stevens' view, the inquiry should "not necessarily turn on whether the state law at issue takes the form of what is traditionally described as substantive or procedural. Rather, it turns on whether the state law actually is part of a State's framework of substantive rights or remedies." *Id.* at 419.  This is because there may be state procedural rules that "become so bound up with the state-created right or remedy that it defines the scope of that substantive right

26

or remedy" and, therefore, "make it significantly more difficult to bring or to prove a claim, thus serving to limit the scope of that claim." *Id.* at 420.

Although the Third Circuit has yet to decide whether Justice Stevens' concurrence controls, the Court is persuaded by the majority of district and circuit courts that have done so.[9] *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 60 (E.D.N.Y. 2017) (collecting cases). In doing so, courts presented with the same issue presently before the Court have framed the inquiry as whether the state statute "provides a procedure that is 'so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy.'" *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011) (quoting *Shady Grove*, 559 U.S. at 420 (Stevens, J. concurring in part and concurring in judgment)); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 409 (D. Mass. 2013). If the answer is in the affirmative, the federal rule must yield to the state law, since it would "effectively abridge[], enlarge[], or modif[y] a state-created right or remedy." *Shady Grove*, 559 U.S. at 422 (Stevens, J. concurring in part and concurring in judgment).

*4. Application*

Against this legal backdrop, the Court finds that Rule 23 is not "sufficiently broad" to cover the state statutory notice provisions. First, the conflicting rules do not attempt to answer the same question or subject. *See Shady Grove*, 559 U.S. at 399. Here, the state laws in question address notice provisions for antitrust and consumer protection-related lawsuits; Rule 23, on the other hand, is a general federal procedural rule governing class actions. Second, contrary to *Erie*'s twin aims, to decline to apply state statutory notice provisions "in federal court would encourage forum

---

[9] From the Court's perspective, in agreement with Justice Stevens, the state statutes at issue focus on various forms of deceptive practices. Rule 23 is more generic and applies to all class actions. As such, the narrower and more focused approach of the state should apply.

shopping and the inequitable administration of laws." *In re Asacol Antitrust Litig.*, No. 15-12730, 2016 U.S. Dist. LEXIS 94605, at *48 (D. Mass. July 20, 2016). This is also consistent with the majority of district courts that have been presented with the same issue, and have concluded that state statutory notice provisions control in federal court. *See Asacol*, 2016 U.S. Dist. LEXIS 94605, at *48 (statutory notice provisions in Arizona, Hawaii, Nevada, and Utah apply in federal court); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 232-33 (M.D. Pa. 2010) (Hawaii notice provision applies); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1158 (N.D. Cal. 2009) (same). Accordingly, because EPPs failed to comply with the notice provisions under Arizona's Uniform Antitrust Act, Hawaii's Antitrust Act, Nevada's Unfair Trade Practices Act, and Utah's Antitrust Act, as well as Massachusetts's Consumer Protection Act and West Virginia's Consumer Credit Protection Act, EPPs' class claims under these statutes are dismissed without prejudice.

For these same reasons, the Court also finds that the class action bars incorporated in the Montana, Tennessee, and Utah consumer protection laws are not preempted by Rule 23. Here, EPPs deviate from the majority of district and circuits, which have followed Justice Steven's concurrence in *Shady Grove*, and endorse the approach taken in *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 133, 1335 (11th Cir. 2015). In *Lisk*, the Eleventh Circuit held that there was "no relevant, meaningful distinction between" the New York law in *Shady Grove* and the Alabama Deceptive Trade Practices Act, which also bars class actions. In doing so, the court, echoing Justice Scalia's plurality decision, explained, "the question whether a federal rule abridges, enlarges, or modifies a substantive right turns on matters of substance—not on the placement of a statute within a state code." *Id.* at 1336. However, "[t]he decision in *Lisk* has not been widely followed outside of the Eleventh Circuit." *Delgado v. Ocwen Loan Servicing, LLC*,

No. 13-4427, 2017 U.S. Dist. LEXIS 186408, at *23 (E.D.N.Y. Nov. 8, 2017). Instead, "most courts outside of that circuit implicitly or explicitly disagree[] with its interpretation of *Shady Grove* and its determination that there was no 'meaningful distinction'" between the New York law in *Shady Grove* and the Alabama class action bar. *Id.* (collecting cases). Instead, consistent with the courts to have considered this issue, the Court finds that the class action bars in the Montana, Tennessee, and Utah consumer protection acts control in federal court. *Id.* at *23-24. Moreover, in *Delgado*, the court explained, "the specific inclusion of the class action bar within the Alabama, Tennessee, and Georgia consumer protection statutes . . . evinces a desire by the state legislature to limit not only the form of the action but also the remedies available, placing those bars squarely within Justice Stevens' concurrence." *Id.;*[10] *Fejzulai v. Sam's West, Inc.*, 205 F. Supp. 3d 723, 728-29 (D.S.C. 2016). That same reasoning holds here.

