Lisa J. Rodriguez
**DILWORTH PAXON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102-2101
Phone: (856) 675-1926
ljrodriguez@dilworthlaw.com

*Liaison Counsel for the Proposed End-Payor
Classes*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE LIPITOR ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All End-Payor Class Actions | MDL No. 2332<br><br>Case No. 3:12-cv-2389-PGS-JBD |

## MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF END-PAYOR CLASS PLAINTIFFS' <u>SETTLEMENT AND OTHER RELIEF</u>

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ........................................................................1

II.    STATEMENT OF FACTS ..........................................................3

III.   HISTORY OF END-PAYOR LITIGATION.................................4

IV.    SUMMARY OF SETTLEMENT..................................................6

    A.    The Settlement Fund ..........................................................6

    B.    The Releases.......................................................................7

V.     ARGUMENT................................................................................8

    A.    The Court Should Certify the Proposed Classes For Settlement
        Purposes..............................................................................9

    B.    The Elements of Rule 23(a) Are Satisfied.........................11

        1.    The Numerosity Requirement Is Met. .....................11

        2.    There are Questions of Law and Fact Common to all Class
            Members Under Rule 23(a)(2)................................12

        3.    End-Payor Plaintiffs' Claims are Typical of Those of the
            Classes....................................................................13

        4.    The End-Payor Classes are Adequately Represented..............14

        5.    The Settlement Classes are Ascertainable. ...............15

            (a)    The Classes are defined by reference to
                objective criteria. ........................................16

            (b)    There is a reliable and administratively feasible
                mechanism for determining Class membership. ...........17

    C.    Certification Is Appropriate Under Rule 23(b)(3). .............21

        1.    Common Questions of Law and Fact Predominate Across

i

EPPs' Antitrust Claims. ........................................................21

    (a)    Proving liability involves predominantly common issues.........................................................22

    (b)    Proving antitrust injury involves predominantly common issues.........................................................24

    (c)    Proving damages involves predominantly common issues.........................................................26

    2.    A Class Action is Superior to Other Available Methods of Adjudication.........................................................27

D.    Counsel Meet The Requirements Of Rule 23(g) And Should Be Appointed Co-Lead Counsel And Liaison Counsel. .....................28

VI.    THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT.........................................................29

    1.    The Settlement is Within the Range of Possible Approval.........................................................31

    2.    The Settlement is the Result of Arm's-Length Negotiations.........................................................34

    3.    The Settlement Followed More Than 11 Years of Litigation and Extensive Discovery.........................................................34

    4.    The Proponents of the Settlement are Experienced in Antitrust Litigation. .........................................................35

VII.    THE PROPOSED NOTICE PLAN SHOULD BE APPROVED .................35

A.    The Proposed Manner Of Notice Complies With Rule 23. ...............36

B.    The Form Of Notice Complies With Rule 23. .....................................38

C.    Epiq Is Qualified To Serve As End-Payor Settlement Administrator.........................................................38

D.    Huntington Bank Is Qualified To Be The Escrow Agent. .................39

E.    The Proposed Schedule For Final Approval Is Adequate And Fair. ..39

VIII.  CONCLUSION...............................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................9, 21, 27, 28

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)..................................................................21

*In re Aremissoft Corp. Sec. Litig.*,
210 F.R.D. 109 (D.N.J. 2002)..................................................................33

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946)..................................................................26

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir. 2015) ..................................................................*passim*

*Cannon v. Cherry Hill Toyota, Inc.*,
184 F.R.D. 540 (D.N.J. 1999)..................................................................13

*Carrera v. Bayer Corp.*,
727 F.3d 300 (3d Cir. 2013) ..................................................................17

*In re Cendant Corp. Sec. Litig.*,
109 F. Supp. 2d 235 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir.
2001) ..................................................................35

*City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*,
867 F.3d 434 (3d Cir. 2017) ..................................................................15, 16, 20

*In re Cmty. Bank of N. Va.*,
622 F.3d 275 (3d Cir. 2010) ..................................................................9

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
795 F.3d 380 (3d Cir. 2015) ..................................................................27

*In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*,
656 Fed. Appx. 8 (3d Cir. 2016)..................................................................15, 16

*Dodge v. Cambrex Corp.*,
  No. 03-cv-4896, 2007 WL 608365 (D.N.J. Feb. 23, 2007)................................13

*Easterday v. USPack Logistics LLC*,
  No. 15-cv-7559, 2023 WL 4398491 (D.N.J. July 6, 2023)..............29, 30, 34, 38

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010) ................................................................29

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)............................................................................36

*In re Flonase Antitrust Litig.*,
  284 F.R.D. 207 (E.D. Pa. 2012)..................................................*passim*

*In re Gen. Inst. Sec. Litig.*,
  209 F. Supp. 2d 423 (E.D. Pa. 2001)....................................................35

*Gregory v. McCabe, Weisberg & Conway, P.C.*,
  No. 13-cv-6962, 2014 WL 2615534 (D.N.J. June 12, 2014) ...........................29

*Hassine v. Jeffes*,
  846 F.2d 169 (3d Cir. 1988) ................................................................13

*In re Hydrogen Peroxide Antitrust Litigation*,
  552 F.3d 305 (3d Cir. 2008) ......................................................9, 22, 24, 25

*In re Ins. Brokerage Antitrust Litig.*,
  282 F.R.D. 92 (D.N.J. 2012)................................................................15

*Kelly v. RealPage Inc.*,
  47 F.4th 202 (3d Cir. 2022) ...........................................................17, 20

*Kress v. Fulton Bank, N.A.*,
  No. 19-cv-18985, 2022 WL 2357296 (D.N.J. June 30, 2022) ..........................30

*Lazy Oil Co. v. Witco Corp.*,
  166 F.3d 581 (3d Cir. 1999), *cert. denied*, 528 U.S. 874 (1999) ......................34

*In re Lidoderm Antitrust Litig.*,
  No. 14-md-2521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ..................25, 27

*Lincoln Adventures LLC v. Those Certain Underwriters at Lloyd's,*
*London Members*,
No. 08-235, 2019 WL 4877563 (D.N.J. Oct. 3, 2019) ......................................31

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) .................................................................22

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017) ............................................................22, 23

*In re Loestrin 24 FD Antitrust Litig.*,
No. 13-md-02472, ECF No. 1427 (D.R.I. Mar. 23, 2020) ................................38

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019) ..................................................26

*In re Loestrin 24 FE Antitrust Litig.*,
MDL No. 2472 (D.R.I.) ...........................................................20

*McCoy v. Health Net, Inc.*,
569 F. Supp. 2d 448 (D.N.J. 2008) ...................................................33

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)..................................................................36

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D 527 (S.D.N.Y. 2021). .................................................19, 24

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) .............................................................26

*In re Neurontin Antitrust Litig.*,
No. 02-1830, 2011 WL 286118 (D.N.J. Jan. 25, 2011) ....................................23

*New Directions Treatment Servs. v. City of Reading*,
490 F.3d 293 (3d Cir. 2007) ............................................................14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ...........................................................13

*In re Nexium Antitrust Litig.*,
297 F.R.D. 168 (D. Mass. 2013)..........................................23, 24, 27

*In re Niaspan Antitrust Litig.*,
   397 F. Supp. 3d 668 (E.D. Pa. 2019)....................................................26

*In Re: Novartis and Par Antitrust Litig.*,
   No. 18-cv-04361 (S.D.N.Y.), ECF No. 600-4....................................33

*In re Opana Antitrust Litig.*,
   MDL No. 2580 (N.D. Ill.)...................................................................20

*In re Opana ER Antitrust Litig.*,
   14-cv-10150, ECF No. 1091 (N.D. Ill. Dec. 15, 2022) ....................32

*In re Pet Food Prods. Liab. Litig.*,
   629 F.3d 333 (3d Cir. 2010) ...............................................................9

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)....12, 15, 35, 36, 38

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
   338 F.R.D. 294 (D. Mass. 2021)..................................................24, 26

*In re Relafen Antitrust Litig.*,
   218 F.R.D. 337 (D. Mass. 2003).........................................................26

*In re Remeron End-Payor Antitrust Litig.*,
   No. 02-cv-2007, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) .....................37, 40

*In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*,
   No. 18-MD-2819, 2022 WL 3043103 (E.D.N.Y. Aug. 2, 2022) .....................32

