## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE LIPITOR ANTITRUST LITIGATION | MDL No. 2332 |
| | Master Docket No.: 3:12-cv-2389 (PGS/JBD) |
| This Document Relates To: | |
| All Direct Purchaser Payer Class Actions | **MEMORANDUM** |

   This case is before the Court on Direct Purchaser Plaintiffs' Motion for Class Certification.  (ECF No. 1221).  Here, Direct Purchaser Plaintiffs (hereinafter, "DPPs") seek class certification on the basis that Defendant Ranbaxy Inc., Ranbaxy Laboratories Limited, and Ranbaxy Pharmaceuticals, Inc. (hereinafter, "Ranbaxy" or "Defendant")  and Pfizer Inc., Pfizer Manufacturing Ireland, Warner-Lambert Co., and Warner-Lambert Co. LLC (hereinafter, "Pfizer")[1] engaged in challenged conduct, namely a disputed Settlement Agreement, which led to the restraint of generic Lipitor competition and resulted in class-wide antitrust impact in the form of overcharges.  (*See* ECF No. 1222 at 26). DPPs claim that class members were

---

[1] This Motion was originally filed by both Pfizer and Ranbaxy.  In August 2023, when oral argument was tentatively scheduled, DPPs and EPPs announced their tentative settlement with Pfizer.  As such, Pfizer no longer participated in the motion practice surrounding this motion.  Herein, the Court refers only to the remaining Defendant Ranbaxy although initial briefing was filed by both Pfizer and Ranbaxy.

financially injured in that DPP class members were denied an earlier opportunity to purchase either (1) Ranbaxy's generic Lipitor (meaning that DPP class members paid brand prices longer than they would have absent the challenged conduct) or (2) an alternative generic because Ranbaxy's exclusivity had cornered the generic market. DPPs argue that Defendant's actions blocked market competition which resulted in DPP class members incurring substantial overcharges. (ECF No. 1222 at 24). On November 27 and 28, 2023, oral argument on the present motion, the Motion for Class Certification by the End-Payor Purchaser Plaintiffs (ECF No. 1251), and the Motion for Summary Judgment (ECF No. 1183) were heard.

In the present motion, DPPs seek to define the following class under Federal Rule of Civil Procedure 23:

> All persons or entities in the United States and its territories who purchased Lipitor or its AB-rated bioequivalent generic products directly from any of Defendants at any time during the period June 28, 2011 through May 28, 2012 (the "Class Period").

> Excluded from the proposed Class are the defendants and their officers, directors, management, employees, subsidiaries, or affiliates, all federal governmental entities, and all persons or entities that (i) purchased Lipitor directly from Pfizer for the first time during the Class Period after November 30, 2011, but did not purchase generic Lipitor directly from Ranbaxy during the Class Period; and (ii) all persons or entities that purchased Lipitor directly from Pfizer after November 30, 2011 that did not also purchase generic Lipitor after November 30, 2011.

(ECF No. 1222 at 10). According to DPPs, this definition encapsulates sixty-three members.[2]

First, the Court granted summary judgment, finding that there was no genuine issue of material fact as to an essential element of the cause of action: causation. (ECF No. 1415). Causation—which is inextricably linked with antitrust injury—prevents the Court from certifying a class where causation cannot be shown. There is no cause of action, and accordingly, there is no class. Second, even if summary judgment had been denied, class certification here would still be inappropriate because DPPs have failed to demonstrate that impracticability of joinder as required under Federal Rule of Civil Procedure 23(a).

Numerosity is discussed below.

## I.

The Court summarizes the facts relevant to this Motion below. A fulsome discussion of the facts underlying this litigation is recited in the Court's Memorandum on Summary Judgment. (ECF No. 1415).

The dispute underlying this Motion reaches back nearly a decade and surrounds Lipitor—or atorvastatin calcium—a cholesterol medication. In Spring

---

[2] Per the DPPs' Memorandum in Support of this Motion (ECF No. 1222), this list omits two proposed members of the class originally identified in Dr. Leitzinger's Expert Report: Dik Drug and Kinray. (Leitzinger Rep. at Ex. 6; *see also* ECF No. 1222 at 28 n.63).