In sum, the Court finds that the four notice provisions under Arizona, Hawaii, Nevada, and Utah antitrust laws are applicable here and Plaintiffs failed to comply. Likewise, the notice provisions in Massachusetts and West Virginia's consumer protection laws control. As such, EPPs' claims under these six statutes are dismissed without prejudice; Plaintiffs may file an amended complaint that specifically pleads compliance with each state's notice requirement. Similarly, EPPs' class claims under Montana, Tennessee, and Utah's consumer protection statutes are dismissed without prejudice; in these three states, Plaintiffs may amend their complaint to

---

[10] Both Alabama and Georgia's consumer protection statutes contain similar language to Montana, Tennessee, and Utah, which all prohibit the use of class actions to enforce the rights created therein. Ala. Code Ann. § 8-19-10(f) ("A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class"); Ga. Code Ann. § 10-1-399(a) ("Any person who suffers injury or damages . . . as a result of consumer acts or practices in violation of this part . . . may bring an action individually, but not in a representative capacity").

include only claims brought on behalf of Montana, Tennessee, and Utah plaintiffs in their *individual* capacities.

### III. State Antitrust Challenges

Defendants next seek dismissal of EPP's Illinois, Rhode Island, and Utah state antitrust claims, since these states lack standing under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746-47 (1977). In *Illinois Brick,* the Supreme Court held that indirect purchasers lacked Article III standing to assert federal antitrust claims against manufacturers since their injury was likely only a small portion of the injury caused by the defendants' alleged conduct. *Id.* at 725-26.

*1. Illinois Antitrust Act*

Relying on *Illinois Brick*, Defendants contend that EPPs' Illinois antitrust claim fails, since they lack standing. The plain language of the Illinois Antitrust Act ("IAA") states "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae." 740 Ill. Comp. Stat. § 10/7(2). EPPs respond, contending that under *Shady Grove*, the Court should treat the Illinois Antitrust Act as a procedural law and, therefore, follow Rule 23.

District courts are divided on whether the Illinois Antitrust Act precludes indirect purchasers from filing class actions. However, a majority of courts have held that the Act is distinguishable from the New York law in *Shady Grove* and that it prohibits indirect purchaser class actions. *See, e.g.*, *In re Opana Er Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016); *United Food & Commer. Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1083-84 (N.D. Cal. 2014); *Digital Music*, 812 F. Supp. 2d at 415-16; *Wellbutrin XL*, 756 F. Supp. 2d at 677. As discussed above, the New York

law at issue in *Shady Grove* involved a general procedural rule that conflicted with Rule 23; here, however, the limitation prescribed in the IAA is "in the same paragraph of the same statute that creates the underlying substantive right." *Digital Music*, 812 F. Supp. 2d at 416; *see also Wellbutrin XL*, 756 F. Supp. 2d at 677. Further, the restrictions in the Illinois Antitrust Act appear to reflect a policy decision regarding the feasibility of duplicative recovery, which is explicitly entrusted to the attorney general, not indirect purchasers. *Wellbutrin XL*, 756 F. Supp. 2d at 677 (citing *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F. 2d 1469, 1480 (7th Cir. 1991)). In finding that the Act to bars indirect purchaser antitrust class actions, courts have explained "[t]he Illinois restrictions on indirect purchaser actions are intertwined with Illinois substantive rights and remedies . . . [such that] application of Rule 23 would 'abridge, enlarge or modify' Illinois' substantive rights, and therefore Illinois' restrictions on indirect purchaser actions must be applied in federal court." *Id.*; *see also Nexium*, 968 F. Supp. 2d at 408-09; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-2503, 2015 U.S. Dist. LEXIS 125999, at *66 (D. Mass. Aug. 14, 2015) (holding that it would be inconsistent with *Shady Grove* to conclude that Rule 23 preempts the ban on class actions contained within Illinois Antitrust Law).

Several district courts have taken a less restrictive interpretation of the Illinois Antitrust Act and have allowed indirect purchasers to bring class actions under the Act. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 817-18 (N.D. Ill. 2017); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729 (S.D.N.Y 2017); *In re Aggrenox Antitrust Litig. (Aggrenox II)*, No. 14-2516, 2016 U.S. Dist. LEXIS 104647, at *23-28 (D. Conn. Aug. 9, 2016). In *Broiler Chicken*, the Northern District of Illinois held that Rule 23 applies in federal court, despite the state law's requirement that the attorney general bring class actions, since the Act does not hinder the class's substantive rights. *Broiler Chicken*, 290 F. Supp. 3d at 818. This is "because

any indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action." *Aggrenox II*, 2016 U.S. Dist. LEXIS 104647, at *28. As such, these courts view the Illinois Antitrust Act as a procedural conflict with Rule 23, rather than substantive, and, therefore, apply Rule 23 to permit indirect purchasers to file class actions under the Act, so long as they satisfy its prerequisites. *See, e.g.*, *Propranolol.*, 249 F. Supp. 3d at 728.