*Reyes v. Netdeposit, LLC*,
   802 F.3d 469 (3d Cir. 2015) ..............................................................12

*Smith v. Prof'l Billing & Mgmt. Servs., Inc.*,
   No. 06-cv-4553, 2007 WL 4191749 (D.N.J. Nov. 21, 2007).....................30, 34

*In re Solodyn Antitrust Litig.*,
   No. 14-md-2503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) ......23, 24, 25, 27

*In re Suboxone Antitrust Litig.*,
   421 F. Supp. 3d 12 (E.D. Pa. 2019)........................................13, 15, 21

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
MDL No. 2445, 2023 WL 8437034 (E.D. Pa. Dec. 4, 2023).......................32, 37

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ................................................................8

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004)........................................................23

*Teva Pharms. USA, Inc. v. Abbott Lab'ys*,
252 F.R.D. 213 (D. Del. 2008) ..........................................................27

*In re Thalomid & Revlimid*,
No. 14-cv-6997, 2018 WL 6573118 (D.N.J. Oct. 30, 2018).............................27

*In re Valsartan*,
2023 WL 181892 .............................................................................20

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
No. 19-cv-2875, 2023 WL 1818922 (D.N.J. Feb. 8, 2023)................................16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................................................................8, 12

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2003) ..........................................................12, 22

*In re Wellbutrin XL Antitrust Litig.*,
282 F.R.D. 126 (E.D. Penn. 2011).......................................................12

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969).........................................................................24

*In re Zetia (Ezetimibe) Antitrust Litig.*,
18-md-2836, ECF 2151 (E.D. Va. June 6, 2023) .............................................37

*In re Zetia (Ezetimibe) Antitrust Litig.*,
No. 18-md-2836, 2020 WL 5778756 (E.D. Va. Aug. 14, 2020).................24, 26

**Statutes**

California Civil Code Section 1542.........................................................8

Health Insurance Portability and Accountability Act ................................................18

Sherman Act, 15 U.S.C. §§ 1 & 2, *et seq.* ...............................................................8

**Other Authorities**

Fed. R. Civ. P. 23 ......................................................................................... *passim*

## I.      INTRODUCTION

The End-Payor Plaintiffs[1] ("EPPs" and, together with Defendant Pfizer,[2] the "Parties"), on behalf of themselves and the end-payor classes (the "Classes" or the "EPP Classes") they seek to represent, respectfully submit this Memorandum of Law in Support of their Unopposed Motion for Preliminary Approval of End-Payor Plaintiffs' Settlement and Other Relief. EPPs seek, *inter alia*, certification of the EPP Classes for settlement purposes, preliminary settlement approval, approval of the proposed form of notice and plan of allocation, appointment of Class Counsel, and a final settlement schedule.

EPPs are litigating individually and on behalf of a class of third-party payors ("TPPs") and a class of consumers who purchased, paid, and/or reimbursed for branded Lipitor or generic Lipitor (atorvastatin calcium) in 24 states and the District of Columbia. EPPs allege that Pfizer and first-filing generic manufacturer Ranbaxy[3]

---

[1] A.F. of L.-A.G.C. Building Trades Welfare Plan; the Mayor and City Council of Baltimore; New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund; Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana; Bakers Local 433 Health Fund; Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund; Nancy Billington; Emilie Heinle; and Andrew Livezey.

[2] Pfizer, as used herein, refers collectively to Defendants Pfizer Inc., Pfizer Ireland Pharmaceuticals, Warner-Lambert Company, and Warner-Lambert Company LLC.

[3] "Ranbaxy," as used herein, refers to Ranbaxy Inc., Ranbaxy Laboratories Limited, and Ranbaxy Pharmaceuticals, Inc.

(together, "Defendants") engaged in anti-competitive conduct to prevent or delay market entry of generic Lipitor. As a result, EPPs and the Classes paid higher prices for Lipitor and its generic equivalents than they would have in a competitive market.

Now, after more than *11 years* of hard-fought litigation, EPPs and Pfizer have reached a Settlement which, if approved, would resolve the litigation between them.[4] The proposed Settlement provides for Pfizer to pay $35 million into an escrow account and would conclude all EPP claims in this litigation against Pfizer.[5]

EPPs seek the entry of a Preliminary Approval Order, substantially in the form of the proposed Order attached as Exhibit B to the Wexler Declaration, which:

1.    Certifies the two Classes for settlement purposes;

2.    Appoints the designated named End-Payor Plaintiffs as Class Representatives for their respective Classes;[6]

3.    Appoints Cohen Milstein Sellers & Toll PLLC, Wexler Boley & Elgersma LLP, Motley Rice LLC, and Grant & Eisenhofer P.A. as Co-Lead Counsel for the Settlement Classes ("Class Counsel" or "Co-Lead

---

[4] The fully executed settlement agreement (hereinafter "Settlement" or "Settlement Agreement") is attached as Exhibit A to the Declaration of Kenneth A. Wexler in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of End-Payor Plaintiffs' Class Settlement and Other Relief (the "Wexler Declaration").

[5] Nothing in the Settlement Agreement relates to the EPPs' claims against Ranbaxy.

[6] EPPs seek to appoint the following entities as Class Representatives for the TPP Class: A.F. of L.-A.G.C. Building Trades Welfare Plan; the Mayor and City Council of Baltimore; New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund; Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana; Bakers Local 433 Health Fund; and Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund. EPPs seek to appoint the following individuals as Class Representatives for the Consumer Class: Nancy Billington; Emilie Heinle; and Andrew Livezey.

2

Counsel"), and Dilworth Paxson LLP as Liaison Counsel;

4.  Preliminarily approves the proposed Settlement, including the proposed Plan of Allocation;

5.  Approves the proposed Notice Plan, method of dissemination, and proposed notices, and directs that notice be provided to the Classes in accordance with the proposed Notice Plan;

6.  Appoints Epiq Systems Inc. ("Epiq" or "Claims Administrator") as the notice provider to implement the Notice Plan and as the settlement administrator to supervise claims processing and distribution;

7.  Appoints The Huntington Bank as Escrow Agent;

8.  Sets a schedule for completing the notice and approval process and all related dates, including setting a date for a Final Fairness Hearing; and

9.  Stays—as to Pfizer—the End-Payor Class Action, except proceedings for purposes of effectuating the Settlement.

## II.   STATEMENT OF FACTS

This Court is well-versed in the underlying facts and allegations in the case. *See* ECF No. 455. In short, EPPs allege Pfizer engaged in an anticompetitive scheme to maintain and extend its monopoly power in the Lipitor market. The alleged scheme included (i) fraudulently obtaining a patent and wrongfully listing it in the Food and Drug Administration ("FDA") Orange Book; (ii) engaging in serial sham patent litigation; (iii) filing a sham citizen petition; (iv) entering into an unlawful reverse payment "pay-for-delay" market-allocation agreement with Ranbaxy; and (v) thwarting efforts to obtain judicial declarations that Lipitor patents were invalid, unenforceable, and/or would not be infringed by generic Lipitor formulations. *See generally* ECF No. 815 (Third Amended Complaint).

The proposed EPP Classes consist of (i) individual consumers and (ii) TPPs (*e.g.*, insurers and self-insured health plan sponsors); they are the last purchasers in the prescription drug distribution chain. EPPs allege that members of the EPP Classes paid more for their atorvastatin calcium requirements than they would have in the absence of Defendants' unlawful conduct.

## III. HISTORY OF END-PAYOR LITIGATION

After multiple similar cases were centralized in this District, EPPs filed a Consolidated Class Action Complaint. ECF No. 150. On November 16, 2012, Defendants filed motions to dismiss. *See* ECF Nos. 243, 245. Defendants also moved to dismiss the Direct Purchaser Plaintiffs' ("DPPs'") Complaint. *See* ECF Nos. 244, 246.  On September 5, 2013, the Court granted in part and denied in part Pfizer's motion to dismiss the DPPs' complaint, leaving intact their claims to the extent they were based on the purportedly anticompetitive settlement between Pfizer and Ranbaxy. ECF No. 455. In a docket annotation accompanying the Order, the Court indicated that "the law set forth in the Memorandum most likely applies to the indirect purchaser group complaint" and "request[ed] that the parties confer and determine which allegations of the indirect purchaser groups complaint are dismissed and which apply to the reverse payment allegations."