2008, various patents belonging to Pfizer were near their expiration. According to DPPs, Pfizer was attempting to ensure that its control of the Lipitor market would not expire in March 2010. According to DPPs, during this process, Pfizer encountered resistance from Ranbaxy who was attempting to market generic Lipitor; Ranbaxy was arguing that the original expiring patent relied on "misleading and fraudulent data . . . ." (ECF No. 1222 at 13).

Accordingly, in or around June 2008, Pfizer and Ranbaxy entered into a settlement agreement (hereinafter, the "disputed Settlement Agreement") which DPPs claim constituted "an unlawful contract, combination and conspiracy to allocate the entire United States market for atorvastatin calcium to Pfizer until November 30, 2011." (ECF No. 472 (hereinafter, "Compl.") at ¶ 6). Under the disputed Settlement Agreement, Pfizer gave financial inducements to Ranbaxy to allegedly ensure that Ranbaxy delayed the entry of its own generic atorvastatin calcium to extend Pfizer's monopoly. A part of the disputed Settlement Agreement involved Pfizer releasing Ranbaxy from a patent infringement suit involving a separate Pfizer drug, Accupril. DPPs allege that this release—which involved a release of hundreds of millions of dollars in potential liability for a suit that Pfizer was apparently likely to win—in exchange for a settlement amount of around one million dollars constituted a large, unjustified reverse payment to Ranbaxy in exchange for Ranbaxy's agreement to delay the release of generic Lipitor.

Pursuant to the disputed Settlement Agreement, Ranbaxy was permitted to launch its generic Lipitor at the earliest on November 30, 2011. However, DPPs allege that absent the disputed Settlement Agreement, Ranbaxy would have started selling a generic Lipitor product at an earlier time. (ECF No. 1222 at 22). DPPs claim that had Ranbaxy not entered into this disputed Settlement Agreement, Ranbaxy would have been economically motivated to reach a settlement with an earlier no-payment entry date given the popularity and economic success of the Lipitor drug. DPPs claim that prices fell significantly once generic Lipitor competition entered the market in November 2011 and fell even lower as additional generic options entered the market. Specifically, DPPs argue that generic competition caused significant class-wide average price drops and price drops for each of their proposed class members. In support of their motion for class certification, DPPs present the expert report of Dr. Jeffrey Leitzinger (*See* ECF No. 1223 (hereinafter, "Leitzinger Rep.")). DPPs also present the expert report of Kurt Karst—an expert report prepared on the issue of causation.

While DPPs and Defendant make varying arguments about different parts of Rules 23(a) and 23(b), the Court finds that the first prong of Rule 23(a) is unsatisfied. Accordingly, the Court limits its analysis to the numerosity prong of Rule 23.[3]

---

[3] Nothing herein means that the other class certification requirements have been satisfied.

Specifically, DPPs argue that there are sixty-three direct purchaser entities counting as separate class members. (ECF No. 1222 at 28). Further, they argue that joinder is impracticable given the class size, judicial economy, and the geographic dispersion of the class. (ECF No. 1222 at 28–29).

For its part, Ranbaxy argues that DPPs do not meet the requirements of Rule 23(a) specifically arguing that DPPs cannot satisfy the numerosity requirement under Rule 23(a)(1) because the proposed class includes eighteen members, not sixty-three. (ECF No. 1241 at 18–23). Further, Ranbaxy argues that under Rule 23(a)(1), joinder is not impracticable under the *Modafinil* factors, and DPPs have not satisfied their burden to demonstrate as much. (ECF No. 1241 at 8–17). In support of their arguments, Ranbaxy provides the expert report of Dr. Bruce Stangle. (*See* ECF No. 1223-45 (hereinafter, "Stangle Rep.")).

## II.

"'The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) (internal citations and marks omitted). "[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 n.1 (3d Cir. 2020) (citing Fed.R.Civ.P. 23(a)-(b)).