Although district courts have taken different approaches in interpreting the Illinois Antitrust Act, the Court finds the rationale of *Digital Music* persuasive. The language of the Act presents a substantive conflict with Rule 23; as such, since the Illinois Antitrust Act controls, the Court finds that EPPs lack standing to assert claims under the Act and, therefore, dismisses this claim with prejudice.

*2. Rhode Island Antitrust Act*

Defendants next move for dismissal of EPPs Rhode Island antitrust claims since they, too, lack standing to bring an antitrust claim under *Illinois Brick*. Since the Supreme Court's decision, multiple states have enacted *Illinois Brick* repealer statutes that allow indirect purchasers to recover under their state law. On July 15, 2013, Rhode Island passed such a repealer, which states "[t]he fact that a person or public body has not dealt directly with the defendant shall not bar or otherwise limit recovery." R.I. Gen. Laws § 6-36-7(d). As such, Plaintiffs argue the statute should be applied retroactively and, even if it cannot be applied retroactively, they nevertheless fall within the repealer's protection since Plaintiffs suffered damages past July 15, 2013.

Here, Defendants argue that the activity alleged in this claim predated July 15, 2013, since the alleged anticompetitive conduct that prevented the generic brands from entering the market occurred prior to November 30, 2011. (SAC ¶¶ 23, 469, 512, 523, 535). As such, since the conduct

32

giving rise to the present cause of action occurred prior to the passing of Rhode Island's repealer, Defendants contend it does not apply and, under *Illinois Brick*, must be dismissed.  In addition, Defendants aver that the statute cannot be applied retroactively.

Under Rhode Island law, it is well established that statutes cannot be applied retroactively, unless clearly stated.   The Rhode Island Supreme Court has held that, "statutes and their amendments are construed to operate prospectively unless a specific contrary intent is expressed by the Legislature, or retroactivity must necessarily be inferred from the language employed by the law makers." *State v. Jennings,* 944 A.2d 171, 173 (R.I. 2008); *see also Rodrigues v. State,* 985 A.2d 311, 318 (R.I. 2009); *Wilkinson v. State Crime Lab. Comm'n*, 788 A.2d 1129, 1140-41 (R.I. 2002); *Hydro-Manufacturing v. Kayser-Roth Corp.*, 640 A.2d 950, 954-55 (R.I. 1994). Additionally, courts have consistently held that the Rhode Island repealer applies prospectively. *See, e.g., In re Aggrenox Antitrust Litig. ("Aggrenox I"),* 94 F. Supp. 3d 224, 252-53 (D. Conn. 2015); *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-2508, 2015 U.S. Dist. LEXIS 121620, at *63, (E.D. Tenn. July 24, 2015);  *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 759 (E.D. Pa. 2014).  Finally, Plaintiffs' contention that Defendants' conduct has continued past July 15, 2013, thereby placing it within the repealer's protection, is belied by the explicit allegations set forth in their Complaint, which focus solely on Defendants' actions made prior to November 30, 2011. (SAC ¶¶ 23, 469, 512, 523, 535).  As such, because Rhode Island's repealer does not apply retroactively and none of the  activity giving rise to their claims occurred after the date of enactment (July 15, 2013), EPPs' Rhode Island antitrust claims are dismissed with prejudice.

*3. Utah Antitrust Act*

Lastly, in addition to failing to provide notice, Defendants contend that EPPs' Utah antitrust claims fail, since none of the named Plaintiffs are Utah residents, as required under Utah law. (SAC ¶ 487). As such, Defendants contend that EPPs lack standing to assert claims under the Utah Antitrust Act. *See Niaspan*, 42 F. Supp. 3d at 759-60. Plaintiffs respond that dismissal is not warranted, since only a member of a putative class must be from Utah. *See In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-2687, 2017 U.S. Dist. Lexis 115294, at *112-13 (D.N.J. July 20, 2017).

Under the Utah Antitrust Act, "[a] person who is a *citizen* of this state or a *resident* of this state" can bring a claim. Utah Code Ann. § 76-10-3109(1)(a) (emphasis added). The majority of courts that have been presented with this statute require at least one Utah citizen or resident be a named plaintiff. *See Opana Er*, 162 F. Supp. 3d at 725; *Aggrenox I.*, 94 F. Supp. 3d at 251-52; *Niaspan*, 42 F. Supp. 3d at 759-60; *Nexium,* 968 F. Supp. 2d at 410; *In Re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 U.S. Dist. LEXIS 121373, at *30 n.10 (D.N.J. Oct. 20, 2011). Here, neither party disputes that none of the named Plaintiffs are Utah residents or citizens. As such, guided by the majority of courts to address this issue, because there must be at least one named plaintiff who is a Utah citizen or resident in order to establish standing for the putative class, EPPs' claims under the Utah Antitrust Act are dismissed without prejudice.