While reserving their objections to the Court's adverse rulings, ECF No. 457, EPPs subsequently amended and narrowed their complaint to claims rooted in the alleged reverse payment between Pfizer and Ranbaxy, ECF No. 473. Defendants

renewed their motions to dismiss. ECF Nos. 491, 494. On October 31, 2014, the Court granted Defendants' Motions to Dismiss, dismissing the EPPs' Amended Complaint with Prejudice. ECF No. 601. On appeal, the Third Circuit reversed and remanded the case for further proceedings. ECF No. 669.

EPPs then filed a Second Amended Complaint ("SAC"), reviving their patent and reverse-payment claims. ECF No. 700. Defendants moved to dismiss the SAC; the Court granted and denied in part Defendants' motion but permitted EPPs to file a Third Amended Complaint ("TAC"). *See* ECF Nos. 755, 813. EPPs filed the operative TAC on September 20, 2018. ECF No. 815.

At various points during the litigation, the Court referred the case to mediation. *See, e.g.*, ECF Nos. 617, 948. Mediation proving unsuccessful, the parties proceeded with class certification and causation discovery. These discovery efforts were substantial. The parties engaged in document discovery involving over 16 million pages of documents. Plaintiffs took the deposition of Defendants' two experts and defended the depositions of three of their own experts, eleven EPPs, and various class certification-related witnesses.

Defendants ultimately moved for summary judgment on causation, which all plaintiffs opposed. ECF Nos. 1183, 1217. EPPs moved for class certification, seeking to represent two classes—a TPP Class and a Consumer Class—under the antitrust and consumer protection laws of 24 states and the District of Columbia in

connection with Pfizer and Ranbaxy's anticompetitive conduct.[7] ECF No. 1251.

These motions were pending as settlement discussions between EPPs, Pfizer, and Ranbaxy ensued. The parties engaged in extensive arm's-length negotiations, both in-person and via telephone. With the assistance of a mediator, the Honorable Faith Hochberg (Ret.), and then-current, now-retired, Magistrate Judge Douglas E. Arpert, the EPPs and Pfizer ultimately reached an agreement to resolve this Action as to Pfizer. The EPPs' litigation against Ranbaxy remains ongoing.

## IV. SUMMARY OF SETTLEMENT

### A. THE SETTLEMENT FUND

Pfizer has agreed to pay $35 million (the "Settlement Fund Amount") to settle all End-Payor Class claims against it in this Action. Wexler Decl., Ex. A (Settlement Agreement), ¶¶ 7, 9. Pfizer shall deposit the Settlement Fund Amount into the Escrow Account held and administered by The Huntington Bank within twenty (20) business days after this Court grants preliminary approval to the Settlement.[8] *Id.* ¶ 7.

Subject to Court approval, the Settlement Fund Amount will be used to

---

[7] EPPs moved alternatively for certification of a single issues class on anti-competitive effects pursuant to Rule 23(c)(4). ECF No. 1251.

[8] Should Co-Lead Counsel fail to notify Pfizer of the establishment and identity of the Escrow Account within fourteen (14) calendar days before said payment is due, Pfizer shall deposit the Settlement Fund Amount into the Escrow Account within fourteen (14) calendar days of receiving such notification. *Id.* ¶ 7.

reimburse Co-Lead Counsel for the costs, fees, and expenses related to the administration of the Settlement, reimburse the costs and expenses incurred by Co-Lead Counsel in litigating the End-Payor Class Action, pay Co-Lead Counsel's attorneys' fees of up to 34% of the Settlement Fund, and pay service awards of up to $15,000 to each named End-Payor Plaintiff representative ("Fund Expenses"). *Id.* ¶¶ 10, 11.[9] After subtracting Fund Expenses, the remaining balance of the Settlement Fund Amount ("Net Settlement Fund") shall be distributed to the EPP Classes pursuant to EPPs' proposed Plan of Allocation, which is also subject to Court approval. *See* Wexler Decl., Ex. O (Plan of Allocation).

### B.   THE RELEASES

Upon the Settlement Agreement becoming final, and in consideration for the Settlement Fund Amount, EPPs, on behalf of themselves and the EPP Classes, have agreed to release Pfizer and related entities as to claims alleged, or which reasonably could have been alleged, in the EPP Action (a) concerning the alleged anticompetitive scheme to prevent or delay approval and market entry of AB-rated generic equivalents of Lipitor; or (b) concerning end-payor purchases of Lipitor and/or its AB-rated generic equivalents in the Class States and arising under the

---

[9] The Parties have also entered a Confidential Supplement relating to the percentage of opt-outs necessary to trigger Pfizer's right to terminate the Settlement. *Id.* ¶ 17. This Confidential Supplement will be provided to the Court, *in camera*, upon request. *Id.* The Settlement Agreement and the Confidential Supplement are the only two agreements governing the Parties' settlement.

Sherman Act, 15 U.S.C. §§ 1 & 2, *et seq.*, or any other federal or state statute or common-law doctrine relating to antitrust or consumer protection (the "Released Claims"). Wexler Decl., Ex. A (Settlement Agreement), ¶ 12. EPPs, on behalf of themselves and the EPP Classes, also agreed to waive and release their rights under Section 1542 of the California Civil Code, respecting unknown claims, and similar state or federal laws. *Id.* ¶ 12(b). The Released Claims specifically do not affect the claims and rights the EPPs and EPP Classes have against Ranbaxy. *Id.* ¶ 12(c). Nor does the Settlement release claims arising in the ordinary course of business that are unrelated to the allegations in the EPP case. *Id.* ¶ 12(d).

## V.    ARGUMENT

A court must approve a class-action settlement. Fed. R. Civ. P. 23(e). The Federal Rules of Civil Procedure permit certification of a settlement class if the action satisfies all four threshold requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and falls within one of the three types of class action enumerated in Rule 23(b). *See* Fed. R. Civ. P. 23(a), (b); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011).

Here, EPPs seek certification under Rule 23(b)(3), which requires that common issues predominate over individual ones and that a class action be superior to other available methods of adjudication. *See* Fed. R. Civ. P. 23(b); *Sullivan*, 667 F.3d at 296.  Class certification is appropriate only if the court is satisfied, after a rigorous analysis, that Rule 23's prerequisites have been satisfied. *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). Plaintiffs bear the burden of demonstrating by a preponderance of the evidence their compliance with Rule 23. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).

"The [United States] Supreme Court has made clear that '[s]ettlement is relevant to a class certification.'" *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997)). Accordingly, a district court may consider the proposed settlement when evaluating whether class certification is appropriate. *Pet Food*, 529 F.3d at 341. The district court thus need not inquire, in the context of a request to certify a settlement class, "whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

While the Third Circuit stressed in *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 316 (3d Cir. 2008), that limited consideration of the merits may be relevant in considering a motion for class certification, it also made clear that the reason for this is not to predict which party will win. *Id.* at 317 n.17. Merits are relevant only if they pertain to the requirements of Rule 23. *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 294 (3d Cir. 2010), as amended (Oct. 20, 2010). The touchstone of the class-certification inquiry thus remains whether the Rule 23 requirements have been satisfied. *Id.* at 294-95.

### A. THE COURT SHOULD CERTIFY THE PROPOSED CLASSES FOR SETTLEMENT PURPOSES.

EPPs seek certification of two classes of End Payors (the "Classes") under the antitrust and consumer protection laws of the Class States[10]:

**The "Third-Party Payor ('TPP') Class":**

All entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, purchased, paid, and/or provided reimbursement for some or all of the purchase price of branded Lipitor or generic atorvastatin calcium, in the Class States, other than for resale, at any time during the period from June 28, 2011 through and until December 31, 2012.

Excluded from the TPP Class are a) Pfizer, Ranbaxy, and their subsidiaries and affiliates; b) Federal and state governmental entities; c) Medicare Part D Plans; and d) Medicaid Plans.

**The "Consumer Class":**

For the Total Generic Exclusion Period of June 28, 2011 through November 29, 2011: All individuals who purchased, paid, and/or provided reimbursement for some or all of the purchase price of branded Lipitor, in the Class States, without the use of a Pfizer co-pay card.