A district court determines actual conformance with Rule 23 via a "'rigorous analysis'" of the evidence and arguments put forth. *Marcus*, 687 F.3d at 326 (internal citations omitted). "Rigorous analysis" requires a district court to "'resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action.'" *Id.* (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 316, 307 (3d Cir. 2008)). Consequently, a district court "may delve beyond the pleadings to determine whether the requirements for class certification are satisfied." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320 (internal citations and marks omitted). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Marcus*, 687 F.3d at 591. Actual, not presumed, conformance with Rule 23 is essential. *Id.* at 326 (internal citations omitted).

As stated by the Third Circuit, Rule 23(a) requires:

> (1) [T]he class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

*Hargrove,* 974 F.3d at 470 n.1 (quoting *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed.R.Civ.P. 23)).

Federal Rule of Civil Procedure 23(a)'s numerosity requirement mandates that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a).   Rule 23(a) has no numerical ceiling or floor to satisfy the numerosity requirement, but "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001) (citing *James Wm. Moore et al.,* 5 MOORE'S FED. PRAC. § 23.22[3][a] (Matthew Bender 3d ed. 1999)). However, the Third Circuit has noted that "district courts are always under an obligation to ensure that joinder is impracticable[.]" *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249–50 (3d Cir. 2016).   The impracticability analysis for classes under forty members, though, should be "particularly rigorous." *Id.* at 250.

As laid out by the Third Circuit, factors for consideration regarding the impracticability of joinder include, but are not limited to: "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." *Id.* at 253.   The Third Circuit has noted that "not all [factors] are created equal" and that judicial economy and the ability to litigate as joined parties are of primary importance. *Id.*

Together, these factors work to serve the greater purpose of numerosity requirement of Rule 23(a). That purpose has been described by the Third Circuit in *Marcus* as follows:

> First, it ensures judicial economy. It does so by freeing federal courts from the onerous rule of compulsory joinder inherited from the English Courts of Chancery and the law of equity. Courts no longer have to conduct a single, administratively burdensome action with all interested parties compelled to join and be present. The impracticability of joinder, or numerosity, requirement also promotes judicial economy by sparing courts the burden of having to decide numerous, sufficiently similar individual actions seriatim. As for its second objective, Rule 23(a)(1) creates greater access to judicial relief, particularly for those persons with claims that would be uneconomical to litigate individually. Finally, the rule prevents putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their own claims.

*In re Modafinil Antitrust Litig.*, 837 F.3d at 252 (quoting *Marcus*, 687 F.3d at 594–95 (internal marks omitted)).

## III.

In its analysis, the Court is obligated to conduct a "rigorous analysis" of the evidence and arguments presented to determine whether actual conformance with Rule 23 has been met. *Marcus*, 687 F.3d at 326 (internal citations omitted). For the reasons below, DPPs have not met their burden to show that joinder is impracticable by the preponderance of the evidence.

Although "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met[,]" given the rigorous analysis required of the Court on a motion for class certification, the Court analyzes the impracticability of joinder. *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001) (citing *James Wm. Moore et al.,* 5 MOORE'S FED. PRAC. § 23.22[3][a] (Matthew Bender 3d ed. 1999)); *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.,* No. 21-cv-3500, 2023 WL 2314911, at *4 (E.D. Pa. Feb. 28, 2023) (analyzing the impracticability of joinder even where there were forty-nine known purchasers).

In the first instance, the parties dispute how many actual class members belong within the DPP class. For their part, DPPs assert that the class is comprised of sixty-three members. (ECF No. 1222 at 19). Defendant claims that class-members number at most eighteen because of two different issues: consolidated corporate entities and uninjured purchasers. (ECF No. 1241 at 24–29). The Court believes that such arguments to "pick-off" members of the proposed class are best addressed in a Rule 23(b)(3) predominance analysis rather than within the Rule 23(a)(1) numerosity analysis. Accordingly, the Court will not analyze these arguments at this time. *Value Drug Co. v. Takeda Pharms.*, U.S.A., Inc., No. 21-cv-3500, 2023 WL 2314911, at *8 (E.D. Pa. Feb. 28, 2023); *see also In re Niaspan Antitrust Litig.,* 397 F. Supp. 3d 668, 685–86 (E.D. Pa. 2019) (evaluating such

arguments as to whether plaintiffs could show antitrust injury for class certification purposes within a 23(b)(3) analysis).