In sum, EPPs' antitrust claims under Illinois and Rhode Island are dismissed and there is no right to amend due to futility. Under Utah, the claim is dismissed without prejudice; but Plaintiff may amend to name such plaintiff within thirty days.

*4. States Requiring Concerted Action*

Defendants next seek dismissal of Count I of EPPs' Kansas, New York, and Tennessee antitrust claims, which asserts a single claim of monopolization against Pfizer, based on fraudulently obtaining and listing the '995 Patent, obtaining reissuance of that patent, filing serial sham litigation and a sham citizen petition, and entering into a reverse settlement agreement with Ranbaxy. (SAC ¶ 504). Specifically, Defendants argue that because Kansas, New York, and Tennessee require unlawful behavior between two or more individuals, Count I must be dismissed since it alleges unilateral conduct by Pfizer.

It is clear from the Complaint that the allegations concerning the obtaining, listing, and reissuance of the '995 Patent, in addition to the sham litigation and sham citizen petition, are all unilateral actions by Pfizer (SAC ¶ 500). As such, since these allegations describe unilateral conduct, Defendants contend that Count I fails in Kansas, New York and Tennessee. *See* Kan. Stat. Ann. §§ 50-101, -112, -132; N.Y. Gen. Bus. Law § 340(1); Tenn. Code Ann. §§ 47-25-101, -102.

The Kansas Monopolies and Unfair Trade Act proscribes "all arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition" and those "designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles." Kan. Stat. Ann. § 50-112. The Act defines a "trust" as a "combination of capital, skill, or acts, by two or more persons" and prohibits conspiracy or combination "with any other persons . . . for the purpose of monopolizing any line of business." Kan. Stat. Ann. §§ 50-101, 132. While there is scant case law interpreting the Kansas Monopolies and Unfair Trade Act, the Kansas Court of Appeals has held that since the Act emphasizes agreements between two or more individuals, the legislature

intended for the Act to require more than unilateral conduct. *Smith v. Philip Morris Cos.*, 335 P.3d 644, 662-67 (Kan. Ct. App. 2014*); see also In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 283 (D. Mass. 2004).

Like Kansas, the New York Donnelly Act defines an antitrust violation as "every contract, agreement, arrangement, or combination whereby a monopoly in the conduct of any business, trade, or commerce . . . may be established or maintained, or whereby [c]competition or the free exercise of any activity in the conduct of any business, trade, or commerce . . . is or may be restrained." N.Y. Gen. Bus. Law § 340(1). As such, in New York "[a]n antitrust claim under the Donnelly Act…must allege both concerted action by two or more entities and a consequent restraint of trade within an identified relevant product market." *Global Reins. Corp.-U.S. Branch v. Equitas Ltd.*, 969 N.E. 2d 187, 192 (N.Y. 2012*); see also In re Aluminum Warehousing Antitrust Litig.* No. 13-2481, 2014 U.S. Dist. Lexis 140765, at \*23 (S.D.N.Y. Sept. 14, 2014). However, the Northern District of New York has held that allegations of monopolistic activities, based on conspiring with other individuals, suffices to state a claim under the Donnelly Act. *See N. Cnty. Communs. Corp. v. Verizon N.Y. Inc.*, 233 F. Supp. 2d 381, 385 (N.D.N.Y. 2002).

Finally, like Kansas and New York, the Tennessee Trade Practices Act proscribes "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition . . . and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer." Tenn. Code Ann. § 47-25-101. Despite limited case law interpreting the statute, several district courts have held that "the absence of an arrangement or conspiracy between two actors is a bar" to a claim under the Tennessee statute. *Sheet Metal Workers Local 441 Health &*

*Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 445-46 (E.D. Pa. 2010); *see also In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1108-09 (N.D. Cal. 2007); *Relafen*, 221 F.R.D. at 284.

As established above, the case law as well as the plain language of the Kansas, New York, and Tennessee antitrust statutes require concerted action between two parties. As such, allegations relating to Pfizer's unilateral conduct fails to state a claim under these statutes. The Court is not persuaded by Plaintiffs' argument that all alleged conduct falls within a single cause of action. Therefore, Defendants' motion as it relates to Kansas, New York, and Tennessee are granted in part and denied in part. To the extent Count I is based on Pfizer fraudulently obtaining the '995 Patent, listing that patent in the Orange Book, obtaining reissuance of the '995 Patent, filing a sham citizen petition, and engaging in sham litigation, these claims are dismissed, since the conduct is unilateral. However, the Court denies Defendants' motion to the extent that they seek dismissal of Count I based on the reverse settlement agreement with Ranbaxy.