For the Generic Overcharge Period of November 30, 2011 through December 31, 2012: All individuals who purchased, paid, and/or provided reimbursement for some or all of the purchase price of generic atorvastatin calcium, in the Class States.

Excluded from the Consumer Class are a) judges assigned to this case and their

_____

[10] Arizona, California, Washington, D.C., Florida, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, West Virginia, and Wisconsin.

chambers' staff and any members of the judges' or chambers' staff's immediate family; b) Pfizer's and Ranbaxy's officers, directors, and employees; c) individuals who only purchased through a Medicare Part D or Medicaid Plan; d) individuals who only purchased branded Lipitor after November 30, 2011 and did not purchase generic atorvastatin calcium; and e) any "flat copay" consumers who purchased Lipitor only via a fixed dollar copayment that did not vary on the basis of the drug's status as brand or generic.

As set forth below, preliminary certification of the Classes for settlement purposes is appropriate under Rule 23(a) and 23(b)(3).

**B.    THE ELEMENTS OF RULE 23(A) ARE SATISFIED.**

**1.    The Numerosity Requirement Is Met.**

The first element of Rule 23(a) requires that the class be of sufficient size that the joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1).  Generally, if the "'potential number of plaintiffs exceeds 40, the [numerosity] prong of Rule 23(a) has been met.'" *Id.* (citation omitted).

The numerosity requirement is easily satisfied. For example, from November 30, 2011 through December 31, 2012, pharmacy benefit manager Prime Therapeutics ("Prime") processed 1,077,550 Lipitor transactions within the Class States; these purchases were associated with 229,207 unique Member IDs. *See* ECF No. 1297-2, Expert Report of Laura R, Craft, MPH ("Craft Report"), ¶¶ 4, 54. Data produced by just one of the named EPPs further supports a finding of numerosity,

11

including purchases associated with 559 unique member IDs for the Total Generic Exclusion Period and 2,363 unique member IDs for the Generic Overcharge Period. *Id.* ¶¶ 61-64. This more than satisfies the numerosity requirement. *See, e.g.*, *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 137 (E.D. Penn. 2011).

### 2. There are Questions of Law and Fact Common to all Class Members Under Rule 23(a)(2).

The second prerequisite to class certification requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(a). A common question "is capable of class-wide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality "does not require that all class members share identical claims, and indeed 'factual differences among the claims of the putative class members do not defeat certification.'" *Prudential*, 148 F.3d at 310. "[E]ven a single common question will do." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (internal quotation omitted). Where plaintiffs allege anticompetitive activity, the claims ordinarily involve common questions of law and fact because the claims proceed from a single course of conduct. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2003).

Rule 23(a)(2) is satisfied here. Common questions include, *inter alia*, whether Pfizer willfully obtained and maintained monopoly power in the market for Lipitor

and its generic equivalents; whether Defendants engaged in anticompetitive conduct; and whether their conduct delayed generic entry and led to overcharges for brand and generic Lipitor. *See* ECF No. 815 (TAC), ¶ 493. EPPs will answer each of these questions with evidence that is common to the Classes.

### 3.    EPPs' Claims are Typical of Those of the Classes.

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Generally, a named plaintiff's claim is typical of the class members' claims when all the claims arise from the defendants' same overarching scheme. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001); *see also Dodge v. Cambrex Corp.*, No. 03-cv-4896, 2007 WL 608365, at *5 (D.N.J. Feb. 23, 2007); *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 544 (D.N.J. 1999). The requirement does not mandate that all the putative class members share identical claims. *Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988). Nor do factual differences preclude a finding of typicality. *Dodge*, 2007 WL 608365, at *5.

The claims of both the EPPs and Classes arise from an identical course of unlawful conduct—namely, Defendants' market-allocating agreement—and arise from the same legal theory under state antitrust and consumer protection laws. By foreclosing competition in the atorvastatin calcium market, Defendants forced all end payors to pay higher prices for their atorvastatin calcium requirements. Rule 23's typicality requirement is thus satisfied. *See In re Suboxone Antitrust Litig.*, 421

13

F. Supp. 3d 12, 49 (E.D. Pa. 2019); *In re Flonase*, 284 F.R.D. at 218.

### 4. The EPP Classes are Adequately Represented.

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Whether adequate representation has been established "'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007). Both objectives are met here.

First, EPPs are represented by experienced counsel thoroughly familiar with litigating complex class actions, including similar end-payor pharmaceutical antitrust class actions involving delayed generic competition. *See* Wexler Decl., Ex. E (Firm Resumes). Further, since this litigation began over a decade ago, these firms have consistently demonstrated the willingness and ability to fairly and adequately represent the EPP Classes. They capably handled myriad motions to dismiss, succeeded on appeal of their dismissal, engaged in extensive discovery, and have otherwise fought vigorously for the interests of the Classes as a whole.

Second, the named EPPs have vigorously prosecuted their claims and have the same litigation incentives as absent Class Members. The Named EPPs fiercely pursued antitrust liability and overcharge damages on behalf of the Classes; their interests are aligned and therefore the requirements of Rule 23(a)(4) are met. *See,*

14

*e.g.*, *In re Suboxone*, 421 F. Supp. 3d at 67-68; *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 107-08 (D.N.J. 2012).

### 5.    The Settlement Classes are Ascertainable.

The Third Circuit has a heightened ascertainability requirement for litigation classes. *Byrd*, 784 F.3d at 163-65. Accordingly, in addition to demonstrating that a class is defined with reference to objective criteria, the proponent of certification of a litigation class must submit evidence of an administratively feasible methodology for identifying class members before class certification. *Id.* at 164-65. This two-prong inquiry does not require EPPs to "identify all class members at class certification," *id.*, or "demonstrate that a single record, or set of records, conclusively establishes class membership," *City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 441 (3d Cir. 2017). Instead, EPPs "need only show that 'class members *can* be identified.'" *Byrd*, 784 F.3d at 163 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013)).

The Third Circuit has recognized that this prerequisite must be met regardless of whether a litigation or settlement class is sought. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F. 3d 283, 308 (1998). In *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 656 Fed. Appx. 8, 8-9 (3d Cir. 2016), however, the Third Circuit reversed the denial of certification of a settlement class for lack of ascertainability. The court noted that the existence of an administratively feasible method for ascertaining a class "is not implicated by this

15

case, because the settlement agreement removes the need for a trial." *Id.*; *cf. In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 19-cv-2875, 2023 WL 1818922, at *20 (D.N.J. Feb. 8, 2023) ("[P]laintiffs need do no more at the class certification stage than identify with precision the records they need [and] show how to get and mine them to verify putative class and subclass members."). Regardless, the Classes meet both prongs of the Circuit's ascertainability standard.

> **(a)  The Classes are defined by reference to objective criteria.**

The Classes are defined precisely and rely on objective criteria—not subjective assessments—to determine class membership. *See City Select*, 867 F.3d at 439 n.3; *Byrd*, 784 F.3d at 163.

**The TPP Class is Objectively Defined:** As set forth above, the TPP Class generally includes all entities that (i) have purchased, paid, and/or provided reimbursement for some or all of the purchase price of branded Lipitor or generic atorvastatin calcium, other than for resale; (ii) for consumption by their members, employees, insureds, participants, or beneficiaries; (iii) in one of the Class States; (iv) between June 28, 2011, and December 31, 2012; and (v) do not fall within any of the four exclusion categories. *See supra* Section V.A.

**The Consumer Class is Objectively Defined:** The Consumer Class is also objectively defined and applies to purchases made in two different time frames:

Total Generic Exclusion Period (*i.e.*, when no generic was yet available) includes all individuals that: (i) have purchased, paid and/or

reimbursed some or all of the purchase price of branded Lipitor, without the use of a Pfizer co-pay card (ii) in one of the Class States; and iii) do not fall within any of the five exclusion categories.

Generic Overcharge Period (*i.e.*, after generic entry): includes all individuals that: (i) have purchased, paid and/or reimbursed some or all of the purchase price of generic atorvastatin calcium (ii) in one of the Class States; and (iii) do not fall within any of the five exclusion categories.

*See id.* None of these components requires the Court to rely on impermissible subjective criteria; the Class definitions thus satisfy the first ascertainability prong.