Turning now to the question of the impracticability of joinder: the Court believes that—even if the Court were to accept that the class were comprised of sixty-three members—the DPPs have failed to meet their burden to show impracticability of joinder by a preponderance of the evidence. DPPs argue that the size of the class and its geographic dispersion "render joinder difficult, inconvenient, judicially inefficient, and costly, supporting certification." (ECF No. 1222 at 28–31). Further, they argue that judicial economy "favors certification because joinder of individual plaintiffs would involve additional counsel, discovery, and unnecessary delay. Many class members have small claims relative to the cost of litigating this case . . . ." (*Id.* at 29). Such argumentation fails to substantively address the relevant impracticability factors as enumerated by the *Modafinil* court: judicial economy, claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages. *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 257–58 (3d Cir. 2016) (internal citations omitted).

The Court addresses each *Modafinil* factor below.

1. *Judicial Economy*

The first impracticability factor, judicial economy, examines the administrative burden that multiple or aggregate claims place upon the courts. Rule 23(a) imposes a "'high standard' when analyzing 'judicial economy as a factor.'" *Value Drug*, 2023 WL 2314911, at *9 (quoting *In re Zetia (Ezetimibe) Antitrust Litig.*, 18-cv-2836, 2022 WL 1577219, at *16 (E.D. Va. Jan. 25, 2022), *report and recommendation adopted*, 342 F.R.D. 95 (E.D. Va. 2022)). For the reasons below, the Court does not believe that DPPs have shown that judicial economy is best served by a class action.

In their brief, DPPs argue that the class size renders joinder "difficult, inconvenient, judicially inefficient, and costly . . . ." (ECF No. 1222 at 29). At oral argument, DPPs' counsel argued in favor of class certification because prospective discovery disputes would be created by the Court's decision to not certify the class and the difficulties in resolving said disputes. (Nov. 27, 2023 Tr. at T70:5–10). Looking merely at the record and the number of attorneys in this case, and future motion practice that could ensue from the Court's decision not to certify the class, the Court is not unmoved by DPPs' concerns. However, as pointed out by the Third Circuit in *Modafinil*, the judicial economy prong of the impracticability analysis "does not permit consideration of . . . the need to conduct further discovery if the class is not certified." *Modafinil*, 837 F.3d. at 256. This principle is applicable in

this case given that it bears upon the discovery yet to be conducted and the logistical implications created by this Court's decision not to certify the class.

Considering specific factors put forth by the *Modafinil* court—those being docket control and the practicalities of litigation such as attorney appearances— DPPs have failed to provide sufficient reasons by the preponderance of the evidence that judicial economy would be greatly served by the certification of this class. For instance, DPPs contend that Defendant's arguments regarding the Court's ability to control discovery in this matter just as well through joinder are not supported by evidence "given the large number of discovery disputes following the denial of class certification in *Value Drug* and *Zetia*." (ECF No. 1257 at 14–15). However, DPPs draw no connections between the present case and *Value Drug* or *In re Zetia* other than the procedural posture of the cases.   Further, such argumentation brings the Court back to its comment that, as stated by the Third Circuit, the judicial economy prong of Rule 23(a)'s numerosity requirement does not permit the consideration of the need to conduct future discovery in a Rule 23(a) numerosity analysis. *Modafinil*, 837 F.3d. at 256.   Accordingly, DPPs' argument fails to address the concerns underlying the impracticability prong set forth by the *Modafinil* court.

Similarly, DPPs have not suggested that this case would raise complex legal issues across the joined cases that would render it judicially economical to try this case as a class action. For instance, unlike in *In re Niaspan*, where the court faced

"the prospect of individual plaintiffs represented by dozens of different attorneys with the potential for a multitude of summary judgment briefs espousing an array of arguments and additional complications at trial," *In re Niaspan Antitrust Litig.*, 397 F. Supp. 3d 668, 677 (E.D. Pa. 2019), DPPs have presented no such arguments. Indeed, quite the opposite: the Court has ruled on a single summary judgment motion on an issue of causation that is binding across the prospective classes. (*See* ECF No. 1415).