## IV. State Law Consumer Protection Claims

Defendants next challenge the sufficiency of EPPs' state consumer protection claims. The Court discusses each state individually.[11]

*1. California*

Defendants first seek dismissal of EPPs' claims under the California Unfair Competition Law, since EPPs failed to plead reliance. The Unfair Competition Law proscribes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. As such, courts have understood Section 17200 to provide relief for three varieties of unfair competition:

---

[11] Because the Court has already dismissed EPPs' claims under Massachusetts, Montana, Tennessee, Utah and West Virginia's consumer protection statutes, it does not address the remaining arguments pertaining to these states.

"practices which are unlawful, unfair, or fraudulent." *Ditropan XL*, 529 F. Supp. 2d at 1105. However, contrary to Defendants' assertion, reliance is only required "when a[n] [Unfair Competition Law] claim is premised on allegations that the Defendants engaged in fraudulent business practices." *Id.* at 1106. Here, EPPs claims are predicated on unlawful and unfair business practices engaged by defendants.   Specifically, Plaintiffs challenge, among other things, Defendants' sham litigation, fraudulent procurement of the PTO, and reverse settlement agreement. As such, "at the very least, [EPPs] allege a claim premised on the unfair prong." *Id.*; *see also In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 160 (E.D. Pa. 2009).   Therefore, because EPPs' allege sufficient facts to sustain an Unfair Competition Law claim based on unfair business practices, Defendants' motion for judgment on the pleadings with respect to this claim is denied.[12]

*2. Illinois*

Defendants next seek dismissal of EPPs' claims under the Illinois Consumer Fraud and Deceptive Business Practices Act since: (1) the Act does not provide additional relief beyond antitrust claims; (2) EPPs failed to plead deception or reliance; and (3) EPPs fail to demonstrate that the alleged conduct was consumer-oriented or had a consumer nexus. The Illinois Consumer Fraud and Deceptive Business Practices Act states that "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. Ann. 505/2.   However, the state legislature did not intend for the Act to serve as an "additional antitrust enforcement mechanism." *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993

---

[12] Moreover, it should be noted that, at the pleading stage it is difficult to determine whether Plaintiff's claims under California law are even based on fraudulent conduct; as such, the Court also finds Defendants' motion to be premature.

(Ill. 1990) (consumer fraud statutes cannot be used when conduct is not actionable under the state antitrust law); *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1046-48 (N.D. Ill. 2007) (consumers can bring a consumer fraud claim when conduct is actionable under the Illinois Antitrust Act). As such, if the plaintiff fails to plead an antitrust claim under the Illinois Antitrust Act, those same allegations of anticompetitive conduct cannot give rise to a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*; *Siegel*, 480 F. Supp. 2d at 1034; *Wellbutrin XL*, 260 F.R.D. at 162.

As discussed above, the Illinois Antitrust Act prohibits indirect purchaser class actions. Moreover, when reviewing the Complaint, EPPs' claims are primarily focused on anticompetitive conduct and its "allegations of consumer fraud overlap entirely with the allegations of anticompetitive conduct." *Wellbutrin XL*, 260 F.R.D. at 162 (quoting *Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. Ct. 1996)). Simply put, "plaintiffs may not assert what are essentially antitrust claims in the guise of a claim under [the Illinois Consumer Protection Act]." *Id.* Since any amendment would be futile, judgment on the pleadings is granted without leave to amend.

*3. Maine*

Defendants next seek dismissal of EPPs' claims under the Maine Unfair Trade Practices Act, since EPPs failed to allege deception and, alternatively, EPPs are not considered "consumers" under the Act. The Act proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. tit. 5 § 207. "A business practice is 'unfair' if the injury it produces is (1) 'substantial,' (2) not 'outweighed by any countervailing benefits to consumers or competition that the practice produces,' and (3) not reasonably avoidable by consumers." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp.

2d 538, 584 (M.D. Pa. 2009) (quoting *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998)). "In pricing cases, the allegedly unfair practice must also induce the consumer to acquire something that he or she would not otherwise have purchased." *Id.* However, where as here, the purported conduct resulted in higher prices, the Maine Unfair Trade Practices Act provides no such relief, since higher prices do not induce a consumer to make purchases. *In re Graphics Processing Units (GPU) Antitrust Litig.*, 527 F. Supp. 2d 1011, 1031 (N.D. Cal. 2007). As such, since any amendment to EPPs' claims under the Maine Consumer Protection Act would be futile, judgment on the pleadings is granted without leave to amend. *See Chocolate Confectionary*, 602 F. Supp. 2d at 585.