> **(b)** **There is a reliable and administratively feasible mechanism for determining Class membership.**

Unlike in *Carrera*, where class members did not have receipts to support affidavits attesting to class membership, *see* 727 F.3d at 309, each member of the Classes has access to receipts or other records showing their purchase of branded Lipitor or generic atorvastatin calcium. And there is a reliable and administratively feasible method for determining class membership for both Classes. Although a class is not ascertainable if "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,'" *Marcus*, 687 F.3d at 593, "ascertainability does not mean that 'no level of inquiry as to the identity of class members can ever be undertaken,'" *Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022) (quoting *Byrd*, 784 F.3d at 171). Moreover, a single purchase meeting the objective criteria of the applicable Class definition suffices to demonstrate Class membership.

Here, one of EPPs' experts, Laura Craft—a pharmaceutical data expert and President of OnPoint Analytics—demonstrates for each Class that: (i) robust data exists; and (ii) together with a routine claims-administration process, such data will confirm Class membership and allow for the application of exclusions. And, although not necessary, additional documents or information (including affidavits) can corroborate Class membership if requested.

**Data exists to confirm Class membership and apply exclusions:** As Ms. Craft explains in her Report, the creation and retention of detailed pharmaceutical transaction data in a standardized format is mandated by federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"). *See* Craft Report ¶¶ 16, 21-24. Contemporaneously generated transaction-level data is transmitted in real time from the point of sale and is retained by multiple entities, including the pharmacies that dispense prescription drugs and the PBMs that provide claims-adjudication services. *See id.* ¶¶ 28-30; *see also* Wexler Decl., Ex. G (Declaration of Eric J. Miller ("Miller Decl.")), ¶ 18 ("The databases maintained by PBMs record detailed information regarding *every* transaction by an individual and its corresponding TPP in order to administer and adjudicate claims." (emphasis added)). The PBMs themselves have confirmed they maintain this detailed data. *See, e.g.*,

Wexler Decl., Ex. H-J (PBM Declarations).[11]

The data provide the objective criteria necessary to confirm class membership and exclusions, including the who, what, when, where, and how much (cost-wise and prescription-wise) of each transaction, and permit the precise tracing of "each prescription drug through the distribution chain all the way to the end purchaser." Craft Report ¶¶ 21, 23, 34. And because there are both legal requirements and business incentives to retain this data long term, the data is available and readily accessible to EPPs. *See id.* ¶¶ 25-27; 45 C.F.R. § 164.512(e). Indeed, the named consumer and TPP plaintiffs and three of the six largest PBMs in the United States have already produced detailed transaction-level data in this matter, Craft Report ¶¶ 34, 60, demonstrating that data from other PBMs and pharmacies can easily be obtained by class members, whether individually or through their representatives, such as ASOs or TPAs, *see* Miller Decl. ¶¶ 8 & n.1, 12; *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 548-49 (S.D.N.Y. 2021) (recognizing PBMs as "a centralized source to obtain the information necessary to ascertain the class").

**The data, along with a claims process that includes claim forms containing affidavits, will confirm Class membership and exclusions:** Given the

---

[11] TPPs and consumers also generate data tracking their purchase of prescription drugs and the portion of the purchase price each pays for any given transaction. *See* Craft Report ¶¶ 60-80.

abundance of purchase data available from PBMs, TPPs, and consumers, a "routine claims administration process" can be used "to confirm which individuals and entities qualify as class members and which do not." Craft Report ¶ 15. Claim forms, including the ones proposed here, generally request verification and elaboration regarding the information contained in the data. *See* Wexler Decl., Ex. K (proposed Claim Forms).[12] They also typically require supporting documentation of purchases or payments and a certification (*i.e.*, affidavit), signed under penalty of perjury, that the claimant satisfies class membership requirements and that none of the exclusions applies. *See id.* This process is corroborated by Eric Miller, Senior Vice President of Case Administration at A.B. Data, who has implemented this same process to confirm class membership and apply exclusions in numerous similar pharmaceutical antitrust cases. Miller Decl. ¶¶ 2-3, 10-22.

The Third Circuit has repeatedly held that such a methodology, which combines available data with affidavits, satisfies the ascertainability standard. *See, e.g.*, *Kelly*, 47 F.4th at 223-25; *Hargrove*, 974 F.3d at 480; *City Select*, 867 F.3d at 441; *In re Valsartan*, 2023 WL 181892, at *19-20; *cf. Byrd*, 784 F.3d at 170 ("There will always be some level of inquiry required to verify that a person is a member of

---

[12] Sample claim forms from similar pay-for-delay cases involving the same counsel that represent Defendants here are submitted herewith. *See, e.g.*, Wexler Decl., Ex. L (Claims Forms from *In re Opana Antitrust Litig.*, MDL No. 2580 (N.D. Ill.), and *In re Loestrin 24 FE Antitrust Litig.*, MDL No. 2472 (D.R.I.)).

a class . . . .").

### C.   CERTIFICATION IS APPROPRIATE UNDER RULE 23(B)(3).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Settlement Classes satisfy both requirements.

### 1.   Common Questions of Law and Fact Predominate Across EPPs' Antitrust Claims.

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. As the Supreme Court has explained: "Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof,'" but rather that "common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 469 (2013). Accordingly, EPPs must make a "showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.* at 459.

This test is "readily met" in cases such as this that allege "violations of the antitrust laws." *Amchem*, 521 U.S. at 625; *cf. In re Suboxone*, 421 F. Supp. 3d at 55 ("[v]iewing th[e] evidence as a whole creates a question, common to all class

21

members, of whether [defendant drug manufacturer] engaged in an anticompetitive . . . scheme."). As discussed herein, the three essential elements of End-Payor Plaintiffs' antitrust claims—liability, antitrust injury, and damages—are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide*, 552 F.3d at 311-12.

**(a)   Proving liability involves predominantly common issues.**

EPPs use common evidence to prove the common legal elements of their claims.[13] Thus, "common issues . . . predominate here because 'the [liability] inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did.'" *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002); *see also In re Warfarin*, 391 F.3d at 528-29.

First, to successfully establish that Defendants violated state antitrust laws, EPPs will demonstrate that Defendants' settlement agreement was, in fact, a large, unjustified reverse payment from Pfizer to Ranbaxy. *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 253 (3d Cir. 2017). Using common evidence, including analysis of Defendants' settlement agreement itself, economic evidence developed through fact discovery, and expert analysis, EPPs will prove the existence of an agreement between Pfizer and Ranbaxy. Second, EPPs will prove under a rule-of-reason

---

[13] EPPs set forth herein how they intend to prove their case against Defendant Ranbaxy. EPPs would have proven their case against Pfizer in the same way.

analysis that the reverse payment had anticompetitive effects in the atorvastatin calcium market that outweighed any pro-competitive justifications proffered by Defendants. *See id.* at 249-51. EPPs will also use common economic evidence showing Defendants' conduct delayed the entry of generic atorvastatin calcium, which denied EPPs the cost-savings afforded by generic entry. *See* ECF No. 1252-1, Expert Report of Hal J. Singer, Ph.D., ¶¶ 38-55 ("Singer Report"). EPPs' claims therefore will be proven through common evidence of Defendants' conduct. *See In re Flonase*, 284 F.R.D. at 219-20; *In re Neurontin Antitrust Litig.*, No. 02-1830, 2011 WL 286118, at *6 (D.N.J. Jan. 25, 2011).

No variations among the state laws under which EPPs bring their claims cause individual questions to predominate over the numerous common questions. The applicable state statutes in this case are "virtually identical in their required elements." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 700 n.45 (S.D. Fla. 2004); *see also In re Solodyn Antitrust Litig.*, No. 14-md-2503, 2017 WL 4621777, at *19-20 (D. Mass. Oct. 16, 2017); *In re Nexium Antitrust Litig.*, 297 F.R.D. 168, 176 (D. Mass. 2013). Indeed, reviewing the state statutes asserted in this case clarifies that common questions of law and fact will predominate at trial. *See* Wexler Decl., Ex. F (State Law Chart).[14] Because the substantive elements of these

---

[14] Each statute provides a cause of action for indirect purchasers, and each recognizes an unreasonable restraint of trade as a statutory violation. The relevant antitrust

claims substantially overlap, any minor variations among them do not preclude class certification here.[15]

> **(b)   Proving antitrust injury involves predominantly common issues.**

EPPs will rely on common evidence to demonstrate they suffered antitrust injury, also called antitrust impact. Proof of impact requires showing that the Classes were "injured to some extent" by Defendants' unlawful conduct. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 & n.9 (1969). For class certification, EPPs' burden "is not to prove the element of antitrust impact," but to demonstrate that it "is capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide*, 552 F.3d at 311-12.