Instead, DPPs' arguments in support of judicial economy in this case are purely administrative. Administrative concerns do not equal judicial economy. As noted by our colleague on the Eastern District of Pennsylvania, Hon. Mark A. Kearney: "[t]he issue is whether joinder is *impracticable*; it is not whether class treatment is easier for counsel or the Court. It would almost always be easier to work with one party and lawyer as a matter judicial economy." *Value Drug Co.*, 2023 WL 2314911, at *1 (emphasis added).

DPPs have failed to discuss this impracticability in their briefing or otherwise provide the Court with evidence as to why service of process would be difficult to effectuate or as to why the appearance of numerous attorneys would be stressful on the judicial system—particularly where the judicial system has been managing it here. DPPs have not pled that they do not know the names and addresses of class members nor that they do not know the existence of all class members. Likewise,

DPPs have not suggested that the prospective class would not engage in resource-sharing or the other common litigation courtesies typical of these cases. While the Court agrees that the DPPs need not present affidavits and declarations explaining why joinder would be impracticable by individual class members, such evidence would be helpful; the Court needs a basis on which to decide that joinder is too expensive, time involved, and logistically unfeasible.

Given that DPPs have not shown the actual, practical difficulties of joining all the potential class members' by inquiring whether joinder 'would be expensive, time-consuming, and logistically unfeasible[,]'" DPPs have not demonstrated by a preponderance of the evidence that judicial economy would be served by certifying the class. *Modafinil*, 837 F.3d at 254 (quoting 5 MOORE'S FED. PRAC. § 23.22). As such, this factor weighs against class certification and in favor of joinder.

### 2. *Claimant's Ability and Motivation to be Joined*

The second impracticability factor is the claimants' ability and motivation to be joined as plaintiffs. The purpose of this factor is to broaden the larger goal of Rule 23 to provide small claims plaintiffs with access to the judicial system. *In re Modafinil Antitrust Litig.*, 837 F.3d at 257. As the Third Circuit further explained in *Modafinil*:

> This primarily involves an examination of the stakes at issue for the individual claims and the complexity of the litigation, which will typically correlate with the costs of pursuing these claims. Though joinder is certainly more economical for most plaintiffs than pursuing

the case alone, it is often still uneconomical for an individual with a
negative value claim[4] to join a lawsuit.

*Id.* at 257.  DPPs do not present sufficient evidence to establish this impracticability

factor.   For the reasons below, this factor weighs against class certification.

Specifically, DPPs state that the class members are comprised of more than

sixty different members with different claims and market shares.   DPPs' expert

estimates individual damages from overcharges ranging from $800 through

$778,671,500.  (Leitzinger Rep. at 60).  DPPs represent that most class members

have claims worth less than the cost of litigation, which DPPs estimate at

approximately $3.7 million using another antitrust class action litigation, *Nexium,*[5]

as a benchmark. (ECF No. 1222 at 29 n.68).  Defendant argues against using this

number as a benchmark, stating that using $3.7 million as a benchmark "compares

apples to oranges, because DPPs improperly compare the full cost of one plaintiff

litigating on its own (with each plaintiff repeatedly incurring duplicative costs) as

opposed to the shared costs of a joinder action." (ECF No. 1241 at 14).   The Court

agrees.  Utilizing the total cost incurred by litigating an entire case confuses the

issue; a court does not look to the hypothetical cost incurred by each proposed class

---

[4] As defined by the Third Circuit, a negative value claim is a "claim[ ] that could
not be brought on an individual basis because the transaction costs of bringing an
individual action exceed the potential relief. " *In re Baby Prods. Antitrust Litig.,*
708 F.3d 163, 179 (3d Cir. 2013).
[5] *In re Nexium (Esomeprazole) Antitrust Litig.,* 296 F.R.D. 47 (D. Mass. 2013).

member should they have initiated their own individual suits in the alternative world that class certification is not granted. Rather, the Court looks to what the *shared* costs would be in a *joined* action where—while there may be duplicative costs— many costs—such as expert fees—could and would be shared. The Court therefore has no benchmark against which to evaluate the negative claims argument for any of the prospective class members. The Court will not speculate as to these costs and is unmoved by the numbers provided by DPPs.