It is worth briefly noting that the court is unpersuaded by Plaintiff's reliance on *In re Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160 (D. Me. 2004), which held that deception or reliance only applies to "unfair or deceptive acts," not "unfair methods of competition." *Id.* at 186-87. First, federal courts have criticized the rationale in *In re Motor Vehicles*, concluding that its "crabbed reading of *Tungate*" is incongruent with the Maine Supreme Court's holding since "[t]he Maine Supreme Court [did] not qualify its pronouncement as applicable to only 'unfair or deceptive acts.'" *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 787 (N.D. Ohio 2011) (quoting *Flash Memory*, 643 F. Supp. 2d at 1159); *see also Chocolate Confectionary*, 602 F. Supp. 2d at 584-85; *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1126-27 (N.D. Cal. 2008). Second, the allegations in that case concerned group boycotts,[13] not price fixing or reverse settlements, which the *In re Motor Vehicles* court reasoned would nevertheless support an unfair method of competition claim.

---

[13] In their brief in opposition to Defendants' motion, EPPs make explicitly clear that they "have not alleged a claim based on group boycott." (Pls' Brief in Opp. at 41).

4. *Nebraska*

Defendants next seek dismissal of Plaintiffs' claims under the Nebraska Consumer Protection Act, since the purportedly wrongful conduct does not have a consumer nexus. The Nebraska Consumer Protection Act proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" and allows injured individuals a private right of action. Neb. Rev. Stat. Ann §§ 59-1602; -1609. In order to state a valid claim under the Act, "the unfair or deceptive act or practice must have an impact upon the public interest." *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 142 (Neb. 2000). "The purpose of the Act is to provide consumers with protection against unlawful practices in the conduct of any trade or commerce which directly or indirectly affects the people of Nebraska" and "was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies." *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 37 (Neb. 2004). As such, "the Act allows any person who is injured by a violation of §§ 59-1602 to 59-1606 which directly or indirectly affects the people of Nebraska to bring a civil action to recover damages." *Id.* at 38.

Here, as discussed above, EPPs allege that Defendants engaged in anticompetitive schemes to prevent the market entry of generic-brand Lipitor, which caused EPPs to pay a premium. Since the schemes alleged in the Complaint had an indirect impact on Nebraska consumers, EPPs' have adequately alleged that the scheme impacted the public interest. As such, Defendants' motion for judgment on the pleadings with respect to EPPs' claims under the Nebraska Consumer Protection Act is denied.

5. *Nevada*

Defendants argue that EPPs claims under the Nevada Deceptive Trade Practices Act should be dismissed, since EPPs failed to allege consumer reliance. Under Section 41.600 of

Nevada's Revised Statutes, "any person who is a victim of . . . [a] deceptive trade practice as defined in [the Nevada Deceptive Trade Practices Act]" may a bring an action thereunder. Nev. Rev. Stat. § 41.600.  Some courts have held that when a plaintiff seeks relief based on prohibited acts listed under Section 598.0915, the plaintiff is required to demonstrate deception or reliance. *See, e.g.*, *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 657 (D. Nev. 2009); *Sheet Metal Workers*, 737 F. Supp. 2d at 417.  However, contrary to Defendants' contention, EPPs' claims do not arise under Section 598.0915; instead, EPPs' claims appear to be predicated on Section 598.0923(3), which states that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . violates state or federal statute or regulation relating to the sale or lease of goods or service." Nev. Rev. Stat. § 598.0923(3).

Under Section 598.0923(3), the Nevada Deceptive Trade Practices Act  does not appear to require the plaintiff must plead reliance, nor do Defendants identify any case-law that would otherwise support this contention. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 98 (D. Mass. 2008) (parties agreeing that the Nevada Deceptive Trade Practices Act does not require proof of reliance); *see also In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1080-81 (S.D. Cal. 2017) (rejecting the defendant's motion to dismiss the end purchaser plaintiff's Nevada Deceptive Trade Practices Act claims, arising from an alleged antitrust conspiracy regarding packaged seafood products).  As such, since EPPs' claims are predicated on allegations of anticompetitive conduct, which are considered prohibited acts under Nev. Rev. Stat. § 598A.060(a), the Court denies Defendants' motion for judgment on the pleadings.

*6. New Mexico*

Defendants next challenge EPPs' claims under the New Mexico Unfair Practices Act, since the Act does not provide relief for price fixing and, in any event, they fail to plead unconscionable

conduct.  The New Mexico Unfair Practices Act prohibits unfair, deceptive, and unconscionable trade practices. N.M. Rev. Stat. § 57-12-2.  Given the remedial nature of the Act, "courts construe its provisions broadly to facilitate this purpose." *Chocolate Confectionary*, 602 F. Supp. 2d at 585 (citing *State ex rel. Stratton v. Gurley Motor Co.*, 737 P.2d 1180, 1185 (N.M. 1987)).  The Act defines "unconscionable trade practice" as "an act or practice in connection with the sale . . . of any goods or services . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2(E).