EPPs will rely on common factual proof to make this showing. *See Castro*, 134 F. Supp. 3d at 847-48 (endorsing "two-step method" for proving antitrust injury

---

statutes mirror the federal antitrust laws, contain federal harmonization provisions, and/or have been interpreted in harmony with federal antitrust law. The consumer protection statutes relied upon have been interpreted to permit recovery for anticompetitive, unfair, or unconscionable conduct, including anticompetitive conduct like that upon which EPPs' antitrust claims are premised.

[15] Numerous federal courts have certified similar classes in antitrust actions involving the laws of multiple states. *See, e.g.*, *In re Restasis*, 335 F.R.D. 1, 39-40 (E.D.N.Y. 2020)(32 jurisdictions); *In re Solodyn*, 2017 WL 4621777, at *11, 20 (40 jurisdictions); *In re Namenda*, 338 F.R.D. at 575-76 (30 jurisdictions); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294, 306-07 (D. Mass. 2021) (21 antitrust jurisdictions, and 11 consumer protection jurisdictions); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 18-md-2836, 2020 WL 5778756, at *28 (E.D. Va. Aug. 14, 2020) (30 jurisdictions); *In re Nexium Antitrust Litig.*, 297 F.R.D. at 175-76 (26 jurisdictions); *In re Flonase*, 284 F.R.D. at 219-20 (4 jurisdictions).

by (i) showing that defendants' unlawful conduct caused "artificially inflated prices" that (ii) were paid by "substantially all class members"). First, EPPs will rely on common evidence of causation to prove that Defendants' suppression of the market entry of generic atorvastatin calcium resulted in higher prices for both branded Lipitor and generic atorvastatin calcium, which in turn caused overcharges paid by EPPs. *See* Singer Report ¶¶ 38-42 & Figs. 1-3. Generic competition reduces prices because (i) AB-rated generics are priced below their branded equivalents, and (ii) when there are multiple generic competitors on the market, they compete with one another on price, further lowering prices. *See id.* ¶¶ 32-36. Second, EPPs will establish that all or nearly all Class members paid such overcharges because of Defendants' conduct. *See id.* ¶¶ 43-44, 46-99 & Tbls. 2-5, Figs. 4-11.

Individualized questions regarding the exclusion of uninjured Class members will not predominate over the common questions central to establishing antitrust injury. *See In re Solodyn*, 2017 WL 4621777, at *18; *In re Lidoderm Antitrust Litig.*, No. 14-md-2521, 2017 WL 679367, at *23 (N.D. Cal. Feb. 21, 2017). As explained by Dr. Singer, the number of any uninjured Class members is *de minimis.* Singer Report ¶¶ 96-98.

For present purposes, though, what matters is not whether EPPs have in fact proven antitrust injury but whether that essential element "is capable of proof at trial through evidence that is common to the class." *In re Hydrogen Peroxide*, 552 F.3d

at 311-12. EPPs have demonstrated that to be the case.

### (c) Proving damages involves predominantly common issues.

The predominance requirement is satisfied as to damages where, as here, they will be reliably calculated using common, class-wide evidence. "Calculations [of damages] need not be exact," though "any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015). "Overcharges, the difference between the actual price and the presumed competitive price multiplied by the quantity purchased, provide what the Supreme Court has long recognized as the principal measure of damages for plaintiffs injured as customers . . . ." *In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 344 (D. Mass. 2003) (internal quotation omitted). Plaintiffs are permitted to "make a just and reasonable estimate of the damage based on relevant data." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

Using evidence common to the Classes and consistent with EPPs' liability theory, Dr. Singer calculates aggregate overcharge damages caused by the alleged anticompetitive conduct. Singer Report ¶¶ 49-51, 55-56, 100-18 & Tbls. 7-13. This Court and others have previously accepted such aggregate damages models.[16]

---

[16] *See, e.g.*, *In re Ranbaxy*, 338 F.R.D. at 305-06; *In re Zetia Antitrust Litig.*, 2020 WL 5778756, at *24; *In re Restasis Antitrust Litig.*, 335 F.R.D. 1, 12, 30-32 (E.D.N.Y. 2020); *In re Niaspan Antitrust Litig.*, 397 F. Supp. 3d 668, 689 (E.D. Pa. 2019); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 391 (D.R.I. 2019);

### 2.   A Class Action is Superior to Other Methods of Adjudication.

The "superiority" requirement of Fed. R. Civ. P. 23(b)(3) ensures that resolution by class action will "'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615. "The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 409 (3d Cir. 2015).

In cases such as this, where a defendant's wrongdoing resulted in class-wide impact, but individual losses are small, the class-action mechanism is superior to other methods of adjudication. Even if the individual Class members were incentivized to file suit individually, doing so would "produc[e] numerous identical issues in each case that would waste judicial [and the parties'] resources and leave all parties vulnerable to unfair inconsistencies." *In re Flonase*, 284 F.R.D. at 234. Because the Class Members' claims are predicated on the same core facts and legal

---

*In re Thalomid & Revlimid*, No. 14-cv-6997, 2018 WL 6573118, at \*15 (D.N.J. Oct. 30, 2018); *In re Solodyn*, 2017 WL 4621777, at \*18-19; *In re Lidoderm*, 2017 WL 679367, at \*17, 23; *In re Nexium*, 297 F.R.D. at 182-83; *In re Flonase*, 284 F.R.D. at 220-25; *Teva Pharms. USA, Inc. v. Abbott Lab'ys*, 252 F.R.D. 213, 229-31 (D. Del. 2008).

theories, a class action is the superior means for adjudicating their claims collectively. *Id.* Finally, there are no trial management difficulties presented here and, at any rate, the Parties' settlement obviates the need for any trial to manage. *See Amchem*, 521 U.S. at 620. EPPs thus satisfy Rule 23(b)(3).

### D.   COUNSEL MEET THE REQUIREMENTS OF RULE 23(G) AND SHOULD BE APPOINTED CO-LEAD COUNSEL AND LIAISON COUNSEL.

Under Rule 23(g), the Court must appoint class counsel when certifying a class. Fed. R. Civ. P. 23(g)(1). A Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court must also ensure that class counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Counsel satisfy these criteria.

Proposed Co-Lead and Liaison Counsel are qualified, experienced, and intimately familiar with antitrust class actions, including pharmaceutical antitrust actions.[17] They have also spent considerable capital and human resources litigating this matter, including through settlement conferences, hearings, fact and expert

---

[17] *See* Wexler Decl., Ex. E (Firm Resumes).

discovery, and substantive briefing.

EPPs thus respectfully request that this Court certify the Classes for settlement purposes, appoint the designated named EPPs as Class Representatives for their respective Classes, and appoint Co-Lead and Liaison Counsel.

## VI.   THE   COURT   SHOULD   PRELIMINARILY   APPROVE   THE SETTLEMENT

Federal courts favor class-action settlements. Indeed, in this Circuit there is an "especially strong" presumption in favor of class-action settlements. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010). Judicial review of class-action settlements is a two-step process under Rule 23(e) of the Federal Rules of Civil Procedure. *Easterday v. USPack Logistics LLC*, No. 15-cv-7559, 2023 WL 4398491, at *5 (D.N.J. July 6, 2023). First, courts conduct a preliminary fairness evaluation and, if the proposed settlement is preliminarily acceptable, directs notice be given to all class members who would be bound thereby. *Id.* Second, courts hold a fairness hearing to evaluate any objections from class members and to consider the fairness, reasonableness, and adequacy of the proposed settlement. *Id.*[18]

At the preliminary approval stage, a court evaluates whether the proposed settlement is within the *range* of possible approval and free of obvious deficiencies or reasons to doubt its fairness. *Easterday*, 2023 WL 4398491, at *5; *Gregory v.*

---

[18] These preliminary and final procedures are summarized in the Manual for Complex Litigation, Fourth (2004) § 21.6.