Additionally, the Court agrees with Defendant that class members have sizable claim values. Indeed, more than sixty percent of the proposed class members have at least one million dollars in prospective damages and more than seventy percent of these proposed class members have at least $500,000 in prospective damages. (*See* Leitzinger Rep. at Ex. 12). Even without a benchmark of the cost of litigation, these claims are significant and surely do not render the extraordinary treatment afforded by class membership absent more of a showing from DPPs.

The Court also does not believe that DPPs adequately addressed the issue of negative value claims (if indeed there are any). At oral argument, DPPs' Counsel represented that there were "eight [prospective class members] with treble damages claims of under $70,000" and "twenty-five class members have claims of under a million dollars." (Nov. 27, 2023 Tr. at T70:15–18). DPPs argue that these small claims weigh in favor of class certification given that they would involve litigation

on negative-value claims. DPPs point to the proposed damages of each of the class members to demonstrate that it would be uneconomical for the smaller DPPs to bring a lawsuit. However, this argument only tangentially addresses the issue before the Court since these arguments go to the economic feasibility of these individual entities bringing individual actions, not the economic feasibility of these entities being joined as parties in a traditional lawsuit.

Like in *Value Drug*, the only evidence DPPs present is the projected size of each purchaser's claim. DPPs, by pointing to overcharges, implore the Court to make a logical leap. That is, DPPs wish the Court to infer that because these prospective class members' claim values are so low, it would be uneconomical for these individual entities to be joined in a lawsuit. However, DPPs have not presented evidence on the same. As explained by the Fourth Circuit, assuming "'without any evidence, that absent a class action, the[ ] smaller claimants would sue individually and thus bear the entire cost of litigation' . . . misconstrues the standard." *In re Zetia (Ezetimibe) Antitrust Litig.,* 7 F.4th 227, 235–36 (4th Cir. 2021). Instead of showing that smaller claimants would not be able to be joined, DPPs have shown that "it may be uneconomical for these claims to be pursued in individual litigation;" they have not shown "that it would be uneconomical for these . . . class members to individually joined as parties in a traditional lawsuit." *Modafinil*, 837 F.3d at 258. To support arguments in favor of class certification and the impracticability of

joinder, "[p]laintiffs must bring to bear some evidence to this effect—and the district court may not consider the economics of individual suits in analyzing this factor." *Id.* Here, DPPs have failed to bring forth such evidence.

Additionally, the Court notes that three of the proposed class members hold a large portion of the total class claims. Like in *Modafinil* where three of the class members held 97% of the total value of the class claims, here, three prospective DPP class members hold approximately 91% of the total class claims. (*See* Leitzinger Rep. at Ex. 12). The Court harbors serious reservations that this grouping is the proper recipient of the special treatments afforded to a class action, and—without deciding the matter today—the Court notes its serious reservations regarding the fact that these three class members "can hardly be considered candidates who need the aggregative advantages of the class device." *Modafinil*, 837 F.3d at 258. On balance, the Court cannot allow the sheer number of smaller claims to unduly weigh its analysis on this factor as doing so would amount to speculation given that the party "supporting the class cannot rely on conclusory allegations that joinder is impractical . . . ." *Marcus*, 687 F.3d at 596 (citing *Roe v. Town of Highland*, 909 F.2d 1097, 1100 n.4 (7th Cir. 1990)).

The Court is further convinced that the parties would cooperate with one another to be joined. Looking at the evidence presented to it, the Court is persuaded by the fact that—because a number of the proposed class members share corporate

ownership and a number of the class members regularly work with one another through different aspects of their business—joinder is practicable. (Stangle Rep. at ¶¶ 91–97).   Dr. Stangle details a number of mergers between the proposed class members and notes the differing times throughout which these acquisitions occurred, some occurring before 2011 and others occurring as recently as 2018.[6]   The Court agrees with Dr. Stangle that the "broad time period over which these mergers and acquisitions have taken place" shows that "the willingness and ability to cooperate cannot be attributed to a single point in time, but rather [that] the incentives for cooperation among proposed class members have existed and continue to be present." (Stangle Rep. at ¶ 91).