"Federal courts generally permit [New Mexico Unfair Practices Act] actions in price-fixing cases provided that the plaintiff alleges a 'gross disparity' between the price paid for a product and the value received." *Chocolate Confectionary*, 602 F. Supp. 2d at 585 (collecting cases); *see also Flash Memory*, 643 F. Supp. 2d at 1159-60; *Liquid Aluminum Sulfate*, 2017 U.S. Dist. LEXIS 115294, at *108-09; *In re Aftermarket Filters Antitrust Litig.*, No. 08-4883, 2009 U.S. Dist. LEXIS 104114, at *37 (N.D. Ill. Nov. 5, 2009).  Unlike *GPU*, 527 F. Supp. 2d at 1029-30, where the court dismissed the plaintiffs' New Mexico Unfair Practices Act for failing to plead unequal bargaining power, the Court is satisfied that, at this juncture, that EPPs have sufficiently pled enough facts to state a claim under the New Mexico statute.  EPPs Complaint is replete with allegations of price fixing and anticompetitive schemes, and it is beyond cavil that these schemes resulted in consumers paying a substantial premium for goods that they would have otherwise paid a fraction for. *See TFT-LCD*, 586 F. Supp. 2d at 1127 (allegations of price fixing and "gross disparity" between the value of products received and amount paid sufficient to state a claim under the New

43

Mexico Unfair Practices Act).  As such, the Court denies Defendants' motion for judgment on the pleadings as to EPPs' New Mexico Unfair Practices Act claims.

*7. New York*

      Defendants next challenge EPPs' claims under the New York Consumer Protection from Deceptive Acts and Practices Act, since EPPs fail to allege particular conduct directed specifically at them and, in the alternative, fail to allege consumer reliance.  Section 349 of New York's Business Law states, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a).  "[S]ection 349 is directed at wrongs against the consuming public." *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 613 (S.D.N.Y. 2005) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995)).  In order to state a claim under Section 349, the plaintiff must prove three elements: (1) "the challenged act or practice was consumer-oriented;" (2) "it was misleading in a material way;" and (3) "the plaintiff suffered injury as a result of the deceptive act." *Flash Memory*, 643 F. Supp. 2d at 1160 (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000)).  "To satisfy the consumer-oriented prong, plaintiffs need only allege consumer-oriented conduct that implicates the public interest in New York." *In re Dynamic Random Access Memory Antitrust (DRAM II) Litig.*, 536 F. Supp. 2d 1129, 1144-45 (N.D. Cal. 2008)).

      Here, contrary to Defendants' assertion, the Court is satisfied that EPPs have alleged sufficient facts to sustain a claim under Section 349.  As discussed above, EPPs' claims focus on the anticompetitive conduct of Defendants, which prevented the earlier market entry of generic Lipitor and, as a result, caused individuals to pay a premium. *See MacQuarie Grp. Ltd. v. Pac. Corporate Grp., LLC*, No. 08-cv-2113, 2009 U.S. Dist. LEXIS 16554, at *23-25 (S.D. Cal. Mar.

2, 2009) (recognizing that "courts routinely treat[] antitrust violations as deceptive acts"); *see also New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002)).  In fact, similar allegations were made in both *TFT-LCD*, 586 F. Supp. 2d at 1128-29, and *DRAM II*, 536 F. Supp. 2d at 1143-44, where the district courts denied the defendants' motions to dismiss, finding  the plaintiffs alleged sufficient facts to state a claim.  As such, for these reasons, the Court denies Defendants' motion as to EPPs' Section 349 claims.

*8. North Carolina*

Defendants next contend that EPPs lack standing to assert claims under North Carolina's Unfair and Deceptive Trade Practices Act, since Plaintiffs are neither competitors nor in commercial dealings with Defendants.  Section 75-1.1 of the Act proscribes "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce" and provides "any person" or "business of any person, firm or corporation" the right to sue for injuries arising from unfair business practices. N.C. Gen. Stat. §§ 75-1.1; -16.  "Federal courts interpreting the [North Carolina's Unfair and Deceptive Trade Practices Act] have allowed claims asserted by businesses against one another as long as the challenged practices affect commerce or the marketplace." *Sheet Metal Workers*, 737 F. Supp. 2d at 419.  Here, as discussed, EPPs claim that Defendants engaged in anticompetitive schemes, which ultimately resulted in consumers purchasing Lipitor at inflated prices. This suffices, under the Act, to confer EPPs with standing; as such, Defendants' motion for judgment on the pleadings is denied. *See id.*  The Court only adds that Defendants' reliance on *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 519-20 (4th Cir. 1999) is of no moment.  In *Food Lion*, the Fourth Circuit held that the plaintiffs could not bring a claim against the defendant under the Act, despite engaging in deceptive conduct, since the conduct "did not harm the consuming public." *Id.* at 520.  Here, unlike *Food Lion*, EPPs'

45

allegations that Defendants' anticompetitive scheme resulted in consumers paying inflated costs for Lipitor demonstrates a harm to the "consuming public."