*McCabe, Weisberg & Conway, P.C.*, No. 13-cv-6962, 2014 WL 2615534, at *2, 7 (D.N.J. June 12, 2014). In short, there must be "'a conceivable basis for presuming that the standard applied for final approval—fairness, adequacy, and reasonableness—will be satisfied.'"[19] *Easterday*, 2023 WL 4398491, at *5. Courts consider on preliminary approval: (i) whether the parties' settlement negotiations occurred at arm's length, (ii) whether there was sufficient discovery to inform the settlement decision, and (iii) the settlement proponents' experience in similar litigation. *Id.* at *5 ("A settlement is presumed fair when it results from 'arm's-length negotiations between experienced, capable counsel after meaningful discovery.'"); *Kress v. Fulton Bank, N.A.*, No. 19-cv-18985, 2022 WL 2357296, at *2 (D.N.J. June 30, 2022) (discussing the "key indicia of fairness"); *Smith v. Prof'l Billing & Mgmt. Servs., Inc.*, No. 06-cv-4553, 2007 WL 4191749, at *1 (D.N.J. Nov. 21, 2007).[20]

---

[19] Rule 23(e)(2) sets forth the factors a court must consider in granting final approval: (A) whether the class representatives and class counsel have adequately represented the class; (B) whether the proposed settlement was negotiated at arm's length; (C) whether the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) whether the proposal treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2). As set forth herein, each of these factors is exceedingly likely to be satisfied.

[20] These same cases also provide that preliminary settlement approval establishes a presumption of fairness when the court makes these findings and where only a small fraction of the class has objected. *See, e.g.*, *Smith*, 2007 WL 4191749, at *1.

Based on upon the years of hard-fought litigation and its extensive knowledge of counsel and this case, this Court can and should preliminarily approve the proposed Settlement.

### 1.    The Settlement is Well Within the Range of Approval.

The proposed Settlement has no obvious shortcomings and is plainly within the range of possible approval. It provides for a $35 million payment into an escrow account established for the benefit of the EPP Classes. Subject to the Plan of Allocation, after deduction of fees, costs and expenses, and service awards to the named EPPs,[21] the balance in the Settlement Fund will be distributed to EPP Class Members based on (i) their status as consumers or TPPs; (ii) the volume of their purchases of brand and generic Lipitor during the Class Period; and (iii) the number of claims made within the respective allocation pools. *See* Wexler Decl., Ex. O (Plan of Allocation).

---

Although no objections could have been received to date, the deadline for submitting objections is generally established upon preliminary approval. Under these circumstances, the appropriate time for considering objections (if any) is at the final approval stage, after the deadline for submitting objections has passed.

[21] EPPs propose filing a formal fee petition for these awards 35 days before the Fairness Hearing. The Court may thus consider any request for fees in determining whether to grant final approval of the proposed Settlement. A 34% fee award is, however, within the range of amounts typically approved as reasonable by courts in the Third Circuit. *See, e.g.*, *Lincoln Adventures LLC v. Those Certain Underwriters at Lloyd's, London Members*, No. 08-235, 2019 WL 4877563, at *6 (D.N.J. Oct. 3, 2019) ("Courts in the Third Circuit, including this one, have viewed fee percentages of 33% as reasonable." (citing cases)).

EPP Class Members will thus be able to receive substantial financial relief from Pfizer that would have been uncertain and difficult to obtain otherwise. As with all litigants, EPPs ran a risk of an adverse verdict on summary judgment or at trial. An appeal of an adverse verdict, or defending an appeal from a successful verdict, would add more time, expense, and uncertainty. In sharp contrast, the proposed Settlement provides a certain and substantial recovery opportunity for members of the EPP Classes who submit valid claims. Moreover, members of the EPP Classes will obtain recovery while preserving their claims against Ranbaxy.  The Settlement thus permits the EPP Classes to mitigate their risks going forward.

Thus, overall, the proposed Settlement represents an excellent result for the Classes. The consideration to be paid by Pfizer, when balanced against the risks and potential benefits of continued litigation against Pfizer, demonstrates that the Settlement falls well within the range of what is fair, reasonable, and adequate, and merits preliminary approval. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, MDL No. 2445, 2023 WL 8437034, at *8-9 (E.D. Pa. Dec. 4, 2023) (approving $30 million settlement of generic suppression litigation); *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, No. 18-MD-2819, 2022 WL 3043103, at *5-6 (E.D.N.Y. Aug. 2, 2022) (same); *In re Opana ER Antitrust Litig.*,14-cv-10150, ECF No. 1091 (N.D. Ill. Dec. 15, 2022) (approving $15 million settlement of generic suppression litigation).

The proposed plan of distribution likewise warrants preliminary approval. The '[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'" *In re Aremissoft Corp. Sec. Litig.*, 210 F.R.D. 109, 126 (D.N.J. 2002). Courts generally find reasonable "a plan of allocation that reimburses class members based on the type and extent of their injuries." *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 469 (D.N.J. 2008).

The proposed Plan of Allocation here meets this standard. *See* Wexler Decl., Ex. O. EPPs' economist, Dr. Singer, identified three types of overcharges caused by the delayed entry. *See* Wexler Decl., Ex. C (Settlement Decl. of Dr. Hal Singer dated Apr. 16, 2024), ¶¶ 2, 7-14. For each subtype of overcharge, Dr. Singer calculated the consumer share of the overcharge, leaving the TPP share as the remainder. *Id.* Using the data and damages calculations he presented in prior reports in this litigation, Dr. Singer calculated an equitable allocation that would distribute 20.3% of the Net Settlement Fund to consumers and 79.7% to TPPs. *Id.* EPPs' Plan of Allocation, which incorporates these equitable allocations, is similar to other court-approved *pro rata* allocation plans in cases brought by consumers and TPPs to recover damages arising from generic suppression and can be implemented with a high degree of efficiency. *See, e.g., In Re: Novartis and Par Antitrust Litig.*, No. 18-cv-04361 (S.D.N.Y.), ECF No. 600-4. Thus, the proposed distribution plan fairly and

appropriately reimburses End-Payor Class members.

### 2. The Settlement is the Result of Arm's-Length Negotiations.

"A settlement is presumed fair when it results from 'arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Easterday*, 2023 WL 4398491, at *5. The negotiations here were conducted at arm's length over a multiple-year period. The Parties scrutinized the strengths and weaknesses of the pending claims and utilized their wealth of experience with pharmaceutical antitrust litigation while engaging in extensive discussions of the merits of the respective claims and defenses and the value of End-Payors' claims under the circumstances and procedural posture of the case. *See* Wexler Decl. ¶ 14. This factor strongly supports preliminary approval. *See, e.g.*, *Easterday*, 2023 WL 4398491, at *5; *Smith*, 2007 WL 4191749, at *2.

### 3. The Settlement Followed More Than 11 Years of Litigation and Extensive Discovery.

End-Payor Plaintiffs initiated this litigation in 2012. The years leading up to the proposed Settlement were spent actively engaged in document and deposition discovery; the retention and consultation with experts on class certification, liability, and damages; and mediation, as well as briefing and arguing the appeal of this Court's first dismissal order. This long procedural history evinces that the parties had the discovery necessary to make informed settlement decisions and further supports preliminary approval of the Settlement. *See Lazy Oil Co. v. Witco Corp.*,

34

166 F.3d 581, 588 (3d Cir. 1999), *cert. denied*, 528 U.S. 874 (1999).

### 4. The Proponents of the Settlement are Experienced in Antitrust Litigation.

In approving class-action settlements, courts regularly defer to the judgment of experienced counsel who have engaged in arm's-length settlement negotiations. *See, e.g.*, *In re Gen. Inst. Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001); *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir. 2001); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534, 543 (D.N.J. 1997), *aff'd*, 148 F.3d 283, 311 (3d Cir. 1998). Here, the settlement negotiations were conducted by EPPs' counsel, who have extensive experience in generic suppression antitrust class actions, class actions generally, and other complex cases. Class Counsel know well how to pursue generic-suppression cases and are fully aware of the risks and rewards of proceeding based upon their 11-year litigation of this case. Counsel's informed and reasoned judgment should be given weight in the Court's preliminary approval determination. *See, e.g.*, *In re Prudential*, 962 F. Supp. at 543.

For these reasons, the Could should preliminarily approve the Settlement.