As such, this factor weighs against class certification and in favor of joinder.

---

[6] Specifically, Dr. Stangle notes:

> Members of the proposed class have demonstrated a willingness and ability to cooperate among themselves. . . . [S]everal of the members of the proposed class have combined through mergers and acquisitions. For example, Bellco Drug Corporation, H.D. Smith, and Valley Wholesale Drug Company have all merged with ABDC. Burlington Drug Company merged with Smith Drug Company in 2016.  Dik Drug Company, Kinray, and The Harvard Drug Group have all merged with Cardinal Health. Some of these mergers and acquisitions occurred before June 28, 2011. For example, ABDC acquired Bellco Drug on October 1, 2007.  Other mergers and acquisitions, such as when Cigna Health merged with Express Scripts, occurred as recently as 2018. The merger activity of the PBMs (Cigna Health and Optum) is particularly interesting as a recent news article explains PBMs have been increasing their buyer power through acquisitions.

(Stangle Rep. at ¶ 91).

### 3. *Financial Resources of Class Members*

The third impracticability factor, the financial resources of class members, examines the means of the prospective class members in pursuing litigation. As pointed out by their adversaries, DPPs fail to address this factor in their briefs. Based on the information before the Court, the Court will not speculate on this factor but notes Defendant's argument that twenty-six of the proposed class members overlap with the *In re Zetia* class where the "court found that 'every putative class member is a company operating in the sophisticated market for pharmaceuticals,' with 'millions of dollars in annual revenue.'" (ECF No. 1241 at 18 (quoting *In re Zetia*, 2022 WL 15777219, at \*22)).

DPPs have not carried their burden by a preponderance of the evidence to show that joinder is impracticable, and this factor weighs against class certification and in favor of joinder.

### 4. *Geographic Dispersion of Class Members*

The fourth impracticability factor, the geographic dispersion of class members, weighs slightly in favor of class certification. The DPPs have shown that the prospective class members are dispersed across the United States and have a large presence in Puerto Rico. (*See* Leitzinger Rep. at Ex. 7). However, this factor standing alone does not outweigh the power of the first two impracticability factors nor does it address technological advancements after the COVID-19 pandemic that

permit courts to regularly conduct remote proceedings. The latter point, raised by Defendant and relevant case law, was not addressed by DPPs. (*See* ECF No. 1241 at 17; *Value Drug*, 2023 WL 2314911, at *14).

As such, the factor weighs slightly in favor of class certification.

### 5.   *Ability to Identify Future Claimants*

The fifth impracticability factor laid out by the *Modafinil* court, the ability to identify future class members, has not been explicitly addressed by either DPPs or Defendant. This factor is "'another traditional element of the numerosity analysis . . . because the need to join unknown future members may make joinder impractical.'" *Value Drug*, 2023 WL 2314911, at *14 (citing *Muse v. Holloway Credit Sols., LLC*, 337 F.R.D. 80, 88 (E.D. Pa. 2020)).

Defendant argues that Dr. Leitzinger has identified a complete list of potential claimants in his report at Exhibits 6, 7, and 12. DPPs have not addressed this issue. As such, the Court is unable to evaluate this factor on the information before it, and it weighs neutrally.

### 6.   *Injunctive relief versus damages*

Given that DPPs do not seek injunctive relief, this factor is inapplicable to this case. *See Value Drug*, 2023 WL 2314911, at *14.

## IV.

Given that the Court has previously ruled that DPPs cannot prove an essential element of their action, causation, this motion is denied.  (*See* ECF No. 1415).

However, even if the Court had not granted summary judgment on causation, class certification would still be denied.  This is because, after its analysis of the impracticability factors set forth by the *Modafinil* court, the Court finds that DPPs have failed to prove by the preponderance of the evidence that joinder is impracticable under Rule 23(a)(1).

PETER G. SHERIDAN, U.S.D.J.