*9. Rhode Island*

Finally, Defendants challenge EPPs' claims under the Rhode Island Unfair Trade Practices and Consumer Protection Act, since: (1) the misconduct alleged in the Complaint is not prohibited under the Act and (2) EPPs are not "consumers" as defined under the Act.  The Rhode Island Unfair Trade Practices and Consumer Protection Act proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. Laws § 6-13.1-2.  The Act goes on to list twenty "acts or practices" that are considered unfair or deceptive competition. R.I. Gen. Laws § 6-13.1-1(6)(i)-(xx).  In determining whether a practice is "unfair" under the Act, courts must consider: "(1) whether the practice affronts public policy, as delineated by the common law, statutes, and 'other established concept[s] of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).'" *Chocolate Confectionary*, 602 F. Supp. 2d at 587 (quoting *Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001)).

The Court finds Defendants' first argument unconvincing.  The majority of courts that have been presented with this issue have held that the three prong *Ames* standard "encompass price-fixing injuries, and [therefore] consumers subject to collusive pricing possess a cognizable claim under the [Act]." *Chocolate Confectionary*, 602 F. Supp. 2d at 587; *TFT-LCD*, 586 F. Supp. 2d at 1129-30; *DRAM II*, 536 F. Supp. 2d at 1144-45.  As such, since EPPs allege anticompetitive conduct, which resulted in consumers purchasing Lipitor at a premium rate, EPPs have sufficiently alleged unfair conduct under the Rhode Island Unfair Trade Practices and Consumer Protection

46

Act. *See DRAM II,* 536 F. Supp. 2d at 1145 (allegations that the defendants engaged price fixing "offend[s] public policy as has been established by statute and/or common law").

Alternatively, Defendants seek dismissal of EPPs' Rhode Island Unfair Trade Practices and Consumer Protection Act claims since they are not "consumers" within the meaning of the Act. The Act limits claims to "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes." R.I. Gen. Laws § 6-13.1-5.2(a). Citing no supporting case law, EPPs contend that the Act defines "person" to include entities such as corporations, trusts, and associations. However, contrary to EPPs' assertion, "the Rhode Island Supreme Court has construed the [Rhode Island Unfair Trade Practices and Consumer Protection Act]to require that only natural persons are permitted to bring private rights of actions under the statute." *In re Dynamic Random Access Memory (DRAM I) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1117 (N.D. Cal. 2007) (citing *ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1354 (R.I. 1997)); *see also TFT-LCD*, 586 F. Supp. 2d at 1130 (same); *Sheet Metal Workers*, 737 F. Supp. 2d at 423 (same). As such, Defendants' motion for judgment on the pleadings is granted. "However, because there may be unusual circumstances under which a business entity may be able to allege that its purchases were primarily for personal, family or household purposes, the Court will not preclude plaintiffs from amending the complaint to allege such a claim on behalf of business entities." *TFT-LCD*, 586 F. Supp. 2d at 1130.

To sum up, the Court declines to grant judgment as to EPPs' consumer protection claims in California, Nebraska, Nevada, New Mexico, New York, and North Carolina. However, the Court grants Defendants' motion, without leave to amend as to EPPs' Illinois and Maine consumer protection claims; and *with* leave to amend with regards to EPPs' Rhode Island consumer protection claims.

47

## ORDER

IT IS on this <u>21</u> day of <u>August</u>, 2018,

**ORDERED** that Defendants' Motion for Judgment on the Pleadings (ECF No. 755) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

- Defendants' Motion for Judgment on the Pleadings based on preemption principles is **DENIED**;

- Defendants' Motion for Judgment on the Pleadings as to EPPs' state consumer protection claims in California, Nebraska, Nevada, New Mexico, New York, and North Carolina is **DENIED**.

- Defendants' Motion for Judgment on the Pleadings as it pertains to EPPs' Arizona, Hawaii, Nevada, and Utah antitrust claims is **GRANTED WITHOUT PREJUDICE**; EPPs are granted leave to amend their Complaint to plead compliance with these notice provisions;

- Defendants' Motion for Judgment on the Pleadings as it pertains to EPPs' Massachusetts, Montana, West Virginia, Rhode Island, Tennessee and Utah consumer protection claims is **GRANTED WITHOUT PREJUDICE**; EPPs are granted leave to amend their Complaint to plead compliance with Massachusetts and West Virginia's notice provisions, and plead individual claims in Montana, Rhode Island, Tennessee, and Utah;

- Defendants' Motion for Judgment on the Pleadings as it pertains to EPPs' Illinois and Rhode Island antitrust claims, and EPPs' Illinois and Maine consumer protection claims is **GRANTED WITH PREJUDICE**;

- Defendants' Motion for Judgment on the Pleadings as to Count I of EPPs' Complaint under Kansas, New York, and Tennessee is **GRANTED** to the extent these claims are predicated on unilateral activity by Pfizer.

- EPPs have thirty (30) days from the filing of this Memorandum and Order to file an Amended Complaint, consistent with this Memorandum.


PETER G. SHERIDAN, U.S.D.J.

48