## VII. THE PROPOSED NOTICE PLAN SHOULD BE APPROVED

EPPs propose a single Notice Plan to inform Class members should the Court certify the proposed settlement classes and preliminarily approve the proposed settlement. Under Rule 23(c)(2)(3), the Court must direct to class members the best

notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 & n.11 (1974). "Rule 23(e) notice is designed to be only 'a summary of the litigation and the settlement [and] it is crucial to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.'" *See In re Prudential*, 962 F. Supp. at 527. Courts regularly find adequate combined notice of both the existence of a class action, as required by Rule 23(c)(2), and the substance of the settlement, as required by Rule 23(e)). *See, e.g.*, *id.* at 526-28. The Notices and methods for providing notice to Class members here satisfy both Rules and should be approved.

## A.   THE PROPOSED MANNER OF NOTICE COMPLIES WITH RULE 23.

The best notice practicable is notice that can be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). Notice may be provided by "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B).

Under EPPs' proposed Notice Plan, Epiq will employ a multi-faceted approach to notice. First, Epiq will send direct, individual notice via U.S. First Class mail to approximately 56,000 TPPs included in Epiq's proprietary database of TPPs

of prescription drugs within a healthcare plan. *See* Wexler Decl., Ex. D (Decl. of Cameron R. Azari, Esq., Epiq Class Action and Claims Solutions, Inc. ("Azari Decl.")), ¶¶ 29-31. Epiq will also email notice to over 45,000 potential TPP Class Members with available email addresses. *Id.* ¶ 34.

Second, it will employ publication notice to reach those who cannot be reached directly by mail or e-mail. *See, e.g.*, *In re Restasis*, 527 F. Supp. 3d at 274; *In re Remeron End-Payor Antitrust Litig.*, No. 02-cv-2007, 2005 WL 2230314, at *15 (D.N.J. Sept. 13, 2005). The Claims Administrator will utilize various forms of media notice, including targeted digital advertisements, notices on social media, internet sponsored search listings, and an informational release to target individual Consumer Class members and any TPP Class members that, for whatever reason, were unaware of the Settlement. *See* Wexler Decl., Ex. D (Azari Decl.), ¶¶ 36-50, 52. The Notice Plan also provides for print advertising in two national trade publications to reach additional TPP Class Members. *Id.* ¶ 51.

The proposed Notice Plan "will reach plan sponsors with plans (90,864) with 100 or more active participants covering 95.9% of identified participants in the TPP Class (178,831,060) and 80% of the Consumer Class, for a combined reach of at least 80% of Class Members." *Id.* ¶ 23. Notice plans with these attributes are routinely approved in pharmaceutical antitrust cases. *See, e.g.*, *In re Suboxone Antitrust Litig.*, 2023 WL 8437034, at *2, 20; *In re Zetia (Ezetimibe) Antitrust Litig.*,

18-md-2836, ECF 2151, at 4-5 (E.D. Va. June 6, 2023); *In re Restasis*, 527 F. Supp. 3d at 273-75; *In re Loestrin 24 FD Antitrust Litig.*, No. 13-md-02472, ECF No. 1427, at 3-4 (D.R.I. Mar. 23, 2020). Accordingly, EPPs respectfully submit that their manner of giving notice should be approved.

### B.    THE FORM OF NOTICE COMPLIES WITH RULE 23.

The proposed settlement notices are written in plain, easily understood language and clearly and concisely describe, *inter alia*: (i) the claims asserted in the Action; (ii) the Classes; (iii) the Settlement terms; (iv) the time and manner for requesting exclusion; (v) the binding effect of a class judgment on Class members; (vi) the Court-approved process for the proposed Settlement; and (vii) Class Counsel's request for attorneys' fees, costs, expenses, and service awards. *See* Wexler Decl., Exs. M, N. They also prominently feature Class Counsel's contact information, directions to a website providing supplemental information, and the Claims Administrator's contact information. *Id.* The proposed notices thus satisfy both Rule 23(c)(2) and 23(e). *See, e.g.*, Fed. R. Civ. P. 23(c)(2)(B), (e); *Easterday*, 2023 WL 4398491, at *5-6; In *re Prudential*, 962 F. Supp. at 526-28.

Similarly, the TPP and consumer claim forms End-Payor Class members must complete to receive any settlement funds are straightforward, not overly burdensome, and clearly and succinctly explain the information that must be provided and the deadlines for doing so. *See* Wexler Decl., Ex M.

### C.    EPIQ IS QUALIFIED TO SERVE AS CLAIMS ADMINISTRATOR.

Epiq is an experienced national class action and claims administrator and has been appointed as claims administrator in many consumer and antitrust class actions, including pharmaceutical antitrust cases. Wexler Decl., Ex. D. Epiq is eminently qualified to serve in that capacity here. As Claims Administrator, Epiq will have the authority to contact the claimants as necessary to confirm the information provided in the Claim Forms or to seek additional information as required. Under the supervision of Class Counsel, Epiq will ensure that End-Payor Class Members' claims are administered fairly and accurately.

### D. THE HUNTINGTON BANK IS QUALIFIED TO SERVE AS ESCROW AGENT.

EPPs also request that the Court approve The Huntington Bank as the Escrow Agent for the Settlement Fund, from which any taxes, court-awarded attorneys' fees, costs and expenses, and payments to the EPPs will be deducted, with the remaining amount available for distribution to the Classes. The Huntington Bank is well-known and highly respected in the field of escrow-account management and was selected with Pfizer's consent. With the Court's approval, the Escrow Agent will establish the escrow account and will comply with all requirements for the account identified in the Settlement Agreement. *See* Wexler Decl., Ex P.

### E. THE PROPOSED SCHEDULE IS ADEQUATE AND FAIR.

EPPs seek the Court's approval of the following schedule:

| Event | Deadline for Compliance |
|-------|-------------------------|
| Date for Fairness Hearing | 120 calendar days after entry of the |

|  | Preliminary Approval Order |
|---|---|
| Mailing Notice complete | No later than 30 calendar days after entry of the Preliminary Approval Order (the "Notice Date"). |
| Publication of Summary Notice and Notice posted on LipitorAntitrustSettlement.com | No later than 30 calendar days after entry of the Preliminary Approval Order. |
| Deadline for filing Claim Forms | No later than 180 calendar days after entry of the Preliminary Approval Order. |
| Deadline for requests for exclusion, objections, and notices of intent to appear at the Fairness Hearing | No later than 45 calendar days after the Notice Date. |
| Deadline for EPPs to file motion for final approval of the Settlement, the Plan of Allocation, and application for attorneys' fees, costs, expenses, and service awards. | 35 calendar days prior to the Fairness Hearing. |
| Deadline for EPPs to file reply, if any, in further support of above motion. | 7 calendar days prior to the Fairness Hearing. |

EPPs propose a period of 45 days from the Notice Date to the date by which Class members must postmark a request to exclude themselves from the Classes. This proposed 45-day period provides Class Members sufficient time to decide whether to opt out. Courts have approved opt-out periods of 45 days (or shorter) in many analogous cases, including similar generic suppression antitrust class actions. *See, e.g.*, *In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *13.

## VIII. CONCLUSION

EPPs respectfully request that the Court certify the two Classes for settlement purposes, preliminarily approve their proposed Settlement with Pfizer, and grant the

additional relief as outlined herein or as the Court deems appropriate.

**DATED:** May 3, 2024

Respectfully submitted,

*/s/ Lisa Rodriguez*
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102-2101
Phone: (215) 575-7000
Fax: (215) 754-4603
ljrodriguez@dilworthlaw.com

*/s/ Sharon Robertson*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
srobertson@cohenmilstein.com

*/s/ Kenneth A. Wexler*
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, Illinois 60606
kaw@wbe-llp.com

*/s/ Michael Buchman*
**MOTLEY RICE LLC**
777 Third Avenue, 27th Flr.
New York, New York 10017
mbuchman@motleyrice.com

*/s/ Robert G. Eisler*
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Reisler@gelaw.com

*Interim Co-Lead Counsel for the Proposed EPP Classes*

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 3, 2024, a copy of the foregoing Memorandum of Law in Support of Unopposed Motion for Preliminary Approval of End-Payor Class Plaintiffs' Settlement and Other Relief was filed electronically. Those attorneys who are registered with the Electronic Filing System may access this filing through the Court's System and notice of this filing will be sent to these parties by operation of the Court's Electronic Filing System.

*/s/ Lisa J. Rodriguez*